# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## <u>DISMISSAL AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/17/2024

**To:** Mr. Abdul Muhammad
9735 S. Green St
CHICAGO, IL 60643
Charge No: 440-2023-10163

EEOC Representative and email:     JAIRO MARQUEZ
Investigator
jairo.marquez@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 440-2023-10163.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
07/17/2024

Amrith Kaur Aakre
District Director

Ex. A

**Cc:**
Thomas Doyle
Board of Education
1 N DEARBORN ST STE 900
Chicago, IL 60602

Thomas Doyle
City of Chicago Board of Education
1 N DEARBORN ST STE 900
Chicago, IL 60602

Sa'ad Alim Muhammad
Power & Dixon Law Firm
1525 E. 53rd Street, Suite 447
Chicago, IL 60615

Sa'ad Muhammad
Power & Dixon
1525 E 53rd Street Suite 447
CHICAGO, IL 60615


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2023-10163 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2023-10163 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.



Ex. B





Ex. C



## THE WHITE HOUSE

### WASHINGTON

April 29, 2003

Mr. Abdul Muhammad
Chicago, Illinois

Dear Mr. Muhammad:

Congratulations as you are honored for your outstanding service as
a public school teacher in Chicago.

Education continues to be among America's top priorities. For
the United States to remain strong, all young people must have the
opportunity to reach their full potential. By helping students to learn,
you help them prepare for the challenges and opportunities ahead.
I commend you for your dedication and important work, which has
benefited countless students, your community, and our Nation.

Laura joins me in sending our best wishes on this special occasion.

Sincerely,

George W. Bush

Ex. D





Ex. E



**CHICAGO VOCATIONAL CAREER**        **ACADEMY**
Marie Chambers Miles, *Principal*                    *Children First*

January 26, 2005

Mr. Abdul Muhammad:

Congratulations on your recent inclusion into the ninth edition of Who's Who Among America's Teachers, 2005. This is a wonderful honor to have a student hold you in such high esteem and to recognize you as someone who made a difference. I, along with the administrative team of Chicago Vocational Career Academy am also very proud to have you as a wonderful teacher for our students. Again, congratulations.

Sincerely,

*Marie Chambers Miles*

Marie Chambers Miles

cc:     File

2100 East Eighty-Seventh Street      Chicago, Illinois 60617      Telephone 773.535.6099      Facsimile 773.535.6975
E-mail: cvca@cps.k12.il.us      www.chicagovocational.com
Assistant Principals: Gertrude Hannah      Samuel Kidd      Rosalind Valentine

Ex. F



Ex. G

From: **Harris, Leonard** <lharris5@cps.edu>
Date: Wed, Aug 7, 2019, 9:19 AM
Subject:
To: Abdul Muhammad <AKMuhammad@cps.edu>
Cc: Leonard Dixon <Leonard.Dixon@cookcountyil.gov>, cc: Diane McGhee (Juvenile Temporary Detention Center) <Diane.McGhee@cookcountyil.gov>, Philippe Magloire (Juvenile Temporary Detention Center) <Philippe.Magloire@cookcountyil.gov>, William Steward (Juvenile Temporary Detention Center) <william.steward@cookcountyil.gov>

Hello Principal Muhammad,

 Thank you for being very instrumental in bringing the Hamilton production to Nancy B. Jefferson School.  The production was awesome and the students really enjoyed the opportunity to showcase their talents with the Hamilton cast.

Sincerely,

 Principal  Harris

Dr. Leonard Harris
Principal
Nancy B. Jefferson Alternative H.S.
1100 S. Hamilton Ave.
Chicago IL. 60612
312-433-7120

14-0827-EX8

August 27, 2014

**PRINCIPAL CONTRACT (NEW ALSC)**

**THE CHIEF EXECUTIVE OFFICER REPORTS THE FOLLOWING DECISION:**

Approve the employment of the principals listed below selected by the Chief Executive Officer after receiving the recommendation of the Lindblom Math and Science Academy High School appointed Local School Council pursuant to Section 5/34-2.4b of the Illinois School Code.

**DESCRIPTION**: Employ the individual named below to the position of principal subject to the Uniform Appointed Principal's Performance Contract #08-0123-EX2 and Principal Eligibility Policy #14-0723-PO1.

The Talent Office has verified that the following individual has met the requirements for eligibility.

| NAME | FROM | TO |
|------|------|-----|
| Alan Mather | Interim Principal Lindblom H.S. | Contract Principal Lindblom H.S. Network: 11 P.N. 123824 Commencing: July 1, 2014 Ending: June 30, 2018 |

**AUTHORIZATION:** Authorize the General Counsel to include other relevant items and conditions in the written agreement. Authorize the President and Secretary to execute the agreement.

**LSC REVIEW:** The appointed Local School Council has been advised of the Chief Executive Officer's selection of the named individual as contract principal of Lindblom Math & Science Academy High School.

**AFFIRMATIVE ACTION STATUS:** None.

**FINANCIAL:** The salary of the named individual will be established in accordance with the provisions of the Administrative Compensation Plan.

**PERSONNEL IMPLICATIONS:** The position to be affected by approval of this action is contained in the 2014-2015 school budget.

Approved for Consideration:                                    Approved:

_____                              _____
DENISE LITTLE                                                         BARBARA BYRD-BENNETT
Chief Officer of Networks                                        Chief Executive Officer

Approved as to Legal Form:

_____
JAMES BEBLEY
General Counsel

Ex. H

16-0622-EX4

June 22, 2016

### PRINCIPAL CONTRACT (NEW ALSC)

**THE CHIEF EDUCATION OFFICER REPORTS THE FOLLOWING DECISION:**

Approve the contract of the principal listed below selected by the Chief Education Officer after receiving the recommendation of the Lindblom Math and Science Academy High School appointed Local School Council pursuant to Section 5/34-2.4b of the Illinois School Code.

**DESCRIPTION**: Employ the individual named below to the position of principal subject to the Uniform Appointed Principal's Performance Contract #14-0625-EX12 and Principal Eligibility Policy #14-0723-PO1.

The Talent Office has verified that the following individual has met the requirements for eligibility.

| NAME | FROM | TO |
|------|------|-----|
| Wayne Bevis | Interim Principal<br>Lindblom | Contract Principal<br>Lindblom<br>Network: 11<br>P.N. 123824<br>Commencing: July 1, 2016<br>Ending: June 30, 2020 |

**AUTHORIZATION:** Authorize the General Counsel to include other relevant items and conditions in the written agreements. Authorize the President and Secretary to execute the agreement.

**LSC REVIEW:** The appointed Local School Council has been advised of the Chief Education Officer's selection of the named individual as contract principal of Lindblom Math and Science Academy High School.

**AFFIRMATIVE ACTION STATUS:** None.

**FINANCIAL:** The salary of the named individual will be established in accordance with the provisions of the Administrative Compensation Plan.

Ex. H-1

16-0622-EX4

**PERSONNEL IMPLICATIONS**: The position to be affected by approval of this action is contained in the 2016-2017 school budget.

Approved for Consideration:                              Approved:


JANICE K. JACKSON                                        FORREST CLAYPOOL
Chief Education Officer                                   Chief Executive Officer


Approved as to Legal Form:


RONALD L. MARMER
General Counsel

2

# Local School Council
# Reference Guide



**2024**





**Ex. 1**



# Letter From The Director of the Office of Local School Council Relations

Dear Local School Council Members,

Congratulations on joining your school Local School Council (LSC)! Your decision to serve is a vital step toward shaping the future of your school and community. As an LSC member, you play a crucial role in driving student success and strengthening our schools.

We are pleased to provide this **updated LSC Reference Guide** to support you in this important work. This guide is designed to equip you with the information, resources, and tools necessary to navigate your role effectively. *In this latest updated version of the guide, we have included several one-page summaries of various areas of your work.* We hope you find the one-page summaries helpful. Additionally, the guide incorporates *all of the changes related to Continuous Improvement Work Plans (CIWP), Principal Evaluation, the new CPS School Budget Framework, new Model LSC bylaws, made clear LSC Student Rights & Responsibilities, amended LSC legislation, and updates to the Open Meetings Act* that occurred over the last few years. We encourage you to use the entire guide regularly to inform your decisions and practice as an LSC member.

The Office of Local School Council Relations is here to partner with you at every step of your journey. Our team is dedicated to providing the support, training, and guidance you need to make a meaningful impact. **As experts in Local School Council matters, we encourage you to reach out to us for any assistance.**

Together, let's continue making a difference!

Warm regards,

Kishasha Williams-Ford, *MPA, M.Ed., LLM, JD*
Director, Office of Local School Council Relations
Chicago Public Schools



# LOCAL SCHOOL COUNCIL

# RESOURCE GUIDE

## Part One: LSC Roles and Responsibilities

**Introduction**

Local School Councils are authorized by the state legislature to "achieve these priority goals, the general assembly intends to make the individual local school the essential unit for educational governance and improvement and to establish a process for placing the primary responsibility for school governance and improvement in furtherance of such goals in the hands of parents, community residents, teachers, and the school principal at the school level."

Per Illinois School Code: [105 ILCS 5/34-1.01.B.](105 ILCS 5/34-1.01.B.)

# LOCAL SCHOOL COUNCIL MEMBERSHIP

Local School Councils comprise parents, community, staff, and student representatives. Parents and community residents elect parents and community representatives.

School staff members are appointed to serve on councils by the Board of Education ("Board") after a non-binding staff advisory poll (election). In addition, schools that serve grades seven through twelve have one to three student representative(s) that the Board appoints after a student election. The Board appoints LSC members for alternative program schools, and those councils may have a different membership composition. LCS membership is outlined below.

## COMPOSITION OF MOST LOCAL SCHOOL COUNCILS OF SCHOOLS
## <u>NOT</u> DESIGNATED AS AN ALTERNATIVE SCHOOL

**ELEMENTARY SCHOOLS without 7th & 8th Grades - LSCs INCLUDE 12 VOTING MEMBERS (Quorum 7)**
1 Principal
6 Parent Representatives
2 Community Representatives
2 Teacher Representatives
1 Non-Teacher Staff Representative

**ELEMENTARY SCHOOLS with 7th & 8TH Grades - LSCs INCLUDE 13 VOTING MEMBERS (Quorum 7)**
(does not apply to K-6 schools)
1 Principal
6 Parent Representatives
2 Community Representatives
2 Teacher Representatives
1 Non-Teacher Staff Representative
1 Student Representative

**HIGH SCHOOLS with Pre-K –12, 7th -12th , 9th-12th, & 10th-12th Grades - LSCs INCLUDE 15 VOTING MEMBERS (Quorum 8)**
1 Principal
6 Parent Representatives
2 Community Representatives
2 Teacher Representatives
1 Non-Teacher Staff Representative
3 Student Representatives

**COMPOSITION OF MOST LOCAL SCHOOL COUNCILS OF SCHOOLS DESIGNATED AS AN ALTERNATIVE (ALSC) SCHOOL***

**ALTERNATIVE ELEMENTARY SCHOOLS - (ALSCs) INCLUDE 13 VOTING MEMBERS (Quorum 7)**
1 Principal
6 Parent Representatives
2 Community Representatives
2 Teacher Representatives
2 Advocates

**ALTERNATIVE  SCHOOL HIGH SCHOOLS - (ALSCs) INCLUDE 14 VOTING MEMBERS (Quorum 8)**
1 Principal
6 Parent Representatives
2 Community Representatives
2 Teacher Represent
2 Advocates
1 Student Representative in High Schools

**In this category:  Ariel Elementary, Devry HS, Lindblom HS and Thomas Early Childhood Center**

**ALTERNATIVE SCHOOLS WITH TEACHER TRAINING - (ALSCs) INCLUDE 10 VOTING MEMBERS  (Quorum 6)**
1 Principal
2 Parent Representatives
2 Community Representatives
2 Teacher Representatives
2 Advocate
1 Chief Education Officer or designee

**In this category: Chicago Academy Elementary School, Chicago Academy High School, Collins High School, National Teachers Academy Elementary School, Solorio High School and Tarkington Elementary School**

**Administrators in Charge (AIC)**

Assigned retired principal to cover a principal position on a temporary basis who serves at the discretion of the Chief Executive Officer. An administrator in charge IS **NOT A MEMBER OF THE LSC** and therefore, does not count for quorum and is not permitted to vote on motions.

# ALTERNATIVE LSCs WITH UNIQUE COMPOSITIONS

The ALSCs of the schools listed below have compositions differing from the standard ALSC compositions for elementary or high schools.

**<u>Nancy B. Jefferson Alternative High School (11 Members)</u>  (Quorum 6)**
Principal; 2 Community; 2 Teachers; 6 Advocates; The Presiding Judge of the Cook County Juvenile Court (or designee); The Superintendent of the Cook County Juvenile Temporary Detention Center (or designee)

**Simpson High School for Young Women (12 Members)  (Quorum 7)**
Principal; 2 Parents; 2 Community; 2 Teachers; 4 Advocates; 1 Student

**Vick Early Childhood and Parent Center (11 Members)  (Quorum 6)**
Principal; 4 Parents; 2 Community; 2 Teachers; 2 Advocates

**York Alternative High School (11 Members)  (Quorum 6)**
Principal; 3 Community; 2 Teachers; 4 Advocates; The Director of the Cook County Department of Corrections (or designee)

**Military Academy High Schools: Boards of Governors (BOGs) (16 Members)  (Quorum 9)**
Principal; 6 Parents; 2 community members, 2 teachers;1 JROTC Instructor; 2 Advocates; Cadet Battalion Commander (or Highest Ranking cadet) and 1 Commandant or Academy Superintendent


Note: The ALSCs of Vick Early Childhood Parent Center and DeVry Advantage Academy High School are appointed to two-year terms beginning December 1 of every even- numbered year (Board Report 08-0227-EX31).

## POWERS AND DUTIES OF TRADITIONAL LOCAL SCHOOL COUNCILS

The powers and duties of Local School Councils of schools *not designated as alternative schools include the following:*

### Compliance
- Comply with the Open Meetings Act, Freedom of Information Act, and All State and Federal laws, all applicable collective bargaining agreements, court orders, rules and policies.

### Continuous Improvement Work Plan (CIWP)
- Approve the CIWP and any amendments to the CIWP **if the school is not on probation. Schools on probation for five (5) or more years shall regain their power to approve the CIWP** (105 ILCS 5/34-8.3(e-5)
- Hold two well-publicized public meetings annually to:
  - Present the CIWP, proposed budget, and the annual report accounting for LSC activities both programmatically and financially.
  - Present updates on implementation and progress toward goals.
- Monitor the implementation of the CIWP.
- May request that the principal close positions and open new ones consistent with the provisions of the CIWP, provided the decisions are consistent with applicable law and collective bargaining agreements.

### Conduct Meetings
- Post meeting notice and agenda 48 hours prior to LSC meetings or LSC committee meetings.
- Notify the school community of all meetings.
- All meetings should comply with the standards of Title III of the Americans with Disabilities Act (ADA)
- Prepare agenda, minutes/reports of meetings, and maintain a record of the reports and agendas.
  - It is highly recommended that all agendas and the LSC's approved minutes are posted on the school's website and accessible to the community in a timely manner.
- Include public participation in LSC meetings.
- Follow LSC's Rules of Order.
- Discuss issues fully and freely with all LSC members allowed to participate.
- Fill parent and community member vacancies on the LSC.
- Cancel meetings, only if done by a vote of the council, in an open meeting in advance of the scheduled meeting. No individual member has the authority to cancel a meeting.

### Advise the Principal

- Advise the principal concerning the school's attendance and disciplinary policies and school fees.
- Make recommendations to the principal on new teacher hires.

- Make recommendations to the principal on textbook selection and the curriculum that are consistent with the curriculum objectives of the Board and the State and in conformity with the Chicago Teachers' Union Contract.
- Evaluate the school's allocation of teaching resources and other certificated and uncertificated staff and, based on that evaluation, make recommendations concerning the reallocation of staff if it is determined the existing allocation does not adequately support instructional objectives or school programs.

**Budget and Fundraising Responsibilities**
- Monitor the Budget and make sure it is reflective of the goals and objectives in the CIWP.
- Approve the school's budget and approve all properly funded budget transfers if the school is not on probation. **Schools on probation for five or more years shall regain their power to approve the Budget.**
- Pre-approve all expenditures from the school's internal accounts that exceed the limits set by the Board for expenditures not requiring LSC approval (currently $1,000.00 in elementary schools and $2,500.00 in high schools). Splitting purchases to avoid the limit is prohibited.
- Approve increasing the expenditure limits for internal accounts above the $1,000.00 (for elementary schools) and $2,500.00 (for high schools) limits (limits cannot be lowered from original amounts).
- Approve, in accordance with Board policy, all internal accounts receipts and expenditures
- Pre-approve all fundraising activities to be conducted by non-school organizations in or with the school.

**School Facilities**
- Work collaboratively to grant the use of assembly halls and classrooms, when not otherwise needed, for public lectures, concerts, and other educational and social activities, in compliance with Board Rules.

**School Policies**
- Adopt and revise a school uniform or dress code policy.

**Responsibilities for Principal Selection and Evaluation**
- Select a principal for the school to serve under a four-year contract.
- Evaluate a contract principal's performance on an annual basis:
- Spring Evaluation: Professional Practices
- Fall Evaluation: Growth Measures including other factors agreed upon with the Principal.
  - These factors are combined to create a single overall rating for the prior year (called a "summative" evaluation).
- Perform a "cumulative evaluation" of the contact principal during the fourth year of the contract from the contract start date up to the evaluation day. Complete the evaluation at least 150 days before the contract ends.
- Determine whether the principal's contract shall be renewed (based on the cumulative evaluation).
- Inform the principal in writing of the LSC's decision on contract renewal.

- Select a new contract principal to fill an existing or future contract principal vacancy.
- May direct the Chief Executive Officer to approve written charges against the principal on behalf of the LSC with a vote of seven (7) members.(105 ILCS 5/34-85(a)(1)).

**Contact Information Accuracy**

- LSC members will inform the principal and LSC secretary of any changes in their contact information, phone number, email address, home address, etc.
- The principal is to update the LSC Dashboard with the new contact information.

# POWERS AND DUTIES OF APPOINTED LSCs &  BOARDS OF GOVERNORS

The Powers and duties of appointed local school councils and boards of governors designated as alternative schools include:

**Compliance**
- Comply with the Open Meetings Act, Freedom of Information Act,  and all State and Federal laws, all applicable collective bargaining agreements, court orders and rules and policies.

**Continuous Improvement Work Plan (CIWP)**
- Approve the Continuous Improvement Work Plan (CIWP) and any amendments to the CIWP **if the school is not on probation.** If the school has been on probation for five (5) or more years, they regain the power to approve the CIWP. (105 ILCS 5/34-8.3(e-5).
- Hold two well-publicized public meetings annually to present the CIWP, proposed budget, and the annual report accounting for LSC activities both programmatically and financially.
- Monitor the implementation of the CIWP.
- May request that the principal close positions and open new ones consistent with the provisions of the CIWP provided the decisions are consistent with applicable law and collective bargaining agreements.

**Conduct Meetings**
- Post meeting notice and agenda 48 hours prior to LSC meetings or LSC committee meetings.
- Notify the school community of all meetings.
- All meetings should comply with the standards of Title III of the Americans with Disabilities Act (ADA).
- Prepare minutes/reports on meetings and maintain a record of the reports. It is highly recommended that all agendas and the LSC's approved minutes are posted on the school's website and accessible to the community in a timely manner.
- Include public participation in LSC meetings.
- Follow LSC's Rules of Order.
- Discuss issues fully and freely with all LSC members allowed to participate.
- Cancel meetings, only if done by a vote of the council, in an open meeting in advance of the scheduled meeting. No individual member has the authority to cancel a meeting.

**Budget and Fundraising Responsibilities**

- Monitor the Budget and make sure it is reflective of goals and objectives in the CIWP.
- Approve the school's budget and approve all budget transfers within funds if the school is not on probation. If the school has been on probation for 5 or more years they regain the power to approve the budget (105 ILCS 5/34-8.3(e-5).
- Pre-approve all expenditures from the school's internal accounts that exceed the limits set by the Board for expenditures not requiring LSC approval (currently $1,000.00 in elementary schools and $2,500.00 in high schools). Splitting purchases to avoid the limit is prohibited.
- Approve increasing the expenditure limits for internal accounts above the $1,000.00 (for elementary schools) and $2,500.00 (for high schools). The limits cannot be lowered from the original amounts.
- Approve, in accordance with Board policy, all internal accounts receipts and expenditures.
- Pre-approve fundraising activities conducted by non-school organizations in or with the school.

**School Facilities**

- Advise the principal concerning granting the use of school facilities, such as assembly halls and classrooms, for social and educational activities, in compliance with Board rules.

**School Policies**
- Adopt and revise a school uniform or dress code policy.

**Advise the Principal**
- Advise the principal concerning the school's attendance and disciplinary policies and school fees.
- Recommend to the principal on new teacher hires.
- Make recommendations to the principal on textbook selection and the curriculum that are consistent with the curriculum objectives of the Board and the State and in conformity with the Chicago Teachers' Union Contract.
- Evaluate the school's allocation of teaching resources and other certificated and uncertificated staff and, based on that evaluation, make recommendations concerning the reallocation of staff if it is determined the existing allocation does not adequately support instructional objectives or school programs.

**Responsibilities for Principal Selection and Evaluation**
- Complete the principal selection training provided by the Office of Local School Council Relations prior to undertaking the process of selecting principal candidates to recommend to the CEO.
- Work closely with the Network Chief of Schools and the Office of Local School Council Relations during the process of selecting principal candidates to recommend to the CEO.

- Place a principal vacancy advertisement in the CPS personnel bulletin, review resumes, conduct interviews of principal candidates and submit to the Network Chief and CEO a list of one (1) to three (3) candidates in order of preference.
- Evaluate a contract principal's performance every year of the contract.
- Evaluate, in the fourth year of the contract, a contract principal's performance during the entire duration of the current contract (called a "cumulative" evaluation).
- Submit to the Network Chief of Schools and the CEO a recommendation, based on the cumulative evaluation, regarding the renewal or non-renewal of the principal's contract.

# POWERS AND DUTIES OF PRINCIPALS

All school principals have the power to:

- Supervise the school's educational program, including developing and implementing the CIWP and the School Budget in consultation with the LSC and the Professional Personnel Leadership Committee (PPLC).
- Supervise the daily operations of the school.
- Direct, supervise, evaluate, and discipline employees assigned to the school.
- Direct the work of non-Board employees assigned to the school pursuant to third-party contracts.
- Make recommendations to the Board concerning the employment, discharge or layoff of any employee assigned to the school.
- Enter into contracts binding the Board for no more than $10,000 if the LSC approves the contract.
- Unless prohibited by law or Board rule, provide LSC members with all information necessary for them to perform their powers and duties.
- Unless prohibited by law or rule, provide LSC members with copies of all internal audits and other pertinent information generated by audits or reviews of programs or operations of the school.
- Direct the hours that the school shall be open and available for use, including for LSC regular and special meetings and other LSC-related functions.
- Grant the use of assembly halls and classrooms, when not otherwise needed, for public lectures, concerts and other educational and social activities, in compliance with Board rules.
- Send copies of LSC meeting minutes to the Network Office within ten (10) days of approval.

**Principal's Duty to Share Information with the LSC**
*At the beginning and throughout each school year, the principal provides each LSC member with current and accurate information regarding the following:*
- Continuous Improvement Work Plan (CIWP
- School Budget and the CPS Budget Codes
- Internal Account Reports
- School ESSA Title I Parental Involvement Policy and School - Parent Compact (if applicable)
- School Report Card
- Position Report
- School Organizational Chart (with names and duties of staff and contact information)
- School Calendar
- List of Council members and their addresses (LSC members must consent to disclosure of their telephone numbers and email addresses prior to that information being made public).
- Copy of the LSC Bylaws (if any)

**During the school year the principal (or designee) updates the LSC Dashboard with current LSC member information and provides LSC members with a copy of the following:**

- Monthly Internal Account Reports
- School Budget Updates
- Attendance and Discipline Policies and Summaries
- Internal audits and audits or reviews of school programs or operations
- Drafts of the new CIWP, including amendments, and the School Budget (well in advance of the meetings at which the LSC will be asked to review and/or approve them)
- Any reports reasonably necessary for the LSC to perform its duties

## LSC CALENDAR

| July 1 | New LSC term begins in even-numbered years. |
|---|---|
| July 1-14 | LSC conducts Annual Organizational Meeting to elect Chairperson and Secretary for one-year terms and to set the schedule of the regular meetings for the school year. |
| September-October | <ul><li>Establish Professional Personnel Leadership Committee (PPLC) by 5th week of school.</li><li>If the school has a bilingual education program, form a Bilingual Advisory Committee (BAC) by the first week of October and send the names of officers to the Office of Multilingual - Multicultural Education (OMME)  and to the Network Office.</li><li>LSC issues the LSC annual report on the LSC activities and conducts the first Biannual Progress Report to the school community on the CIWP and budget.</li><li>If a school receives Title I funds, a Parent Advisory Council must be formed.</li><li> Complete the summative portion of the prior year's principal evaluation.</li></ul> |
| November 1 | Deadline to approve the principal's Summative Evaluation for the prior school  year.<br>Deadline for the LSC to add additional evaluation criteria for the current school year to the principal's performance evaluation with the principal's agreement. |
| November 30 | Deadline to revise the prior year's principal evaluation if there was a feedback session.<br>LSC sends Final Summative Rating to the principal and Chief Executive Officer or designee. |
| January<br><br>February 1* | <ul><li>Student nomination period during **20th and 21st week of school of odd-numbered years**.</li><li>Deadline for the LSC to: complete cumulative evaluation and provide current principal written notice of its decision regarding the renewal of their four-year performance contract (traditional LSCs) or its</li></ul> |

| February | recommendation to the CEO on the renewal of the contract (appointed LSCs) for contracts ending June 30th.. <br> ● Student elections during **22ⁿᵈ week of school in odd-numbered years**. |
|---|---|
| **March/April** | Parent/Community and Student Elections and School Staff Polls (for traditional LSCs) and Parent, School Staff and Student Polls (for appointed LSCs) conducted on Report Card Pick-Up Day in even-numbered years. Appointed LSCs also forward candidate recommendations for community, advocate and educational expert positions to the Board. |
| **April/May** | ● LSC conducts public meetings to present the proposed CIWP and budget for the next year to the public with an opportunity for public comment. <br> ● Submit approved budget and CIWP to the Network Office. <br> ● LSC provides a second Biannual Progress Report to the school community. |
| **May 1** | LSC submits the Professional Practice component of Principal Evaluation to the contract principal. |
| **May 15\*** | ● If a traditional LSC does not renew the current principal's contract, the LSC must select a new principal not later than 45 days before expiration of the contract. If unable to select a new contract principal, the LSC shall forward the names of three (3) candidates for the position of principal to the Chief Executive Officer by May 30. <br><br> ● If LSC does not select a new principal by the contract expiration date (June 30 for most principal contracts) or submit a list of three (3) candidates to the CEO, the CEO appoints an interim principal. The interim principal shall serve until the LSC selects a new contract principal with at least seven (7) affirmative votes. |
| **May 30** | Deliver the revised Professional Practice component of the Principal Evaluation if there was a feedback session to the principal |
| **June** | File the Statements of Economic Interests with the Principal by the due date. |

***\*These dates apply to contracts that begin on July 1. All other contract deadlines should observe the following timeline:***
**(1) Notify the current principal in writing at least 150 days before the contract expires regarding the renewal or nonrenewal of his/her four-year performance contract;**
**(2) Sign contract at least 45 days before the current contract expires, and;**
**(3) If necessary, send the list of three names to the CEO at least 30 days before the contract expiration date.**

# Local School Council Officers

The LSC is required to elect a Chairperson (must be a LSC parent) and a Secretary at the annual organizational meeting (July 1-14) to serve one-year terms. In addition, the LSC must elect a
Freedom of Information Act / Open Meetings Act Officer (or Officers) and may elect other officers, including, but not limited to, a Vice- Chairperson. It is recommended that all additional officers are also elected at the annual organizational meeting.

**Note:** Unless the LSC limits their terms, the member(s) designated to serve as the FOIA and OMA Officer(s) may serve from year to year for as long as they remain on the LSC.

**CHAIRPERSON**
**Who can be the LSC Chairperson?**
Only a parent representative may serve as the chairperson.

**How long does each LSC Chair serve?**
The chairperson is selected at the LSC's organizational meeting and serves for a one-year term. During the year, if a vacancy occurs, a new chairperson, who must be a parent member, is selected by the members of the LSC to serve for the rest of the term.

**Responsibilities of the LSC Chairperson:**
- Involve LSC members, including the principal, in the preparation of the agenda.
- Make sure that meeting notices and agendas are posted in accordance with the Illinois School Code and the Open Meetings Act.
- Preside at meetings.
- Encourage all LSC members to participate.
- Sign official CPS documents after the LSC has voted to approve the action or decision reflected in the documents. The Chair's signature indicates the LSC's approval, not the Chair's personal approval, of the action or decision reflected in the documents.
- Call Special LSC meetings.
- May indicate the LSC meeting is virtual if the Governor has issued an emergency health disaster declaration that covers the area of the LSC meeting.
- The Chair has the same powers as other LSC members to make and vote on motions.
- Input the Principal's annual evaluation scores into the Principals Evaluation Online Tool (PEOT). https://secure.cps.edu/PEOT/Account/Login
  - Note: to obtain access to PEOT you must
    - Have a working email listed in the LSC Dashboard
    - Be designated as Chair in the LSC Dashboard
    - Use the same email in the LSC dashboard to register for PEOT

**VICE CHAIRPERSON**
Some LSCs create a vice chairperson position. Any member of the council can be the
vice chairperson. The responsibilities of the vice chair may be set forth in the LSC's Bylaws. If
the LSC decides to elect a vice chairperson, it is recommended that the election occur at the
annual organizational meeting.

**How long does the Vice Chairperson serve?**
The LSC's bylaws should include the length of the vice chairperson's term. It is recommended
that the vice chairperson serves a one-year term

**Responsibilities of the Vice Chairperson**:
Generally, the vice chairperson acts in the chairperson's absence, including presiding at meetings and signing official CPS documents to indicate the LSC's approval of the matter reflected in the documents. The vice chairperson cannot call special meetings nor indicate that the LSC meeting will be virtual. The LSC may additionally establish the specific responsibilities of the vice chairperson in the LSC's Bylaws. Suggestions for vice chairperson job duties are included in the Model Bylaws section of this guide.

**SECRETARY**
**Who can be the LSC Secretary?**
Any member of the LSC can be the secretary.

**How long does each LSC Secretary serve?**
The secretary is selected at the annual organizational meeting for a one-year term. If there is a vacancy a new secretary is elected by the members of the LSC to serve for the remainder of the term.

**Responsibilities of the LSC Secretary:**
- Takes minutes at all LSC meetings.
- In a timely manner, prepare minutes of all meetings in draft form.
- Distributes the draft minutes to members in sufficient time for members to review them prior the meeting at which the LSC will vote on their approval.
- Makes any changes approved by the LSC in the draft minutes.
- Maintains all approved meeting minutes and other LSC records.(minutes may not be destroyed)
- Prepares any correspondence authorized by the LSC.
- Post notices and agendas for LSC meetings if the LSC Chairperson has delegated that responsibility to the secretary.

**FREEDOM OF INFORMATION ACT/ OPEN MEETINGS ACT OFFICER(S)**
**Who can be Freedom of Information Act (FOIA) / Open Meetings Act (OMA) Officer(s)?**
Any member of the LSC may serve as the Open Meetings FOIA/OMA Officer(s).

**Responsibilities of the FOIA Officer**
- Completes online training provided by the Illinois Attorney General within thirty (30) days after being designated by the LSC. To take the online training, the designated member must first register at https://foiapac.ilag.gov/.
- Annually complete the online training provided by the Illinois Attorney General.
- Advises the LSC on Freedom of Information Act (FOIA) requests and the requirements of the FOIA.
- Respond to Freedom of Information Act Requests for documents (ie minutes, agendas, recording of open meetings.
- Provide requested documents within five (5) <u>business</u> days. May request an extension of five (5) business days

**NOTE:** Some items are excluded from disclosure. For example closed session recording/minutes are never disclosed to the public, unless the LSC has voted to make those items public.

**Responsibilities of the OMA Officer**
- Completes online training provided by the Illinois Attorney General within 30 days after being designated by the LSC. To take the online training, the designated member must first register at https://foiapac.ilag.gov/.
- Annually complete the online training provided by the Illinois Attorney General.
- Advises the LSC on the requirements of the Open Meetings Act (OMA).
- Respond to Inquiries from the State of Illinois Attorney General's Public Access Counselor about alleged violation of OMA.
- Coordinate with LSC members the draft response and gather documents to send to the Public Access Counselor within seven (7) calendar days.

**How long does or do the FOIA/OMA Officer(s) serve?**
The member(s) designated to serve as the FOIA/OMA Officer(s) serve(s) indefinitely. The LSC may limit their term(s), for example, to one year, to coincide with the terms of the other LSC officers, but is not required to do so. The annual organizational meeting is a good opportunity for the LSC to reaffirm a members's continued participation or designate a new member(s) to act as the FOIA/OMA Officer(s), if there is a vacancy. After compliance with the initial training requirement, the designated member(s) must complete the online training annually.

**Requirement After Filling FOIA/OMA Officer Vacancy**: Whenever the LSC designates a new FOIA/OMA Officer to fill a vacancy, they must complete the online training within thirty (30) days of designation.

**FOIA/OMA Officers may contact their LSC Specialists if there are questions at 773-553-1400. Some matters may be escalated for support to the CPS Freedom of Information Act Officer.**

## Scan here to access the Attorney General's website for OMA and FOIA Training



## LSC Committees

The LSC may elect to establish committees to support school priorities or carry out LSC responsibilities.

Process/Rules for LSC Committees:
- Vote to establish the committee at the organizational meeting (or at later meetings).
- The LSC must vote on who can serve as members on committees (i.e. LSC members and non-LSC members).
- Identify and vote on the specific persons who will serve on the committee.
- Establish how long the committee will operate.
- Both LSC and non-LSC members are eligible to be officers of the established committee(s), except for chairperson.
- ALL Committee chairpersons must be a LSC member *(except the Bilingual Advisory Committee)*.
- Any LSC member who is NOT on a committee has the right to observe committee meetings.
- All committees must abide by the The Open Meetings Act and its requirements (posting notice/agenda 48-hours before meeting, meetings open to public, public comment, minutes etc)
- Committees must have a quorum of its members present at its meetings to conduct business. Quorum of the committee is typically the majority of its members.  Alternatively, the LSC can vote to establish a quorum count that is less than a majority of the committee, if deemed necessary.

**Note**: Committees can only make recommendations to the LSC. Committee recommendations do not force the LSC to take a particular action.

# OTHER COMMITTEES

In addition to local school councils, other committees must be established by either the LSC or by parents with assistance of the principal in accordance with the funding the school receives for particular programs.

**Bilingual Advisory Committee (BAC)**
The LSC of schools providing a bilingual education program must recognize or establish a Bilingual Advisory Committee (BAC). Schools receiving bilingual funds must have a BAC that advises the principal and the LSC on plans for the bilingual program and the use of bilingual funds. The chair and the majority of the BAC members must be parents of students in the bilingual program.

**Every Student Succeeds Act (ESSA) Parent Advisory Council (PAC)\***
Schools receiving federal Title I funds must have an ESSA Parent Advisory Council (PAC) that advises the principal and the LSC on plans for the Title I program, the use of Title I funds and parental involvement activities.

The ESSA Title I Parent Advisory Council (PAC) is not a formal committee of the LSC, but a separate body open to all Title I parents at the school that must work closely with the principal. The ESSA Title I PAC is advisory only; the PAC's role is to ensure that Title I parents have input in the ESSA programming of the school and that the school provides parental involvement activities if it receives Title I funding. All programming and budgets proposed by the ESSA Title I PAC must be consistent with and included in the school's CIWP and be approved by the LSC. For instance, any budgets prepared by the PAC must be approved by the LSC, which has the final authority over school funds.

**Professional Personnel Leadership Committee (PPLC)**

The PPLC is to formally present recommendations to the LSC on all matters of the educational program.  This is best done by including a PPLC Report as an agenda item of  each regular LSC meeting (105 ILCS 5/34-2.4a (b)) .

All schools must have a Professional Personnel Leadership Committee (PPLC) made up of certified teachers and other certified personnel who work at the school, to advise the principal and the LSC on the educational program and curriculum, and on development and implementation of the Continuous Improvement Work Plan.

Staff members in positions that require state licensure or certification can serve on the PPLC, except for the principal.

The PPLC does NOT address personnel problems. That is handled by the Professional Problems  Committee covered in the Chicago Teachers Union Contract.

The PPLC should be established by the fifth week of school. The two current Teacher representatives are automatically a part of the PPLC. The teaching staff, including the Principal, may vote on the number of additional PPLC representatives, up to a maximum of 7 elected members. The teaching faculty must hold an election in which each member can vote for the number of seats agreed upon by the faculty.

*Note: the principal does not vote for PPLC membership, they only vote for the establishing the size of the PPLC.*

The PAC and PPLC are not committees established by the Local School Council. It is the principal's responsibility to ensure their establishment. It is recommended that the LSC recognize these committees and receive reports from them on a regular basis.

## LENGTH OF TERMS AND METHODS OF SELECTION

All LSC members terms of office are two (2) years, except student member(s). Student members serve for one year. Persons elected or appointed to fill midterm vacancies serve for the remainder of the term of the member whose position they fill.

### Parent Members

Parent and community voters elect the parent members of the traditional Local School Councils in an election held every even-numbered year. Thereafter, the LSC fills midterm parent vacancies by a majority vote of the serving members. Once elected to fill the vacancy, the parent members may immediately serve and vote. The ALSC parent members may only begin to serve on the council and vote on matters after the Board appoints them.

The Board of Education appoints the parent members of the Appointed Local School Council (ALSC) after a non-binding advisory poll held every even-numbered year. In the non-binding advisory poll parents indicate their preferred parent candidate for appointment to the ALSC.The Board appoints parents to fill midterm vacancies in the parent member positions on the basis of recommendations of candidates to fill the vacancies by the ALSC, the Network Chief of Schools and the Chief Executive Officer. The Board exercises absolute discretion in the appointment of the parent members of the ALSC. This means that the Board may or may not  appoint any candidate recommended or any other candidate it selects to fill the parent seats on the ALSC.

### Death of a Student

If the child of a parent member of the LSC dies during the member's term in office, the member may continue to serve on the LSC for the balance of their term.105 ILCS 5/34-2.1 ( r ) (1)

### Community Members

Parent and community voters elect the community members of the traditional Local School Councils in an election held in every even-numbered year. Thereafter, the LSC fills midterm vacancies in the community member positions by majority vote of the serving members.

The Board appoints the community members of the Appointed Local School Councils on the basis of recommendations of candidates to fill those positions by the ALSC, the Network Chief of Schools and the Chief Executive Officer. The Board fills midterm vacancies in the community member positions also on the basis of recommendations of candidates to fill those positions by the ALSC and the Network Chief of Schools, and the Chief Executive Officer. The Board also exercises absolute discretion in the appointment of the community members of the ALSC. The ALSC community members may only begin to serve on the council and vote on matters after the Board appoints them.

### School Staff Members

The Board appoints teacher and non-teacher members of all Local School Councils after a non-binding advisory poll held every even-numbered year.  Schools with traditional LSCs will have all eligible staff members indicate their candidate preferences for appointment of teachers and non-teaching staff.

ALSCs or BOGs hold non-binding advisory polls to indicate their candidate preferences for the

appointment for teacher candidates (including JROTC instructor) only.  ALSCs and BOGs do not have non-teaching staff members.

After the non-binding staff polls are concluded and a staff record review is conducted, a recommendation is made to the Board of Education to appoint staff to the LSC/ALSC/BOG. Staff members may only begin to serve and vote on matters after the Board appoints them.

If a seat becomes vacant after the election held every even-numbered year, another staff poll shall be conducted to fill midterm vacancies. The Board exercises absolute discretion in the appointment of all school staff members of all LSCs, ALSCs and Boards of Governors (BOG). This means that the Board may appoint any candidate in a staff poll regardless of the staff's preferences for the candidate(s) to be appointed.

**Criteria Used to Determine if a Staff Member Will be Appointed to the LSC**
Candidates must satisfy a review to determine if they meet the high standard of conduct and professionalism expected of an LSC representative. The review will consider the candidate's employee discipline or misconduct history including the type, frequency, and circumstances of any history of misconduct, violation, or discipline. As a general principle, conduct or disciplinary history that will exclude candidates from appointment include but are not limited to: i.Conduct involving moral turpitude; ii. Conduct involving dishonesty or fraud; iii. Conduct reflecting a lack of integrity, ethics; and, iv. Conduct endangering the health and safety of those under the applicant's care.

**Advocate Members**
The Board appoints the advocate members of the Appointed Local School Councils. This is done on the basis of recommendations of candidates to fill those positions by the ALSC, the Network Chief of Schools and the Chief Executive Officer.The Board also appoints persons to fill midterm vacancies in the advocate member positions. This is done on the basis of recommendations of candidates to fill those positions by the ALSC, the Network Chief of Schools and the Chief Executive Officer. The Board exercises absolute discretion in the appointment of the advocate members of the ALSC. Advocate members may only begin to serve on the council and vote on matters after the Board them.

**Student Members**
The Board appoints the student members of all Local School Councils with students who will be in grades seven or higher except the Board of Governors of the military academies after an election held every year in which all the students of a school are eligible to indicate their preferences for the candidates for appointment to the LSC as the student member(s). The Board also appoints students to fill midterm vacancies in the student member position(s) after a student election. The Board appoints the high school student member of the Boards of Governors of the military academies based on military rank. The Board appoints students with the most votes except in appointed councils and boards where the Board exercises absolute discretion in the appointment of the student members of the ALSC or BOG.

# ELIGIBILITY RULES

**Parent Members**

A parent is eligible to serve on the Local School Council, if the parent:

- Is the biological or adoptive parent, step-parent* or legal guardian** of a child enrolled in the school;
- Is not employed at the school in which they serve (if employed at the school they must resign before taking office to be eligible to serve on the LSC); and
- Is not employed by the Chicago Board of Education.

*To qualify as a step-parent, a person must either:

- Be married to the biological or adoptive parent; or
- Be the domestic partner of the biological or adoptive parent; or
- Be a party to a civil union with the biological or adoptive parent

**Legal guardianship is awarded by a court of competent jurisdiction. Therefore, temporary guardianship or temporary custody given to another person by a parent does not suffice. Foster parents are not considered "legal guardians" of a student for the purposes of LSC membership.

**Voluntary Student Transfers**

The LSC membership of a parent member terminates automatically when the member's only or last child enrolled in the school is voluntarily transferred from the school. The termination is effective the date of the transfer.

**Involuntary Student Transfers**

These transfers must follow all Board policies and guidelines. The eligibility of an LSC parent member whose child is involuntarily transferred from the school may be challenged. In such cases, a hearing will be conducted under Board Rule 6-28 to determine the parent member's eligibility to remain on the LSC based on whether or not the involuntary transfer complied with Board rules and policies.

**Student Graduation**

The LSC membership of a parent member terminates automatically when the member's only or the last child enrolled in the school graduates. The termination is effective as of the last day of the semester or the school year (as determined by the Chicago Board of Education), not the date of the graduation ceremony.

If, in an election year, any parent will no longer have a child enrolled in the school due to graduation, that parent may choose to run as a community representative for the council. If the child fails to graduate prior to June 30, the parent elected as an LSC community member will not be seated and that community position will be declared vacant.

**Community Members**
A community resident is eligible to serve on the Local School Council if the resident:
- Resides in the school attendance area or voting district (for "multi-area" schools);
- Is not the parent, step-parent or legal guardian of a child enrolled in the school;
- Is not an employee of the Board or a vendor providing services at the school (employees must resign from the Board before taking office to be eligible to serve on the LSC);
- Is not employed at the school in which they serve (if employed at the school they must resign before taking office to be eligible to serve on the LSC);
- Is not employed by the Chicago Board of Education; and
- Is at least 17 years old.


**Community Members Moving out of the School's Attendance Area or Voting District**
If a community member moves out of the school's attendance area or voting district, their eligibility to continue serving may be challenged pursuant to Board Rule 6-28. In such cases, the Law Department will conduct a hearing to determine the community member's eligibility to remain on the LSC depending on whether they continue to reside in the school's attendance area or voting district.

If the Board modified the boundary of a school during the nomination period or during a members' term, the member may continue to serve for that term as long as they live within the boundary in effect when they were elected.

**Advocate Members**
A person may serve as an advocate if they are at least eighteen years old and possesses skills, expertise, or experience that can contribute to the school's progress.  Advocate members may not be a parent, step-parent, or legal guardian of a student enrolled in the school, employee of the Board or related to the principal.

**Teacher Member**
A teacher is eligible to serve on the Local School Council, Appointed Local School Council or Boards of Governors, if they are:
- Employed and assigned to perform a majority of their employment duties at that attendance center.

*Assistant principals are not eligible to be LSC teacher members.*

**Non-Teacher Staff Member**
A non-teacher staff member is eligible to serve on the Local School Council if they are:
- Employed and assigned to perform a majority of their employment duties in a position not requiring certification at that attendance center.

**Voluntary Transfers of Staff**
The LSC membership of a school staff member who voluntarily transfers to another school or voluntarily leaves their school or Board employment, ends automatically as of the last day that they are assigned to the school. Immediately thereafter, the school may conduct a non-binding staff poll to select another staff member to be appointed by the Board to fill the vacancy.

**Involuntary Transfers of Staff**

A school staff member who is involuntarily transferred to another school or who otherwise involuntarily loses his or her position at the school remains on the LSC. In order to create a vacancy in their position to be filled by another staff member employed at the school, their eligibility to continue serving on the LSC must be challenged and a hearing must be conducted pursuant to Board Rule 6-28. Their position on the LSC may be filled if the hearing results in a finding that they are ineligible to continue serving on the LSC and their position on the LSC is declared vacant. Alternatively, the staff member may resign from the LSC.

After either occurs, a non-binding staff poll must be conducted at the school to select another staff person assigned to the school to be appointed by the Board to fill the vacancy. A staff poll is required even if there is only one school staff member candidate running to fill the vacant position.

**Student Members**

A student representative can serve on the Local School Council if they are a full-time student. However, if a student representative voluntarily transfers from the school, the student's LSC membership terminates automatically as of the date of the transfer. After that, a binding election of the students must be conducted to select another student for Board appointment to fill the vacancy.

If ANY member of the LSC leaves a position and causes a vacancy, then that position should be filled as soon as possible.

# FILLING VACANCIES ON TRADITIONAL LOCAL SCHOOL COUNCILS

| Question | Traditional LSC Vacancy Type | | |
|---|---|---|---|
| | Teacher/ Non-Teacher | Community/ Parent | Student |
| What is the process for filling LSC vacancies? | After advertising the vacancy, interested teachers and non-teachers must complete and submit nomination paperwork. The school administration hosts a non-binding staff poll at the school. The poll is held during the school day. | After advertising the vacancy, interested parent and community members must complete nomination paperwork. "Filling Vacancies" must be included on the posted LSC meeting agenda. A quorum of members must be physically present at the meeting. Then, a vote is taken on the motion to fill the vacancy at an open LSC meeting. | After advertising the vacancy, interested students complete and submit nomination paperwork. The school administration hosts a student election poll at the school. The poll is held during the school day. |
| Who may vote for the candidates to fill the vacancy? | ALL eligible staff at the school may vote in the poll. Eligible staff are those assigned to work at the school for more than half of their workweek. | ALL members of the LSC may vote on the candidate at the meeting. | ALL students at the school may vote in the student election poll. |
| How is the candidate selected after the poll/vote to fill the vacancy? | The staff person with the most votes is forwarded for review for a recommendation for appointment by the Board of Education. | The candidate with the majority vote of serving members will fill the vacancy. | The student with the most votes will fill the vacancy. The vote is binding. |
| When do recommended candidates begin service on the council and can vote on LSC matters? | After the Board of Education appoints the recommended staff at a Board of Education Meeting. | Immediately after being voted onto the council | After the Board of Education appoints the recommended student at a Board of Education Meeting. |

**SPECIAL RULES FOR FILLING VACANCIES TRADITIONAL COUNCILS BELOW QUORUM**

If a traditional LSC **falls below** a quorum of members on the council ( 7 Members for Elementary or  8  Members for High School). The council may utilize the following alternative quorum requirements to fill vacancies to reach a quorum of members on the council.

- **Elementary Schools**: A special meeting may be called to fill parent or community vacancies. The Chairperson or four (4) LSC members may call the special meeting to fill the vacancies.  At least four (4) members must be physically present and two (2) of the members at the meeting must be parents and/or community members. The only action that can take place at the special meeting is to fill the vacancies.   A motion to fill the vacancy can be approved by a majority of the members present voting "Yes".
- **High Schools**: A  special meeting may be called to fill parent or community vacancies. The Chairperson or five (5) LSC members may call a special meeting to fill the vacancies.  At least five (5)members must be physically present and two (2) of the members at the meeting must be parents and/or community members.  The only action that can take place at the special meeting is to fill the vacancies.   A motion to fill the vacancy can be approved by a majority of the members present voting "Yes".
- Once there are enough serving LSC  members to have quorum then the normal quorum rules are in effect and a quorum must be physically present to conduct business.  Motions made after the LSC has added enough members to have quorum must be approved by a majority of the serving members.

# FILLING VACANCIES ON APPOINTED LSC & BOARD OF GOVERNORS

Vacancies on an ALSC/BOG may be filled according to the reference chart below. Remember all ALSC/BOG candidates are recommended to the Board of Education for appointment to fill vacancies. The Board exercises absolute discretion in the appointment of ALL members of the ALSC/BOG.

| Question | ALSC/BOG  Vacancy Type | | |
| --- | --- | --- | --- |
| | **Teacher** | **Community/Parent Advocate** | **Student or  Cadet Commander** |
| What is the process to fill ALSC/BOG  vacancies? | After advertising the vacancy, interested teachers must complete and submit nomination paperwork. The school administration hosts a non-binding staff poll at the school. The poll is held during the school day. | After advertising the vacancy, interested parties must complete and submit nomination paperwork. "Filling Vacancies" must be included in the posted ALSC/BOG meeting agenda. A quorum of members must be present at the meeting. Then, a vote is taken on the motion to fill the vacancy at an open LSC meeting. | After advertising the vacancy, interested students complete and submit nomination paperwork. The school administration hosts a student election poll at the school. The poll is held during the school day. The JROTC Student with the highest rank is eligible. as Cadet Commander |
| ***Who may vote*** to ***recommend*** a candidate to fill a  vacancy? | ALL eligible staff at the school may vote in the poll.  Eligible staff are those assigned to work at the school for more than half of the workweek. | ALL members of the ALSC/BOG may vote on the candidate at the meeting. | ALL students at the school in ALL grades at the school may vote. There is no vote for the Cadet Commander |
| How is the recommended candidate selected after the poll/vote to fill the vacancy? | The staff person with the most votes to fill the vacancy is forwarded for review for a recommendation for appointment by the Board of Education. | The recommended candidate with the majority vote of the council is forwarded to the Chief of Schools (COS) for review and approval.  The  COS may approve or reject the recommendation. | The student with the most votes or the Cadet Commander is recommended to fill the vacancy. The Cadet Commander is recommended based on their JROTC rank. |
| When do recommended candidates begin service on the council and can vote on ALSC/BOG business matters? | After the Board of Education appoints the recommended staff at a Board of Education Meeting. | After the Board of Education appoints the recommended Community/Parent Advocate at a Board of Education Meeting. | After the Board of Education appoints the recommended student at a Board of Education Meeting. |

# WHISTLE-BLOWER PROTECTION

**Is there any protection for whistle blowing?**

- **Yes.** The identity of any Board employee or LSC member who has disclosed information  they reasonably believes is evidence of (1) a violation of any law, rule, regulation, or policy; (2) waste, fraud, or mismanagement; (3) an abuse of authority; or (4) a danger to the health or safety of students or the public, may not be disclosed during any investigation of the information or related matters without the written consent of the employee or LSC member. 105 ILCS 5/34-2.4c

- Furthermore, no disciplinary action may be taken against such an employee or LSC member for the disclosure of such information. For the purposes of this section, disciplinary action means any retaliatory action taken against an employee or LSC member by the Board, Board employees, LSCs, or exclusive bargaining representatives of employees. Such action includes, but is not limited to, reprimand, suspension, discharge, demotion, involuntary transfer, harassment, or denial of promotion, or voluntary transfer.

# CHICAGO BOARD OF EDUCATION ETHICS CODE

The Board's Ethics Policy (Click HERE for PDF of the policy) should be reviewed by all LSC members. You can review the policies, guidelines, questions and answers on the CPS ethics page https://cps.edu/ethics.

Here is a summary of important parts of this policy that impact LSC members.

| Section of the Code | Overview of Key Ethics Code Provisions for LSC Members |
|---|---|
| Nepotism Section VII(C) | <ul><li>The definition of Relative can be found in Section II of the Code, Part Y.</li><li>LSC members cannot hire or appoint their Relatives.</li><li>LSC members cannot influence others to hire or appoint their Relatives.</li><li>LSC members cannot hire or appoint a Person in order to get a Relative hired or appointed.</li><li>LSC members cannot advocate any employment actions involving their Relatives.</li><li>LSC members cannot advocate for a contract agreement with a Relative or a Relative's place of business.</li><li>LSC members with relatives employed at the school must abstain from voting on the entire budget, entire school improvement plan, and any transfer of funds that may affect the relative.</li></ul> |
| Economic Interest and Conflicts of Interest Section VII(B) | <ul><li>The definition of Economic Interest can be found in Section II of the Code, Part L.</li><li>LSC members cannot have an Economic Interest in a contract or business of the school.</li><li>LSC members cannot have an Economic Interest in the buying, selling, or leasing of an item for which their LSC or school paid.</li><li>LSC members cannot be paid by another employer for their position/work as an LSC member.</li><li>LSC members cannot receive money from the school except for particular reimbursements.</li><li>LSC members cannot vote on the current Principal's contract if they intend to apply to be Principal.</li><li>If they vote, and the LSC votes not to renew the contract they are ineligible to apply.</li><li>If LSC members do not resign before the Principal selection begins, they are ineligible to apply.</li><li>LSC members cannot vote or discuss proposals of Not-For-Profits which donate funds or services to the school when the LSC member or their spouser sits on the board of the organization.</li></ul> |
| Gifts, Loans, and Favors Section IV(F) | <ul><li>LSC members and their spouses and members of their household cannot accept anything of value if there is an understanding that the member's actions are to be influenced because of that gift.</li></ul> |

| Use of Confidential Information Section IV(B) | ● LSC members cannot share confidential information that was learned as part of the LSC member's membership. |
|---|---|
| Post-membership Restrictions Section VII(E) | ● Former LSC members are not eligible for employment at the school where they served until one year after their LSC membership ends.<br>● Former LSC members cannot have an economic interest in a contract involving the school until one year after their LSC membership ends. |
| Political Activities Section VII(D) | ● LSC members cannot use their position to engage in political activity or endorse a candidate for elective office.<br>● LSC members cannot use Board resources to perform any political activity. |
| Rights and Responsibilities Section III(B) | ● LSC members must follow the Code of Ethics.<br>● LSC members must report any violations or potential violations of the Code to the Ethics Advisor.<br>● LSC members must cooperate with the Ethics Advisor regarding ethics violations. This includes supplying witness testimony, documents, and other requested information. |
| Penalties Section XII | ● LSC members who violate the Code may be disqualified or removed from office. |

**Nepotism:**

If a LSC member has a relative employed by CPS who is working in the school served by the LSC member:
- The LSC member **must not discuss or vote on the CIWP/Budget and may not vote on any transfer of funds that impacts the relative.**

**Parent Mentors and Parent LSC Members**

**What is a Parent Mentor?**

A Parent Mentor is a volunteer trained by an outside organization to assist classroom teachers by working with students one-on-one or in small groups for two hours per day, four days per week. After providing a set number of hours, they may be eligible for a stipend from the organization.

**What is a Parent Local School Council (LSC) Member?**

A parent LSC member is one of six parent representatives on the Local School Council, the governing body of the school. LSC members have the opportunity to make important decisions such as selecting the school principal or voting on the school budget.

**Can a person be both a Parent Mentor and a Parent LSC Member?**

Yes, but the person cannot be both a parent mentor and a parent LSC member at the same school.

**Why does the person need to be at different schools to be both a Parent Mentor and a parent LSC member?**

Per the <u>Code of Ethics</u>, no LSC member shall be an employee of a third party that compensates the member to work at the school where they serve on the Local School Council. This means that parent LSC members cannot be paid to work at the same school where they serve as parent mentors.

**What can a parent do if they want to be both a Parent Mentor and an LSC Member?**

The parent can either (1) be a parent mentor at a different school from where they are serving as a parent LSC Member or (2) be a parent mentor at their child's school and be an LSC member at another school if they qualify.

*Example: Ana Ramirez has a daughter who attends Apple Elementary School and a son who attends Orange High School. She would like to be a parent mentor at her daughter's school so they can walk to and from school together. She would also like to serve on the LSC.*

*Ana can be a parent mentor at Apple Elementary School and be a parent LSC member at Orange High School. Ana CANNOT be a parent mentor and a parent LSC member at Apple Elementary School.*

**Can a Parent LSC member resign to immediately become a Parent Mentor at the school they served?**

No, per the Code of Ethics, parent LSC members are not eligible to work at the school they served for a period of one year.

Should you believe an ethics violation has occurred or have a question please contact the Board of Education's Ethics Office at <u>ethicsinquiries@cps.edu</u>. Inquiries and reports are reviewed by the Ethics Advisor and may warrant further investigation.

## Scan here to view the Chicago Board of Education's Ethics Code



**STATEMENT OF ECONOMIC INTERESTS**
The Board of Education requires ALL LSC members (including the principal and students) to file a Statement of Economic Interest. Council members will have forty-five (45) days from the date that the statement is sent to the principal to complete and submit the statement. If selected or appointed to fill a vacancy, the statement must be submitted within seven (7) days of appointment (Board Rule 6-29).

Responding "yes" to any question does not necessarily make a person ineligible.
Responses will inform the Board of the following:
● Any business entity in which such person has an ownership interest
● Any contract with the Board, any Local School Council
● Any contract with any public school in the school district
All questions require answers as of the date of filing and are applicable to the previous twelve (12) months.

**Consequences If Statement Is Not Filed**
Failure of an LSC member to complete the form shall automatically disqualify him or her them from serving on the LSC for the remainder of the LSC term of office.

**Due Process**
LSC members who do not file a Statement by the applicable deadline will receive a letter informing them of the intent to disqualify them for failure to file.

LSC members who wish to continue serving must file a Statement of Economic Interests within thirty (30) days of the date of the letter. If the LSC member fails to meet the filing requirements within thirty (30) days from the date of the letter, the LSC member will be automatically disqualified. The member and the LSC shall also be forwarded a Declaration of Vacancy. The vacancy shall be effective on the date the Declaration is issued. If the LSC member fails to meet the filing requirements within 30 days from the date of the letter, the LSC member will be automatically disqualified from serving on the Local School Council and removed. The LSC or the Board, as appropriate, will appoint an eligible person to serve the remainder of the term. LSC members who fail to comply with the filing requirements do not have the right to appeal.

# CRIMINAL CONVICTION DISCLOSURE

**Persons who have been elected to serve on an LSC may serve provided they:**
- File a complete Criminal Conviction Disclosure Form for each term of office pursuant to Section 5/34-2.1(f-5) of the Illinois School Code (105 ILCS 5/34-2.1[f-5]), and
- Have cleared a criminal background investigation for each term of office which indicates they have not been convicted of crimes enumerated in Section 34-2.1(f-5) of the Illinois School Code which would render them ineligible to serve.

Board Rule (6-30) requires that each LSC member (whether newly-elected or appointed) file a complete Criminal Conviction Disclosure form with the principal, who is responsible for:

- Collecting the form;
- Maintaining a copy on file in the school;
- Notifying the Office of Local School Council Relations of refusals by Council members to file a Criminal Conviction Disclosure Form;
- Submitting the completed original form to the Office of Local School Council Relations.

The Code further provides that any candidate for an LSC who does not complete and file a Criminal Conviction Disclosure Form shall be ineligible for election, selection, or appointment to an LSC. Therefore, traditional LSCs may not select a candidate who has not completed a Criminal Conviction Disclosure Form to fill a parent or community member vacancy on the LSC. Similarly, appointed LSCs may not recommend a candidate who has not completed a Criminal Conviction Disclosure Form to fill a parent, community, or advocate member vacancy on the ALSC.

# REMOVAL FROM OFFICE

**An LSC member may be removed from the LSC by a majority vote of the currently serving members of the  LSC,  if the LSC member:**
- Has missed three (3) consecutive regular meetings, or
- Has missed five (5) regular meetings within a 12-month period (emergency, special or committee meetings do not count).

**Due Process**
An LSC's vote to remove a member is valid only if the LSC member:
- Is notified of the LSC's intent to remove  the member at least seven (7) days prior to the vote;
- Is notified personally or by certified mail to the member's last known address; and
- Is given an opportunity to explain the member's actions and to vote on the question of the member's removal from the LSC.

**Removal by the Chicago Board of Education Due To Noncompliance with Rules & Policies**
An LSC member may be removed if the LSC member (also applies to ALSCs and BOGs):
- Becomes ineligible to serve and a challenge to the member's eligibility is filed and found to be valid;
- If an LSC member becomes ineligible to serve and does not voluntarily resign or is not automatically removed, the member may be challenged;
- Any person may challenge a member's eligibility to serve at any time. The challenge must be based on the eligibility criteria;
- All challenges shall be filed according to the procedures prescribed in the applicable Board Rule or Policy;
- Fails to complete the required 3-day training program within six (6) months of taking office;
- Fails to file the required Statement of Economic Interests Form;
- Is found to have violated the Board's Code of Ethics Policy, such as by voting on the CIWP or School Budget although relatives work at the school where the member serves;
- Fails to disclose a criminal conviction on the Criminal Conviction Disclosure Form; or
- Refuses to submit fingerprints for the purpose of completing the criminal background investigation.

# KEY TERMS AND DEFINITIONS

The following table provides an alphabetical reference to many of key terms used in the guide.

| | |
|---|---|
| Abstain | Formally decline to vote either for or against a proposal or motion. |
| Advocate (Member of the Appointed LSC) | An individual who is at least 18 years of age and possesses skills or expertise in a field that is the educational focus of or will contribute to the fulfillment of the educational mission of an alternative school.<br><br>May not be related to the principal or academy superintendent; may not be parent/legal guardian of a current student; may not work in the school of which they are advocates; may not be an employee of the Board. |
| Alternative School | A school created by the Board of Education that has a specialized student population, educational focus, curriculum, or school design, with an appointed body to involve parents, community members, and school staff in the activities of the school. The requirements and powers for traditional LSCs do not apply to these schools. The CEO develops the specifications for the school's advisory body. |
| Bilingual Advisory Committee (BAC) | If the school has a Bilingual Education program, the LSC must have a BAC whose members are parents of students in that program. The BAC advises the principal and LSC on the bilingual program plans and use of Bilingual Education funds. |
| Binding Poll | The person(s) with the highest number of votes is selected, and the Chicago Board of Education will appoint the person(s). |
| Budget Transfer | Moving money from one category within a fund to another category within that fund, which must be approved by the LSC. |
| Bylaws | Rules for how the LSC works. An example is included in the Resources for this section of the LSC Guide. |
| Charter School | An attendance center authorized pursuant to the Illinois Charter School Law. |
| Closed or Executive Session | As part of a public LSC meeting, LSC members may meet privately as a body, without the public, for reasons outlined in the Open Meetings Act. |
| Code of Ethics | Standards of conduct that apply to all CPS Board Members, LSC Members, and Employees. |
| Community Resident | Community Resident members of the LSC must be at least 17 years old and live within the school's attendance area or voting district boundary or District 299 if the school does not have attendance or voting boundaries. They cannot have a child enrolled in the school, be related to the principal, work for the Board of Education or work in the school where they serve. |

| | |
|---|---|
| Continuous Improvement Work Plan -- CIWP<br><br>See LSC Guide section on CIWP | A three-year plan for school progress developed by the principal with input from members of the school community. It is used when making budget decisions. It is revised after year one and two. The LSC must present the proposed CIWP to the school community before it is approved. The LSC uses the plan to keep track of progress. After years one and two, the school updates the plan and approves the plan. |
| Contract Addenda | It is an additional item that is added to the contract. The LSC and candidate principal have to agree on the addenda, and it requires the approval of the Law Department. The addenda must be included in the motion to offer the contract. |
| Contract School | An attendance center managed and operated by an organization retained by the Board to provide instruction and other services. |
| The Department of Principal Quality (DPQ) | Manages the process that principal candidates must complete before they can be selected as contract principal. |
| Discretionary Funds | Funds that can be used for multiple purposes as determined by the principal and LSC |
| Economic Interest | A financial gain or benefit that a person receives |
| Elementary Local School Councils (Traditional ) | In elementary schools without 7th and 8th grade: The LSC includes 12 members: Principal, six parents, two teachers, two community residents, one non-teacher staff member.<br><br>In elementary schools with 7th and 8th grade: The LSC includes 13 members: Principal, six parents, two teachers, two community residents, one non-teacher staff member, and one student. |
| Emergency Meeting | A type of special meeting called by the LSC for the purpose of addressing an unexpected extraordinary event that requires immediate action that the LSC is empowered to vote upon. Reasons for calling emergency meetings do NOT include failure to plan, to meet deadlines, or failure to provide notice in a timely manner. *Emergency meetings are usually called in association with natural disasters.*<br><br>If the standard for an emergency meeting is not available, a special meeting may be called instead, as long the notice and agenda are posted within 48 hours of the meeting. |
| Fiduciary | A person who holds a legal or ethical relationship of trust with one or more other parties. |
| Forum | A meeting or town hall meeting to introduce final candidates to the school community |
| Freedom of Information Act (FOIA) | The law states that public bodies must disclose public documents to the public upon request. LSCs must meet the requirements of this Act. The LSC designates a member or members to complete training on the FOIA and act as Freedom of Information Act Officer for the LSC. |
| High School Local School Councils (Traditional) | Includes 15 members: Principal, six parents, two teachers, two community residents, one non-teacher staff member, and three full-time students |
| Local School Council | A school's governing body that is an elected or appointed council or a board of governors |

| | |
|---|---|
| Majority Vote | The minimum number of "yes" votes needed to pass a general motion.  It is the majority of the members currently serving on the LSC.  To calculate the majority vote:  The number of currently serving members divided by two (2)  plus one (1).  The decimal value is dropped. Example: 12 serving members- Majority vote is 7 "yes" votes. A majority vote does not apply to selecting a new contract principal or the transfers of funds. |
| Military Academy | One type of alternative school created by the Board that has a military science curriculum and an appointed Board of Governors to involve parents, community members, students, and school staff in the activities of the school. |
| Nepotism | The practice among those with power or influence of favoring relatives or friends, especially by giving them positions in an organization or a company. |
| Non-Binding Poll | The poll provides a recommendation to the Chicago Board of Education on the person who should be appointed to serve. The Board may or may not appoint the recommended person. |
| Officers of the LSC | The LSC officers include the chairperson, who must be a parent member, and secretary, who may be any LSC member. The LSC may also select other officers, including a Vice Chairperson and an Open Meetings Act and Freedom of Information Act Officer or Officers. |
| Open Meetings Act (OMA) | LSCs must meet the requirements of this Act in conducting their business. The LSC members must take the OMA training. The LSC identifies a member or members to complete online training on the OMA annually. |
| Organizational Meeting | The first meeting of the LSC each school year is required to be held between July 1-14. At the meeting, officers are elected, and the regular meeting schedule for the year is planned and thereafter posted for the public. |
| Partisan | A  strong supporter of a political party, person, or cause |
| Parent Eligibility for LSC | Each parent candidate must be the parent or legal guardian of a student currently enrolled and attending at the school, not related to the principal, not an employee of CPS. |
| Principal Contract | Principals receive a four-year contract.  A Traditional LSC may vote to enter into a contract with a principal. For an  appointed LSC, the council may vote to recommend principal candidates to the CEO for a contract. For appointed councils, the contract is between the Chicago Board of Education and the principal. |

| | |
|---|---|
| Principal Evaluation | The Local School Council evaluates the principal based on the evaluation requirements in the School Code using the Board-approved evaluation form. The CEO or designee evaluates the principal based on the evaluation requirements in the School Code using the Board-approved evaluation form. |
| Probation | A school that is identified as needing support. The CEO or Network Chief develops, and the Board approves the Continuous Improvement Work Plan (CIWP) and budget for schools on probation less than five years. |
| Professional Personnel Leadership Committee (PPLC) | The PPLC advises the principal and LSC on the educational program. The committee is not part of the LSC but provides advice on the curriculum and instruction of the school. |
| Public Participation | Part of an LSC meeting where the public has the opportunity to share feedback with the LSC. Every LSC meeting must include public participation. The LSC may set reasonable rules for public participation. |
| Quorum | The number of LSC members needed to be physically present to vote and take action on business matters. Quorum has seven (7) members for a traditional elementary school  LSC and Eight (8) members for a traditional  high school LSC. For appointed LSCs, one-half of the full membership plus one. If a quorum is not present, the LSC cannot vote on motions. |
| Reconvened Meeting | A meeting that is a continuation of a properly called meeting (regular or special). The prior meeting must have <u>not</u> been adjourned (voted to end) and must have an approved motion for the body to reconvene. The reconvened meeting must have the exact agenda as the continued prior meeting. |
| Recuse | Excuse oneself from a conversation or discussion of a business matter because of a potential conflict of interest or lack of impartiality. |
| Rollover Funds | Funds that are left after the previous year's expenses have been paid. Most funds do not rollover. |
| Rules of Order | Guidelines established by the LSC for conducting LSC meetings. Established by Robert's Rules of Order |
| Special Meeting | The Chair or four LSC members of a traditional elementary school LSC may call a special meeting, which is additional to the regular LSC meeting in elementary schools<br><br>The Chair or five LSC members of a traditional  high school LSC may call a special meeting, which is additional to the regular LSC meeting in high schools |
| Statement of Economic Interest | A form that must be completed annually that highlights potential conflicts with the Ethics Code |
| Student Eligibility for LSC, Appointed LSC  or Boards of Governors | Must be attending full-time student(s) in schools with traditional LSCs that have grades 7th to 12th. Students in grades 6th to 12th are eligible to run. Students must be in grades 7th grade and up to serve on a LSC.  For  appointed councils or boards of governors, they must be high school students in good academic standing. In a Military Academy, the student representative is the Cadet Battalion Commander or other senior cadet. |

| Teacher Eligibility for LSC Membership | Must be employed more than 50 percent of their time in a position at the school where a majority of the teacher's duties are performed, a position that requires teacher qualifications; cannot be an assistant principal. |
|---|---|
| Title I Parent Advisory Council (PAC) | Schools receiving Federal Title I funds must have a PAC, which works with the LSC to make sure that ESSA Title I parents provide recommendations for ESSA programs and that the school provides parent involvement programs. All programs and budget proposals by the PAC must be consistent with and part of the CIWP. |
| Uniform Principal's Performance Contract | The contract between the LSC and the principal whose term is four (4) years. |

# IMPORTANT CONSIDERATIONS
# REGARDING DIVERSE LEARNERS

It is essential that all stakeholders support accelerating achievement for students with diverse learning needs. Key focus areas that drive this important work include:

- Ensuring grade level access to the **Common Core State Standards.(CCSS)** for diverse learners by leveraging existing technologies and reexamining the ways in which teachers differentiate instruction to meet the needs of students with varying learner profiles.
- Leveraging **Multi -Tiered Systems of Support (MTSS)** to ensure that data-based instructional planning is at the forefront when considering unit and lesson planning that meets the needs of all students.
- Embedding **progress monitoring** as a common practice among teachers and staff to inform instructional planning and delivery.
- Adopting **data collection and data analysis** on the mastery of key constructs for all students at regular intervals to determine which key shifts in instruction, if any, need to be made to accelerate skill attainment.
- Utilizing **evidence-based practices** and instructional supports that serve to accelerate outcomes and address student academic, functional, social-emotional, behavioral, communication, and/or physical needs.
- Planning intentionally for student progress to post-secondary opportunities by ensuring that **transition planning** is both relevant and meaningful.

Though these focus areas are not inclusive of all the work that can and should be done to accelerate outcomes for students with diverse learning needs, they are an important starting point when thinking through how to improve outcomes for students with diverse learning needs.Schools must ensure that all students are provided with multiple ways to access learning, multiple ways to demonstrate their knowledge as well as a myriad of ways to engage with content. In doing so, a school can create learning environments that serve to benefit all students, especially diverse learners.

**What should the LSC know to help diverse learners?**
Every principal must provide the LSC with a brief report that includes the following information:

- The academic growth of students with disabilities as measured by district, state, and local assessments.
- Progress monitoring data aligned to the implementation of tiered interventions for students with diverse learning needs, including students with disabilities.
- Suggestions for changing or modifying current instructional models so that students with disabilities may be educated with their general education peers to a greater extent (to the maximum extent appropriate to their individual needs).

LSC members should be included in the school's disability awareness training.

# LSC RULES

**LSC Member Eligibility**

**<u>Definitions</u>**
Wherever used in this Section, the following words and phrases shall have the following meaning:

**Parent:** means, (a) biological or adoptive parent, (b) stepparent or (c) legal guardian of an enrolled student of an attendance center.

**Stepparent:** means a person who is (a) married to the child's parent, a party to a civil union with the child's parent or the domestic partner of the child's parent, (b) resides with the child and (c) exercises care and custody of the child. In order to establish that the stepparent exercises care and custody of a child, the stepparent must provide (i) a marriage certificate, civil union certificate, or domestic partner documentation and (ii) a sworn affidavit by the biological or adoptive parent attesting that the stepparent, in conjunction with the parent, does exercise care and custody of the child. Other evidence that may demonstrate care and custody includes but is not limited to the following: (iii) the child is declared as a dependent on the stepparent's most recent income tax return; (iv) the child is covered under the step-parent's health insurance; or (v) the child is listed as the stepparent's child for Medicare, Social Security, Medicaid or other public aid programs. This rule shall not be construed to give stepparents any right of access to student records except as provided in the Illinois School Student Records Act (105 ILCS 10/1 et seq.).

**Legal guardian:** means a person who has been formally appointed guardian of a child by a court of competent jurisdiction.

**Local School Council or LSC**: means an elected Local School Council or an appointed Local School Council or Boards of Governors, except when otherwise noted.

**Employed at the School**: Means to receive compensation and act under the direction and supervision of a principal or his/her designee who oversees the detail of the person's work. An employee of a third party may not serve on a Local School Council at a school at which he or she is employed; however, he or she may be eligible to serve at another school.

**Employed by the Board of Education**: Means to be in the employ of the Board of Education whether or not employed at the school.

**Enrolled in a School**: means that the student is currently attending the school at which the parent or legal guardian serves. Graduation is on the last day of the academic school year or semester and not on the date of a graduation ceremony or commencement exercise. Pursuant to the Illinois School Code, the last day of the academic year or semester is determined by the Chicago Board of Education.

**Eligibility**
Persons who have been elected to serve on a Local School Council may serve and continue to serve for the length of their term provided they meet and continue to meet the eligibility requirements set forth below.

**Parent Representative**
A person may serve and continue to serve as a parent representative as long as he/she:
- Has a child enrolled in the school in which he/she serves;
- Is not employed at the school in which he/she serves; and
- Is not employed by the Board of Education or another organization who performs work at a school where the LSC member serves

If a parent representative of a Local School Council ceases or fails to have a child enrolled in the school at which membership on the Local School Council at which he/she serves, for reasons other than graduation or voluntary transfer of the child, or becomes an employee of the Board of Education, the parent's membership on the Local School Council and all voting rights shall be terminated immediately upon the written determination of ineligibility by the General Counsel following the challenge procedures set forth below. In cases where the parent representative's membership ends due to the graduation of his or her child, he or she serves until the end of the school year or semester in which his or her child graduates. In cases where the parent representative's membership ends due to the voluntary transfer of the child, the parent's membership and voting rights shall be terminated as of the date of the transfer. If the child of a parent member of the LSC dies during the member's term of office, the parent may continue to serve on the council for the balance of the term of office.

**Community Representative**
A person may serve and continue to serve as a community representative as long as he/she:
- Resides in the attendance area served by the school
- Is not employed at the school in which he/she serves;
- Is not employed by the Board of Education or another organization who performs work at a school where the LSC member serves;
- Is not a parent of a student enrolled at the school; and
- Is at least 17 years of age.

If a community representative ceases to reside within the attendance area or voting boundaries of, or has a child enrolled in, the school at which he/she serves, or becomes an employee of the school or Board of Education, his or her membership on the Local School Council and all voting rights are terminated immediately upon the written determination of ineligibility by the Chief Executive Officer or designee following the challenge procedures set forth below.

**Teacher Representative**
A teacher representative is paid out of budget account number 51100 and is NOT in a position requiring an administrative certificate.

A teacher representative may continue to serve as long as the teacher is employed and assigned to perform a majority of their duties at the school.

If a teacher representative resigns from employment with the Board of Education, resigns from

the Local School Council or voluntarily transfers to another attendance center, the teacher's membership on the Local School Council and all voting rights are terminated immediately as of the date the teacher's resignation is received by the Board of Education, as of the date the teacher's Local School Council resignation is received by the Local School Council, or the effective date of the teacher's voluntary transfer to another attendance center.

If a teacher representative resigns from employment with the Board, or resigns from the Local School Council or voluntarily transfers to another attendance center, or is absent from employment at the school for an extended and defined period of time due to illness, disability, leave of absence, the initiation of dismissal proceedings, or any other reason, the principal shall notify the Office of the Chief Executive Officer or designee of a teacher representative's permanent or temporary absence.

The Office of the Chief Executive Officer or designee shall certify, as appropriate, that a vacancy exists in such teacher representative's position. When a vacancy is certified, the Office of the Chief Executive Officer or designee shall issue written notification to the principal and the Local School Council advising the school to initiate a non-binding staff advisory poll.

The school shall forward the results of the poll to the Office of the Chief Executive Officer or designee in a timely manner. After receipt of the results, the Board will declare the existence of a permanent or temporary vacancy in the teacher representative's position and will appoint a replacement teacher representative until such time as the absent teacher resumes service at the attendance center or for the remainder of the term, whichever occurs first.

**Non-Teacher Representative**
A Non-teacher representative is paid out of budget account number 52100.

A non-teacher staff representative may continue to serve as long as the staff member is employed and assigned to perform a majority of their duties at the school, provided that if a non-teacher staff representative resigns from employment with the Board of Education, or resigns from the Local School Council or voluntarily transfers to another attendance center, the non-teacher staff representative's membership on the Local School Council and all voting rights are terminated immediately as of the date the non- teacher staff representative's resignation is received by the Board of Education, or as of the date the non-teacher staff representative's Local School Council resignation is received by the Local School Council or the effective date of the non-teacher staff representative's voluntary transfer to another attendance center.

If a non-teacher staff representative resigns from employment with the Board, or resigns from the Local School Council or voluntarily transfers to another attendance center or is absent from employment at the school for an extended and defined period of time due to illness, disability, leave of absence, the initiation of dismissal proceedings, or any other reason, the principal shall notify the Office of the Chief Executive Officer or designee of a non-teacher staff representative's permanent or temporary absence.

The Office of the Chief Executive Officer or designee shall certify, as appropriate, that a vacancy exists in such non-teacher staff representative's position. When a vacancy is certified, the Office of the Chief Executive Officer or designee shall issue written notification to the principal and the

Local School Council advising the school to initiate a non-binding staff advisory poll. The school shall forward the results of the poll to the Office of the Chief Executive Officer or designee in a timely manner.

After receipt of the results, the Board will declare the existence of a permanent or temporary vacancy in the non-teacher staff representative's position and will appoint a replacement non-teacher staff representative until such time as the absent non-teacher staff member resumes service at the attendance center or for the remainder of the term, whichever occurs first.

**Miscellaneous Employees**

Employees paid out of the budget account number 52140 are NOT eligible to serve on the LSC at any school.

**Staff Member Criteria Used to Determine if a Staff Member Will Be Appointed to the LSC:**
Staff interested in serving on an LSC may use the criteria listed below and the disciplinary document they received as a part of the discipline process to determine if they would be appointed should they receive the most votes in the non-binding staff poll. Candidates must satisfy a review to determine if they meet the high standard of conduct and professionalism expected of an LSC representative. The review will consider the candidate's employee discipline/misconduct history including type, frequency, and circumstances of any history of misconduct, violation, or discipline.  As a general principle, conduct or disciplinary history that will exclude candidates from appointment include but are not limited to:
- Conduct involving moral turpitude
- Conduct involving dishonesty or fraud
- Conduct reflecting a lack of integrity or ethics
- Conduct endangering the health and safety of those under the applicant's care

**Student Representative**
A person may serve as a student representative for a one-year term beginning July 1 and ending the following June 30th as long as the student is and remains enrolled in the school in which they serve on a full-time basis and is in grades 7-12. For students who graduate while serving as a student representative of a Local School Council, their term shall end upon graduation. The student serves until the end of the school year or semester in which they graduate.

In cases where the student representative voluntarily transfers from the school, the student's membership and voting rights on the Local School Council shall be terminated as of the date of the transfer. If a student representative of a Local School Council ceases to be enrolled on a full-time basis in the school he/she serves for reasons other than graduation or voluntary transfer, the student's membership on the Local School Council and all voting rights shall be terminated immediately upon the written determination of ineligibility by the Chief Executive Officer or designee following the challenge procedures set forth below.

**Audit of Records**

The Chief Executive Officer or designee may have cause to review pertinent records relating to individual LSC members in order to discover any relevant changes in an LSC member's eligibility. If such a review indicates that an LSC member does not meet the eligibility criteria in this rule, an investigation shall be conducted in accordance with the Local School Council member removal procedures set forth below.

**<u>Local School Council Removal Procedures</u>**

1. Any person may challenge the eligibility of an LSC member based on the eligibility criteria in this rule. Challenges shall be in writing and shall include:

   a. The name, address, and phone number of the person filing the challenge;
   b. A statement of facts upon which the challenge is based and any evidence which supports the challenger's position.

2. In cases where an allegation of ineligibility under this rule is made by another LSC member or an employee of the Board, the identity of the LSC member or Board employee may not be disclosed during any investigation of the allegation without his or her written consent. 105 ILCS 5/34-2.4(c)("WhistleBlower Protection").

3. In addition, the Board, its agents, and employees may act upon anonymous challenges, personal knowledge, or other information of council members' ineligibility, including, but not limited to, the audit of records described above. A Board employee or agent with information indicating that an LSC member is not eligible under this rule may initiate an investigation by submitting a written request for investigation to the Law Department.

4. Filing of Challenges - Challenges and requests for investigation pursuant to this Rule shall be filed with the Law Department.

5. Investigation of Ineligibility - The General Counsel shall review challenges and requests for investigations. If the General Counsel determines that the challenge or request has merit, the General Counsel may refer the matter for investigation if additional information is required. The information provided by the challenger(s) and the results of any investigation shall be reviewed by the General Counsel. If the results of the investigation indicate that the LSC member may be ineligible, the General Counsel shall convene a hearing to afford the General Counsel's representative the opportunity to present evidence of ineligibility and the concerned council member an opportunity to personally present statements and evidence on his or her behalf. The concerned council member shall be notified in writing of the date, time, and place of the hearing, of his or her right to have a representative at the hearing, and the specific basis for his or her alleged ineligibility.

6. A hearing officer shall conduct a hearing and shall afford the General Counsel's representative the opportunity to present evidence of ineligibility and the concerned council member an opportunity to personally present statements and evidence substantiating his/her eligibility to serve on the council. The General Counsel shall have authority to promulgate rules, including, but not limited to, rules of procedure,

procedural manuals, and rules of evidence, to govern hearings under this Rule. As soon as possible after the conclusion of the hearing, the hearing officer shall make a recommended finding to the Chief Executive Officer or designee regarding the council member's eligibility.

7.    The Chief Executive Officer or designee shall decide the question of the council member's eligibility. If the Chief Executive Officer or designee finds that the concerned council member is ineligible to serve based on the eligibility criteria in this rule, the Chief Executive Officer or designee shall declare the member ineligible, and a vacancy on the council, which shall be effective on the date the Declaration is issued. However, the vacancy may be filled only after:

(1)    The concerned council member fails to request reconsideration within the time allowed; or
(2)    The concerned council member's request for reconsideration is denied.

8.    Notice of Declaration of Vacancy - The Chief Executive Officer or designee shall forward the determination to each challenger and challenged LSC member in writing by regular and certified mail and to the affected LSC by regular mail.

**Request for Reconsideration**

Within thirty (30) days of the date of a Declaration of Vacancy by the Chief Executive Officer or designee, the challenged LSC member may submit a request to reconsider to the Chief Executive Officer or designee. Failure to request reconsideration within 30 days after the Declaration of the vacancy will render the Declaration of vacancy as final. The request for reconsideration should state specific reasons or grounds for rescinding the Chief Executive Officer or designee's prior determination concerning the council member's eligibility.

The Chief Executive Officer or designee shall review the determination. New evidence not readily available at the time that the challenge was filed may be submitted. The decision of the Chief Executive Officer or designee shall be final and shall be forwarded to the challenger, the challenged LSC member, and the affected Local School Council.

**Appointment to Vacancy**

If a challenged parent or community LSC member is found to be ineligible to serve on the elected Local School Council pursuant to this process and a vacancy is declared, the LSC shall fill the vacancy by appointment of a qualified person who meets the eligibility requirements.

If a challenged teacher or non-teacher staff LSC member is determined to be ineligible to serve on the elected Local School Council and a vacancy is declared, the Board shall fill the vacancy by appointment of a qualified person who meets the applicable eligibility requirements after a non-binding advisory poll of the school staff.

If a challenged student LSC member is found to be ineligible to serve on the elected Local School Council and a vacancy is declared, the Board shall fill the vacancy by appointment of a

qualified person who meets the applicable eligibility requirements after a binding student election.

If a challenged member to an appointed Local School Council or Board of Governors is determined to be ineligible to serve on the council or board and a vacancy is declared, the Board shall fill the vacancy by appointment in accordance with the Board's Policy on Governance of Alternative and Small Schools.

# Loss of Local School Council Eligibility Due to Ethics Violations

Local School Council ("LSC") shall mean an elected Local School Council or an appointed Local School Council or Board of Governors except when otherwise noted

**Challenges to Local School Council Members' Eligibility Based on Ethical Violations**

1. Any person may challenge a Local School Council member's eligibility to serve based on ethical violations covered in the Board's Code of Ethics Policy ("Code of Ethics"). Filing a false Statement or failure to comply with the Code of Ethics may be grounds for disqualification from serving on any Local School Council for the remainder of the concerned member's term(s) of office. Challenges shall be in writing and shall include:

   a. the name, address,email, and phone number of the person filing the challenge;
   b. a statement of the facts upon which the challenge is based and any evidence which supports the challenger's position.

2. In cases where an allegation of an ethical violation under this Board Rule is made by another LSC member or Board employee, the identity of the LSC member or Board employee may not be disclosed during an investigation of the allegation without his or her written consent. 105 ILCS 5/34-2.4(c) ("Whistle Blower Protection").

3. In addition, the Board, its agents, and employees, may act upon: (i) anonymous information regarding council members' ethical violations; or (ii) personal knowledge or other information of ethical violations by council members obtained by Board agents or employees. A Board employee or agent with information of an ethical violation by an LSC member may initiate an investigation by submitting a written request for investigation to the Law Department.

4. Filing of Challenges – Challenges, requests for investigation, and reports of LSC members' ethical violations may be filed with the Law Department or the Board's Ethics Advisor.

5. Investigation of Ethical Violations. The General Counsel shall review challenges based on ethical violations, requests for investigation of alleged ethical violations, and reports of such violations received from Board agents or employees or anonymous sources. If the General Counsel determines that the challenge, request, or report has merit, he/she shall refer the challenge, request, or report for investigation.

6. The General Counsel shall review the results of the investigation. If the results of the investigation indicate that the LSC member may have committed an ethical violation, the General Counsel shall convene a hearing to afford the General Counsel's representative the opportunity to present evidence of ethical violations and the concerned council member an

opportunity to personally present statements and evidence on their behalf. The concerned council member shall be notified in writing of the date, time, and place of the hearing, of their right to have a representative at the hearing, and of the specific provisions of this rule or the Board's Code of Ethics Policy which they are alleged to have violated.

7. A hearing officer shall conduct a hearing and shall afford the General Counsel's representative the opportunity to present evidence of ethics violation(s) and the concerned council member an opportunity to personally present statements and evidence regarding the allegations of ethics violations. The General Counsel shall have authority to promulgate rules, including, but not limited to, rules of procedure, procedural manuals, and rules of evidence, to govern hearings under this Rule. As soon as possible after the conclusion of the hearing, the hearing officer shall make a recommended finding to the Chief Executive Officer or designee regarding the alleged ethical violation.

8. The Chief Executive Officer or designee shall decide the question of whether an ethics violation occurred. If the Chief Executive Officer or designee finds that an ethical violation has occurred, the Chief Executive Officer or designee shall declare the member ineligible effective on the date the Declaration is issued. The vacancy on the council which shall be effective on the date the Declaration is issued. However, the vacancy may be filled only after: (1) the concerned council member fails to request reconsideration within the time allowed, or (2) the concerned council member's request for reconsideration is denied.

**Declaration of Vacancy**

When a council member has been afforded a hearing pursuant to this Rule and the Chief Executive Officer or designee has found that the council member should be disqualified from the Local School Council based upon a violation of the Code of Ethics or this Rule, the Secretary of the Board shall forward a Declaration of Ineligibility and a Declaration of Vacancy to the concerned council member and Local School Council by certified and regular mail to the council member's last known address and to the affected LSC by regular mail. The vacancy shall be effective on the date the Declaration is issued.The vacancy may be filled only after: (1) the concerned council member fails to request reconsideration within the time allowed; or (2) the concerned council member's request for reconsideration is denied.

**Request for Reconsideration**

1. Within thirty (30) days of the date of a Declaration of Vacancy based upon a ruling by the Chief Executive Officer or designee, the challenged council member may submit a request to reconsider to the Chief Executive Officer or designee. The request for reconsideration should state specific reasons or grounds for rescinding the Chief Executive Officer's or designee's prior determination concerning the council member's eligibility. New evidence not readily available at the time that the challenge was filed may be submitted.

2. The Chief Executive Officer or designee shall review the request for reconsideration and issue a final determination.

3. The Secretary of the Board shall forward the final determination to the challenger if any, and the challenged council member by certified and regular mail to the concerned council member's last known address and to the affected LSC by regular mail.

4. Failure to file a request for reconsideration within the time allowed will render final a Declaration of Vacancy based upon a ruling by the Chief Executive Officer or designee.

**Statement of Economic Interests Filing Requirements**

Failure to timely file a Statement of Economic Interests (hereinafter "Statement"), or failure to file a complete Statement, shall result in automatic disqualification from the Local School Council for the remainder of the concerned member's term of office. The Secretary of the Board shall every year, transmit to all schools a sufficient number of blank Statements of Economic Interests for all Local School Council members. Local School Council members shall file the Board's Statement of Economic Interests with the Secretary of the Board by the deadline specified in the annual Statement. Council members will have 45 days from the date the Statement is sent to principals to complete and submit such Statement.

Council members appointed after the due date of the annual Statement shall initially file the Board's Statement within seven (7) days of their appointment. Council members shall deliver

their completed Statements to the principal of the school where they serve by the deadline specified in the annual Statement or, if appointed after the due date of the annual Statement, within seven (7) days of their appointment. Such delivery shall be considered as the filing of the Statement with the Secretary of the Board.

Within seven (7) days of the applicable filing date, principals shall forward to the Secretary of the Board all Statements and/or the names of any council members who have failed to file Statements as required. Local School Councils shall maintain copies of their members' Statements on file at their schools for public inspection.

When a council member has failed to file a complete Statement by the applicable filing date, the Secretary of the Board shall automatically issue a Declaration of Intent to Disqualify to the concerned council member by certified and regular mail to the council member's last known address and the affected LSC by regular mail.

The concerned council member shall have thirty (30) days from the date of the Declaration of Intent to Disqualify to file a complete Statement. If the council member does not file a complete Statement within the time allowed, the Secretary of the Board shall automatically forward a Declaration of Vacancy to the concerned council member and Local School Council by certified and regular mail to the council member's last known address and the school where he or she serves. The vacancy shall be effective on the date the Declaration is issued.

There shall be no right to request reconsideration of a Declaration of Vacancy based upon a failure to timely file a complete Statement. Either the concerned Local School Council or the Board, as appropriate, may immediately proceed to fill the vacancy by appointment of a qualified person who meets all applicable eligibility requirements to serve the remainder of the disqualified member's term.

**Notice of Declarations**

The Secretary of the Board shall forward a Declaration of Intent to Disqualify and Declaration of Vacancy for failure to timely file a complete Statement to the concerned council member in writing by certified and regular mail to the concerned council member's last known address and the affected LSC by regular mail. The Secretary of the Board shall forward a Declaration of Vacancy based upon findings by the General Counsel to the challenger if any, and the concerned council member in writing by certified and regular mail to the concerned council member's last known address and the affected LSC by regular mail.

**Appointment to Vacancy**

If a parent or community Local School Council member is determined to be ineligible to serve on the elected Local School Council pursuant to this rule and a vacancy is declared by the Secretary of the Board, the Local School Council shall fill the vacancy by appointment of a qualified person who meets the applicable eligibility requirements.

If a teacher, non-teacher staff or student Local School Council member is determined to be ineligible to serve on the elected Local School Council pursuant to this rule and a vacancy is declared by the Secretary of the Board, the Board shall fill the vacancy by appointment of a

qualified person who meets the applicable eligibility requirements after a non-binding advisory poll of school staff or after a binding election of students, whichever is appropriate.

If a member of an appointed Local School Council or Board of Governors is determined to be ineligible to serve on the council or board and a vacancy is declared, the Board shall fill the vacancy by appointment in accordance with the Board's Policy on Governance of Alternative and Small Schools.

## Removal of Local School Council Members for Certain Criminal Convictions or Failure to Disclose Criminal Convictions

For purposes of this Rule references to Local School Council ("LSC") shall mean an elected Local School Council or an appointed Local School Council or Board of Governors except when otherwise noted herein. Persons who have been elected to serve on a Local School Council may serve for the length of the term provided that they file a truthful Criminal Conviction Disclosure Form pursuant to Section 34-2.1(f) of the Illinois School Code (105 ILCS 5/34-2.1(f)), and have cleared a criminal background investigation which indicates that they have not been convicted of crimes enumerated in Section 34-2.1(f-5) of the Illinois School Code for which a person is either permanently ineligible for election to or service on a Local School Council or ineligible for a period of ten (10) years after conviction.

**Criminal Conviction Disclosure**
All candidates must file a Criminal Conviction Disclosure Form prior to the election. A Board conducted criminal background investigation must be completed for each Local School Council member before they take office. Failure to file a Criminal Conviction Disclosure Form, filing a false or incomplete Criminal Conviction Disclosure Form, or failure to provide the information required by the Illinois State Police which shall include, but is not limited to, fingerprints or other personal identification information, shall result in the disqualification from the Local School Council for the remainder of the member's term of office.

Each candidate must submit a Criminal Conviction Disclosure Form to the principal. Principals shall forward Criminal Conviction Disclosure Forms to the Office of Local School Council Relations.

Principals shall notify the Office of Local School Council Relations of refusals by council members to file a Criminal Conviction Disclosure Form.

Principals shall maintain on file at their school copies of the Councils' Criminal Conviction Disclosure Form for public inspection.

**Ineligibility Due to Criminal Conviction**
A person who has been convicted of any of the following offenses at any time shall be ineligible for election or appointment to a Local School Council:

Indecent Solicitation of a Child, Sexual Exploitation of a Child, Pandering, Keeping a Place of Juvenile Prostitution, Pimping, Juvenile Pimping, Exploitation of a Child, Child Pornography, Criminal Sexual Assault, Aggravated Criminal Sexual Assault, Predatory Criminal Sexual Assault of a Child, Criminal Sexual Abuse, and Aggravated Criminal Sexual Abuse.

A person who has been convicted of any of the following offenses within the 10 years prior to the date of nomination or appointment shall be ineligible for election or appointment to a Local School Council: Controlled Substance Trafficking, Criminal Drug Conspiracy, and Street Gang Criminal Drug Conspiracy

## Declaration of Vacancy

The Chief Executive Officer or designee shall declare a vacancy on the Council for (a) failure to file a Criminal Conviction Disclosure Form, (b) filing a false or incomplete Criminal Conviction Disclosure Form, (c) failure to provide the information required by the Illinois State Police in order to complete the background investigation, or (d) having been convicted of a crime for which a person is ineligible to serve on a Local School Council pursuant to this rule and Section 34-2.1(f-5) of the Illinois School Code.

Upon determination by the General Counsel that a Council member failed to file, or filed a false or incomplete Criminal Conviction Disclosure Form, has failed to provide information necessary for the completion of the background check, or has been convicted of a crime for which a person is ineligible to serve on a Local School Council pursuant to this rule and Section 34-2.1(f-5) of the Illinois School Code, the Chief Executive Officer or designee shall notify the Council member by certified mail and the affected LSC by regular mail.

If the Council member does not file a form or file an amended form within ten (10) days of receiving notice of the determination, the Chief Executive Officer or designee shall declare a vacancy on the Council.

1. Investigation of Ineligibility - The Law Department shall conduct an investigation of the facts relating to the LSC member's criminal history and the veracity of the LSC member's Criminal Conviction Disclosure Form. The General Counsel shall review the results of the investigation. If the results of the investigation indicate that the LSC member may be ineligible under this rule, the General Counsel shall refer the matter for a hearing.

2. A hearing officer shall conduct a hearing on the LSC member's criminal history and the veracity of the LSC member's Criminal Conviction Disclosure Form and afford an opportunity to the challenged LSC member to personally present statements and evidence substantiating his/her eligibility to serve on the council. The General Counsel shall have the authority to promulgate rules, including, but not limited to, rules of procedure, procedural manuals, and rules of evidence, to govern hearings under this rule. The hearing officer shall make a recommended determination to the Chief Executive Officer or designee regarding eligibility as soon thereafter as possible.

3. Declaration of Vacancy - Any vacancy on the LSC caused by a disqualification pursuant to this Rule shall be declared by the Chief Executive Officer or designee in those cases where a finding of ineligibility is made. Any vacancy that is declared by the Chief Executive Officer or designee shall be effective on the date that the determination is issued; however, the vacancy may be filled only after: (1) the concerned council member fails to request reconsideration within the time allowed; or (2) the concerned council member's request for reconsideration is denied.

4. Notice of Declaration of Vacancy - The Chief Executive Officer or designee shall forward the determination to the challenged LSC member in writing by regular and certified mail to the member's last known address and the affected LSC by

regular mail.

**Request for Reconsideration**

Within thirty (30) days of a Declaration of Vacancy by the Chief Executive Officer or designee, the challenged LSC member may submit a request for reconsideration to the Chief Executive Officer or designee. New evidence not readily available at the time that the vacancy was declared may be submitted. The Chief Executive Officer or designee shall review the request for reconsideration. The decision of the Chief Executive Officer or designee shall be final and shall be forwarded to the challenged LSC member by certified and regular mail to the member's last known address, and the affected Local School Council by regular mail.

**Appointment to Vacancy**

If a challenged parent or community LSC member is found to be ineligible to serve on the elected Local School Council pursuant to this process and a vacancy is declared, the LSC shall proceed to fill the vacancy by appointment of a qualified person who meets the eligibility requirements. If a challenged teacher LSC member or non-teacher staff LSC member is determined to be ineligible to serve on the Local School Council and a vacancy is declared, the Board shall fill the vacancy by appointment of a qualified person who meets the applicable eligibility requirements after a non-binding advisory poll of school staff. If a challenged student LSC member is determined to be ineligible to serve on the Local School Council and a vacancy is declared, the Board shall fill the vacancy by appointment of a student who meets the applicable eligibility requirements after a binding election of students.

If a member of an appointed Local School Council or Board of Governors is determined to be ineligible to serve on the council or board and a vacancy is declared, the Board shall fill the vacancy by appointment in accordance with the Board's Policy on Governance of Alternative and Small Schools.

# Chicago Public Schools Policy



## Governance of Alternative and Small Schools

**Section** 602.5     **Board Report** 20-0325-PO1     **Date Adopted** March 25, 2020

**THE CHIEF EXECUTIVE OFFICER RECOMMENDS:**

That the Chicago Board of Education amend Board Report 07-0124-PO2. The purpose of the amendment is to update the name of network leaders that support the appointment of members to Local School Councils ("LSC") and Board of Governors and to lower the minimum age requirement for LSC Community Representatives from 18 to 17 years old.

On January 24, 2007, the Chicago Board of Education rescinded Board Reports 98-0429-EX2, Guidelines and Procedures for the Operation of Local School Councils at Small Schools, 00-1025-EX2, Guidelines for Alternative Local School Councils, and 03-0924-EX01, Guidelines for Military Academy Boards of Governors and adopted a new Policy on the Governance of Alternative and Small Schools.

**POLICY TEXT:**

**I.      Purpose, Goals and Applicability**

Alternative schools and small schools are attendance centers with: specialized school design, educational foci or curricula; and/or specialized student populations.

The Illinois General Assembly was aware of the specialized characteristics of alternative and small schools and limited the application of certain provisions of the Illinois School Code to such schools. Specifically, the Illinois School Code provides that the provisions with respect to the composition, organization, operation and powers of Local School Councils do not apply to alternative schools or small schools created by the Chicago Board of Education ("Board"). Instead, the Board may develop appropriate alternative methods for involving parents, community members and school staff to the maximum extent possible in all of the activities of alternative and small schools. 105 ILCS 5/34-2.4(b). The purpose of this policy is to establish such alternative methods for those Chicago Public Schools designated by the Board as either small or alternative schools.

This Policy shall not apply to schools designated by the Board as alternative or small schools in the following instances:

(a) When the Board enters into a school management agreement or school development agreement with a third-party for the management of a school. In such instances, the CEO, in consultation with the third-party, shall develop the composition and duties of the school's advisory body and such requirements shall be included in the agreement with the third party.

(b) When the Board approves an alternative method for involving parents, community members and school staff in the activities of the school pursuant to 105 ILCS 5/34-2.4(b) and the Board's Policy to Establish Renaissance Schools.

**II.      Definitions**

Alternative School:  A school created by the Board that has a specialized student population, educational focus, curriculum or school design, with an appointed body created pursuant to 105 ILCS 5/34-2.4(b) to involve parents, community members and school staff in the activities of the school.

Small School: A school created by the Board that has a specialized educational focus, curriculum or school design and an enrollment of approximately 600 students if a high school or 350 students if an elementary school, with an appointed body created pursuant to 105 ILCS 5/34-2.4(b) to involve parents, community members and school staff in the activities of the school.

Military Academy: One type of alternative school created by the Board that has a military science curriculum and an appointed Board of Governors created pursuant to 105 ILCS 5/34-2.4(b) to involve parents, community members and school staff in the activities of the school.

Principal: The lead administrator in a school selected by the Chief Executive Officer who possesses a Type 75 Administrative Certificate issued by the State of Illinois and meets applicable principal qualification requirements established by the Board.

Academy Superintendent: The lead administrator in a military academy selected by the Chief Executive Officer who possesses a Type 75 Administrative Certificate issued by the State of Illinois and meets applicable principal qualification requirements established by the Board.

Commandant: A retired military officer or non-commissioned officer, certified JROTC instructor and Board employee who is in charge of the military program and instruction at a military academy. The commandant shall be under the direct supervision of the principal/academy superintendent and the broad supervision of the Military Area Officer.

JROTC Instructor: A Board employee who is a retired military officer or non-commissioned officer certified by one of the U.S. armed services as qualified to teach and train cadets participating in the JROTC Program.

Teacher: A Board employee possessing an Educational Certification from the State of Illinois assigned to perform a majority of his or her duties at an alternative school or small school and who is not the principal/academy superintendent or assistant principal.

Parent: A parent/legal guardian of a student currently enrolled in the school, as defined in Board Rule 6-28, and who is not related to the principal or academy superintendent and who is not an employee of the Board. In an alternative school designed to serve students enrolled for one year or less, parents of students who had been enrolled in the school within eighteen (18) months of the date of their appointment as parent representatives may serve out the entire term of their appointment.

Community Resident: A person who resides either within the attendance boundaries of a school or within District 299 if the school does not have attendance boundaries. Community residents may not be: (1) related to the principal or academy superintendent, (2) employees of the Board, or (3) parents of students currently enrolled in the school where they serve.

Eligible Student: A pupil currently enrolled full-time in a small or alternative high school who is in good academic standing (at least a 2.5 grade point average and high school attendance rate of 90% and no history of incidents of misconduct or violations of the Board's student discipline policy as a high school student) shall be eligible to serve on Appointed Local School Councils and Boards of Governors.

Advocate: An individual such as a community activist, business leader, former senior military officer or other professional who is at least 18 years of age and who possesses skills or expertise in a field which is the educational focus of or will contribute to the fulfillment of the educational mission of an alternative school or small school. An Advocate may not be: (1) related to the principal or academy superintendent, (2) an employee of the Board, or (3) the parent or legal guardian of a student enrolled in the school where they serve. An Advocate is not required to reside within District 299.

The appointed bodies of military academies shall be known as Boards of Governors (hereinafter "boards.") The appointed bodies of alternative schools and small schools shall be known as Appointed Local School Councils (hereinafter "councils").

III.     **Initial Establishment**

No sooner than two years from the date a new alternative or small is opened, the Board shall establish a council or board in accordance with the terms of this policy. Except when otherwise authorized by the Board, the composition of the council or board established for a new school shall be as described in section IV of this policy.

IV.     **Composition**

Unless an alternate composition is otherwise authorized by the Board, the composition of a council established after the date this Policy is adopted shall be:
*   the Principal,
*   six Parents,
*   two Teachers,
*   two Community Residents
*   two Advocates, and,
*   in high schools, one full-time Eligible Student in good academic standing.

Unless an alternate composition is otherwise authorized by the Board, the composition of a board established after the date this Policy is adopted shall be:
*   the Principal/Academy Superintendent,
*   Commandant,
*   two Teachers,
*   one JROTC Instructor,
*   six Parents,
*   two Community Residents,
*   two Advocates; and
*   the Cadet Battalion commander or other Senior Cadet.

The members of a council or board may submit a proposal to the Network Chief of Schools ("COS") for a change in its composition, with reasons justifying the proposal, for approval by the Chief Executive Officer ("CEO") and Board.  If approved, any change in composition will be effective for the next biennial Local School Council election period, unless otherwise authorized by the CEO and the Board.

Notwithstanding the foregoing, on or before July 1, 2007, the composition of councils and boards in existence on the date this Policy is adopted shall be presented to the Board for confirmation or adjustment as appropriate. Any such adjustments shall, at a minimum, ensure that the composition of such councils and boards includes at least two Advocate members that support the mission of the school.

To the extent practicable, appointments to councils and boards shall reflect a school's racial and ethnic diversity. The Office of Local School Council Relations will be responsible for ensuring that the composition and operation of councils and boards is consistent with this Policy.

V.     **Candidate Eligibility Requirements**

Each candidate for appointment to a council or board other than those whose appointment is automatic by virtue of his or her position at the school shall submit the following forms to the principal or academy superintendent: (1) Nomination Form; (2) Statement of Economic Interests; (3) Criminal Conviction Disclosure Form; and (4) Candidate Statement of qualifications and plans if elected. In addition, each teacher candidate and JROTC Instructor candidate must submit a Teacher Candidate Information Form which describes their professional development credentials, community service and organizational memberships.  Each student candidate must submit a Student Statement.  Each Advocate candidate must submit a resume. The eligibility requirements for each position on a council or board are as follows:

1.     Parent Eligibility.

Each Parent candidate must:
- be the parent or legal guardian of a student currently enrolled in the school, as those terms are defined herein;
- not be related to the principal;
- not be an employee of the Board; and
- pass a criminal background investigation.

In an alternative school designed to serve students enrolled for one year or less, parents of students who had been enrolled in the school within eighteen (18) months of the date of their appointment as parent representatives may serve out the entire term of their appointment.

2.     Teacher Eligibility.

Assistant principals are ineligible to serve on councils or boards. Each Teacher candidate must:
- be employed and assigned as a teacher or in a position for which teacher qualifications are required; and
- be employed to perform the majority of his/her employment duties at the school where he/she is a teacher candidate.

3.     JROTC Instructor Eligibility.

Each JROTC Instructor candidate must:
- be employed and assigned as a JROTC Instructor; and
- be employed to perform the majority of his/her employment duties at the school where he/she is a JROTC instructor candidate.

4.     Student Eligibility.

Candidates for the position of Student Representative on a council or board at a high school must be full-time students in good academic standing.

At a military academy, the student representative shall be the Cadet Battalion Commander or other senior cadet with the next highest military ranking if the Cadet Battalion Commander does not meet the requirements to serve as the student representative, unless otherwise determined by the Board.

5.     Community Resident Eligibility.

Each Community Resident candidate must:
- reside within either a school's attendance area or District 299 if the school does not have attendance boundaries;
- be at least (17) years of age;
- not be related to the principal or academy superintendent;
- not be the parent/legal guardian of a student currently enrolled at the school;
- not be an employee of the Board; and
- pass a criminal background investigation.

6.     Advocate Eligibility.

Each Advocate candidate must:
- be at least 18 years of age;
- not be related to the principal or academy superintendent;
- not be the parent/legal guardian of a student currently enrolled at the school;
- not be an employee of the Board;
- possess skills, expertise or experience in the field which is the educational focus of the school at which he or she serves or possess attributes which will contribute to the fulfillment of the educational mission of the school;
- pass a criminal background investigation.

## VI.   Appointment

The following process shall apply for the appointment of members to a board or council:

| Category | Appointment Process |
|---|---|
| Principal | Automatic appointment by virtue of position. |
| Academy Superintendent | Automatic appointment by virtue of position (military academy high schools only). |
| Commandant | Automatic appointment by virtue of position (military academy high schools only). |
| JROTC Instructor | Appointed by the Board following a non-binding advisory poll of the school staff (military academy high schools only). |
| Teacher | Appointed by the Board following a non-binding advisory poll of the school staff. |
| Student | Appointed by the Board following a non-binding advisory poll of the student body (only on high school Appointed Local School Councils). |
| Cadet Battalion Commander or Highest-ranking Cadet Officer | Appointed by the Board (military academy high schools only) |
| Parent/Legal Guardian | Appointed by the Board following a non-binding advisory poll of parents. |
| Community Resident | Appointed by the Board on recommendation of the CEO. |
| Advocate | Appointed by the Board on recommendation of the CEO. |

1.   Parent Appointments

All parents/legal guardians of children enrolled in an alternative school or small school are eligible to participate in a non-binding advisory poll for the purpose of recommending candidates to serve as parent representatives to the school's council or board. The poll shall be conducted under the supervision of the Office of the CEO or designee. The results of the poll shall be reported to the (COS) and submitted to the Board with a recommendation by the CEO. The CEO may recommend any of the names from the poll for appointment by the Board or may recommend other names. The Board will exercise absolute discretion in appointing parent representatives.

In the event of a vacancy, the council or board shall recommend to the (COS) a candidate for consideration by the CEO for recommendation to the Board for appointment to fill the vacancy for the remainder of the term. The CEO may recommend any of those names for appointment by the Board or may recommend other names to fill the vacancy. The new parent representative shall serve on the council or board until the end of the original two-year term.

2.   Teacher and JROTC Instructor Appointments

All school staff members who are Board employees and perform a majority of their duties at the school are eligible to participate in non-binding advisory polls for the teacher and JROTC Instructor representatives to councils and boards. The polls shall be conducted under the supervision of the Office of the CEO or designee. The results of the polls shall be reported to the (COS) and submitted to the Board with a recommendation by the CEO. The CEO may recommend any of those names from the poll for appointment by the Board or may recommend other names.  In addition to the poll results, the Board will

consider additional criteria in making appointments, including, but not limited to, professional development, membership in professional organizations, and other related experience. The Board will exercise absolute discretion in appointing teacher and JROTC instructor representatives.

In the event that a teacher or JROTC instructor representative is unable to perform his/her employment duties at the school due to illness, disability, leave of absence, or any other reason, the CEO shall declare a vacancy or temporary vacancy and the Board shall appoint a replacement representative after considering the preferences of the school staff as ascertained through a non-binding advisory poll. The CEO may recommend any of those names for appointment by the Board or may recommend other names to fill the vacancy. The new teacher or JROTC instructor representative shall serve on the council or board until the end of the prior representative's leave or the end of the original two-year term, whichever comes first.

3.      Student Appointments

Where appropriate, full-time members of a high school's student body are eligible to participate in a non-binding advisory poll for the student representative to the council. The results of the poll shall be reported to the (COS) and submitted to the Board with a recommendation by the CEO. The CEO may recommend any of those names from the poll for appointment by the Board or may recommend other names. The Board will consider additional criteria, including, but not limited to, a student's school service, community service, and other relevant experience. The Board will exercise absolute discretion in appointing student representatives.

In the event that a student representative is for any reason unable to continue to serve on a council, the CEO shall declare a vacancy and the Board shall appoint a replacement representative after considering the results of a non-binding advisory poll. The CEO may recommend any of those names for appointment by the Board or may recommend other names to fill the vacancy. The new student representative shall serve on the council until the end of the original one-year term.

If the Cadet Battalion Commander in a military academy does not meet the eligibility requirements for appointment to the board as described herein, the Board of Education shall appoint the next highest-military ranking senior cadet who meets the criteria. In the event a cadet member is for any reason unable to continue to serve on a board, the CEO shall declare a vacancy and the Board shall appoint the next highest-military ranking senior cadet who meets the criteria. The new student cadet representative shall serve on the board until the end of the original one-year term.

4.      Community Resident and Advocate Appointments

Both the principal or academy superintendent and council or board may submit lists of candidates for the Advocate and Community Resident positions to the (COS). The (COS) shall then submit to the CEO: (1) the list or lists of candidates submitted to them; (2) lists of any additional candidates, if desired; and (3) nomination materials for each candidate, including Nomination Forms, Statements of Economic Interests, Criminal Conviction Disclosure Forms, resumes of Advocate candidates and Candidate Statements. The CEO may submit any of those names for appointment by the Board, or may submit other names. The Board will exercise absolute discretion in the appointment of Community Residents and Advocates.

In the event of a vacancy, the council or board shall recommend a candidate for consideration by the (COS) and the CEO for recommendation to the Board for appointment to fill the vacancy for the remainder of the term. The CEO may recommend any of those names for appointment by the Board or may recommend other names to fill the vacancy. The new community or advocate representative shall serve on the council or board until the end of the original two-year term.

VII.    **Term of Office**

The term of office for both council and board members shall be two (2) years. Student members shall serve for one (1) year.

**VIII.**    **Removal of Members of Appointed Local School Councils or Boards of Governors**

1.    Subject to notice and a hearing convened pursuant to Board Rules, the Board may remove members from councils or boards for the reasons stated below:

(i)    Failure to meet eligibility requirements for their position as stated in Section V, "Candidate Eligibility Requirements," throughout their entire term of office.

(ii)    Failure or Refusal to Complete the Mandatory Training. Incoming council and board members are required to attend a training program within six months of taking office. The Board may remove a council or board member for failing or refusing to complete the mandatory training.

(iii)    Violation of State Law or Board Rules and Policies. The Board may remove council and board members for violating Illinois law or Board Rules or Policies, including, but not limited to, the Code of Ethics. In particular, members of councils and boards shall not engage in any contract, work, business, or sale of any article with or to the school where they serve. Council and board members may also be removed by the Board for failure to file the required Statement of Economic Interests.

(iv)    Criminal Convictions. The Board may remove council and board members pursuant to Board Rule 6-30 for failure to disclose criminal convictions listed in the Criminal Conviction Disclosure Form. The obligation to disclose criminal convictions is ongoing and the Board shall remove any member convicted of a crime listed on the Criminal Conviction Disclosure Form that renders the member ineligible to serve.

(v)    Unbecoming Conduct. The Board shall have the authority to suspend or remove council or board members for unbecoming conduct, which involves any type of action that disrupts the educational process at the school in which he/she serves. Such conduct includes, but is not limited to, the following:

- member refuses to attend council or board meetings or walks out of meetings before a vote is taken, without reasonable justification;
- member refuses to resolve disputes with the principal or academy superintendent or other council or board members to structure programs conducive to learning;
- member uses or attempts to use his/her office to influence disciplinary actions against school personnel or students or the improper closing of school staff positions or programs; or
- member refuses to remain in attendance for the duration of council or board meetings with the intent to terminate quorum.

Removal of a council or board member for unbecoming conduct is subject to a hearing. The CEO's designee shall have the burden of going forward with evidence to substantiate the allegations against the council or board member in question. The challenged council or board member shall have the opportunity to personally present statements and evidence to rebut the charges.

2.    A council or board may remove a member for not attending regular meetings. A member may be removed by a majority vote of the council or board if that member has missed three consecutive regular meetings (not including committee meetings) or five regular meetings over a 12-month period (not including committee meetings). The member in question shall have the right to explain the reasons for his/her absence and to vote on whether he/she shall be removed. A vote to remove a member shall be valid only if the member has been notified in writing of the intent to remove him or her at least seven days prior to the vote, by either personal delivery or certified mail sent to the member's last known address.

**IX.**    **Vacancies**

All vacancies on a council or board shall be filled through the appointment process described in Section VI.

**X.** **Authority & Responsibilities**

1. Principal/Academy Superintendent Recommendations and Evaluation

The selection of all principals and academy superintendents (applicable to military academies) shall be under the sole authority of the CEO and the Board. However, councils and boards have the following powers and duties with respect to principal or academy superintendent recommendations:

(i)     Complete the principal selection training provided by the Office of Local School Council Relations prior to undertaking the process of selecting principal candidates to recommend to the CEO.

(ii)     Work closely with the (COS) and the Office of Local School Council Relations during the process of selecting principal candidates to recommend to the CEO.

(iii)     After placing the advertisement in the personnel bulletin, review resumes, conduct interviews of principal candidates, submit to the (COS) to forward to Chief Officer for High Schools or the Chief Officer for Elementary Schools and the CEO a list of one to three candidates for principal or academy superintendent in order of preference. The CEO may then recommend one of these candidates to the Board for employment as principal or academy superintendent under a four-year contract. If none of the candidates is acceptable, the CEO may request a new list of names from the council or board or select a candidate not on the list submitted by the council or board to recommend for appointment as principal or academy superintendent by the Board.

(iv)     Submit to the (COS) to forward to the Chief Officer for High Schools or the Chief Officer for Elementary Schools and the CEO a recommendation regarding the renewal or non-renewal of the principal's or academy superintendent's contract by no later than 150 days prior to the contract's expiration. The principal or academy superintendent must be informed at least 150 days before the contract's expiration as to whether the council or board will recommend that the contract be renewed. Renewal will be solely at the discretion of the CEO and the Board.

(v)     Evaluate the principal or academy superintendent annually using the Board-approved principal performance evaluation form by May 1 of every year of the principal's or academy superintendent's contract.

(vi)     Evaluate the principal or academy superintendent in writing not later than 150 days prior to the expiration of his or her contract to assess the educational and administrative progress made at the school during the term of the contract in order to determine whether to recommend the renewal of the principal's or academy superintendent's contract to the CEO.  Such evaluation shall be based on the criteria set forth in the principal's or academy superintendent's contract and shall take into consideration the prior three (3) annual evaluations of the principal's or academy superintendent's performance.

(vii)     Student members of high school councils or boards shall not be eligible to vote on personnel matters that include, but are not limited to, principal or academy superintendent evaluation, or principal or academy superintendent candidate recommendations.

2. General Powers and Duties

Councils and boards have the following general powers and duties:

(i)     Approve a School Improvement Plan and submit the plan to the (COS).  At least twice a year, the principal or academy superintendent shall publicly report to the entire school community on the progress and problems of implementing the School Improvement Plan.  The school community shall be afforded the opportunity to make recommendations regarding the School Improvement Plan.

(ii)     Approve an Expenditure Plan and submit the plan to the (COS).  The expenditure plan shall be consistent with and subject to the terms of any contract for services with a third party entered into by the Board.   The expenditure plan must also be consistent with applicable law, collective bargaining agreements, Board policies and standards. The expenditure plan shall be administered by the principal or academy superintendent.

**CPS Policy** | 602.5 | **8** of 10

(iii)    Approve transfer allocations within funds via a super majority (50% of the council plus 2), provided that such transfer is approved by the principal or academy superintendent and is consistent with applicable law and collective bargaining agreements.

(iv)    Convene at least two (2) well-publicized meetings annually to present the proposed Expenditure Plan and the School Improvement Plan to the school community. At these meetings, the council/board shall provide an opportunity for public comment.

(v)    Hold an organizational meeting to elect a chairperson, who shall be a parent, and elect a secretary and establish the regular meeting schedule for the year. The organizational meeting is to be held between July 1 and July 14 of each year.

(vi)    Approve fundraising proposals by external organizations using school facilities.

(vii)    Approve purchases to be made with Internal Accounts funds consistent with the requirements of the Internal Accounts Manual and Board Rules or Policies. Additional approval by the Board or Chief Purchasing Officer may also be necessary.

(viii)    Make recommendations to the principal or academy superintendent for appointments to fill vacant, additional, or newly created teacher positions at the school.

(ix)    Make recommendations to the principal or academy superintendent concerning textbook selection and curriculum development consistent with the system-wide curriculum objectives contained in the School Improvement Plan.

(x)    Evaluate the allocation of teaching resources and the assignment/deployment of certified and uncertified staff that is consistent with the instructional objectives listed in the School Improvement Plan. Make recommendations to the principal or academy superintendent for reallocation of teaching and non-teaching staff resources based on this evaluation.

(xi)    Advise the principal or academy superintendent regarding attendance and disciplinary policies for the school, consistent with the Board's student code of conduct/discipline policy.

(xii)    Comply with the Illinois Open Meetings and Illinois Freedom of Information Acts, other applicable state and federal laws, as well as all applicable collective bargaining agreements, court orders, and Board Rules and Policies.

(xiii)    Make public the names and addresses of its members.

(xiv)    Advise the principal or academy superintendent regarding granting the use of school facilities such as assembly halls and classrooms for social and educational activities.

(xv)    If appropriate, initiate a student dress code and/or uniform policy if requested by parents or the CEO.

(xvi)    Encourage participation of parents and community members in school events and school volunteer activities.

(xvii)    Provide parents and community members with a forum to discuss important school and community-related issues and to address school leaders.

(xviii)    Assist school leaders in the identification and development of community resources for the school and students by reaching out to government agencies, local businesses and community organizations to obtain information and resources.

(xix)    Assist school leaders in the promotion of the school, its staff and students.

**CPS Policy** | 602.5 | **9** of 10

## XI.  Manner of Operation

1.      No action by the council or board is valid unless approved by a vote of a majority of the serving membership, a quorum of the full membership being present.  A quorum of the full membership is 50% plus one.

2.      The principal or academy superintendent and student member or Cadet Battalion Commander or other senior cadet member, if any, may not vote, nor be included in any quorum calculation, when the council or board is considering the matters of principal or academy superintendent recommendations or evaluation.

3.      Councils and boards may adopt rules, bylaws and policies necessary to conduct their business in an efficient manner that are not inconsistent with Board Rules or Policies or applicable State or Federal laws.

4.      Councils and boards shall annually, (1) elect a chairperson who shall be the parent or legal guardian of a child attending the school, and may elect a vice-chairperson, (2) elect a secretary, and (3) adopt and publish a calendar of regular meetings.

| | |
|---|---|
| **Amends/Rescinds** | Amends 07-0124-PO2 |
| **Cross References** | 07-0124-PO2 (Rescinds 98-0429-EX2; 00-1025-EX2; and 03-0924-EX01) |
| **Legal References** | Illinois School Code, 105 ILCS 5/34-2.4b. and 105 ILCS 5/34-2.1s. |
| **Public Comment** | Pursuant to Board Rule 2-6 this Policy was subject to Public Comment from 1/24/19 – 2/22/20 and adopted at the March 25, 2020 Board Meeting [Board Report 20-0325-PO1] |

## MODEL BYLAWS FOR A TRADITIONAL LSC

## Bylaws of the _____ Local School Council
SCHOOL NAME


### Article I – Name and Authority

**Section 1.   Name**
The name of this Local School Council shall be the _____ Local School
Council (hereinafter "LSC").

**Section 2.   Offices**
The LSC shall maintain its offices and records at _____ (school address)
with the agreement and cooperation of the principal.

**Section 3.   Authority**
The LSC is a Local School Council organized under the authority of the Illinois School Code.

### Article II – Governance
These Bylaws, the applicable rules and regulations of the Chicago Board of Education and the
Illinois School Code shall govern the operation of this LSC.

### Article III – Purpose

The purpose of the LSC shall be to carry out its responsibilities pursuant to the Illinois School
Code and Board Rules and to improve the quality of education at the attendance center.

### Article IV – Basic Policies

The following are basic policies of the LSC:

a.      The LSC shall be noncommercial, nonsectarian, nonpartisan, and nonpolitical.

b.      The name of the LSC shall not be used in any manner to suggest LSC
approval or endorsement except in those instances where the LSC has considered a
matter over which they have been granted authority to act and affirmatively approved
by a majority vote of its membership. Nothing in this Article shall prohibit an LSC
member from giving their independent endorsement. Any LSC member using their
name for an independent endorsement shall so indicate in the endorsement. Nothing
in this Article shall be construed to restrict the constitutional rights of an individual
who is a member of the LSC.

c.      The LSC will not devote or allow the use of its resources for the publication and distribution of statements or campaign material, in any political campaign on behalf of or in opposition to any candidate for public office.

d.      Neither the LSC nor any of its members acting in their official capacity as members of the LSC shall directly or indirectly use or allow the use of any of its resources in any campaign for Local School Councils on behalf of or in opposition to any candidate for a Local School Council.

e.  No member of the LSC or of an LSC committee shall take or receive either directly or indirectly, any money, or thing of value that is to serve as a means of influencing their action in the member's capacity as a member of the LSC or an LSC committee. No member shall solicit, accept, or agree to accept for personal gain any direct or indirect favor, gift, loan, free service, gratuity, entertainment, or other items of economic value if the donor has or is seeking to obtain contractual or other business or financial relations with the Board or with the LSC; has interests that may be substantially affected by the performance or nonperformance or the member's duties on the LSC; or is attempting to reward or influence the member's impartiality or give that appearance.

These prohibitions do not preclude: (a) acceptance of unsolicited advertising or promotional material of nominal value; or (b) acceptance of food, entertainment, and refreshments of nominal value on infrequent occasions in the ordinary course of a meeting, inspection tour, or training session in which the member is properly in attendance.

f. The LSC shall, to the maximum extent allowed by the law, participate in the decision-making process to improve the quality of education for the students of the school.

## Article V – Membership

**Section 1.    General Powers.** The affairs of the LSC shall be managed by its members.

**Section 2.    Number, Tenure and Qualifications.**   The LSC shall be composed of eight (8) elected members, The elected members shall consist of six (6) parents of students currently enrolled at the attendance center who are not employees of the Board of Education and two (2) community residents residing within the attendance area or voting district of the attendance center who are not employees of the Board of Education and who do not have children attending the school.

The Board of Education appoints student(s) following a binding election by the student body. In schools serving grades K-12, 7-12, 11-12 and 9-12, three (3) students are appointed. In school serving seventh and eighth grade one (1) student is appointed.

The Board of Education appoints two (2) teachers and one (1) non-teaching staff member following a non-binding staff poll. Each member shall hold office until the end of their term of office, until their death or resignation, or until their removal in accordance with the Illinois School Code.The Board of Education has the absolute discretion on the appointment of school staff.

**Section 3. Nomination and Election.** The LSC shall assist and cooperate with the Board of Education in conducting elections for LSC membership at the attendance center in accordance with the provisions of the Illinois School Code and the guidelines and procedures adopted by the Board of Education to ensure fair and equitable elections. The LSC shall not adopt or use any other election guidelines or procedures.

**Section 4. Term.** All members shall serve a term of two (2) years except the student members, who shall serve a term of one (1) year. Any LSC member who decides to resign from the LSC during their term may submit a written resignation to the LSC Chairperson, LSC Secretary or Principal, who shall forward the written resignation to the entire LSC (email is highly recommended). A parent LSC member whose child dies may continue to serve until the end of their term. Any LSC member who fails to meet the eligibility requirements for their office will be subject to removal from office in accordance with Board of Education Rules 6-28, 6-29 or 6-30. Any such member may resign from office in lieu of removal.

**Section 5. Dues.** There shall be no obligation for any member of the LSC to pay dues or any type of membership fee.

**Section 6. Compensation.** Members of the LSC shall serve without compensation and without reimbursement of any expenses incurred in the performance of their duties, except as may otherwise be provided by the Board of Education.

**Section 7. Vacancies.** In the event a vacancy occurs during a parent or community member's term for whatever reason, the LSC shall appoint a person otherwise eligible for election to the vacant position to serve on the LSC for the remainder of that member's term. In the event that less than the maximum number of parent or community persons eligible are elected to the LSC at a regular LSC election, the LSC shall appoint eligible persons to serve as members of the LSC for terms consistent with the terms held by the elected members of the LSC.

*Filling Vacancies*

1. LSCs that have vacancies are to advertise that a vacancy exists and that they are looking for candidates to fill the vacant position(s).

2. Councils with at least enough serving members to have quorum, the LSC, with a quorum present, may make motions to fill parent and community vacancies with individuals who have completed the nomination packet and who meet the eligibility requirements. The motion to fill the vacancy can be approved by a majority of the serving members voting "Yes".

3. School staff vacancies require that the school staff vote in a non-binding poll for staff who have completed the nomination packet and meet the eligibility requirements for the vacancy. The Board has absolute discretion in the appointment of school staff to fill the vacancy.

4. Student vacancies may be filled by the student body voting in a binding election to fill the vacancy for students that meet the eligibility requirements. The Board will appoint the winner(s).

Student and staff members may not be counted as members or vote until the Board has appointed the member.

*Filling Vacancies - Councils Without Quorum*
Councils that do not have enough serving members to meet quorum requirements may be able to meet an alternative set of quorum requirements that allow the council to fill parent and community member seats.

A.      Elementary Schools: The LSC may meet to fill parent and community vacancies if the LSC has four (4) members present and at least two (2) of the members are parent and/or community members. The only action that can take place at the meeting is the process of filling the vacancy.  The  chairperson or four (4) LSC members may call a special meeting to fill the vacancies and the motion to fill the vacancy can be approved by a majority of the members present at the meeting voting "Yes".

B.      High Schools: The LSC may meet to fill parent and community vacancies if the LSC has five (5) members present and at least two (2) of the members are parent and/or community members. The only action that can take place at the meeting is the process of filling the vacancy.  The  Chairperson or five (5) LSC members may call a special meeting to fill the vacancies and the motion to fill the vacancy can be approved by a majority of the members present at the meeting voting "Yes".

**Section 8. Removal of Members.**  The LSC may remove members by a majority vote for missing three (3) consecutive regular meetings or five (5) regular meetings in a twelve (12) month period. The regular meetings that may be considered in removing a member are the regular meetings scheduled at the Annual Organizational Meeting. If the regular meeting schedule is changed after the Organizational Meeting, absences of the newly scheduled meetings may not be considered for the removal. The LSC must notify the member by personal delivery or certified mail directed to the member's last known address of its intent to vote on their

removal at least seven (7) days prior to the vote. At the meeting at which the LSC will vote on removal, the member shall have the right to explain the reasons for their absence and to vote on the question of their  removal.

Pursuant to rules, the Board of Education may also remove members for any of the following reasons:

- Failure to meet the eligibility requirements for their office
- Failure to complete a Criminal Disclosure Form to disclose criminal convictions subject to disclosure on the form
- Failure to pass a criminal background investigation
- Failure to provide fingerprints for completion of the criminal background investigation
- Failure to comply with the Ethics Code
- Failure to comply with the training requirements for LSC members
- Failure to file an Annual Statement of Economic Interest

## Article VI – Meetings

**Section 1.   Annual Organizational Meeting.**  The LSC will hold an Annual Organizational Meeting no sooner than July 1 and no later than July 14 of each year at the school where it serves. At the organizational meeting, the LSC shall elect, at a minimum, a Chairperson (must be a parent member) and a Secretary (may be any member) to each serve a term of one (1) year and shall set a schedule of regular meetings for the school year.

**Section 2.   Regular Meetings.**   The schedule of regular meetings shall be made available to the public. Regular meetings may be held on legal holidays. The time and place of regular meetings shall be convenient to the public.

**Section 3.   Special Meetings**.   The Chairperson or any four (4) members of an elementary school or five (5) members of a high school may call special meetings by giving the other LSC members notice in writing specifying the time, place, and purpose of the meeting. Notice of special meetings shall also be given to the public in accordance with the provisions of Article VI, section 5 of these Bylaws and the Open Meetings Act. The time and place of such special meetings shall be convenient to the public. Special meetings may not be held on a legal holiday. The LSC may only discuss and take action at special meetings on items specifically listed on the agenda.

**Section 4.   Public Participation.**   All LSC meetings shall be open to the public except meetings or sessions that are closed to the public as allowed by the Open Meetings Act (OMA). The public shall be afforded an opportunity to address the LSC at all open meetings.

**Section 5.   Notice and Agenda.**   A notice and agenda for all meetings, regular or special, must be posted at the school and meeting location, if other than the school, at least forty-eight (48) hours before the scheduled starting time of the meeting. The notice must inform the public of the meeting's date, time, and location, and the agenda must specifically identify all items the LSC proposes to act on at the meeting. Items not specifically identified in the agenda of a regular meeting may only be discussed at the meeting. Items not specifically identified in the agenda of a special meeting may not be discussed at the special meeting.

If the LSC changes the date, time, or location of more than one (1) regular meeting at a time, the LSC must give at least 10 days notice of the changes by publication in a newspaper of general circulation in the school community that the LSC serves. Notice of such change must also be posted at the school. If there is a change to only a single meeting, the 10-day notice and publication requirement does not apply.

The LSC must also give public notice of any rescheduled or reconvened meeting at least 48 hours before that meeting is held. The agenda of the rescheduled or reconvened meeting must be included in the public notice. The notice requirements do not apply to reconvened meetings if the original meeting was open to the public and either the reconvened meeting is held within 24 hours after the original meeting or an announcement of the time and place of the reconvened meeting is made at the original meeting and there is no change in the agenda.

In addition to the public meeting notice requirements, written notice of the time, place and purpose of special meetings must also be given to all LSC members before the meeting.

**Section 6.   Quorum and Manner of Acting.**
*Defining Quorum:*
        A.      A quorum of the LSC members must be physically present at the meeting  for the LSC to conduct any business. At an elementary school seven (7) members must be physically present at a meeting for the LSC to formally conduct any business. At a high school eight (8) members must be physically present at a meeting for the LSC to formally conduct any business.

        B. The principal and the student member(s) shall not be counted for purposes of determining whether there is a quorum present and shall have no vote when the LSC is considering any of the following matters:

   1.   Evaluation of the principal's performance
   2.   Renewal of the principal's contract or the addition of any additional terms (addenda) to a new or renewed principal's contract
   3.   The direct selection of a new principal
   4.   The determination of names of candidates to submit to the Chief Executive Officer for the position of principal

In addition, the student member may not vote on other personnel matters, including the allocation of teaching and staff resources.

C. Generally, except as noted in Article V, Section 7 and Article VI, Section 6, a(3) above and subsections d and e below, whenever a vote is taken on any measure before the LSC, a quorum being present, the affirmative vote of a majority of the members then serving shall determine the outcome of that measure.

D. At least seven (7) affirmative votes are required, regardless of the number of vacancies on the LSC, for the LSC to take the following actions:
1. Selecting a new contract principal
2. Directing the Chief Executive Officer to approve written dismissal charges against the principal on behalf of the LSC

E. Regardless of the number of vacancies on the LSC, a "Super-Majority" is required to approve school budget transfers within a particular fund for money already allocated by the LSC:
1. Eight (8) affirmative votes in elementary schools
2. Nine (9) affirmative votes in high schools


**Article VII – Officers**

**Section 1. Enumeration and Qualifications.** The officers of the LSC, as required by law, shall be a Chairperson, a Secretary and a Freedom of Information/Open Meetings Act Officer or Officers. The LSC may elect such other officers from among its members as it deems necessary for the efficient operation of the LSC. The Chairperson shall be a parent member of the LSC. Any member may serve in the remaining offices.

**Section 2. Election of Office**. The LSC shall, at a minimum, select the Chairperson and Secretary at the Annual Organizational Meeting and may select other officers at the Annual Organizational Meeting.

**Section 3. Term of Office of Chairperson and Secretary**. The term of office of the Chairperson and Secretary shall be one year except that a new Chairperson or Secretary selected to fill an unexpired term of office shall serve only the remainder of the unexpired term.

**Section 4. Vacancies**. In the event a vacancy occurs during an officer's term for any reason, such vacancy shall be filled in the same manner as the original selection of the officer.

**Section 5. Chairperson.** The Chairperson shall preside at all meetings of the LSC. The chairperson shall have the authority to call special meetings of the LSC by giving notice to the other members of the LSC in writing, specifying the time, place, and purpose of the meetings and by giving public notice in the manner provided in Article VI, section 5. Subject to the direction and control of the entire LSC, the Chairperson shall have general supervision,

direction, and control of the business and affairs of the LSC and shall perform all duties incident to the office of Chairperson including posting/ensuring the posting of meeting notices and agenda, signing any official records or documents to reflect the LSC's approval of the matter(s) reflected in such records or documents and such other duties as may be assigned to the chairperson by the LSC.

The Chairperson may indicate that the LSC meeting will be virtual if the Governor or Director of Illinois Department of Public Health has issued a disaster declaration related to public health which impacts the location of the LSC meeting if all the provisions of 5 ILCS 120/7(e) are met:
- All members physically present or present virtually can hear and be heard
- Public at the regular meeting location or other location can hear all discussion testimony and all roll call votes of all the members.
- At least one member of the LSC must be at the physical location of the LSC meeting.
- All votes are roll call votes
- Notice for the meeting must be provided at least 48 hours prior to the meeting with the phone number or links for audio or video participation. The notice must be posted at the physical location of the meeting.   (It is also highly recommended to post the notice and meeting links on the school website.)
- The virtual meeting must be recorded and the recording shall be made available to the public upon  request.

**Section 6.   Secretary.** The Secretary shall conduct the official LSC  correspondence, reserve all documents and communications, record and maintain an accurate record of the proceedings of the LSC in the minutes. The secretary will maintain one copy of the minutes in the school office and a duplicate set of minutes (recommended to be kept by the Secretary), issue and post notices of regular and special meetings as required by the chair. The secretary shall  perform all duties incident to the Office of the Secretary and other duties as may be assigned to the secretary from time to time by the LSC.
The minutes shall contain, at minimum, the time, date and place of each meeting (open or closed), the names of all LSC members recorded as physically present, or present by means of video or audio conference and absent and a record of all matters discussed and all votes taken.

The LSC shall approve all open meeting minutes no later than the second regular meeting or thirty (30) days after the meeting for which the minutes were taken, whichever is later and shall make such minutes available for public inspection within ten (10) days of approval. Upon the expiration of their term, the Secretary shall deliver to the LSC all books, records, papers, minutes, recordings of LSC meetings (open and closed) or links to the recordings, and other property of the LSC.

**Section 7.   FOIA/OMA Officer(s).** The FOIA/OMA officer(s) shall advise the LSC concerning the requirements of the Freedom of Information Act and Open Meetings Act and work with the

LSC to respond to requests.  The standard term limit of one (1) year does not apply to this role unless it is established by the LSC.

**Section 8.    Other Officers.**  The LSC may elect such other officers as it determines are necessary for the efficient operation of the LSC. In the event that such officers are elected, their terms may expire at the same time that the terms of the Chairperson and the Secretary expire.

**Section 9.    Vice Chairperson.**    If elected, the Vice Chairperson presides at the LSC meetings in the absence of the Chairperson. In the absence of the Chairperson,  the Vice Chairperson shall conduct all duties of the Chairperson (except those detailed below), including signing any official records or documents to reflect the LSC's approval of the matter(s) reflected in such records or documents. The Vice Chairperson may not call a special meeting or indicate that the LSC meeting will be virtual.

**Section 10.    Sergeant-At-Arms.**    If elected, the Sergeant-At-Arms shall maintain order at LSC meetings and perform such other duties as delegated by the LSC or the Chairperson, including setting up for meetings, signing in visitors and speakers, making copies of the meeting notices and agendas and advising the LSC and Chairperson on meeting procedures.

**Article VIII – Committees**

**Section 1.    Committees.**  The LSC may create such standing committees and special committees from time to time as it determines are necessary for its efficient operation, provided that if standing committees are created, the LSC shall amend these Bylaws to describe the membership, duties, and responsibilities of such committees.

**Section 2. Committee Powers Limited.**  The committees shall have the power to make recommendations to the LSC and such other powers as provided in these Bylaws. The committees shall not have the power to make final decisions concerning the exercise of the powers of the LSC or binding the LSC. All committees created by the LSC are subject to the requirements of the Illinois Open Meetings Act.

**Article IX – Powers and Duties**

The powers and duties of the LSC include:

a.    Conducting an annual evaluation of the current contract principal's performance, taking into consideration their annual evaluation by the Chief Executive Officer or designee.

b.    Conducting a cumulative evaluation of the current contract principal's performance in the fourth year of the contract, taking into consideration the annual evaluation(s) of the principal's performance during the term of the contract by the LSC and the Chief Executive Officer or designee.

c.    After such cumulative evaluation, determining whether the principal's current contract shall be renewed.

d.    Directly selecting, with at least seven (7) votes, a new principal to serve under a four-year performance contract in the event that the current principal's contract is not renewed or in the event of a vacancy in the principal's position.

e.    Submitting the names of three (3) candidates to the CEO to select the school's new contract principal in the event that the LSC is unable to directly select the new principal with at least seven (7) votes.

f.    Adding additional terms to a principal's contract. Such terms shall not discriminate on the basis of race, sex, creed, color, disability unrelated to ability to perform or sexual orientation. Such terms shall be consistent with the Board of Education's Uniform Principal's Performance Contract and shall be submitted to the Board's Law Department for approval prior to a vote to award the principal's contract.

g.    Approving the School Expenditure Plan developed by the principal with respect to funds allocated and distributed to the attendance center by the Board of Education and exercising such other powers and duties as enumerated in the Illinois School Code concerning the expenditure of Needs-Based Flexible Funding and Discretionary Funding

h.    Approving the Continuous Improvement Work Plan (CIWP) developed by the principal in consultation with the LSC and the PPLC.

i.    Requesting that the principal close positions and open new ones consistent with the provisions of the CIWP provided the decisions are consistent with applicable law and collective bargaining agreements.

j.    Convening two meetings with the school community to present the CIWP and Expenditure Plan developed by the principal, and the annual report, and to receive public comment thereon.

k.    Reporting at least twice a year to the school community on progress and problems with respect to implementation of the CIWP.

l.      Evaluating the allocation of teaching and non-teaching staff resources to determine if such allocation is consistent with instructional objectives and school programs as reflected in the CIWP.

m.      Making recommendations to the principal concerning respective appointments of persons to fill any vacant, additional, or newly created positions for teachers at the attendance center.

n.      Making recommendations to the principal concerning textbook selection.

o.      Advising the principal concerning the attendance and disciplinary policies of the attendance center and school fees.

p.      Directing the Chief Executive Officer to approve written charges against its principal on behalf of the council with a "yes" vote of seven (7) members.

q.      Complying with the training requirements established for LSC members by the Illinois School Code.

r.      Filing an Annual Statement of Economic Interests.

s.      Filling vacant Parent and Community LSC seats


**Article X – General Provisions**

**Section 1.   Conflicts.**   Any provision of these Bylaws that conflict with the Illinois School Code, as amended from time to time, shall be null and void.

**Section 2.   Amendment of Bylaws.**   These Bylaws may be amended at any regular meeting of the LSC by a two-thirds vote of the LSC, provided that notice and the language of the proposed amendment shall have been given to all members and to the public at least seven (7) days before the regular meeting at which such amendment is to be considered. Prior to the final approval of any amendments to these Bylaws, the proposed amendments must be submitted to The Office of Local School Council Relations for submission to the Law Department for approval.

**Section 3. Parliamentary Authority.**   The rules contained in the current edition of Robert's Rules of Order shall govern the meetings of the LSC in all cases in which the rules are applicable and not in conflict with these Bylaws or the Illinois School Code.

**Section 4.   Contracts.**   No Board of Education employee, LSC member, or LSC may bind the Board of Education to a contract without the approval of the Board of Education. However, the principal may approve contracts, not to exceed $10,000.00, for non-biddable items if the contract is endorsed by the LSC.

**Section 5. Participation by Video or Audio Means (Public Act 103-0311).** (See note below).

Provided a quorum is physically present, an LSC member may attend a meeting by video or audio conference if he or she is prevented from physically attending because of:

(1) personal illness or disability,

(2) Employment related issues

(3) Family or other emergency

(4) Unexpected child care obligations (*new amendmen*t 2023)

If a member wishes to attend a meeting by video or audio means, he or she must notify the Chairperson in advance of the meeting unless advance notice is impractical. The Chairperson will inform the Principal in order to make appropriate arrangements. The member's participation by video or audio conference must be approved by a majority of the serving members.

Video or audio conference must be clearly audible to LSC members and the public in attendance. The meeting minutes shall indicate whether the members of the LSC were physically present for the meeting or present by means of video or audio conference. An LSC member, who attends a meeting by audio or video means, as provided in this bylaw, may participate in all aspects of the meeting including voting.

_____          _____

**LSC Chairperson**                                              **LSC Secretary**

_____**School**

**These Bylaws were adopted/amended on:_____Date**

**by a vote of_____in favor and_____opposed.**

**Note:** The provisions of Article X, Section 5, are the minimum statutory requirements other than the length of notification that is given the Chairperson, the audibility requirement and the process for accommodating the request. Alternatively, an LSC may prohibit members from participating by video or audio means altogether by not adopting this rule as part of the bylaws.

Also, an LSC may modify the sample bylaw to (1) include additional requirements such as mandating that a member attending by phone participate for the entirety of the meeting until adjournment; (2) alter the advance notification period to identify a specific notice period, and/or (3) identify a different LSC member, other than the Chairperson, to receive the advance notice (e.g., the Secretary).



# LOCAL SCHOOL COUNCIL
# RESOURCE GUIDE
## Part Two: Meetings

**Introduction**

Local School Councils can conduct official business and take official actions only when they meet formally as a body. Therefore, all LSC members need to be familiar with the legal requirements for their meetings. In this section, we explain those legal requirements.

The LSC is the governmental  body with the responsibility of creating a structure that will impact students so that they will make the academic progress that is the goal of every CPS school. Collaboration and teamwork between all LSC members in LSC meetings are vital to reaching a consensus and effectively performing your powers and duties. We include best practice recommendations to facilitate efficient, effective, and successful LSC meetings to advance your school's progress.

# REQUIREMENTS FOR LSC MEETINGS

The Illinois School Code and the Policy on the Governance of Alternative Schools establish requirements for the operation of Local School Councils, including their meetings.

**The most important of these requirements include**

- A majority of the full membership shall constitute a quorum. This means that for traditional Elementary school LSCs, a quorum is 7 members since 7 is a majority of both 12, their full membership in elementary schools without 7th and 8th grade, and 13 for the full membership in Elementary schools that have 7th and 8th grades. The full membership in High Schools is 15, and the quorum is 8.
- The quorum for appointed LSCs (ALSC) will depend on their full membership, which varies. However, the quorum for most elementary school ALSCs, which have 13 members, will also be 7, while the quorum for most high school ALSCs, which have 14 members, will be 8.
- Schools with a Teacher Training component have a full membership of 10 and the quorum is 6 while the military schools (Boards Of Governors/BOG) have a full membership of 16 and the quorum is 9.
- Whenever a vote is taken on any measure before the LSC, a quorum being present, the affirmative (or "yes") votes of a majority of the members then serving shall determine the outcome of the vote except that the principal and the student member(s) shall have no vote, and may not be counted for purposes of establishing a quorum when the LSC is considering:
    - The performance evaluation of a contract principal
    - The renewal of the principal's contract
    - The selection or recommendation of a contract principal

- In addition, student member(s) shall not vote on any personnel matters, including the allocation of teaching and staff resources. This means that students do not vote on the school's budget or the school's Continuous Improvement Work Plan (CIWP).

**Voting Privileges for LSC Student Representatives**

| LSC Actions Requiring a Vote | May the Student Representative Vote |
|---|---|
| Vote to go into closed session for matters where the student(s) can vote. | Yes (Only for matters where they may be counted for quorum and may vote.) |
| Budget transfers of **NON-personnel** related matters | Yes |
| Vote on LSC Officers | Yes |
| Vote on Regular LSC meeting schedule at the Organizational meeting | Yes |
| Vote on allowing a LSC member to attend electronically. | Yes |
| Vote on the LSC By-Laws | Yes |
| Vote on fundraising activities by outside organizations using the school. | Yes |
| Vote on School Uniform or dress code | Yes |
| Vote on recommendations to the principal on selection of textbooks. | Yes |
| Vote on recommendations to the principal concerning curriculum development. | Yes |
| Vote on the LSC Agendas and Minutes | Yes |
| Vote on Internal Account Reports | Yes |
| Vote to endorse the principal entering into a contract up to $10,000.00 | Yes |
| Vote to advise the principal on attendance and disciplinary policies for the school. | Yes |
| Vote to request of the Board the manner in which training and assistance shall be provided to the local school council. | Yes |

| | |
|---|---|
| Vote on parent and community LSC vacancies. | Yes |
| Vote on increasing the Limits that the principal can spend from the internal accounts without LSC approval | Yes |
| Vote on granting the use of the school assembly halls and classrooms, when not otherwise needed, for public lectures, concerts, and educational and social activities. | Yes |
| Vote on the removal of LSC members for missing Regular LSC meetings. | Yes |
| Vote to approve LSC and committee minutes | Yes |
| Vote on Fundraising Proposals | Yes |
| Vote on LSC procedural matters | Yes |

| | |
|---|---|
| Evaluation of the principal's performance * | No |
| Renewal of the principal's contract or the inclusion of any additional terms (addenda) to a new or renewed principal's contract * | No |
| The direct selection or recommendation for a new contract principal. * | No |
| • Vote on the Continuous Improvement Work Plan (CIWP) or Budget* Requesting that the principal close positions and open new ones consistent with the provisions of the CIWP * | No |
| • Evaluating the allocation of teaching and non-teaching staff resources to determine if such allocation is consistent with instructional objectives and school programs as reflected in the CIWP * | No |
| • Making recommendations to the principal concerning respective appointments of persons to fill any vacant, additional, or newly created positions for teachers at the attendance center * | No |
| Vote to go into closed session for principal evaluation, selection, retention. | No |

*While the voting privileges of the student LSC members are limited by state statute their voice in the discussion of all these matters is encouraged and should be regarded as valuable. There are a number of ways that students can gather information to comment on important matters for which they may not vote. Student LSC members may participate in the following activities, provided they are approved by the LSC and principal: conducting surveys, interviews and focus groups with students. All surveys must be reviewed and approved by the Law Department. Principal approval is also required to ensure that the student surveys, interviews and focus groups do not disrupt the educational activities of the school.

# ADDITIONAL GUIDANCE
# CLOSED SESSION & STUDENT ATTENDANCE IN CLOSED SESSION

In consultation with the Law Department, our office provides the following information on student attendance in closed sessions.

**On Matters Students May Vote**
Students are permitted in closed session without restriction for matters in which students are allowed to vote.

**On Matters Students May NOT Vote**
Students are permitted into closed session, **with restrictions**, for matters in which students are not permitted to vote ( i.e. principal contract, principal selection, principal contract renewal, personnel matters and principal evaluation.)

On those matters in which student LSC members are not permitted to vote, students should be considered as "experts" and may be invited by an approved motion into closed session. Students may be invited for a limited duration and purpose to briefly provide the voting members of the LSC relevant information regarding their viewpoint or representative voice of their constituency. After the student shares the information with the council members, the student will be immediately excused from the session.

# THE ANNUAL ORGANIZATIONAL MEETING

The official LSC Organizational Meeting must be held between July 1 and July 14 of each year at the attendance center to:

- Select a parent member as the Chairperson to serve a one-year term expiring next June 30
- Select any member as the Secretary to serve a one-year term expiring next June 30
- Establish a schedule of regular meetings for the school year

The exact date and time of the meeting may be set in one of three ways:

- The LSC may vote to set the date and time of the meeting;
- Before June 30, the Chairperson may call the meeting as a special meeting;
- Any four (4) elementary school members, or any five (5) highschool members including the principal, may call the organizational meeting as a special meeting.

NOTE: The principal must be consulted to ensure that the school will be open and available for the meeting on the desired date and time. If the school is not available, a different date and time for the meeting must be selected. The LSC, the LSC Chairperson or any members do not have the authority to dictate the availability of the school, but the principal must make the school available for the meeting sometime between July 1 and 14.

The principal may facilitate the calling of the meeting as a special meeting by calling the members to survey them on a date and time convenient for all to attend.

For a special meeting, the notice and agenda must be posted at the meeting location and if the location is not the usual location,  the notice must also be posted at the normal meeting location at least 48 hours before the special meeting. All members need to be told in writing about the date, time, place, and purpose of the special meeting before it happens. This is true even if the Local School Council (LSC) has already voted on these details.

The notice and agenda must be posted in a location where it is continually visible to the public for at least 48 hours before the meeting. **The organizational meeting is open to the public and is subject to the Open Meetings Act.** Therefore, a notice and the agenda for the meeting must be posted at the school

at least 48 hours before the scheduled start time of the meeting. We recommend that the notice and agenda be posted at the main entrance of the school where the public can readily see it and other prominent places throughout the school, including an LSC Bulletin Board.  The notice must be posted in a location where it will be visible in compliance with the Americans with Disability Act  (ADA).

**Materials:**
At the meeting, LSC Members should receive information about the school and the LSC – this list includes recommended material.
- Current CIWP
- Current School Budget and the CPS Budget Codes
- Current Internal Account Reports
- Current School ESSA/ Title I Parental Involvement Policy and School-Parent Compact (if applicable)
- School Report Card
- Current Position Report
- School Organizational Chart (with names and duties of staff and contact information)
- School Calendar
- List of Council members and their contact information (LSC members must consent to disclosure their telephone numbers and email addresses to the public)
- Copy of the current LSC Bylaws (if any)

**Required Actions:**
- Elect a Chairperson (must be a parent member).
- Elect a Secretary (may be any LSC member).
- Set the dates, time and location of the regular LSC meetings for a period of one year.
- Elect FOIA Office and OMA Officer if there is a vacancy.

**Optional Actions:**
- Elect any additional Officers (Sergeant of arms, Vice Chairperson (preferably a parent member, but can be any member).
- Establish New Committee(s)

**How can LSCs receive help? LSCs may request assistance from:**
- Office of Local School Council Relations : 773-553-1400 LSCrelations@cps.edu

- The Law Department, School Law Unit 773-553-1700.

# OPEN MEETINGS ACT

The Open Meetings Act ("OMA") establishes requirements for public bodies in the State of Illinois, including Local School Councils, in conducting their business.

One of those requirements is that LSCs conduct business in "open meetings." An open meeting is a meeting open to the public. All LSC members are to complete the online training on the Open Meetings Act with the Office of the Illinois Attorney General's Office within 90 days of taking office. Please use the following link to **register:** https://foiapac.ilag.gov/createaccount.aspx

**The open meeting requirement applies to:**
- Any gathering of a majority of a quorum of members (four (4) or more for traditional Elementary LSCs or five (5) for traditional High School) to discuss LSC business whether in person or by video or audio conference, telephone call, or electronic means (such as, but not limited to, electronic mail ("e-mail"), electronic chat, instant messaging or other means of contemporaneous interactive communication).

- Any similar gathering of a majority of a quorum of any LSC committee to discuss committee business.

**OMA COMMITTEE MEETING GUIDANCE:**
To determine the LSC committee meetings to which the OMA applies, follow these steps.
- First, determine the full membership of the committee, including any non-LSC members.
- Then determine how many members make up a majority, or the quorum, of the full membership.
- Then determine how many members make up a majority of the quorum. For example, if there are 5 members of the Budget Committee, the quorum is 3. Since a majority of the quorum is 2, the OMA will apply whenever two or more Budget Committee members meet to discuss committee business.

# EXECUTIVE OR CLOSED SESSIONS AND MEETINGS

The Open Meetings Act also allows public bodies to discuss certain subjects in sessions or meetings closed to the public, called "closed" or "executive" sessions or meetings.

Although the LSC may discuss and deliberate certain matters during closed sessions or meetings, no final action may be taken either during closed sessions or at a closed meeting. Any final action must be taken by the LSC at an open meeting concerning matters discussed during closed sessions or meetings must begin with an explanation that informs the public about the business being decided.

**Subjects that a Council may discuss in closed/executive sessions or meetings:**
An LSC may discuss any of the following subjects in closed/executive session or meeting:

- litigation, if a lawsuit against, affecting, or on behalf of LSC members has been filed and is pending, or when the LSC determines that such an action is probable
- the evaluation, selection, retention, or request for suspension or dismissal of the school principal. This exception does not apply to discussions about principal evaluation or selection procedures, although it does apply to discussions about or interviews with the current principal or particular candidates for principal.
- the addition of addenda to the principal's performance contract
- the minutes of prior closed/executive sessions or meetings, whether for approval purposes or to conduct the required semi-annual review of closed meeting minutes
- the qualifications of candidates for LSC vacancies
- school safety and security issues

The LSC may vote to allow individuals who cannot vote on a measure being discussed in closed session to attend the closed session. This motion is made prior to the motion that is made to go into the closed session.

**Executive/Closed Session During a Meeting**
An LSC may close a portion of a meeting that was open to the public upon a majority vote of the serving members taken at the open meeting. The motion to go into closed session must specifically state an allowable exception contained in the OMA which authorizes closure.

**During the closed session:**
- ✓ Only topics specified in the motion to hold a closed session may be discussed in the closed session.
- ✓ **Audio recording of the session is required**
- ✓ Minutes MUST be taken

**After Closed Session:**
- Once the LSC has returned from the closed session, a motion must be made, seconded and voted on to return to open session.

**Special Meetings**
A meeting called to take care of important business matters that can not wait until the next regular meeting.

**Emergency Meetings\***
A type of special meeting called by the LSC for the purpose of addressing an unexpected extraordinary event that requires immediate action that the LSC has authority to vote upon. Notices and agendas for meetings held in the event of a bonafide emergency may be posted less than 48 hours before the meeting, but must be posted as soon as possible before the meeting. Reasons for calling emergency meetings do NOT include **failure to**

**plan**, **to meet deadlines**, or **failure to provide notice in a timely manner**. Emergency meetings are usually called in association with natural disasters. If the standard for an emergency meeting is not available, a special meeting may be called instead, as long the notice and agenda are posted at least 48 hours prior to the meeting.

**\*The failure of the LSC to take action on business that has a deadline does not constitute an emergency.**

**Closed Meetings**
Local School Councils may also vote in advance to hold **Closed Meetings** which are closed to the public or to close portions of future open meetings. If your council is considering scheduling a meeting like this please contact your LSC Relations Specialist or call 773-553-1400.

Note: the LSC may not vote to allow a member to participate virtually in the series of closed meetings unless the vote was made at the original scheduling of the series of closed meetings to allow that individual to participate virtually for one of the 4 reasons

If they come out of the closed session to vote to allow virtual participation they are in violation of the OMA since the meeting agenda and notice were not posted prior to the open session.

**Meetings During a Disaster Declaration**:
Whenever the Governor or Director of the Illinois Department of Health issues a disaster declaration related to health concerns as defined by the Illinois Emergency Management Act, the following should take place:

- The Chair of the LSC will decide if the meeting should be in person or virtual. This must be done in a manner that allows the link, and dial-in access code via phone for a virtual meeting to be included on the notice and agenda (We highly recommend that the agenda be posted on the school's website)
- All virtual participants must have adequate equipment in order to hear and be heard.
- There STILL must be an established physical space, open to the public, (usually the normal meeting space) where the notice and agenda is posted. This space must be able to access the virtual meeting as well and should enable the public physically present to hear all discussion and votes. At least one (1) member of the LSC must be at the physical location with the ability to manage all audio and video expectations previously mentioned.

# GUIDANCE FOR STUDENT ATTENDANCE in CLOSED SESSIONS

In consultation with the Law Department, our office provides the following information on student attendance in closed sessions.

**On Matters Students May Vote**
Students are permitted in closed session without restriction for matters in which students are allowed to vote.

**On Matters Students May NOT Vote**
Students are permitted into closed session, (see below for restrictions) for matters in which students are not permitted to vote ( i.e. principal contract, principal selection, principal contract renewal, principal personnel matters and principal evaluation.)

Specific Restrictions for Student Participation in a CLOSED SESSION:
1. Discussions around principal personnel issues
2. Principal Selection or Evaluation

On those matters in which student LSC members are not permitted to vote, students should be considered as "experts" and may be invited by an approved motion into closed session. Students may be invited for a <u>limited duration and purpose to briefly provide the voting members of the LSC relevant information regarding their viewpoint</u> or representative voice of their constituency. After the student shares the information with the council members, the student will be immediately excused from the session. Please see the full list of student voting privileges listed earlier in this chapter.

**The Open Meetings Act Requirements for LSC Meetings**

**Schedule**
- Requires that all meetings be held at times and places convenient and accessible to the public and that public participation be allowed at all open meetings.
- Requires LSCs to set a schedule of the time, date, and location of all regular meetings for the school year at the annual organizational meeting. After it is approved, the schedule must be publicized and posted at the school and made available to the public. (At the organizational meeting, the LSC may appoint a member who will be responsible for posting the agendas and notices of all meetings.)
- Requires LSCs to provide written notice, including the agenda, for any reconvened meeting at least 48 hours before the meeting is reconvened unless: (A) the meeting was open to the public and (B) the reconvened meeting will be held within 24 hours; or an announcement of the time and place of the reconvened meeting was made at the original meeting and there is no change in the agenda.
- Prohibits LSCs from holding special or rescheduled regular meetings on legal holidays.
- Requires the chairperson or four members of an elementary school or 5 members of a high school  who call a special meeting to post a written notice and agenda for the meeting at the school (and at the meeting location, if it is not the school), at least 48 hours before the meeting.
- Requires the chairperson or four members of an elementary school or 5 members of a high school who call a special meeting to give written notice of the time, place and purpose of the meeting to all other LSC members prior to the meeting.
  - Notice must be given prior to the meeting as soon as possible.

**Notification and Agenda**
Requires LSCs to post a **written notice and agenda** for each regular LSC meeting at the school (and at the meeting location, if it is not the school), at least 48 hours before the meeting. We recommend that the notice and agenda be posted in a place the public can see easily such as the main entrance of the school and parent or LSC bulletin boards. The notice must be visible to the public for a continuous 48 hours prior to the meeting. The notice must be posted in a location where it will be visible in compliance with the Americans With Disability Act  (ADA).

Requires LSCs to give at least 10 days' notice through publication in a newspaper of general circulation in the school community the LSC serves if the LSC changes the date of more than one regular meeting at a time. OLSCR recommends that the school add the notice to the school's website.

Requires LSCs to provide any newspapers or other news media that have asked to be informed of meetings with notice of its regular meetings and any special or rescheduled meetings.Open Meetings Act Requirements

**Participation and Voting**

- The OMA allows the LSC to vote to add items for discussion to the LSC agenda of Regularly Scheduled meetings.  The LSC may NOT vote on items added to the agenda the day of the meeting.
- The LSC may not add any new items to the agenda of a special meeting.  Only those items on the posted Special meeting agenda may be discussed and/or voted on.
- The OMA requires that a **quorum** of the membership be physically present in person at the location of a meeting for any formal or official actions to be taken at the meeting. The "physical presence" requirement applies whether the meeting is open or closed.
- The OMA requires that all **LSC votes** be taken in **the open meeting.**
- **The OMA prohibits LSC members from voting by absentee, proxy, written or secret ballot.**
- If the LSC votes to allow a member or members to participate virtually**, then all subsequent votes on motions must be a roll call vote.**


**Per Article X (Section 5) of the Model LSC Bylaws: Participation by Video or Audio Means ([Public Act 103-0311](#)).** (See note below). Provided a quorum is physically present, an LSC member may attend a meeting by video or audio conference if he or she is prevented from physically attending because of:

      (1) personal illness or disability,

      (2) Employment related issues

      (3) Family or other emergency

      (4) Unexpected child care obligations (*new amendment* 2023)


If a member wishes to attend a meeting by video or audio means, he or she must notify the Chairperson in advance of the meeting unless advance notice is impractical. The Chairperson will inform the Principal in order to make appropriate arrangements. The member's participation by video or audio conference must be approved by a majority of the serving members. Should any of the members physically present leave the meeting and cause the council to drop below quorum in the physical space, the virtual attendees will immediately become observers and may not vote. Those in the physical space, if below quorum, may not vote as well.

If a member is participating virtually, then all votes on motions must be roll call votes.

Video or audio conference must be clearly audible to LSC members and the public in attendance. The meeting minutes shall indicate whether the members of the LSC were physically present for the meeting or present by means of video or audio conference. An

LSC member, who attends a meeting by audio or video means, as provided in this bylaw, may participate in all aspects of the meeting including voting.


## Minutes and Agendas

The OMA requires LSCs to maintain **written minutes** and agendas of all meetings including closed sessions and LSC committee meetings. These minutes and agendas are permanent records. This means that the LSC minutes (Open and Closed) and agenda of the LSC and LSC committee minutes and agenda may not be destroyed.

Maintaining written minutes on paper is a requirement of all LSC's. This would include having a folder in the school main office with printed copies of approved minutes for public view. Also, remember that keeping approved minutes on school website is a recommendation but not required

All closed sessions must be audio or video recorded and the recording may be destroyed after 18 months as long as the LSC has approved the associated written minutes and approved the destruction of the recording.

Recordings of open meetings made by the LSC have the following retention periods:
- Audio recordings must be retained for 60 days after adoption of minutes
- Video recordings must be retained for 30 days after the date of last airing.

Schools should work with the Department of Policy & Procedure to store and/or dispose of all records. Use the Records Management email, recordsmgmt@cps.edu for further details or clarifications

**Meeting minutes must include:**
> ✓ Date, Time, and Place
> ✓ Members who were physically present, virtually present or absent
> ✓ A summary of discussion on all matters proposed, deliberated, or decided, and any votes taken.

Minutes must be approved within 30 days after that meeting or at the public body's second subsequent regular meeting (see chart below) Written minutes must be available to the public 10 days after they are approved.

**Minute Approval Sample Timeline Examples**

| Type of Meeting | Meeting Date | Minutes Approval Due (minutes may be approved prior to this date) | Date Minutes must be available to the public |
|---|---|---|---|
| September Regular | September 10th | November 12th | 10 days after the minutes are approved |
| September Special | September 15th | November 12th | |
| September Special | September 22nd | November 12th | |
| October Regular | October 4th | December 7th | |
| November Regular | November 12th | January 9th | |
| December Regular | December 7th | Second regular meeting after December's meeting | |
| January Regular | January 9th | Second regular meeting after January meeting | |

**Freedom of Information Training**

- The Freedom of Information Act requires LSCs to designate member(s) to complete online training on the Freedom of Information Act and to act as the Freedom of Information Act Officer(s) for the LSC.
  - If not previously designated or if the member(s) previously designated are no longer serving, the annual organizational meeting affords the LSC a good opportunity to designate the FOIA Officer(s) member(s) to act as the FOIA/OMA Officer(s) for the body.
  - The member(s) designated as the FOIA Officer(s) must complete the on-line training within 30 days after being designated by the LSC. After compliance with the initial training requirement, the designated FOIA member(s) must complete the on-line training annually.

**Note about the Online Training:**

To take the training, LSC members must first register on the Illinois Attorney General's website at https://foiapac.ilag.gov/createaccount.aspx

## PREPARING AGENDAS FOR REGULAR AND SPECIAL MEETINGS

The agenda lists what the LSC will vote on and/or discuss at its meeting. The LSC must prepare a new agenda for every meeting with the specific items listed that the LSC will vote on. LSC members and members of the school community may suggest items to be placed on an agenda.

The agenda for future regular meetings should be decided and approved by the LSC at the end of the previous regular meeting or at a special meeting. After approval, the LSC Chair is responsible for preparation and posting the agenda. In the absence of the LSC Chair, the LSC should decide who will prepare the written agenda and be responsible for posting it. If the meeting is held some place other than the school, the new meeting location needs to be included on the agenda. If the meeting location is not at the school then the notice and agenda must be posted at the location of the meeting <u>and</u> at the school in a place that is continuously visible to the public from the outside of the building for the 48 hours before the meeting. The agenda must be posted in a place the public can see it easily, such as outside the main entrance of the school. Only posting the agenda on parent or LSC bulletin boards inside the school are useful, but do not meet the requirement for the 48 hour notice since the school is locked during the evening. It is recommended that the Principal be made aware of the posting of the agenda. The notice must be posted in a location where it will be visible in compliance with the Americans With Disability Act (<u>ADA</u>).

In addition to the required locations, the notice and agenda may be posted on the school's website. The Regular meeting agenda may be approved at the beginning of each meeting and changes (amendments) may be made at that time. Items for discussion may be approved to be added to the regular meeting agenda at the start of the meeting, but <u>not</u> voted on at the meeting. For Special meetings, the only items listed on the posted special meeting agenda may be discussed. No new discussion items may be added to a special meeting agenda.


## Suggestion for the Preparation of Agenda In preparing and approving the agenda, it is recommended that the LSC:

- Set times for each part of the agenda
- Review previous minutes and include items that need revisiting on the agenda
- Ensure that the agenda is distributed to members at least two days before the meeting
- Post the agenda at least 48 hours prior to meeting (mandatory)

## Agenda for Special Meetings

In addition to the regular meetings, the LSC may hold a special meeting about a topic or issue the members decide is important related to their governance or for matters that can not wait until the next scheduled regular meeting.

- The LSC must provide public notice of a special meeting at least 48 hours before the meeting, including the time and location, and an agenda, which must list each matter to be addressed at the special meeting.
- Written notice and agenda needs to be given to each LSC member prior to the meeting.
- **Only matters included in the agenda may be discussed at a special meeting**. In addition to the public notice requirements above, notice of special meetings must also be given to LSC members in writing prior to the meeting.

## Emergency Meetings
Notice may be posted less than 48 hours before a meeting held in the event of a bonafide emergency but must be posted as soon as practicable prior to the meeting.

**NOTE: Bonafide emergencies, allowing LSCs to meet with less than 48 hours' notice to the public, will rarely, if ever, arise.**

**Examples of called meetings that are <u>NOT</u> considered an "emergency: Missed deadlines for Budget approval, Contract Renewal, Continuous Improvement Work Plans, Evaluation, Fundraisers, Budget Transfers etc.**

## Actions
**No action can be taken at a regular or special meeting that was not listed on the posted agenda**. Such items may be listed as either "New Business" or "Old Business." If an agenda of a regular meeting is amended to add a specific item not included in the posted agenda, the item may only be discussed at the meeting and may not be voted on.

# PUBLIC PARTICIPATION

Public participation is required at all open LSC meetings (regular, special and committee meetings) and at the two Annual Progress Report Meetings.

- The LSCs may establish rules governing public participation. Such rules may include that speakers:
  - Sign-up to speak prior to the beginning of the meeting
  - Will be permitted to speak in the order in which they signed up
  - May speak for a limited amount of time (for example, two or three minutes)
  - Conduct themselves in a civil manner or lose their right to address the council and may be asked to leave the meeting if they are disrespectful or disruptive

- Public comment is an opportunity for the LSC to hear from the public. The LSC is not required to provide answers to questions from the public.
- LSCs are encouraged, if possible, to provide interpreters (including sign language) at meetings as needed in order to maximize the participation of parents and the community.
- Members of the public may videotape and/or audiotape LSC regular and special meetings. Such recording, however, may not interfere with or disrupt the meeting. The LSC may require that the recording cease if it disrupts the meeting. Any disruptive behavior from LSC meeting participants opposed to the process of the public recording the meeting does not constitute a reason for the recording to cease, even if the opposition to the recording has been deemed disruptive to the execution of the meeting.
- The LSC should consider reading a statement before the public comment period begins to alert the public of the rules and expectations for public participation. Additionally, it is important to inform the public that some matters (like day-to-day operations, school personnel, and student discipline matters, to name a few) are not under the purview or authority of the LSC. Comments/questions or concerns related to matters the LSC has no authority should be specifically addressed by the principal, outside an LSC meeting.

**The LSC may request that the disruptive individual be removed from the meeting if the disruptive behavior continues.**

## SAMPLE NOTICE OF REGULAR MEETING
## This notice must be posted 48 hours prior to meeting

Name of School_____ Local School Council

**Notice is Hereby Given** that the LSC has scheduled a regular meeting of the LSC to begin at: Time: _____ on, Date:_____ at, Address:_____

The agenda for the meeting is as follows:

1. Call to Order
2. Roll Call
3. Approval of Agenda
4. Approval of Minutes from Previous Meeting
5. Announcements/Introduction of Guests
6. Public Comment
7. Reports:
   a. Chair
   b. Principal
   c. Professional Personnel Leadership Committee (PPLC)
   d. School Improvement Plan Committee
   e. Budget Committee
   f. Bilingual Advisory Committee
   g. ESSA Parent Advisory Council
   h. Student Report (Student Voice/Student Council) (Optional)

   *(NOTE: The Student Report is an optional report that the LSC Student member(s) can ask the Chair to include in the agenda. Some ideas about creating the student report:*
   - *The student(s) can consult with the Student Voice Committee at the school about things that are important to share from the student's perspective with the LSC. This can include any student celebration or student related activities happening at the school*
   - *The LSC student(s) member can simply write the report and read it during the meeting, or you can create a short presentation*
   - *Reporting in each meeting is not required. Whether the student(s) has a monthly report will depend on the student activities happening at the school)*

   i. Other Committees
8. Old Business

**List items to be Acted Upon**

_____

_____

9. New Business

    a.  Budget Transfers
    b.  Filling LSC Vacacnies (Parent or Community)

10. Announce Date of Next Meeting and Set Agenda
11. Adjourn

_____ Chair

Posted Time:_____ , Date _____

## SAMPLE NOTICE OF SPECIAL MEETINGS

In addition to the regular meetings, the LSC may hold a special meeting about a topic or issue the members decide is important. The LSC must provide public notice of a special meeting at least 48 hours before the meeting, including the time and location and agenda, which must list each issue to be addressed at the special meeting. In addition to the public notice requirements, notice of special meetings must also be given to LSC members in writing prior to the meeting.

**This notice must be posted 48 hours prior to meeting**

_____ Local School Council
*(Name of School)*

**Notice is hereby given** that the chairperson or (4) four members of an Elementary  LSC or (5) five members of a High School LSC has/have called a special meeting to begin at
_____ on _____ at ____/__/____ at _____
*(Time)*                    *(Day)*                                  *(Date)*                    *(Address)*
The purposes of this Special Meeting are set forth in the following agenda:
1. Call to Order
2. Roll Call
3. Approval of Agenda
4. Public Comment
5. Specific Items to be Discussed (The LSC Must List These Items Below)
    a. _____
    b. _____
    c. _____
    d. _____
6. Adjourn

_____ , Chairperson

Or

List Four LSC Members (Elementary) or /Five LSC Members (High School): (Signatures Not Required)
1._____
2._____
3._____
4._____
5._____
Posted:Time:_____ Date_____

# SAMPLE AGENDA

Jane Doe LSC Regular (or Special) Meeting
Jane Doe School Library,1976 N. Street
Monday, April 27, 2026 at 6:00 p.m.

1. Call to Order
2. Roll Call
3. Approval of Agenda
4. Approval of Minutes from Previous Meeting
5. Announcements/Introduction of Guests
6. Public Comment
7. Reports (Possible)
   a. Chair
   b. Principal
   c. PPLC
   d. Continous Improvement Work Plan Committee
   e. Budget Committee
   f. Bilingual Advisory Committee
   g. ESSA Title I Parent Advisory Council
   h. Other Committees
8. Old Business

**List Items to be Acted Upon**

_____

_____

9. New Business

**List Items to be Acted Upon**

_____

_____

10. Approval of Agenda for Next Regular Meeting Announce Date of Next Meeting and Set Agenda
11. Adjourn

**\*Note: Items not specifically listed on the agenda cannot be voted on and Items cannot be added to a special agenda for discussion.**

When a Chair Person or four/five members call a special meeting:the notice is to list member(s) calling a special meeting – signatures not required)

_____

_____

_____

_____

_____

Posted: Time_____          Date _____

## Meeting Rules of Order – Simplified

### Guiding Principles

- Everyone has the right to participate in discussion if they wish, before anyone may speak a second time.
- Everyone has the right to know what is going on at all times. Only urgent matters may interrupt a speaker.
- Only one thing (motion) can be discussed at a time.

A **motion** is the topic under discussion.  After being recognized by the chairperson of the council, any member can introduce a motion when no other main motion is on the table. A motion requires a second to be considered. If there is no second, the matter is not considered. Each motion must be disposed of (passed or defeated)

**How operate in a meeting:**

**You want to bring up a new idea before the group (that's associated with an agenda topic).**
After recognition by the chairperson of the council, present your motion. A second is required for the motion to go to the floor for discussion, or consideration.

**You want more time personally to study the proposal being discussed.**
Motion to  postpone to a definite time or date.

**You want to take a short break.**
Motion to recess for a set period of time.

**You want to end the meeting.**
Motion to adjourn.

**Unanimous Consent:**
If a matter is considered relatively minor or opposition is not expected, a call for unanimous consent may be requested. If the request is made by others, the chairperson of the council will repeat the request and then pause for objections. If none are heard, the motion passes.

You may **INTERRUPT** a speaker for these reasons only:

- if you can't hear, safety reasons, comfort, etc. – question of privilege
- if you see a breach of the rules – point of order
- if you disagree with a call for Unanimous Consent – object

| Meeting - Quick Reference | | | | | |
|---|---|---|---|---|---|
| | **Must be Seconded** | **Open for Discussion** | **Can be Amended** | **Vote Count Required to Pass** | **May be Reconsidered or Rescinded** |
| **Main Motion** | ☑ | ☑ | ☑ | Majority of serving members | ☑ |
| **Limit Debate** | ☑ | ☑ | | Majority of serving members | ☑ |
| **Close Discussion** | ☑ | | | Majority of serving members | ☑ |
| **Recess** | ☑ | | ☑ | Majority of serving members | |
| **Adjourn (End Meeting)** | ☑ | | | Majority of serving members | |
| **Refer to Committee** | ☑ | ☑ | ☑ | Majority of serving members | ☑ |
| **Postpone to later time** | ☑ | ☑ | ☑ | Majority of serving members | ☑ |
| **Motion to Offer a First NEW Principal Contract** | ☑ | ☑ | ☑ | 7 Eligible voters | |
| **Motion to Offer a Renewal Principal Contract** | ☑ | ☑ | ☑ | Majority of the serving members | ☑ If Vote Failed until Vote to Begin Principal Selection |
| **Motion to approve budget transfers** | ☑ | ☑ | ☑ | Supermajority **(quorum +1)** | |

## QUORUM REQUIREMENT FOR MOTIONS

**A quorum is the minimum number of members needed to be physically present to conduct business, regardless of how many members are serving on the LSC.**

The **elementary** school with a traditional LSC the quorum is **ALWAYS 7** members.
The **high school** with a traditional LSC the quorum is **ALWAYS 8** members.

**ALSC/BOG quorum is one half of the full membership plus one. Please refer to Part One of this guide under the section titled, "COMPOSITION OF MOST LOCAL SCHOOL COUNCILS OF SCHOOLS <u>NOT</u> DESIGNATED AS AN ALTERNATIVE SCHOOL" membership counts for each type of ALSC/BOG.**

If there is no quorum, no business may be conducted and no votes may be taken. Members present may discuss the issues on the agenda, but **cannot take any formal actions.**

Exception: If the number of serving members is less than the quorum, then an Elementary school LSC may meet to fill parent and/or community vacant seats with four (4) members present as long as two of the members are Parent or Community members.

**OR**

Exception: If the number of serving members is less than the quorum, then a High School may meet to fill parent and/or community vacant seats with five (5) members present as long as two of the members are Parent or Community members.

The only actions that can be taken are those used to vote on adding Parent or Community members to fill vacancies. Once enough members have been added so the serving members are equal to quorum, then normal quorum rules are applied.

**If a quorum is present, then the LSC members can make and vote on motions.**

- An LSC member must be recognized by the Chair before obtaining the floor to make a motion. This means the Chair of the meeting must say, "It is your turn or you have the floor," etc before you can make a suggestion or give your opinion about what the LSC should do with a motion.
- Once you have the floor, you may make a formal proposal, or motion, beginning with the statement, "I motion that..."
- Someone else must second the motion by saying, **"I second the motion**." If the motion is not seconded, it dies.

- Once a motion is made and seconded, the Chair states the motion so everyone is clear on what is being proposed. From this point, until the motion has been voted on, all discussion must focus on the motion.
- After stating the motion, the Chair asks for discussion.
- If members wish to discuss the motion, the Chair opens debate. Each participant may speak to the question twice, but no one may speak the second time until everyone has had the chance to speak once.
- A member may propose an amendment to a motion. Information on proposing an amendment follows the motion form items in this part of the LSC guide.
- Once discussion/debate is complete, the Chair or any LSC member calls the question.
- After everyone has had a chance to join the discussion on the motion – **or there is no discussion,** the **Chair** takes the vote. Votes may be taken by voice, show of hands, or calling the roll to note each member's vote.
- If this has someone participating virtually, then all votes must be roll-call votes in order to allow the public to hear how each member voted.
- The Chairperson announces the vote. "**Let the record show that the motion (passed or failed) with a vote of for, against, and abstention**."

**Example of Proposal and Discussion of a Motion**

- The LSC member should ask to be recognized: **"Madam - Mr. Chair?**"
- The Chair recognizes the LSC Member.  **"Mr. - Ms. Smith has the floor."**
- The LSC member states their motion: "We have $5,000.00 in **discretionary** funds. **I move that we use $500 from those funds to purchase Great Books material for grades 1 to 3."**
  - The Chair may say: **"There is a motion on the floor, do I hear a second?"**
  - A motion **"dies"** if it is not seconded. Another member can say, **"I second the motion.**

- If your motion is seconded, the chair restates the motion: **"A motion is on the table that we use $500 in  discretionary money to purchase Great Books material for grades 1 to 3."**
- The chair then opens the motion for discussion, **"Any discussion?"**
- If recognized, the LSC member may say, **"I think that our children need to be exposed to great literature at an earlier age. Right now our Great Books program only serves grades 4 to 8."**
- **Note: A member of the LSC may recommend an amendment of the motion. See section in this guide after the forms on proposing a motion for information on amending a motion.**
- After everyone has had a chance to join the discussion on the motion, the chair takes the vote. **"All in favor of the motions to use $500 in  discretionary   money to**

purchase Great Books material for Grades 1 to 3, please say aye. All opposed, say No. Any abstentions?"

- Votes may be taken by a voice (aye, no) show of hands or by calling the roll to note each member's vote. (See the section on Voting Rules on page 28 and Chart on page 30.) If this is a virtual meeting, then all votes must be **"Roll-Call"** votes.
- After the votes are tallied, the chairperson announces the vote. **"Let the record show that the motion (carried-failed) with a vote of ___ for, ___ against, and ___ abstention.**

| | |
|---|---|
| 1. | The LSC member should ask to be recognized: **"Madam - Mr. Chair?**" |
| 2. | The Chair recognizes the LSC Member. **"Mr. - Ms. Smith has the floor"** |
| 3. | The LSC member states their motion: "We have $5,000.00 in **discretionary** funds . **I move that we use $500 from those funds to purchase Great Books material for grades 1 to 3."** <br> ○ The Chair may say: **"There is a motion on the floor, do I hear a second?"** <br> ○ A motion **"dies"** if it is not seconded. Another member can say, **"I second the motion.** |
| 4. | If your motion is seconded, the Chair restates the motion: **"A motion is on the table that we use $500 in discretionary money to purchase Great Books material for grades 1 to 3."** |
| 5. | The chair then opens the motion for discussion, **"Any discussion?"** |
| 6. | If recognized, the LSC member may say, **"I think that our children need to be exposed to great literature at an earlier age. Right now our Great Books program only serves grades 4 to 8."** |
| **Note: A member of the LSC may recommend an amendment of the motion. See section in this guide after the forms on proposing a motion for information on amending a motion.** | |
| 7. | After everyone has had a chance to join the discussion on the motion, the chair takes the vote. **"All in favor of the motions to use $500 in discretionary   money to purchase Great Books material for Grades 1 to 3, please say aye. All opposed, say No. Any abstentions?"** |
| 8. | Votes may be taken by a voice (aye, no) show of hands or by calling the roll to note each member's vote. (See the section on Voting Rules on page 23.) |
| 9. | After the votes are tallied, the chairperson announces the vote: **"Let the record show that the motion (carried-failed) with a vote of ___ for, ___ against, and ___ abstention.** |

# SAMPLE MOTION FORM

_____ **LOCAL SCHOOL COUNCIL**

**Motion Form#**_____
**Date**_____

**Motion Made By**:_____ **Seconded By**:_____

**Motion:** _____
_____
_____
_____

**RESULTS**____**To**_____ _____ _____=_____ **MOTION CARRIED?**____**Yes**___ **No** ▬

       *(YES)*   *(NO)*   *(ABSTAIN)*   *(ABSENT)*   *(TOTAL)*

Record of Votes On Motion:
General_____Special_____ (**NOTE\* In a Transfer of Funds vote, a yes vote of eight (8) in elementary schools and nine (9) in high schools is needed**.)

S

| | | COUNCIL MEMBER | YES | NO | ABSTAIN | ABSENT | NOT ELIGIBLE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Signed_____ Date_____ # of Vacancies_____

## SAMPLE OF A COMPLETED  MOTION FORM

### **Westinghouse** LOCAL SCHOOL COUNCIL

**MOTION FORM #**            **35**
**DATE**                     April 27, 2026
**MOTION MADE BY**           Jody Lyons
**SECONDED BY**              Nelson Thomas

**MOTION**                   Move to authorize principal to organize parent resource center in collaboration with the local library.


**Results:**  _12__   _____   _____   _____   _12__   *MOTION CARRIED?* Yes _X_, No ___
     *(YES)*    *(NO)*   *(ABSTAIN)*  *(ABSENT)*  *(TOTAL)*

**RECORD OF VOTES ON MOTION: General**      _12__      **Special**      _____

|    |    | COUNCIL MEMBER | YES | NO | ABSTAIN | ABSENT | NOT ELIGIBLE |
|----|----|----------------|-----|----|---------|--------|--------------|
| P  | VC | Jody Lyons     | X   |    |         |        |              |
| P  |    | Flora Ogden    | X   |    |         |        |              |
| P  |    | VACANCY        |     |    |         |        |              |
| P  | C  | Ana Rodriguez  | X   |    |         |        |              |
| P  |    | Nelson Thomas  | X   |    |         |        |              |
| P  |    | Vicki Thomas   | X   |    |         |        |              |
| C  |    | Rita Mitchell  | X   |    |         |        |              |
| C  | S  | Stella Young   | X   |    |         |        |              |
| T  |    | Delia Key      | X   |    |         |        |              |
| T  |    | Barnard Lewis  | X   |    |         |        |              |
| Pr |    | Danny Chase    | X   |    |         |        |              |
| NT |    | Jerome Jones   | X   |    |         |        |              |
| S  |    | Jim Smart      | X   |    |         |        |              |

**SIGNED:** Stella Young          **DATE: 4/27/2026**     **#VACANCIES:**      1

_____   _____   _____

**SECRETARY**

## HOW TO AMEND A MOTION

- A member may wish to make an amendment to a motion: "I wish to amend the motion to..."
- The amendment must also be seconded. (If it is not seconded, it dies and the original motion stands). If it is seconded, the Chair restates the amendment: "There is an amendment to the motion that we..."
- The Chair invites the member who proposed it to open discussion on the amendment: "Would you like to open the discussion on the amendment?"

**That member then responds to or adds to the discussion.**

- After discussion, the Chair repeats the amendment: "We are voting on the amendment that we..." All in favor of the amendment, please say aye; all opposed, say no; any abstentions?" (May be a roll call or raised hands.)
- If the amendment passes, the Chair will state: "The motion now on the table is to..."
- If the amendment fails, the Chair restates the original motion: "The motion now on the table is that we..."
- The Chair opens discussion of the original motion: "Any discussion on this motion?"
- After discussion on the motion, the Chair takes the vote as above and announces the results of the vote.

## VOTING RULES

A quorum is the minimum number of members needed to conduct business and to vote on any matter, regardless of how many members are actually serving on the LSC. In order to conduct business at any meeting, there must always be a quorum physically present (present in person) for the duration of the meeting.

**FOR TRADITIONAL ELEMENTARY SCHOOLS THE QUORUM IS ALWAYS 7.**

**FOR TRADITIONAL HIGH SCHOOL LSCs, THE QUORUM IS ALWAYS 8.**

**FOR APPOINTED LSCS, THE QUORUM IS ALWAYS ONE-HALF OF THE FULL MEMBERSHIP PLUS ONE.**

For most appointed elementary school LSCs, which have a full membership of 13, the quorum will be 7. For most appointed high school LSCs, which have a full membership of 14, the quorum will be 8. The quorum for appointed LSCs with full memberships other than 13 or 14 will be one-half of their full membership plus one.

If **there is no quorum**, no business may be conducted and no votes may be taken. The members present may discuss matters on the agenda but **cannot** take any action.

In most, but not all, cases, the number of votes needed to pass a motion will be a simple majority of the members who are **currently serving** on the LSC.

**All votes** taken by the Local School Council must be taken in an open session, by either a voice vote, by a show of hands or by roll call, and the minutes must indicate how the LSC members voted. If this is a virtual meeting, all votes must be taken by "Roll Call Vote".

Local School Council members **may not vote by secret ballot nor take any final action at a closed session on any issue.**

On votes to **Evaluate, Retain or Select** a contract principal by **traditional LSCs** or votes to **Evaluate, Recommend the Retention or Recommend the Selection** of a contract principal by **appointed LSCs,** the principal and student(s) representative **cannot** be considered in determining if a quorum is present. LSC meeting minutes must reflect the members who were physically present as well as those attending by other means.

If a quorum is physically present, a majority of the members currently serving, not a majority of the members present at a meeting, must vote in the affirmative on matters for the LSC to approve the matter in most instances.

## VOTING RULES: LSC's with Membership Below Quorum
## Traditional LSCs

- Councils that do not have enough serving members to meet quorum requirements may be able to meet an alternative set of quorum requirements that allow the council to fill Parent and Community seats.

- Elementary Schools: The LSC may meet to fill Parent and Community Vacancies if the LSC has four (4) members present and at least two of the members are Parent and/or Community members. The only action that can take place is the process of filling the vacancy. The Chair-Person or Four LSC members may call a special meeting to fill the vacancies and motion to fill the vacancy can be approved by a majority of the members present voting "Yes".

- High Schools: The LSC may meet to fill Parent and Community Vacancies if the LSC has Five (5) members present and at least two of the members are Parent and/or Community members. The only action that can take place is the process of filling the vacancy. The Chair-Person or Five LSC members may call a special meeting to fill the vacancies and motion to fill the vacancy can be approved by a majority of the members present voting "Yes".

## VOTING AND QUORUM RULES FOR GENERAL MOTIONS

**When can an LSC vote?**
- An LSC may vote only when a quorum is physically present.

**What if a quorum is not present?**
- If a quorum is not present, the members present may discuss matters on the agenda but
may not take action on them.
- The LSC may only take steps to obtain a quorum, decide if and when to take a recess to wait for additional members to arrive or decide if and when to adjourn if no additional members arrive.

## NOTE: Vacancies do not lower the quorum number. Quorum always remains the same number.

**If a quorum is present, how many votes are needed to pass a motion?**
- In most instances*, a majority "Yes" vote of the currently serving membership is needed to pass a motion. See the chart below.

| MEMBERS CURRENTLY SERVING | YES VOTES NEEDED TO PASS A MOTION IN AN ELEMENTARY SCHOOL LSC | YES VOTES NEEDED TO PASS A MOTION IN A <u>HIGH SCHOOL LSC</u> |
|---|---|---|
| 16 | --- | 9 |
| 15 | --- | 8 |
| 14 | --- | 8 |
| 13 | 7 | 7 |
| 12 | 7 | 7 |
| 11 | 6 | 6 |
| 10 | 6 | 6 |
| 9 | 5 | 5 |
| 8 | 5 | 5 |
| 7 | 4 | *No Quorum On Traditional LSCs |
| 6 | *No Quorum On Traditional LSCs | *No Quorum On Traditional LSCs |

**\*An appointed LSC may be able to achieve quorum with 6 members, depending on its full membership. In that case, 4 votes would be needed for a general motion to pass.**

## VOTING TO APPROVE CIWP (CONTINUOUS IMPROVEMENT WORK PLAN —THE SCHOOL IMPROVEMENT PLAN)

**Prior to voting on the CIWP the Principal and LSC must present the CIWP to the public and allow the public to comment and make recommendations.**

Motion to Approve and/or Amend the Continuous Improvement Work Plan (CIWP):
- Requires another member to second it
- Is Debatable
- To pass, requires a "yes" vote of the majority of the serving members

**Example**: "I move that the school's continuous improvement work plan for the__to___ school year, dated as of [month] [day], [year], be approved in all respects."

**Example:** "I move that the school's continuous improvement work plan for the___ to___ school year, dated as of [month] [day], [year], be approved as amended."

Voting Rules For Approval of the CIWP
- When a quorum is physically present, the voting rules for passing general motions apply to the vote to approve the CIWP.

**VOTING TO APPROVE SCHOOL BUDGET**
**Prior to voting on the School Budget the Principal and LSC must present the Budget to the public and allow the public to comment and make recommendations.**

Motion to Approve and/or Amend the School Budget:
- Requires another member to second it
- Is Debatable
- To pass, requires a "yes" vote of the majority of the serving members

**Example:**
"I move that the school's budget for the ___ to_____ school year. dated as of [month] [day], [year], be approved in all respects."
Motions to Amend Allocation of Funds in the proposed School Budget Require another member to second it
- Are Debatable
- To pass, requires a "yes" vote of the majority of the serving members

Motions to Amend an approved Budget and Motions to transfer Previously Allocated money within funds

- Require another member to second it
- Are Debatable
- Require at least eight (8)  "yes' votes to pass for an elementary school LSC, nine (9) "yes" votes to pass for a high school LSC and ten (10) "yes"  votes in a school with a Boards of Governors (Military High Schools)

**Example:**
"I move to transfer the previously allocated funds in the amount of [x] dollars from being allocated to [XXX          ] to being allocated to [YYY   ]."

Motion to Allocate New, and/or Previously Unallocated Funds
- Requires another member to second it
- Is Debatable
- To pass, requires a "yes" vote of the majority of the serving members

**Example:**
"I move that the previously unallocated funds in the amount of [x] dollars be allocated to [Y ]."

# VOTING AND QUORUM RULES FOR PRINCIPAL SELECTION, EVALUATION, AND RETENTION

The **principal** and the **student** representative(s) **may not be counted for determining a quorum and may not vote on the following matters:**
- Selecting a contract principal (traditional LSCs)
- Recommending three (3) candidates for contract principal in order of preference to the CEO (traditional LSCs)
- Recommending candidates for contract principal
- Renewing a principal's contract (traditional LSCs)
- Recommending the renewal of a principal's contract (appointed LSCs)
- Evaluating a contract principal
- Approving additional terms to principal contract or renewal contract  (traditional LSCs only)

**7 votes are always needed for a traditional LSC to** enter into the first contract(with or without an addendum) for **a new contract principal, regardless of the number of vacancies**

A majority **"yes"** vote of the currently serving membership is required for an LSC to:
- Evaluate a contract principal
- Renew or recommend the renewal of a principal's contract
- Approving additional terms to principal's renewal contract (traditional LSCs only)

- Submit 3 contract principal candidates to the CEO
- Appointed LSC and Boards of Governors (BOG) submit 1 to 3 contract principal candidates to the CEO

## SCHOOLS ON PROBATION
### School Improvement Plan and Budget

The Illinois School Code provides that each school placed on probation in years 1 through 4 shall have a school improvement plan and a school budget for correcting deficiencies identified by the Board. In compliance with that statutory provision, the CEO or designee (the school's Network Chief) develops, and the Board approves, school improvement plans for schools placed on probation that contain specific steps that the local school councils and the school's staff must take to correct the identified deficiencies. Also, in compliance with that provision, the CEO or designee develops, and the Board approves, budgets for schools placed on probation that include specific expenditures directly calculated to correct the educational and operational deficiencies identified at the school. All budget amendments are also approved by the CEO or designee. However, the schools that have been on Probation for 5 or more years regain the authority to develop and approve both the CIWP and the Budget.

This means that the LSCs of schools placed on probation for less than 5 years do not have the authority to approve the CIWP, the School Budget or any Budget Transfers. However, the LSCs remain an important part of the process in developing and monitoring the CIWP. In developing the CIWP and the corresponding school budget, the Network Chief and principal will consult with the LSC and all involved parties. The CIWP and school budget will then be approved by the Network Chief before being submitted to the Board of Education. Once the school is no longer on probation or has been on probation for 5 or more years the LSC will have the authority to approve the CIWP and school budget plan.

### Principal Retention/Selection Process

In most instances, the LSCs of schools placed on probation have the authority to retain the school's contract principal for a new four-year term or to select a new contract principal. Pursuant to its statutory powers over schools on probation, the Board of Education has the authority to reconstitute such schools or to remove their contract principals. If the Board exercises either power over a school on probation, the following will occur:
The school will remain on probation until it makes Adequate Yearly Progress for two (2) consecutive years or five (5) years pass from the date the Board takes such action, whichever occurs later;
- If the principal was removed as part of the probation process the LSC will not have the authority to select a new contract principal until the school is no longer on probation.

- If the school is on probation for 5 or more years and the principal was removed by the Board as one of the probation actions then the LSC works with the Network to identify the serving principal for the school.

For further information on probation, please refer to the Board's School Performance, Remediation and Probation Policy for the current school year.

**MEETING RECORDS (MINUTES)**

The Illinois Open Meeting Act requires that LSCs must maintain written minutes of all meetings, including closed sessions and all LSC committee meetings.
The following lists indicate requirements for records of meetings.
- Minutes of open meetings must be approved within thirty days or two (2) regular meetings after the meeting for which the minutes were taken, whichever is later.
- Approved minutes must be made available to the public within ten (10) days after their approval by the LSC.
- It is also requested that the minutes be sent to the Network Office within ten (10) days of their approval (the Principal may have them faxed or sent in the CPS mail run to the Network Office).

We recommend that schools keep copies of the following open meeting records in a binder kept in the school's main office so that they are readily available to anyone who requests to review or inspect them:

- Notices and Agendas
- Member Sign-in Sheets (if maintained)
- Public Speaker Sign-in Sheets (if maintained)
- Approved Minutes of Open Sessions
- Approved Minutes of Closed Sessions the LSC Voted to Make Public

Minutes of closed sessions or meetings may be kept **confidential.**

**Maintaining Confidentiality:**
At least every six (6) months, LSCs must review the need to maintain the confidentiality of closed meeting minutes and must determine, by vote in an open session, whether to maintain the confidentiality of the minutes. If kept confidential, we recommend that the minutes of closed meetings or sessions be maintained separately from the open meeting minutes.

**All** closed sessions or meetings must also be video or audio recorded. The following list summarizes the requirements for meeting records.

**Summary List of Requirements for Meeting Records**

- Agenda and notices of meetings are legal documents of the LSC.
- Minutes are required of **all** LSC meetings, open and closed, and of all LSC committee meetings.
- If the council approves, the secretary may use a phone or <u>tape recorder</u> to record the meetings. Each tape becomes part of the legal record and must be labeled and kept as part of the minutes. If a phone is used then the recording should be downloaded to a USB Drive and the drive is labeled and becomes part of the legal record and kept as part of the minutes.If the recording was of a closed session the recording must be deleted from the phone.(Members of the public may also record the LSC meeting, but their tapes are not official records.)
- If the secretary makes a recording of the meeting for personal use, that recording is NOT a part of the official record.
- The secretary is to present the written minutes for approval by the council.
- Audio or video recording must be made at **all** closed sessions and the recording must be kept for at least 18 months.  The recording may only be destroyed if the LSC has approved written minutes of the closed session, has voted to destroy the recording and at least 18 months have passed since the closed meeting..
- We recommend that each council member receive the written minutes of the open meeting  at least two to seven days before the meeting so that they can read the minutes and make corrections if necessary. Copies should be made available to the public at each meeting.
- Minutes shall be approved within 30 days after the meeting or at the second subsequent regular meeting, whichever is later.
- Once the open meeting minutes are approved, a copy is sent to the Network Office.
- Minutes must also be kept in a binder in the main office and be made available to the public within 10 days after being approved.
- Verbatim record of public comment is NOT required to be included as part of the meeting  minutes.

**Minutes must include the following:**

- Date, time, place of meeting and name of school
- Type of meeting (Regular, Special, Committee)
- Members present physically
- Members participating by virtually
- Members absent
- A summary of all matters proposed, discussed, or decided upon
- A record of any votes taken
- If a member is tardy or leaves early, the minutes should reflect the time he/she arrives or leaves
- Whether quorum is or is not physically present

**Requirements for all posted and or scheduled meetings of the LSC.**

- A LSC member must be present and call the meeting to order at the scheduled time.
- A LSC member takes attendance and minutes
- If a quorum is present physically the meeting may proceed.
- If a quorum is not present physically at the meeting, the LSC member(s) present at the meeting may adjourn the meeting for lack of a quorum, OR attempt to bring additional members to the meeting.
- If the LSC members in attendance, without quorum decide to move forward with the meeting, the members may only discuss topics on the agenda, then public comment should be allowed.

NO member of the LSC (this includes LSC Chairs and Principals) may unilaterally cancel a meeting that was properly noticed (agenda posted) before the start of the meeting,

Members absent from a regular scheduled meetings (with quorum) who are absent may be removed for missing three (3) regularly meetings in a row or five (5) regular meetings in a twelve (12) month period.

## SAMPLE MINUTES

The **March 9, 2026** regular meeting of the John Doe Local School Council was called to order by the chairperson, Mrs. Annie Smith, at 7:00 p.m., in the school's lunchroom. A quorum was present.

**Members in attendance were:** Mrs. Annie Smith, Mr. John Smith, Ms. Pamela Jones, Mrs. Alice Green, Mrs. Maria Martinez, Mr. Angelo Gonzalez, Ms. Jane Stein, Ms.
Nellie Price and Mr. Steve Johnson, Principal.

**Members not in attendance were**: Mr. Alex Jones and Ms. Sonia Angels.

A motion was made by Mrs. Maria Martinez to approve the agenda. The motion was seconded.The motion passed with 9 yes votes, 0 no votes and 0 abstentions.

The minutes of the **February 6, 2026** meeting were approved as read. (Or, the minutes of the **February 6, 2026** meeting were approved as corrected.) **(List Corrections**)

The secretary, Ms. Pamela Jones, read the correspondence. Letter, informing the LSC of training sessions, from Local School Council Relations. Motion made by Mrs. Pamela Jones and seconded to send three LSC members to the training. Motion passed 6 yes 2 no and 1 abstention.

Committee Reports were given by the following:
**BAC** (Bilingual Advisory Committee) - Mrs. Ortiz, Chairman of the BAC reported that textbooks have been received and that testing for the bilingual students has been completed.

**ESSA/Title I PAC** (Parent Advisory Council)- Mrs. Green, Chairperson, submitted the PAC monthly meeting report.

**PPLC** - The PPLC Chairman, Mrs. Horton, reported that the PPLC has prepared recommendations for the principal and LSC to consider for the 2026-2027 CIWP.

**Principal's Report** - Mr. Johnson reported that attendance for the previous month was up. There is a balance of $1,000.00 in the internal accounts. A motion was made by Mr. Johnson and seconded to accept the internal accounts report as given. Motion passed unanimously.

**Old Business -** There was no old business
**New Business** -The Principal Evaluation Committee will meet on April 14, 2026 at 6:00pm. in the school's lunchroom.

**The meeting was adjourned at 9:05 p.m.**
**Next meeting will be held on April 22, 2026 at 7:00pm**

**Respectfully submitted,**
(Secretary's signature)

**These minutes were approved as read (corrected) on**_____ .

# FREQUENTLY ASKED QUESTIONS AND ANSWERS

**How can LSCs receive help?**

LSCs may request assistance from the Office of Local School Council Relations, 773-553-1400.

**QUESTIONS ABOUT MEETINGS**

**May LSCs meet between the time of the election and June 30 in an election year?**
- Yes, LSCs may continue to meet and conduct business until the end of the term, June 30, in election years.
  - However, if the only, or remaining, child(ren) of a parent representative graduate(s) or is (are) voluntarily transferred at the end of the school year, the parent representative's term automatically ends as of the last day of the school year. Therefore, such parents cannot participate as LSC members in any LSC meetings conducted after the last day of the school year.

**Should LSCs provide interpreters at LSC meetings?**

Yes. LSCs are encouraged to provide interpreters, if possible  (including sign language) at meetings as needed in order to maximize the participation of parents and the community.

**How does an LSC call a Special Meeting?**
- The Chair or any four (4) LSC members of a traditional elementary school LSC or five(5) members of a traditional high school LSC may call Special Meetings by giving written notice specifying the time, place, and purpose of the meeting to each LSC member prior to the meeting and posting a notice and agenda for the meeting at the school and other meeting location at least 48 hours in advance. The Chair or four or five members calling the meeting are to place their names and/or signatures on the meeting notice and agenda to disclose who has called the meeting.

**Who presides at Special Meetings?**
- The Chair presides at all meetings, even Special Meetings that have been called by four or five other LSC members. If the Chair is absent, the Vice Chair (or other member designated in the LSC bylaws, if any) will preside.

**What notice is required for reconvening a meeting?**
- The LSC must give written notice, including the agenda, to reconvene an unfinished meeting at least 48 hours before the meeting is reconvened unless:
  - (a) the original meeting was open to the public;
  - (b) there is no change in the agenda; and
  - (c) the reconvened meeting will be held within 24 hours of the original meeting or

○ (d) the time and place of the reconvened meeting are announced at the original meeting.

**If the LSC does NOT have quorum and is considering cancellation of a meeting, the following must happen first:**
- A member of the LSC must still be present at the location of the scheduled meeting
- Public comment should still be taken (if applicable)
- Take attendance via meeting minutes
- Members may discuss agenda items (but may not vote)
- If the council desires to cancel a FUTURE meeting, they must place the time and date of the meeting to be canceled on the agenda of a meeting prior to the meeting they plan to cancel.

**What if the LSC cancels a meeting?**
- If possible, the LSC should notify the public by posting a notice of cancellation at the school and having the school send the notice home to parents. Meetings may not be cancelled without approval of the LSC by majority vote of the LSC at a LSC meeting conducted prior to the cancelled meeting.

**When is the LSC required to allow public participation at LSC meetings?**

- The LSC is required to allow public participation at all open meetings, whether regular, special. The LSC may adopt and publish reasonable rules governing public participation.

**Does the OMA (Open Meeting Act) apply to retreats or sessions arranged solely to provide training for LSC members?**
- No, as long as no LSC business is discussed.

**Does the OMA apply to social gatherings of LSC Members?**
- The OMA does not apply to purely social gatherings where LSC business is not discussed. If proper notice has not been given, including an agenda, LSC members may not discuss LSC business at the social gathering.

**What if the LSC violates the OMA?**
- If an LSC violates the OMA, any person may file a lawsuit against the LSC in Cook County Circuit Court or may file a complaint with the Cook County State's Attorney, who may also file the lawsuit. The lawsuit must be brought within 60 days of the failure to comply with the OMA or when the State's Attorney discovers the violation. A lawsuit may even be brought before the LSC holds its meeting, if it appears that the LSC will not comply with the OMA in holding the meeting.

- If the Court finds that an LSC violated the OMA, the court may grant any relief it deems appropriate. Most courts, however, will require that the non-compliance be cured, either through making part of the meeting open to the public or by affirming the LSC action in public session. The court may also order the LSC to pay the attorney's fees and litigation costs for the lawsuit. Any LSC that has been found by the court to have violated the OMA may also be found guilty of a Class C misdemeanor, which can carry imprisonment and a fine.

- Alternatively to a civil action against the LSC or a complaint to the State's Attorney's Office, any person who believes an LSC has violated the OMA may file a complaint with the Illinois Attorney General's Public Access Counselor within 60 days of the violation. The Public Access Counselor may investigate the complaint and may request records from the LSC. Within 7 business days, the LSC must provide the requested records and may respond in writing to the complaint. Thereafter, the Attorney General may issue a binding opinion concerning the alleged violation. If the opinion finds that a violation occurred, the LSC must take necessary action as soon as practicable to cure the violation or must file an action for administrative review of the opinion.

**What if the LSC has questions about the OMA?**

Call the Office of Local School Council Relations at (773) 553-1400 or scan the QR code below to review the Frequently Asked Questions about OMA from the Illinois Attorney General.



## Meeting Agenda Resource: Inspiring Quotes

**SCHOOL PROGRESS**

**Starts with hope…**

Where there is hope, there is life. Where there is life there is possibility, and where there is possibility, change can occur.
Jesse Jackson

Donde hay esperanza, hay vida. Donde hay vida hay posibilidad, y donde hay posibilidad, un cambio puede ocurrir.
Jesse Jackson

**Takes thinking ahead…**

Never be afraid to sit awhile and think.
Lorraine Hansberry

Nunca temas sentarte un largo rato y pensar. Lorraine Hansberry

**Focuses with goals…**

Education is the key to unlock the golden door of freedom.
George Washington Carver

La educación es la llave para abrir la puerta dorada de la libertad.
George Washington Carver

**Requires leadership…**

Give me leverage, and I will move the Earth. (Greece)

**Requires respect…**

He who does not know one thing knows another. (Kenya)

**Requires commitment…**

You must be the change you wish to see in the world.
Mahatma Gandhi

Dame ventaja, y moveré la Tierra. (Griego)

Aquel que no sabe una cosa sabe otra. (Kenya)

Debes ser el cambio que deseas ver en el mundo.
Mahatma Gandhi

**Requires communication…**

Lower your voice and strengthen your argument. (Lebanon)

Baja la voz y fortalece tu argumento. (Líbano)

**Develops with cooperation…**

The best leader is never recognized. People turn to one another and say, "We did it ourselves." (Zen)

El mejor líder nunca es reconocido. Las personas se miran una a la otra y dicen "Lo hicimos nosotros mismos." (Zen)



# Local School Council Resource Guide

## Part Three: School Improvement
### Continuous Improvement Work Plan (CIWP)

**Introduction**

This part of the LSC Resource Guide explains the important role of the Local  School Council's role in developing and supporting the Continuous Improvement Work Plan (CIWP). This guide explains the CIWP. The CIWP relates to another important part of school decision-making: the budget. The CIWP is a plan to achieve progress that then guides uses of the school's funds. However, the budget does not drive the CIWP.

# The Continuous Improvement Work Plan (CIWP)

The Continuous Improvement Work Plan (CIWP) is a comprehensive school-wide plan to improve the education of students. Each school must prepare this improvement plan for increased student achievement. The CIWP is an accountability tool for the Local School Council, the school community, the school district, and the Illinois State Board of Education. This Section explains how the LSC can use the CIWP to monitor school progress.

The school community sets goals for progress in the CIWP and then organizes action steps to accomplish those goals. The CIWP is an ongoing planning, acting, evaluation, and improvement process. The LSC has an important role in making and monitoring the plan. The LSC can check the progress toward meeting the goals and adjust the plan as necessary.

The CIWP is a three-year plan. Planning the next CIWP cycle begins during the second semester of the third year of the current CIWP.

The CIWP **planning process** should begin by reviewing the current CIWP. Then, the school's strengths and weaknesses can be evaluated to identify opportunities and constraints. The strengths and weaknesses of the school are evaluated, and the school's academic performance for the last two and a half years are reviewed. This information guides the school in areas that need additional support and to set future goals.

Preparing the CIWP and using it to monitor school progress is detailed below.

# OVERVIEW

The Illinois School Code requires all schools to develop a plan, called the School Improvement Plan, to improve the quality of education provided by the school. The plan must include:

- Results of state tests;
- Measurable goals;
- Analysis of school performance;
- Professional development activities.

The Chicago Public Schools improvement planning process is the Continuous Improvement Work Plan or "CIWP." The CIWP has three purposes:

- The blueprint for the improvement of the school and the education of the students;
- An Implementation Plan that guides the work of all stakeholders in the school community;
- An accountability tool for the Local School Council, the school community, the school district and the Illinois State Board of Education.

All Local School Councils are responsible for presenting the CIWP to the school community and accepting public comment on the plan. All schools, except those on probation for less than five (5) years, have the authority to control the CIWP and approve it.

It is strongly encouraged that schools on probation for less than five years also get LSC approval of the CIWP.

**Planning the CIWP should:**
- Focus on the **strengths and needs** of the school.
- **Include parent/community** ideas.
- **Establish 2-3 Priorities**
- **Provide opportunities for members of the school community to have a say in the educational programs of the school.**

**Preparing the CIWP:**

- The **principal is responsible** for developing the CIWP and convening a CIWP team in consultation with the LSC, all categories of school staff, and parents, and community residents may be included.
- The CIWP is the basis for making the school's budget.
- The CIWP must include:
  - Measurable goals
  - Analysis of school performance

**The CIWP planning process should:**

- Make use of the varied expertise and experiences of members of the school community in establishing the CIWP Planning Team;
- Result in the establishment of realistic goals that will drive the continuous improvement cycle of the schools;
- Provide opportunities for members of the school community to have a say in the educational programs of the school;
- Focus the school community on the unique strengths and needs of the school
- Result in the planning of strong implementation plans that are likely to lead to significant progress at the school;
- Create a climate in which the school community agrees on what needs to be done, and works together to accomplish it;
- Include internal review progress to ensure the school is making progress towards its goals.

**Approving the CIWP:**

- The **LSC must present the proposed CIWP** to the parents and community before it is approved through public meetings on the plan for implementation.

- The LSC allows the public to comment and make suggestions on the CIWP
- All schools must approve the CIWP except for those schools on probation for less than five (5) years. (*For schools on Probation for less than 5 years it is recommended that the LSC also approve the CIWP).*

**Using the CIWP to Support Progress:**

- The **principal** is responsible for the **implementation** of the CIWP.
- The **LSC** is responsible for **monitoring** the plan. The LSC should check on the status of the implementation plans on an ongoing basis.
- The principal and LSC can use the **CIWP action planning website**
- https://ciwp.cps.edu to keep track of progress.
- The public can view the school's CIWP from this website https://cpsci.my.site.com
- The principal can propose changes to the CIWP. Changes can be made to action plans, and the school's budget can be adjusted if needed to support the changes. The LSC approves the changes.
- During implementation, the CIWP team can make changes to priorities. To do so, they submit an amendment for approval by the LSC.

## Responsibilities of the LSC and PPLC for the CIWP

Both the LSC and the School's Professional Personnel Leadership Committee (PPLC) have important responsibilities in the CIWP process.

**The Role of the PPLC**

- The role of the PPLC "is to develop and formally present recommendations to the principal and the local school council on all matters of the educational program, including, but not limited to curriculum, school improvement plan development and implementation, and school budgeting."
- Principals can involve the PPLC by appointing PPLC members to the CIWP team and/or creating opportunities for the PPLC to provide recommendations to the CIWP planning process.

**The Role of Traditional & Appointed LSCs**

Both Traditional and Appointed LSCs should participate actively in preparing the CIWP, however, the principal is responsible for the planning process and presents the final plan to the LSC.

Responsibilities of Traditional and Appointed LSCs**:**
- Approve the CIWP and any amendments to the CIWP, except for schools on probation for less than five (5) years**;**
- Monitor the implementation of the CIWP and the Budget;
- Hold a public meeting to present the proposed CIWP and Budget to the school community (the meeting must include an opportunity for public input and comment)
- Hold two well-publicized public meetings annually to report on progress and problems with implementing the CIWP.

**LSC Approval of the CIWP**

For schools on probation, the Network Chief develops the CIWP for schools on probation for less than five (5) years. For schools on Probation for five (5) or more years the LSC approves the CIWP and Budget

All schools, except for schools on probation for less than five years, the LSC maintains final approving authority over both the Budget and the CIWP and any revisions to the Budget or CIWP recommended by the Network Chief should be resubmitted by the school to the LSC for final approval.

The principal is responsible for developing the CIWP with input from a diverse group of stakeholders from the school. Parent and teacher participation is required. The principal should serve as the chairperson of the CIWP Team, appointing other team members from the school and community, including members from the LSC,

PAC, and all categories of school staff, including the PPLC.

The LSC must present the proposed CIWP to parents and the school community before approval. Once the LSC approves the CIWP, the principal is responsible for implementing the plan, and the LSC is responsible for monitoring its implementation.

The LSC must convene two (2) meetings during the school year to report to the school community on the school's progress and problems with implementing the CIWP.

## CPS Priorities and School Plans

Principal and LSC should be aware of current CPS focus and priorities and how these priorities align with the school's CIWP.

# DEVELOPING A NEW CIWP

Each school takes the following steps to organize the CIWP:

- Identify a CIWP team that consists of 8 – 12 committed stakeholders to act as the steering committee for the entire CIWP planning process. For all schools, parent and teacher participation is required in the plan's development. The principal should serve as the chairperson of the CIWP Team, appointing other team members from the school and community, which should include members from the PPLC, ILT, and/or LSC and PAC.

- Complete/update the school's self-evaluation using any available scorecard, performance, and/or survey data.

- Set **Goals** for each of the next three school years, including School level measures and State metrics.

## Making the Plan

- The principal establishes the CIWP Team, chairs the team meetings, and oversees the work.
- The CIWP team develops the plan collaboratively.
- The plan includes 2-3 priorities **focused on the school's selected Areas of Focus (Priority Areas)**.
- An **Action Plan** with checkpoints (action steps) is developed for each priority.
- The CIWP Team completes the **Fund Compliance** and Parent and Family Compact/Involvement Policy (if required).
- The CIWP Principal obtains LSC approval of the Budget and CIWP, and as necessary, the approval of the Network. While the budget approval is a separate activity, the budget supports the priorities planned in the CIWP.

## Approving the Plan

- The LSC and the Network must approve the plan (only Network approval is required for schools that have been on probation for less than five ( 5) years.

## Role of the LSC

- Conduct a well-publicized meeting to present the proposed plan to the school community at which the public is allowed to comment on the plan.

- Hold two more well-publicized public meetings annually to report on progress and problems with implementing the CIWP.

- Vote to approve or request changes to the CIWP.

# PLANNING YOUR SCHOOL'S CIWP

Every three (3) years, your school prepares a new CIWP. Then during the time period of that plan, the LSC monitors and adjusts the plan as necessary to meet the goals.

**Sample Schedule to Develop the CIWP**

During Year One of the new CIWP, the school implements the plan, and the principal and LSC monitor the plan. During The spring of Year One the school and the LSC review the CIWP and make adjustments if needed, for Years Two and Three.  The LSC presents the CIWP for Year Two and Three to the public and takes public comment, and approves the plan or the revised plan.

The LSC assesses the degree to which the school has accomplished the goals during the first year of the plan and reports the results to the public in the Annual Report of the LSC.

During Year Two of the CIWP, the school and LSC monitor the plan's implementation. During The spring of Year Two, the schools and the LS review the CIWP and make adjustments if needed for Year Three. The LSC presents the CIWP for Year Three to the public and takes public comment, and approves the plan or the revised plan.

The LSC assesses the degree to which the school has accomplished the goals during the second year of the plan and reports the results to the public in the Annual Report of the LSC.

During Year Three of the CIWP, the school and the LSC monitor the plan. During the spring of Year Three, the school and the LSC review the current CIWP and use the results to prepare the foundation for the new CIWP three year plan.

The school prepares the next three-year plan in the spring of the third year of the plan. The LSC presents the new CIWP three-year plan to the public and takes public comment on the plan. The LSC then approves the next three-year plan.

The principal assesses the degree to which the school has accomplished the goals of the current three (3) year plan and reports those results to the LSC.  The LSC reports the results of the three (3) year plan as part of the Annual Report that the LSC makes to the public.



# LOCAL SCHOOL COUNCIL

# RESOURCE GUIDE

## Part Four: Budgeting to Support School Progress

**Introduction**

As a Local School Council member, you play a critical role in developing, approving and monitoring your school budget. You will be making decisions on how millions of dollars are spent each year. This guide is designed to help you make the best possible decisions on how your school's money is spent so that dollars are used to support educational improvement and student achievement.

This guide is designed to enable you to:

• Have a solid understanding of your roles & responsibilities as a LSC member in regards to the school budget.

• Understand the funding sources of your budget and how funds are allocated and be comfortable with reviewing budget and other financial reports.

• Be familiar with how to monitor and approve changes to the budget on an ongoing basis and understand how internal accounts work and are monitored.

## SCHOOL BUDGET BASICS

## Major Funding Sources

The budget is prepared each year and covers twelve months, which is referred to as the fiscal year. For CPS, the fiscal year is July 1 to June 30.

The money in school budgets, like the money for all of CPS, comes from three major revenue sources:

• City of Chicago property taxes and other local sources
• Funding from the State of Illinois
• Funding from the federal government (e.g. Title I, Title III)

Funds are allocated to schools based on different methods, which are often defined by the source of the funds. These allocation methods are described in the sections that follow. Most funds are restricted—limited to a certain kind of use—and that is determined by the source of the funds.

For tracking purposes, each source of funds has its own fund number and many also have a grant number, which provides for even more detailed tracking. Some grant numbers change each fiscal year because we receive different grants from the federal or state government. This might be confusing if you look for the same grant number each year. We have tried in this document to highlight for you when the grant number for the same funding may change from year to year.

Some funds "carry over" or "roll over" —which means that the school will still be able to use those funds the next school year if they are not completely used by the end of the fiscal year.

The following chart is a summary that lists the source of funds, the fund number, a brief description, restrictions, and whether funds roll over. Later sections go into more detail.

## Sources and Restrictions on School Funds

| Fund | Fund Number | Description | Restrictions on how funds are used | Do funds roll over to next year? |
|---|---|---|---|---|
| **Needs-Based Flexible Funding** | 115 | Schools receive a per-pupil amount to be used for additional teaching positions, additional administrative staff, and non-personnel items. | These funds are intended to supplement the core teacher and administrative allocation provided to your school. | No |
| Core Positions | 115 | Positions allocated for the core administrative and instructional purposes for K-12 general education and diverse learner instructional programs outside of OSD cluster classrooms. All schools receive 1 principal, 1 assistant principal, 1 counselor, and 1 clerk, along with a core set of teachers to provide a rich instructional offering, which can be staffed at the discretion of the school. | These are allocated as positions and not dollars. Schools do not need to worry about the cost of these positions as they are paid for centrally. | No |
| **Diverse Learners** | 114, 220 | Schools receive separate funding to serve the needs of diverse learners in cluster classrooms. Each school is allocated a number of special education teachers and paraprofessionals, based on the number of cluster classrooms. | Positions must be used to serve diverse learners.<br><br>Fund 114 is used for diverse learner spending from local and state sources, and fund 220 is for spending from federal sources. | No |
| **Title I** | 332 | Supplemental discretionary dollars from the federal government that are also distributed based on your school's Poverty Index and not all schools qualify for Title I. | Title I funds must be used to supplement your school's instructional program. They cannot be used for non- instructional purposes, and they cannot be used to fulfill any district requirement. | No |
| **Early Child-hood** | Usually 362 | Schools receive separate funding for their preschool students. Pre-K students are not counted in the Needs-Based Flexible Funding per-pupil calculations. The Office of Early Childhood Education allocated teachers and aides to schools for preschool classrooms. | Positions must be used to serve preschool students. | No |
| **Bilingual** | 115 (state)<br><br>356 (federal) | Funds for schools with 20 or more English Learners(ELs) of the same language background for a Transitional Bilingual Education (TBE) Program. Schools with 19 or fewer ELs of the same language background must provide a Transitional Program of Instruction (TPI). | TBE and TPI services might be provided by the classroom or content teacher who holds the appropriate endorsement, or by a teacher who pushes in and co-teaches for part of the day. | No |

## Explanation of the Fund Categories

***Needs-Based Flexible Funding (Fund 115):*** Most schools receive their funds for general education and diverse learner core instruction through. Four positions, principal, assistant principal, counselor and clerk, are called "Foundation Positions," and each school receives one of each position. These positions are found in fund 115, Grant 000000. Schools receive a core allocation of teachers based on opportunity index and enrollment. These teachers are funded out of Fund 115, Grant 000570. Rather than schools paying for these positions, schools choose to staff teachers in these positions and then costs are covered centrally. This means that schools can choose their teaching staff without having to worry about paying for more veteran or experienced teachers. Finally, schools also receive a per-pupil allocation in Fund 115, Grant 000575, which are used for additional teaching positions, additional administrative staff, and non-personnel.

As a short-hand, we often combine the fund and grant together in a single number, such as 115-000000 or 115-000575. Grant numbers are used in this instance to separate the funding for tracking purposes.

Specialty and Alternative/Options schools receive discretionary funds in a similar way to Traditional schools, but their positions allocations are determined differently due to the unique demographics of their student population. The following pages explain more about these school budgets. Options schools serve students who need a new pathway toward high school graduation. Examples include Specialty schools that primarily serve students with significant diverse learning needs. Examples include early childhood centers such as Vick School and high schools such as Vaughn.

***Diverse Learners (Fund 114/Fund 220):*** Schools receive separate funding to serve the needs of diverse learners in cluster classrooms. This funding is given as position allocations. The Office for Students with Disabilities (OSD) determines the number of teachers and paraprofessionals that each school will receive, based on the number of cluster programs at a school. Diverse learner cluster classroom teachers and aides are found in school budgets in either Fund 114 or Fund 220.

Fund 114 is used for diverse learner spending that comes from local and state sources, and Fund 220 is used for diverse learner spending that comes from federal sources. While this is important for the budget office, it makes little difference for schools. What is important to know is that teacher and aide positions in either Fund 114 or 220 are given to your school to serve the needs of diverse learners in cluster classrooms.

***Early Childhood (Fund 362):*** Schools may receive separate funding for early childhood. Pre-K students are not counted in the per-pupil calculation for Needs-Based Flexible Funding, and schools are not expected to use their Needs-Based Flexible

Funding dollars for pre-K classrooms.

The Office of Early Childhood education allocates teachers and aides to schools for pre-K classrooms. Early Childhood positions can be found in a number of different places in your budget. Most often, you will find these positions in Fund 362, but in some cases, positions are funded in Fund 115, Grant 000006. While the funding source makes little difference to the school, it is important to know the different funds and grants where you may find early childhood positions.

| Category | Do's and Don'ts |
|---|---|
| Positions | **DO** use funds for instructional positions that do not fill a core requirement. Positions can include teachers, teacher assistants, tutors, instructional computer technicians or assistants, guidance counselors, and school community representatives.<br><br>**DO NOT** use funds for required positions, non-instructional positions, or capital expenses. Prohibited positions include assistant principals, directors, school assistants, clerks, business managers, office managers, or substitute teachers for non-Title I positions. |
| Purchased Services | **DO** use funds for admission fees and bus services for field trips tied to curriculum, registration fees and travel expenses for conferences, educational consultants, repair and maintenance contracts for equipment purchased with Title I funds.<br><br>**DO NOT** use funds for non-instructional services, transportation for extra-curricular activities, or for repair/maintenance contracts of non-Title I equipment. |
| Supplies and Materials | **DO** use funds for consumable supplies, books to supplement (but not replace) basal/primary textbooks, workbooks, audio/visual, software, periodicals. Supplies/materials must be used for instruction.<br><br>**DO NOT** use funds for basal/primary textbooks or replacements, or for non-instructional items for security, office use, or program administration. |
| Equipment and Furniture | **DO** use funds for computers, workstations, and audio/visual equipment used for an instructional purpose.<br><br>**DO NOT** use funds for items for office use or program administration, athletic or band equipment, or replacement of equipment or furniture purchased with local funds. |

## Several resources are available to assist in managing Title I budgeting

## TITLE 1: DO's and DON'Ts FOR THE USE OF SCHOOL FUNDS

**Do's:**

ESSA Title I: All expenditures are supplemental and must be used for instructional purposes only to improve academic achievement. Schools operating a Targeted Assistance Program (TAP) must use these funds only to serve the identified lowest performing students.

● Salaries (above required positions) – Teacher, Substitute for Title I funded teachers and teachers attending staff development activities, Teacher Assistant, Tutor, Instructional Computer Assistant, Tech Coordinator, School Community Representative, Guidance Counselor, Security for instructional programs only

● Benefits - Health, Pension, FICA, and other related benefits

● Purchased Services - Admission fees and bus service for field trips tied to curriculum, conference registration fees/travel for teachers, education consultants, contracts for repair and maintenance of equipment purchased with ESSA Title I funds

● Supplies and Materials - Consumable supplies, books to supplement not replace Basal/Primary textbooks, workbooks, audio/video, software, periodicals

● Equipment and Furniture - Computers, workstations, audio/video equipment

Per Stevens Amendment, when issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds, including but not limited to State and local governments, shall clearly state the Stevens amendment: "Funds for this activity were funded by ESSA Title I."

**Don'ts:**

ESSA Title I: Funds cannot supplant, or take the place of locally funded expenditures that support the basic instructional program at the school and cannot be used for non-instructional purposes or capital expenses:

● Salaries – Salaries for required positions, Substitute for non 332 funded teachers unless a teacher is attending staff development activities, School Assistant, Clerk, Assistant Principal, Business Manager or Operations Manager or related administrative salaries

● Purchased Services - Contracts for non-instructional services or repair and maintenance of equipment not purchased with ESSA Title I funds, transportation to extra-curricular activities (competitions/performances)

● Supplies and Materials - Basal/Primary textbooks or replacements, non-instructional items for security, office use, or to assist in administering programs, athletics/band uniforms

● Equipment and Furniture – Items for office use, or to assist in administering programs; replacement of equipment or furniture purchased with local funds, extracurricular athletic/band equipment

# Example:

| Fund-Grant Number | Type of Early Childhood Funding |
|---|---|
| 115-000006 | Preschool funding from local funds |
| 332-Grant number changes each year | Title I funds used for some Child Parent Centers. The grant value is different from your Title I discretionary funds. |
| 362-various grant numbers that may change each year | Preschool funding from grants |

Special Programs: Your school may receive additional dollars or positions because of special programs. Examples of these are, International Baccalaureate (IB) programs,, JROTC programs, and Career and Technical Education (CTE).

Many of these programs are funded in Fund 115, but in various grant values. Some of the programs are in other funds and have grant numbers that change each year, as the federal grant award changes. This helps with tracking, but you may not see the same grant number from year to year.

**This chart identifies the most common programs and the fund-grant number associated with each:**

| Fund-Grant Number | Special Program |
|---|---|
| 115-000018 | JROTC |
| 115-006068 | Critical Language Initiative |
| 115-008001 | Regional Gifted Centers |
| 115-008002 | Regional Gifted Centers – ELL |
| 115-008004 | International Gifted Programs |
| 115-008005 | International Baccalaureate (IB) Programs |
| 115-008007 | Magnet Schools |
| 115-008008 | Classical Schools |
| 115-008009 | Montessori Programs |
| 369-various grant numbers that change each year | Career and Technical Education |

***Local Revenue (Fund 124):*** In addition to the above, a source of funding for some schools is local fundraising. Many LSCs have led efforts to supplement their school budgets by soliciting donations, gifts, and grants. Some schools get additional revenue from vending machines or property rentals. These funds may be found in Fund 124, which is used for school-raised funds.

***Operations Positions:*** Central office allocates positions to schools for operations and maintenance, security, lunchroom, and transportation. Sometimes you will find these positions in your budget. In some cases, the positions are budgeted centrally, even though the staff members work at your school. In either case, these are positions that are provided to your school. You are not expected to use Needs-Based Flexible Funding for these positions, although some schools use their discretionary dollars to budget for additional security guards. Engineers, custodians, and bus aides are now budgeted centrally, although these positions were found in school budgets in the past.

| Fund-Grant Number | Operations Positions |
|---|---|
| 115-376708 | Bus monitors |
| 210-000000 | Security guards |
| 312-000000 | Lunchroom workers |

## Options and Specialty School Funding

The district-run options schools and district-run specialty schools do not receive SBB funds. Instead, these schools receive positions and supplemental dollars through a different formula based on the special circumstances of the school. If your school is an options or specialty school, you will find your core instruction funding in one of the following funding sources:

| Fund-Grant Number | Type of Core Instruction Funding |
|---|---|
| 115-000086 | Positions allocated to district options schools |
| 115-000102 | Flexible dollars allocated to district options schools |
| 115-000089 | Positions allocated to specialty schools |
| 115-000102 | Flexible dollars allocated to specialty schools |

## BILINGUAL EDUCATION FUNDS
### Program Description

Bilingual Education Programs serving English Learners (ELs) in Illinois school districts are mandated by state law and are governed by Article 14C of the Illinois School Code and the 23rd Illinois Administrative Code Part 228.

The district identifies students who come from non-English language backgrounds and determines whether the student is an English Learner (EL). Schools with 20 or more English Learners of the same language background must establish and maintain a Transitional Bilingual Education (TBE) Program. TBE program components include instruction in language arts and core content subjects in the students' home language

and English as a second language (ESL) instruction. Native language instruction must be provided by a teacher who holds a bilingual endorsement and ESL instruction must be provided by a teacher who holds an ESL endorsement.

Schools with 19 or fewer ELs of the same language background must provide a Transitional Program of Instruction (TPI). In TPI, students must receive ESL instruction from an ESL endorsed teacher and receive content support and accommodations as needed. Depending on the size of the program, TBE and TPI services might be provided by the classroom or content teacher who holds the appropriate endorsement, or by another teacher who pushes in and co-teaches for part of the day.

**Bilingual Advisory Committee (BAC)**
Pursuant to the Chicago School Reform Act, every school implementing a state mandated Transitional Bilingual Education (TBE) or Transitional Program of Instruction (TPI) program is required to constitute a Bilingual Advisory Committee (BAC). The BAC is recognized as a standing committee of the Local School Council (LSC) and serves to identify and address academic concerns related to the school's bilingual education programs in the Continuous Improvement Work Plan (CIWP) and budget allocations. The BAC Chair and a majority of its members must include parents of students enrolled in the school's bilingual education program. The BAC meets at least four times per school year, and hosts additional training meetings to develop leadership and advocacy skills of parents/legal guardians of ELs.

**State and Federal EL Funding Eligibility Requirements**
The Transitional Bilingual Education programs and/or the Transitional Programs of Instruction are funded based on the number of English Learners enrolled in a school. The number of ELs is taken from the current-year, month of January school data. A school having one or more English Language Learners must provide bilingual education services (TBE or TPI, as appropriate).

The district uses the state and federal allocations to provide district schools with supplemental positions and funding for specific activities that are allowed through the grant and that support bilingual education services in our schools.

# State EL Funding

Schools with at least 20 active ELs in grades K and above receive a 0.5 supplemental teaching position. The position is staffed with an EL-endorsed teacher who supports the principal, ensuring EL services and instruction is provided in compliance with the Illinois 23 Administrative Code Part 228. The best strategy for using this position is to staff the English Learner Program Teacher (ELPT) or an EL resource teacher, so that the teacher can provide the required components of services to students across the school who are not able to receive all the required components of EL services from their classroom/core content teacher.

## Federal EL Funding

The 23 Illinois Administrative Code 228 requires schools to provide English Learners (ELs) with instruction in Transitional Bilingual Education (TBE) and/or Transitional Program of Instruction (TPI) Programs. Local funding from Student Based Budgets (SBB) must be allocated to support required Bilingual Education services for ELs, as they are included in the general student population for funding purposes and may be eligible for Title I services, etc.

The Illinois State Board of Education (ISBE) identifies CPS as the Local Education Agency (LEA) and grants the Office of Multicultural-Multilingual Education (OMME) the authority to allocate state supplemental EL, and Title III funds to CPS schools according to EL-specific need within the district. State (Supplemental EL) and Federal (Title III) grant funds are earmarked to cover any excess cost in providing mandated and supplemental services to ELs.

The District receives supplemental funds from the State according to core services ELs receive. Allocations are calculated in January and determined by the total number of ELs in grades K-12 served within a school.

## FY25 English Learner Staffing (K-12 students)

| L Enrollment | 600 + | 50-599 | 20-49 | Less than 20 |
|---|---|---|---|---|
| EL After School Tutoring (EL Grades 2-8, 9-12) | $5,500 | $5,500 | $5,500 | - |
| English Language Program Teacher Annual Stipend | $3,000 | $2,500 | $1,000 | $1,000 |
| Bilingual Advisory Committee Funding | $1,250 | $1,250 | $1,250 | _ |

| EL Enrollment | 600 + | 50-599 | 20-49 | Less than 20 |
|---|---|---|---|---|
| EL Supplemental Position (EL Resource Teacher) | 2.0 supplemental state teaching | 1.0 supplemental state teaching | 0.5 supplemental state teaching | |
| Per-Pupil Allocation | | | | $450/pupil |
| Dual Language Education Coordinator (DLC) | Each traditional CPS school approved for a Dual Language Education (DLE) Program (implementing or in a planning year) receives a 1.0 supplemental (SUP) DLC position . | | | |

# Foundational Teacher Position Formula - Elementary

| | |
|---|---|
| **Core Classroom Teachers K-8** | Minimum 10 teachers  OR<br>1 Teacher per:<br><br>**26 students** : Opportunity Index **<=30**<br>**24 students** : Opportunity Index **31-41**<br>**22 students** : Opportunity Index **42-52** |
| **Holistic Teachers** | Minimum 3 teachers (ES)  OR<br><br>For every 5 core classroom teachers (plus cluster teachers) : 1 holistic teacher provided |

**Allocations are allotted based on a *building-wide* Teacher:Student ratio; the allocation is not a class-size allocation.  The formulas use non-cluster 20th Day enrollment of the current school year plus applicable newcomer growth adjustments.**

# Foundational Teacher Position Formula - High School

| | |
|---|---|
| High School  Teachers | A minimum of 10 teachers for High School to ensure full complement<br>of required courses. |
| | For every additional **21** students within a HS, an additional teacher is allocated |
| | For schools with an Opportunity Index **31-41** the student teacher ratio is **19** |
| | For schools with an Opportunity Index **42-52**, the student teacher ratio is **18** |

**Allocations are allotted based on a *building-wide* Teacher:Student ratio; the allocation is not a class-size allocation.  The formulas use non-cluster 20th Day enrollment of the current school year plus applicable newcomer growth adjustments.**

## CPS Traditional Schools: EL Supplemental Funding Information

| Position/ Program Title | Funding Sources and Position Requirements | Responsibilities |
|---|---|---|
| EL Supplemental Position (EL Program Teacher) {ELPT} | Supplemental 2.0, 1.0 or 0.5 teaching positions are State-funded.<br><br>**Per the CTU Contract, these teaching positions must be staffed by the ELPT.**<br><br>The position is staffed with an ESL- or bilingual-endorsed teacher who supports the principal in ensuring EL services and instruction are provided in compliance with the Illinois 23 Administrative Code Part 228.<br><br>**Positions are subject to closure if:**<br><br>● Not staffed by teachers holding the ESL and/or Bilingual endorsement(s)<br><br>● ELPT does not participate in OMME quarterly PD/training as required<br><br>● Teacher is tasked with responsibilities outside of the scope of this role (ex. World Language instruction, Substitute teaching, lunch duty, etc.).<br><br>**Principals nominate ELPTs to OMME by the last week of school. The nominee needs to be for the next school year.**<br><br>The teacher staffed in the position should match the teacher nominated. | The **ELPT** supports the principal in ensuring compliance of all Bilingual Education mandates and in establishing a quality program for ELs, irrespective of the number of ELs in the school.<br><br>Identify EL services not provided by the classroom/core content teacher/s. These services can be provided through a co-teaching, push-in, and/or pull-out model (i.e. native language instruction for low incidence languages, etc.). |

| Position/ Program Title | Funding Sources and Position Requirements | Responsibilities |
|---|---|---|
| **DL Coordinator (DLC) Position** | DLC 1.0 positions are funded with Title III funds.<br><br>**1.0 DLC positions are prohibited to be used as classroom teaching positions.**<br><br>Individuals staffed as DLCs must hold a bilingual (preferred) and/or ESL endorsement.<br><br>**Positions are subject to closure if:**<br><br>● **Unstaffed by October 15th,**<br><br>● **Not staffed by teachers holding the ESL and/or Bilingual endorsement(s)**<br><br>● **DL Coordinator does not participate in OMME Dual Language Training**<br><br>● **DL Coordinator is tasked with responsibilities outside of the scope of this role (ex. Student instruction, Substitute teaching, lunch duty, etc.).**<br><br>**Principals are required to verify that Title III funded positions only perform duties outlined in the DLC Description.** | Each DLE Program is provided a 1.0 DLC position whose responsibilities include program planning and providing DLE Program professional development at the school. The DLC is part of the Dual Language Leadership Team (DLLT) whose responsibilities include overseeing DLE Program coordination and ultimately ensuring structures are in place to meet program goals and sustainability. |

## Additional Supplemental Funds

| Funding Type | Requirements | Consideration |
|---|---|---|
| **Bilingual Advisory Committee Funding** | Per Illinois School Code, schools with mandated TBE programs must form a Bilingual Advisory Committee (BAC).<br><br>Eligible schools are allocated $1250 to support BAC parent engagement for SY22-23.  BACs decide how funding is spent.<br><br>Some  approved expenditures include:<br>● Refreshments for monthly BAC meetings<br>● BAC workshops<br>● Parent transportation (if more than  1.5 miles) to school BAC meetings  or collaborative Academic Network BAC meetings<br>● Childcare while participating in  BAC activities<br><br>Note: While a TPI program requires the school have a Bilingual Advisory Committee (BAC) there is NO funding for the TPI BAC | The BAC is a subcommittee of the LSC and  has a standing position to advise principals  around Federal, State, and District Bilingual Education mandates.<br><br>Funds are released in early fall, once  OMME has confirmation that a BAC has been  established for the upcoming school year. |
| **EL Tutoring (Grades K-8)** | Funds are earmarked for 3 Bilingual and/or ESL-endorsed teachers to provide  ELs weekly after-school tutoring sessions  for two hours. Tutoring programs are  scheduled to run November/early  December through April.<br><br>The program  goal is to provide bilingual and ESL  content support to ELs so they are  successful in accessing academic content. OMME supports the program implementation through Aspen Programs and Services | Schools eligible for EL Tutoring do not  automatically receive funds. Funds become  available during Quarter 2 of each school year, only after schools complete and submit an EL Tutoring application to OMME and are approved to receive funds.<br><br>The application  includes information about informational  webinars, required reporting, and specific timelines. |

| Funding Type | Requirements | Consideration |
|---|---|---|
| **ELPT Annual Stipend** | The ELPT supports the principal in addressing all Bilingual Education mandates and establishing an EL Program that meets the needs of all ELs in the school, irrespective of the total number of ELs in the school.<br><br>The ELPT receives a stipend for any additional time dedicated to fulfilling responsibilities associated with this role. The stipend can only be given to staff in teaching positions (Administrators and ESP staff do not qualify for stipend).<br><br>**Principals nominate ELPTs to OMME by Early June of the current school year for the following year.** There will be a reminder about the nomination process, but the link to the SY23 Nomination form will be located on OMME's Employee Intranet page.<br><br>The stipend is given directly to the person identified by the principal as the ELPT which must be reflected in the Google ELPT Designation form. The stipend amount is disbursed in two payments (end of Semester I and end of Semester II). | The **ELPT** supports the principal in ensuring compliance of all Bilingual Education mandates and in establishing a quality program for ELs, irrespective of the number of ELs in the school. |

| Funding Type | Requirements | Consideration |
|---|---|---|
| **Supplemental EL Funding (per pupil)** | This supplemental funding can be used for English Learner (EL) instruction, EL instructional materials, and professional development for teachers of ELs:<br><br>● portion of the salary of an EL endorsed resource teacher (i.e.ELPT) who provides EL services<br><br>● a stipend for an EL endorsed teacher to provide after school tutoring to ELs<br><br>● instructional materials, including software, which are research based, intended for ELs, and they have demonstrated effectiveness for EL instruction<br><br>● professional development for teachers of ELs, aligned to and intended to improve instruction of English Learners in TBE, TPI, or Dual Language programs.<br><br>● substitute teacher coverage for EL teacher to attend EL professional development | For any of the expenses, ensure that funding:<br><br>● is used to enhance instruction for ELs<br><br>● supplemental to resources all students already have access to<br><br>● is used exclusively for ELs |

**DISTRICT SCHOOLS**

In FY2025, the District will pursue a new type of school funding that looks at the allocation of core administrative and instructional positions rather than the dollars used to fund those positions. This will allow schools to staff teachers and educational support personnel without having to worry about their costs.

**Administrative Foundation**

All schools are allocated one principal, one assistant principal, one clerk, and one counselor regardless of size. Schools that are not Sustainable Community Schools, have an enrollment greater than or equal to 500 students, and have an Opportunity Index (OI) of 30 or higher will receive a restorative justice coordinator. Larger schools and higher-need schools will receive additional counselors to support student well-being. All elementary schools (ES) will receive one counselor for every 600 students. If an ES has an enrollment between 250 and 500 students with an OI greater than or equal to 48 or an enrollment between 350 and 600 students with an OI greater than or equal to 40, then it will receive a second counselor. All high schools (HS) will receive one counselor for every 500 students.

If a HS has an enrollment between 250 and 500 students with an OI greater than or equal to 48 or between 350 and 500 students with an OI greater than or equal to 40, then it will receive a second counselor. Title I eligible schools will receive a supplemental interventionist at the ratio of 1:450 students for ES and 1:600 students for HS with a minimum of one and maximum of four interventionists.

**Instructional Foundation**
From an instructional perspective, all ES will receive at least one teacher per grade and an additional teacher for the departmentalization of junior high. They will receive a further three holistic teachers to provide for courses such as physical education, art/music, and world language. This foundational instructional allocation comes out to 10 core teachers and three holistic teachers for a traditional K–8 ES. Additional teachers are then allocated based on the school's enrollment and OI. The enrollment used is FY24 20th day minus cluster students (since special education teachers are allocated for special education cluster classrooms) plus adjustments for enrollment growth driven by newcomer students that took place during the school year.

For ES with an OI of 30 or less, schools will receive one teacher for every 26 students. For an ES with an OI between 31 and 41, that ratio is lowered to one teacher for every 24 students. For an ES with an OI of 42 or above, that ratio is further lowered to one teacher for every 22 students. Schools will receive holistic teachers to cover physical education, arts, and other specials courses for every five core classroom teachers allocated in the formulation above plus any cluster classrooms since students with disabilities take electives in the general education environment.

All HS will receive a minimum core allocation of 10 teachers to provide for a full complement of courses in key subject areas. Schools with the need for more than 10 teachers are then allocated based on enrollment and OI. For a HS with an OI of 30 or less, schools will receive one teacher for every 21 students. For a HS with an OI between 31 and 41, that ratio is lowered to one teacher for every 19 students. For a HS with an OI of 42 or above, that ratio is further lowered to one teacher for every 18 students. Similar to elementary schools, the enrollment used is FY24 20th day minus cluster students (since special education teachers are allocated for special education cluster classrooms) plus adjustments for enrollment growth driven by newcomer students that took place during the school year.

**Discretionary Funding**
Schools will receive additional needs-based flexible funding based on their enrollment and OI to spend on additional personnel and non-personnel needs. The allocations are determined using the formula detailed in the table below.

**Table 1: Needs-Based Flexible Funding Formula for Traditional District Schools**

|  | Elementary School | High School |
|---|---|---|
| **Base** | $365/student | $1,095/student |
| **Increment** | $12 for each OI point above 14 | $18 for each OI point above 14 |
| **Floor** | $140,000 | $420,000 |
| **High-Need Floor (OI>=40)** | $180,000 | $460,000 |

## THE LSC'S ROLE IN THE BUDGET

State statute authorizes LSCs to be responsible for approving the expenditure plan (budget) prepared by the principal with respect to all funds allocated and distributed to the attendance center by the Board AND to approve receipts and expenditures for all internal accounts of the attendance center, and to approve all fund-raising activities by non-school organizations.

**The LSC has responsibility for:**

• Providing input in the development of the budget and for approving ALL funds in the budget.

• Ensuring that the budget supports the School Improvement Plan; otherwise known as Continuous Improvement Work Plan (CIWP).

• Presenting with the principal the proposed budget to the community and accepting public comment on the budget.

• Requesting revisions to the budget.

• Providing LSC endorsement before a principal can enter into contracts for $10,000 or less.

• Approving all transfers of funds.

• Requesting the principal close or open positions.

• Approving large expenditures from Internal Accounts and all fundraising activities by non-school groups that use the school.

• Monitoring the internal accounts activity

**The Principal has responsibility for:**

• Developing a budget to support the CIWP with input from the LSC and others.

• Entering into contracts with LSC approval.

• Providing LSC's with audits and reviews of the programs and operations of the school.

• Presenting with the LSC, the proposed budget to the community and accepting public comment

• Obtaining input and approval of the budget from LSC (For schools on probation for less than five (5) the Network Chief must approve of the budget.)

**For schools on probation for less than five (5) years, the Network Chief has responsibility for**:

• Providing input in the development of the budget to make sure it supports the School Improvement Plan.

• Requesting revisions to the budget

• Approving the school budget

• Approving the transfer of funds.

• Requesting the principal close or open positions.

• Approving and monitoring internal accounts.

• Approving large expenditures and all fund raising activities by non school groups that use the school except for the rental for cell towers and parking lots which will be handled by Real Estate Department.

# PREPARING THE NEXT SCHOOL YEAR'S BUDGET

**Budget Timeline**

This is a general timeline for the budget process. The actual calendar dates may change year to year. The timeline on this page gives you an overview of the structure of the process; not specific dates as to when each step will occur. Specific dates and deadlines will be announced each year when the budget is released to schools.

The process starts with the preparation of the School Improvement Plan, the CIWP (Continuous Improvement Work Plan). The budget is designed to support the activities that the CIWP includes. The CIWP is a three-year plan. During years 1 and 2 of the implementation of the plan, the budget may be adjusted if there are changes in the CIWP. The second year and third year of the CIWP also can be adjusted. See the guidance on the preparation and implementation of the CIWP for information about that process. The budget for year 2 is approved during the spring of year 1 of the plan's implementation. The budget for year 3 is approved during the spring of year 2 of the plan's implementation. The following schedule lists the actions to prepare the budget for each year.

**November – April:** Develop or confirm the CIWP for the next year.

**March - June:**
• Schools receive proposed dollar amounts for the next fiscal year.
• Budget developed to support the CIWP.
• LSC presents the CIWP and Budget to the school community.and receives comments from the public.
• The Principal and LSC adjust the CIWP and Budget based on public comment if needed
• LSC approves the CIWP and Budget.
• Budget is formally submitted by the Principal: The Principal must deliver the budget to the Network Chief and certify that the LSC has approved the budget.

**June-August:** Board approves Total CPS Budget.

By law, the LSC must conduct two meetings where the budget is discussed and the public is invited to ask questions or make comments. One of these meetings can be held during the budget approval process to discuss budget proposals. The second can be held at the end of the school year to discuss results. The meeting should include the Instructional Leadership Team and should describe the school's mission, major goals, programs, accomplishments, and the use of funds to pursue goals. The public is then invited to ask questions and make comments.

## Steps to Prepare the Budget for the Next School Year

The budget is developed after the Continuous Improvement Work Plan (CIWP) to enable the school to carry out that plan.

**Step 1:** Develop or confirm (if you are in the first, second or third year of the CIWP) your Continuous Improvement Work Plan. Illinois state law requires each CPS school to develop a school improvement plan every three years. This plan establishes:
• A school's mission;
• Strategic priorities for the next three years;
• Specific actions that the school will take to accomplish its goals.

The principal works with the LSC and other stakeholders to develop a school improvement plan that describes how the school will improve academic achievement. The LSC votes to approve the school improvement plan. *See Part 3 of the LSC Guide for more information about the preparation of the CIWP.*

**Step 2: The principal receives the dollar amounts and positions from the school system and shares that information with the LSC within a few days after receiving the information.** The principal then uses the allocation from the system to prepare a budget based on the CIWP and presents the LSC with that proposed budget. (See the official timeline for each budget year).

Note: The uses of school funds provided by the federal government under Title I of the Elementary and Secondary Education Act/Every Student Succeeds Act have to be voted on by the school's Parent Advisory Council (PAC) before being submitted to the LSC for approval.

**Step 3:** The LSC discusses with the Principal whether the expenditures in the budget will allow the school to carry out the school improvement plan effectively and efficiently. The LSC can recommend changes in the budget.
**Step 4:** The LSC must present the budget to the community for comment.and the principal and LSC adjust the Budget based on public comment if needed.
**Step 5:** The LSC votes to approve the budget. A budget must be approved by the majority of serving members.

**Special Cases**
• **LSCs of Schools on probation for less than 5 years:** The LSC participates in a presentation to the stakeholders of the proposed budget that supports the priorities of the CIWP. The LSC takes an advisory vote, with the final budget approval by the Network Chief. However, if the school has been on probation for 5 or more years the LSC regains the power to approve the Budget.

• **LSCs of Schools not on probation, and do not have quorum:** Board Rule 6-31

indicates that if the <u>serving membership</u> of an LSC has fallen below the quorum requirement (7 members in elementary schools and 8 in high schools) for taking action, the CEO or designee shall exercise the powers of the LSC to approve the budget and to transfer funds.

# Recommendations for a Collaborative and Effective Budget Approval Process

We are all aware that the district has limited funds and there are great measures taken to ensure that funding of schools is equitable and fair. We also know that when money is involved in a discussion, the conversation can easily become heated and contentious.

This section is dedicated to providing helpful reminders and tips so that budget approval discussions can be effective and collaborative.

**Important Understandings**
● Student enrollment is a key component that drives the budget! Student enrollment will determine SBB allocations, and therefore it makes up most of the money available to the school for the budget.
● Student enrollment and staff salaries and benefits (determined by contracts) are not under the control of the LSC.
● The LSC has authority for the allocation of resources provided to the school, but not the amount provided to the school.
● Many funds come with restrictions. LSCs should have a strong knowledge of the school, staff and understand the limitations of resource allocations:
● How certain funds must be used exclusively for its designed purpose, which must be tracked and accounted for.
● Keep in mind that the allocation of resources is an exercise in trade-offs and this may not be easy. Different people can see the trade-offs differently.

**Recommendations to Work in Partnership with Your Principal During the Budget Planning Process**
● Focus your energies around school priorities and solving problems. Partner with your principal to generate creative solutions to challenges. By providing effective feedback and offering solutions, you build a strong school and an even stronger community.
● Take time to review and study the information and budget materials given to you in advance of the meetings.
● Make notes on questions to ask and ask a lot of questions. If you are not clear about something, chances are high that many other LSC members are not clear either. If possible, ask as many questions as possible before a meeting.
● Be patient! Your principal may not be able to answer all your questions immediately, but will get back to you as soon as possible.
● Be mindful that many expenditures happen according to a set pattern. For example, salary costs are calculated in advance and paid out by the central office at a steady rate throughout the year. What you want to focus on is unanticipated, or new, expenditures throughout the year.

The **CIWP** should be the driver in every decision you make in regard to the budget!

## The LSC's Responsibility to Monitor the Budget

The LSC monitors the budget, internal accounts and implementation of CIWP. Here is important information about this role.

***Budget Changes****:* The LSC is involved in ongoing monitoring of the budget and is required to approve any changes in the way funds are used (budget transfers). If the school wants to spend funds in ways not specified in the budget, the principal must obtain approval from the LSC. If there are major changes ($5,000 or more) in the budget, their effect on the school improvement plan (CIWP) must be assessed before they are approved.

● Budget transfers of funds previously voted on by the LSC must be approved by at least eight (8) members in elementary schools, nine (9) members in high schools and ten (10) members in Military Academies.
● Changes in the use of Title I parent involvement funds have to be voted on by the school's Parent Advisory Council (PAC) before being submitted to the LSC for approval.
● Budget transfers can only take place within the same fund and grant.
● Requisitions over $5,000 require Network Chief or Central Office approval.
● *LSC approval of purchases of goods over $35,000 and of professional services over $35,000 require central office approval and a contract.'*
● *In addition to LSC approval, Board of Education approval is required for contracts over $500,000.*

***Internal Accounts:*** In addition to your school budget, all schools have Internal Accounts. The school's Internal Account is a management system designed to handle the cash that schools get from students, parents, and the community. The sources of this cash include student fees, fund-raising activities, vending machines, special events, and gifts, grants, or donations. These accounts can add up to a substantial amount of money. Internal accounts money must be used to directly or indirectly benefit the students.

LSCs have the authority to:
● Approve all Internal Account receipts and expenditures.
● Approve all internal account expenditures over $1,000 at elementary schools and $2,500 at high schools for all CPS attendance centers prior to the expenditure by an affirmative vote of a majority of serving LSC members.
● On a monthly basis, review the school's internal accounts reports and bank statement activity.
● Approve all fundraising activities by non-school organizations using school facilities.
● Request and review an audit of the school's internal accounts from the Office of Audit Services at cpsauditservices@cps.edu.

Principals should give the LSC a copy of the Internal Accounts Summary Trial Balance and a copy of the school's monthly bank reconciliation. The school's Budget Committee may want to take on this responsibility and report to the LSC.

Making a purchase from Internal Accounts requires the same care and accountability as purchases from the budget. The latest Internal Accounts Manual is on the School Internal Accounts Intranet Site: CLICK HERE for access**.**

## KEY TERMS

| Term | Explanation |
|------|-------------|
| Account | The account is used to specify what money will be spent on, such as salaries, equipment, or a service. Accounts have an Account Number or code for tracking purposes. Like types of expenditures have similar Account Numbers. |
| Budget Transfer | A change in the planned use of funds that require movement of funds from one budget category to another to cover the spending need. There are requirements for approval of budget transfers based on the amount of funds. All fund transfers require the approval of the LSC by a supermajority of 8 yes votes in elementary schools, 9 yes votes in high schools and 10 yes votes in Military Academies. |
| Continuous Improvement Work Plan (CIWP) | The school improvement plan that identifies the strategies and actions that schools will take to improve student learning progress. The budget of a school should support the CIWP. |
| Diverse Learners | Students with special needs. |
| Fiscal Year | The 12 months of a budget. The CPS fiscal year is July 1 until June 30. |
| Fund | A category of budgeted money—the category is based on the source of the dollars and purpose. Funds and Grants work together to provide even more detail on the source of funds. |
| Fund Number | A number used to identify the Fund. |
| Grant | Used in conjunction with Funds, Grants provide more detail on the source of funds. Grant numbers provide for tracking. Grant numbers may change each year even for the same category of funds to be able to distinguish and properly track the revenue and the spending. |
| Internal Accounts | Cash accounts the school maintains for miscellaneous transactions and purchases from funds raised by the school. |
| Parent Advisory Council (PAC) | The PAC must approve allocations and changes of Title I funds before they are presented to the LSC for approval. |
| Program | Identifiers used to reflect the type of spending, such as instruction. |
| Restricted Fund | Limited to a certain kind of use |
| Roll over of Funds | Some funds that are not used during a fiscal year will be available in the next fiscal year after they "roll over." |
| Needs-Based Flexible Funding | Funds allocated on a per pupil basis based on opportunity index to supplement core administrative and instructional allocation, as well as other materials and services needed within a school |
| Title I, II, and III | Title I, II, and III of the Elementary and Secondary Education/Every Student Succeeds Act (ESEA/ESSA). For convenience, hereinafter "Title I," "Title II," and "Title III" throughout this Guide. These are categories of federal funds with specific purposes for their use that are available to some schools. |

# KEY BUDGET GUIDANCE

## FY2025 Budget Model

| Questions | Answers |
|---|---|
| **Where do Needs-Based Flexible Funding dollars show up on the budget?** | **Needs-Based Flexible Funding** dollars show up in Fund 115 Grant 000575. Your allocation is set up as a "fund cap" in the budgeting system, which means that the system will not allow you to spend more than the allocated amount. |
| **How do we start building the budget?** | The best way to start is to use the school's updated Continuous Improvement Work Plan (CIWP) and its identified strategic priorities as the basis for budgeting efforts. The Network Chief will work with you to ensure that your budget helps achieve your CIWP goals and priorities. |
| **When will enrollment numbers be adjusted?** | In accordance with state statute, we will maintain a 20th day policy for teacher layoffs due to enrollment, but will provide schools the opportunity to make their own budget adjustments.

On the 10th day of school, schools will receive an enrollment update and corresponding budget update for an increase in enrollment, and will have 4-5 days to revise their budget and submit any position closings in order for CPS to meet its 20th day statutory obligations. |
| **What about funding for middle schools located at a high school?** | Some district and charter schools that have middle grades located within high schools have historically received a higher level of funding for their middle grade students. Those middle school students will be treated as high school students for the funding formulas used for teacher allocations and Needs-Based Flexible Funding |

## ADMINISTRATIVE POSITIONS

| Questions | Answers |
|---|---|
| **What is the minimum administrative staff a school must have?** | State law requires each school to have a principal. The CTU contract requires all schools to have a clerk and for elementary schools to have a counselor. Every student will attend a school with a core administrative operational team inclusive of a Principal, an Assistant Principal, a Clerk, Part-time or Full time School Assistants, a minimum of 1 counselor, with additional counselors. Schools that are not Sustainable Community Schools, have an enrollment greater than or equal to 500 students, and have an Opportunity Index (OI) of 30 or higher will receive a restorative justice coordinator. Larger schools and higher-need schools will receive additional counselors to support student well-being regardless of student population. |
| **What if we need additional clerks or counselors??** | You may use your Needs-Based Flexible Funding dollars to purchase additional administrative staff above what is provided centrally.. |
| **Are there any other types of administrative positions we can hire if our school has unique needs?** | Schools can and have created new administrative positions that allow them to meet their CIWP most effectively. Talk with your Principal and Network Chief about options and strategies to best meet your goals. |

## TEACHING POSITIONS, OTHER EXPENDITURES AND BUDGET PROCESS

| Questions | Answers |
|---|---|
| What class size should we use to staff my school? | Follow the Board's class-size policy when determining class-size. |
| What about Art, Music, and PE teachers? And Librarians? | With the new funding formula, all elementary schools are provided with a minimum of three holistic teachers to cover art, P.E. and another elective of the schools choosing. As the school's enrollment increases, additional core and holistic teachers are provided. |
| Are there any licensing flexibilities? Can a HS teacher teach 9th and 8th grade classes, for example? | Grades 6-8 require Middle Grades endorsement in appropriate subject areas. To the extent that a Type 09 licensed teacher has those endorsements, they can be assigned to teach 8th grade in the subject area endorsed.

Other specific situations require consultation with Talent Office's Employee Solutions. You can consult with the School Support Center with any questions. |
| Does the budgeted cost for a position include benefits? | Yes, the budgeted cost you use for all staff will be the total cost for that staff, including benefits. |
| What about Step and Lane increases over the course of a year? | The cost for the position in your budget will include all anticipated step increases for the following year.

However, it will not be able to capture <u>unanticipated</u> lane increases for individual teachers. Work with your staff to understand their efforts that would lead to any lane increases, and hold resources in your contingency budget to account for the increases that may happen in the middle of a budget year.

(Example: Obtaining a new degree) |
| What about teachers that go on Maternity, Paternity, FMLA? | Schools will <u>not</u> have to pay for Maternity/Paternity/FMLA leave out of their budgets. Funding for Temporarily Assigned Teachers covering for teachers on paid leave will be paid centrally. |
| How do we budget for substitutes? | Funding for substitute teachers has been included in the funding each school receives. The funding should be budgeted to account for substitute needs for the entire year, as there will be no additional funds allocated. |
| What are Needs-Based Flexible Funding dollar supposed to cover? | Beyond the option to hire additional teachers and administrative staff, these funds can go towards anticipated expenditures for Educational Support Personnel, instructional materials, assessments, other instructional programs, and professional learning. |

| | |
|---|---|
| **Who has to approve our budget?** | Schools on probation for less than 5 years: Network Chief approves your entire budget; the LSC's vote is advisory. |
| | Schools on probation for 5 or more years: the LSC approves the entire budget or if the LSC is below quorum then the Network Chief approves the budget. |
| | Schools not on probation: The LSC approves the entire budget |
| | Schools not on probation, but the number of serving members is less than quorum: |
| | Board Rule 6-31 indicates that if the serving membership of an LSC has fallen below the quorum requirement (7 members in elementary schools and 8 in high schools) for taking action, the CEO or designee shall exercise the powers of the LSC to approve the budget and to transfer funds. |
| **Can we share resources with other similar schools in order to add new initiatives, accomplish key goals, or simply ensure we can make their budget work?** | Schools have the ability to share resources with similar schools under the coordination of their Network Chief. Many schools want to add a new music program, or language program, but cannot afford it on their own. In this case, schools should meet with their Network Chief to help identify other schools that may have a similar need for a 0.5 FTE / 0.5 FTE split. |
| | The Network Chief will supervise and manage this process with principals to ensure resource sharing is done effectively, efficiently, and can be managed appropriately. |
| **Can we remove or raise the cap off the number of hours a part-time/seasonal (miscellaneous) employee can work?** | The limitations on Part-Time/Seasonal Employees are statutory and are not changing. |
| **Can we remove or raise the cap on using retirees?** | The limitations on retirees are statutory and we cannot change it. |

# ALLOWABLE AND NON-ALLOWABLE COSTS

## Title I
### Allowable and Non Allowable Checklist – FY25

| ESSA Title I Allowable and Non Allowable Checklist – FY25 | | | |
|---|---|---|---|
| *The purpose of this document is to provide assistance to schools in determining eligible costs that help identify, create and structure opportunities to strengthen education, drive school reform, and improve the academic achievement of at-risk students using Title I funds (Fund 332).* | | | |
| **Expenditure Type** | **Description** | **Allowable** | **Not Allowable** |
| Administration | Lobbying activities to influence funding levels or the awarding of contracts | | x |
| Administration | Administration/School Office Support | | X |
| Administration | Non-instructional computer assistant, administrative school assistant, clerk, business manager, or operations manager | | x |
| Administration | Contracts for non-instructional, non-school climate, or non-school reform services | | X |
| Administration | Supplies, materials, and equipment for administration use (5% of allocation) | | X |
| Capital Improvements | Capital projects (repair/maintenance of building, structural improvements, permanent fixtures to buildings) | | x |
| Capital Improvements | Building Supplies/Repairs/Modifications | | X |
| Capital Improvements | Paint for structures for building/capital improvement | | X |
| Capital Improvements | Wiring of any kind (for internet service, telephone lines, etc.) | | X |
| Equipment | Contracts for repair and maintenance for equipment purchased with Title I funds | X | |
| Equipment | Necessary and reasonable supplemental classroom furniture and equipment (computers, workstations, other classroom equipment) that supplements the provision of equipment paid by the district. **NOTE: Only a limited amount of equipment is allowable under the district Title I application. Not open to all equipment and must be tied to Title I allowable activities | X | |
| Equipment | Contracts for repair and maintenance for equipment NOT purchased with Title I funds | x | |
| Extra-curricular | Sports/Band | | X |
| Extra-curricular | Transportation services to extracurricular activities for competitions, performances, or sports | | x |
| Extra-curricular | Supplies, materials, and equipment  for athletics | | X |
| Extra-curricular | Band uniforms | | X |
| Extra-curricular | Athletics/Athletic Awards/Yearbooks | | X |
| | Security or Engineer - Only allowable if working for allowable program; no other | | x |

| | | | |
|---|---|---|---|
| Extra-curricular | activities can be charged to OT, and if other activities exist, must split cost across programs | | |
| Field trips | Admission fees and bus service for field trips tied directly to classroom curriculum, program curriculum, and/or concrete skills (not recreational or solely culminating activities) | X | |
| Field trips | College Readiness tours (local travel) | X | |
| Field trips | Non-local student travel: Only if it can be demonstrated that:<br>1) the skills and activities the students would be learning and doing are unique to that particular space and could not be replicated on-site or at a closer location<br>2) costs are necessary and reasonable<br>3) trip activities and objectives tie directly to classroom or program curriculum CPS student travel approval process must be followed | X | |
| Field trips | Field Trips- amusement or water parks for entertainment | | x |
| Food | Food for **staff** activities – Professional development working lunches: only in the case where it is disruptive to the activity and/or not feasible to release for lunch.<br><br>Must have documentation including sign in sheets and agendas reflecting working lunch.  Expenses must be "reasonable and necessary" (reasonable such that costs should be fair, responsible and as economical as possible and necessary to support the activity) and based on expected attendance. | x | |
| Food | Food for **parent** activities – If the event is related to ESSA Title I Parent Involvement you may use funds allocated for this purpose. Food and beverage costs are allowable if the training or activity runs over a normal meal time.<br><br>Expenses must be "reasonable and necessary" (reasonable such that costs should be fair, responsible and as economical as possible and necessary to support the activity) and based on expected attendance. | X | |
| Food | Food for **student** activities - Food and beverage expenditures for student activities should be coordinated through Nutrition Services, if possible. Otherwise, allowable for programs in excess of four hours and over a meal time.  Expenses must be "reasonable and necessary" (reasonable such that costs should be fair, responsible and as economical as possible and necessary to support the activity) and based on expected attendance. | X | |
| Instruction | Formative and interim assessments | X | |
| Instruction | Supplies and materials that supplement instructional program (workbooks, audio/video, software, periodicals) | X | |

| | | | |
|---|---|---|---|
| Instruction | Instructional materials (Additional or supplemental textbooks, not adopted textbooks) | X | |
| Instruction | Licenses for software or curriculum used by school (Plato or Upward Bound membership are examples of allowable expenditures) | X | |
| Instruction | Tutoring | X | |
| Instruction | Salaries and Benefits: Literacy coach or curriculum specialist, additional core curriculum or grade level teachers, classroom paraprofessionals (but not administrative paraprofessionals) | X | |
| Instruction | Student Stipends | | x |
| Instruction | Replacement of Quota Teachers | | x |
| Other | Per-diem – follow district guidelines | X | |
| Other | Alcohol beverages | | x |
| Other | Banquets/Award Programs/Carnivals/Luncheons/Brunches/Parties/Picnics | | x |
| Other | Bereavement or congratulatory cards, flowers or gifts | | x |
| Other | Decorations/flowers | | x |
| Other | Employee incentive or recognition gifts | | x |
| Other | Fundraiser Support - No food, door prizes, equipment or other materials for fundraisers | | x |
| Other | Gift Certificates/Gift Cards | | x |
| Other | Graduation activities/materials | | x |
| Other | Incentives or rewards for students or parents | | x |
| Other | Non-classroom furniture | | x |
| Other | Raffles/door prizes | | x |
| Other | Theater Systems/Auditorium Installations | | x |
| Other | Uniforms - Staff or student | | x |
| Other | Water Coolers/Water Systems | | x |
| Other | Appliances (stoves, refrigerators, microwaves, etc.) | | x |
| Parent Involvement | Advertising – Brochures informing parents of school achievement, rules, regulations, etc. are allowable. | X | |
| Parent Involvement | Mailings – Informational to parents | X | |
| Parent Involvement | Parent training or educational services | X | |
| Parent Involvement | Parent Stipends (unless working part-time providing a non-administrative service. Local 143B Union regulations may apply) | | x |
| Parent Involvement | Parent Recognition Luncheon | | x |
| Parent Involvement | Parent Recognition Luncheon | | x |
| Parent Involvement | Parent-Student Dinner/Parent-Staff Dinners | | x |
| Professional Development | Conference registration fees for PD for administrators and school staff that is tied to instructional program, school climate and school reform | X | |
| Professional Development | Education consultants | X | |

| | | | |
|---|---|---|---|
| Professional Development | Professional Development – instructional best practice/pedagogy, coaching/mentoring, school climate, and school reform | X | |
| Professional Development | Substitute Teachers to release core academic program staff for PD activities | X | |
| Professional Development | Off-site retreats/PD: Only allowable if it can be demonstrated that, 1) the skills and activities the students would be learning and doing are unique to that particular space and could not be replicated on-site or at a closer location, and 2) costs are necessary and reasonable and follow applicable CPS policy and procedures. The per person/per day cost cannot exceed $125; CPS The retreat budget, agenda and travel approval must be submitted 4 weeks prior to scheduled retreat. | X | |
| Professional Development | Off-site retreats/PD hosted: Overnight hotel accommodations for multiple-day retreats | | x |
| Staff travel | Staff travel reimbursements – employees are reimbursed for these costs based on CPS board policy for travel allowances. | X | |
| Staff travel | Lodging and per-diem - Follow district guidelines. No hotels for conferences or training held within 50 miles one way of Chicago Public Schools. | X | |
| Staff travel | No costs for tours or souvenirs offered by conference events will be reimbursed. | | x |
| Student supplies | Homeless Student supplies (including emergency clothing) | X | |
| Student supplies | Supplemental instructional supplies, such as small calculators, notebooks, supplemental texts and novels that students could use for academic purposes, provided they are of reasonable cost | X | |
| Student supplies | Student Incentives - No cash or gifts of any kind, including: Six Flags Great America Admission pass, YMCA pass, amusement/water park admissions, gift cards, laptops, iPods | | x |
| Student supplies | T-shirts/bookbags/baseball caps, athletic uniforms, letter sweaters or other school "spirit" apparel with school or district logos. | | x |
| Student transportation | Transportation associated with eligible programming | X | |
| Student transportation | Transportation to and from school for students in temporary living situations ONLY | X | |

# Title II
## Allowable and Non Allowable Checklist – FY25

Title II is authorized by the Every Student Succeeds Act (ESSA). Use of funds is subject to state and federal eligibility, usage, and monitoring requirements.  One of the objectives of Title II funding is to provide qualifying schools with supplemental funding intended to reduce class size.

**NOTE:** Per Sec. 511, when issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds, including but not limited to State and local governments, shall clearly state the Stevens amendment: "Funds for this activity were provided by ESSA Title II."

● Positions paid for by Title II must be supplemental and **used for reduced class size only**
● All Federally-funded positions are subject to attestations of "time and effort" to ensure their efforts are aligned to the intent and scope of the funds (in this case, Title II)

# Title III

## Allowable and Non Allowable Checklist - FY25

Title III funding provides qualifying schools with supplemental funding intended to help ensure that children and youth who are English Learners attain English language proficiency, develop high levels of academic attainment in English, and meet the same challenging state academic standards that all children are expected to meet.

Title III is an entitlement program, under the Every Student Success Act (ESSA). The allocation of funds is subject to state and federal eligibility, usage, and monitoring requirements.

**NOTE:** Per Sec. 511, when issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds, including but not limited to State and local governments, shall clearly state the Stevens amendment: "Funds for this activity were provided by Title III

The Illinois State Board of Education (ISBE) identifies CPS as the Local Education Agency (LEA) and grants OMME the authority to allocate Title III funds to CPS schools according to EL-specific needs within the district.

Federal (Title III) grant monies are earmarked to cover any excess cost in providing EL-specific supports and services that enhance and maximize EL programs. CPS maximizes the use of these supplemental funds by providing the following to eligible schools.
● Dual Language Coordinator 1.0 FTE
● EL tutoring (Grades K-8) (not loaded in the original budget)

# Supplemental EL Funding - FY25

The State of Illinois Supplemental EL funding provides supplemental funds to help local school districts meet the extra costs of providing language instruction support to meet the needs of English Learners (ELs) and to facilitate their integration into the regular public school curriculum.

● The Transitional Bilingual Education / Transitional Program of Instruction (TBE/TPI) programs are for students who come from a diverse language background and have not met proficiency on the English Language Proficiency Screener and/or ACCESS
● Allocate resources to provide content area instruction that is accessible to all English learners
● Determine what services, instruction, activities and interventions will best meet assessed student needs
● Utilize state funds appropriately and effectively to provide supplemental support

**Recommended allocations for EL Programs from local funds and Title I**

| Type of Allocation | Details |
|---|---|
| Professional Development | Provide PD for teachers of ELs that is relevant to any of the following:<br><br>● Current research in the education of ELs (e.g. use of native language instruction, dual language education, differentiation for ELs based on English language proficiency levels, teaching English as a second language, English language development, Spanish language arts, Spanish language development, etc.)<br>● Content-area and language proficiency assessment of English Learners.<br>● Research-based methods and techniques for teaching language and literacy to English Learners<br>● Research-based methods and techniques for teaching language and literacy to English learners identified as having special needs |
| Instructional Materials | Purchase research-based materials to support literacy, language, and content-specific instruction for ELs. This may include student text sets in the languages of the students and in English; software that supports language and literacy development of ELs. |
| Before and After School Programs | Provide additional support to ELs before and after school targeting student needs in academic, language and social/emotional development. |
| Salaries for Teachers | Fund salaries for ESL- and/or bilingual-endorsed teachers teaching ELs in order to reduce class size and/or provide targeted, enhanced instruction to ELs. |
| Salaries for Tutors | Fund salaries for tutors for ELs to provide native language support and/or facilitate student understanding and access to content area instruction (e.g. English and/or native language arts and other core subjects). |
| Parental Empowerment and Engagement | Schools that have a Transitional Bilingual Education (TBE) program are required to establish a Bilingual Advisory Committee (BAC) and may use at least $1250 of the supplemental funds. These funds will help to foster parent engagement and support parents of ELs by providing training and capacity building opportunities. |

The Illinois State Board of Education (ISBE) identifies CPS as the Local Education Agency (LEA) and grants OMME the authority to allocate Supplemental EL funds to CPS schools according to EL-specific needs within the district.

State Supplemental EL grant funds are earmarked to cover any excess cost in providing EL-specific supports and services that enhance and maximize EL programs. CPS maximizes the use of these supplemental funds by providing the following to eligible schools.

- EL Resource teacher (ELPT): 0.5, 1.0, or 2.0 FTE
- Bilingual Advisory Council $1250 (not loaded in the original budget)
- English Learner Program Teacher (ELPT) stipends (not loaded in the original budget)

Local funding: In order to ensure that all EL students are provided instruction, per IL Administrative Code Section 228, OMMEstrongly recommends that the principal staff and schedules Bilingual- and/or ESL- endorsed teachers in core content courses. Positions paid out of local funding should be allocated for EL teachers before receiving EL supplemental positions.

# INQUIRY REPORT

Budget Inquiry is a robust tool in Oracle that can provide detailed information on school budgets. Six important details are provided.

1. Original Budget

2. Current Budget

3. Commitments

4. Obligations

5. Expenditures

6. Funds Available

This report allows each school to inquire into each budget classification. The information can be shown in summary format or as a detailed list, as indicated below from the selections on the menu. The detailed report shows original budget dollars, current budget dollars, commitments in dollars, obligations in dollars, expenditures in dollars, and funds (dollars) available. The report can be sorted by fund, account, program or grant. A report on just one budget classification can also be generated.

More detailed information about transactions to and from this line can be generated. The report can also show the descriptions of each of the budget line components if so selected. A function is also in place to allow the report to be exported to Microsoft Excel.

Principals should contact their School Budget Specialist for detailed information on how to generate these reports.

The screen below shows the inquiry search criteria and sorting screen.



# SEGMENT LOOKUP TOOL

The Segment Lookup tool in Oracle provides the budget classification description listing. It gives a description for each fund, account, program and grant number used in the system. It also provides the Oracle and Legacy numbers associated.

The report below is an example of a listing that is selected for programs associated with high schools.



# POSITION REPORT

Position report contains personnel information for each school. It includes a comprehensive list of school positions. Detailed information on individual positions is currently available. The information provided includes: name, budget classification, committed/encumbered/expended funds against the position number, job code, scheduled time, open/close dates, etc.

A sample report can be requested for your school. The principal should contact the School Resource Strategy Department for more information on how to run reports and receive detailed information.

The screenshot below shows some of the information available on an individual position.





# LOCAL SCHOOL COUNCIL

# RESOURCE GUIDE

## Part Five: Principal Evaluation

## Introduction

Chicago is the only major city in the United States in which parent-majority Local School Councils (LSCs) hire their principal and then evaluate their principal's performance as a key step to lay the groundwork for improving their school.

In important ways, Chicago's LSCs function like the school boards that oversee most U.S. school districts outside of the nation's large cities. These school boards usually choose a superintendent of schools for a limited-year contract and then may choose to rehire or not to rehire their superintendent. Similarly, because of the 1988 Chicago School Reform Act passed by the Illinois General Assembly, Chicago's LSCs select principals for four-year contracts and then evaluate their performance during the contract term.

# The Unique Role of LSCs in Principal Evaluation

Hiring and evaluating your school's principal is a unique opportunity and responsibility. Research consistently shows that the principal's leadership is the single most critical force that shapes all aspects of your school's effectiveness.

Principals hired by an LSC are "contracted;" that is, they sign a four-year contract. One of the provisions in the principal's contract is that the LSC will evaluate them. The contract states that "The evaluation shall be in writing in a form prescribed by the Board of Education, which includes the following criteria:

1. Student academic improvement
2. Student absenteeism
3. Instructional leadership
4. The effective implementation of programs, policies, or strategies to improve student academic achievement
5. School management
6. Any factors deemed relevant by the local school council" [Principal Contract, Section IV.A.(a) 6)]

## Two Types of Principal Evaluations

Local School Councils must carry out two different types of evaluation of their principals:

**Type 1: Annual Principal Evaluation**
The process of annual principal evaluation is carried out during each of the four years of the principal's contract. Its key purposes are to monitor the principal's performance, to advise and assist the principal as they carry out key duties during the year, and to take stock of the principal's performance at the end of the year.

No annual principal evaluation will be issued by the LSC unless the contract principal has served five or more school months as the new principal. This means that the principal contract must start no later than October 31st (BR 23-0824-EX3).

The CEO/Network Chief also conducts an annual evaluation of each principal. The Network Chief sends the data used in the Chief's evaluation of the principal to the Local School Council per the Uniform Principal's Performance Contract section *IV A (b) (Board Report 14-0625-EX12)*. The LSC Chairperson may request a copy of this annual evaluation from the Network Chief. If further assistance is required, please contact the Office of LSC Relations.

**Type 2: End-of-Contract (Cumulative) Evaluation**
The end-of-contract (cumulative) evaluation is carried out during the third to sixth month of the final year of the contract. It must be completed no later than 150 days before the end of the contract. In addition, the principal must be notified of the evaluation and the renewal/non-renewal decision no later than 150 days before the end of the contract. If the contract ends June 30 (as most do), the evaluation is

carried out in the fall and winter of the principal's final contract year. The cumulative evaluation must be completed prior to the LSC voting on the renewal of the contract.

The cumulative evaluation also helps the LSC and principal determine the strengths and weaknesses of the school's progress during the existing contract term as the basis for planning future priorities for improving the school.

The cumulative evaluation, which must be approved in an open session, will become key evidence if an LSC decides not to renew their principal's contract. If the principal has received all evaluations of Meets (*Proficient*) or Exceeds (*Excellent*) Expectations in the CEO's prior Years' Evaluations under this contract, the principal may request an arbitration hearing as detailed in 105 ILCS 5/34-2.3 (1.5). The Principal must file the request for arbitration with the Law Department within fifteen days of the non-renewal vote decision. Careful evaluation processes are essential to successfully defending an LSC's decision.

***Note: There is no provision in the Principal's Performance Contract for a feedback session following the LSC 's completion and vote on the cumulative evaluation.***

## Some Key Considerations for Effective Evaluation

For both types of principal evaluations, there are common approaches and practices for effective evaluation.



These three overlapping circles represent the basic foundations for an effective principal evaluation.

The LSC should base the principal evaluation on

● current research about effective principals and effective principal evaluation.

- local school priorities for school improvement and an effective principal.
- laws and policies governing annual principal performance evaluation and the cumulative principal evaluation, as principal evaluation is both a legal and contractual obligation of the LSC.

## Overview of the Principal Performance

## Evaluation Form and Process

Under the Illinois School Code, Local School Councils (LSCs) evaluate principals annually using the Board-approved principal evaluation form. The principal contract requires that the Principal and LSC meet at least once as the LSC gathers information to prepare its annual evaluation of the principal *(Uniform Principal's Performance Contract Section IV A (c) (Board Report 14-0625-EX12))*. On August 24, 2023, the Board approved the current LSC Principal Evaluation Form for use by LSCs. This chapter in the Local School Council Resource Guide provides details explaining this form, evaluation criteria, and timelines. Note: that the LSC Principal Evaluation Form is aligned to the domains and components within the CPS School Leadership Framework used by the CEO/Network Chiefs to annually evaluate principals.

Using the Principal Evaluation Form, the LSC will evaluate the principal in two key categories (Professional Practices and Student Growth) and vote on a Preliminary Final Summative Evaluation Rating.

1. Professional Practice (weighted at 50% of the final rating) (Due May 1) and
2. Student Growth and Other Measures (weighted at 50% of the final rating) (Due in October.)
3. A Preliminary Final Summative Principal Evaluation Rating using the information from the Professional Practices, The Student Growth and Other Measures and other factors as agreed to (Due November 1)

The first component of the evaluation assesses Professional Practice and is determined based on the LSC's interactions with the principal throughout the school year, including observations of the principal's work with students, staff, families, and community. The LSC will rate the principal's professional practice on each of the following four domains:

- Organizational Leadership
- Instructional Core
- Climate & Culture
- Talent

The second component of the evaluation assesses Student Growth and Other Measures. The CPS Department of School Quality Measurement and Research will

determine the data points for this part of the evaluation.

The LSC will review the Professional Practice and the Student Growth and other measures and any additional evaluation factors that were agreed to by the principal and LSC by November 1 of the prior year.

The LSC will vote on a preliminary final summative evaluation rating for the prior year by November 1.

**Summary of Key Aspects of the Evaluation Form and Process**

1. Evaluation Form – The LSC Principal Evaluation Form and the CEO's Principal Evaluation Form are aligned. The principal's performance will be rated based on the same professional practice domains, student growth measures, and rating levels by the CEO/Network Chiefs and the LSC.
2. Online Tool – Utilize the Principal Evaluation Online Tool (PEOT) to streamline communication between the LSC and the principal. The PEOT offers convenient features such as the ability to compile and save evaluation information at any time and easily access prior evaluations to determine a cumulative rating as the principal's contract concludes. This tool aims to enhance collaboration and efficiency in the evaluation process.
3. Principal Professional Practice Domains - The LSC Principal Evaluation form evaluates the principal based on four (4) domains and 28 key behaviors.
4. Student Growth and Other Measures - The evaluation form ensures that academic growth indicators and other student outcomes are important components of the LSC's annual evaluation of the principal. The two-phase timeline for completing the evaluation ensures that LSCs will have student growth and other data to assess in combination with the principal professional practice portion of the evaluation for the same time period. Further, the student growth measures and other measures used by LSCs will align with the same measures used by the CEO/Network Chiefs in their principal evaluation and by the Board to evaluate school progress.

5. The Two-Phase Timeline – Principals will receive a final summative evaluation rating that includes student growth and other measures from the same school year as the principal practice evaluation rating completed in the Spring. In order for this to occur, the evaluation form will be completed in two phases. Each spring, the LSC will finalize the principal's professional practice portion of the evaluation and enter it into PEOT by May 1st. If changes in the evaluation are made after the optional feedback session, those changes will be voted on in an open session of an LSC meeting and will be entered into PEOT by May 30th. Each Fall, the LSC will finish its evaluation after receiving the student growth and other measures for the performance period under review (the previous school year). During that period, the LSC will combine the two assessment components and any additional indicators. A vote will be conducted in the open session of an LSC meeting to approve the Preliminary Summative Rating of the principal by November 1st.
6. The LSC will give the approved rating to the principal. If a feedback session results in changes to the evaluation, those changes will be approved in the open session of

an LSC meeting, and the Final Summative Principal Evaluation Rating will be entered into PEOT by November 30th. If no feedback session is held, the Preliminary Summative Rating becomes the Final Summative Principal Evaluation Rating. The Final Summative Principal Evaluation Rating is given to the principal, and a copy is given to the CEO or designee (Network Chief).

## Overview of the LSC Principal Evaluation Process

**Step 1:** During the Summer and Fall the LSCs should 1) identify a member who will be responsible for entering information into PEOT, 2) review the four (4) domains and 28 key behaviors so all LSC members understand the criteria for evaluating the principal's professional practice and 3) identify, if desired, additional indicators that will be included in the principal's evaluation. By mutual agreement (agreement between the LSC and the principal), the LSC establishes additional indicators and records them by November 1st.

**Step 2:** Throughout the school year, the LSC meets with the principal to discuss the evaluation, collects evidence of the principal's professional practice based on reports delivered by the principal at LSC meetings and observations at school and school events.

**Step 3:** At the end of the school year (by May 1st), the LSC rates the principal on the applicable 28 key behaviors on the LSC Principal Evaluation Form to establish a professional practice rating. An optional feedback session may occur during the month of May. If, on the basis of the Feedback Session, there is a revision in the Final Principal Professional Practice Scores and Ratings, these are recorded in PEOT by May 30th. The LSC must vote in an open session on the evaluation scores and ratings before the information is entered into PEOT.

**Step 4:** LSCs receive a report each fall from the Department of School Quality Measurement and Research that tabulated the overall score for the Student Growth and Other Measures component of principal evaluation. Based on the tabulated data a report is generated for the LSCs. LSCs are notified in the fall when this report is available to be viewed in PEOT. Note, that for LSC convenience, PEOT will automatically score the school's data for each measurement based on the school's performance as well as tabulate the combined score of all Student Growth and Other Measures.

The LSC should consider both the Student Growth data and results together with their already completed Professional Practice rating plus any additional indicators. The LSC will then arrive at a decision on the Preliminary Summative Rating, enter it into PEOT, and share it with the principal by November 1st. The LSC may conduct an optional Feedback Session once a rating is generated. The LSC may vote to revise their rating on the basis of the Feedback Session. If the rating is revised, it must be voted on in open session and, if approved, entered into PEOT by November 30th. The Final Summative Principal Evaluation Rating must be approved by a majority of the serving members of the LSC. If no feedback session is held the preliminary summative rating becomes the Final Summative Principal Evaluation

Rating.  The Final Summative Principal  Evaluation Rating Is given to the principal and a copy is given to the CEO or designee (network chief).

**Timeline for LSC Principal Evaluation**

| | |
|---|---|
| October – Novemer | <u>Complete the final evaluation, including the Student Growth and Other measures for the Prior Year, and vote on the Final Summative Principal Evaluation Rating and enter the information into PEOT. NOTE: Theprofessional practice approved in the spring may not be changed</u><br>•       LSC reviews the Student Growth and Other measures and votes in open session on the Preliminary Summative Rating to complete the evaluation from the prior school year. Results are entered into PEOT by November 1st<br>•       Hold optional feedback sessions and revise evaluation if needed. Vote on any revisions in open session and enter changes into PEOT by November 30th. |
| October - March | <u>Define Performance Expectations for the Current School Year</u><br>•       Local School Council (LSC) and principal review and discuss the evaluation, including Professional Practice results from the previous year.<br>•       By mutual agreement, LSC establishes additional indicators (optional) and records them by November 1st.<br><br><u>Monitor Professional Practice for the Current Year</u><br>•       LSC collects evidence of Professional Practice based on reports delivered at monthly meetings and observations at school and school events. |
| April | <u>Determine Preliminary Professional Practice Scores</u><br>•       LSC members meet in closed session to discuss preliminary ratings for Key Behaviors. LSC scores the principal's performance on each Key Behavior for each domain. This occurs before the open session vote.<br>•       The LSC votes in open session to approve the evaluation which must be given to the principal by May 1st. |
| May | <u>Conduct Feedback Session</u><br>•       LSC shares preliminary ratings with the Principal in PEOT at least 48 hours before the feedback session. LSC and principal meet for feedback on Professional Practice in a closed session. The LSC may modify Key Behavior Scores and/or Domain Scores following this conversation. The feedback session must take place by  May 30th .<br><br><u>Finalize Professional Practice Scores</u><br>•       LSC votes to approve final domain scores for Professional Practice in an open session only if the LSC has changed the approved earlier Principal Professional Practice Scores and Ratings.<br>•       LSC chairperson or designee enters final domain scores into PEOT by May 30th.<br>•       LSC shares final Professional Practice scores with the principal by May 30th . |

| October | Add Student Growth and Other Measures Scores Determine Final Evaluation Score |
|---|---|
| | • Department of School Quality Measurement and Research **sends Student Growth Report to LSC.** |
| | • LSC meets in closed session to decide the Preliminary Summative_ Rating by combining the Principal Professional Practice Score (completed in the Spring) together with the Student Growth and Other Measures Score and the principal's performance on any additional indicators. The LSC votes in open session on the preliminary Summative Rating. |
| | • LSC chairperson or designee enters the Preliminary Summative Rating and any comments into PEOT and shares by November 1st. |
| | • The LSC chairperson shares the final preliminary summative rating with the Principal by November 1st . If the rating is revised based on a Feedback Session, the final summative principal evaluation rating is voted on in an open session and entered into PEOT, and submitted to the Principal and CEO by November 30th. |

## Process for Evaluating Professional Practice

The LSC will annually evaluate the principal's professional practice by assessing the same four domains that the CEO/Network Chief uses to evaluate the principal. The principal's score in this area totals 50% of the principal's overall evaluation rating. This table lists the four professional practice Domains you will evaluate along with the corresponding weight they are given in the Professional Practices Evaluation Score.

| Domain | Weighted Percentage of Overall Evaluation Score |
|---|---|
| **Domain 1:** Organizational Leadership | 25% |
| **Domain 2:** Instructional Core | 25% |
| **Domain 3:** Climate & Culture | 25% |
| **Domain 4:** Talent | 25% |

The LSC will complete the following steps to evaluate the principal's professional practice:

1. **Collect Evidence** - Local School Council members will collect evidence of a principal's professional practice based on interactions at meetings and observations of the principal's work in the school and in the community. A principal delivers reports at each LSC meeting. These reports are a crucial opportunity for LSC members to understand the principal's practice and to ask questions to obtain additional information. LSCs should consider the four domains when planning the monthly agenda. There is more information on collecting evidence in Appendix G.

2. **Decide on the Rating** - The LSC shall rate the principal on each domain based on a principal's performance on the applicable 28 Key Behaviors identified in the evaluation form (Appendix A). The LSC is charged with evaluating the principal's fulfillment of each Key Behavior throughout the school year and assigning a score. The scores given to each of the Key Behaviors within a domain are totaled for a combined score in each domain.

**Benefits of Using Behavior-Based Rating Scales Include:**
- Provides a way to measure performance based on behavior.
- Anchors performance in concrete behaviors.
- Provides a way to discuss performance in a more objective way.
- Enables the LSCs to calculate more precise ratings because they are evidenced based

**Building an Effective Principal Evaluation Team**
For either the annual evaluation or cumulative evaluation, there are several different ways that your LSC can organize an effective principal evaluation team. Your preferred method will depend on the dynamics of your group and how you best reach consensus. It is important to decide on an evaluation method at the beginning of the school year because it will determine who will gather information throughout the year to support the evaluation decisions.

- A subcommittee of the LSC gathers information, rates all the key behaviors and domains and then brings the ratings back to the entire LSC for discussion.
- Subgroups of the LSC are assigned to domains with which particular members are most familiar. These subgroups gather information about their assigned domains, rate them, and bring them back to the entire LSC for discussion.
- Decide whether the LSC Chairperson or designee is responsible for entering ratings in PEOT.

**Suggested Ground Rules for Principal Evaluation Meeting**

To make principal evaluation meetings as productive and efficient as possible, your LSC can agree to a set of ground rules for proceeding effectively. For example:

- Choose a neutral moderator (who need not be the LSC chairperson) to help the group arrive at consensus ratings on the domains.
- Arrive and start meetings on time.
- Raise your hand to be recognized when you wish to speak.
- Ask questions with respect. Speak one at a time, and listen when someone else is talking.
- Agree to work through disagreements and stay with the evaluation process from beginning to end.
- Stay focused on the principal's professional development as it impacts overall school achievement.
- Encourage participation by all. Encourage others who have not yet spoken to voice their opinions before those who have already spoken speak again.
- Be brief, avoid repetition.
- Respect each other and each other's points of view.
- Monitor your speaking time
- Use an LCD projector (if available) to project PEOT and/or print out the LSC Principal Evaluation form in Appendix A for members to reference

**Organizing the Evaluation Process**

- LSC meets in open session to decide on evaluation methods (e.g. gathering information and completing the evaluation form as a council, as a subcommittee or an individual), to decide whether to include non-LSC members on  the Principal Evaluation Team.  If non-LSC members are on the committee, they may vote on recommendations to be presented to the entire LSC for discussion and final approval. The LSC will set the ground rules for conducting the evaluation process (including a timeline).

- Principal provides monthly updates on activities related to the four domains as part of the regular principal's report. The principal and LSC discuss the principal's progress.

- LSC monitors the principal's progress in the domain areas and gathers information to clarify the evaluation ratings.

- A member of the LSC principal evaluation team prints copies of the LSC principal evaluation form to refer to regularly at meetings.

- Contact your LSC Relations Specialist to learn best LSC Principal Evaluation practices or to address questions.

**How to Plan the Evaluation Process and Monitor Progress**

**What are the Different Evaluation Methods?**
As already discussed, the LSC should create its Principal Evaluation Team in the way that it believes will be most effective, based on an analysis of how the LSC has worked together most effectively in the past.

**What is the timeline of Principal Evaluation Activities?**
The LSC should agree on a specific timeline for carrying out the principal evaluation during the school year.

**How Should the Principal Provide a Monthly Update?**
It is recommended that the principal provide the LSC with written monthly updates to help keep the LSC informed about their performance throughout the year. This does not need to be an elaborate report, instead a simple listing of activities under the corresponding domains will work well. This can be a regular part of the principal's report. These lists will save time for the principal because the LSC should not have as many questions to ask during the information-gathering portion of the process.

**How Does the LSC go about Gathering Information to Rate the Domains?**
Make sure to review the steps listed below to ensure that you gather the necessary information to support your evaluation decisions. Leave plenty of time to gather information. A list of potential support materials appears in (Appendix G).

1.   Decide what information is needed.

2.   Determine who are the best people to gather the information. Members of the LSC will know different people who will be able to help in the process.

3.   Determine the sources for the information. Evidence of principal achievement in the domains can also be found through:
    - Regular interactions with the principal, teachers and other staff, administrators, students, parents and community members
    - Documents available at the school or Network Office. Principals are obligated to make documents available to the LSC. If the LSC has difficulty getting documents, contact the Network or the Office of Local School Council Relations at 773-553-1400.
    - Data about your school is available on the Chicago Public Schools Department of School Quality Measurement and Research website https://cps.edu/performance
    - Data interview(s) with the principal
    - School and classroom visits arranged in cooperation with the principal

4.   Optional satisfaction surveys developed by the LSC and approved by the CPS Law Department. Contact an attorney in the school Law Department for assistance at  773-553-1700. Since these surveys are being used for the principal evaluation the results are confidential.

5.   Set a deadline for gathering the information. This will help ensure that the LSC stays on task and on time.

6.   Organize and review the information.

7.   Arrange a meeting with the principal to discuss any additional questions that the LSC was unable to answer and give the principal a chance to provide feedback on the information: (sometimes the principal is the best source of information, but it is always good to get other perspectives). Plan carefully for this meeting.

One of the best ways to gather information from the principal is to ask behavioral questions. If there are key behaviors under a specific domain that the LSC is having a difficult time rating, ask the principal for specific examples of how his actions demonstrate this behavior on the job. It is most effective to ask about real examples (omitting names or details that compromise confidentiality):

*   Tell me about a time when you effectively...
*   What was your role?
*   What were the difficulties you faced and how did you overcome them?
*   What did you learn from the experience?
*   Where did you apply that learning?

Although these questions may sound like an interview, remember that the focus is on specific examples and stories that show how the principal has demonstrated skills related to a key behavior or domain. Use all the information gathered to complete the evaluation form.

**How does the LSC Approach Rating the Domains?**

LSCs may go about the domain rating process in several different ways. Below is a list of suggested methods to complete the evaluation process:
*   A subcommittee of the LSC gathers information, rates all the domains, and then brings the ratings back to the entire LSC for discussion.
*   Subgroups of the LSC are assigned to domains with which particular members are most familiar. These subgroups gather information about their assigned domains, rate them, and bring them back to the entire LSC for discussion.
*   Each LSC member rates all key behaviors and domains independently and then brings the ratings back to the entire LSC. In a closed session, each member should share the evidence with other members. The LSC reviews the individual ratings as a group to reach a consensus on one set of ratings. The LSC should avoid simply averaging the ratings together because averaging will result in a less meaningful overall rating.
*   The LSC as a group discusses each domain and reaches a consensus on a rating for each domain.
*   The ratings need to be voted on during an open session.  **Do NOT say the rating number values out loud in the open session.** The LSC chairperson

or designee enters the approved ratings in the Principal Evaluation Online Tool (PEOT).

Reaching consensus is important so that all members have a voice in the rating process. Reaching consensus on domain ratings at this point in the process also helps LSCs to easily achieve the majority vote it needs to approve the evaluation at the end of the process.

---

- Use the key behaviors to help determine the rating on the domain.
- Make sure the rating can be supported with specific examples that describe the domain.
- Avoid rating the domain too high or too low just because the person being rated is a nice person or a difficult person. Remember, everyone has areas that can be improved and your responsibility is to improve the school's effectiveness for students.
- When rating the key behaviors, notice if there are certain categories that are rated much lower than the other(s).

---

**How to Determine a Final Combined Professional Practice Score and Rating**

1. The LSC will discuss and determine scores for each of the applicable 28 Key Behaviors. The LSC will assign a numerical value to each Key Behavior using a 1-4 scale where 1=Strongly Disagree, 2=Disagree, 3=Agree, and 4=Strongly Agree (See Appendix B). Note that any discussions related to evaluating the principal's performance should occur in a closed session meeting in accordance with the Open Meetings Act.

2. Once consensus is reached and a vote is taken in an open session, the LSC chairperson or designee will enter the scores for each Key Behavior in PEOT and post them by May 1st. If changes to ratings occur after an optional feedback session, post the revised ratings by May 30th.

3. PEOT will automatically tabulate the combined score and performance level for each domain by adding together the scores entered for each Key Behavior and dividing by the total number of Key Behaviors listed for that domain (See Appendix B).

4. PEOT will also automatically apply the weights enumerated for each domain to calculate the final overall Professional Practice score and rating (See Appendix B).

| Ratings are based on the following range of scores. Rating designations are applied to each domain as | Performance Rating |
|---|---|
| 3.5–4 | Excellent |
| 2.5–3.4 | Proficient |
| 1.5–2.4 | Developing |
| 1-1.4 | Unsatisfactory |

**Working Toward Consensus**

You can expect that there will be conflicts resulting from differences of opinion and points of view. Do not quit or back down when things get difficult. Stay in there and work out the disagreements. The evaluation will be much better as a result. To help resolve differences of opinions and points of view, remember that all assessments need to be based on observation of principal behavior. The key behaviors are an important reference point.

If the discussion of the domains gets time-consuming and tense, keep these points in mind:

● Evaluation should be fair and based on behavior demonstrated by the principal, not on opinions.

● Valuable feedback is constructive and very important for the principal to improve the school and his/her skills.

● Try to keep the discussion on track.

● It is important for the LSC to reach a consensus on ratings for each of the four domains.

The principal should complete a self-evaluation of their professional practices prior to the LSC finalizing their ratings of the principal's professional practices. After the LSC approves the evaluation, a copy of the evaluation must be provided to the principal by May 1st. The principal may then give the LSC a copy of the principal's self-evaluation. The LSC and the principal may agree to hold an optional feedback session to discuss the principal evaluation. The LSC can, but is not required to, revise the evaluation based on an optional feedback session with the principal. An important way to ensure the evaluation is fair is to conduct a feedback session with the principal. The feedback session allows the principal to respond to the evaluation and request revisions in the ratings.

## Feedback Session

After 1) the LSC reaches a consensus on evaluation ratings and completes the evaluation form and 2) the principal completes his/her self-evaluation, they should exchange their evaluations in preparation for the feedback session. The exchange should happen before the feedback session to allow both the principal and LSC time to review and plan. Comparing the two evaluations provides information for discussion points during the feedback session. During the feedback session, the principal and the LSC can discuss the principal's Professional Practices and set expectations for the following year.

If the LSC revises the evaluation, the LSC must vote to approve the revision in an open LSC meeting.

***Note: Either the principal or the LSC may request a feedback session for the annual evaluation. However, both the principal and the LSC must agree to the feedback session. See Principal Performance Contract - Section IV A. (d).***



The key to a productive feedback session is good preparation by both the LSC and the principal

## Prepare for the Feedback Session For LSC Members

The LSC shares the ratings with the Principal in the Principal Evaluation Online Tool (PEOT) at least 48 hours before the feedback session. The LSC should meet before the feedback session to decide which members would like to discuss the ratings with the principal. Having a copy of the principal's self-evaluation and comparing it with the LSC evaluation may provide additional information that will be valuable to the LSC. Pay special attention to:

● Domains rated very differently by the principal and the LSC

● Any domain rated significantly lower than other domains

● Factors that the LSC feels were not covered in the evaluation

The LSC should come to the feedback session prepared to:

● Explain their ratings and give examples, in case the principal has questions.

● Give constructive, helpful feedback to the principal on his/her overall performance this year. For instance, what did they think the principal did especially well? What areas need improvement next year?

Preparing examples for any domains that are rated differently by the principal and LSC in advance of the meeting will make the conversation easier. In addition to comparing the evaluations, the LSC should decide on 3 to 5 most important points to discuss with the principal regarding the evaluation. This will help focus the discussion and prevent it from becoming emotional or heated. It is also helpful to designate one or two people who will provide feedback to the principal during the meeting. The LSC should also come to the feedback session prepared to discuss priority goals they would like the principal to focus on during the next school year.

**Prepare for the Feedback Session For the Principal**

The principal should print a copy of the LSC evaluation of the Preliminary Principal Professional Practice Score/Rating from the PEOT and use the points listed in the previous section to compare the two evaluations in preparation for the feedback session. In addition, the principal should bring questions about any of the LSC's ratings and copies of progress reports, and any other materials that might be helpful in the discussion. The principal should also come to the feedback session with some suggested priority goals of his or her own for the next school year.

**Reminder**

**The Feedback Session**

**It is a closed LSC meeting between the principal and LSC members only, unless the principal and LSC agree to include non-LSC members.**

**If agreed to, it must occur within 30 days of the LSC submitting its preliminary principal professional practice score and/or the final summative score to the principal.**

**Conduct the Feedback Session**

While the LSC's evaluation is the definitive one, the principal may provide additional information that is valuable to the LSC during the feedback session. The LSC and

principal should discuss the format they would like to use for the discussion, but outlined below are some recommended guidelines.

**Three Key Steps of the Feedback Session**

- The LSC and principal discuss each domain rating that contained a discrepancy between the two evaluations. Both the LSC and principal should be prepared to give examples to support their ratings.

- The LSC presents the three to five important points that it has prepared.

- The Principal responds.

**Guidelines for Giving and Receiving Constructive Feedback**

If completed, the feedback session can be the most beneficial and most challenging part of the evaluation process. Done well, it facilitates communication, learning, and improvement. Done poorly, it can create misunderstanding and resentment.

**For LSC Members**

Here are some guidelines for giving constructive feedback:

- **Be well prepared** before the feedback session. Be sure that you have behavioral examples to support any low ratings you may have. Review the principal's self-evaluation and identify areas where your ratings are far apart. Be prepared to discuss those points.

- **Start with positives**. Talk about what has worked well during the year and the principal's strengths. Focus on behavior, not attitude or feelings.

- When **discussing weak areas or areas for improvement, again,** focus on behavior, not attitude or feelings. Identify the behavior and the effect or consequences of that behavior on the school. Stay as objective as possible. How would strengthening a behavior help the school? Provide suggestions for improvement, such as professional development training for school leaders or finding a mentor.

- Practice giving feedback to your LSC before your meeting with the principal, and give each other feedback. **Give the principal the opportunity to respond.**

- Avoid: blame, anger, and judgments of the person. Be objective about strengthening the behavior.

- Follow the golden rule, provide feedback to others as you would have them provide feedback to you!

**For Principals**

Receiving feedback will make a big difference in how the feedback session goes. It is challenging to stay objective and not get defensive, particularly when weaknesses or development areas are being pointed out. Here are some guidelines for receiving constructive feedback:

**Listen to the feedback** and reflect back what you have heard. This lets the LSC know you have heard what they have to say.

**Acknowledge what was true about the feedback**. Even if you disagree with the LSC rating on a particular domain, there is always some degree of truth in the feedback.

If you disagree with a rating or with some piece of feedback, state your own point-of-view and briefly share information that the LSC may not have had to clarify your point of view. Focus most of your comments on your own behavior during the school year.

**Create a partnership with your LSC in developing improvement plans for the upcoming year.** The best way to create a positive end of year feedback session is by having a strong partnership throughout the year.

**Reminder**

Set a date to approve the final evaluation. The LSC must take a public vote to approve the final evaluation before it can enter the final rating in the PEOT and share it with the principal and the CEO's designee by November 30th.

When these steps are completed, the LSC will share the completed form with the principal and the CEO's designee by November 30th using the PEOT.

## Some Guiding Principles for Good Evaluation

- A good evaluation is fair.

- A good evaluation supports the principal's performance. It determines areas for improvement and provides the LSC with a forum to provide valuable feedback. This feedback helps the principal focus and plan for improvement.

- A good evaluation improves communication between the principal and LSC. This evaluation process provides an opportunity for sharing information and discussing principal responsibilities in a clear and well- defined way.

- A good evaluation is objective. Do not base your evaluation on personal characteristics of the principal or any special treatment you receive.

- A good evaluation is a year-round activity that regularly assesses the principal's progress, not a sudden "gotcha" or letter of praise.

**Evaluation is not**

- based only on test scores.
- based on isolated incidents.
- based on personality conflicts.
- focused entirely on the negative.

**Evaluation Requires the Principal's On-going Collaboration**

Because evaluation is a year-round activity, it requires the on-going cooperation of your principal to make regular progress reports and to supply data and other information to the LSC. Your principal should provide monthly updates on progress concerning the four principal evaluation domains.

In addition to state law, key provisions of Section II of the "Uniform Principal's Performance Contract reinforce your principal's obligation to collaborate with the LSC in providing information to the LSC in a timely fashion with respect to CIWP development, (ii-c), expenditure plan development (ii-e), and internal audits (ii-h).

Further, your principal should provide monthly updates on the progress with respect to the four domains that are the current focus of LSC's annual and end-of-contract principal evaluation, the key priorities of the School Continuous Improvement Work Plan and the status of the budget.

The principal shall faithfully perform his or her duties and obligations as a member of the Local School Council at the Attendance Center.

- The principal shall endeavor to establish clear lines of communication regarding school goals, accomplishment, practices, and policies with the Local School Council, parents, and teachers and unless prohibited by law or Rule of the Board of Education, shall provide to the Local School Council information necessary for the Local School Council to perform the duties under the Illinois School Code.

**Evaluation Starts Early and Sticks to a Timeline**
Evaluation cannot be a last-minute process. Start early. Set a Timeline and stick to it.

**Evaluation Follows a set of Ground Rules**
Sample ground rules were highlighted earlier in this chapter.

**Evaluation is Aided by High Quality Training and Assistance**
The training you complete as a new LSC member should be supplemented by further high-quality training and assistance when you are actually carrying out the principal's annual or end-of-contract evaluation.

**Evaluation is Facilitated by Filling all LSC Vacancies**
An LSC with no vacancies can provide a broader range of perspectives and more human resources to carry out LSC evaluation responsibilities. Further, an LSC with vacancies runs the risk of not having a sufficient number of members present to take crucial votes as the evaluation proceeds.

**Completing an Effective End of Contract Cumulative Principal Evaluation**
The LSC must complete and approve the end-of-contract cumulative evaluation before the LSC makes a renewal decision. This evaluation must focus on the same criteria that are spelled out in the Illinois School Code for both the annual and cumulative principal evaluation.

While many principles and practices for conducting an effective annual principal evaluation also apply to the end-of-contract cumulative principal evaluation, there are some important differences that distinguish the end-of-contract evaluation:

● The end-of-contract cumulative evaluation covers the roughly three-and-a-half years between the time the principal began their present contract and time of the evaluation.

● The end-of-contract evaluation must be completed before the LSC makes a decision about whether or not to renew the principal's contract. The decision to renew or not renew the current principal's contract must be made in time to notify the current principal in writing by February 1, for principals whose contracts expire on June 30. For contracts with other expiration dates, the principal must be notified about the renewal/non-renewal decision in writing 150 days before the end of his or her contract.

● The LSC must complete and approve the end-of-contract cumulative evaluation; and the evaluation process may take several months. Further, if the principal's contract is not renewed, this decision may be subject to challenge through arbitration. One of the key justifications that an LSC can offer to support a non-renewal decision is a thorough end-of-contract principal evaluation.

The cumulative evaluation, which must be approved in an open session, will become key evidence if an LSC decides not to renew their principal's contract. If the principal has received all evaluations of Meets (Proficient) or Exceeds (Excellent) Expectations in the CEO's prior Years' Evaluations under this contract, the principal may request an arbitration hearing as detailed in 105 ILCS 5/34-2.3 (1.5). The Principal must file the request for arbitration with the Law Department within fifteen days of the non-renewal vote decision. Careful evaluation processes are essential to successfully defending an LSC's decision.

Below are recommendations for conducting a high-quality, end-of-contract cumulative evaluation. Steps required by law, CPS policy, or the Uniform Principal's Performance Contract contain a "must". These recommendations and requirements are presented in the format of a suggested calendar for LSC action. (This calendar assumes that the principal's contract expires on June 30th. If a principal's contract expires on another date, you can develop a calendar for LSC action based on the fact that the principal must be notified in writing on whether a new contract will be offered or not 150 days before the end of his or her contract).

Because of many important similarities between a thorough end-of-contract evaluation and a thorough annual evaluation, we often refer the reader back to relevant steps in the description of an effective annual evaluation process, in explaining how to carry out the end-of-contract evaluation.

The calendar of events listed below is based on contracts ending June 30th. In parenthesis are the month(s) of the last year of the contract if the contract does not end June 30th.

**September-October (third to fourth month after the contract start date)**
● LSC reviews the principal evaluation criteria and evaluation form for the end-of contract cumulative evaluation, reviews addenda that the LSC added to the principal's contract, and discusses this information with the principal. Refer to Step 1 of the annual evaluation process for more details. The LSC should request the following information from the principal:
  ✓ The School Continuous Improvement Work Plan and school budget for the last three years.
  ✓ The Network Chief evaluation report (if available) for each year.
  ✓ The LSC's evaluations for the last three years.
  ✓ Documentation of at least twenty (20) hours per year of professional development in accordance with his or her administrator's recertification plan, which may include but is not limited to attendance at education workshops, university conferences or other professional seminars and LSC training.

● LSC decides how they will structure their principal evaluation. Although the LSC may choose to carry out their evaluation in several ways (non-LSC members may assist in developing and disseminating the evaluation.

● LSC endorses a code of conduct for the process (including confidentiality, non- discrimination, and compliance with the Open Meetings Act)

- LSC develops and begins to carry out a calendar of activities for completing the evaluation, which includes a strategy for gathering several different types of information for completing the evaluation from various stakeholders in the school.

- LSC members participate in training to learn more about how to carry out an effective end-of-contract evaluation. The LSC may also receive on-going assistance from their LSC Specialist throughout the entire process.

- LSC fills any vacancies, so that they are not hindered in taking action while completing the evaluation.

**November (fifth month after the contract start date )**
- LSC completes the data-gathering process to prepare the principal's end-of-contract cumulative evaluation.

**December (sixth month after the contract start date )**
- LSC must complete the required ratings in the Principal Performance Evaluation form, with respect to the principal's performance during the contract to date (in closed session).

- LSC must vote to approve the evaluation in open session.

- LSC must deliver a copy of the evaluation to the principal.

**January (seventh month after the contract start date)**
- LSC must vote in open session on a motion to offer the current principal a new four-year contract. If the motion to offer a new four-year contract fails, the LSC may vote to begin principal selection. The vote on the cumulative evaluation must precede the vote to award a new four (4) year contract to the principal and must be listed on the agenda for a vote to take place.

- The LSC shall, if requested by the principal, provide reasons for its decision not to renew in writing. This statement of reasons will be important if the principal requests arbitration *(See the restrictions on being able to request arbitration on page 2 above or in 105 ILCS 5/34-2.3 1.5)*. These reasons must be provided at least 128 days before the expiration of the contract.

- February 1st is the deadline for the LSC to deliver notification in writing regarding the renewal or non-renewal of his or her contract for contracts that expire on June 30th (or the deadline is 150 days before the contract expires, if the contract has another expiration date).

**Addenda**
- If the LSC wants to add addenda to the contract the LSC needs to approve the addenda and send the addenda to the law department for approval. If the law department makes changes to the addenda then the LSC must approve the

revised addenda.

- The motion to approve a four year contract which contains approved addenda, then the addenda should be included in the language of the motion to offer a four year contract.

**Appendix A:** Principal Evaluation Form

## Appendix B: Principal Evaluation Online Tool (PEOT)

The **example** below illustrates how the online tool will tabulate the LSC's individual scores.

<u>Directions</u>: The LSC will assign a numerical value to each Key Behavior using a 1-4 scale where 1=Strongly Disagree, 2=Disagree, 3=Agree and 4=Strongly Agree.

This step will be completed by PEOT:

| | **Key Behavior** | Strongly Disagree 1 | Disagree 2 | Agree 3 | Strongly Agree 4 | N/A |
|---|---|---|---|---|---|---|
| | **Component A: Vision, Mission & Goals: Collaborates with the school community to set vision, mission and goals that reflect high expectations for every student.** | | | | | |
| 1 | Creates Continuous Improvement Work Plan (CIWP) goals with input from students, staff, families, and other members of the community | | | 3 | | |
| 2 | Regularly makes connections to the school vision and mission | | 2 | | | |
| 3 | Advocates for historically marginalized students (persons of color, various gender identities, English learners, Special Education) | | | 3 | | |
| | **Component B: Strategic Planning & Change Management: Works with staff and caregivers to align resources to school goals.** | | | | | |
| 4 | Collaborates with LSC and school stakeholders to align the budget with the school's strategic plan | | 2 | | | |
| 5 | Takes action to ensure that staff have the necessary materials, supplies, and equipment | | | 3 | | |
| | **Component C: Continuous Improvement: Leads continuous improvement processes, including tracking school goals and addressing areas of improvement.** | | | | | |
| 6 | Encourages staff to be reflective and feel safe in admitting areas/ practices that need improvement | | 2 | | | |
| 7 | Encourages use of data broken down to examine how different groups of students (especially historically marginalized) are doing | | | 3 | | |
| 8 | Uses data to identify areas to prioritize for improvement | | | | 4 | |
| 9 | Celebrates successes | | | | 4 | |

| | |
|---|---|
| **TOTAL POINTS** | 26 |
| **COMPETENCY SCORE** | 2.9 |

## Appendix C: Sample Calculation for Combining Domain Scores into a Final Principal Professional Practice Rating

When calculating the final overall Principal Professional Practice Rating, each of the 4 domains are equally weighted.

| Domains | | Weight |
|---|---|---|
| 1 | **Organizational Leadership:** Oversees systems, structures, and processes for continuous improvement | 25% |
| 2 | **Instructional Core:** Ensures rigorous and coherent curriculum, instruction and assessments aligned to the needs of every student | 25% |
| 3 | **Climate & Culture:** Ensures that organizational norms, routines and systems equitably promote the students' intellectual, social, and emotional development | 25% |
| 4 | **Talent:** Ensures development, and retention of diverse talent and cultivates distributed leadership structures | 25% |

In the example below, a performance level is identified for each domain based on the scores recorded for the Key Behaviors. The performance level is multiplied by the weight and then the weighted points are totaled to determine the overall Principal Professional Practice Score. The Principal Professional Practice Score is then converted into a "Proficient" rating according to the Summative Rating Key on the next page.

| Domain | Performance Level | Weight | Points |
|---|---|---|---|
| **Domain 1 – Organizational Leadership:** Oversees systems, structures, and processes for continuous improvement | 2.9 | 25% | .73 |
| **Domain 2 – Instructional Core:** Ensures rigorous and coherent curriculum, instruction and assessments aligned to the needs of every student | 3 | 25% | .75 |
| **Domain 3 – Climate & Culture:** Ensures that organizational norms, routines and systems equitably promote the students' intellectual, social, and emotional development | 3 | 25% | .75 |
| **Domain 4 – Talent:** Ensures development, and retention of diverse talent and cultivates distributed leadership structures | 4 | 25% | 1 |
| **Principal Practice Total Points** | | | **3.23** |
| **Overall Principal Practice Rating** | | | **Proficient** |

| Rating | Principal Practice Rating |
|--------|---------------------------|
| 3.50-4.0 | Excellent |
| 2.50-3.49 | Proficient |
| 1.50-2.49 | Developing |
| 1.0 – 1.49 | Unsatisfactory |

## Appendix D: Process for Including Optional Additional Indicators

In some cases, LSCs may want to identify areas of focus for the principal that are not included in either the Professional Practice or Student Growth and Other Measures sections. **Additional Indicators** are appropriate when a LSC feels that there are goals unique to the school that are important for the principal to prioritize.

If additional indicators are developed, they must be mutually agreed upon (agreement between the LSC and the Principal) no later than November 1st or such later date as specified by the CEO. Please use these indicators to inform the Final Summative Principal Evaluation Rating.

## Appendix E: Legal Requirements for Principal Evaluation

For the annual evaluation, the LSC must meet with the principal at least once as it gathers information for the evaluation, as required by the Uniform Principal's Performance Contract.

- The LSC's evaluation of the principal must be approved by an affirmative vote of the majority of the serving members of the LSC in an open session.

- The ratings and contents remain confidential unless the principal wishes to release them to the public.

- The LSC and its committees must comply with the requirements of the Open Meetings Act during the evaluation process.

- Within 30 days after the principal's receipt of the LSC's annual evaluation, the LSC and principal may meet to discuss the evaluation (in a feedback session).

- The LSC may, but is not required to, adjust the evaluation ratings on the basis of the feedback session.

- Annually, the LSC must send a copy of its final summative principal evaluation rating to the principal and the CEO or Designee (Network Chief).

**When in the Principal Performance Evaluation Process are Closed (Executive) Sessions Appropriate?**

As stated above, the LSC and its committees must comply with the requirements of the Open Meetings Act during the evaluation process. However, when the LSC or its committees are discussing confidential personnel information, the LSC should meet in a closed or "executive" session of the LSC. Some examples of occasions when executive sessions are appropriate include:

● Evaluation committee meetings when a Principal Evaluation Committee is discussing evaluation ratings or the LSC is discussing or making decisions about the evaluation ratings.

● LSC meetings when members wish to discuss the content of the evaluation before voting to approve the ratings or to prepare for the feedback session; and the feedback session.

● Meetings to discuss confidential input from members of the school community.


# Appendix F: Confidentiality Agreement and Code of Conduct for Principal Evaluation

There are some key specifics your Principal Evaluation Team must abide by when they are involved in the evaluation process, which is incorporated into the agreement below.

You may want to have each of the individuals who will be involved in your principal evaluation process sign this agreement, which incorporates these requirements. Your LSC Chairperson should collect the signed agreements during your first LSC meeting regarding principal evaluation. In addition, members should also monitor each other to ensure that all members are adhering to the following conditions.


● I agree that I will not make any evaluation decisions on the basis of a person's race, color, ethnicity, national origin, religion, age, sex, marital status, parental status, mental or physical disability (unrelated to job performance), finances, or sexual orientation. Furthermore, I will not ask any questions or make any comments during the evaluation that pertain to these topics.

● I agree to adhere to the requirements of the Open Meetings Act.

● I agree that I will conduct the principal evaluation process and make a retention decision based on the best interests of the school as determined by the standards stated in the Illinois School Code.

## Appendix G: Principal Performance Evaluation Support Materials

- Furthermore, I agree to keep all discussions, documentation, and information related to the principal evaluation process completely confidential.


Name: _____

Date: _____


*Agreement based on materials developed by Designs for Change and PENCUL.*

This list of support materials is provided to assist LSCs as they look for evidence of work in the four domains. This list contains examples and suggestions. **It is not an exhaustive list**. The exact types of supporting materials will vary from school to school. LSCs should consider both the quantity and quality of these materials, as well as the activities and programs they reflect.

Domain 1: Organizational Leadership
*Component A:* Vision, Mission & Goals:  Collaborates with the school community to set vision, mission, and goals that reflect high expectations for every student
- List of CIWP team
- Team meeting sign-in sheets and/or minutes from 2 required meetings
- Principal's monthly reports to the LSC (Engagement process for CIWP)
- Family newsletters
- State of the School Presentation

*Component B*: Strategic Planning & Change Management: Works with staff and caregivers to align resources to school goals
- Minutes from grade-level team meetings
- Written vision and/or mission statement
- Principal's monthly reports to the LSC
- Budget Amendments/Transfers List

*Component C:* Continuous Improvement: Leads continuous improvement processes, including tracking school goals and addressing areas of improvement
- List of CIWP meetings and attendance rosters
- List of budget meetings and attendance rosters
- Sample of student data analysis with goals identified
- Schoolwide Data Tracker
- Celebratory Events (related to school goals)

Domain 2: Instructional Core
*Component A:*  Courses & Content: Takes action to ensure academic programming responds to students' needs and sets them on a path to success after graduation
- Course Catalog
- Curriculum Scope & Sequence
- Lists and descriptions of student recognition or award programs
- Sample student learning contracts

*Component B:* Instructional Strategies: Takes action to ensure instructional strategies meet the needs of all types of students
- Instructional Planning Feedback

- Lesson or Unit Planning Feedback System/Tracker
- Copies of Teacher Lesson Plans
- Personalized Learning Plans
- Technology Plan
- List of innovative supplemental programs

*Component C:* Assessment Data: Takes action to ensure the school monitors what students are learning and adjusts

- Assessment Plan
- Student Data Dashboard/Tracker
- Personalized Learning Plans
- School/Team Professional Learning Agendas w/Minutes

Domain 3: Climate & Culture

*Component A:* Family & Community Engagement: Builds strong relationships with families, LSC, and community members

- List of parent activities/volunteer opportunities/meetings and names of participants
- Parent/community surveys and corresponding summaries of responses
- Newsletters, bulletins or flyers sent to families
- Number of parents who attended report card pick-up days
- Lists and descriptions of community partnerships
- Evidence of exhibitions of student work to maximize family engagement
- School website content

*Component B:* Connectedness & Well-being: Creates a safe and welcoming environment for students, staff, and self

- Clear expectations for student conduct and consistent consequences
- Newsletters and bulletins sent to students/staff
- Evidence of embedding mindfulness into schoolwide/classroom routines
- Collaborating with marginalized groups to leverage ideas of value affirming practices
- Intra-school conversations for students to explore culture and diversity
- Utilization of arts and culture as a tool for understanding and communicating with students and communities
- Professional learning conversations to develop staff capacity to initiate conversation about culture and diversity

*Component C:* Systems & Structures: Effectively communicates and manages school logistics

- Safety and security plan is on file
- Facilities, safety and security reports
- Communication protocols
- Schedules for staff collaboration/planning times, transitions, recess, and dismissal

Domain 4: Talent

*Component A:* Development & Evaluation: Provides strong professional learning opportunities for staff

- Staff development agendas, attendance rosters and workshop evaluations
- List of completed staff development activities (conferences, workshops, etc)
- List of state-required and other in-services/conferences attended by the principal
- List of principal's professional memberships
- List of principal's mentoring activities
- Professional Learning Plan

*Component B:* Professional Culture & Retention: Creates a positive working environment for staff
- Staff community building
- Staff wellness check-ins
- Evidence of retention strategy
- Celebration staff accomplishments, successes, and milestones


*Component C:* Distributed Leadership: Builds strong teams and shares leadership
- Evidence of a variety of teams to drive school improvement
- Instructional Leadership Team Schedule/Agenda and Meeting Minutes
- Leadership Team Coaching Tracker
- RACI Chart/First Responders List (if applicable)

## Appendix H: The Cumulative Evaluation

A cumulative evaluation is conducted at the beginning of the fourth year of a principal's contract. The same evaluation form that is used for annual evaluations is used for the cumulative evaluation, except that the LSC takes into account the principal's performance during the previous three years, rather than just assessing one year's performance. In most cases, LSCs review the evaluation forms (if they are available) from the previous three years as the primary basis for the cumulative evaluation.

The rating scale is: "Excellent," "Proficient," "Developing," or "Unsatisfactory."

 Please consult with your LSC Specialist  if you need assistance.

### Appendix I: Student Participation

The Student LSC representatives may voice their opinions and participate in the evaluation process but not vote on the approval of the evaluation or be counted to achieve quorum at any meeting addressing principal evaluation. If the process warrants a closed session, the students must:
- be voted in to participate
- offer feedback representative of the student body or their own view
- answer any relevant questions specific to the student  feedback
- leave the closed meeting prior to any further discussion

*NOTE: Neither the principal or the student should be counted toward quorum for principal selection, retention or evaluation.*



# LOCAL SCHOOL COUNCIL

# RESOURCE GUIDE

## Part Six: Principal Selection

## Introduction

In 1988, the Illinois General Assembly passed the "Chicago School Reform Act" which delegates the school principal selection authority to the school community's elected Local School Council. Therefore, Principal Selection is one of the most important responsibilities of a Local School Council (LSC).

Principals are key to the success of all schools. Their role is complex and must be carried out effectively to ensure student success. The District understands the critical role of the principal to ensure all students reach their highest potential. The role of the LSC in the selection process is vital to ensure there is a high quality principal in every District school. The Chicago Public School District appreciates the time and dedication of LSC members to select a quality candidate who is the best fit for the school as the "contract principal".

The Office of LSC Relations, Department of Principal Quality and the Chiefs of Schools are key resources to assist LSCs in the selection process. This section provides information necessary for the selection process.

# GUIDELINES FOR PRINCIPAL SELECTION

This section outlines both the required and highly recommended steps in the principal selection process and is designed as a guide for the LSC. Each step of the process provides the Council with information that will offer a framework for selection.

**Principal Selection Sequence**

1. Organize the Selection Process

2. Prepare and Post Principal Position Advertisement

3. Review Resumes and Identify Candidates to Advance to Interviews

4. Conduct Candidate Interviews and Conduct Reference Checks

5. Hold Principal Candidate Forum

6. Select Finalists and Award Contract

***LSC Responsibilities for Principal Selection***

To select a new contract principal:
- Complete Principal Selection training with Office of Local School Council Relations (OLSCR).
- Work closely with the Chief of Schools to understand the current school and student performance, review the CIWP and identify the skills and qualifications needed of the best candidate to lead the school.
- Create a principal position advertisement to be posted on the CPS website, following approval from the Chief of Schools.
- Create the principal selection process timeline, including steps and activities including but not limited to review the submitted candidate materials, candidate interviews, candidate school site visits, candidate forum, and reference checks.
- Approve any desired contract addenda and obtain the Law Department's approval.
- Achieve consensus of seven or more LSC members to vote in favor of the contract principal.

**STEPS TO SELECT A PRINCIPAL**

The LSC must select a new principal if:

- The current principal's contract is not renewed
- The current contract principal leaves the position based on retirement, resignation, transfer, or other reason
- The principal is on extended leave and has exhausted the Family Medical Leave Act job-protected timeframe

If the LSC does not begin or complete the process of selecting a new contract principal, the CEO will appoint an acting and/or interim principal for the school until the LSC selects a new contract principal. The LSC must award a contract within 90 days of the former contract Principal's departure and seven (7) votes are needed for approval.

It is recommended that the LSC meet with the LSC specialist on principal selection so that all members hear the same information about principal selection. It is encouraged that LSC members review the Module 6 training or take the online training again so that it is fresh. Members are to have completed their training within the first six months from when they took office. Go to LINK or contact Office of local School Council Relations at 773-553-1400 for more Information.

**THE NETWORK CHIEF CAN SUPPORT THE LSC IN THE NEW PRINCIPAL SELECTION PROCESS**

The Network Chief can collaborate with the LSC in the principal Selection process by:

- Helping identify school needs based on performance data
- Providing recommendations for the advertisement
- Recommending interview questions
- Participating in interviews, community forums, or school walkthroughs

The Network Chief will work very closely with the newly selected principal:

- As the principal's direct supervisor
- Providing support, mentorship and coaching
- Providing ongoing professional development
- Creating a transition plan for a smooth start

The Network Chief will work closely with the new principal as a supervisor, mentor, coach, and trainer to ensure a smooth transition.

## *Training*

We recommend that all members of the Local School Council complete Training Part 6, Selection of a Principal, before beginning the process. It is important that all members know what is required as they begin the new principal selection process. Go to https://cps.edu/lsc for information on Training or contact the Office of Local School Council Relations at 773-553-1400.

**The Sequence to Select a Principal**

**Step 1. Organize the Selection Process**
*The discussion of the process for principal selection must be conducted during an open session of the LSC meeting or LSC committee meeting (including approving the candidates who will be moving on in the process). The use of closed sessions in the principal selection process is available only for review and discussion of individual candidate's qualifications and interviews.*

A. <u>Define the Structure of the Selection Process</u>:
- Create a timeline for completing the selection process.
- Choose a Principal Selection Committee of LSC members and possible non- LSC members.
- Develop the steps and activities of the Selection Process (including conducting interviews, phone screens, school visits, candidate forums, etc.)
- Identify LSC members' roles in the selection process.
- Follow the Code of Conduct: The intent of the Code of Conduct Agreement is to ensure confidentiality and professionalism throughout the selection process. Each LSC committee member completes and signs the Code of Conduct Agreement (Form 1 in the Resources Section).

B. Selecting Participants for the Selection Committee

The LSC determines who will be on the selection committee. There are several options:

- All of the LSC members
- Subset of the LSC members
- Some LSC Members and non-LSC school community stakeholders (for example parents, community, school staff, etc.)
- Non-LSC Member Participants (Non-LSC members serve in an advisory capacity and provide recommendations to the LSC. Non-LSC members may vote on any Principal Selection Committee decision.)

The LSC must vote in open session to approve non-LSC Members as part of the Principal Selection Committee. (While the LSC may establish a Selection Committee which may include non-LSC members, we refer to the "LSC" as carrying out all selection activities and procedures in this section).

**Step 2. Prepare and Post Principal Position Advertisement (Required)**

A. Assess Needs of the School
- Conduct a comprehensive school and student performance assessment to identify the necessary skills and qualifications that the principal should possess to achieve school and student goals.
- Review school and student performance assessment results and identify experience, skills and qualifications necessary for a principal candidate to best meet the needs of the students and school community.
- Review the principal advertisement  for the last principal selection process to see what they identified as qualifications to be a principal of their school.
- Consult with the Network Chief to review the school performance data, review the language to be used in the principal advertisement, and discuss the strengths and needs of the school.
  - This meeting is a public meeting that has been properly posted.

Utilize the "School Needs Questionnaire" (Form 2 in the Resources Section) and "School Strengths" (Form 3 in the Resources Section) to identify school strengths and needs. This information is important for the position advertisement and interview questions.

B. Draft advertisements include a list of required and preferred criteria of candidate experience, education, and other qualifications that are essential to student success and the school's progress.
C. Identify the documents the candidate must submit, usually just a resume and cover letter. The cover letter is an opportunity for candidates to express their intent and explain how their experiences, knowledge and attributes qualify them for the position.
D. Vote to approve the position advertisement. **Note: this vote is required.**

## Process to Post the Position Advertisement

1.     Email position advertisement to Chief of Schools, LSC Specialist, and CPSPrincipals@CPS.edu for approval and posting on the CPS website. Note: Chief of Schools approval and posting on the CPS website for a minimum of ten (10) business days or fourteen (14) calendar days are required.

2.     Email LSC and Chief **approved** ad to Department of Principal Quality, CPSPrincipals@cps.edu using the template in the LINK .

The LSC may decide to advertise the position on additional sites. The LSC must pay for any additional advertisement costs. There are several different sources the LSC can use to find candidates for the principal's position. Targeted education sites can be helpful to promote the opportunity and expand the applicant pool. Sites to consider for additional posting include:

- Educational Magazines (Education Week)
- Professional and Educational Websites

*Note: The deadline listed in the Principal Opportunities controls the end date of the application period. It is advisable to make sure that ads in other publications will be published at least several weeks before the deadline in the Principal Opportunities add.*


*Step 3. Review Resumes* (Required) *and Identify Candidates to Advance to Interviews* (Recommended)

**Process to Review Resumes and Identify Candidates**

A)     The Department of Principal Quality will email to the LSC Chair the complete list of eligible candidates and materials submitted by the candidates approximately two days after the advertisement closes. After the LSC receives the list of eligible candidates and materials submitted by candidates from the Department of Principal Quality, the LSC conducts a review of the submitted materials. It is recommended that the resume review is conducted in a closed session.

B)     Resume review of all candidates is required and includes an analysis of the application and resume compared to the position criteria detailed in the advertisement. Recommended Sorting categories include:

- **Meets** Meets all required and preferred skills, qualifications and experience detailed in the advertisement and will advance to the interview step;

- **Requires Further Review** Meets all required skills, qualifications and experience detailed in the advertisement and requires further review by LSC to advance to interview step;

- **Does Not Meet** Does not meet the required skills, qualification and experience detailed in the advertisement and will not advance to the interview step.

- Additional Research: It is recommended that the LSC conduct additional research, if applicable, on the candidate's current school and position, including position title

confirmation, review of student performance data of the applicant's current school with emphasis on student growth using the Student Growth and Other Measures and School Report Card which can be found on the CPS website under "Find A School"/School Report which is at this link: https://cps.edu/findaschool.

C)    Identify candidates to advance to interviews based on resume, cover letter review and additional research if conducted. In a closed session, discuss the candidates and select three (3) to five (5) candidates to recommend to the LSC for advancement to interviews.

D)    In open session, LSC votes on which candidates will be interviewed.

Note: Resume review is required. Seven votes in favor of one candidate are required to award a contract. However, it is strongly recommended that a Principal contract not be awarded based solely upon resume review.


***Step 4: Conduct Candidate Interviews and Conduct Reference Checks***
***(Recommended)***

**Process for Conducting Interviews**

LSCs should follow the agreed upon interview and selection activity structure. Quorum for the LSC or Interview Committee must be physically present to conduct interviews in closed session. Following are key steps for interview and selection activities.

A)    Identify committee members who will participate in interviews. Choose at least four to six people to ask the interview questions during the first round of interviews. The interviewers should be objective and unbiased  when asking questions and writing notes.
In deciding who should be part of the first interview team, think about whether or not there is anyone who has had previous interviewing experience, and who has the available time to participate in all the interviews. All interviewers should participate in all interviews to ensure consistent assessment of candidates. Remember to follow the established operating agreements to help make the best decision.

Prepare objective, unbiased interview questions based on the criteria outlined in the position advertisement and school needs. Questions should be formatted in the behavioral interview style in order to have candidates articulate their experiences and accomplishments versus sharing what the candidate might do in the future. "Best Practices for Successful Interviews'' (Form 6 in the Resources Section).

If the structure includes multiple rounds of interviews and site visits, the interview questions should be tailored to the activity. The initial interview typically focuses on learning about the candidate's experiences, gaining information about the candidates' leadership presence and

style, as well as, communication skills analyzing how the candidate talks about their work and engages with the LSC members.

If there is a panel of interviewers, one committee member should serve as moderator and timekeeper of the panel interviews. Determine who will ask questions. For example, one person could ask all the questions and others observe or multiple interviewers can ask questions.
Phone screens are an efficient step for the initial interview screen of candidates.

B)    Do not ask **discriminatory** or **illegal questions** (Form 7 in the Resources Section). Illegal and discriminatory questions can lead to a legal challenge of the selection process.

C)    Define the rating criteria to objectively assess each candidate from the interview. An interview note sheet and rubric should be developed to ensure consistent rating and analysis of candidates by each interviewer.

D)    Schedule interview days and times according to the selection process timeline. One committee member should be the point of contact for the candidates. This person should send the interview invitation, interview confirmation and all follow-up communications with the candidates.

E)    Conduct initial interviews – phone screen or in-person. All candidates must be asked the same questions. Interviews must be the same length of time for each candidate.
Prepare candidate materials for each interviewer including candidate resume and cover letter, interview questions and interview notes and rubric sheets.
Remember that the LSC is gathering information about the candidate, but the candidate is also gathering information about the LSC and the school. Prepare materials for candidates, such as school paper, local news articles on the school, information about interesting school programs.
During interviews, engage the candidate and be objective, consistent and do not pre- judge candidates.

*Following are tips for the interview:*

- Introduce - Begin the interview with each interviewer introducing themselves and their relationship to the school and LSC. After the introductions, let the candidate do most of the talking while the interviewers listen.
- Inform - Provide an overview of the selection and interview process.
- Educate - Tell the candidate about your school and school community.
- Rapport - Establish a rapport with the candidate. When candidates feel relaxed and comfortable in an interview, they often reveal more about themselves. The more information the interviewers learn about the candidates, the better the decisions will be.
- Engage - Involve students in the process. For example, have students welcome candidates to interviews and lead candidates on tours of school. How candidates engage with students can be very informative of the candidates' leadership and communication style

At in-person interviews, have each candidate complete the "Reference Authorization Form" (Form 9 in the Resources Section)

The purpose of the post Interview process is to debrief each interview and determine which candidates:

- Advance to next round of interviews or selection activity
- Need further review before advancing to next round of interviews or selection activity
- Do not advance in the selection process

In a **closed session**, interviewers should individually compile notes and ratings. After individual interviewer notes and ratings are complete, the LSC discusses the candidates and the information that has been gathered about them to narrow the candidate pool to one (1) to three (3) finalists.

In open session, LSC votes to select one (1) to three (3) finalist candidates for the next round of interviews or selection activity.

F)	Notify applicants who do not advance to initial interview should be notified by phone or email by the LSC Chair. The notification should state appreciation for interest in the position and that the individual is not being considered for the principal position with the school at this time. This notification should be sent within three (3) to five (5) business days of the decision/ recommendation.

Notify applicants who are selected to advance to interviews should be notified by phone or email by the LSC Chair of their advancement and the next steps in the selection process.

G)	Conduct a **second round of interviews** if needed (optional). In addition to steps established for initial interviews, the LSC should employ the following steps for **the second round of interviews:**

- Preparation of questions
- Structure of interview and which committee members will ask questions

- Post interview debrief discussion
- Determine which candidates to advance to next step in process

**H)  Conduct Reference Checks** (Recommended)

Use the Tip Sheet on "Conducting Reference Checks" and utilize the "Competency- Based Form for Reference Checks" (Form 10 in the Resources Section). Decide who will conduct the reference checks. This should be done when meeting to select the candidates to invite for second interviews. Conduct reference checks during the same time period that the second round of interviews are taking place. Members of the committee who are not participating in the interview can do the reference checking.

- Utilize the "Competency-Based Form for Reference Checks" (Form 10 in the Resources Section)
- Prepare a list of questions to ask for references.
- Assign reference checks.
- Preview reference check procedures.
- Check references of candidates.
- <u>Get references from three (3) sources:</u>
  - Contact the references the candidate provided.
  - Contact an LSC member or members at the candidate's former school to get references.
- Contact one or more individuals at the candidate's school not named by the candidate.  The names of such individuals may be obtained from the candidate's references.
- Prepare reports on reference checks.

**I)  Conduct School Site Visits** (optional)

Use the **Information Sheet** on "School Visit to Your Candidates' School" and worksheet for "School Visit at Your School" (Form and Information Sheets 11 and 12 in the Resources Section). Be observant and pay attention to how well the candidate communicates and relates to staff, students and parents.

When planning a visit to the candidate's current school, clear two or three possible visit days with the principal but do not disclose the exact date of the visit. When inviting the candidate to visit the LSC's school, involve some students to assist in conducting the tours.

a)  Visit to Finalist Schools:
- Prepare site visit checklist based on CPS Performance Standards and school's criteria for principal.
- Utilize the "Worksheet for School Visit to the Candidate's School" (Form 11 in the Resources Section).
- Preview site visit procedures.
- Complete site visit.
- Prepare a report on site visit.

b)  Visit to LSC's School:

- Utilize the "Worksheet for School Visit at Your School" (Form 12 In Resources).
- Prepare site visit checklist based on CPS Performance Standards and school's criteria for principal.

### Step 5: Hold Candidate Forum for School Community *(optional)*

Utilize the "Scheduling Form for Community Forum" (Form 13 in the Resources Section) and the Information on "Conducting Community Forum" (Tip Sheet 9) found in the Tip Sheets to schedule and conduct the forum.

A) Prepare for Community Forum

The LSC presents the finalists in a structured public forum and allows those interested to ask questions of candidates. The LSC Chair should confirm the schedule with LSC members and candidates.

- Preview procedures for forum
- Announce the Forum
- Conduct the Forum

### Step 6: Select Finalists and Award Contract *(Required)*

A) Select two (2) to three (3) finalists

- Review documents and reports
- Adjust plan if candidates do not meet criteria
- Vote in open session to select finalists Note: this vote is required.

Note: While the Open Meetings Act allows the LSC to discuss, consider, and come to a tentative agreement, the action to hire a candidate must be made in an open meeting. These discussions must include a public recital of the nature of the matter being considered and other information that will inform the public of the business being conducted. The finalists must be identified by name during this meeting.

B) Addenda to Contract (optional)

In closed session, the LSC discusses any possible addenda to be added to the principal contract. In open session, the LSC discusses and votes on addenda to add to the principal contract. The LSC sends the draft addenda to the Law Department. If the Law Department changes the addenda the LSC needs to vote in open session on the revised addenda. The LSC informs the candidates of the contract addenda.

B) Conduct Final Vote

LSC discusses final candidates in closed session and makes a final selection in open session. Note: This vote in an **open session** of the LSC meeting is required.
In a closed session:

- Discuss the candidates' traits as observed during the interviews, school visits and community forum.
- Review all the information gathered about each candidate to assist in making the final selections.
- Take a straw poll on the candidates, ranking them in order from 1 to 3, with 1 being the top candidate.
- Discuss what addenda to the contract, if any, would be appropriate, either for all candidates or for particular candidates.

In an **open session:**
Approve the final recommendations on the matters discussed in a closed session of the LSC. In open session make a motion to award to the principal selected a four-year principal contract (read any addenda to the contract) into the motion. Obtain a second to the motion and open discussion of the motion. Call the question and vote on the motion. The motion requires at least seven (7) yes votes for a new principal contract and a majority of the serving LSC members if this is a contract renewal.

C) Complete five (5) original Uniform Principal Performance Contract forms, making sure all spaces are completed and vote tally is recorded accurately, and all LSC members voting affirmatively sign the Certification of Principal Selection By LSC form.
D) Obtain signatures of the LSC Chairperson, LSC Secretary and the new Principal on the five (5) original copies.

E) Provide an original signed contract to: 1. Principal, 2. LSC Record Keeper, 3. Department of Principal Quality, 4. Office of LSC Relations and 5. Network Office. The individual delivering the contracts should receive a receipt from the Office of LSC Relations, the Department of Principal Quality and the Network Office.  See Principal Position Principal Career Opportunities on the CPS website

F) Review of Contract
- The Department of Principal Quality manages the review of the signed contract by the Board of Education's Law Department.
- If the Law Department identifies issues with the contract, the Office of LSC Relations works with the LSC Chairperson and Principal to correct issues and submit a revised contract to the Department of Principal Quality.

G) Presentation of Contract to the Board of Education
- Once the principal contract has been reviewed by key District departments, the contract Board Report is presented to the Board of Education to accept and file. The Board does not approve contacts. The Board's role is to accept and file.
- If the <u>LSC does not reach consensus</u> to award a contract, the LSC completes the following process:
- If LSC cannot select a new contract principal with seven (7) votes, the LSC shall submit a list of three (3) candidates in order of preference to the Department of Principal Quality to submit to the CEO.
- The CEO may then select one (1) of the candidates to be offered the contract.
- If the CEO declines to select a candidate as contract principal, the LSC may vote in open session to offer a contract to the candidate of their choice, including a contract with any addenda approved by the Law Department.
- Thereafter, the LSC submits five (5) original contracts to the appropriate Board Departments for acknowledgment.

*If the LSC does not submit the list or the CEO declines to select a recommended candidate,* the LSC may begin the principal search process over in lieu of selecting one of the previously considered candidates as the principal. If the LSC fails to submit three candidates in order of preference to the CEO or the CEO declines to select a recommended candidate as the principal, the CEO will appoint a principal on an interim basis for a period of one year or until the school's LSC awards a contract.

If the <u>LSC selects a candidate with seven (7)</u> votes, execute the following:
- The LSC Chairperson, LSC Secretary and the candidate selected sign five (5)
original contracts as well as any approved addendum to the contract.
- Determine who will send the certification form and the signed contracts (including approved addenda) to CPS.

## LEGAL RESPONSIBILITIES AND DEFINITIONS

### *LSC without Authority to Award Principal Contract*

If a school is on probation, the LSC does not always lose their authority to select and award a principal contract. If the Chicago Board of Education (the Board) has removed a school's contract principal after making a determination pursuant to Illinois School Code 34-8.3, the LSC does not have the authority to award a principal contract. The LSC's authority will be reinstated after the school is off probation pursuant to District Policy. To find out more information about a school's performance, consult the CPS website or the Network office.

If the school has been on probation for 5 or more years and the principal was removed as part of the Illinois School Code 34-8.3 action then the Network Officer and the LSC will consult on the appointment of a principal.

### *Qualified Candidates*

- Candidates must have satisfied the Board's current CPS Principal Eligibility Policy (Board Policy (23-1025-PO4) requirements in order to be awarded a four-year principal contract.
- The Principal Talent Office manages the CPS principal eligibility process. If a candidate has satisfied requirements of the CPS Principal Eligibility Policy, the person is deemed Eligible and added to the list of eligible candidates. Only candidates who have met the eligibility requirements can apply for a principal position and be awarded a contract.

### *Legal Requirements for the Selection of a New Contract Principal*

If a LSC has voted not to renew the contract of its current principal, the Illinois School Code 105 ILCS 5/34-2.3 provides that the LSC "shall" select a new contract principal no later than 45 days before the current principal's contract expires (May 15 if it expires on June 30.)

If a vacancy in the contract principal's position arises due to death, resignation, or other reasons, the Illinois School Code requires that the LSC "shall" select a new contract principal no later than 90 days after the vacancy arises.

The Code also requires that seven (7) members must vote "yes" to select a new principal, regardless of the number of LSC vacancies. Like all formal votes of the LSC, the vote to offer a four-year contract must be taken in an open meeting.

## REMINDERS

The current principal and student member(s) of LSCs cannot participate in the vote nor do they count toward quorum. The LSC is accountable to maintain membership quorum required to conduct votes including voting to award a principal contract.

If a teacher LSC member decides to become a candidate for the principalship, he/she must abstain from voting on the renewal of the current principal's contract and must resign from the LSC prior to the start of the principal selection process. Otherwise, the teacher shall be ineligible to apply for the principalship.

The Illinois School Code (105 ILCS 5/34-2.3-1.C.ii) further provides that if the LSC fails to select a new principal no later than 45 days before the current principal's contract expires or within 90 days of the date a vacancy in the position arises, it "shall" submit a list of three candidates for the position in order of preference to the CEO.

After receiving the list of three (3) candidates, the CEO has thirty (30) days to select one of the candidates as the school's new contract principal for the next four years. If the LSC fails to select a new contract principal and fails to send the list of candidates to the CEO or the CEO does not select one of the candidates as the new contract principal, the CEO will appoint a principal on an interim basis for a period of one year or until the school's LSC awards a contract with seven "yes" votes

## *The Uniform Principal's Performance Contract*

The Uniform Principal's Performance Contract was adopted by the Board of Education in June 2014, Board Report 14-0625-EX12 and is effective for all contracts signed after June 25, 2014.

In addition to this standard contract, the LSC may negotiate additional criteria with the selected principal candidate, to be added to the contract. The Illinois School Code permits the LSC and principal to add "additional criteria", the addenda, to the principal's contract of a rehired or new contract principal, but only when the contract is negotiated. Proposed addenda must be consistent with other provisions of the Uniform Principal's Performance Contract, cannot be discriminatory and be aligned to provisions of state law concerning the authority and responsibility of the principal.

Proposed addenda must be approved by the CPS Law Department.

Addenda may focus on a key practice or initiative that the LSC wants the principal to follow or complete during the contract.

Here are two examples of contract addenda:

- The principal agrees to develop a comprehensive computer technology program that engages fourth to eighth graders in activities designed (1) to develop student competence in the use of computers as research tools and (2) to perform demanding academic tasks, such as the preparation of research papers, using computers. The program proposal must be developed within the first year of the contract and presented to the LSC for review and approval and implementation no later than the second year of the contract.

- The principal agrees to develop a comprehensive discipline program reflecting input from all stakeholders and specifically addressing classroom management, school discipline in all areas of the school and its grounds, related education for all staff, and the reduction of suspensions. The plan must state clear roles and responsibilities of the assistant principal, staff, students, parents, and other pertinent parties. The program proposal must be developed within the first year of the contract and be presented to the LSC for review and approval and implementation no later than the second year of the contract.

*If the LSC decides to renew the incumbent contract principal,* the principal receives a new contract and addenda may be added to the standard contract.

Pursuant to 105 ILCS 5/34.2.4(b), schools designated as alternative schools have governing bodies appointed by the Board. These appointed bodies (Appointed LSCs and Boards of Governors [ALSCs and BOGs]) recommend up to 3 candidates to the Chief Executive Officer to select a candidate as their school's contract principal. The appointed bodies do not award principal contracts. For further details please contact the Office of LSC Relations or the Board's Law Department.

## *Types of Principals*

### Contract
Selected or retained in four-year terms. The contract principal may displace the incumbent assistant principals and hire new assistant principals.Is a member of the LSC and permitted to vote excluding principal evaluation, contract renewal & selection

### Interim
Appointed to fill the position of principal if the LSC does not have the authority to award a principal contract, the contract principal is out of the school for an extended period, or the LSC does not come to a consensus to award a contract. The interim principal may displace and hire assistant principals. Is a member of the LSC and permitted to vote excluding principal evaluation, contract renewal & selection

### Acting
Assigned to cover the principal position for up to 100 school days, which can be renewed at the discretion of the Chief Executive Officer. The acting principal cannot displace incumbent assistant principals. Not a member of the LSC and not permitted to vote.

### Administrator in Charge (Retired Principal)
Assigned retired principal to cover a principal position on a temporary basis who serves at the discretion of the Chief Executive Officer. An administrator in charge is not a member of the LSC and therefore, does not count for quorum and is not permitted to vote on or influence LSC business.

### Appendix I: Student Participation
The Student LSC representatives may voice their opinions and participate in the evaluation process, but not vote on the approval of the evaluation or be counted to achieve quorum at any meeting addressing principal evaluation.

- offer feedback representative of the student body or their own view
- answer any relevant questions specific to the feedback
- leave the closed meeting prior to any further discussion

# FORMS AND INFORMATION SHEETS

Form 1--REQUIRED
Code of Conduct and Confidentiality Agreement

Form 2
School Needs Questionnaire

Form 3
School Strengths

Form 4
Worksheet for Resume Screen

Form 5
Resume Screening Guide

Form 6
Best Practices for Successful Interviews

Form 7
Illegal and Discriminatory Questions

Form 8
Interview Competency Assessment Form

Form 9
Authorization for Reference Check

Form 10
Competency-Based Reference Form for Reference Check

Form 11
Worksheet for School Visit to the Candidate's School

Form 12
Worksheet for School Visit at Your School

Form 13
Scheduling Form for Community Forum

Form 14
Certification of Principal Selection by Local School Council

Form 15
Certification of Principal Selection by ALSC

Form 16
Certification by LSC to Submit a List of Principal Candidates to the CEO

## Form 1

## *Code of Conduct and Confidentiality Agreement*

I agree that I will not make any selection decisions on the basis of a person's race, color, ethnicity, national origin, religion, age, sex, marital status, parental status, mental or physical disability (unrelated to job performance), finances, or sexual orientation. Furthermore, I will not ask any questions or make any comments during the evaluation that pertain to these topics.

I agree to adhere to the requirements of the Open Meetings Act.

I agree that I will conduct the principal evaluation process and make a selection decision based on the best interests of the school as determined by the standards stated in the Illinois School Code.

I agree that I will not conduct this principal evaluation process or make a retention decision based on personal issues not related to standards stated in the Illinois School Code.

Furthermore, I agree to keep all discussions, documentation, and information related to the principal selection process completely confidential.

Name:_____Date: ⸳

*Agreement based on materials developed by Designs for Change and PENCIL*

**Form 2**

## *School Needs Questionnaire*

1. What are the school's biggest challenges, or needs?

2. How do you think a principal can best help us overcome those challenges or needs?

3. What are our school's greatest strengths or success?

4. Is there anything else you can think of that will help us to find the best possible principal for our school?

**Form 3**

### *School Strengths*

The purpose of this worksheet is to identify selling points you can use to help candidates become excited about the opportunity to be your school's principal. You can use the responses people gave on the School Needs Questionnaire/Survey and/or conduct a brainstorming session to create your list of school strengths.

Some great things about our school are:

# Form 4

# Resume Review

Using the "Worksheet for Resume Review" (Form 5), have all members of the LSC or a subgroup of the LSC review all of the resumes and cover letters submitted and discuss them to help ensure consistency.

A) Review the Candidates' Resumes and Cover Letters

Look for the established key characteristics in the resumes and cover letters to identify 3 to 5 candidates to interview**.** Below are some steps to assist the LSC in making decisions based on these written materials.

- Avoid bias and discrimination in the screening process.
- Refine, as necessary, the "Worksheet for Resume Screen (Form 5)," so that the revised form lists the "Top Priority Principal Competencies" that are specific criteria for the LSC principal selection search.
- Rate each candidate (looking at both the resume and accompanying cover letter) on the indicated scale on the form from 1 to 4, with "1" representing "no evidence that the candidate possesses this skill" and "4" representing "strong evidence that the candidate possesses this skill."
- Tally the points for the chosen set of skills that the candidate was given. Since all skills may not be equally important to the school's needs, this total should not be used as an absolute guide. Nevertheless, the total score gives some indication as to whether there is a good match between the school's needed skills and the candidate's skill.
- Review resumes and cover letters for errors in spelling, grammar, job history and performance data that could provide additional information on the candidate to be used in consideration of advancement in the process.
- Select candidates to interview, require further review before advancing to interview and not advancing to interview. Indicate category at bottom of form.

B) Categorize the Candidates

- Once each member of the group has read the applications individually, divide them into three (3) groups – **Meets; Requires Further Review; Does Not Meet** based upon enthusiasm about interviewing the person.

- Identify applicants for which the decision to interview is unanimous or nearly unanimous.
- Decide on others to be interviewed, with the group reaching consensus through discussion.

Discussions about a specific candidate's qualifications should take place in a **closed meeting** but any candidate selections for interview must be voted on in an **open meeting**.

# Form 5

## *Worksheet for Resume Screen*

Complete this form as you review the resumes of potential candidates.

Your Name:_____

Candidate Name:     _____

Chicago Leadership Collaborative (CLC) Graduate: Yes          No.     Date:

Top priority principal skills                                     Points:

1=low to 4= high

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| 1 | 2 | 3 | 4 |
| 1 | 2 | 3 | 4 |
| 1 | 2 | 3 | 4 |
| 1 | 2 | 3 | 4 |
| 1 | 2 | 3 | 4 |
| 1 | 2 | 3 | 4 Quality of Candidate Letter |
| 1 | 2 | 3 | 4 Quality of Candidate Writing |

**Total Score =**

Categorize the candidate in one of the following three groups by writing a letter on the line below:

- **A Meets** Meets all required and preferred skills, qualification and experience detailed in the advertisement and will advance to interview step;

- **B Requires Further Review** Meets most required skills, qualification and experience detailed in the advertisement and requires further review by LSC to advance to interview step;

- **C Does not Meet** Does not meet the required skills, qualification and experience detailed in the advertisement and will not advance to the interview step.

Candidate Rating:  _____

# Form 6

## Successful  Interview Best Practices

✓   To help the applicant focus, begin by saying something like the following:

*"We have reviewed your resume, and we are familiar with the major steps in your career. Could you discuss the major competencies we seek and give examples of how you have demonstrated them?"*

•  Does the applicant focus on providing a comprehensive response to this question, or does he or she simply summarize a set of experiences in his or her career?

•  Politely press the candidate for specific examples of real events from his or her experience. Turn the need into a question that begins with a phrase like: "tell me about a time when...," or "Give me an example of..." or "Describe a situation where you..."

✓   Ask **follow-up / probing questions** to get more detail about the candidate's experience.

•  For example: *"What was the context that told you there was a problem?" "What was your role in resolving it?" "On what resources did you rely?" "What was the result of your efforts?" "What were the difficulties you faced?" "What did you learn?" "What, if anything, would you do differently if given the chance?"*

✓   Repeat this same process of selecting and developing questions and follow- up questions for all the key skills that the LSC has identified.

✓   Another useful area to explore is to ask: *"What are some of the things you would like to know about our school that would allow you to be an effective leader here?"* The int*erviewer can pursue this line of questioning by providing some data and/or by citing some specific real problems the LSC is trying* to solve.

✓   Spend most of the interview time listening to what the candidates have to say.

✓   End the interview by asking whether there are questions that the applicant would like to ask about the school that he or she hadn't had a chance to discuss.

✓   Ask each candidate to sign the "Authorization for Reference Check" (Form 8) to ensure that the LSC has the candidate's permission to interview individuals familiar with his or her past experience.

✓   Also see Form 7 (illegal and discriminatory questions).

# Successful Interview Best Practices (continued)

## After the Interview

Assess the School's top priority principal skills for each candidate directly after each interview while the information the candidate shared is still fresh. Build in 5 to 10 minutes to discuss initial impressions.

Utilizing the "**Interview Competency Assessment Form"** (Form 8 in the Resources Section) or one created by the LSC provides the interviewers with a place to score candidates on the competencies, technical skills and specific experiences the LSC has chosen as selection criteria. In addition, it provides a place to write observations about the candidate's strengths and weaknesses, any concerns about the candidate and recommendation for whether or not the candidate should be invited back for another round of interviews.

Discuss the Results:

Hold a closed meeting to discuss the results of the interviews. Keep the following questions in mind throughout the discussion.

- Does the candidate meet the needs and requirements the LSC has established? (Be prepared to discuss specific evidence.)
- If yes, what are the candidate's strengths and weaknesses?

Process for discussing the interview results and selecting candidates for the next round of interviews:

- Each interviewer should review his/her interview notes (from Interview Worksheets if used) in order to reacquaint themselves with the candidates' qualifications.
- Each interviewer should determine which candidates are not worth pursuing before the discussion begins.
- Each interviewer should bring all notes, including their Interview Competency Assessment Forms and Interview Worksheets, to this meeting so that they can cite specific stories or examples given by candidates if necessary.

During the meeting to select candidates for the next round of interviews, keep these hints in mind:

- Review the summary of survey data (including school strengths, issues, problems and needs) as a reminder of what the LSC has identified as the school's priorities and the leadership skills needed in the new principal before the candidate interviews begin.
- Have everyone briefly share their opinions about how the interviews went. Solicit comments on how using the competency-based interview questions felt and in general what "worked well" and what "needed improvement

## Successful  Interview Best Practices (continued)

- Determine which candidates received the highest ratings. Usually, time can be saved by eliminating the lowest rated candidates and only concentrating on discussing the highest rated individuals. Utilize the technique employed for initially screening the candidates' resumes.
  - o  A = Candidates that meet the needs of the school and the LSC is definitely interested in pursuing.
  - o  B = Candidates that meet many requirements but the LSC is uncertain about.
  - o  C = Candidates that do not meet the needs of the school and therefore the LSC is not interested in pursuing

Discuss "A" candidates first, then the "B" candidates, and if necessary, move on to the "C" candidates.

- Discuss the positive attributes with regard to these candidates. Interviewers who gave the candidates a particularly high score in certain areas should explain why they did so by sharing some of the examples of specific answers the candidates gave during the interviews.
- Discuss the negative attributes with regard to these candidates. Interviewers who gave a candidate a particularly low score in certain areas should explain why they did so, based on what the candidate said or how she/he behaved during the interview.
- Discuss any factors that might have affected the scores given.
- Discuss and record any concerns, questions, or issues about each of the candidates so that these things can be addressed in the next round of interviews.
- Determine which candidates to invite back for the next round of interviews.
- Remember: All votes related to candidate selection must be taken at an open meeting. Is it not necessary, however, to refer to candidates by name until the final decision Rather, the candidates may be referred to by a number.

✓ Notify Candidates of Next Steps
Decide who will call and send letters to inform the candidates who have not been selected for a future round of interviews and who will be invited for another interview. After each round of interviews, inform every candidate whether or not they will be invited back for the next round. Inform them by telephone or by mail within 3-5 days of the LSC's decision

# Form 7
# Illegal and Discriminatory Questions

Engaging the candidate and gleaning important information regarding skill and fit is instrumental in identifying the successful candidate. In this process it is easy to unintentionally ask a question or have a discussion that may seem harmless but opens the LSC to a discrimination suit/action.

Remember to plan ahead and think carefully about the questions to be asked. Also, keep in mind that sometimes the indirect question may actually be the hot button.

Whether in a casual conversation with the candidate or during the actual interview the LSC should not discuss the following topics or ask the listed questions.

**Age**
- How old are you?
- When did you graduate?
- How many years do you plan on working?
- How long have you been working?

**Ethnicity & Place of Birth**
- That is an interesting name, where does it originate from?
- What is your native language?
- Where were you born?
- What kind of accent is that?

**Religion & Politics**
- Do you go to church?
- Do you celebrate a <<insert>> holiday? What holidays do you observe?
- What political party do you support?

**Marital Status, Children & Lifestyle  Choices**
- Are you married or have a partner?
- Do you have children? How old are they?
- Do you plan to start a family? Are you pregnant?
- Are you gay?
- What organizations or groups are you engaged with?
- What does your spouse or partner do for a living?
- With whom do you live?
- Do you own a car?
- Do you have outstanding debt?
- Do you have any tattoos or piercings?

# Form 7

# Illegal and Discriminatory Questions (Continued)

**Health**
- Do you smoke?
- Do you have a disability?
- Do you drink socially?
- How many days have you taken off from previous positions?
- "What's wrong with your leg"
- When was the last time you used illegal drugs?

**Military Service**
- Are you a part of the National Guard?
- What type of discharge did you receive from the Military?
- Did you experience any combat?

**Criminal Records**
- Have you ever been arrested?

Occasionally, a candidate may inadvertently volunteer information in these areas. Should this occur do not pursue it further and politely steer the conversation back to a neutral subject.

Asking the same questions of each candidate also helps to eliminate the risk of entering into a conversation where taboo information is disclosed and keeps all applicants on an even playing field.

## Form 8

### *Interview Competency Assessment Form*   Page 1
### PRINCIPAL

Your School:_____

Interviewer: _____

Candidate's Name: _____

Chicago Leadership Collaborative (CLC) Graduate: Yes        No.

Date: _____

Stage of process just completed: _____1st round interviews _____ 2nd round

interviews Technical Skills and Specific Experience: _____

_____

Please rate the following skills according to this scale:

0 = None     2 = Minimal   4 = Moderate   6 = Good   8 = Excellent   10 = Exceptional

_____ :

_____ :

_____ :

_____ :

_____ :

Behavioral Competencies

Please rate the following competencies using the competency scales:

    1.   Educational/Curriculum Leadership

    2.   Administrative Skills

    3.   Community Awareness/Involvement

    4.   Visionary Leadership/Change Management

    5.   Prioritizing, Planning, and Organizing

    6.   Communication Skills

    7.   Influencing/Motivating

    8.   Interpersonal Sensitivity

    9.   Results Orientation

## *Interview Competency Assessment Form* (Continued)

### SUMMARY

Candidate Strengths

Candidate Weaknesses

Key Concerns

Recommendations

_____        Recommend to continue interviewing

_____        Recommend not to continue interviewing

## Form 9

### *Authorization for Reference Check*

This form is to be signed by candidates during the first interview.

I hereby authorize _____ (name of your school) to investigate, discuss and verify my educational and employment background, including but not limited to information regarding my character, general reputation, and professional characteristics.

_____
Candidate's signature

_____
Date

## Form 10

### *Competency-Based Reference Form for Reference Check*

Use this form in contacting the references of your active candidates. You will be conducting the reference checks for those candidates you have chosen to invite back for a second interview.

Reference Name:_____Candidate's Name:_____

Chicago Leadership Collaborative (CLC) Graduate:   Yes        No.

Completed by:_____  Date:_____

Phone number of reference:  _____

Nature and length of the relationship:

What are [Candidate's Name]'s strengths?

What are [Candidate's Name]'s weaknesses?

One of our most important school needs is_____ , so we are looking for someone who has a strong competency in_____  .

How well would [Candidate's Name] help us meet this need, and in what ways?

## Competency-Based Reference Form (continued)

What difficulties would [Candidate's Name] have in helping us meet this need?

Would you hire [Candidate's Name] if you were in our position?        Yes      No If no, why?

If you were going to give us advice about how to work well with [Candidate's Name], what would it be?

[Ask about any concerns, issues or questions that arose during the interview process here.]

Do you have any additional comments about [Candidate's Name]?

# Form 11
## *Worksheet for School Visit to the Candidate's School*

This worksheet is to be filled out by the individuals who visit the candidate's school.

Your name:_____   Date of Visit: _____

Candidate's Name:_____

Chicago Leadership Collaborative (CLC) Graduate: Yes     No.

Name of School: _____

What observations did you make about the ways in which the candidate interacted with other members of the school—administrators, teachers, and students?

How did the other members of the school seem to react to him/her?

In what ways did the candidate conduct him/herself that you particularly liked?

How did the candidate conduct him/herself differently than you would have liked?

Are there any concerns or questions you had that were addressed during the visit? If so, what were they, and how were they addressed?

**Form 12**

## *Worksheet for School Visit at Your School*

This worksheet is to be filled out by the individual who escorts the candidate on the school visit at your school. The worksheet contains two sections: the first section should include the escort's impressions of the candidate and how he/she conducted themselves throughout the visit; the second section should contain the general impressions of those people who met the candidate during the visit.

Your Name:_____Date of Visit: _____

Candidate's Name:_____

Chicago Leadership Collaborative (CLC) Graduate: Yes No.

*For the escort:*

In what ways did the candidate conduct him/herself well? (For example, the way that he/she interacted with the children, the initiative he/she took in introducing themselves to the staff)

How did the candidate conduct him/herself differently than you would have liked?

Do you have any concerns that arose from the school visit about the candidate and his/her ability to be an excellent principal for your school?

## *Worksheet for School Visit at Your School* (continued)

For those who met the candidate during the visit:

Name:_____ Role (teacher, student, etc.): _____

Comments:


Name:_____ Role (teacher, student, etc.): _____

Comments:


Name:_____ Role (teacher, student, etc.): _____

Comments:


Name:_____ Role (teacher, student, etc.): _____

Comments:


Name:_____ Role (teacher, student, etc.): _____

Comments:


Name:_____ Role (teacher, student, etc.): _____

Comments:

## Form 13

### *Scheduling Form for Community Forum*

The following worksheet is to be used when you call the finalist candidates to schedule the community forum. You should write in the dates and times your LSC is available to host the community forum before you call the candidates. Then, present those options to each of the candidates to see when they are available. Finally, once you have matched everyone's schedules, write in the final date, time and location of the forum at the bottom of the page.

Your name:_____     Date:_____

To be completed before you call the candidates:

Dates and times LSC is available to host the community forum:

_____          _____

_____          _____

_____          _____

To be completed with Names of Candidates

_____          _____          _____

CLC Graduate: Y    N                    Y    N                    Y    N

Dates & times from the above list that each candidate is available for the forum:

_____     _____     _____

_____     _____     _____

_____     _____     _____

Final date and of forum:                    Location of forum:

_____          _____

# Form 14 Certification of Principal Selection by Local School Council

**NOTE: There must be a quorum of seven (7) elementary or eight (8) high school members physically present and the reference to high school student should be just "student".**

14-0625-EX12   FINAL                         EXHIBIT A

## Certification by a Traditional Local School Council of a Principal Selection

### (Please type or print)

School: _____

Principal Candidate's Name: _____

Contract Type:  ☐ New ☐ Renewal

We, the members of the Local School Council, hereby certify that at our meeting of _____ (date)
a quorum of 7 members was physically present and we voted to select _____
as Principal and we further certify that the following is a true and accurate record of this vote:

| | Number |
|---|---|
| **LSC Members Currently Serving** | |
| **LSC Members Present at Meeting** (exclude Principal & H.S. Student Representative) | |
| **LSC Members Absent From Meeting** (exclude Principal & H.S. Student Representative) | |
| **Yes Votes\*** | |
| **No Votes** | |
| **Abstained from Vote** | |

Further, we certify that we complied with the Open Meetings Act by posting public notice and an agenda for the meeting at least 48 hours in advance (and, if a special meeting, provided written notice to each member); and that the principal (and student representative if a high school) did not vote in the selection process and was (were) not counted for the purpose of determining whether a quorum existed at the above meeting.

Signatures of the Local School Council Members Who Voted **Yes** for Candidate Named Above:

Date:_____

1. _____          7. _____
2. _____          8. _____
3. _____          9. _____
4. _____          10. _____
5. _____          11. _____
6. _____

| Contract Type | * Votes Required to Award Contract |
|---|---|
| New Contract | 7 Yes votes required |
| Renewal Contract | A majority of the members currently serving must vote Yes |

*Chicago Public Schools | Principal's Contract for Schools with a Traditional Local School Council*   Page 8

# Form 15

## *Certification of Principal Selection by ALSC*

14-0625-EX12   FINAL                    EXHIBIT B

### Certification by an Appointed Local School Council
### of a Principal Contract Recommendation
(Please type or print)

School: _____

Contract Type:  ☐ New  ☐ Renewal

We, the members of the Appointed Local School Council, hereby certify that at our meeting of _____ (date) a quorum of members was physically present and we voted to recommend the following Principal Candidate(s) (up to 3) and we further certify that the following is a true and accurate record of this vote:

_____          _____          _____
Recommended Candidate #1          Recommended Candidate #2          Recommended Candidate #3

|  | Number |
|---|---|
| **ALSC Members Currently Serving** |  |
| **ALSC Members Present at Meeting** *(exclude Principal & H.S. Student Representative)* |  |
| **ALSC Members Absent From Meeting** *(exclude Principal & H.S. Student Representative)* |  |
| **Yes Votes** |  |
| **No Votes** |  |
| **Abstained from Vote** |  |

Further, we certify that we complied with the Open Meetings Act by posting public notice and an agenda for the meeting at least 48 hours in advance (and, if a special meeting, provided written notice to each member); and further, that the principal (and student representative if a high school) did not vote in the recommendation process and was (were) not counted for the purpose of determining whether a quorum existed at the above meeting.

Signatures of the Appointed Local School Council Members Who Voted **Yes** to Recommend the Candidate(s) Named Above:

Date:_____

1. _____          8. _____
2. _____          9. _____
3. _____          10. _____
4. _____          11. _____
5. _____          12. _____
6. _____          13. _____
7. _____          14. _____

*Chicago Public Schools | Principal's Contract for Schools with an Appointed Local School Council*    Page 8

## Form 16
### *Certification by LSC to Submit a List of Principal Candidates to the CEO*

14-0625-EX12   FINAL                          EXHIBIT A

### Certification by a Traditional Local School Council
### to Submit a List of Principal Candidates to the CEO
**For use when an LSC does not have the 7 required votes to award a Principal's Contract**

(Please type or print)

School: _____      Network: _____

We, the members of the Local School Council, hereby certify that at our meeting of _____ (date), a quorum of 7 members was physically present and we were unable to directly select a new contract principal with seven (7) affirmative votes.  Therefore, we voted _____ to _____ to _____ to submit

                                                     # of "Yes" Votes   # of "No" Votes   # of Abstentions

up to three (3) candidates for the position of contract principal, listed in order of preference, to the Chief Executive Officer, one of which will be selected by the Chief Executive Officer to serve as principal of the Attendance Center.  We also undertook a separate vote to determine which candidate names would be submitted to the Chief Executive Officer and the order of preference and certify that the following is a true and accurate record of this vote:

| Name of Candidates (In order of preference) | Number of "Yes" Votes |
|---|---|
| 1. | |
| 2. | |
| 3. | |

Further, we certify that we complied with the Open Meetings Act by posting public notice and an agenda for the meeting at least 48 hours in advance (and, if a special meeting, provided written notice to each member); and that the principal (and student representative if a high school) did not participate in any votes regarding the submission of candidate names to the Chief Executive Officer and was (were) not counted for the purpose of determining whether a quorum existed at the above meeting.

Signatures of the Local School Council Members Who Voted **Yes** to Submit Up to Three (3) Candidates to the Chief Executive Officer:

Date: _____

1. _____      7. _____
2. _____      8. _____
3. _____      9. _____
4. _____      10. _____
5. _____      11. _____
6. _____

*Chicago Public Schools | Principal's Contract for Schools with a Traditional Local School Council*   Page 9

| | |
|---|---|
| **Tip Sheet 1**<br>What are Operating Agreements and How Do We Create Them? | |
| **Tip Sheet 2**<br>How to Read and Analyze a Resume | |
| **Tip Sheet 3**<br>Organizing Your Selection for Each Round of Interviews | |
| **Tip Sheet 4**<br>Analyzing the First Round of Interviews and Selecting Candidates For the Next Round | |
| **Tip Sheet 5**<br>Conducting Successful Competency-Based Interviews | |
| **Tip Sheet 6**<br>Conducting Successful Reference Checks | |
| **Tip Sheet 7**<br>Conducting a Visit to Your Candidates' Current School | |
| **Tip Sheet 8**<br>Conducting a Visit to Your School | |
| **Tip Sheet 9**<br>Conducting a Community Forum | |
| **Tip Sheet 10**<br>Negotiating Additions to the Contract | |

## TIP SHEET 1
### *What Are Operating Agreements And How Do We Create Them?*

**Definition and purpose of operating agreements:**

Operating agreements are standards that a group establishes for itself

Some of the reasons a group should create operating agreements are:
- to foster accountability among members of the group;
- to ensure that its meetings and processes run as efficiently and effectively as possible.

Examples of operating agreements are:
- Be on time for meetings.
- Do not interrupt others while they are speaking.
- Tell the truth.
- Treat others with respect.

**How to establish operating agreements**

Think of operating agreements that you consider to be important in having a highly functional group. If you have trouble coming up with ideas:
- Remember a time when you were part of a group process that was frustrating to you. Why were you frustrated? What were the problems within the group?
- Remember a time when you were part of a group that functioned very well together? Why was the group so successful?

  o *Share your ideas with other members of the group.*
  o *Appoint someone to record everyone's ideas.*
  o *Brainstorm with the group about any other operating agreements that have not yet been mentioned.*

- After you finish brainstorming, review the list you have created to make certain that everyone agrees that each of the ideas listed is important and should become formal operating agreements for the group.
- Appoint someone to write the final list and distribute it to all the members of the group at the next meeting.
- Having this list should remind each of you of the conditions and standards you have agreed to follow throughout the selection process.

  o *Agree that the group will be governed by these agreements.*
  o *Agree that the agreements will be in operation at all meetings and will be enforced by the President or his/her designee.*

**TIP SHEET 2**
**How to Read and Analyze A Resume**

**Purpose of screening resume:**
Most likely, your LSC will receive many resumes from candidates interested in your principal position. You will have to use those resumes as a tool for narrowing your pool of candidates. You need to be able to read and analyze a resume and identify whether or not a candidate meets the minimum requirements.

**Tips for analyzing a resume:**
- Notice the grammar and spelling on the candidate's cover letter and resume.
- Notice whether or not the person's career path seems to demonstrate a track record of advancement and successful leadership.
- Notice if the person is a Chicago Leadership Collaborative (CLC) graduate.
- Notice the length of time he or she has spent at all of his/her jobs.
  - *How many jobs has he had compared to the total number of years he has worked?*
  - *How many jobs has she remained for less than 3 years? Why were those jobs so brief?*
  - *Notice the job titles.*
  - *Do the titles indicate advancement?*
- Pay attention to the detail of the position descriptions.
  - *Do the duties they describe seem to fit the duties of your opportunity?*
  - *Do their accomplishments indicate that they are superior performers?*
  - *Do the descriptions of their responsibilities match the level and seniority of their positions?*
  - *Can you see, feel, and understand what they did on the job from day to day?*
- Notice their educational background.
  - *Are their degrees listed?*
  - *What is the quality of the schools they have attended?*
  - *Compare the dates of their degrees with their career history.*
  - *Do they list their certifications?*
- Notice the date that they began their most recent job.
  - *Is it recent? If yes, then this triggers a lot of questions:*
  - *Why are they interested in leaving their current position so quickly?*
  - *Does this indicate a problem in terms of their decision-making process?*
  - *Did they exercise poor judgment in making their last move?*
- Is the candidate still employed? If not, is there any indication why?

## TIP SHEET 3

## Organizing Your Selection for Each Round of Interviews

Now that you have begun screening candidates, it is time to get your selection committee organized for the interviewing process. The following is a step-by-step process for how to successfully organize your committee for each round of interviews.

- Decide which committee members will be conducting interviews.
- Block out times that those committee members are available to interview candidates.
  - o Keep in mind that committee members could use a Saturday to do all of the interviews for one round in one day.
- Decide who will call the candidates to schedule interviews.
- Decide how your committee would like to conduct the interviews: individual interviews or panels.
  - o If you are conducting panel interviews, make certain that roles are assigned to members. There should be at least one member of the panel who is responsible for each of the following tasks:
    - Facilitating introductions between the candidate and the rest of the panel
    - Asking the technical skill and competency-based interview questions
    - Taking notes on the candidate's responses
    - Keeping time to ensure that all of the information is covered within the appropriate amount of time
    - Closing the interview, letting the candidate know when he/she should hear from the LSC, and thanking the candidate for his/her time
- Be sure that you have all of the interview materials you will need for each candidate you will be meeting:
  - o The candidate's resume;
  - o The **Worksheet for Resume Screen** (if you have particular issues or questions about the resume that you would like to address);
  - o **Interview Competency Assessment Form;**
  - o **Reference Authorization Form.**
- Make certain you know and have marked on the **Interview Competency Assessment Forms** which Technical Skills and Specific Experience and which Principal Competencies you are responsible for assessing for each candidate.
- Make certain you know which interview questions you are supposed to ask each candidate. Remember that all candidates should be asked the same questions.
- Make certain that you have received enough training and have a good understanding of how to conduct a competency-based interview. If you have any questions, now is a good time to ask!

TIP SHEET 3 CONTINUED

## *Organizing Your Selection for Each Round of Interviews*

- Make certain that you understand how you will be using the scales to score each candidate on the competencies.
- Remember that you are gathering information about the candidate but the candidate is also gathering information about you and your school.
- As you conduct the interviews, remember to do each of the following tasks:
    - o Ask about all of the technical skills and competencies you are responsible for assessing;
    - o Take good notes during the interview;
    - o Complete the Interview Competency Assessment Form directly after the interview is finished;
    - o Hold a meeting to discuss the results of the interviews. You can learn more about this in Tip Sheet 4: Analyzing the Results of Your Interviews and Selecting Candidates.
- The LSC Chair will call or mail candidates to inform them who has not been selected for future rounds of interviews.

**TIP SHEET 4**

## Analyzing the First Round of Interviews and Selecting Candidates for the Next Round

Now that you have conducted your interviews, it's time to decide which candidates you will invite back for the next round of meetings. Remember that all votes related to candidate selection must be taken at an **open** meeting.

This tip sheet will provide you with some hints about how to analyze the results of your interviews and select those candidates you would like to meet again. The information that follows applies to each round of interviews you conduct.

Through analyzing the interview results and discussing the candidates' qualifications, there are two questions that each of you will want to answer for yourselves about each candidate the committee has interviewed:

- Does he/she meet the needs and requirements your LSC has established?
- If yes, what are his/her strengths and weaknesses?

Keep these questions in mind as you proceed with your discussion.

**Process for discussing the results of your interviews and selecting candidates for the next round of interviews:**

    **(i)**    Obtain the Interview **Competency Assessment Forms** and **Interview Worksheets.**

    (ii)    Take a few minutes to review the scores given to each candidate and the comments written about each candidate in order to review the candidates' qualifications.

    (iii)    Determine which candidates should not be pursued.

    (iv)    Contact the candidates and let them know through appropriate correspondence whether or not you will be continuing the interview process with them.

During the meeting when you are selecting candidates for the next round:

    (i)    Everyone briefly share their opinions about how the interviews went, how they felt using the competency-related questions and the kinds of problems or difficulties they had.

    (ii)    Take a few minutes to review the compilations.

    (iii)    Determine which candidates received the highest ratings.

    (iv)    Usually you can save yourselves time by eliminating the lowest rated candidates and only concentrating on discussing the highest rated individuals in the group.

## TIP SHEET 4 CONTINUED

### Analyzing the First Round of Interviews and Selecting Candidates for the Next Round

You can have the same technique that you did when you were screening the candidates' resumes.

- o  A= Meets
- o  B= Requires more Research
- o  C= Does Not Meet

- Discuss the "A" candidates first, then the "B" candidates, and if necessary, move on to the "C" candidates.

- Discuss the positive things about these candidates.
- Interviewers who gave the candidates particularly high scores in certain areas should explain why they did so by sharing some of the examples the candidates gave during the interviews.
- Discuss the negative things about these candidates.
- Interviewers who gave candidates particularly low scores in certain areas should explain why they did so by sharing some of the examples the candidates gave during the interviews.
- Discuss any mitigating factors that might have affected the scores given.
- Share any concerns, questions, or issues you have about each of the candidates so that these things can be addressed in the next round of meetings.
- Decide which candidates you would like to invite back for the next round of interviews/meetings.

**TIP SHEET 5**

## Conducting Successful Competency-Based Interviews

There are several steps to be taken in conducting a successful competency-based interview. The following information covers the basics you will need to remember as you begin interviewing candidates. Try to review this tip sheet before each round of interviews to refresh your memory about how to conduct a successful interview.

- When candidates feel relaxed and comfortable in an interview, they often reveal more about themselves. The more information you have about the candidates, the better informed your decisions will be.
- When you take the time to establish rapport, candidates feel more positive about you and the interview.
- Since one of these candidates could possibly be your next principal, you want to give them a good impression by showing that you are interested in them and what they have to say.
- Put candidates at ease by making "small talk" at the beginning of the interview.
- Treat them with complete respect.
- Establish frequent eye contact with them.
- Compliment them on anything appropriate that will encourage them to feel good about themselves in the interview.
- Listen and respond empathetically so that candidates feel as though you understand their circumstances, feelings, and actions.
- Encourage them to ask questions at any point during the interview.
- Avoid using body language that might indicate to candidates that you are not interested in them or what they are saying.
- Avoid using body language that might indicate to candidates that you are not interested in them or what they are saying.
- Oftentimes interviewers get caught up in candidates' opinions about certain issues, their wishes for what they will do on the job, or how friendly they are. None of these things represent the candidates' actual experiences or abilities, which will be the best indicators of how they will perform as your principal.

**Draw candidates out as much as possible to gather information you need.**

- Ask questions such as:

  - o "Would you tell me about a time when..."
  - o "Give me a specific example of..."

- Ask follow-up questions that focus on the facts and details of the examples candidates have given:
  - o "What was the situation?"
  - o "What did you do?"
  - o "How did you feel?"
  - o "What happened?"
  - o "Walk me through exactly what you did next."
  - o "Why did you do that?"
  - o "What were the results?"
  - o "What did you learn?"

**Take detailed notes on what candidates say.**

These notes will be invaluable when it is time for you to rate candidates on competencies, as well as when you discuss the candidates as a group to make decisions about which individuals to invite back for the next round of interviews. Write your questions down in advance of the interview so that you will be familiar with them.

**Spend most of your time listening to what the candidates have to say.**

Confirm your understanding of what they say by:

- Asking them questions
- Summarizing what they say and asking for confirmation. For example;
- "Let me make sure I understand. In the situation you described, first you... then you...?"

Manage the pace of the interview so that you have enough time to cover all of the areas that you are responsible for assessing.

Use compliments as a means of redirecting the conversation and moving on to other topics. For example:

- "Well it sounds like you did a great job with that. But I wanted to go back and ask you about..."
- Be silent when necessary. There are times when you will learn much more by silence than by talking

**Recognize when candidates are not answering your questions directly and dig deeper for the facts**

**Why?**
As you will probably experience, some candidates like to speak in generalities or tell you their opinions and wishes instead of telling you about specific experiences they have had. Frankly, their opinions and future plans might sound terrific, but you want to hear about what they have actually accomplished.

**How?**
When candidates speak in generalities:
- Ask them to describe exactly what their own role was in the situation
- You want to hear about what he/she did as distinguished from what other members of a group did.
- If candidates use terms like "always", "usually", and "never":
- Try to steer them away from generalizing and move them back to the details of the particular situation they are describing.
- For both situations described above, use the question:
  > "Can you tell me exactly what you did in the situation you are describing?"

When candidates give opinions rather than facts:
- Sometimes candidates will express their philosophies by saying things like, "It is my belief that the student always comes first."
  - o When you hear statements like this, try to bring them back to specific stories or examples.
  - o Ask them to provide a specific example that will show their philosophy in action.
- Sometimes candidates will offer opinions as a way to demonstrate their abilities. They might say something like, "I don't think we handled the situation in the best way. I think we should have..."
  - o When you hear statements like this, ask them to describe a situation or experience where they took a proactive role and acted according to their opinions.

**Final Tips about conducting competency-based interviews:**

- Do not prejudge candidates. Give every candidate a fair chance and listen with an objective ear.
- Always begin the interview by introducing yourself and your relationship to the school and LSC. But after introductions, let the candidate do most of the talking while you listen.
- Be aware of how much time you will be able to spend with the candidate during the interview so that you can manage the pace.
- Ensure that you get complete answers. You should feel comfortable asking follow-up questions or pressing for specific examples if something is not clear or if an answer is incomplete.
- Ask every candidate the same questions during the interview.
- **Do not ask questions about a person's race, color, ethnicity, national origin, religion, age, sex, marital status, parental status, mental or physical disability (unrelated to job performance), finances, or sexual orientation.** This is discriminatory and illegal.
- Have handouts available for candidates, such as: the school paper, website address, local news articles on your school and other information about interesting school programs and activities.
- Thank candidates for taking the time to meet with you.

## TIP SHEET 6 Conducting Successful Reference Checks

References can provide meaningful insight to a candidate's ability to perform a job successfully. The types of candid insights you can obtain in the referencing process are difficult to learn from a resume or from the interview process. Just as with interviewing, gathering information from references is all about asking the right questions and listening closely to the answers.

**Contact references offered by the candidate:**
- The names of such individuals may be obtained from the candidate's references.
- Contact one or more individuals at the candidate's school not named by the candidate.
- Prepare reports on reference checks.

**Process for conducting reference calls:**
1. Decide who will conduct the reference calls.
2. Conduct the reference calls on all active candidates between the first and second rounds of interviews.
3. Before you begin each of your calls, complete the top of the **Competency-Based Reference Form** with the candidate and reference's information.
4. Call the individual.
   a. Tell him or her that you are calling to conduct a reference check on (candidate's name) and ask if s/he has about 10 to 15 minutes to spend with you. If not, ask when a better time would be to call back.
   b. If s/he is not there, leave a detailed message about why you are calling to make certain that s/he calls you back promptly.
   c. If s/he doesn't call you back within a couple of days, call again.
5. When you begin the actual reference, introduce yourself, your relationship to the school, and, in case s/he doesn't know already, state the position for which (candidate's name) is being considered.
6. Give a little introduction to the type of referencing process you are conducting. Inform him/her that you will be asking him/her to talk about the candidate's strengths, weaknesses, and work style.
7. Ask the individual what his/her relationship to the candidate is-how long they have known/worked together, in what capacity, and specific projects they have worked on together.
8. Proceed to ask the individual all of the questions listed on the **Competency- Based Reference Form.**
9. Ask about any additional concerns, issues, or questions that your selection committee have that might have arisen during the interview process.
10. Ask the individual for any additional comments he/she might have.
11. Once the reference seems to be complete, thank the individual for his/her time.
12. As you conduct the reference, it will probably be easiest to write the information onto the **Competency-Based Reference Form.** But, if you choose to take notes on separate paper, it might be helpful to write the information into the form after the call is completed.

## *Conducting Successful Reference Checks*

**Things to remember when making reference calls:**

- There are legal issues involved in checking references, so the committee should consider formally notifying candidates of when their reference check period will begin. This clears up any confusion about who will be contacted and when private information about candidates may be shared with others.
- Don't allow written letters to serve as references. Letters rarely shed negative light on candidates, and in addition, phone conversations allow you to ask specific questions, hear verbal responses, detect emotional cues, and probe for candid opinions. This direct communication is important.
- When you call references, inform them that any information that they share will be confidential and discussed only among those individuals making the hiring decision.
- Plan your phone conversation well so that you can listen to the answers rather than think of the next question. Use the **Competency-Based Reference Form** to help you plan.
- Be friendly and courteous on the phone. If you do not have good phone manners, consider giving this responsibility to someone else. It is a rule of thumb that people are generally more helpful and open to those with whom they feel comfortable speaking.
- Don't let the first reference you contact set the tone for all other conversations. Regardless of how you feel about the candidate at the end of your first conversation, you should be objective in your approach to each reference.
- Don't be afraid to ask difficult and probing questions because they often provide the most information.

**Common problems with checking references:**

Some references **do not want to talk to you** about former employees because:

- They might be **following a policy that instructs them not to give any information** about former or current employees.
- They may fear that if they talk to you, they will reveal negative things about the candidate and damage his/her chances for getting the position. These are difficult situations. You should try to relax, remain positive, and get as much information about the candidate as you can. If you are not able to properly conduct the reference interview, you might consider asking the candidate for someone else to contact.
- **"Smooth Talkers"** will make any candidate look like the candidate of your dreams. Listen closely to what these people are saying and detect instances where they sidestep your question. Side-stepping questions means the response to your question is positive but does not give you the information you requested. Keep track of the issues these people try to evade.

- **Be sure to check all the references,** especially if your candidate gets **mixed reviews.** If you feel one of your conversations was particularly unusual, either unusually negative or unusually positive, use other references to uncover inconsistencies.

**TIP SHEET 7**
**Conducting a Visit to Your Candidates' Current School**
Visiting a candidate's school and observing him or her at work is a great way to do a first-hand reference check. It allows you to see how the candidate interacts with other school administrators, teachers, and students. You can obtain a better understanding of the candidate and the ways in which their experience at this school will or will not contribute to their success as the principal of your school.

This type of school visit is optional. If you feel that you need additional information about a candidate, then visiting the candidate's school and observing the person at work might be worthwhile. However, you might encounter some situations and schools where this type of visit would be very difficult to conduct. Remember, the more information you have to make your final selection, the better!

**Process for conducting a school visit to a candidate's current school:**
*Before the school visit:*
- Obtain permission from the building principal for the visit.
- Decide who will conduct the school visit.
- Agree on dates and times when you are all available to spend 2 to 3 hours at the candidate's school.
- Call and inform the candidate that a few members of your LSC would like to visit his or her school during a school day to observe them "on the job."
  - o Tell him or her the dates and times that you are available and ask for the best time for him/her.
- Assure the candidate that he or she should not schedule any special meetings or affairs but that you are just interested in observing his/her everyday activity.

*During the school visit:*
- Notice how the candidate interacts with other administrators, teachers, and students.
- Pay attention to how people seem to react to the candidates.
- Note any ways in which they conduct themselves that you particularly like.
- Note any ways in which they conduct themselves that you don't like.
- Be aware of any questions or concerns that you have about them and try to use this as an opportunity to either eliminate or confirm those issues.
- Use the Worksheet for School Visit to the Candidate's School to write your observations.
- Although it may be difficult, try to take some notes as you make your way through the school visit. Your observations will be much easier to remember after you leave if you can jot down even small notes to remind yourself of what happened.
- If it is too difficult to take notes directly onto the worksheet during the visit, then use the questions as a guide for the kind of information you are trying to gather.

Write your notes and observations on the worksheet after the visit is over.

## TIP SHEET 8

## Conducting a Visit to Your School

Conducting a school visit for each of the candidates at your school is a great way for you to see how well they interface with your school administrators, teachers, and students. It is also a good way to make the school community feel like they are involved in the principal selection process.

This type of school visit is optional, depending on the amount of time you have and whether the circumstances at your school allow for organizing this kind of event. If you are able to organize and conduct school visits for each of your candidates, keep in mind that they can include things like: visits to classrooms, a full tour of the facilities, and/or a meeting with top administrators. You should only include those aspects of a school visit with which you feel most comfortable.

**Hints for conducting a successful visit:**
- Discuss your plans to conduct a school visit well in advance with your current principal and your Area Instruction Officer.
- Decide who will escort each of the candidates during school visits.
- Schedule separate school visits for each finalist candidate and plan on the visits lasting up to three hours.
- Call candidates to schedule their visits to your school.

**If you are including a classroom visit:**
- Allow each candidate to select the classroom he or she would like to visit before they come.
- Suggest to the teachers of those classrooms that they sit down with their students and brainstorm about questions to ask the candidates ahead of time.
- If students are reluctant to stand up and ask these questions, present a list to the candidates and ask that they just speak to the students and answer their questions.
- Ask the teachers to allow the candidates to ask questions as well.

**If scheduling a meeting with staff or school administrators:**
- Plan in advance.
- Ask staff and administrators to sign up for the meeting ahead of time and limit the total number of attendees to 10 people.
- Have the candidates start by saying a few words about themselves and their vision for the school.
- Allow ample time for staff and administrators to ask questions.
- Allow the candidates to ask questions as well

# TIP SHEET 9

## Conducting a Community Forum

A forum is the best way for the community to get involved with the selection process. It is also a time when you can see how well your finalists interact with parents, business leaders, and other individuals from the community.

You should have a forum in which all of the finalists participate. The location and time of the forum should be publicized, in accordance with the Open Meetings Act, so that anyone who would like to attend and gather more information about the candidates can do so. The forum should take much the same form as a town hall meeting where individuals can ask questions of each of the candidates.

**Process for organizing a community forum:**
- Schedule one forum in which all of the candidates will participate. It is a good idea to stagger the candidates and bring them out in 15-minute intervals. This way, each candidate can be introduced separately and has the same amount of time in front of the audience.
- If you have not held a school visit, plan to take the candidates on a mini-tour of the facilities when they come for the forum.
- Decide who will call each of the candidates to schedule the forum.
- Try to establish several different dates and times when most of the LSC members are available to participate in the forum. This way, you will have some flexibility in trying to schedule the forum with the candidates.
- Call the candidates to schedule the forum.
- Be sure to announce the forum at least 3-5 business days before it is scheduled to occur.
- Post fliers at the school, around the community, at the location of the forum, and send the flier home with students.
  - o Be sure to put the names of your finalists on the flier, as well as the location and time of the forum.
  - o To guarantee attendance, call a few key community leaders, and request their presence.
- You might want to ask each of the finalists to write a one-page summary of their background, qualifications, and their vision for the school. If your community is a bilingual community, ask the candidate to submit the summaries in two languages. Hand out the summaries to all who attend the forum.

The selection committee should not attempt to write these summaries. Put the burden on the candidates to offer any personal information about themselves.

This is important because:
- Candidates are their own best advocates in the final round.
- Candidates must decide which personal information to disclose to the public.
- The selection committee must remain publicly objective, so that it cannot be blamed for writing a better summary for one candidate than another.

## TIP SHEET 10

### *Negotiating Additions to the Contract*

At this point, your LSC has taken an in-depth look at your school's problems and needs, and has determined the kind of principal it will take to successfully lead your school. As a result of some of the things you have discovered during this process, you might wish to add your school's Uniform Principal's Contract. The following information provides you with some examples of the kinds of contract additions you might wish to make as well as the process you should follow in making these additions and negotiating them with candidates.

**Examples of contract additions:**
- The principal shall provide a budget performance report at each monthly LSC meeting.
- The principal shall provide a monthly report on progress made towards meeting the CIWP goals.
- The principal shall visit each classroom at least two classroom periods in each school year.
- The principal shall, by the first day of school, receive training to increase his or her Spanish speaking proficiency.

**Process for making additions:**
- Based on what you have determined to be your school's problems and needs, brainstorm and discuss contract additions that you believe are integral to the success of your school's principal.
- Appoint one person to write down all of the ideas mentioned during the discussion.
- After your brainstorming is complete, read the list you have created to determine whether or not each of the ideas is truly important to add.
- Submit the contract additions to the CPS Law Department for review.
- Amend additions as necessary.
- Remember that any formal contract additions must be voted on in an  open meeting of the LSC.
- Present these additions to the finalist candidate(s) you have selected. Candidates might disagree with some of the additions you have made, or might suggest that you word them differently. Remember that finalizing your contract additions should be a collaborative effort between you and the candidate, and approved by the Law Department.



# LOCAL SCHOOL COUNCIL

# RESOURCE GUIDE

## Part Seven: Internal Accounts and Fundraising

## Introduction

Internal Accounts: In addition to your school budget, all schools have Internal Accounts. The school's Internal Account is a management system designed to handle the cash that schools get from students, parents, and the community. The sources of this cash include student fees, fund-raising activities, vending machines, special events, lease income, class ring sales, and gifts, grants, or donations. These accounts can add up to a substantial amount of money. Internal accounts money must be used to benefit the students directly or indirectly.  Each school has two sources of funds to spend on its educational and extracurricular activities: (1) the school's allocated budget and (2) the school's Internal Accounts. Local, state, and federal governmental revenues primarily fund the school budget. Fundraisers primarily fund internal accounts. Sound financial management, budgeting, and record keeping are necessary for both funding sources.  (105 ILCS 5/34-2.3(15b)

**The Illinois School Code provides that the Powers and Duties of LSCs include:**

LSCs have the authority to:
- Approve all Internal Account receipts and expenditures.
- Approve all internal account expenditures over $1,000 at elementary schools and $2,500 at high schools for all CPS attendance centers prior to the expenditure by an affirmative vote of a majority of serving LSC members.
- On a monthly basis, review the school's internal accounts report and bank statement activity.
- Approve all fundraising activities by non-school organizations using school facilities.
- Request and review an audit of the school's internal accounts from the Office of Audit Services at 773-553-2803
- Approve all contracts for goods or services to be paid for with internal account funds

**Board Action:**
To provide guidance to Principals regarding management of the internal accounts, the Board has written an:

Insider's Guide to School Business and Internal Accounts
http://cps.k12.il.us/FinancialResources/Finance/GeneralAccounting.shtml

School Responsibilities:
- Maintaining accurate and up-to-date records of all financial internal accounts transactions
- Using the Oracle Internal Accounts Management System (IAMS)
- Completing and submitting monthly reports
- Completing the annual Internal Accounts Survey
- Completing an annual physical inventory and fixed asset register using TIPWEB
- Safeguarding and protecting the school's assets (cash, equipment, other property)

# MONTHLY INTERNAL ACCOUNTS REPORTS- REVIEWED AND APPROVED BY THE LSC

### Cash Receipts Journal
This report lists the Treasurer's receipts issued and deposits made during the reporting period. Information listed for each receipt is: Receipt Date, Receipt Number, to whom the receipt was issued and the amount credited to each account (all receipts go in the Cash on Hand or Credit Card account). Information listed for each deposit is: Date, Deposit Number, the amount transferred from the Cash on Hand or Credit card account to the bank account and direct deposit amounts credited to revenue accounts.

### Cash Disbursement Journal
This report lists the checks issued, voided and spoiled during the reporting period. Information listed for each issued check is: Check date, Check number, Payee, and the amount charged to each account.

### Summary Trial Balance
This report lists the beginning balance, total additions, total subtractions and the ending balance for each account in the system during the reporting period. The listing is in numeric order. The account numbers beginning with 2 are revenue accounts and the ending balances represent money available to spend. If the ending balance is in brackets it indicates the account has been overspent by the amount in brackets. The debit column represents an increase to accounts that begin with one (1). The Credit column represents an increase to the accounts that begin with two (2).

**General Journal Entry Guidelines for Internal Accounts**

A General Journal entry is a double entry bookkeeping transaction that is recorded   by debiting one account and crediting another account for the same total amount for the purpose of distributing funds or correcting an error. Every Internal Account transaction creates a Journal Entry. However, this guidance pertains to Manual General Journal Entries.

**Common General Journal Entries**
- Record bank fees for new checks
- Record a returned deposit
- Correct receipt transaction AFTER receipt has been deposited
- Correct amount of a check
- Record bank errors that have not been corrected in the current month
- Transfer funds from one revenue account to another revenue account

**LSC Required Approval for Chart of Accounts**

- The LSC approval is required when schools are completing a journal entry to Repurpose funds. Example: Journal entry to move funds from the Gym Uniform account to the Field Trip account.
- The LSC must approve the repurposing of funds and it must reflect in the LSC minutes with the following information:
  Account number and Account name the funds are being moved from and to.
- The purpose for moving those funds.
- The amount being moved.

LSC approval is required when Schools are requesting to use rental income for a specific purpose. The approval must be reflected in the LSC minutes as mentioned above.

- Schools cannot disburse funds directly from the rental income accounts.
- Once the LSC has approved the use of the rental income funds, a general journal entry is completed to move those funds to the specific account.

Be sure to monitor and remove funding requests when the event is completed.

**Fundraisers:** LSCs must also approve fundraisers by non-school groups. Non- school groups must submit a CPS Fundraising Accounting Proposal Form. After the fundraiser, the non-school group is required to submit the Local School Fundraising Accounting Report form in order to account for how much was raised. Guidelines for fundraising are included in the Resources section. All funds raised on behalf of students or the school by registered external organizations or school/parent organizations must be turned over to the school at the conclusion of the fundraising activity and deposited into school internal accounts.

# FUNDRAISING GUIDELINES

CONDUCTING FUNDRAISERS

1. Prior to commencing a fundraising activity, the staff member designated as the sponsor of the fundraising event must complete the Local School Fundraising Accounting Proposal Form and submit to the principal, network chief, and LSC (if applicable) for approval. **All fundraisers require an Approved Local School Fundraising Accounting Proposal prior to the start of the fundraiser.**

2. Fundraisers must be clearly defined and benefit the student body or school affiliated student group conducting the fundraiser within the same year the funds were raised.

3. Fundraisers must not interfere with scheduled instructional time and educational programs or disrupt daily school operations.

4. Fundraising events must follow district health policies.
5. Schools must adhere to the *Commercial Activity Policy (06-0628-PO1)* when considering fundraising activities related to advertising and sponsorship.
6. Participation in fundraising events is completely voluntary. Under no circumstances shall students, parents, or staff be pressured or mandated to participate in an approved school-sponsored fundraising activity nor shall they be punished, penalized, or discriminated against for choosing not to participate.
7. Students who wish to fundraise for their school or student organization must find a staff sponsor who is approved by the principal or their designee.
8. Proceeds from these fundraising activities should be used to benefit the student body or school affiliated student group and funds shall be evenly distributed amongst all students for whom the funds were collected regardless of participation.
9. As per the *Local School Wellness Policy for Students (22-0622-PO4)*, principals, school staff, parents and /guardians and students are strongly encouraged to promote non-food fundraisers. Exceptions as outlined in this policy are as follows:
   a. During a school-sponsored activity or trip off school grounds and longer than the school day;
   b. At concession stands at a sports stadium, gym, field house or auditorium, whether on or off school grounds;
   c. As part of a school sports game, performance or event where parents and/or guardians and other adults are a significant part of an audience;
   d. At school fundraising events held off of school grounds; and
   e. Outside of school hours (i.e., between 30 minutes after the final bell and midnight).

## FUNDRAISING APPROVALS AND FORMS

1. Prior to commencing a fundraising activity, the staff member designated as the sponsor of the fundraising event must complete the Local School Fundraising Accounting Proposal Form and submit to the principal, network chief, and LSC (if applicable) for approval.
2. If proceeds are shared, the percentage split must be clearly defined in this proposal.
3. LSCs MUST pre-approve all fundraising activities conducted by external organizations in or with the school and approve all contracts of $10,000 or less.
4. Only approved fundraising activities as evidenced by proper approvals on the Local School Fundraising Accounting Proposal Form may be conducted.
5. Concession sales and other continuous fundraising activities must be approved at the beginning of the school year. Sales should be tracked on the applicable Concession Sales Accounting Report or Ticket Accounting Report and a Perpetual Inventory Card must be maintained.
6. Within 10 school days of the last date of the fundraising activity, the School Treasurer must submit to the Network Office a completed Local School Fundraising Accounting Report and the Concession Sales Accounting Report.

FUNDRAISING APPROVALS

| EVENT TYPE | PRINCIPAL | LSC | NETWORK CHIEF |
|---|---|---|---|
| Conducted by the School (including student groups and staff) | x | | x |
| Conducted by or with a Registered External Organization | x | x | x |
| School Affiliated Non-Student Groups | x | x | x |
| Loyalty or rewards programs | x | x | x |
| Book Fairs, Picture Sales, or other events requiring a contract | x | x | x |
| *Crowdfunding Campaigns | x | x | x |
| **School Facility Rental | x | x | |

*Network Chief reviews and monitors crowdfunding campaigns.
**Refer to Board Rule 6-25.

The table below provides more information about forms you may use to record and track your fundraising activities.

| FORM | PURPOSE |
|---|---|
| Local School Fundraising Proposal | To outline the fundraising activity, expected revenue and expenditures, and gain approval. |
| Local School Fundraising Accounting Report | To verify receipts and expenditures |
| Concession Sales Accounting Report | To track the amount of receipts and the amount of goods sold. |
| Ticket Accounting Report | To report the collection of tickets and explain any differences. |
| School Expenditure Requisition Order | To indicate what is being purchased with school internal accounts. |

| Payor List | To record money collected from students by using a student listing. This list is used when the amount collected is $20.00 or less and in the same amount.<br><br>**Exception:** A Payor List may be used for **Picture Day** to collect amounts over $20 and various dollar amounts. |
|---|---|
| Teacher Receipt book | To provide individual receipts for collections from students and to provide students with a copy of the receipt. Teacher Receipt Book should be used to collect for amounts over $20. |
| Treasurer's Receipt | To document all money collected or received by the school. |
| Perpetual Inventory Card | To verify purchases and product status. |
| Pre-Numbered Tickets | To track the number of individuals attending an event. |

## PROCEEDS FROM FUNDRAISERS

1. Proceeds from fundraisers must be deposited in school internal accounts and should be deposited as outlined in Section 9 of this manual. Under no circumstances shall fundraising proceeds be deposited into the personal bank account of the fundraising sponsor, staff, or students.
2. Schools must use pre-numbered tickets, maintain a record of the number of tickets sold and cash receipts using the Ticket Accounting Report, and submit to the school treasurer after which a Treasurer's Receipt will be provided.
3. Exception: Collections from students for picture sales may be recorded on a Payor List using the actual dollar amount received from each student. The school should not remit any portion of the collections to the photographer until the pictures are delivered and a proper invoice is submitted.
4. Staff may conduct staff-sponsored fundraisers for the purpose of hosting staff socials. Proceeds from these events should be recorded in school internal accounts. See section below on *Recording Proceeds in IAMS*.
5. Once the fundraiser has ended and all expenses have been paid from the fundraiser account, a journal entry must be completed to move the proceeds to the designated account the funds were raised for.

## PROHIBITED FUNDRAISING ACTIVITIES

1. Students and staff are prohibited from door-to-door sales and soliciting in parking lots, outside of buildings, in streets or in street intersections.
2. Sales quotas may NOT be imposed on students, parents, school affiliated student groups or staff when fundraising activities include the sale of items.
3. External organizations and LSCs may NOT sponsor continuous fundraising activities such as a school store or other year-round sales nor may they solicit contributions

from students within the school.

4. Fundraisers conducted by the student body or school affiliated student group may NOT be held to benefit school staff.

**ADDITIONAL CONSIDERATIONS**

1. When fundraisers involve the sale of tickets to events such as a school play or musical, schools must ensure appropriate accommodations are in place to meet the needs of all participants.
2. Raffle ticket sales and any other activity that may constitute gambling are not permitted in school buildings when students are present. In order to lawfully operate a fundraising event that utilizes raffle tickets, schools must register for a raffle fee license with the City of Chicago 30-60 days in advance of the fundraising event. For more information, visit: *https://www.cityofchicago.org/city/en/depts/bacp/sbc/business_licensing.html*.

# CROWDFUNDING GUIDELINES

In addition to the general guidelines listed above, fundraising conducted through crowdfunding should follow the guidelines as outlined below, to the extent possible.

SCHOOL-BASED CROWDFUNDING

1. Crowdfunding campaigns conducted by schools may only be conducted on Board approved and designated websites. As of the publication date of this manual, the ONLY Board approved website is _Donors Choose_. Use of GoFundMe is explicitly prohibited.
2. Public image and message should be considered when setting up campaigns.
3. When setting up a crowdfunding campaign, there must be two administrative rights level users for each fundraiser. The school principal must be an administrative rights level user.
4. All monies received should be provided via check issued to the school and in the name of the school.
   a. Under NO circumstances shall checks be made payable to the sponsor or other staff for direct deposit into their personal bank accounts.
5. Donations received MUST be used for their stated and approved purpose in accordance with Board Policy.

BE CAUTIOUS OF AND IDENTIFY THE CROWDFUNDING TYPE:

● "All or Nothing" — means that if the amount requested is *not reached*, the project *does not* get funded. The *donor* has the option to pick another project to fund or give the requesting teacher a credit toward their next project.
● "Keep it All" — means that if *any amount* is reached, the school will receive a check *even if the goal is not reached*.

Be sure to monitor and remove funding requests when the event is completed.

## RECORDING PROCEEDS FROM FUNDRAISERS IN IAMS

1. Proceeds from fundraisers should be recorded in the 25000 Account Series. A separate account should be created for each activity.
   a. One-time fundraising activities (e.g., pictures and ticket sales) should be recorded in the 25100 Account Series.
   b. Continuous fundraising activities (e.g., school store) should be recorded in the 25200 Account Series.
2. Donations received from <u>crowdfunding campaigns</u> and <u>loyalty and rewards programs</u> should be recorded to the 28100 Account Series. A separate account should be created for each activity. A grant acceptance request must be submitted and approved in Oracle Grants, Gifts and Donations (GGD) before funds may be disbursed.
3. Funds raised by staff for staff should be recorded in Account 29101 Staff Social Fund.
4. Proceeds from the leasing of a school facility should be recorded as follows:
   a. Account 21310 Building Lease Income
   b. Account 21330 Swimming Pool Income
5. Proceeds from concession sales should be recorded in the 24000 Account Series.
6. Per Board Rules, proceeds from the sale of refreshments at the stadia shall be credited to the Lunchroom Fund. See *Sec.5.7 Sale of Refreshments at Stadia*.

## COMMON QUESTIONS

1. If a fundraiser is conducted by an external organization on behalf of the school and on school grounds, should the proceeds be deposited in Internal Accounts?

   Yes, proceeds collected from fundraisers conducted by external organizations on behalf of the school and on school grounds should be deposited in Internal Accounts.

2. If a fundraiser is conducted by an external organization on behalf of the school but not on school grounds, should the proceeds be deposited in Internal Accounts?

   The proceeds should be deposited into the organization's account and a check given to the school for the percentage due. Upon receipt, funds should be deposited into Internal Accounts and credited to a 28XXX account (Gift, Grants, Donation).

3. If an external organization raises funds to support vendor payment for a vendor providing service at a school, can the organization pay the vendor directly?

   No, external organizations may not pay vendors directly. Funds should be turned over to the school and deposited in Internal Accounts. All vendors are required to go through the Procurement Vendor Sponsorship Process. Vendors must meet all requirements and pass the necessary background checks to be issued a vendor number. Once a vendor number is issued, schools may open a PO or issue a check after service is rendered.

## BUILDING USAGE AND LEASING SCHOOL FACILITIES

School buildings may be used by School Affiliated Non-Student Groups (e.g., LSC, PTO, PTA, and PPLC), School Affiliated Student Groups (e.g., French club, math club, and debate team), and Community and other Non-School Affiliated Student Groups. If approved by the LSC, school facilities may be used for commercial use by private for-profit organizations. The consumption of alcohol or tobacco products is prohibited on Board property. See *Board Rule 6-25,* for more information.

Permits are required for the ONE-TIME or OCCASIONAL use of the school building or the school grounds by a non-Board of Education entity. These permits must be obtained prior to the scheduled activity. Continuous, repetitive use of the building or grounds (including all Chicago Park District programs) requires Board approval and must be documented by a license agreement, a lease agreement, or an inter-agency agreement. The principal and the LSC, in accordance with the procedures and requirements specified on the back of the *School Usage Permit*, approve permit applications. Refer to the Real Estate Department's Intranet site for additional information on the leasing of school facilities.

## UNAUTHORIZED FUNDRAISERS USING THE CPS NAME OR A SCHOOL NAME

If you become aware of a person, group, or an organization fundraising in the name of CPS, or in a CPS school name, without following the processes above, please report this to the Law Department at (773) 553-1700.

# KEY TERMS AND DEFINITIONS

The following table provides an alphabetical reference to many of the key terms used in the guide.

| | |
|---|---|
| Abstain | Formally decline to vote either for or against a proposal or motion. |
| Advocate (Member of the Appointed LSC) | An individual who is at least 18 years of age and possesses skills or expertise in a field that is the educational focus of or will contribute to the fulfillment of the educational mission of an alternative school.<br><br>May not be related to the principal or academy superintendent; may not be parent/legal guardian of a current student; may not work in the school of which they are advocates; may not be an employee of the Board. |
| Alternative School | A school created by the Board of Education that has a specialized student population, educational focus, curriculum, or school design, with an appointed body to involve parents, community members, and school staff in the activities of the school. The requirements and powers for traditional LSCs do not apply to these schools. The CEO develops the specifications for the school's advisory body. |
| Bilingual Advisory Committee (BAC) | If the school has a Bilingual Education program, the LSC must have a BAC whose members are parents of students in that program. The BAC advises the principal and LSC on the bilingual program plans and use of Bilingual Education funds. |
| Binding Poll | The person(s) with the most votes is selected, and the Chicago Board of Education will appoint the person(s). |
| Budget Transfer | Moving money from one category within a fund to another category within that fund, which must be approved by the LSC. |
| Bylaws | Rules for how the LSC works. An example is included in the Resources for this section of the LSC Guide. |
| Charter School | An attendance center authorized pursuant to the Illinois Charter School Law. |
| Closed or Executive Session | As part of a public LSC meeting, LSC members may meet privately as a body, without the public, for reasons outlined in the Open Meetings Act. |
| Code of Ethics | Standards of conduct that apply to all CPS Board Members, LSC Members, and Employees. |
| Community Resident | Community Resident members of the LSC must be at least 17 years old and live within the school's attendance area or voting district boundary or District 299 if the school does not have attendance or voting boundaries. They cannot have a child enrolled in the school, be related to the principal, work for the Board of Education or work in the school where they serve. |

| | |
|---|---|
| Continuous Improvement Work Plan -- CIWP<br><br>See LSC Guide section on CIWP | A three-year plan for school progress developed by the principal with input from members of the school community. It is used when making budget decisions. It is revised after year one and two. The LSC must present the proposed CIWP to the school community before it is approved. The LSC uses the plan to keep track of progress. After years one and two, the school updates the plan and approves the plan. |

| Contract Addenda | It is an additional item that is added to the contract. The LSC and candidate principal have to agree on the addenda, and it requires the approval of the Law Department. The addenda must be included in the motion to offer the contract. |
|---|---|
| Contract School | An attendance center managed and operated by an organization retained by the Board to provide instruction and other services. |
| The Department of Principal Quality (DPQ) | Manages the process that principal candidates must complete before they can be selected as contract principal. |
| Discretionary Funds | Funds that can be used for multiple purposes as determined by the principal and LSC |
| Economic Interest | A financial gain or benefit that a person receives |
| Elementary Local School Councils (Traditional ) | In elementary schools without 7th and 8th grade: The LSC includes 12 members: Principal, six parents, two teachers, two community residents, one non-teacher staff member.<br><br>In elementary schools with 7th and 8th grade: The LSC includes 13 members: the Principal, six parents, two teachers, two community residents, one non-teacher staff member, and one student. |
| Emergency Meeting | A type of special meeting called by the LSC for the purpose of addressing an unexpected extraordinary event that requires an immediate action that the LSC is empowered to vote upon. Reasons for calling emergency meetings do NOT include failure to plan, to meet deadlines, or failure to provide notice in a timely manner. *Emergency meetings are usually called in association with natural disasters.*<br><br>If the standard for an emergency meeting is not available, a special meeting may be called instead, as long the notice and agenda are posted within 48 hours of the meeting. |
| Fiduciary | A person who holds a legal or ethical relationship of trust with one or more other parties. |
| Forum | A meeting or town hall meeting to introduce final candidates to the school community |
| Freedom of Information Act (FOIA) | The law states that public bodies must disclose public documents to the public upon request. LSCs must meet the requirements of this Act. The LSC designates a member or members to complete training on the FOIA and act as Freedom of Information Act Officer for the LSC. |
| High School Local School Councils (Traditional) | Include 15 members: Principal, six parents, two teachers, two community residents, one non-teacher staff member, and three full-time students |
| Local School Council | A school's governing body that is an elected or appointed council or a board of governors |
| Majority Vote | The minimum number of "yes" votes needed to pass a general motion. It is the majority of the members currently serving on the LSC. To calculate the majority vote: The number of currently serving members divided by two (2) plus one (1). The decimal value is dropped. Example: 12 serving members- Majority vote is 7 "yes" votes. A majority vote does not apply to selecting a new contract principal or the transfers of funds. |
| Military Academy | One type of alternative school created by the Board that has a military science curriculum and an appointed Board of Governors to involve parents, community members, students, and school staff in the activities of the school. |

| | |
|---|---|
| Nepotism | The practice among those with power or influence of favoring relatives or friends, especially by giving them positions in an organization or a company. |
| Non-Binding Poll | The poll provides a recommendation to the Chicago Board of Education on the person who should be appointed to serve. The Board may or may not appoint the recommended person. |
| Officers of the LSC | The LSC officers include the chairperson, who must be a parent member, and the secretary, who may be any LSC member. The LSC may also select other officers, including a Vice Chairperson and an Open Meeting Act and Freedom of Information Act Officer or Officers. |
| Open Meetings Act (OMA) | LSCs must meet the requirements of this Act in conducting their business. The LSC members must take the OMA training. The LSC identifies a member or members to complete online training on the OMA annually. |
| Organizational Meeting | The first meeting of the LSC each school year is required to be held between July 1-14. At the meeting, officers are elected. Finally, the regular meeting schedule for the year is planned and thereafter posted for the public. |
| Partisan | A strong supporter of a political party, person, or cause |
| Parent Eligibility for LSC | Each parent candidate must be the parent or legal guardian of a student currently enrolled and attending the school, not related to the principal, not an employee of CPS. |
| Principal Contract | Principals receive a four-year contract. A Traditional LSC may vote to enter into a contract with a principal. For an appointed LSC, the council may vote to recommend principal candidates to the CEO for a contract. The contract is between the Chicago Board of Education and the principal for appointed councils. |

| | |
|---|---|
| Principal Evaluation | The Local School Council evaluates the principal based on the evaluation requirements in the School Code using the Board-approved evaluation form. The CEO or designee evaluates the principal based on the evaluation requirements in the School Code using the Board-approved evaluation form. |
| Probation | A school that is identified as needing support. The CEO or Network Chief develops and the Board approves the Continuous Improvement Work Plan (CIWP) and budget for schools on probation for less than five years. |
| Professional Personnel Leadership Committee (PPLC) | The PPLC advises the principal and LSC on the educational program. The committee is not part of the LSC but provides advice on the curriculum and instruction of the school. |
| Public Participation | Part of an LSC meeting where the public has the opportunity to share feedback with the LSC. Every LSC meeting must include public participation. The LSC may set reasonable rules for public participation. |
| Quorum | The number of LSC members needed to be physically present to vote and take action on business matters. Quorum has seven (7) members for a traditional elementary school LSC and Eight (8) members for a traditional high school LSC. For appointed LSCs, one-half of the full membership plus one. If a quorum is not present, the LSC cannot vote on motions. |
| Reconvened Meeting | A meeting that is a continuation of a properly called meeting (regular or special). The prior meeting must have not been adjourned (voted to end) with an approved motion for the body to reconvene. The reconvened meeting must have the exact agenda as the continued prior meeting. |

| | |
|---|---|
| Recuse | Excuse oneself from a conversation or discussion of a business matter because of a potential conflict of interest or lack of impartiality. |
| Rollover Funds | Funds that are left after the previous year's expenses have been paid. Most funds do not roll over. |
| Rules of Order | Guidelines established by the LSC for conducting LSC meetings. Established by Robert's Rules of Order |
| Special Meeting | The Chair or four LSC members of a traditional elementary school LSC may call a special meeting, which is additional to the regular LSC meeting in elementary schools<br><br>The Chair or five LSC members of a traditional high school LSC may call a special meeting, which is additional to the regular LSC meeting in high schools |
| Statement of Economic Interest | A form that must be completed annually that highlights potential conflicts with the Ethics Code |
| Student Eligibility for LSC, Appointed LSC or Boards of Governors | Must be attending full-time student(s) in schools with traditional LSCs that have grades 7th to 12th. Students in grades 6th to 12th are eligible to run. Students must be in grades 7th grade and up to serve on an LSC. For appointed councils or boards of governors, they must be high school students in good academic standing. In a Military Academy, the student representative is the Cadet Battalion Commander or another senior cadet. |
| Teacher Eligibility for LSC Membership | Must be employed and in a position at the school where a majority of the teacher's duties are performed, a position that requires teacher qualifications; cannot be an assistant principal. |
| Title I Parent Advisory Council (PAC) | Schools receiving Federal Title I funds must have a PAC, which works with the LSC to make sure that ESSA Title I parents provide recommendations for ESSA programs and that the school provides parent involvement programs. All programs and budget proposals by the PAC must be consistent with and part of the CIWP. |
| Uniform Principal's Performance Contract | The contract between the LSC and the principal whose term is four (4) years. |

| Section of the Code | Overview of Key Ethics Code Provisions for LSC Members |
|---|---|
| Nepotism Section VI | • The definition of Relative can be found in Section II of the Code, Part DD.<br>• LSC members cannot hire or appoint their Relatives.<br>• LSC members cannot influence others to hire or appoint their Relatives.<br>• LSC members cannot hire or appoint a Person in order to get a Relative hired or appointed.<br>• LSC members cannot advocate any employment actions involving their Relatives.<br>• LSC members cannot advocate for a contract agreement with a Relative or a Relative's place of business.<br>• LSC members with relatives employed at the school must abstain from voting on the entire budget, entire school improvement plan, and any transfer of funds that may affect the Relative. |
| Economic Interest and Conflicts of Interest Section IX | • The definition of Economic Interest can be found in Section II of the Code, Part P.<br>• LSC members cannot have an Economic Interest in a contract or business of the school.<br>• LSC members cannot have an Economic Interest in the buying, selling, or leasing of an item for which their LSC or school paid.<br>• LSC members cannot be paid by another employer for their position/work as an LSC member.<br>• LSC members cannot receive money from the school except for particular reimbursements.<br>• LSC members cannot vote on the current Principal's contract if they intend to apply to be Principal.<br>• If he or she votes, and the LSC votes not to renew the contract they are ineligible to apply.<br>• If the LSC member does not resign before the Principal selection begins, he or she is ineligible to apply.<br>• LSC members cannot vote or discuss proposals of Not-For-Profits which donate funds or services to the school when the LSC's life partner sits on the board of the organization. |
| Gifts, Loans, and Favors Section XII | • LSC members cannot accept anything of value if there is an understanding that the member's actions are to be influenced because of that gift. |
| Use or Confidential Information Disclosure of Section XIV | • LSC members cannot share Confidential Information that was learned as part of the LSC member's membership. |
| Post-membership Restrictions Section XV | • Former LSC members are not eligible for employment at the school where they served until one year after their LSC membership ends.<br>• Former LSC members cannot have an Economic Interest in a contract involving the school until one year after their LSC membership ends. |
| Political Activities Section XVIII | • LSC members cannot use their position to engage in Political Activity or endorse a Candidate for Elective office.<br>• LSC members cannot use Board resources to perform any Political Activity. |

| Rights and Responsibilities Section XIX | <ul><li>LSC members must follow the Code of Ethics.</li><li>LSC members must report any violations or potential violations of the Code to the Ethics Advisor.</li><li>LSC members must cooperate with the Ethics Advisor regarding ethics violations. This includes supplying witness testimony, documents, and other requested information.</li></ul> |
|---|---|
| Penalties Section XXI | <ul><li>LSC members who violate the Code may be disqualified or removed from office.</li></ul> |

## MODEL BYLAWS FOR A TRADITIONAL LSC

## Bylaws of the *<ADD SCHOOL NAME>* School Local School Council

### Article I – Name and Authority

**Section 1.   Name**
The name of this Local School Council shall be the *<ADD SCHOOL NAME >*  Local School
Council (hereinafter "LSC").

**Section 2.   Offices**
The LSC shall maintain its offices and records at <ADD ADDRESS OF SCHOOL>
with the agreement and cooperation of the principal.

**Section 3.   Authority**
The LSC is a Local School Council organized under the authority of the Illinois
School Code.

### Article II – Governance
These Bylaws, the applicable rules and regulations of the Chicago Board of
Education and the Illinois School Code shall govern the operation of this LSC.

### Article III – Purpose

The purpose of the LSC shall be to carry out its responsibilities pursuant to the
Illinois School Code and Board Rules and to improve the quality of education at the
attendance center.

### Article IV – Basic Policies

The following are basic policies of the LSC:

a.      The LSC shall be noncommercial, nonsectarian, nonpartisan, and
nonpolitical.

b.      The name of the LSC shall not be used in any manner to suggest LSC
approval or endorsement except in those instances where the LSC has considered
a matter over which they have been granted authority to act and affirmatively
approved by a majority vote of its membership. Nothing in this Article shall prohibit
an LSC member from giving their independent endorsement. Any LSC member

using their name for an independent endorsement shall so indicate in the endorsement. Nothing in this Article shall be construed to restrict the constitutional rights of an individual who is a member of the LSC.

c.      The LSC will not devote or allow the use of its resources for the publication and distribution of statements or campaign material, in any political campaign on behalf of or in opposition to any candidate for public office.

d.      Neither the LSC nor any of its members acting in their official capacity as members of the LSC shall directly or indirectly use or allow the use of any of its resources in any campaign for Local School Councils on behalf of or in opposition to any candidate for a Local School Council.

e.   No member of the LSC or of an LSC committee shall take or receive either directly or indirectly, any money, or thing of value that is to serve as a means of influencing their action in the member's capacity as a member of the LSC or an LSC committee. No member shall solicit, accept, or agree to accept for personal gain any direct or indirect favor, gift, loan, free service, gratuity, entertainment, or other items of economic value if the donor has or is seeking to obtain contractual or other business or financial relations with the Board or with the LSC; has interests that may be substantially affected by the performance or nonperformance or the member's duties on the LSC; or is attempting to reward or influence the member's impartiality or give that appearance.

These prohibitions do not preclude: (a) acceptance of unsolicited advertising or promotional material of nominal value; or (b) acceptance of food, entertainment, and refreshments of nominal value on infrequent occasions in the ordinary course of a meeting, inspection tour, or training session in which the member is properly in attendance.

f. The LSC shall, to the maximum extent allowed by the law, participate in the decision-making process to improve the quality of education for the students of the school.


**Article V – Membership**

**Section 1.    General Powers.** The affairs of the LSC shall be managed by its members.

**Section 2.    Number, Tenure and Qualifications.**   The LSC shall be composed of eight (8) elected members, The elected members shall consist of six (6) parents of

students currently enrolled at the attendance center who are not employees of the Board of Education and two (2) community residents residing within the attendance area or voting district of the attendance center who are not employees of the Board of Education and who do not have children attending the school.

The Board of Education appoints student(s) following a binding election by the student body. In schools serving grades K-12, 7-12, 11-12 and 9-12, three (3) students are appointed. In school serving seventh and eighth grade one (1) student is appointed.

The Board of Education appoints two (2) teachers and one (1) non-teaching staff member following a non-binding staff poll. Each member shall hold office until the end of their term of office, until their death or resignation, or until their removal in accordance with the Illinois School Code.The Board of Education has the absolute discretion on the appointment of school staff.

**Section 3. Nomination and Election.** The LSC shall assist and cooperate with the Board of Education in conducting elections for LSC membership at the attendance center in accordance with the provisions of the Illinois School Code and the guidelines and procedures adopted by the Board of Education to ensure fair and equitable elections. The LSC shall not adopt or use any other election guidelines or procedures.

**Section 4. Term.** All members shall serve a term of two (2) years except the student members, who shall serve a term of one (1) year. Any LSC member who decides to resign from the LSC during their term may submit a written resignation to the LSC Chairperson, LSC Secretary or Principal, who shall forward the written resignation to the entire LSC (email is highly recommended). A parent LSC member whose child dies may continue to serve until the end of their term. Any LSC member who fails to meet the eligibility requirements for their office will be subject to removal from office in accordance with Board of Education Rules 6-28, 6-29 or 6-30. Any such member may resign from office in lieu of removal.

**Section 5. Dues.** There shall be no obligation for any member of the LSC to pay dues or any type of membership fee.

**Section 6. Compensation.** Members of the LSC shall serve without compensation and without reimbursement of any expenses incurred in the performance of their duties, except as may otherwise be provided by the Board of Education.

**Section 7.    Vacancies.**    In the event a vacancy occurs during a parent or community member's term for whatever reason, the LSC shall appoint a person otherwise eligible for election to the vacant position to serve on the LSC for the remainder of that member's term. In the event that less than the maximum number of parent or community persons eligible are elected to the LSC at a regular LSC election, the LSC shall appoint eligible persons to serve as members of the LSC for terms consistent with the terms held by the elected members of the LSC.

*Filling Vacancies*

1.    LSCs that have vacancies are to advertise that a vacancy exists and that they are looking for candidates to fill the vacant position(s).

2.    Councils with at least enough serving members to have quorum, the LSC, with a quorum present, may make motions to fill parent and community vacancies with individuals who have completed the nomination packet and who meet the eligibility requirements. The motion to fill the vacancy can be approved by a majority of the serving members voting "Yes".

3.    School staff vacancies require that the school staff vote in a non-binding poll for staff who have completed the nomination packet and meet the eligibility requirements for the vacancy. The Board has absolute discretion in the appointment of school staff to fill the vacancy.

4.    Student vacancies may be filled by the student body voting in a binding election to fill the vacancy for students that meet the eligibility requirements. The Board will appoint the winner(s).

Student and staff members may not be counted as members or vote until the Board has appointed the member.

*Filling Vacancies - Councils Without Quorum*

Councils that do not have enough serving members to meet quorum requirements may be able to meet an alternative set of quorum requirements that allow the council to fill parent and community member seats.

A.    Elementary Schools: The LSC may meet to fill parent and community vacancies if the LSC has four (4) members present and at least two (2) of the members are parent and/or community members. The only action that can take place at the meeting is the process of filling the vacancy.  The  chairperson or four (4) LSC members may call a special meeting to fill the vacancies and the motion to fill the vacancy can be approved by a majority of the members present at the meeting voting "Yes".

B.    High Schools: The LSC may meet to fill parent and community vacancies if the LSC has five (5) members present and at least two (2) of the members are parent and/or community members. The only action that can take place at the meeting is the process of filling the vacancy.  The  Chairperson or five (5) LSC members may call a special meeting to fill the vacancies and the motion to fill the vacancy can be approved by a majority of the members present at the meeting voting "Yes".

**Section 8. Removal of Members.**  The LSC may remove members by a majority vote for missing three (3) consecutive regular meetings or five (5) regular meetings in a twelve (12) month period. The regular meetings that may be considered in removing a member are the regular meetings scheduled at the Annual Organizational Meeting. If the regular meeting schedule is changed after the Organizational Meeting, absences of the newly scheduled meetings may not be considered for the removal. The LSC must notify the member by personal delivery or certified mail directed to the member's last known address of its intent to vote on their removal at least seven (7) days prior to the vote. At the meeting at which the LSC will vote on removal, the member shall have the right to explain the reasons for their absence and to vote on the question of their  removal.

Pursuant to rules, the Board of Education may also remove members for any of the following reasons:

● Failure to meet the eligibility requirements for their office
● Failure to complete a Criminal Disclosure Form to disclose criminal convictions subject to disclosure on the form
● Failure to pass a criminal background investigation
● Failure to provide fingerprints for completion of the criminal background investigation
● Failure to comply with the Ethics Code
● Failure to comply with the training requirements for LSC members
● Failure to file an Annual Statement of Economic Interest

**Article VI – Meetings**

**Section 1.    Annual Organizational Meeting.**  The LSC will hold an Annual Organizational Meeting no sooner than July 1 and no later than July 14 of each year at the school where it serves. At the organizational meeting, the LSC shall

elect, at a minimum, a Chairperson (must be a parent member) and a Secretary (may be any member) to each serve a term of one (1) year and shall set a schedule of regular meetings for the school year.

**Section 2.    Regular Meetings.**   The schedule of regular meetings shall be made available to the public. Regular meetings may be held on legal holidays. The time and place of regular meetings shall be convenient to the public.

**Section 3.   Special Meetings**.    The Chairperson or any four (4) members of an elementary school or five (5) members of a high school may call special meetings by giving the other LSC members notice in writing specifying the time, place, and purpose of the meeting. Notice of special meetings shall also be given to the public in accordance with the provisions of Article VI, section 5 of these Bylaws and the Open Meetings Act. The time and place of such special meetings shall be convenient to the public. Special meetings may not be held on a legal holiday. The LSC may only discuss and take action at special meetings on items specifically listed on the agenda.

**Section 4.    Public Participation.**   All LSC meetings shall be open to the public except meetings or sessions that are closed to the public as allowed by the Open Meetings Act (OMA). The public shall be afforded an opportunity to address the LSC at all open meetings.

**Section 5.    Notice and Agenda.**   A notice and agenda for all meetings, regular or special, must be posted at the school and meeting location, if other than the school, at least forty-eight (48) hours before the scheduled starting time of the meeting. The notice must inform the public of the meeting's date, time, and location, and the agenda must specifically identify all items the LSC proposes to act on at the meeting. Items not specifically identified in the agenda of a regular meeting may only be discussed at the meeting. Items not specifically identified in the agenda of a special meeting may not be discussed at the special meeting.

If the LSC changes the date, time, or location of more than one (1) regular meeting at a time, the LSC must give at least 10 days notice of the changes by publication in a newspaper of general circulation in the school community that the LSC serves. Notice of such change must also be posted at the school. If there is a change to only a single meeting, the 10-day notice and publication requirement does not apply.

The LSC must also give public notice of any rescheduled or reconvened meeting at least 48 hours before that meeting is held. The agenda of the rescheduled or reconvened meeting must be included in the public notice. The notice requirements do not apply to reconvened meetings if the original meeting was open to the public and either the reconvened meeting is held within 24 hours after the original meeting or an announcement of the time and place of the reconvened meeting is made at the original meeting and there is no change in the agenda.

In addition to the public meeting notice requirements, written notice of the time, place and purpose of special meetings must also be given to all LSC members before the meeting.

### Section 6.   Quorum and Manner of Acting.
*Defining Quorum:*

A.       A quorum of the LSC members must be physically present at the meeting for the LSC to conduct any business. At an elementary school seven (7) members must be physically present at a meeting for the LSC to formally conduct any business. At a high school eight (8) members must be physically present at a meeting for the LSC to formally conduct any business.

B. The principal and the student member(s) shall not be counted for purposes of determining whether there is a quorum present and shall have no vote when the LSC is considering any of the following matters:

1) Evaluation of the principal's performance
2) Renewal of the principal's contract or the addition of any additional terms (addenda) to a new or renewed principal's contract
3) The direct selection of a new principal
4) The determination of names of candidates to submit to the Chief Executive Officer for the position of principal

In addition, the student member may not vote on other personnel matters, including the allocation of teaching and staff resources.

C. Generally, except as noted in Article V, Section 7 and Article VI, Section 6, a(3) above and subsections d and e below, whenever a vote is taken on any measure before the LSC, a quorum being present, the affirmative vote of a majority of the members then serving shall determine the outcome of that measure.

D. At least seven (7) affirmative votes are required, regardless of the number of vacancies on the LSC, for the LSC to take the following actions:
   1)   Selecting a new contract principal

2) Directing the Chief Executive Officer to approve written dismissal charges against the principal on behalf of the LSC

E. Regardless of the number of vacancies on the LSC, a "Super-Majority" is required to approve school budget transfers within a particular fund for money already allocated by the LSC:
1) Eight (8) affirmative votes in elementary schools
2) Nine (9) affirmative votes in high schools


## Article VII – Officers

**Section 1.    Enumeration and Qualifications.**    The officers of the LSC, as required by law, shall be a Chairperson, a Secretary and a Freedom of Information/Open Meetings Act Officer or Officers. The LSC may elect such other officers from among its members as it deems necessary for the efficient operation of the LSC. The Chairperson shall be a parent member of the LSC. Any member may serve in the remaining offices.

**Section 2.    Election of Office**. The LSC shall, at a minimum, select the Chairperson and Secretary at the Annual Organizational Meeting and may select other officers at the Annual Organizational Meeting.

**Section 3.    Term of Office of Chairperson and Secretary**.  The term of office of the Chairperson and Secretary shall be one year except that a new Chairperson or Secretary selected to fill an unexpired term of office shall serve only the remainder of the unexpired term.

**Section 4.  Vacancies**.  In the event a vacancy occurs during an officer's term for any reason, such vacancy shall be filled in the same manner as the original selection of the officer.

**Section 5.  Chairperson.** The Chairperson shall preside at all meetings of the LSC. The chairperson shall have the authority to call special meetings of the LSC by giving notice to the other members of the LSC in writing, specifying the time, place, and purpose of the meetings and by giving public notice in the manner provided in Article VI, section 5. Subject to the direction and control of the entire LSC, the Chairperson shall have general supervision, direction, and control of the business and affairs of the LSC and shall perform all duties incident to the office of Chairperson including posting/ensuring the posting of meeting notices and agenda, signing any official records or documents to reflect the LSC's approval of the

matter(s) reflected in such records or documents and such other duties as may be assigned to the chairperson by the LSC.

The Chairperson may indicate that the LSC meeting will be virtual if the Governor or Director of Illinois Department of Public Health has issued a disaster declaration related to public health which impacts the location of the LSC meeting if all the provisions of 5 ILCS 120/7(e) are met:
● All members physically present or present virtually can hear and be heard
● Public at the regular meeting location or other location can hear all discussion testimony and all roll call votes of all the members.
● At least one member of the LSC must be at the physical location of the LSC meeting.
● All votes are roll call votes
● Notice for the meeting must be provided at least 48 hours prior to the meeting with the phone number or links for audio or video participation. The notice must be posted at the physical location of the meeting. (It is also highly recommended to posts the notice and meeting links on the school website.)
● The virtual meeting must be recorded and the recording shall be made available to the public upon request.

**Section 6. Secretary.** The Secretary shall conduct the official LSC correspondence, reserve all documents and communications, record and maintain an accurate record of the proceedings of the LSC in the minutes. The secretary will maintain one copy of the minutes in the school office and a duplicate set of minutes (recommended to be kept by the Secretary), issue and post notices of regular and special meetings as required by the chair. The secretary shall perform all duties incident to the Office of the Secretary and other duties as may be assigned to the secretary from time to time by the LSC.
The minutes shall contain, at minimum, the time, date and place of each meeting (open or closed), the names of all LSC members recorded as physically present, or present by means of video or audio conference and absent and a record of all matters discussed and all votes taken.

The LSC shall approve all open meeting minutes no later than the second regular meeting or thirty (30) days after the meeting for which the minutes were taken, whichever is later and shall make such minutes available for public inspection within ten (10) days of approval. Upon the expiration of their term, the Secretary shall deliver to the LSC all books, records, papers, minutes, recordings of LSC meetings (open and closed) or links to the recordings , and other property of the LSC.

**Section 7.   FOIA/OMA Officer(s).** The FOIA/OMA officer(s) shall advise the LSC concerning the requirements of the Freedom of Information Act and Open Meetings Act and work with the LSC to respond to requests.  The standard term limit of one (1) year does not apply to this role unless it is established by the LSC.

**Section 8.      Other Officers.**  The LSC may elect such other officers as it determines are necessary for the efficient operation of the LSC. In the event that such officers are elected, their terms may expire at the same time that the terms of the Chairperson and the Secretary expire.

**Section 9.   Vice Chairperson.**   If elected, the Vice Chairperson presides at the LSC meetings in the absence of the Chairperson. In the absence of the Chairperson,  the Vice Chairperson shall conduct all duties of the Chairperson (except those detailed below), including signing any official records or documents to reflect the LSC's approval of the matter(s) reflected in such records or documents. The Vice Chairperson may not call a special meeting or indicate that the LSC meeting will be virtual.

**Section 10.   Sergeant-At-Arms.**   If elected, the Sergeant-At-Arms shall maintain order at LSC meetings and perform such other duties as delegated by the LSC or the Chairperson, including setting up for meetings, signing in visitors and speakers, making copies of the meeting notices and agendas and advising the LSC and Chairperson on meeting procedures.

**Article VIII – Committees**

**Section 1.   Committees.**   The LSC may create such standing committees and special committees from time to time as it determines are necessary for its efficient operation, provided that if standing committees are created, the LSC shall amend these Bylaws to describe the membership, duties, and responsibilities of such committees.

**Section 2. Committee Powers Limited.**  The committees shall have the power to make recommendations to the LSC and such other powers as provided in these Bylaws. The committees shall not have the power to make final decisions concerning the exercise of the powers of the LSC or binding the LSC. All committees created by the LSC are subject to the requirements of the Illinois Open Meetings Act.

**Article IX – Powers and Duties**

The powers and duties of the LSC include:

a.    Conducting an annual evaluation of the current contract principal's performance, taking into consideration their annual evaluation by the Chief Executive Officer or designee.

b.    Conducting a cumulative evaluation of the current contract principal's performance in the fourth year of the contract, taking into consideration the annual evaluation(s) of the principal's performance during the term of the contract by the LSC and the Chief Executive Officer or designee.

c.    After such cumulative evaluation, determine whether the principal's current contract shall be renewed.

d.    Directly selecting, with at least seven (7) votes, a new principal to serve under a four-year performance contract in the event that the current principal's contract is not renewed or in the event of a vacancy in the principal's position.

e.    Submitting the names of three (3) candidates to the CEO to select the school's new contract principal in the event that the LSC is unable to directly select the new principal with at least seven (7) votes.

f.    Adding additional terms to a principal's contract. Such terms shall not discriminate on the basis of race, sex, creed, color, disability unrelated to ability to perform or sexual orientation. Such terms shall be consistent with the Board of Education's Uniform Principal's Performance Contract and shall be submitted to the Board's Law Department for approval prior to a vote to award the principal's contract.

g.    Approving the School Expenditure Plan developed by the principal with respect to funds allocated and distributed to the attendance center by the Board of Education and exercising such other powers and duties as enumerated in the Illinois School Code concerning the expenditure of Supplemental Aid (SA), funds, and student-based budgeting.

h.    Approving the Continuous Improvement Work Plan (CIWP) developed by the principal in consultation with the LSC and the PPLC.

i.      Requesting that the principal close positions and open new ones consistent with the provisions of the CIWP provided the decisions are consistent with applicable law and collective bargaining agreements.

j.      Convening two meetings with the school community to present the CIWP and Expenditure Plan developed by the principal, and the annual report, and to receive public comment thereon.

k.      Reporting at least twice a year to the school community on progress and problems with respect to implementation of the CIWP.

l.      Evaluating the allocation of teaching and non-teaching staff resources to determine if such allocation is consistent with instructional objectives and school programs as reflected in the CIWP.

m.      Making recommendations to the principal concerning respective appointments of persons to fill any vacant, additional, or newly created positions for teachers at the attendance center.

n.      Making recommendations to the principal concerning textbook selection.

o.      Advising the principal concerning the attendance and disciplinary policies of the attendance center and school fees.

p.      Directing the Chief Executive Officer to approve written charges against its principal on behalf of the council with a "yes" vote of seven (7) members.

q.      Complying with the training requirements established for LSC members by the Illinois School Code.

r.      Filing an Annual Statement of Economic Interests.
s.      Filling vacant Parent and Community LSC seats

**Article X – General Provisions**

**Section 1.   Conflicts.**   Any provision of these Bylaws that conflict with the Illinois School Code, as amended from time to time, shall be null and void.

**Section 2.   Amendment of Bylaws.**   These Bylaws may be amended at any regular meeting of the LSC by a two-thirds vote of the LSC, provided that notice and the language of the proposed amendment shall have been given to all members and to the public at least seven (7) days before the regular meeting at which such amendment is to be considered. Prior to the final approval of any amendments to these Bylaws, the proposed amendments must be submitted to The Office of Local School Council Relations for submission to the Law Department for approval.

**Section 3. Parliamentary Authority.**   The rules contained in the current edition of Robert's Rules of Order shall govern the meetings of the LSC in all cases in which the rules are applicable and not in conflict with these Bylaws or the Illinois School Code.

**Section 4.   Contracts.**   No Board of Education employee, LSC member, or LSC may bind the Board of Education to a contract without the approval of the Board of Education. However, the principal may approve contracts, not to exceed $10,000.00, for non-biddable items if the contract is endorsed by the LSC.

**Section 5.  Participation by Video or Audio Means (Public Act 103-0311).**
(See note below). Provided a quorum is physically present, an LSC member may attend a meeting by video or audio conference if he or she is prevented from physically attending because of:
(1) personal illness or disability,
(2) Employment related issues
(3) Family or other emergency
(4) Unexpected childcare obligations (*new amendment* 2023)

If a member wishes to attend a meeting by video or audio means, he or she must notify the Chairperson in advance of the meeting unless advance notice is impractical. The Chairperson will inform the Principal in order to make appropriate arrangements. The member's participation by video or audio conference must be approved by a majority of the serving members.

Video or audio conference must be clearly audible to LSC members and the public in attendance. The meeting minutes shall indicate whether the members of the LSC were physically present for the meeting or present by means of video or audio conference. An LSC member, who attends a meeting by audio or video means, as provided in this bylaw, may participate in all aspects of the meeting including voting.


_____          _____

**LSC Chairperson**                                              **LSC Secretary**

_____**School**

**These Bylaws were adopted/amended on:**


_____

**Date**

by a vote of_____in favor and_____opposed.

**Note:** The provisions of Article X, Section 5, are the minimum statutory requirements other than the length of notification that is given the Chairperson, the audibility requirement and the process for accommodating the request. Alternatively, an LSC may prohibit members from participating by video or audio means altogether by not adopting this rule as part of the bylaws. Also, an LSC may modify the sample bylaw to (1) include additional requirements such as mandating that a member attending by phone participate for the entirety of the meeting until adjournment; (2) alter the advance notification period to identify a specific notice period, and/or (3) identify a different LSC member, other than the Chairperson, to receive the advance notice (e.g., the Secretary).



# ONE PAGE SUMMARIES

**1. LSC Member Roles & Responsibilities**
**2. Effective Meetings**
**3. Continuous Improvement Work Plan (CIWP)**
**4. Budget**
**5. Principal Evaluation**
**6. Principal Selection**
**7. Internal Accounts and Fundraising**
**8. Ethics Policy**
**9. LSC Officers Roles & Responsibilities**
**10.  The Open Meetings Act**
**11.  LSC Committees**
**10. Robert's Rules of Order Cheat Sheet**



## Local School Council
# ROLES AND RESPONSIBILITIES

**HISTORY AND PURPOSE OF LOCAL SCHOOL COUNCILS**

Local School Councils were created in 1988 to be the primary governing body of local schools to achieve the goal of providing a high quality education for children to prepare them for success in college, career, and life.

LSCs have remained an important vehicle for democracy, allowing educators, parents, students and community members the opportunity to make important decisions about how children will be educated.



## 01 PRINCIPAL SELECTION

- Principal vacancy must exist in order to begin the selection process.
- Complete the principal selection training
- Work closely with the Network Chief of Schools and the Office of LSC Relations.
- Place a principal vacancy advertisement in the CPS personnel bulletin, review resumes, conduct interviews.

## 02 CIWP APPROVAL & MONITORING

- Approve the (CIWP) and any amendments.
- Hold two well-publicized meeting annually to present:

    1). Proposed CIWP, proposed Budget, to take public comment on the CIWP and Budget and to vote to approve the CIWP and Budget as presented or as amended

    2). To report on the progress and problems with implementing the CIWP and to present the Annual Report.

- May request that the principal close positions and open new ones consistent with the provisions of the CIWP provided the decisions are consistent with applicable law and collective bargaining agreements.

## 03 MONITOR BUDGET

- Monitor the Budget and make sure it is reflective of plans in the CIWP.
- Approve the school's budget and approve all budget transfers within funds.
- Pre-approve all Internal Account expenditures that exceed $1,000.00 in elementary schools and $2,500.00 in high schools or the limits set by the LSC.
- Approve all internal accounts receipts and expenditures.
- Pre-approve fundraising activities conducted by non-school organizations in or with the school.

## 04 EVALUATION/CONTRACT RENEWAL

- Evaluate a contract principal's performance every year of the contract.
- Conduct a Cumulative Evaluation in the 4th year of the contract.
- Vote on the Cumulative evaluation and the motion to renew the principal's contract
- The Cumulative evaluation and the motion to renew must be made no later than 150 days after the end of the contract.
- If the Principal asks for a reason for non-renewal, the LSC must provide them no later than 128 days from the end of the contract.
- Contract non-renewal results in a Principal vacancy.

August 2024
Page 1 of 1



Chicago Public Schools

## Local School Council

# MEETINGS

**BACKGROUND**

LSCs conduct official business and take official actions only when they meet formally as a body in public. Therefore, all LSC members need to be familiar with the legal requirements for conducting meetings. Collaboration and teamwork between all LSC members in meetings is vital to reaching an agreement and effectively performing your duty as a council.

**Requirements:**

- A majority of the full membership shall constitute a quorum
- Whenever a vote is taken on any measure before the LSC with a quorum being present, the affirmative votes of a majority of the serving members shall determine the outcome of the vote except that the principal and the student member shall have no vote and may not be counted for purposes of establishing a quorum, when the LSC is considering:
  - Contract principal performance evaluation
  - Principal contract renewal
  - Selection or recommendation of contract principal
- An Organizational meeting shall be conducted every year between July 1 and July 14th.
- If an LSC is below quorum, contact OLSCR to learn how to fill vacancies

## QUICK DEFINITIONS

### What is a "meeting"?

A "meeting" is any gathering, whether in person or by video, audio conference, telephone call, electronic means, or other means of contemporaneous (interactive) communication, where there is a majority of a quorum of a public body discussing public business.

### What is a "quorum"?

Quorum is the number of LSC members required for the body to take action. For all LSCs, a quorum is one-half of the full membership plus one. For example: For elementary schools with 12 or 13 members quorum is seven (7), and for high schools with 14 or 15 members quorum is 8. The LSC cannot vote on motions if a quorum is not physically present.

### What is an "Organizational Meeting"?

The first meeting of the LSC each school year is held between July 1st and July 14th to elect officers and set regular meeting dates.

### What is a "closed meeting?"

The Open Meetings Act also allows public bodies to discuss **certain subjects** in sessions or meetings closed to the public, called "closed" or "executive" sessions or meetings. No final action may be taken during closed meetings.

## AGENDAS & PARTICIPATION

### Suggestion for Preparation

It is recommended that the LSC (regular and special meetings):

- Set times for each part of the agenda
- Review previous minutes and include items that need revisiting
- Ensure the agenda is distributed to members at least two (2) days before the meeting
- The agenda must be posted and remain visible to the public at least 48 hours before the meeting (mandatory). For example, on the exterior door of the school).

### Special Meetings

Special Meetings are meetings called to address important business that cannot wait until the next scheduled Regular LSC meeting. Only items on the posted agenda may be discussed and voted on at the special meeting.

Notice/agenda of special meetings must be given in writing to all LSC members prior to the meeting.

Only business matters listed on the POSTED agenda may be discussed and voted upon. The agenda can NOT be amended at the meeting to add the business matters that require a vote.

### Public Participation

LSC must allow the public an opportunity to address the body at all open meetings and may set reasonable rules to govern public participation. Registered speakers who wish to present during Public Participation should follow the guidelines set by the LSC.



August 2024

## MOTIONS

If there is no quorum, no business may be conducted and no votes may be taken. Members present may discuss agenda items, but cannot take any formal actions.

- To make a formal motion, begin with the statement, "I motion/propose that..."
- Someone else must second the motion by saying, "I second the motion." If the motion is not seconded, it dies.
  - The motion must then be voted on through voice, show of hands, or roll call.
  - The Chairperson then announces the vote. "Let the record show that the motion (carried/failed) with a vote of for, against, and abstention.
  - If an LSC member is participating virtually, the vote must be a roll call vote

## VOTING RULES

There must always be a quorum of members present in person for the duration of the meeting to conduct business and vote on any matter. Vacancies do not lower the quorum number.

All votes must be taken in an open session, and the minutes must indicate how the LSC members voted. LSC members may not vote by secret ballot or proxy. The final action (voting) can not be made in a closed session on any issue.

For general motions to be approved, there must be a quorum present. A majority vote of currently serving members must vote "yes" to pass the motion. Currently serving members does not mean just those present at the meeting.

## MEETING RECORDS (MINUTES)

The Illinois Open Meeting Act (OMA) requires that LSCs must maintain written minutes of all meetings, including closed sessions and all LSC committee meetings.

<u>Requirements</u>

- Minutes of open meetings must be approved within thirty days or two (2) regular meetings after the meeting for which the minutes were taken, whichever is later.
- Approved minutes must be made available to the public within 10 days after they're approved by the LSC.
- Minutes must be sent to the Network Office within 10 days of their approval.
- Schools **must** keep copies of the following open meeting records in a binder kept in the school's main office:
  - Notices and agendas
  - Member sign-in sheets
  - Public speaker sign-in sheets
  - Approved open meeting minutes
  - Approved Closed meeting minutes that LSC voted to make public

## MINUTES INCLUDE:

- Date, time, place of meeting and name of school
- Type of meeting (regular, special, committee)
- Members present physically
- Members participating remotely
- Members absent
- Summary of all matters proposed, discussed, or decided upon
- A record of any votes taken, indicating the number of Yes, No, and Abstain votes
- If a member is tardy or leaves early, the minutes should reflect the time they arrive or leave
- Whether quorum is or is not physically present

### FAQ's:

- SPECIAL MEETINGS: Who can call a special meeting?
  - The Chair or any four Elementary LSC members or five High School LSC members may call a Special Meeting.
- RECONVENED MEETINGS: What notice is required for reconvening a meeting?
  - The LSC must give written notice, including the agenda, to reconvene an unfinished meeting at least 48 hours before the meeting is reconvened unless the original meeting was open to the public, if there was no change in the agenda, reconvened meeting will be held within 24 hours of the original meeting, or the time and place of the reconvened meeting are announced at the original meeting
- PUBLIC PARTICIPATION: When is the LSC required to allow public participation at LSC meetings?
  - The LSC is required to allow public participation at all open meetings, whether regular or special.
- QUESTIONS: What if the LSC has questions about meetings and the OMA?
  - Call the Local School Council Relations Office at (773) 553-1400.





## Local School Council

# CONTINUOUS IMPROVEMENT WORK PLAN (CIWP)

- The Continuous Improvement Work Plan (CIWP) is the 3-year school improvement plan required of all CPS schools .
- It defines school goals and action plans to be monitored by the school's Instructional Leadership Team and Local School Council.
- It should be used to make budget decisions.

## LSC ROLE

- Consults with the principal on the development of the CIWP & Budget.
- Monitors the implementation of the CIWP.
- Uses the CIWP to evaluate teacher and staff allocations and curriculum resources in the budget.
- Uses the CIWP to determine academic improvement at the school to evaluate the school leader.
- Holds at least two (2) Public Meetings during the school year for principal and LSC to report on progress and problems with implementation of the plan and accept public comment.
- Approves the CIWP & Budget by a majority vote (Students do not vote on the budget or CIWP*).

## COMPONTENTS

- CIWP Team (approx. 8-12 members. The principal leads the CIWP Team. They will appoint team members from the school and community, which may include members from the PPLC, ILT and/or LSC and PAC.)
- Measurable Goals
- At least 2 Priorities Areas
- Fund Compliance (only schools receiving Title 1 Funds)
- Family and Parent Engagement Plan
- Approval by the majority of the LSC (for schools on probation for less than five years Network Chief approval is required)

## CIWP PROCESS OVERVIEW

- The principal creates the CIWP team, and selects members, which should include the principal, some parents, community members, LSC members, and staff.
- CIWP team writes the Reflections on Foundations, using a variety of data, and sorted by student groups.
  - Identify Student-Centered Problems for each Foundation.
- The CIWP team selects at least 2 Priorities. Priorities are determined by impact on students' daily experiences.
- Set 2 kinds of goals for each Priority to measure progress: Performance Goals (student data) and Practice Goals (teacher and school data).
- Develop an Implementation Plan that says what the school will do to achieve these goals. Create Milestones and Action Steps that explain exactly who will do what and by when.
- Develop a Parent and Family Plan (if school receives Title I funds).
- Enter information for Fund Compliance (if school receives the School Improvement Grant).
- Approve the CIWP and each year's Implementation Plan after a public presentation and in which the public has an opportunity to comment on the plan.

## PRINCIPAL

- Communicate the process and schedule for creating the CIWP to the school community, and the community given the opportunity to make recommendations on the plan.
- Leads the creation of the CIWP by establishing, participating in, and overseeing the CIWP Team.
- Consults with the LSC, Professional Personnel Leadership Committee (PPLC), school staff, students, parents, & community on the plan.
- Submits the plan to the LSC for approval (for schools on probation for less than five years, submits the plan to the Network Chief for approval).
- LSC accepts public comment and a vote is required.
- Ensures implementation and monitoring of the CIWP.
- Holds at least two (2) Public Meetings during the school year for the school leader and LSC to report on progress and problems with implementation of the plan.



August 2024

## PRIORITY AREAS

- Schools determine their Priorities by looking at many different data sources.
- Schools will use quantitative (numbers), qualitative (observations), and survey (stakeholder voice) data to make sure they are getting an accurate view of what is happening at the school.

## IMPLEMENTATION PLAN

- The CIWP Team will develop Milestones and Action Steps for two (2) or more Priorities that they identified.
- The Action Steps include the specific actions that need to occur in order to reach each Milestone.
- The Milestones and Action Steps include a monitoring component to determine the degree of progress, known as Progress Monitoring.
- Schools record data about student achievement in the Performance Goals, and about teaching in Practice Goals.

## FUND COMPLIANCE PARENT AND FAMILY PLAN

- Schools that receive Title I Every Student Succeeds Act (ESSA) Funds are required to complete the Fund Compliance component.
- The Fund Compliance component allows schools using Title I Funds to describe how they will use the activities identified in the CIWP to improve the academic achievement of students (Fund Compliance must be completed for each of the three years of the plan).

- The Parent Involvement Policy is a description of how parents will be specifically involved with their children's education and school.
- The Parent and Family Plan page includes the Parental Involvement Policy, Parent Compact, and Parent Budget.
- All schools that receive Title I Funds are required to complete each section of the Parent and Family Plan.

## CIWP APPROVAL

- Principal verifies that all the required components are completed and included in the plan.
- For schools not on a probation or schools that have been on probation five or more years LSC approval is required. The LSC Chair should sign and date the approval form.
- For schools on probation less than five years, Network Chief's approval is required. Prior to the Approval by the Chief, the Parent Advisory Council (PAC) must vote on the use of the Title I Parent Involvement Funds. Although not required for schools on probation for less than five years, LSC approval is also strongly recommended.
- LSC accepts public comment before final approval.

## MONITORING THE CIWP

- During the fall and spring, the LSC, PPLC, Parents, and Community members review the status and accomplishments in each Implementation Plan.
- The principal and the CIWP team adjust the CIWP Implementation Plan each year.
- The principal and LSC is responsible for reporting the accomplishments and difficulties with the CIWP in the annual report presented to the school community annually in the fall and accepts public comment.
- The principal and LSC are responsible for approving the CIWP each year during an LSC meeting
- The LSC, PPLC, Parents, and Community should provide feedback and questions to better understand the CIWP progress.
- LSCs and principals should establish regular routines for checking in to discuss progress and ways the LSC can support the school in meeting the goals of the plan.
- Networks may establish a periodic check-in process with schools as well.
- Since the CIWP is a living document, the most recent version will live on the website https://cpsci.my.site.com/ciwp/s/



**Chicago Public Schools**

Local School Council

# BUDGET

## LSC'S ROLE IN THE BUDGET

As a member of your local school council, you are responsible for:
- Provide input in the budget development and approve ALL funds in the budget.
- Ensuring the budget is aligned with the CIWP (Continuous Improvement Work Plan).
- Presenting the proposed budget to the community twice and receiving public comment.
- Requesting revisions to the budget.
- LSC must approve all contracts (additional approvals may be needed depending on the amount and type of purchase).
- Approve ALL budget transfers.
- A supermajority of the FULL membership must approve budget transfers if members vote to approve the transfer.
  - Traditional Elementary LSCs – 8 member yes votes
  - Traditional High School LSCs– 9 member yes votes.
  - Military Academies - 10 member yes votes
- Monitoring the internal accounts activity
- The student members <u>do not</u> vote on the approval of the whole budget, but can vote on certain budget transfers

## LSC'S RESPONSIBILITY MONITORING THE BUDGET

**Budget transfers**
- LSC's must approve any changes in the way funds are to be used (i.e., budget transfers).
- Budget transfers must be approved by a supermajority (for traditional LSCs, 8 members at elementary schools, 9 members at high schools and 10 members for Military Academies).
- Budget transfer must occur within the same fund and grant. You cannot move funds from one funding source to another.
- Budget transfers involving Title I parent involvement funds must be voted on by your Parent Advisory Council (PAC) before being submitted to your LSC for approval.
- If budget transfer are $5,000 or more, the LSC must assess the effect of the change on the CIWP.
- Student members may vote on budget transfers that do not involve school personnel.

**Large expenses**
- LSC approval is required for all contracts.
- In addition to LSC approval, Board of Education approval is required for contracts over $500,000.
- In addition to the LSC approval purchases of goods over $35,000 and of professional services over $35,000 require central office approval.

## PRINCIPAL'S ROLE IN THE BUDGET
- Developing a budget to support the CIWP with input from the LSC and others.
- Presenting the Budget to the public and accepting public comment.
- Entering into contracts with LSC approval.
- Providing LSC's with audits and reviews of the programs and operations of the school.
- Obtaining input from LSC and final approval from the LSC for the Budget and Budget transfers.
- If the school is on probation for less than 5 years obtain approval by the Network Chief for the budget and budget transfers.
- If the school has been on probation for 5 or more years the principals shall obtain approval of the budget and budget transfers from the LSC.

## NETWORK CHIEF'S ROLE IN THE BUDGET
- Your principal is responsible for:
- Developing a budget to support the CIWP with input from the LSC and others.
- Entering into contracts with LSC approval.
- Providing LSC's with audits and reviews of the programs and operations of the school.
- Obtaining input from LSC and final approval from the LSC for the Budget and Budget transfers.
- If the school is on probation for less than 5 years obtain approval by the Network Chief for the budget and budget transfers.
- Due to a recent change in legislation, if the school has been on probation for 5 or more years the principals shall obtain approval of the budget and budget transfers from the LSC.

## SCHOOL BUDGET BASICS
- Resources are allocated for different purposes and from different sources
- School budget resources are generally in the form of dollars or positions.
  - Other types of resources include materials, services, and technology.
  - Position costs comprise ~95% of discretionary school dollars in CPS.
- Resources come from various funds and grants, with different rules.
- A fund is an accounting entity. In CPS, funds are the control structures that ensure that public dollars are spent only for authorized purposes and within appropriated amounts.
  - School resources come primarily from General and Special Fund revenues.
- Fund revenues come from local, state, and federal sources.
- Fund budgets and expenses are categorized by unit, grant, program, and account.
  - These categories reflect the planned uses for funds.
  - Restrictions, rules, and compliance for funds are established by categories. Some resources have few restrictions, while others have many restrictions.

August 2024

# Foundational Funding Model

**Opportunity Index (OI)**

The CPS Opportunity Index consists of 12 distinct indicators, including:
- **Community Factors**, which are indicative of the socio-economic environment in which attending students live.
- **School Demographics**, which consider the percentage of the attending student population that fits a particular category.
- **Historical School Funding**, which accounts for resources the school received in prior years.

**Foundational Teacher Positions:**
- Schools will no longer be responsible for funding the variance of teacher position cost based on tenure, creating more year-over-year stability at the school level.
- Because the Foundational Teacher Positions are funded at a ratio lower than contractual class size, this will create more year-over-year stability at the school level.
- Foundational Teacher Position Staffing will be based on the OI and on the 20th day enrollment numbers.
- CTU Class Size positions will be removed at the end of each school year per the contract agreement.

**Foundational Non-Teacher Positions:**
Students attend school with a core administrative operational team: The Principal, an Assistant Principal, a Clerk, Part-time or Full time School Assistants, a minimum of 1 counselor, with additional counselors. Non-Sustainable Community schools with an enrollment of 500 or greater and Opportunity Index of 30 or higher receive a restorative justice coordinator. Larger and higher-need schools also receive additional counselors.

**Allocation:**

| Allocation | Type | Dollars or Positions |
|---|---|---|
| Needs-Based Flexible Funding | Discretionary | Dollars |
| Title I | Discretionary | Dollars |
| Programmatic | Non discretionary /Discretionary | Positions, some dollars |
| Diverse Learner | Non discretionary | Positions |
| Early Childhood | Non discretionary /Discretionary | Positions, some dollars restricted to early childhood purposes |
| Fund 124 | Discretionary | Positions and dollars |
| Operations | Non discretionary | Positions |

**Needs Based Flexible Funding:**
Needs-Based Flexible Funding is the way discretionary funds are allocated to District schools:
- Needs-Based Flexible Funding based on student needs, which sets an equitable standard for a high quality student experience, no matter the size, type or location of their school.
- CPS will use the Opportunity Index (OI) to guide the distribution of a greater share of funding, ensuring that those most impacted by inequity have a strong, vibrant community.
- The funding is based on the OI. Options, Safe, Early Childhood Education Center, and Specialty schools are excluded from this type of funding.
- Other allocation types include quota (ie Diverse Learners); program (ie Gifted); and population (ie Early Childhood)

**Title I resources are allocated to CPS by the federal government to support low income students**
- CPS allocates Title I dollars to schools on a per pupil basis set by district formula.
- Title I resources are supplemental, intended to provide additional support for low income students.
- Title I schools also receive funds to be used for parent involvement.
- Not all schools qualify for Title I funding. CPS uses a poverty index to determine qualifying schools.

## School Budget Development - Timeline

**CIWP Window**

**November - April**
Schools Develop and monitor CIWP

**March-April**
Schools update CIWPs for the upcoming school year in preparation for the budget window to ensure alignment

**May**
- Fund Compliance and Family Plan due

**Budget Window**

**February - March**
School enrollment baselines determined

**February**
- Review enrollment data to establish preliminary staffing needs assessment

**March - April**
- Principal Budget Meetings

**March - April**
- Working Sessions

**April**
- School Budgets Due

**Chief Feedback Window**

**March - April**
- Principals complete Budget Checklist
- Chief Review Period Begins
- Schools adjust budgets as needed based on feedback
- Review CIWP Priorities, Strategies and Action Steps

**LSC Feedback Window**

**March - April**
Schedule LSC meeting(s) to review, discuss and approve budget

**March - April**
- Set LSC Budget Approval Meeting Date

**March - April**
- LSC Review Period Begins
- Schools adjust budgets as needed based on feedback

**Talent Window**

**March - April**
- SOW Talent Webinar
- SOW Window Opens
- SOW Analysis Begins

**March - April**
- SOW Window Closes
- CIWP/Budget Approval Form Due

**June**
- School Impact Webinar
- Onboarding Begins

Budget Page 2 of 2
August 2024

Chicago
Public
Schools

# Local School Council
# PRINCIPAL
# EVALUATION

**HISTORY** — In 1988, the Chicago School Reform Act delegates school principal selection authority to the Local School Council (LSC).

## ROLES OF LSCS IN PRINCIPAL EVALUATION

- **Learn** - Partner with the Principal in school improvement
- Conduct a fair evaluation in order to focus your school improvement efforts
- Commit to the evaluation process – it isn't always easy, but it pays off
- Follow agreed upon ground rules and code of conduct
- Conduct feedback session if the LSC and the Principal agree
- Conduct cumulative evaluation during the fourth year of the contract (must be completed at least 150 days before the end of the contract)
- Principal Evaluation is a year long process and LSCs are encouraged to begin evaluation as soon as possible
- Principal should share evidence with the LSC to assist in the evaluation process
- Evaluation must be approved in an open LSC meeting (principal and student members do not vote and DO NOT count towards quorum)*
- Principal may share a "self" evaluation with the LSC
- Principal and LSC may meet in a closed session to discuss the evaluation
- After a closed feedback session, LSC may change the evaluation, vote on the new evaluation, and submit copies of the evaluation to Network Chief and Principal
- Follow proper guidelines and have any evaluation surveys approved by the CPS Law Department (optional)


Source: @CPS

## ANNUAL & CUMULATIVE PRINCIPAL EVALUATION

Annual evlaution:
- Occurs during each of the four years of the principal contract
- Key purposes of evaluation:
  - Monitor the Principal's performance
  - Advise and assist the Principal as they carry out key duties during the year
  - Assess the Principal's performance for the prior year

Cumulative evlaution:
- Occurs during the fourth-sixth month of the Principal's final contract year.
- For contracts beginning on July 1st, the evaluation should take place between October and December.
- Is completed and given to the Principal in writing no later than 150 calendar days before the end of the contract
- Determine whether or not to offer a new four-year contract

## Guiding Principles for an Effective Evaluation

- Understand laws and policies governing Principal Evaluation
- Conduct research about effective Principals and effective Principal evaluations
- Understand Local School Council priorities and ground rules for a good Principal and a better school
- Know that Principal Evaluations require on-going collaboration with the Principal and are a year long process and should stick to an agreed upon schedule
- Evaluation is aided by high quality training and assistance
- Evaluation should facilitated by filling all LSC vacancies
- Evaluation should not be based only on test scores, isolated incidents, personality conflicts, or focused entirely on the negative

## OVERVIEW OF THE PRINCIPAL PERFORMANCE EVALUATION PROCESS

The LSC will evaluate the Principal in three key categories using the approved form:
- **Professional Practice (weighted at 50% of the overall score)**
- **Student Growth and Other Measures (weighted at 50% of the overall rating score).**
- **Optional Additional Indicators* (weight determined by LSC)**

The LSC will then combine their Professional Practice score, the Student Growth and other Measures, and additional criteria to arrive at a preliminary summative rating score. The LSC will determine the preliminary summative rating level of either Unsatisfactory, Developing, Proficient, or Excellent. The final summative rating may be revised by the LSC on the basis of an optional feedback session with the Principal. If there is no feedback session or there are no revisions from the feedback session, then the preliminary summative score and level become final

August 2024

## PROFESSIONAL PRACTICE

Determined based on the LSC's interactions with the Principal throughout the school year including evidence of the Principal's work with students, staff, families, and community

The LSC will rate the Principal's professional practice on the following four (4) Domains:

### 1. Organizational Leadership

Oversees systems, structures, and processes for continuous improvement

### 2. Instructional Core

Ensures rigorous and coherent curriculum, instruction and assessments aligned to the needs of every student

### 3. Climate and Culture

Ensures that organizational norms, routines and systems equitably promote the students' intellectual, social, and emotional development

### 4. Talent

Ensures development, and retention of diverse talent and cultivates distributed leadership structures



## STUDENT GROWTH AND OTHER MEASURES

Determined based on the school's student performance data provided to the LSC by the CPS Office of School Quality Measurement and Research and the School Report Card from the state

- This data includes various student growth and other measures that are aligned with the evaluation areas in the school code (Examples include):
  - Student Growth on District Assessments
  - Student achievement in State Tests
  - Attendance
  - Progress Toward Graduation
  - Early College and Career Credentials

## OPTIONAL ADDITIONAL INDICATORS

- Vote on additional indicators that have been determined by mutual agreement between the Principal and LSC (must be approved by CPS Law)
- It is recommended that not more than two additional indicators be established
- Additional Indicators must be written, measurable, and their value (weight in the evaluation) established in advance

## HOW TO DETERMINE A FINAL COMBINED PROFESSIONAL PRACTICE RATING

- The LSC will discuss and determine scores for each of the Key Behaviors in closed session. The LSC will assign a numerical value to each Key Behavior using a 1-4 scale where 1=Strongly Disagree, 2=Disagree, 3=Agree and 4=Strongly Agree

- After discussion, the LSC can take a straw poll in closed session of how many members would support the evaluation

- Once consensus is reached and a vote is taken in an open session, the LSC chairperson or designee will enter the scores for each Key Behavior in Principal Evaluation Online Tool (PEOT) by May 1st. If changes in the rating occur after an optional feedback session, the LSC must vote to approve the changes and enter them as final in PEOT by May 30th.

## PREPARE FOR THE FEEDBACK SESSION

According to the Principal's contract, "within 30 days of the Principal's receipt of the Local School Council signed, written evaluation, the Principal and the Local School Council may meet, upon request of either the Principal or the Local School Council, in executive (closed) session, to discuss the contents of the evaluation. As a result of that meeting, the Local School Council may, but is not obligated to, revise its written evaluation." (Sec IV.d. of the contract)

- The LSC and Principal may conduct a feedback session after approval of the Professional Practices Rating.
- The LSC and Principal may conduct a feedback session after the Final Annual Summative Rating is approved.
- If the final annual summative rating is changed, the reasons for the change must be provided

August 2024
Principal Evalution; Page 2of 2



## Local School Council

# PRINCIPAL SELECTION

**HISTORY** — In 1988, the Chicago School Reform Act delegates school principal selection authority to the Local School Council (LSC).

## LSC RESPONSIBILITIES

- **Learn** – Best practices of a principal selection process. Complete a training conducted by OLSCR
- **Assess** – Work closely with the Network Chief to discuss the current status of school and identify the desired skills and qualifications of the best candidate to lead the school
- **Advertise** – Create a principal position advertisement which will be posted, on the CPS website (https://www.cps.edu/careers/school-leadership/principal-opportunities/), following approval from the Network Chief
- **Organize** – Decide on the principal selection process steps and activities
- **Approve** – Approve any desired contract addenda and obtain Law Department's approval
- **Vote** – Minimum of seven LSC members "Yes" votes in favor of awarding a contract to a candidate (ALSCs make recommendations for candidates to CEO with majority vote of current members)

## PRINCIPAL SELECTION PROCESS

### 01 LSC Training
Confirm members of the LSC have completed training Course 6 - Principal Selection

### 02 Organize the Selection Process
Define the structure of the selection process: create a timeline, choose Principal Selection Committee (optional, may include non-LSC members), develop steps of the selection process, identify LSC members' roles, and follow the Code of Conduct to ensure confidentiality of professionalism throughout the selection process.

### 03 Draft and Approve the Principal Position Advertisement- Required
Draft advertisement including a list of required and preferred criteria of candidate experience, education, and other qualifications that are essential to student success and the school's progress. Contact DPQ or OLSCR for principal advertisement template. Vote to approve the position advertisement. **This vote is required.**

### 04 Post the Position Advertisement- Required
Email position advertisement to Chief of Schools for approval, include in email the LSC Specialists, and cpsprincipals@cps.edu for posting on CPS website. Advertisements will be posted for a minimum of 14 calendar days.

### 05 Review Resumes and Identify Candidates to Advance-Required
Department of Principal Quality will email LSC chair a complete list of candidates and materials two (2) days after the advertisement closes. After LSC receives list candidates, LSC reviews materials. **Review of ALL resumes is a required step.**

### 06 Conduct 1st/2nd Round Candidate Interviews
Identify LSC or committee members who will participate in interviews. When reviewing candidates, assess the following: experience, leadership, presence, style, and communication skills. Notify applicants who don't advance within 3-5 business days of decision via phone or email.

### 07 Conduct Reference Checks/Visits-Optional
It's recommended conducting reference checks and visiting the finalists' school sites for this stage of the interview process.

### 08 Candidate Forum for School-Optional
LSC presents finalists in a structured public forum and allow those interested to ask questions of candidates.

### 09 Select Finalists and Vote to Award Contract- Required
Vote in open session to select finalists. Motion to reward contract requires at least 7 yes votes for new principal contract regardless of LSC vacancies.

### 10 Submit Completed & Signed Contract for Presentation to the Board of Education- Required
Complete 1 original Uniform Principal Performance Contract Forms. LSC members who voted affirmatively sign the Certification of Principal Selection by LSC Form;

Your paragraph text

Obtain signatures of the LSC chairperson, LSC secretary, and new Principal on the 1 original copies; The original signed contract to DPQ. Provide a copy of signed contract to the Principal, LSC Secretary, OLSCR, and the Network Chief.

Once the contract has been reviewed by key District departments, the contract Board Report is presented to the Board of Education to accept and file. The Board does not approve contracts.

August 2024

# TYPES OF PRINCIPALS

| Contract | Interim | Acting | Administrator in Charge |
|---|---|---|---|
| Selected in 4 year terms | Appointed if LSC doesn't have authority to award contract, principal is out for extended period, or LSC doesn't come to consensus. | Covers principal position up to 100 days After 100 days assignment, can be renewed by CEO (or CEO designee) | Retired principal to cover principal position on temporary basis at discretion of CEO |
| May displace incumbent assistant principals. | May displace incumbent principals | May not displace incumbent assistant principals | May not displace incumbent assistant principals |
| May hire new assistant principals | May hire new assistant principals | Can not hire new assistant principals | Can not hire new assistant principals |
| Is a member of the LSC and permitted to vote excluding principal evaluation, contract renewal & selection. | Is a member of the LSC and permitted to vote excluding principal evaluation, contract renewal & selection. | Not a member of the LSC and not permitted to vote. | Not a member of the LSC and not permitted to vote. |

**LSC without authority to award principal contract:**

If the Chicago Board of Education has removed a school's contract principal of a school on probation...

Then the LSC will not have the authority to award a principal contract.

The LSC's authority will be reinstated after the school is off probation.

## KEEP IN MIND

### No Principal Renewal?

If a LSC has voted not to renew the contract of its current principal, the LSC shall select a new contract principal no later than 45 days before the current principal's contract expires

### Teacher LSC Member is a Candidate?

If a teacher LSC member decides to become a candidate for the principalship, they must abstain from voting on the renewal of the current principal's contract and must resign from the LSC prior to the start of the principal selection process.

### Who is Eligible?

Only candidates who have met the CPS Principal Eligibility requirements can be awarded a Uniform Principal's Performance Contract.

**Schools with Appointed Local School Councils (ALSC)/Board of Governors (BOG)**

These schools have governing bodies appointed by the Board...

Then these bodies recommend up to 3 candidates to the CEO to select a candidate as their principal.

The appointed bodies do not award principal contracts.

**Uniform Principal's Performance Contract and Addenda:**

If there are additions to the standard contract...

Then the LSC may negotiate additional criteria with the selected principal to be added to the contract. Both parties must agree.

Proposed addenda must be reviewed & approved by the CPS Law Department and part of the contract motion.

**The Network Chief can collaborate with the LSC in the principal Selection process by:**
- Helping identify school needs based on performance data
- Providing recommendations for the advertisement
- Recommending interview questions
- Participating in interviews, community forums, or school walkthroughs

**The Network Chief will work closely with the new principal as a supervisor, mentor, coach, and trainer to ensure a smooth transition.**



## Local School Council

# INTERNAL ACCOUNTS AND FUNDRAISERS

**The Illinois School Code provides that the powers and duties of LSCs includes** approving in accordance with board rules and policies, receipts and expenditures for all internal accounts and to approve all fundraising activities by non–school organizations that use the school building.

### INTERNAL ACCOUNTS

Each school has two sources of funds to spend on its educational and extracurricular activities: (1) the school's allocated budget and (2) the school's Internal Accounts.

The school's Internal Accounts is a financial system to handle the cash that flows through each school's checking account from students, parents, the community, and the Board.

The sources of this cash are varied: student fees, fundraising activities, special events, lease income, and gifts or grants. Good financial management, budgeting, and record keeping are necessary for both funding sources.

### SCHOOL RESPONSIBILITES

- Maintaining accurate and up-to-date records of all financial internal accounts transactions
- Using the Oracle Internal Accounts Management System (IAMS)
- Completing and submitting monthly reports
- Completing the annual Internal Accounts Survey
- Completing an annual physical inventory and fixed asset register using TIPWEB
- Safeguarding and protecting the school's assets (cash, equipment, other property)

### LSC RESPONSIBILITES

**LSCs have the authority to:**
- Pre-approve all expenditures of internal accounts funds over:
- $1,000.00 in elementary schools
- $2,500.00 in high schools
- **Note:** The LSC may raise the limit amounts but may not lower them

**LSC Monitors Internal Accounts**

This includes approving internal accounts receipts and expenditures monthly and, as part of the approval process, review the school's monthly internal accounts reports and the Bank Statement:
- Bank Reconciliation Report
- Cash Receipts Journal
- Cash Disbursements Journal
- Summary Trial Balance

### PRINCIPLES FOR MANAGING INTERNAL ACCOUNTS:

1. Spend the money wisely.
2. **Spend the money in the proper time frame.**
3. Use the money for the intended purpose.
4. Follow the procedures established in the Internal Accounts Guide.
5. Keep accurate and timely records.

An important aspect of managing internal accounts pertains to **spending the money in the proper time frame**:

- Funds collected from students must benefit the students who contributed to raising the funds.
- Fundraising projects must benefit the students and the school program that collected the funds.
- As a general rule, schools should try to spend 95% of all funds credited to the internal accounts during the year in which they were received.
- **Alternatively, funds deposited in the internal accounts by the Board must be spent during the year for which they were budgeted or must be returned to the Board.**

**To provide guidance to Principals regarding management of the internal accounts, the Board has written an:** Insider's Guide to School Business and Internal Accounts. **The information provided in this module is derived from the Guide.**

August 2024



# Local School Council

## GENERAL GUIDELINES FOR FUNDRAISERS

- All funds must be deposited into the school internal accounts unless the fundraiser is conducted exclusively by an external organization.
- If the fundraiser is conducted with an external organization and that organization is registered with the Attorney General, any check made payable to it may be deposited in its own bank account before the proceeds are turned over to the school (which must occur immediately upon the conclusion of the fundraising activity).
- External organizations may not sponsor continuous fundraising activities such as a school store or other year-round sales.
- The Local School Fundraising Proposal/ Agreement must be completed and approved. It must specify how the profits from the activity will be divided if the fundraiser is being conducted with an external organization.
- At the conclusion of the activity, the Local School Fundraising Accounting Report and Concession Sales Report must be completed by the sponsor and submitted within 10 working days of the last fundraising activity.
  - The Local School Fundraising Accounting Report must state the profits and expenses for the activity and the amounts of the profits for the school or amounts of the profits to be divided between the school and the external organization.
  - The Concession Sales Report describes the acquisition and selling of goods.
  - Another form associated with fundraising is the Perpetual Inventory form used to record the purchase of sale of goods for a continuous fundraiser (school). The form must be updated daily or as activity occurs.

## DESCRIPTION OF FUNDRAISING CATEGORY

**1. Independent School Fundraisers**: A fundraiser is considered a "school fundraiser" when it includes students. "school fundraisers" should not be left to outside organizations. (Examples: jean day, t-shirts/uniforms, pre-ordered merchandise, etc.).

Ongoing fundraisers (fundraisers that span the entire school year) can only be conducted by the school.

**2. Fundraisers for the school conducted by the school and an outside registered nonprofit organization where all net proceeds are for the school**: The principal must ensure that the fundraising proposal/agreement of the local school has been completed and approved. The proposal must specify that all net proceeds will go directly to the school.

**3. Fundraisers conducted by the school and a registered outside non-profit organization splitting the proceeds**: Funds must be deposited into internal school accounts.

**4. Fundraisers conducted exclusively by a registered outside non-profit organization that benefits the school or the organization:**
- Fundraisers conducted for the direct benefit of the school: Net proceeds must be immediately transferred to the school upon completion of the activity and payment of expenses must be made according to the agreed schedule.
- Fundraisers for Outside Organization: If the name of the organization implies that the event is for the benefit of the school, the organization MUST add a disclaimer to their advertisements stating that the funds are NOT for the direct benefit of the school. If the event is not held on school property, no approval from the school is required. If the event is being held on school property, the following approval is required.

**5. Fundraisers Conducted at School Exclusively for Disaster Victims or Other Designated Non-Profit Organizations:** Funds raised directly from students must go through internal accounts.

**6. School Site Local School Council Fundraisers:** The Chicago Public Schools policy on fundraisers allows LSCs to raise funds for their operating expenses and/or for the benefit of the school.
- LSCs in schools with fewer than 1,000 students may raise up to $1,500.00 per year.
- LSCs in schools with 1,000 or more students may raise up to $3,000.00 per year for operating expenses.
- All funds raised in excess of the annual limit must be transferred to the school's general fund.
- Any funds raised that have not been spent at the end of the fiscal year will carry over to the following year; fundraising limits for the following year will be reduced by the amount transferred.

**7. Crowdfunding that is carried out on the school campus:** Crowdfunding can only be done with a Board approved website. Currently, the only approved website is Donors Choose. Use of GoFundMe is expressly prohibited.
- The public image must be taken into account when setting up the campaigns.
- There must be two users at the administrative rights level for each fundraiser, and one of them must be the Principal.
- All monies must be paid by check issued to the school made out to the school.
- Donations received must be used for their stated and approved purpose in accordance with Board Policy.
- The Principal and LSC must approve and the Network Chief will review and monitor the Crowdfunding.



Chicago Public Schools

Local School Council

# PRINCIPAL SELECTION

**HISTORY** — In 1988, the Chicago School Reform Act delegates school principal selection authority to the Local School Council (LSC).

## LSC RESPONSIBILITIES

- **Learn** - Best practices of a principal selection process. Complete a training conducted by OLSCR
- **Assess** - Work closely with the Network Chief to discuss the current status of school and identify the desired skills and qualifications of the best candidate to lead the school
- **Advertise** - Create a principal position advertisement which will be posted, on the CPS website (https://www.cps.edu/careers/school-leadership/principal-opportunities/), following approval from the Network Chief
- **Organize** - Decide on the principal selection process steps and activities
- **Approve** - Approve any desired contract addenda and obtain Law Department's approval
- **Vote** - Minimum of seven LSC members "Yes" votes in favor of awarding a contract to a candidate (ALSCs make recommendations for candidates to CEO with majority vote of current members)

## PRINCIPAL SELECTION PROCESS

### 01  LSC Training

Confirm members of the LSC have completed training Course 6 - Principal Selection

### 02  Organize the Selection Process

Define the structure of the selection process: create a timeline, choose Principal Selection Committee (optional, may include non-LSC members), develop steps of the selection process, identify LSC members' roles, and follow the Code of Conduct to ensure confidentiality of professionalism throughout the selection process.

### 03  Draft and Approve the Principal Position Advertisement- Required

Draft advertisement including a list of required and preferred criteria of candidate experience, education, and other qualifications that are essential to student success and the school's progress. Contact DPQ or OLSCR for principal advertisement template. Vote to approve the position advertisement. **This vote is required.**

### 04  Post the Position Advertisement- Required

Email position advertisement to Chief of Schools for approval, include in email  the LSC Specialists, and cpsprincipals@cps.edu for posting on CPS website. Advertisements will be posted for a minimum of 14 calendar days.

### 05  Review Resumes and Identify Candidates to Advance-Required

Department of Principal Quality will email LSC chair a complete list of candidates and materials two (2) days after the advertisement closes. After LSC receives list candidates, LSC reviews materials. R**eview of ALL resumes is a required step.**

### 06  Conduct 1st/2nd Round Candidate Interviews

Identify LSC or committee members who will participate in interviews. When reviewing candidates, assess the following: experience, leadership, presence, style, and communication skills. Notify applicants who don't advance within 3-5 business days of decision via phone or email.

### 07   Conduct Reference Checks/Visits-Optional

It's recommended conducting reference checks and visiting the finalists' school sites for this stage of the interview process.

### 08  Candidate Forum for School-Optional

LSC presents finalists in a structured public forum and allow those interested to ask questions of candidates.

### 09   Select Finalists and Vote to Award Contract- Required

Vote in open session to select finalists. Motion to reward contract requires at least 7 yes votes for new principal contract regardless of LSC vacancies.

### 10   Submit Completed & Signed Contract for Presentation to the Board of Education- Required

Complete 1 original Uniform Principal Performance Contract Forms. LSC members who voted affirmatively sign the Certification of Principal Selection by LSC Form;

Obtain signatures of the LSC chairperson, LSC secretary, and new Principal on the 1 original copies; The original signed contract to DPQ. Provide a copy of signed contract to the Principal, LSC Secretary, OLSCR, and the Network Chief.

Once the contract has been reviewed by key District departments, the contract Board Report is presented to the Board of Education to accept and file. The Board does not approve contracts.

Your paragraph text

August 2024

# TYPES OF PRINCIPALS

| Contract | Interim | Acting | Administrator in Charge |
|---|---|---|---|
| Selected in 4 year terms | Appointed if LSC doesn't have authority to award contract, principal is out for extended period, or LSC doesn't come to consensus. | Covers principal position up to 100 days After 100 days assignment, can be renewed by CEO (or CEO designee) | Retired principal to cover principal position on temporary basis at discretion of CEO |
| May displace incumbent assistant principals. | May displace incumbent principals | May not displace incumbent assistant principals | May not displace incumbent assistant principals |
| May hire new assistant principals | May hire new assistant principals | Can not hire new assistant principals | Can not hire new assistant principals |
| Is a member of the LSC and permitted to vote excluding principal evaluation, contract renewal & selection. | Is a member of the LSC and permitted to vote excluding principal evaluation, contract renewal & selection. | Not a member of the LSC and not permitted to vote. | Not a member of the LSC and not permitted to vote. |

## LSC without authority to award principal contract:

If the Chicago Board of Education has removed a school's contract principal of a school on probation...
Then the LSC will not have the authority to award a principal contract.

The LSC's authority will be reinstated after the school is off probation.

## KEEP IN MIND

### No Principal Renewal?

If a LSC has voted not to renew the contract of its current principal, the LSC shall select a new contract principal no later than 45 days before the current principal's contract expires

### Teacher LSC Member is a Candidate?

If a teacher LSC member decides to become a candidate for the principalship, they must abstain from voting on the renewal of the current principal's contract and must resign from the LSC prior to the start of the principal selection process.

### Who is Eligible?

Only candidates who have met the CPS Principal Eligibility requirements can be awarded a Uniform Principal's Performance Contract.

## Schools with Appointed Local School Councils (ALSC)/Board of Governors (BOG)

These schools have governing bodies appointed by the Board...

Then these bodies recommend up to 3 candidates to the CEO to select a candidate as their principal.

The appointed bodies do not award principal contracts.

## Uniform Principal's Performance Contract and Addenda:

If there are additions to the standard contract...

Then the LSC may negotiate additional criteria with the selected principal to be added to the contract. Both parties must agree.

Proposed addenda must be reviewed & approved by the CPS Law Department and part of the contract motion.

**The Network Chief can collaborate with the LSC in the principal Selection process by:**
- Helping identify school needs based on performance data
- Providing recommendations for the advertisement
- Recommending interview questions
- Participating in interviews, community forums, or school walkthroughs

**The Network Chief will work closely with the new principal as a supervisor, mentor, coach, and trainer to ensure a smooth transition.**



Local School Council

# CODE OF ETHICS

Ethics is an important topic for LSC members so they are in compliance with the guidelines in the Illinois School Code and the CPS Code of Ethics.

## Economic Interest and Conflict of Interest (Section VII(B))

- LSC members cannot have an Economic Interest in a contract, work, or business with the school
- LSC members cannot have an Economic Interest in the buying, selling, or leasing of an item for which their LSC or school paid
- LSC members cannot be employees of a third party that pays the member to work at the school where they serve.
- LSC members cannot receive money from the school except for reasonable and necessary expenses.
- LSC members cannot vote on the current Principal's contract if they intend to apply to be Principal
  - If they vote and the LSC votes not to renew the contract, they are ineligible to apply.
  - If the LSC member does not resign before the Principal Selection begins, he/she is ineligible to apply.
- LSC members cannot vote or discuss proposals for Not-For-Profits that donate funds or services to the school when the member or member's spouse sits on the board of directors of the organization

## POLITICAL ACTIVITY (SECTION VII(D))

- LSC members cannot use their position to engage in Political Activity or endorse a Candidate for Elective office
- LSC members cannot use Board resources to perform any Political Activity
- LSC members cannot use LSC meetings or the school as a way to promote a candidate or themselves running for political office



## Nepotism (Section VII (C))

- LSC members cannot hire or appoint their Relatives.
- LSC members cannot influence or convince others to hire or appoint their Relatives.
- LSC members cannot advocate for employment involving their Relatives.
- LSC members cannot advocate for a contractual agreement with a Relative or a Relative's place of business.
- LSC members with Relatives employed at the school must abstain from voting and discussion on the entire budget, the entire CIWP, and any transfer of funds that may affect the Relative.

## GIFTS, LOANS AND FAVORS (SECTION IV(F))

- Gifts Generally Not Considered An Attempt to Influence are:
  - A single gift of $50 or less,
  - Multiple gifts of $100 or less from the same person or entity over a calendar year
- However, LSC members cannot accept ANYTHING of value if there is an understanding that member's actions are to be influenced because of that gift

## USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION (SECTION IV(C))

- LSC members cannot share confidential information that was learned as a part of the LSC members membership
- Information discussed in closed session remains confidential, some examples:
  - Principal Evaluation
  - Principal Contract Renewal
  - Strengths and Weakness of Candidates applying to fill principal vacancy
  - Candidate qualifications for those seeking to fill vacancies

## POST MEMBERSHIP RESTRICTIONS (SECTION VII(E))

- At the end of LSC members term and they do not seek re-election or re-appointment former LSC members are not eligible for employment at the school where they served until one year after their LSC membership ends
- Former LSC members cannot have an Economic Interest in a contract involving the school until one year after their LSC membership ends

## PENALTIES (SECTION XII)

- LSC members who violate the Code of Ethics may be disqualified or removed from office. This is based on Board Rule 6-29.
- LSC members may be subject to a removal hearing and disqualified from completing their LSC term
  - A neutral third-party hearing officer hears removal hearings
  - LSC members are given the opportunity to provide information to the hearing officer to explain why they should not be disqualified and removed from office
  - The hearing officer makes a recommendation to the CEO (or designee) on whether or not the member should be removed based on the evidence and testimony presented

*Note: Local School Councils do not have the authority to remove members for potential ethical violations. The potential violations should be reported to the Ethics Office or the CPS Office of the Inspector General.



**Local School Council**

# DUTIES OF OFFICERS

## 1 LSC CHAIRPERSON (REQUIRED)

**MUST BE A PARENT MEMBER IN THIS ROLE**

- Involves LSC members, including the principal, in the preparation of the agenda
- Makes and posts the agenda (or delegates posting) within 48 hours of the meeting with date, time, and location in accordance with the Illinois School Code and Open Meetings Act
- Presides at meetings
- Calls special meetings
- Signs official CPS documents after the LSC has voted to approve the action or decision
- The Chair's signature indicates the LSC's approval, not the Chair's personal approval

## 2 VICE CHAIRPERSON (OPTIONAL)

**ANY MEMBER MAY SERVE IN THIS ROLE**

- Acts in the absence or temporary incapacity of the Chairperson
- Cannot call special meetings
- In the absence of the chairperson, sign official CPS documents after the LSC has voted to approve the action or decision.

## 3 SECRETARY (REQUIRED)

**ANY MEMBER MAY SERVE IN THIS ROLE**

- Takes meeting minutes at all public LSC meetings AND closed session meetings
- Audio record all closed-session meetings
- Distribute the draft meeting minutes to members with enough time for review prior to the meeting, at which the LSC will vote on their approval.

- Makes any changes/edits/corrections approved by the LSC in the draft minutes
- Makes meeting minutes available for public inspection within ten (10) days of approval by the LSC
- Keeps records of all approved meeting minutes and other LSC records.
- Give copies of all agendas/approved minutes to school admin for LSC binder in main office
- Prepares any correspondence authorized by the LSC

## 4 FREEDOM OF INFORMATION (FOIA) & OPEN MEETINGS ACT (OMA) OFFICER(S) (REQUIRED)

**ANY MEMBER MAY SERVE IN THIS ROLE**

- Completes online training provided by the Illinois Attorney General within 30 days after being designated by the LSC
- Advise the LSC on Freedom of Information Act (FOIA) policies and procedures.
- Respond to any FOIA requests for records (if not exempt from disclosure) within five business days. (LSC Relations can guide.)
- Respond to any OMA inquiries within seven business days. (LSC Relations can guide.)

## 5 SERGEANT OF ARMS (OPTIONAL)

**ANY MEMBER MAY SERVE IN THIS ROLE**

- Maintains order at LSC meetings
- Performs other duties as delegated by the LSC or the LSC Chairperson
- Signs in visitors
- Maintains order during all LSC meetings
- Makes copies of meeting notices and agenda

## 6 PARLIMENTARIAN (OPTIONAL)

**ANY MEMBER MAY SERVE IN THIS ROLE**

- Knows the rules of order of the LSC
- Helps ensure that the LSC follows the rules of order
- Resolves conflicts related to the LSC following the accepted rules of order





## Local School Council

# OPEN MEETINGS ACT

| HISTORY | The Open Meetings Act (OMA) establishes requirements for public bodies in the State of Illinois, including Local School Councils (LSCs), in conducting their business. The OMA mandates LSCs exist to aid in the conduct of people's business and people have the right to be informed of the business conducted. Furthermore, the OMA ensure that the actions and deliberations of public bodies are done openly. |
|---|---|

## QUICK DEFINITIONS

### What is a "meeting"?

Any gathering, whether in person or by video or audio conference, telephone call, electronic means, or other interactive contemporaneous communication between LSC members that discusses LSC business. This includes any of the described interactions of four or more members in elementary LSC or five or more members in high school LSC.

### What is a "public body"?

All legislative, executive, administrative or advisory bodies which are supported in whole or in part by tax revenue, or which expend tax revenue.

### What is a "quorum"?

The number of LSC members needed to have an official meeting: 7 members for elementary schools and 8 members for high schools. For appointed LSCs, one-half of the full membership plus one. If a quorum is not present, the LSC cannot vote on motions.

### What is an "Organizational Meeting"?

A required meeting each school year held between July 1 and July 14. The LSC votes to select officers (chair, secretary, Open Meeting Act (OMA), and Freedom of Information Act (FOIA) Officers). Finally, the LSC decides its regular meeting dates for the school year.

### What is a "closed meeting?"

The Open Meetings Act also allows public bodies to discuss **certain subjects** in sessions/meetings closed to the public, called closed, or "executive" sessions or meetings. No final action may be taken during closed meetings.

## OMA REQUIREMENTS

### Meetings Location

All **meetings are held in person** and must be held at times and places convenient and open (accessible) to the public. The meeting notice and agenda must be posted at least 48 hours before the meeting at the location where the meeting will be held.

### Voting

A quorum of members must be physically present at a meeting for a vote to take place (7 members for elementary schools and 8 members for high schools). For appointed LSCs, the quorum is one-half of the full membership plus one.

### Public Participation

Public participation must be included as part of ALL LSC meetings and included on the agenda. LSCs must allow the public to address the body at all open meetings and may set reasonable rules to govern public participation. This may include a set number of minutes each speaker is allowed to speak. Registered speakers will participate in public comment in the manner outlined by the LSC.

### Written Minutes

LSCs must maintain written minutes of all LSC and LSC committee meetings, including closed meetings/sessions.

### Meeting Notices

Notices and agendas for all meetings (regular, special, open, closed, rescheduled) must be posted at least 48 hours before the meeting at the school and other meeting locations (if applicable). The notice must indicate the meeting's date, time, and location. The agenda must be posted somewhere that the general public can see it at any time of day or night – like on an exterior door or window; not on an interior door of a locked building.

August 2024

# REGULAR VS. SPECIAL MEETINGS

| Regular Meeting | Special Meeting |
|---|---|
| • May be held on legal holidays<br>• LSCs may vote to amend the meeting agenda to remove items from the posted agenda or to add items (for discussion only)<br>• LSCs may discuss any matter at a regular meeting whether specifically included in the agenda or others | • Requires Chairperson or 4 Elem members or 5 HS members to call meeting at least 48 hours in advance<br>• Must share the agenda in advance with LSC members<br>• May NOT be held on legal holidays<br>• Only the items specifically listed on a special meeting agenda may be voted on or discussed at the meeting |

# VOTING RULES

## Selection of Contract Principal

Selection of a new contract principal requires 7 affirmative or "yes" votes (Note: current principal and student cannot vote or be counted for quorum purposes).

## Transfer of Funds

Transfers of funds from previously approved budget allocations require approval by a supermajority. Traditional ELEM LSCs- 8 yes votes. Traditional HS LSC = 9 yes votes. Military Academies = 10 yes votes

## General Motions

General motions require an affirmative (yes) vote of a majority of the currently serving members. The "currently serving members" include any members absent from the meeting.

# REQUIREMENTS FOR MEETING MINUTES

**Written minutes of meetings must include*:**
- The date, time and place of the meeting
- The members present and whether they are physically present or present by means of video or audio conference
- The members absent
- A summary of the discussions on all matters proposed, deliberated or decided and a record of any votes taken
- Written minutes must be approved no later than the second regular meeting or 30 days after the meeting for which they were taken, whichever occurs later
- Minutes must be made available to the public within 10 days after approval

*Note: A verbatim (word-for-word) record of members' discussions and/or comments during public participation is NOT required in the minutes

# OMA REQUIREMENTS FOR MEETING MINUTES

Written minutes of meetings must include*:
- Whether a quorum was present and, if so, the time at which the quorum was established if a quorum was not present when the meeting was called to order
- The time that members arrived if they arrived late
- The time that members left the meeting if they left before it adjourned and whether their departure resulted in the loss of quorum
- Any actions (votes) that were taken by the LSC and the results

## CLOSED MEETINGS

**All closed meetings must be audio recorded.**
**LSCs may discuss any of the following subjects in closed/executive meetings:**
- Litigation impacting the LSC or LSC members
- School safety and security issues
- The evaluation, retention, selection, or request for dismissal of a contract principal
- The selection of a candidate to fill a vacancy on the LSC (the actual selection must be made in an open meeting)
- The review (at least every 6 months) of minutes of closed meetings or sessions, including whether to maintain their confidentiality (the vote on that matter must be taken in an open session)
- Recordings of closed sessions must be retained for at least 18 months.

After 18 months the LSC may vote to destroy such recordings once the written minutes of the closed session have been approved by the council.

# PARTICIPATION BY ELECTRONIC MEANS

- **Inability to attend the meeting in person must be due to:**
  - Personal illness or disability
  - Employment purposes
  - LSC business
  - Family or other emergency
  - Childcare related issue
- LSC member must notify the principal, LSC Secretary or LSC Chairperson before the meeting unless giving advance notice is not practical
- LSC must have adopted or must adopt a rule conforming to the requirements of the OMA for participation by video or audio conference
- A quorum must be physically present at meeting
- A majority of the serving members must vote to allow the absent member to participate by video or audio conference

## OMA Training Requirement

All LSC members are also required to complete online training on the OMA provided on the Illinois Attorney General's website within 30 days of the their election or appointment http://foia.ilattorneygeneral.net



Local School Council

# COMMITTEES

**The LSC may establish committees as needed to help carry out its duties.**

## FORMING COMMITTEES

- The LSC may create standing and special committees to assist it in carrying out its duties.
- If the LSC forms a standing committee, it must be added to the bylaws, and the membership, duties, and responsibilities must be described.
- Committees can be formed at the start of the year or at any subsequent LSC meetings.

## COMPOSITION

- Committees must be chaired by an LSC Member.
- Committees can be composed of various stakeholders that are not LSC members, such as parents, teachers, staff, and community members

## POWERS OF COMMITTEES

- Make recommendations to the LSC.
- The LSC makes all final decisions regarding any recommendation given by the committee.
- Committees created by the LSC are subject to the Illinois Open Meetings Act requirements.

**Examples of LSC Committees:**
- Budget
- Principal Evaluation
- CIWP

## COMMITTEE MEETINGS

- All committee meetings are required to be held in person.
- Meeting notice and agenda must be posted 48 hours in advance in a place the public can see it.
- Committee meetings are open to the public, and the public may attend.
- A committee must have a quorum of members present to conduct business (votes). To determine the quorum of a committee, the quorum is the total number of possible seats on the committee divided by two, and then one is added.
  - For example, if the committee has ten (10) total members , the quorum for that committee is six (6) : (10 /2 = 5 +1 = 6).
- Public Participation is required at all committee meetings.
- Meeting Minutes are required for all committee meetings.





Chicago
Public
Schools

# Local School Council
## ROBERT'S RULES OF ORDER CHEAT SHEET

Robert's Rules of Order is a manual of parliamentary procedures that governs most organizations with boards of directors.

## TYPES OF MOTIONS

- **Main Motion**: Introduce a new item
- **Motion to Table**: Kills a motion
- **Motion to Postpone**: Delays a vote (can reopen debate on the main motion)

## VOTING ON BUSINESS ON MATTERS (STEPS)

1. **Motion**: A member rises or raises a hand to signal the chairperson.
2. **Second**: Another member seconds the motion.
3. **Restate motion**: The chairperson restates the motion.
4. **Debate**: The members debate/discuss the motion.
5. **Vote**: The chairperson restates the motion and then asks for "yes" votes, "no" votes, and then abstentions.
6. **Announce the vote**: The chairperson announces the result of the vote and any instructions.

**TIP: If the LSC clearly agrees, the chairperson can say, "If there are no objections, we will adopt the motion to…" Pause for objections. If none, say, "Hearing no objections, the motion is adopted." Then, provide any necessary instructions. If someone objects, open the floor for debate, then proceed to a vote and announce the result**

## REQUESTING CLARIFICATION ON MATTERS

Certain situations need attention during the meeting, but they don't require a motion, second, debate or voting. It's permissible to state a point during a meeting where the chairperson needs to handle a situation right away. LSC members can declare a Point of Order, Point of Information, Point of Inquiry, or Point of Personal Privilege

- **Point of Order**: Draws attention to a breach of rules, improper procedure, violating LSC established practices or norms, etc.

- **Point of Information**: A member can provide extra information (without starting a debate) to help others make more informed voting decisions.
- **Point of Inquiry**: A member can ask for clarification or more details about a matter to help them vote wisely.
- **Point of Personal Privilege**: A member can raise concerns about their comfort in the meeting (like room temperature or noise) or address issues with another LSC member's behavior during the meeting.

## TIPS AND RESPONSIBILITIES FOR CHAIRPERSONS

Robert's Rules of Order, or parliamentary procedure, were designed to ensure meetings are fair, efficient, and well-organized. A strong chairperson ensures everyone has the opportunity to speak in an orderly manner, allowing for both listening and being heard. These tips will help chairpersons lead successful meetings without dominating the discussion or being overshadowed by others.

- Follow the agenda to keep the group moving toward its goals.
- Lead by example, be polite when addressing ALL members
- Only allow people who have been called on to speak during the meeting. Control the flow of the meeting by recognizing members who ask to speak.
- **Allow** all members to speak once before allowing anyone to speak a second time on the same matter/topic.
- When discussions get off-track, gently guide the group back to the agenda.
- Model courtesy and respect, and insist that others do the same.
- Help to develop the LSC's skills in parliamentary procedure by properly using motions and points of order.
- Give each speaker your undivided attention, even when you don't agree
- Monitor the emotional tone of the discussions. If matters get hostile, consider taking a break or tabling the matter until a future time

August 2024

| Action | What to say | Can speaker be interrupted? | Need a second? | Can this be debated? | Can this be amended? | Votes needed |
|---|---|---|---|---|---|---|
| Introduce main motion | "I move to…" | No | Yes | Yes | Yes | Majority |
| Support main motion by Second | "I second the motion to…" | No | N/A | No | No | N/A |
| Amend a motion | "I move to amend the motion by…" | No | Yes | Yes | Yes | Majority |
| Postpone item | "I move to postpone the matter until…" | No | Yes | Yes | No | Majority |
| End debate | "I move the previous question." | No | Yes | Yes | No | Majority |
| Recess the meeting | "I move that we recess until…" | No | Yes | No | No | Majority |
| Adjourn the meeting | "I move to adjourn the meeting." | No | Yes | No | No | Majority |
| Enforce the rules or point out incorrect procedure | "Point of order." | Yes | No | No | No | No vote |
| Table a motion | "I move to table…" | No | Yes | No | No | Majority |
| Take up a previously tabled item | "I move to take from the table…" | No | Yes | No | No | Majority |
| Close the meeting for executive session | "I move to go into executive session to discuss the following ….." | No | Yes | No | No | Majority |

NOTE: This document is very condensed, highlighting the most used procedures.  For more details visit https://robertsrules.com/

Roberts Rule of Order  Page 2 of 2

August 2024

14-0625-EX12  FINAL                    EXHIBIT B

## UNIFORM PRINCIPAL'S PERFORMANCE CONTRACT
### For a School with an Appointed Local School Council

This Uniform Appointed Principal's Performance Contract ("Agreement") is made and entered this 23rd day of ___June___, 2022 by and between the Board of Education of the City of Chicago ("Board of Education") and ___Abdul Muhammad___ ("Principal"). This Agreement sets forth the rights and obligations of the parties with respect to the employment of the Principal at ___Lindblom Math & Science Academy___ School (the "Attendance Center").

This Agreement is made pursuant to the provisions of the Illinois School Code, which are incorporated herein by this reference.

In consideration of the following promises, the parties agree as follows:

### I.    TERM

Principal is hereby employed by the Board of Education and agrees to serve for four (4) years as the Principal at the Attendance Center commencing _____ and ending _____, unless this Agreement is terminated earlier as provided in Section V. or declared null and void as provided in Section IX. of this Agreement.

### II.   DUTIES OF PRINCIPAL

The Principal shall be the chief executive/operating officer of the Attendance Center.  The Principal's duties shall include, but not be limited to, the following:

a)    The Principal shall supervise the educational operation of the Attendance Center and shall assume administrative responsibility and instructional leadership, in accordance with Board of Education Rules, Policies and written Procedures and Guidelines promulgated pursuant to Rule or Policy, for the planning, operation and evaluation of the educational program of the Attendance Center.

b)    The Principal's primary responsibility is the improvement of instruction at the Attendance Center.

c)    The Principal shall develop a Local School Improvement Plan also known as the Continuous Improvement Work Plan ("Plan"), pursuant to the Illinois School Code, 105 ILCS 5/34-2.4, for the Attendance Center in consultation with the Attendance Center's Appointed Local School Council, as provided in the Board of Education's Policy on the Governance of Alternative and Small Schools" (hereinafter "Alternative and Small Schools Policy"), all categories of school staff, parents and community residents.  The Principal shall be responsible for the implementation of the Plan.

d)    The Principal shall develop an expenditure plan, pursuant to the Illinois School Code, with respect to funds allocated and distributed to the Attendance Center by the Board of Education. The expenditure plan which reflects the priorities and activities of the Plan shall be developed in consultation with the Appointed Local School Council as provided in the Alternative and Small Schools Policy, the Professional Personnel Leadership Committee of the Attendance Center and all other school personnel.  The Principal shall be responsible for the implementation of the expenditure plan.

e)    The Principal shall provide the Professional Personnel Leadership Committee the opportunity to review and make recommendations regarding (i) the specific methods and contents of the school curriculum within the Board of Education's system-wide curriculum standards and objectives, (ii) the Plan and school budget, and (iii) other educational improvements.

f)    Unless prohibited by law or by Rule or Policy of the Board of Education, the Principal shall provide to the Appointed Local School Council copies of all internal audits and any other pertinent information generated by any audits or reviews of the programs and operations of the Attendance Center.

Ex. J

14-0625-EX12   FINAL                                   EXHIBIT B

g)    The Principal shall direct, supervise, evaluate and suspend with or without pay or otherwise discipline all teachers and other employees assigned to the Attendance Center in accordance with Board of Education Rules, Policies, and written Procedures and Guidelines promulgated pursuant to Board Rule or Policy and consistent with applicable collective bargaining agreements and Illinois law.

h)    The Principal shall direct, supervise, evaluate and issue discipline to or dismiss the assistant principal(s) assigned to the Attendance Center in accordance with Board of Education Rules, Policies, and written Procedures and Guidelines promulgated pursuant to Rule or Policy.

i)    The Principal shall fill vacant positions at the Attendance Center by appointment in accordance with the procedures established by the Chief Executive Officer or designee with such appointment(s) based on merit and ability to perform in the position without regard to seniority or length of service, as provided in 105 ILCS 5/34-8.1.

j)    The Principal shall appoint, dismiss, retain, promote and assign the personnel assigned to the Attendance Center in accordance with Board of Education Rules, Policies, and written Procedures and Guidelines promulgated pursuant to Rule or Policy.

k)    The Principal shall attend academies or other training sessions mandated by the Chief Executive Officer, the Board of Education or the Illinois State Board of Education.

l)    The Principal shall perform faithfully his/her duties and obligations as a member of the Appointed Local School Council of the Attendance Center.

m)    The Principal shall endeavor to maintain a positive education and learning climate at the Attendance Center.

n)    The Principal shall endeavor to establish clear lines of communication regarding school goals, accomplishments, practices and policies with the Appointed Local School Council, parents and teachers, and, unless prohibited by law or by Rule or Policy of the Board of Education, shall provide to the Appointed Local School Council information necessary for the Appointed Local School Council to perform its duties as defined in the Alternative and Small Schools Policy.

o)    The Principal shall fulfill other obligations imposed upon the Principal by: the Illinois School Code; other applicable state and federal laws; Board of Education Rules, Policies and written Procedures and Guidelines promulgated pursuant to Rule or Policy; collective bargaining agreements; and court decisions and decrees and settlements entered into by the Board of Education.

p)    The Principal may, in accordance with Board of Education Rules, Policies and written Procedures and Guidelines promulgated pursuant to Rule or Policy including, but not limited to those concerning conference leave, seek professional growth through collegial activities, attendance at professional meetings and the pursuit of further education.

Failure to perform the duties set forth in this Section, in Board of Education Rules, Policies, written Procedures or Guidelines or the duties specified by the Chief Executive Officer or designee may result in disciplinary action pursuant to Rules, Policies and written Procedures and Guidelines promulgated pursuant to Board Rule or Policy, and may constitute a material breach of this Agreement and cause for termination.

III.    **COMPENSATION**

The Board of Education shall pay salary and provide benefits to the Principal in accordance with the administrative salary plan, as may be amended from time to time, Board Rules, Policies, Guidelines and Procedures promulgated pursuant to Rule or Policy, including all benefits for which full-time, regularly appointed certificated employees are eligible.

14-0625-EX12  FINAL                          EXHIBIT B

## IV.   EVALUATION

A.   Evaluation By The Chief Executive Officer

(a)    The Chief Executive Officer shall conduct an annual evaluation of the Principal in accordance with 105 ILCS 5/34-8. The Chief Executive Officer or designee will not issue an annual evaluation to a new principal based on less than five school months of performance, provided however, nothing in this section shall preclude the Chief Executive Officer or designee from taking steps to manage the performance of a new principal during the first five school months of their contract term or thereafter.

(b)    The annual evaluation conducted by the Chief Executive Officer shall be sent to the Principal and the data used in the evaluation shall be sent to the Appointed Local School Council.

(c) The Principal authorizes the Chief Executive Officer or designee to share with the Appointed Local School Council the Performance Level Rating result from their annual evaluation by the Chief Executive Officer or designee.

(d) The Principal authorizes the Chief Executive Officer or designee to share with the Appointed Local School Council, upon request by the Chairperson of the Appointed Local School Council, the complete annual evaluation that the Principal received from the Chief Executive Officer or designee, including the Principal reflections/comment portion of the evaluation.

(e) The Principal authorizes the Chief Executive Officer or designee to meet with the Appointed Local School Council in executive session to discuss the contents of the Principal's evaluation conducted by the Chief Executive Officer or designee and the Principal may elect to participate in this meeting.

Nothing in this Section is intended to preclude the Principal from sharing with the Appointed Local School Council the contents of his/her Principal's evaluation conducted by the Chief Executive Officer or designee including the Principal reflections/comment portion of the evaluation.

B.   Evaluation By The Appointed Local School Council

(a)    The Appointed Local School Council shall annually evaluate the Principal in accordance with 105 ILCS 5/34-2.3. The evaluation shall be in writing in a form prescribed by the Board of Education, which includes the following criteria.

1)    student academic improvement, as defined by the school improvement plan;

2)    student absenteeism rates at the school;

3)    instructional leadership;

4)    the effective implementation of programs, policies, or strategies to improve student academic achievement;

5)    school management;

6)    the Principal's fulfillment of his/her duties under this Agreement, including the duties specifically identified in Article II of this Agreement;

7)    such other performance factors as are mutually agreed upon by the Principal, and the Chief Executive Officer and approved by the Board of Education in accordance with Article XI. of this Agreement.

Nothing in this section precludes the Board of Education from establishing a new evaluation form comprised of a school and student performance data portion in addition to a principal practice portion as summarized above.

(b)    Not less than 150 days prior to the expiration of this contract, the Appointed Local School Council shall evaluate the Principal, in writing, using the Board-approved evaluation form, to assess the educational and administrative progress made at the school during the term of this Agreement in order to determine whether to recommend the renewal of this Agreement to the Chief Executive Officer. The Appointed Local School Council shall base its evaluation on the criteria set forth in Section IV.(B)(a) above.

14-0625-EX12  FINAL                    EXHIBIT B

(c)      The Principal and the Appointed Local School Council shall meet at least once as the Appointed Local School Council gathers information to prepare its annual evaluation. The Appointed Local School Council shall send its signed, written evaluation, in the form prescribed by the Board of Education, to the Principal on the date specified by the Chief Executive Officer or designee during each year of this Agreement;

(d)      Within 30 days of the Principal's receipt of the Appointed Local School Council's signed, written evaluation, the Principal and the Appointed Local School Council may meet, upon request of either the Principal or the Appointed Local School Council, in executive session, to discuss the contents of the evaluation. As a result of that meeting, the Appointed Local School Council may, but is not obligated to, revise its written evaluation. The Appointed Local School Council shall send a copy of its final evaluation to the Principal, with a copy to the Chief Executive Officer or designee, on the date specified by the Chief Executive Officer or designee.

(e)      For purposes of completing an evaluation during an Appointed Local School Council appointment year, in the event the Board of Education establishes a new evaluation form with a data portion in addition to a principal practice portion, the principal practice portion shall be completed by the outgoing Appointed Local School Council who observed principal practice and the data portion shall be completed by the new Appointed Local School Council when the data for the relevant evaluation period is available. The evaluation is not considered final until both portions are completed.

## V.   CONTRACT TERMINATION

This Agreement may be terminated by the Board of Education upon:

(a)      written agreement of the Board of Education and the Principal;

(b)      removal of the Principal for cause pursuant to 105 ILCS 5/34-85;

(c)      closure of the attendance center or permanent merger of the attendance center into another attendance center;

(d)      death or retirement of the Principal;

(e)      resignation of the Principal, which includes when a Principal is absent without leave;

(f)      approval of the Principal's request for a supplemental personal medical leave or other leave that does not provide position protection;

(g)      removal, reassignment, layoff or dismissal of the Principal pursuant to 105 ILCS 5/34-8.3 and 105 ILCS 5/34-8.4.

Further, this Agreement may be deemed null and void by the Board of Education as described in Section IX of this Agreement. For purposes of Section V.(f) above, a principal on a supplemental personal medical leave or other leave that does not provide position protection maintains their Board employment status during the term of the approved leave notwithstanding the termination of this Agreement.

## VI.   EXPIRATION

Unless terminated earlier, this Agreement, including and notwithstanding the procedures set forth herein, shall expire at the end of its stated term and shall not grant or create any contractual rights or other expectancy of continued employment beyond the term of this Agreement, except as indicated and solely to the extent provided in Section VII of this Agreement.

## VII.   RENEWAL AND NON-RENEWAL

(a)      The Appointed Local School Council shall determine whether or not to recommend to the Chief Executive Officer the renewal of this Agreement with the Principal based upon the evaluation performed pursuant to Section IV(B)(a). The Appointed Local School Council shall notify the Principal and the Chief Executive Officer of its recommendation on the renewal of this Agreement in writing no later than February 1 of the calendar year in which this Agreement expires or, if the Principal's term expires on a date other than June 30, 150 days before expiration of this Agreement.

14-0625-EX12  FINAL                          EXHIBIT B

(b)      The Appointed Local School Council shall have no right to recommend the renewal of this Agreement with the Principal to the Chief Executive Officer if the Principal fails to meet any requirement which is established or imposed by the Board of Education in accordance with 105 ILCS 5/34-8.1 as a condition of the continued employment of the Principal or of the renewal of this Agreement with the Principal.

(c)      Pursuant to 105 ILCS 5/34-8.1, in the event that this Agreement is not renewed by the Board of Education, the Principal's employment as a principal shall terminate upon the expiration of this Agreement, and he/she shall not be reinstated to any former position which he/she previously held with the Board of Education. However, the failure of the Board of Education to renew this Agreement with the Principal shall not limit the Principal from seeking and receiving other employment with the Board of Education based upon his/her experience and valid certifications and, if otherwise qualified under the Illinois School Code, his/her name shall be placed on appropriate eligibility lists which the Board of Education maintains for teaching positions.

(d)      In the event that this Agreement is not renewed and the Principal does not retire or is not otherwise employed by the Board of Education after expiration of the term of this Agreement, the Principal shall be eligible to continue to receive his or her previously provided level of health insurance benefits for a period of 90 days following expiration of the term of this Agreement. Nothing in this subsection (d) is intended to limit or otherwise impact the Principal's rights under COBRA or any other federal or state law concerning insurance.

**VIII.    SEVERABILITY**

The provisions of this Agreement shall be considered severable and independent. If any provision of this Agreement is held invalid or unenforceable, the remaining provisions shall not be affected.

**IX.    VOIDABLE CONTRACT**

It is expressly agreed and understood that as a condition precedent to this Agreement, the Principal shall continuously possess the requisite state certifications/licenses and shall continuously satisfy the Board's employment and other requirements and prerequisites necessary to serve as Principal in the Chicago Public Schools and failure to do so shall constitute grounds for the Board of Education to declare this Agreement null and void.

(a)      The Principal represents (1) that he/she currently and continuously possesses the requisite state licenses and certification(s) to serve as principal in the Chicago Public Schools, which includes, but is not limited to, state certification to conduct teacher evaluations; and (2) that he/she meets any and all requirements for the employment or continued employment as principal which are established or imposed by the Board of Education in accordance with 105 ILCS 5/34-8.1. In the event the Principal does not continuously possess the requisite state certifications/licenses to serve as a principal in the Chicago Public School System or otherwise fails to meet any requirement established or imposed by the Board of Education in accordance with 105 ILCS 5/34-8.1, the Board of Education may declare this Agreement null and void and terminate the Principal.

(b)      The Principal represents: (1) that the information set forth in his/her employment application, principal application and principal eligibility application is true and accurate; and (2) that he/she has never been convicted of any of the enumerated criminal offenses set forth in 105 ILCS 5/34-18.5. In the event that the Board of Education subsequently finds: (1) that the information set forth in said application(s) is not true and accurate; or (2) that he/she has been convicted of any of the enumerated criminal offenses set forth in 105 ILCS 5/34-18.5, the Board of Education may declare this Agreement null and void and terminate the Principal.

**X.    APPLICABLE LAW**

This Agreement shall be interpreted and governed by the laws of the State of Illinois.

14-0625-EX12  FINAL                    EXHIBIT B

## XI.  ENTIRE AGREEMENT

(a)     This Agreement shall constitute the entire Uniform Principal's Performance Contract, and no additions, deletions or modifications may be made to this Agreement during its term unless made in writing and signed by the Board of Education and the Principal. However, notwithstanding anything in this Agreement to the contrary, this Agreement may be modified upon renewal pursuant to 105 ILCS 5/34-8.1. Also, notwithstanding anything in this Agreement to the contrary, the Board of Education may establish or impose requirements in accordance with 105 ILCS 5/34-8.1 as conditions of the execution of this Agreement, and may establish or impose requirements in accordance with 105 ILCS 5/34-8.1 as conditions of the renewal of this Agreement. This Agreement supersedes all prior agreements, arrangements and communications between the parties dealing with the subject matter hereof, whether oral or written.

(b)     Nothing in subsection XI.(a) above shall prohibit the Chief Executive Officer from negotiating additional criteria with the Principal. Such additional criteria shall not discriminate on the basis of race, color, sex, gender identity/expression, age, religion, creed, national origin, sexual orientation or disability unrelated to ability to perform, and shall not be inconsistent with this Agreement, with other provisions of the Illinois School Code governing the authority and responsibility of principals, with Board of Education Rules, Policies, Guidelines or Procedures, or with court decisions, decrees or settlements affecting the Board of Education. Any additional criteria are subject to approval by the Board of Education's General Counsel, working in consultation with the organization representing Principals (currently the Chicago Principals and Administrators Association), for purposes of determining such consistency, and such criteria shall not be effective until they are so reviewed and approved, and included as an attachment to this Agreement prior to execution of this Agreement by the parties.

## XII.  MISCELLANEOUS

(a)     This Agreement shall be binding upon and shall inure to the benefit of any transferees, successors or assigns of the Board of Education. This Agreement may not be assigned by the Principal under any circumstances.

(b)     This Agreement is entered into solely for the benefit of the parties hereto, and any transferees, successors or assigns of the Board of Education pursuant to subsection XII.(a) above. This Agreement is not intended to confer any rights or impose any duties on any third party, and is not intended to expand the liability of any party hereto to any third party

(c)     The Principal agrees to comply during the term of this Agreement with all Board of Education Rules, Policies and written Procedures and Guidelines promulgated pursuant to Rule or Policy and to the extent that such Rules, Policies, Guidelines or Procedures are inconsistent with the terms and conditions of this Agreement, the Rules, Policies, Guidelines or Procedures shall control.

(d)     The Rules and Policies and written Procedures and Guidelines promulgated pursuant to a Rule or Policy of the Board of Education promulgated during the term of this Agreement are hereby incorporated by this reference, and shall supersede any inconsistent terms and conditions of this Agreement.

(e)     The waiver by any party of a breach of any provision of this Agreement by another party, or the failure of any party to enforce any provision or obligation hereunder, shall not operate or be construed as a waiver of any subsequent breach by that party or bar the subsequent enforcement of any provision or obligation under this Agreement.

14-0625-EX12   FINAL                    EXHIBIT B

_____          Dated: _____
**PRINCIPAL**

**BOARD OF EDUCATION:**

By: _____      Dated: _____
President, Board of Education

Attest: _____
Secretary, Board of Education

Approved as to Legal Form:

_____
General Counsel, Board of Education

Board Report No. _____

DocuSign Envelope ID: ...

14-0625-EX12 FINAL          EXHIBIT B

# Certification by an Appointed Local School Council
## of a Principal Contract Recommendation
*(Please type or print)*

School: _Lindblom Math and Science Academy_

Contract Type: ☒ New  ☐ Renewal

We, the members of the Appointed Local School Council, hereby certify that at our meeting of
_6/23/22_ (date) a quorum of members was physically present and we voted to recommend the
following Principal Candidate(s) (up to 3) and we further certify that the following is a true and accurate record of
this vote:

_Abdul Muhammad_
Recommended Candidate #1        Recommended Candidate #2        Recommended Candidate #3

|  | Number |
|---|---|
| **ALSC Members Currently Serving** | 13 |
| **ALSC Members Present at Meeting** (exclude Principal & H.S. Student Representative) | 9 |
| **ALSC Members Absent From Meeting** (exclude Principal & H.S. Student Representative) | 4 |
| **Yes Votes** | 8 |
| **No Votes** | 0 |
| **Abstained from Vote** | 1 |

Further, we certify that we complied with the Open Meetings Act by posting public notice and an agenda for the
meeting at least 48 hours in advance (and, if a special meeting, provided written notice to each member); and
further, that the principal (and student representative if a high school) did not vote in the recommendation process
and was (were) not counted for the purpose of determining whether a quorum existed at the above meeting.

Signatures of the Appointed Local School Council Members Who Voted <u>Yes</u> to Recommend the Candidate(s)
Named Above:

Date: _6/23/22_

1. _Donnie Ayele (Chair)_
2. _C. Tyus_
3. _Marcella Wheatley_
4. _lewis_
5. 
6. 
7. 

8. *DocuSigned by:* Jennifer Crone Griffin   84A9F742752E425...
9. 
10. 
11. 
12. 
13. 
14.



**Department of Principal Quality**
42 West Madison, Third Floor • Chicago, Illinois 60602

Dr. Allison Tingwall
Executive Director

August 24, 2022

Dear Mr. Muhammad:

Please be advised that Board item 22-0824-EX8 to award you a contract as the principal of Lindblom Math and Science Academy was deferred at today's Board of Education Meeting. Importantly, the Chief Executive Officer did not withdraw the recommendation and hopes to be able to ask the Board to act on that recommendation at a future date. Until then, you will continue to lead the school as the Interim Principal.

The CEO has asked the Board to defer action because of recent information about your transition and engagement of school stakeholders. This has raised concerns for the CEO, and he would like to take additional time to evaluate the ALSC's recommendation. The CEO, with the assistance of the Network, will make a full assessment and hopes to resolve those concerns over the next several months. It will be necessary during that period to demonstrate that you are in regular communication with the Network and working collaboratively with our Network staff and me.

It is our hope that we can work cooperatively over the next several months so that we can reach a positive resolution and ensure that our students receive the best educational experience possible.

Sincerely,

Allison C. Tingwall

Allison Tingwall, EdD
Executive Director
Department of Principal Quality

Ex. J-1



| Felicia Sanders | William Klee | Jeffrey Mossley |
|---|---|---|
| Chief Schools Officer | Deputy of High Schools | Deputy of Elementary Schools |

August 24, 2022

Dear Lindblom Parents/Guardians, Students and Staff:

I hope everyone is enjoying the start of school and preparing for a strong school year.

I am reaching out to give you an update on the school's leadership. Today at our monthly Board of Education Meeting, the Chief Executive Officer of CPS asked the Board to postpone taking action on the recommendation to give a 4-year principal's contract to Mr. Abdul Muhammad. Importantly, the CEO did not withdraw his recommendation and hopes to be able to ask the Board to act on that recommendation at a future date. Until then, Mr. Muhammed will continue to lead the school as the Interim Principal.

The CEO has chosen this course of action because of recent information regarding Mr. Muhammad's transition. This has raised concerns for the CEO and he would like to take additional time to evaluate the recommendation. The CEO, with the assistance of the Network Office, will make a full assessment and hopes to resolve these concerns over the next several months.

We hope to work cooperatively over the next several months to bring this to a positive resolution, and we thank you for your patience as we continue to work to provide students and staff with the best possible educational experience at Lindblom.

Sincerely,

*Felicia Sanders*

Felicia Sanders
Chief Schools Officer

Ex. K



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

# Questions
5 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                    Mon, Sep 5, 2022 at 7:57 PM
To: "LaRosa, Devon" <dplarosa@cps.edu>, Allison Tingwall <actingwall@cps.edu>
Bcc: Troy LaRaviere <tlaraviere@mycpaa.com>

Good evening,

I am writing to inquire as to whom I can address my questions to as it relates to the attached letter.  On August 24, Chief LaRosa delivered the letter and stated to me that if I had any questions to reach out to Ms. Tingwall. I emailed Ms. Tingwall the same day to schedule the meeting.  Ms. Tingwall and I met on Thursday, September 1, 2022. In that meeting Ms. Tingwall stated several times that she has just returned from maternity leave and was not involved in meetings that led to the letter that bears her name and signature. Additionally,  she stated that to get answers to my questions, I need to speak with Chief LaRosa. Since there is a lack of clarity as to who can answer my questions, I am emailing you both. Who can I meet with to answer my questions and concerns related to this letter?

---



**20220824_170918.jpg**
1744K

---

**Tingwall, Allison** <actingwall@cps.edu>                                    Mon, Sep 5, 2022 at 10:16 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "LaRosa, Devon" <dplarosa@cps.edu>

Hi Principal Muhammad,

As offered during our meeting, if you send over the questions you have, I will work to get answers for you.

Sincerely,
Allison

On Mon, Sep 5, 2022 at 7:57 PM Muhammad, Abdul <akmuhammad@cps.edu> wrote:
> Good evening,
>
> I am writing to inquire as to whom I can address my questions to as it relates to the attached letter.  On August 24, Chief LaRosa delivered the letter and stated to me that if I had any questions to reach out to Ms. Tingwall. I emailed Ms. Tingwall the same day to schedule the meeting.  Ms. Tingwall and I met on Thursday, September 1, 2022. In that meeting Ms. Tingwall stated several times that she has just returned from maternity leave and was not involved in meetings that led to the letter that bears her name and signature. Additionally,  she stated that to get answers to my questions, I need to speak with Chief LaRosa. Since there is a lack of clarity as to who can answer my questions, I am emailing you both. Who can I meet with to answer my questions and concerns related to this letter?

--
**Allison Tingwall, EdD (she/her/ella)**

**Ex. K-1**

**Executive Director of Principal Quality**

Chicago Public Schools

773-553-1515

Stay connected: DPQ Website    DPQ on Twitter

PRIVILEGE AND CONFIDENTIALITY NOTICE

The information contained in this e-mail and any attachments is confidential and may be legally privileged. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person.

---

**LaRosa, Devon** <dplarosa@cps.edu>                                                    Tue, Sep 6, 2022 at 8:19 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Allison Tingwall <actingwall@cps.edu>

> Morning Principal Muhammad:
>
> As the network chief, my role is to communicate with principals and address their respective concerns.
>
> Additionally, both the network and DOQ will work together to support you. As Dr. Tingwall shared, If you submit the questions to Dr. Tingwall and I, we will ensure they receive the appropriate response.
>
> Thanks
>
> Devon
>
> On Mon, Sep 5, 2022 at 7:57 PM Muhammad, Abdul <akmuhammad@cps.edu> wrote:
> [Quoted text hidden]

---

**Troy LaRaviere** <tlaraviere@mycpaa.com>                                              Tue, Sep 6, 2022 at 10:26 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Aryelle Smith <asmith@mycpaa.com>, Samantha Odyniec <sodyniec@mycpaa.com>

Good morning Abdul.
It might be good to lay out the questions in writing as well but check with Aryelle or Sam.

Respectfully,

Troy LaRaviere
President, Chicago Principals & Administrators Association
542 S. Dearborn, Suite 400
Office: (312) 263-7767
Cell: (773) 494-2528



## Power, voice, and dignity for Chicago's school leaders

**Mission**
Empowering school leaders to champion the policies and resources needed to create safe, nurturing, and holistic school communities for all of Chicago.

**Vision**
CPAA members will harness our political, social, and economic power to uplift our collective voice, ensure we are treated with dignity, and establish working and learning conditions that allow us to realize the full human potential of Chicago's students and school communities.



"Nobody can give us equality or justice. If we are men and women, we take it; and if we can't take it we don't deserve it."
-- Malcolm X


On Mon, Sep 5, 2022 at 7:57 PM Muhammad, Abdul <akmuhammad@cps.edu> wrote:
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                      Thu, Sep 15, 2022 at 6:44 PM
To: "LaRosa, Devon" <dplarosa@cps.edu>
Cc: Allison Tingwall <actingwall@cps.edu>

Good Afternoon,

Here are my questions.

1. Dr. Tingwall's August 24th letter mentions the decision to award my contract has been deferred to a future date because of "recent information" about my "transition." What recent information about my transition was provided to the CEO?

2. The letter also mentions information shared with the CEO regarding my "engagement of school stakeholders." What information about my engagement with school stakeholders was shared with the CEO?

3. I was not made aware of, or given any opportunity to respond to, any concerns shared with the CEO prior to the decision to defer my contract being made. When will I be given an opportunity to clarify any information shared with the CEO that has caused him concern?

4. What specific factors and evidence will be evaluated in assessing the ALSC recommendation?

5. How can I assist the Network engage in collecting the evidence needed to make a full and fair assessment?

6. The letter mentions the Network hopes to resolve concerns over the next "several months." When should I expect to know more on the timing of the Board's decision? For example, does the Board anticipate taking action by the end of this calendar year? Sometime early next calendar year? How many months is several?

7. It is my hope to also stay in close communication with the Network and to continue to work collaboratively to resolve any concerns. How often and in what format would you like to remain in touch? Would you like to establish routine check-ins? Please let me know how you would like me to demonstrate that I am remaining in "regular communication"  and "working collaboratively" with you, as the letter requires.

Thank you.
[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

**Quarterly Support Plan for the Principal at Lindblom**

Chief: Devon LaRosa        Deputy: Anthony Rodriguez        Principal: Abdul Muhammad        Date: 9/23/2022

N16 is committed to the school community and succesful transition of Principal Muhammad. The plan below has been developed to to support principal Muhammad in addressing school culture and climate needs, family and community engagement, and connectedness and wellbeing for students and staff by leveraging effective best practices.

We will review this plan at our weekly principal check-in meetings. Network resources as well as your principal mentor are available to support you in the execution of this plan. We will review the implementation of this plan at the end of Quarter 1 to determine supports for Quarter 2.

**Focus Areas of the Support Plan:**
-Culture and Climate
-Family and Community Engagement
-Connectedness and Wellbeing

| | Suggested Actions | Due Date | Network & District Supports | Updates |
|---|---|---|---|---|
| | Develop a student advisory council that is composed of grades 7-12 and is representative of the student body. Establish a meeting cadence that allows for regular input on the following item(not limited to):<br>-Culture/student perception/culture<br>-Planning for student joy<br>-Student concerns | **9/30** | N16- Student Wellbeing and Success Specialist (Elizabeth Moreno) is available to meet and assist/answer questions with the Admin team on | 9/30-Students have been contacted. Want to meet next week. Students in the cluster program are also represented. First meeting - What does it mean to be on the principal |

Ex. L

| | | | | |
|---|---|---|---|---|
| | | | cultivating student voice | |
| | Develop a community advisory that is composed of community stakeholders, parents, and alumni. Establish a meeting cadence that allows for regular input (not limited to): <br> - Vision/Mission <br> - Community Projects <br> - Community input/discussion it | 10/7 | The principal can partner with the FACE team to coordinate a meeting to outline goals and next steps. | |
| | Create a weekly news bulletin/memo for staff (or incorporate in an existing communication) that: <br> - Supports coordination of school activities (i.e. calendar of events, expectations for staff, etc....) <br> - Highlights best practice/exemplars <br> - Celebrates staff efforts <br> -Promotes Trust and Collaboration | 10/3 | The N16 SEL Specialist and Deputy Chief are available as thought-partners. | 9/30 - Has been developed and will adapt it to add best practices and shout outs to various staff - add mindfulness activities <br> 1st. Colloquium <br> Jam Board where teachers can shout each other out / AD can add things as well (Athlete of the week) |
| | Create an intentional plan for student connectedness, belonging, voice, success, and well being for Qtr 2, 3, and 4 with student and staff input (newly formed student advisory group's input) Representative of all grade levels. <br> Here are a few resources: Student Voice Committee One-Pager , SVCs and OST | 10/15 | THe N16 SEL and Student wellbeing and success specialist is available as a thought-partner. | |
| | All mass communications from the Lindblom Administrative team will be shared in advance of sending to the community for feedback and support. <br> Messages should be sent in draft form 48 hours before the communication should be sent out. <br> All messages should be sent to DC/ Chief and NOM. | 10/7 | Deputy Rodriguez is available to support Principal Muhammad on preparing school-wide communications for | Principal Muhammad has been sharing communications for review. |

| | | | | |
|---|---|---|---|---|
| | | | students, parents and community. | |
| | Prepare a communication for teachers that outlines their expectations for progress reports and quarter 1 reporting (10/21). | **10/7** | Deputy Chief is available to support the principal in development of communication around progress reports and marking periods. | |
| X | Develop and prepare a detailed test administration plan for the PSAT (administration date 10/12) | **9/30** | Peter Leonard in Assessment can support. | 9/30-Schedule sent to DC - 9/29 Click |
| | Develop and share the school's leadership organization structure (who supports various departments, grade levels, safety drills, etc.) with DC, Chief and Nom in preparation for sharing with your school staff/ community. Example: SLT Org Chart. | **10/3** | Principal should partner with your mentor principal for feedback and share with the Chief/Deputy for review. | 9/30- Working on a new iteration.Chief Smith shared one. Socialize a draft with department chairs. |

Principal Muhammad's Accomplishments at Lindblom

**I. COMMUNITY ENGAGEMENT**
    A. Hosted Pancakes with the Principal for Community leaders - **February 17, 2023** Hosted over 70 community leaders and politicians. Pictures here.
    B. Hosted Alderwoman Stephanie Coleman to get support for expanding Lindblom's gym facilities - **November 18, 2022**. Pictures here.
    C. Hosted State Representative Sonya Harper to get support for expanding Lindblom's gym facilities among other things. **January 27, 2023.**

**II. IMPROVED CLIMATE AND CULTURE**
    A. Walked students daily to the bus stop at 63rd & Wolcott.
    B. Drastically reduced student traffic in hallways during colloquium.

**III. STUDENT INCENTIVES AND HIGHLIGHTS**
    A. Field trips for Lindblom students planned by Principal Muhammad.
        1. Took 50 students to the Illinois State Museum in Springfield For Lindblom Day – State Representative Sonya Harper put in a resolution to make that day, 'Lindblom Day' **March 10, 2023.**
        2. Took Real Men Talk students to the Museum of Science & Industry for the Black Excellence exhibit. **March 8, 2023.** Pictures.
    B. Planned and executed an exciting Back to School Pep Rally on behalf of the students. Pictures here. **August 26, 2022.**

**IV. FACILITY IMPROVEMENTS**
    A. Worked with CPS Facilities to clean YEARS worth of trash, clutter and debris from the school. **August 5, 2022**

**V. PARENT/STUDENT RELATIONS AND ACCESSIBILITY**
    A. Organized a Black History Month display in the lobby of Lindblom for parents, students and staff. Pictures here.

**VI. FACULTY EXPANSION AND SUPPORT**
    A. Refocused the Lindblom ILT on instruction and student achievement. At the beginning of the year the Lindblom ILT rated themselves a 1 in ALL categories of the ILT effectiveness rubric. **September 29, 2022**

**VII. TARGETED STUDENT SAFETY INITIATIVES (IN SCHOOL AND IN IMMEDIATE NEIGHBORHOOD)**
    A. **October 14, 2022** Collaborated with Alderwoman Stephanie Coleman and the Chicago Police Department's 7th District to have the squatter house on 63 & Wolcott boarded up. **October 17, 2022** The house was later torn down. **October 27, 2022** Before and after pictures.

Ex. M

# *Community Leadership Breakfast*

February, 17, 2023

---

## *Community Leadership Breakfast*

You are invited to a very special breakfast hosted by Lindblom's Principal, Mr. Abdul Muhammad. This Leadership Breakfast is to connect partners and leaders of Englewood Chicago and discuss initiatives that will help support students of Lindblom Math and Science Academy.



## *Community Leadership Breakfast*

### *When*

Friday, Feb. 17th, 9-10am

### *Where*

6130 South Wolcott Avenue Chicago, IL

Get Directions

### *More information*

**RSVP for this event is no longer available.**

## *PLEASE RSVP*



Muhammad, Abdul <akmuhammad@cps.edu>

---

## CPS/Ald. Coleman- Lindblom School Tour
11 messages

---

**Rivera-Sanchez, Maritza** <mrivera27@cps.edu>                    Wed, Oct 26, 2022 at 4:37 PM
To: Abdul Muhammad <akmuhammad@cps.edu>
Cc: Maritza Rivera-Sanchez <mrivera27@cps.edu>

Good afternoon Principal Muhammad,

Hope you are doing well. Alderwoman Stephanie Coleman would like to schedule a tour of Lindblom. The Alderwoman is
already scheduled to Tour Bass ES on 11/18 from 11am-12pm so we would like to schedule your school before or after
that visit.

Please let me know your availability on 11/18 for a school tour so I may coordinate with the Alderwoman.

Thank you,
Maritza Rivera-Sanchez
Chicago Public Schools

---

**Rivera-Sanchez, Maritza** <mrivera27@cps.edu>                    Wed, Nov 2, 2022 at 10:12 AM
To: Abdul Muhammad <akmuhammad@cps.edu>, Debra Kearney <drkearney@cps.edu>
Cc: Maritza Rivera-Sanchez <mrivera27@cps.edu>

Good morning Principal Muhammad,

I'm following up on my previous email regarding a school visit with Alderwoman Coleman and Senior Advisor to the CEO,
Charles Swirsky. Please let me know if you could accommodate a school visit on 11/18 before or after the Bass ES school
visit that's scheduled from 11am-12pm.

Thank you,
Maritza Rivera-Sanchez
Chicago Public Schools
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                    Wed, Nov 2, 2022 at 11:34 AM
To: "Rivera-Sanchez, Maritza" <mrivera27@cps.edu>, Devon Larosa <dplarosa@cps.edu>
Cc: Debra Kearney <drkearney@cps.edu>, Maritza Rivera-Sanchez <mrivera27@cps.edu>

Good Morning,

Thank you for following up. We would love to host the Alderwoman on November 18, 2022 after her visit at Bass. I am
looping my Network Chief in on this communication.


[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

---

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**Rivera-Sanchez, Maritza** <mrivera27@cps.edu>                       Wed, Nov 2, 2022 at 11:42 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Devon Larosa <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>

Great, thank you so much. I will inform the Alderman and send an invite to confirm the visit.

Thank you,
Maritza Rivera-Sanchez

[Quoted text hidden]

---

**Devon LaRosa** <dplarosa@cps.edu>                       Wed, Nov 2, 2022 at 12:11 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "Rivera-Sanchez, Maritza" <mrivera27@cps.edu>, Debra Kearney <drkearney@cps.edu>, Anthony Rodriguez <anrodriguez@cps.edu>, Sonia Castro <scastro23@cps.edu>

I'll be there!

Sent from my iPhone

On Nov 2, 2022, at 11:35 AM, Muhammad, Abdul <akmuhammad@cps.edu> wrote:

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                       Wed, Nov 2, 2022 at 12:13 PM
To: "Rivera-Sanchez, Maritza" <mrivera27@cps.edu>
Cc: Devon Larosa <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>

Thank you.
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                       Fri, Nov 11, 2022 at 9:31 AM
To: "Rivera-Sanchez, Maritza" <mrivera27@cps.edu>
Cc: Devon Larosa <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>, "Morales, Adrienne" <akgreen2@cps.edu>

Good Morning,

I am following up regarding the time of Alderwoman Coleman's visit on November 18, 2022. Thank you.
[Quoted text hidden]

---

**Larosa, Devon** <dplarosa@cps.edu>                       Tue, Nov 15, 2022 at 9:46 AM
To: Adrienne Morales <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>, "Muhammad, Abdul" <akmuhammad@cps.edu>

Checking back is there a time ?
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>        Tue, Nov 15, 2022 at 6:59 PM
To: "Rivera-Sanchez, Maritza" <mrivera27@cps.edu>
Cc: Devon Larosa <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>, "Morales, Adrienne" <akgreen2@cps.edu>

> Good Evening,
>
> I am following up regarding the exact time of the Alderwoman's visit. Thank you
>
> [Quoted text hidden]

---

**Rivera-Sanchez, Maritza** <mrivera27@cps.edu>        Wed, Nov 16, 2022 at 11:09 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Devon Larosa <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>, "Morales, Adrienne" <akgreen2@cps.edu>

> Good morning Principal Muhammad,
>
> My apologies for the delay. Regrettably, Alderwoman Coleman will not be available to tour Lindblom on Nov. 18th. She is interested in visiting in December, preferably before Dec.15th. They won't be able to confirm a date until they receive her schedule from the City Clerk's Office. I will make sure to reach out as soon as I get her availability.
>
> Thank you,
> Maritza
> [Quoted text hidden]

---

**Larosa, Devon** <dplarosa@cps.edu>        Fri, Nov 18, 2022 at 12:21 PM
To: "Rivera-Sanchez, Maritza" <mrivera27@cps.edu>
Cc: "Muhammad, Abdul" <akmuhammad@cps.edu>, Debra Kearney <drkearney@cps.edu>, "Morales, Adrienne" <akgreen2@cps.edu>

> Heads up,
>
> I am here with Principal Muhammad and we have received word, Ald. Coleman will indeed be attending at 12:30 today. I am not sure how this got missed. We adjusted our schedule.
>
> Please advise if you have any questions
>
> Devon
> [Quoted text hidden]

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 350 of 523 PageID #:383



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

# New Gym
6 messages

---

**marquis dreyer** <marquisdreyer@gmail.com>              Mon, Jan 23, 2023 at 7:34 AM
To: AKMuhammad@cps.edu

Hello Mr. Muhammad,

My husband and I are Lindblom parents. I wanted to know if there are any plans to renovate or secure a new gym for Lindblom.

I understand the building is deemed to be a historical one. However, as the basketball team in particular have home games we would really love for our facility to be as nice as our opponents facilities.

Who can we take this matter to? Even if we have to build a gym close to the school.

Also, Is there as assistant Athletic Director?

Sincerely,

Mrs. Dreyer

Sent from my iPhone

---

**marquis dreyer** <marquisdreyer@gmail.com>              Wed, Jan 25, 2023 at 12:24 PM
To: AKMuhammad@cps.edu

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>              Wed, Jan 25, 2023 at 12:46 PM
To: marquis dreyer <marquisdreyer@gmail.com>

Good Afternoon,

Thank you for your email. I have spoken with the Alderwoman, Stephanie Coleman, regarding our gym facilities and have a meeting with the State Representative Sonya Harper this Friday. I will bring this to her attention as well.

I will reach out to see how we can start this conversation to move this forward for our school and students.

There is no assistant Athletic Director position.

Thank you.
[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

---

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**marquis dreyer** <marquisdreyer@gmail.com>                    Wed, Jan 25, 2023 at 12:54 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Thank you. Is this a closed meeting? If not, I'm sure some of the parents that aren't working may want to sit in for support.

If it's not a closed meeting, what time and location will it be held.

Thank you,

Sent from my iPhone

> On Jan 25, 2023, at 12:46 PM, Muhammad, Abdul <akmuhammad@cps.edu> wrote:

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                    Wed, Jan 25, 2023 at 2:19 PM
To: marquis dreyer <marquisdreyer@gmail.com>

It is a closed meeting. However, I am bringing it up as a concern from myself and many Lindblom parents. Additionally, since we spoke, I reached out to our building manager to find out who are the people I need to speak with to start this process. Once we Identify the appropriate people to speak with, I think we should have a meeting involving parents, students and community members regarding expanding our gym facilities.
[Quoted text hidden]

---

**marquis dreyer** <marquisdreyer@gmail.com>                    Wed, Jan 25, 2023 at 2:32 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Ok, thanks for the update.
[Quoted text hidden]

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 352 of 523 PageID #:385



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

## First Colloquium Day Success!!!
15 messages

---

**Namowicz, Carole** <canamowicz@cps.edu>                                    Wed, Sep 28, 2022 at 4:15 PM
To: Lindblom Math & Science Academy <lindblom@googlegroups.com>

Congrats to everyone for making our first colloquium day of the year a success!

HUGE shootout to **Nick Anaya** who as far as I can tell does not sleep. Nick orchestrated sign-ups and programming for colloquium as well as loaded those students into Aspen (with the help of DeRonne). Nick created the flex matrix and orchestrated student sign-ups for flex (thank you CTE team for helping, Mark and KVR we mean you) all while making sure fixed roster colloquia such as 7th Grade Executive Functions, Senior Seminar, and Academic Approach remained part of student schedules. Nick created attendance rosters for teachers, is facilitating compiling that attendance data for Aspen (for you Bryant), and even showed up early this morning to ensure that all the doors were open since so many teachers were not teaching in their regular rooms today. Finally, security, you rocked it today, halls were the clearest I've seen on a colloquium day in a long time.

Lindblom teachers and staff rule, colloquium day would not have remained and existed as it did today without us!

Love you guys,

Namo

--
Carole Namowicz
AP Chemistry & Honors Chemistry Teacher
Lindblom Math & Science Academy
6130 South Wolcott
Chicago, IL 60636

--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CADtsMgmC%3D8hKozLfiF2LbPLLnpxcyiYLPEzLjVzErz0WayEqkQ%40mail.gmail.com.

---

**Williams, Shohn** <sewilliams7@cps.edu>                                    Wed, Sep 28, 2022 at 4:19 PM
To: "Namowicz, Carole" <canamowicz@cps.edu>
Cc: Lindblom Math & Science Academy <lindblom@googlegroups.com>

Thanks Mrs. Namo today was a great day Swoop Swoop to everyone, peace and blessings to you all.
[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CADf8B%2BtHJfXQdGjK2YyjezRi%2B0qu9YVTc98Zk-ZA3f3eEJjO-A%40mail.gmail.com.

---

**Herrera, Isaias** <iherrera2@cps.edu>                                    Wed, Sep 28, 2022 at 4:23 PM
To: "Namowicz, Carole" <canamowicz@cps.edu>
Cc: Lindblom Math & Science Academy <lindblom@googlegroups.com>

I have been at Lindblom since it opened (not 1921) and this was the best 1st colloquium day ever.
[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAOwehCxV9jh%3DvnfAR0qTPEbmpSdD18vCUrpvhPAoSqdL7Ev0XA%40mail.gmail.com.

---

**Levites, Lauren** <lelevites@cps.edu>                                    Wed, Sep 28, 2022 at 4:24 PM

5/3/23, 11:18 AM    Chicago Public Schools Mail - 1st Colloquium Success!

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 353 of 523 PageID #:386

To: "Williams, Shohn" <sewilliams7@cps.edu>
Cc: "Namowicz, Carole" <canamowicz@cps.edu>, Lindblom Math & Science Academy <lindblom@googlegroups.com>

Thanks everyone for a great 1st colloquium day!!! Thanks Carole and Nick for the crusade to get flex back!
SWOOP!
[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CA%2B7fjjcC-
pbVMRQnxyxMjnmq0vX2uxkYMqoY1eCJDH8%2BawcWYQ%40mail.gmail.com.

---

**Cassidy, Kaellagh** <kccassidy@cps.edu>                                    Wed, Sep 28, 2022 at 4:27 PM
To: "Levites, Lauren" <lelevites@cps.edu>
Cc: "Williams, Shohn" <sewilliams7@cps.edu>, "Namowicz, Carole" <canamowicz@cps.edu>, Lindblom Math & Science
Academy <lindblom@googlegroups.com>

Yes, echoing all this!! Thank you all so much! Today went great - the kids felt good about it and it was very well organized
- a huge lift for you we know!!!
[Quoted text hidden]
--
Kaellagh Cassidy (She/Her/Hers)
Social Science Teacher
Girls Cross Country and Track Coach
10th Grade Lead
NHS Advisor
Lindblom Math and Science Academy

--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy"
group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@
googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/
CAEMgWGXtwDtst5yC1MxjHMkQJwxi5DR%2BdsgitNd%2B%3DTM9q4E68g%40mail.gmail.com.

---

**O'Hara, Joseph** <jaohara@cps.edu>                                         Wed, Sep 28, 2022 at 4:27 PM
To: "Levites, Lauren" <lelevites@cps.edu>
Cc: "Williams, Shohn" <sewilliams7@cps.edu>, "Namowicz, Carole" <canamowicz@cps.edu>, Lindblom Math & Science
Academy <lindblom@googlegroups.com>

Thanks everyone for getting flex back!

## Joseph O'Hara
*Lindblom Math and Science Academy*
*He/Him/His*

On Wed, Sep 28, 2022 at 4:25 PM Levites, Lauren <lelevites@cps.edu> wrote:
[Quoted text hidden]
[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAG-
dzTbUSmYVEAGVw9cQXe0WnrkDyDpxiOJSP8%2BCnVWZJH4ULw%40mail.gmail.com.

---

**Copper, Elizabeth** <escopper@cps.edu>                                     Wed, Sep 28, 2022 at 4:29 PM
To: "Namowicz, Carole" <canamowicz@cps.edu>
Cc: Lindblom Math & Science Academy <lindblom@googlegroups.com>

WOW!!!  TEAM WORK ON ALL LEVELS   SWOOP3X

Elizabeth S. Copper

She/Her/Hers
2013 Golden Apple Fellow
Retired Science Educator
CPSSSF, Inc Executive Director


*"No matter how hard the world pushes against me, within me, there's something stronger – something better, pushing right back."*

— Albert Camus


On Wed, Sep 28, 2022 at 4:15 PM Namowicz, Carole <canamowicz@cps.edu> wrote:
[Quoted text hidden]
[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAK8eu1%2Ba%2BrTC2PO2%2BTiE2bCjoKA_N37bcqWPWV_ys1uEVGZErA%40mail.gmail.com.

---

**Abughoush, Fadi** <fabughoush@cps.edu>                    Wed, Sep 28, 2022 at 4:30 PM
To: "Copper, Elizabeth" <escopper@cps.edu>
Cc: Lindblom Math & Science Academy <lindblom@googlegroups.com>, "Namowicz, Carole" <canamowicz@cps.edu>

Seriously, Amazing Job.
[Quoted text hidden]
--
Fadi Abughoush
Arabic Teacher
World Language Department Chair
Lindblom Math & Science Academy
6130 S Wolcott Ave.
Chicago,IL 60636
@fabughoush
(708) 407-1852

 

--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAEL_AknousRYNGS82cMxTa4W5SrNr8Ojv64rwZWCOdbRuVEadg%40mail.gmail.com.

---

**Wang, Yu-Hui** <ywang1@cps.edu>                           Wed, Sep 28, 2022 at 4:31 PM
To: "Herrera, Isaias" <iherrera2@cps.edu>
Cc: Lindblom Math & Science Academy <lindblom@googlegroups.com>, "Namowicz, Carole" <canamowicz@cps.edu>

Agreed! Millions of thanks to Nick, Namo and all involved!
[Quoted text hidden]
--
Ms. Wang

It's sent from my iPhone. Please excuse any typos!


--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@

googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CADHf%2B8kUpB%2Bn46EyjXM2GN8VDBnPVKbCOh1%2BxOK6DYFoeGHhmA%40mail.gmail.com.

---

**Danya Ata** <data@cps.edu>                                    Wed, Sep 28, 2022 at 4:41 PM
To: "Wang, Yu-Hui" <ywang1@cps.edu>
Cc: "Herrera, Isaias" <iherrera2@cps.edu>, Lindblom Math & Science Academy <lindblom@googlegroups.com>, "Namowicz, Carole" <canamowicz@cps.edu>

Ditto to what Herrera said. This was by far one of the smoothest colloquium days I've experienced!

Sent from my iPhone

> On Sep 28, 2022, at 4:31 PM, Wang, Yu-Hui <ywang1@cps.edu> wrote:

[Quoted text hidden]

[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/AF27494C-B69E-4167-856D-5241F7FA4AF1%40cps.edu.

---

**Gerleve, Melissa** <mfgerleve@cps.edu>                          Wed, Sep 28, 2022 at 4:49 PM
To: Danya Ata <data@cps.edu>
Cc: "Herrera, Isaias" <iherrera2@cps.edu>, Lindblom Math & Science Academy <lindblom@googlegroups.com>, "Namowicz, Carole" <canamowicz@cps.edu>, "Wang, Yu-Hui" <ywang1@cps.edu>

Today was a really good day! I got to pop in to Rock Society who was in full swing rocking out,  got to hear some d-d-deep Poetry pieces , and CCC made the most aesthetically pleasing first days coffee mugs thus far! Thanks to all who put in some seriously hard work. The students and staff all seemed happy at the end of the day 😊
[Quoted text hidden]
--
Melissa Gerleve (she/her)
Art Teacher
Lindblom Math & Science Academy
Check out my class instagram @gerlevesartclass



--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CADj7oRw9wync1v0uudRUDcyEehd-VstN0PWAMe4bCr%3D%2Bu5UHEQ%40mail.gmail.com.

---

**Lindeman, Kathryn** <kalindeman@cps.edu>                       Wed, Sep 28, 2022 at 5:03 PM
To: "Gerleve, Melissa" <mfgerleve@cps.edu>
Cc: Danya Ata <data@cps.edu>, "Herrera, Isaias" <iherrera2@cps.edu>, Lindblom Math & Science Academy <lindblom@googlegroups.com>, "Namowicz, Carole" <canamowicz@cps.edu>, "Wang, Yu-Hui" <ywang1@cps.edu>

Thank you thank you thank you!!

Yay for having real flexes!!!
[Quoted text hidden]
--
Kathryn Lindeman (she/her)
Honors Physics + AP Biology

Lindblom Math and Science Academy
Donate to my classroom

--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CANgmhOaZAQ%3DCVc8R00Jk1gKBSVoT8vq-7mbZ4ijEsaMptGD-HQ%40mail.gmail.com.

---

**April Weathers** <arweathers@cps.edu>                         Wed, Sep 28, 2022 at 5:18 PM
To: "Gerleve, Melissa " <mfgerleve@cps.edu>
Cc: Danya Ata <data@cps.edu>, "Herrera, Isaias" <IHerrera2@cps.edu>, Lindblom Math & Science Academy <lindblom@googlegroups.com>, "Namowicz, Carole" <canamowicz@cps.edu>, "Wang, Yu-Hui" <ywang1@cps.edu>

Echoing sentiments, today was definitely the smoothest colloquium day that I've experienced! The hallways, the organization, it was very nice :) There were even fewer kids wondering around trying to figure out where to go. Shoutout to Nick, Namo and all involved!

Swoop!

Sent from my iPhone

> On Sep 28, 2022, at 4:50 PM, Gerleve, Melissa <mfgerleve@cps.edu> wrote:
>
> --
> Melissa Gerleve (she/her

--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/25F693A2-4170-4875-A221-0D3EA74E8646%40cps.edu.

---

**Goodman, Gregory** <ggoodman@cps.edu>                         Thu, Sep 29, 2022 at 4:47 AM
To: April Weathers <arweathers@cps.edu>
Cc: "Gerleve, Melissa" <mfgerleve@cps.edu>, Danya Ata <data@cps.edu>, "Herrera, Isaias" <IHerrera2@cps.edu>, Lindblom Math & Science Academy <lindblom@googlegroups.com>, "Namowicz, Carole" <canamowicz@cps.edu>, "Wang, Yu-Hui" <ywang1@cps.edu>

I'm late to the party, but yes, yesterday was fantastic! A big payoff we all got to enjoy for months of hard work. Thanks to all those who pulled this together!
[Quoted text hidden]
--
Greg Goodman
Social Studies Teacher
Lindblom Math and Science Academy
Pronouns: *he / him / his*

--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAB6sFTXynp-jtFdbXdmM8zWXHgKdynjTo15fjba6NiD%2BdrbNDQ%40mail.gmail.com.

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                         Thu, Sep 29, 2022 at 9:17 AM
To: Lindblom Math & Science Academy <lindblom@googlegroups.com>

Good Morning Lindblom Staff,

As the new Principal of Lindblom, I was very impressed by everything I saw yesterday and how smooth things went. Although, I do not have anything to compare it to, I know it was highly organized and successful. I want to personally thank Mr. Anaya, who has been working on this since I met him during the summer. I also would like to thank Mr. Clark for the amazing work he did to support Mr. Anaya during the summer. Additionally, Mr. Sidarous, Mr. Deronne and the entire CTE team did an awesome job supporting our first Colloquium Day. As I moved around the building yesterday, I saw that our students were engaged and excited, which could only be possible because of the stellar teachers we have at Lindblom. Please keep up the GREAT work. Thank you!!!

SWOOP! SWOOP!
[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

5/15/23, 8:54 AM Chicago Public Schools Mail - Lindblom Day - Swoop! Swoop!

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 358 of 523 PageID #:391



**Muhammad, Abdul <akmuhammad@cps.edu>**

## Lindblom Day - Swoop! Swoop!
15 messages

**Muhammad, Abdul** <akmuhammad@cps.edu>                                      Wed, Mar 15, 2023 at 1:20 PM
To: Lindblom Google Group <lindblom@googlegroups.com>

# The State of Illinois has Declared March 10, 2023 as,

# "Lindblom High School Day"

On March 10, 2023 Principal Muhammad took students to Springfield for the "Lindblom Day" celebration. Students went to The Illinois State Museum in Springfield Illinois to view an exhibition called "A Generation of eXcellence," which looked at the Gen X high school experience through the lens of Chicago's Robert Lindblom Technical High School (now called the Robert Lindblom Math and Science Academy). Lindblom's students produced a phenomenon program!  The AC Cheerleaders cheer swooped everyone's spirit! Senior Class President, Shelby Holloway did a presentation on "Legacy." Aaron Durr and Madison Sawyer did a presentation on "Lindblom History and the Civil Rights Era!" Students also received $3,000.00 in scholarships. Illinois State Representative, The Honorable Sonya Harper gave a motivating spoke and presented a resolution:

"IT WAS **RESOLVED** BY THE HOUSE OF REPRESENTATIVES OF THE ONE HUNDRED THIRD GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, that we declare March 10, 2023 as, "Lindblom High School Day" in the state of Illinois, and be it further
**RESOLVED,** That a suitable copy of this resolution be presented to the principal of Lindblom Math and Science Academy as a symbol of our respect and esteem!


--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/


📷 resolution cover.jpeg

📷 Resolution.jpeg

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 359 of 523 PageID #:392

printout thereof.

---

**Gerleve, Melissa** <mfgerleve@cps.edu>                          Wed, Mar 15, 2023 at 1:49 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Lindblom Google Group <lindblom@googlegroups.com>

So cool!!!

[Quoted text hidden]
   [Quoted text hidden]
   --
   You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy"
   group.
   To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegro
   ups.com.
   To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAL0FSbB%2Bb5fT%3
   DK7Ssd4MiO0mF4eUkwHgiA6P9nqFCS9wCdcXGA%40mail.gmail.com.

--
Melissa Gerleve (she/her)
Art Teacher
Lindblom Math & Science Academy
Check out my class instagram @gerlevesartclass

---

**Van, Peter** <pavan@cps.edu>                                  Wed, Mar 15, 2023 at 1:50 PM
To: "Gerleve, Melissa" <mfgerleve@cps.edu>
Cc: "Muhammad, Abdul" <akmuhammad@cps.edu>, Lindblom Google Group <lindblom@googlegroups.com>

Awesome! Were there any videos of the speeches?

[Quoted text hidden]
   [Quoted text hidden]
   To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/
   CADj7oRyFz5dsupdKzfWFdRq6xzmQLk0QEsZeSdEmwTpzhUNJCQ%40mail.gmail.com.

--
Peter Van, NBCT
Social Science Department Chair
Lindblom Math & Science Academy
(630) 335-7046
pavan@cps.edu
@peteravan

---

**Confer, MaryAnne** <mopysson@cps.edu>                          Wed, Mar 15, 2023 at 1:58 PM
To: "Van, Peter" <pavan@cps.edu>
Cc: "Gerleve, Melissa" <mfgerleve@cps.edu>, Lindblom Google Group <lindblom@googlegroups.com>, "Muhammad, Abdul"
<akmuhammad@cps.edu>

Very cool!

[Quoted text hidden]
   [Quoted text hidden]
   To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CALAVujrPkrGo-
   WZ04q3KJ5YYruaJbXsCqmsJ%3DvBhi71_Gttcsw%40mail.gmail.com.

--
**MaryAnne Confer** (she/her/hers)

Librarian and Writing Center Director
Lindblom Math and Science Academy
6130 S. Wolcott Ave.
Chicago, IL 60636
LINDBLOM ONLINE LIBRARY
Look at what I've requested for my students on Donors Choose!
Student chrome book issue form

**Ms. Confer is currently reading:**

 

Hijab Butch Blues by Lamya H
Finding Me, a Memoir by Viola Davis (audiobook)

---

**Catlett, Michael** <mecatlett@cps.edu>                                    Wed, Mar 15, 2023 at 2:03 PM
To: "Confer, MaryAnne" <mopysson@cps.edu>
Cc: "Van, Peter" <pavan@cps.edu>, "Gerleve, Melissa" <mfgerleve@cps.edu>, Lindblom Google Group
<lindblom@googlegroups.com>, "Muhammad, Abdul" <akmuhammad@cps.edu>

Do we get this day off?    
Michael Catlett
Lindblom Math & Science
6130 South Wolcott Chicago, IL 60636
Office: 773-535-9300
Email: mecatlett@cps.edu

[Quoted text hidden]
[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CA%2Bb41jEQEhbh%
3Dg0QsCHkbhHz8k6Qka_k8MtgwWi3LatuMqWToA%40mail.gmail.com.

---

**Ian Brannigan** <ibrannigan@cps.edu>                                    Wed, Mar 15, 2023 at 2:04 PM
To: "Catlett, Michael" <mecatlett@cps.edu>
Cc: "Confer, MaryAnne" <mopysson@cps.edu>, "Van, Peter" <pavan@cps.edu>, "Gerleve, Melissa" <mfgerleve@cps.edu>,
Lindblom Google Group <lindblom@googlegroups.com>, "Muhammad, Abdul" <akmuhammad@cps.edu>

Very cool!!!

---

**Dudek, Serafim** <stdudek@cps.edu>                                    Wed, Mar 15, 2023 at 2:04 PM
To: "Catlett, Michael" <mecatlett@cps.edu>
Cc: "Confer, MaryAnne" <mopysson@cps.edu>, "Van, Peter" <pavan@cps.edu>, "Gerleve, Melissa" <mfgerleve@cps.edu>,
Lindblom Google Group <lindblom@googlegroups.com>, "Muhammad, Abdul" <akmuhammad@cps.edu>

I don't have videos, but there are some pictures of the speeches and the trip, in general:

https://drive.google.com/drive/folders/1-x7DYhVIOo7lPxCpgJg7hFhYbfDEmEWY?usp=sharing

[Quoted text hidden]
[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CA%2BSaggwNFD6%
2BrQjQEeKwWDhD14Zs_xXsO90X4pcCShR7hixhxw%40mail.gmail.com.

--
**Serafim (Sam) Dudek**
Lindblom Math and Science Academy
*English & Journalism Teacher*
*Newspaper & Yearbook Advisor*
lindblomtalon.com / @LindblomTalon

---

**Ginyard, Randi** <rsginyard@cps.edu>                              Wed, Mar 15, 2023 at 2:06 PM
To: "Dudek, Serafim" <stdudek@cps.edu>
Cc: "Catlett, Michael" <mecatlett@cps.edu>, "Confer, MaryAnne" <mopysson@cps.edu>, "Van, Peter" <pavan@cps.edu>,
"Gerleve, Melissa" <mfgerleve@cps.edu>, Lindblom Google Group <lindblom@googlegroups.com>, "Muhammad, Abdul"
<akmuhammad@cps.edu>

Swooop Swoop!!

[Quoted text hidden]
  [Quoted text hidden]
  To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CALWdcsVkqROMDKns3a0%2B_
  EEnxbb%3D_k868O7qLpOtLtbpBaqDsw%40mail.gmail.com.


--
Randi Ginyard (Ms, Mrs, she, her)
Lindblom Math and Science Academy
Mathematics Department

"Everybody can be Great because everyone can Serve."  Reverend Dr. Martin Luther King Jr

---

**Williams, Shohn** <sewilliams7@cps.edu>                              Wed, Mar 15, 2023 at 2:19 PM
To: "Ginyard, Randi" <rsginyard@cps.edu>
Cc: "Dudek, Serafim" <stdudek@cps.edu>, "Catlett, Michael" <mecatlett@cps.edu>, "Confer, MaryAnne"
<mopysson@cps.edu>, "Van, Peter" <pavan@cps.edu>, "Gerleve, Melissa" <mfgerleve@cps.edu>, Lindblom Google Group
<lindblom@googlegroups.com>, "Muhammad, Abdul" <akmuhammad@cps.edu>

Mr. Catlett that would be great if we got that day off lol.  Swoop Swoop great news no better place in the world than
Lindblom.

[Quoted text hidden]
  [Quoted text hidden]
  To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAMr7OWES27ynOaF2F_
  oGur97MWf5wgu9%3D9D9dDRDwKEsTYe4Ow%40mail.gmail.com.

---

**Abughoush, Fadi** <fabughoush@cps.edu>                              Wed, Mar 15, 2023 at 2:20 PM
To: "Williams, Shohn" <sewilliams7@cps.edu>
Cc: "Catlett, Michael" <mecatlett@cps.edu>, "Confer, MaryAnne" <mopysson@cps.edu>, "Dudek, Serafim"
<stdudek@cps.edu>, "Gerleve, Melissa" <mfgerleve@cps.edu>, "Ginyard, Randi" <rsginyard@cps.edu>, Lindblom Google
Group <lindblom@googlegroups.com>, "Muhammad, Abdul" <akmuhammad@cps.edu>, "Van, Peter" <pavan@cps.edu>

This is Amazing!!🥳🎉👏❤️

[Quoted text hidden]
  [Quoted text hidden]
  To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CADf8B%
  2BuRGdnt%3D%2BHMOv4td44StX4%3Dm8R-ufn2qZQ%2BjcBSdxG9BQ%40mail.gmail.com.
--
Fadi Abughoush
Arabic Teacher
World Language Department Chair
Lindblom Math & Science Academy
6130 S Wolcott Ave.
Chicago,IL 60636

@fabughoush
(708) 407-1852

 

---

**Weathers, April** <arweathers@cps.edu>                    Wed, Mar 15, 2023 at 2:22 PM
To: "Abughoush, Fadi" <fabughoush@cps.edu>
Cc: "Williams, Shohn" <sewilliams7@cps.edu>, "Catlett, Michael" <mecatlett@cps.edu>, "Confer, MaryAnne"
<mopysson@cps.edu>, "Dudek, Serafim" <stdudek@cps.edu>, "Gerleve, Melissa" <mfgerleve@cps.edu>, "Ginyard, Randi"
<rsginyard@cps.edu>, Lindblom Google Group <lindblom@googlegroups.com>, "Muhammad, Abdul"
<akmuhammad@cps.edu>, "Van, Peter" <pavan@cps.edu>

This is pretty awesome and significant! Swoop 3X!

[Quoted text hidden]

[Quoted text hidden]
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAEL_Ak%
3Dtp1cxummbfoZ%3DXVfKgJtLB%2BMTCcqM2iBUeiBiNvdp-A%40mail.gmail.com.

--
April R. Weathers
School Counselor
Lindblom Math and Science Academy
Counseling Suite: 773-535-9311
School Main Office: 773-535-9300
Lindblom Counseling Website
Behavioral Health Team - Request for Assistance
**Counseling Caseloads**
A-D: Clark
E-K: Eddy
L-Q: Brown
R-Z: Weathers
7th & 8th grade: Alaves

"It always seems impossible until it's done." - Nelson Mandela

---

**Gross, Joy** <jegross1@cps.edu>                    Wed, Mar 15, 2023 at 3:31 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

This is so cool! Swoop Swoop!!
*Ms. Joy E Gross*
jegross1@cps.edu
**Dance Teacher/Dance Ensemble Director**
**CPS Arts Instructional Specialist**
**Lindblom Math and Science Academy**

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

---

**Johnson-Pettigrew, Lisa** <ljohnsonpettigrew@cps.edu>                    Wed, Mar 15, 2023 at 5:06 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

That is awesome!!!!! 🥳

On Wednesday, March 15, 2023, Muhammad, Abdul <akmuhammad@cps.edu> wrote:
> [Quoted text hidden]
> [Quoted text hidden]

---

**Brown, Benita** <bbbrown3@cps.edu> Thu, Mar 16, 2023 at 9:48 AM
To: "Weathers, April" <arweathers@cps.edu>
Cc: "Abughoush, Fadi" <fabughoush@cps.edu>, "Williams, Shohn" <sewilliams7@cps.edu>, "Catlett, Michael" <mecatlett@cps.edu>, "Confer, MaryAnne" <mopysson@cps.edu>, "Dudek, Serafim" <stdudek@cps.edu>, "Gerleve, Melissa" <mfgerleve@cps.edu>, "Ginyard, Randi" <rsginyard@cps.edu>, Lindblom Google Group <lindblom@googlegroups.com>, "Muhammad, Abdul" <akmuhammad@cps.edu>, "Van, Peter" <pavan@cps.edu>

Swoop swoop! 👏

[Quoted text hidden]
> [Quoted text hidden]
> To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAB-AWrYFTMrKHujcobERBEha55DeAWvPiseLEbTzMonJ1Ww-jQ%40mail.gmail.com.

--
Benita Brown *(she, her, hers)*,
School Counselor
Lindblom Math and Science Academy
STLS Liaison
BHT Request for Assistance
Lindblom Counseling Website
Counseling Office: 773-535-9311
School Main Office: 773-535-9300 Ext: 59302
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu> Tue, Apr 18, 2023 at 6:36 PM
To: Omari Kamal <omari@omarikamal.com>, Abdul Muhammad <universalruler1@gmail.com>

FYI
[Quoted text hidden]

# STATE OF ILLINOIS
# HOUSE OF REPRESENTATIVES
## 103RD GENERAL ASSEMBLY

◆

### HOUSE RESOLUTION NO. 109
#### OFFERED BY REPRESENTATIVE SONYA M. HARPER

**WHEREAS**, The Illinois State Museum shines a spotlight on Generation X with the opening of its new exhibition, Growing Up X; and

**WHEREAS**, The exhibition explores the toys, technologies, and cultural touchstones surrounding Gen Xers in their childhood; museum visitors will see items familiar to anyone who grew up in the 1970s and 1980s, such as telephones with cords, record and cassette players, Apple IIe computers, Teddy Ruxpin, and parachute pants; and

**WHEREAS**, A feature of the exhibition is a section called "A Generation of eXcellence", which looks at the Gen X high school experience through the lens of Chicago's Robert Lindblom Technical High School (Robert Lindblom Math and Science Academy); and

**WHEREAS**, Photos, memorabilia, and recollections from Lindblom alumni shed light on what it was like to attend a selective-enrollment high school for the first generation born after the civil rights movement; and

**WHEREAS**, "Lindblom Day" is March 10, 2023 in Springfield, where the exhibition will be honored through ceremonies, activities, and celebrations with Lindblom students and alumni participating in the events of the day; therefore, be it

**RESOLVED, BY THE HOUSE OF REPRESENTATIVES OF THE ONE HUNDRED THIRD GENERAL ASSEMBLY OF THE STATE OF ILLINOIS**, that we declare March 10, 2023 as "Lindblom High School Day" in the State of Illinois; and be it further

**RESOLVED**, That a suitable copy of this resolution be presented to the principal of Robert Lindblom Math and Science Academy as a symbol of our respect and esteem.



Muhammad, Abdul <akmuhammad@cps.edu>

## Facilities Walk Follow Up
18 messages

**Muhammad, Abdul** <akmuhammad@cps.edu>                              Fri, Aug 5, 2022 at 8:31 AM
To: Tiffany Simpson <tsimpson9@cps.edu>, Queena Singleton <qosmith@cps.edu>, Andre Johnson
<ajohnson397@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, Daniell Allen <dallen93@cps.edu>, Marina Shannon
<mjshannon@cps.edu>
Cc: "Castro, Sonia" <scastro23@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>

Good Morning,

Thank you for taking time to participate in the facilities walk on Wednesday, August 5, 2022. Here is a summary of what
we discussed:

- Ms. Singleton will provide Principal Muhammad with a punchlist
- Engineers are responsible for touch up painting throughout the school
- The kitchen staff is responsible for cleaning behind the line. The area behind the line was very dirty.
- Ms. Simpson will contact the alderman to request that trees are trimmed around the school.
- There is chipping paint throughout the school. Ms. Simpson said that 4 quotes are in to correct this. I am very
  concerned about the chipping paint directly above the food line in the cafeteria. We do not have an accurate time
  table of when this will be corrected.
- There are leaks in the ballroom ceiling that need to be repaired.
- The clutter in the ballroom needs to be removed.
- Engineers need to check all mechanical closets to make sure there is no clutter and items are not being stored in
  them.
- The stairwell is very dirty and needs to be thoroughly cleaned.
- All appliances need to be removed in classrooms. Principal Muhammad will communicate this to the teachers and
  staff.
- Ms. Allen needs to provide Princpal Muhammad with the work shcedule and cleaning zone responsibility for all
  custodians.
- Ms. Simpson will provide Principal Muhammad with a quote to 1. Clean Windows 2. Clean fitness center 3. Pool
  Sensor.
- Principal Muhammad made the reqeust to Ms. Simpson that a blitz team come to Lindblom prior to school starting
  to make sure the facilities are clean and ready to receive students on the first day of school.
- Store rooms need to be decluttered.
- Principal Muhammad will communicate to the gym teachers that food is not to be eaten in the gyms.
- Ms. Simpson will replace missing wall tiles in the lunchroom
- Engineers will replace damaged ceiling tiles in the pool area.
- The main office will be stripped and waxed next week
- Broken garbage cans in the hallway will be replaced.
- Ms. Singleton and Princpal Muhammad will have a follow up meeting on Monday, August 8, 2022 at 9:00 am

Chief LaRosa and Ms. Castro, the highlighted areas are of the most concern to me and I would like to get your help to
make sure they are addressed. Also, the kitchen area is very dirty and we are getting a new lunchroom manager. I would
like to get support in reaching out to food services to make sure the kitchen area is thoroughly cleaned prior to student
arrival.

Ms. Allen, I would like to meet with you to review each custodian's schedule and responsibility.

If there is anything that I failed to capture from our conversation, please add it to this email thread.

Thank you.

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy

6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**Allen, Daniell** <dallen93@cps.edu>                                        Fri, Aug 5, 2022 at 8:43 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Debra Kearney <drkearney@cps.edu>,
Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Marina Shannon <mjshannon@cps.edu>,
Queena Singleton <qosmith@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

Received and understood. Karen Fitzpatrick has a copy of custodians schedule and the areas for which they are
responsible for, I can resend it, and I'm available on Monday to come and visit with the Principal Muhammad about 11am,
if that works. The stairwells have not been done as of yet but will be addressing them next week. We have started OT this
week to get to the hallways on 2nd and 3rd floor and we will also have OT Saturday and Sunday of this weekend to finish
up those areas. Please allow no teachers staff in over the weekend so that custodians staff can address the areas needed
to get school ready for August 22nd. Thank You

[Quoted text hidden]

---

**LaRosa, Devon** <dplarosa@cps.edu>                                        Fri, Aug 5, 2022 at 9:46 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Tiffany Simpson <tsimpson9@cps.edu>, Queena Singleton <qosmith@cps.edu>, Andre Johnson
<ajohnson397@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, Daniell Allen <dallen93@cps.edu>, Marina Shannon
<mjshannon@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Debra Kearney <drkearney@cps.edu>

looping new Deputy Chief  Dr. Rodriguez

On Fri, Aug 5, 2022 at 8:32 AM Muhammad, Abdul <akmuhammad@cps.edu> wrote:
[Quoted text hidden]

---

**Singleton, Queena** <qosmith@cps.edu>                                      Fri, Aug 5, 2022 at 10:16 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Good Morning Principal Muhammad. Forgive me if I forgot but what punch list was I to provide? If it is regarding
cleanliness Ms Allen has all areas that were to be cleaned for the start of the school year. As Always let me know what I
can do to further assist.

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                     Fri, Aug 5, 2022 at 2:18 PM
To: Anthony Rodriguez <anrodriguez@cps.edu>

[Quoted text hidden]

---

**Shannon, Marina** <mjshannon@cps.edu>                                      Fri, Aug 5, 2022 at 3:09 PM
To: Tiffany Simpson <tsimpson9@cps.edu>, Queena Singleton <qosmith@cps.edu>, Andre Johnson
<ajohnson397@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, Daniell Allen <dallen93@cps.edu>, "Castro, Sonia"
<scastro23@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>, Thomas Sheehy
<tsheehy1@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>

Greetings Principal Muhammad

Welcome to Lindbloom High School, as I mentioned before I look forward to meeting you soon!

I realize the punch list below for Lindbloom is essential in preparation of the start of school. However, it is the Building Manager, Facility Manage, Custodial Manager and Temporary Staffing Manager's responsibility to meet with Principals to ensure the school is clean, safe and operable. In addition, the Quality Assurance Specialist (QAS) is responsible for monthly audits of all mechanical and structural assets, as well as, the cleanliness of the school. Then, the QAS provides a copy of the deficiency report to the entire facilities team (BM/FM/Engineer/CM/FML) to review and enforce corrections. Afterwards, the BM/CM/Engineer submits quotes and work orders to the CPS Facilities Manager Lead to request funding from O & M, Capital Asset or Capital Service Requests for BIDS.

Therefore, I am encouraging you to schedule this meeting with the Building Manager, Custodial Manager and Temporary Staffing Manager. Otherwise, please contact the JLL Facility Manager and Amarmark Senior Custodian Manager for better results, if the school is not measuring up the expectations. Most importantly, as the CPS Facilities Manager Lead and on behalf of the CPS Quality Assurance Specialist we are dedicated to servicing every Chicago Public School. However, in our roles, we oversee approximately 60+ schools and 40 construction projects with the expectation to ensure each school under our leadership is safe, operational, warm and dry for the start of school. Please do not hesitate to contact me if you have any questions or concerns.

As always, welcome aboard!

Respectfully,

*Marina J. Shannon*
Facilities Manager Lead | South Division
Chicago Public Schools
Department of Operations and Facilities
O: (773) 535-8966
D: (773) 443-9655
M: (773) 230-1551
E: mjshannon@cps.edu



*Missing school custodial staff, call the **Custodial Hotline at 1-866-209-0025**

All rights reserved. This communication, including attachments, is for the exclusive use of addressee as directed by CPS and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.

[Quoted text hidden]

**Muhammad, Abdul** <akmuhammad@cps.edu>                                              Sun, Aug 21, 2022 at 2:08 PM
To: "Shannon, Marina" <mjshannon@cps.edu>
Cc: Tiffany Simpson <tsimpson9@cps.edu>, Queena Singleton <qosmith@cps.edu>, Andre Johnson <ajohnson397@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, Daniell Allen <dallen93@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Debra Kearney <drkearney@cps.edu>, Thomas Sheehy <tsheehy1@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>

Good Afternoon,

6/15/23, 2:11 PM
Chicago Public Schools Mail - re: Cleaning issue at Spencer School
Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 368 of 523 PageID #:401

I am at the school right now and I have some cleaning concerns in the back hallway, back lunchroom area as well as the issue the the chipping paint above the foodline in the lunchroom.

I walked every floor and most of the areas are good. Air conditioning units are in place and floors are waxed. Additionally, I can tell that attention was given to the stairwells, which is great! However, some air conditioner units need to be set up.

Let me know what the plan is moving forward. Thank you.

[Quoted text hidden]

---

**4 attachments**


**20220821_130104.jpg**
3614K


**20220821_123931.jpg**
3908K


**20220821_130110.jpg**
6603K


**20220821_125920.jpg**
8378K

---

**Sheehy, Thomas** <tsheehy1@cps.edu>                                      Sun, Aug 21, 2022 at 2:26 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>,
Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>,

Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

Principal Muhammad:

Are you at the School still? If so, and you have a few minutes I can meet you at the front door in about 5 minutes. If you are busy, no problem. I will see you this week. Let me know.

Tom Sheehy
Facility Manager JLL/CPS - Zone 7-A
Cell: (708) 458-9199/(630) 696-8463
Email: tsheehy1@cps.edu
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                               Sun, Aug 21, 2022 at 2:29 PM
To: "Sheehy, Thomas" <tsheehy1@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

I am here.
[Quoted text hidden]

---

**Sheehy, Thomas** <tsheehy1@cps.edu>                                    Sun, Aug 21, 2022 at 2:34 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

I am at front door entry. Thanks, Tom
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                               Sun, Aug 21, 2022 at 2:54 PM
To: "Sheehy, Thomas" <tsheehy1@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

Mr. Sheehy, thank you for your quick response and support addressing my concerns.
[Quoted text hidden]

---

**Sheehy, Thomas** <tsheehy1@cps.edu>                                    Sun, Aug 21, 2022 at 3:01 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

Principal Muhammad:

You are most welcome. You have a great support staff with Andre, Ed and Tiffany. We all look forward to working with you at Lindblom and improving the facilities.

Sincerely, Tom
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                               Sun, Aug 21, 2022 at 3:05 PM
To: "Sheehy, Thomas" <tsheehy1@cps.edu>

Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

I look forward to working with the entire team.

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                Fri, Sep 2, 2022 at 11:40 AM
To: "Sheehy, Thomas" <tsheehy1@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>, Tiffany Simpson <tsimpson9@cps.edu>

Good Afternoon Mr. Sheehy,

Just following up with you and others who are on this thread to find out exactly what is happening in the Lunchroom regarding the painting above the food line. Please let me know. Thank you.

[Quoted text hidden]

---

**Johnson, Andre** <ajohnson397@cps.edu>                Fri, Sep 2, 2022 at 12:15 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Principal Muhammad,
Any loose chipped paint we've removed prior to school opening. We are still awaiting the vendor for the actual  painting of the food line ceiling.
Will check with the Building Manager for the timeline.
Thanks,
Andre

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                Fri, Sep 2, 2022 at 12:46 PM
To: "Johnson, Andre" <ajohnson397@cps.edu>

Thank you for the update.

[Quoted text hidden]

---

**Simpson, Tiffany** <tsimpson9@cps.edu>                Tue, Sep 6, 2022 at 6:53 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia" <scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds <ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie" <mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, "Sheehy, Thomas" <tsheehy1@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>

Hello Principal Muhammad:

Hope you are well. In regards to the paint, Andre actually scraped the paint so it wouldn't have the hanging appearance. I also sent you an email  alerting you that the actual painting has been funded and scheduled for mid September. It will take place on a Saturday and I will coordinate with the Kitchen Staff.

If you have any further questions and/or concerns, please feel free to contact me.

Respectfully,

TIFFANY SIMPSON - BM

[Quoted text hidden]

--
*Tiffany A Simpson*
Building Manager - 7A
Chicago Public Schools

6/15/23, 2:11 PM
Chicago Public Schools Mail - Daily attendance at school follow up
Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 371 of 523 PageID #:404

JLL Higher Learning
M: (773) 709-2743

Missing school custodial staff, call the Custodial Hotline at 1-866-209-0025
E: tsimpson9@cps.edu



---

**Sheehy, Thomas** <tsheehy1@cps.edu>                                      Tue, Sep 6, 2022 at 12:02 PM
To: "Simpson, Tiffany" <tsimpson9@cps.edu>
Cc: "Muhammad, Abdul" <akmuhammad@cps.edu>, Andre Johnson <ajohnson397@cps.edu>, "Castro, Sonia"
<scastro23@cps.edu>, Daniell Allen <dallen93@cps.edu>, Debra Kearney <drkearney@cps.edu>, Edward Reynolds
<ereynolds5@cps.edu>, "LaRosa, Devon" <dplarosa@cps.edu>, Queena Singleton <qosmith@cps.edu>, "Rush, Melanie"
<mrush6@cps.edu>, "Shannon, Marina" <mjshannon@cps.edu>, Sheree Cole-Evins <scoleevins@cps.edu>

Thanks Tiffany, Tom.
[Quoted text hidden]



Muhammad, Abdul <akmuhammad@cps.edu>

---

# Real Men Talk - Museum of Science and Industry
6 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                    Mon, Mar 13, 2023 at 2:03 PM
To: Lindblom Google Group <lindblom@googlegroups.com>

Good Afternoon,

On Wednesday, March 8, 2023 Dean Williams and I took a group of students from Real Men Talk to the Museum of
Science & Industry for the Black Creativity exhibit. The exhibit was amazing and featured the artwork of some of our
Lindblom students. (Shout-out to our Fine Arts Department) Our students analyzed various art pieces throughout the
exhibit and shared their interpretation with their peers. This was a great culminating activity for Black History Month.
Kudos to Ms. Gentry for helping with the planning and Mr. Catlett for being one of our chaperones.

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named
herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this
document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly
prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and
printout thereof.

---

**5 attachments**



**20230308_104730.jpg**
3694K



**20230308_121816.jpg**
4232K



**20230308_105028.jpg**
2994K



**20230308_104955.jpg**
5656K



**20230308_104519.jpg**
4110K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>      Mon, Mar 13, 2023 at 2:03 PM
To: akmuhammad@cps.edu

Hello "Muhammad, Abdul" <akmuhammad@cps.edu>,

The message you are sending is too large.  All messages must be less than 8.00 MBytes.

If you have questions related to this or any other Google Group, visit the Help Center at https://groups.google.com/support/.

Thanks,

Google Groups

----- Original message -----

X-Google-Smtp-Source: AK7set9ZKiECsvZNF63FeR8+BEQ8XnIrMmbsDslV3sAvtkj4kmZNVH
ZpdHsZgfc11XkWRuAwvR9d
X-Received: by 2002:a92:dc81:0:b0:316:f99d:9ea2 with SMTP id c1-20020a92dc81000000b00316f99d9e
a2mr596645iln.17.1678734212640;
   Mon, 13 Mar 2023 12:03:32 -0700 (PDT)
ARC-Seal: i=1; a=rsa-sha256; t=1678734212; cv=none;
   d=google.com; s=arc-20160816;
   b=BM+1IN99gVuErI2p1FcRMgk9A/BtviclWPYSow0cRWbnIZwoEyQPf9e1GPaZlV2wsz
    ApSEa5a4wUHDRY6dMUobD1Ka/iiRTuOGarrqMCaW11m/aYAaXrUtBiigusvZERdQOzh/
    /9ri3QFY37v/uwhuqaeoE4RZCEKXGWTnftZNO7WkCH6DVIR2gX28G8Gt5LWPtANa7Z9cNnQ
    hz7fB9QYpSWYgtw7xEp2bBsAKQYNEj/2l9a+IuJfOLdOuM564KtR8coVzSuRQ2dl7iTV
    SvmaF0RB8qXrLQNDadpbauUgsrWpXn3N7BfXnHz65DCRyqrDbAEUUFECLUfYqgsMJBlF
    o4Mw==
ARC-Message-Signature: i=1; a=rsa-sha256; c=relaxed/relaxed; d=google.com; s=arc-20160816;
   h=to:subject:message-id:date:from:mime-version:dkim-signature;
   bh=iYw7xMgr/Zuz7CPM0uAdXeZf4Dlik9jaJsFUywyUvpM=;
   b=ZRDckW336QmRRg06d/rRjP0r479ZALyDls/4y0dBZ4IPqFvP9Lp+Yy4gCEyxjZ7h5X
    EzRa6Q3EbrZGzUVol0XbETTJVEJIVYgVGpUvOa9WhnT+Xb3RO5e+hHhkdxa4teLoCT49
    ek6i3xfB5INE1VA6dJU8dCpACFZYcTF96YQa11PD8MQw1xvUA8KC1IiTOaULG4xBZPg3
    VBlisuUxLCq77sh+Ha7DF142khBGtIgH5B8drf5/S/Js7oafp2/VlRVbfeEAaC9PtWeQ
    ZLjGxzeEyHzkmAgsRYoHrO1d+wa+Abm5i4mIV5GoW1raUollqMyrVEjJy/cTnwzYp9Z+
    MnRg==
ARC-Authentication-Results: i=1; gmr-mx.google.com;
   dkim=pass header.i=@cps.edu header.s=google header.b=BwLah7Gw;
   spf=pass (google.com: domain of akmuhammad@cps.edu designates 2001:4860:4864:20::29 as permitted sender)
smtp.mailfrom=akmuhammad@cps.edu;
   dmarc=pass (p=NONE sp=NONE dis=NONE) header.from=cps.edu
Return-Path: <akmuhammad@cps.edu>
Received: from mail-oa1-x29.google.com (mail-oa1-x29.google.com. [2001:4860:4864:20::29])
   by gmr-mx.google.com with ESMTPS id n21-20020a056638265500b00403008ac9dasi88871jat.5.2023.03.13.12.
03.25
   for <lindblom@googlegroups.com>
   (version=TLS1_3 cipher=TLS_AES_128_GCM_SHA256 bits=128/128);
   Mon, 13 Mar 2023 12:03:32 -0700 (PDT)
Received-SPF: pass (google.com: domain of akmuhammad@cps.edu designates 2001:4860:4864:20::29 as permitted
sender) client-ip=2001:4860:4864:20::29;
Authentication-Results: gmr-mx.google.com;
   dkim=pass header.i=@cps.edu header.s=google header.b=BwLah7Gw;
   spf=pass (google.com: domain of akmuhammad@cps.edu designates 2001:4860:4864:20::29 as permitted sender)
smtp.mailfrom=akmuhammad@cps.edu;
   dmarc=pass (p=NONE sp=NONE dis=NONE) header.from=cps.edu
Received: by mail-oa1-x29.google.com with SMTP id 586e51a60fabf-177ca271cb8so2258390fac.2
   for <lindblom@googlegroups.com>; Mon, 13 Mar 2023 12:03:25 -0700 (PDT)
DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
   d=cps.edu; s=google; t=1678734205;
   h=to:subject:message-id:date:from:mime-version:from:to:cc:subject
    :date:message-id:reply-to;
   bh=iYw7xMgr/Zuz7CPM0uAdXeZf4Dlik9jaJsFUywyUvpM=;
   b=BwLah7GwIvOPcxpQB/Ojl1ALwMEJQ0WFTqIdzqd0ggP5c25LFA+05CDdl2rUrvRioL
    mh2xaL9B/Mv95iyN27IrBvB9Emuy6J+EJ5jW9Ijy/WU6kkm4eGC5OeafFpaUj9Joxr4z
    83l9/c3AlbA4Yh6rlWzHVxYk2z+IuLE9GLw90=
X-Google-DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
   d=1e100.net; s=20210112; t=1678734205;
   h=to:subject:message-id:date:from:mime-version:x-gm-message-state
    :from:to:cc:subject:date:message-id:reply-to;
   bh=iYw7xMgr/Zuz7CPM0uAdXeZf4Dlik9jaJsFUywyUvpM=;
   b=D34pPz+gw4mADu0aPHycAYXJBrjKXWlXFixVHfLi/TKxnISz1R0XCQ6OvFnx2L+5It
    I9SpfFu1UoZSsr6jmIX0jeAniYTzN5Fyc19KPNkzkIhJhsCTCMetVftRce3+nIfxfnCV
    irS/2Cc6n6uMoMC5BvK5pbqNSt+rfSRuYb016ncg2LmSKWG6hzq8WsZ+iL1IGlI/dmT9
    may9QWevgRewpFT7/weHT4ZbAT8kEelCyjkmo3zXfw04tZkTRDPHUIEDoQsRB8sMA0u9
    a8/gED+YwcI7tsfriFfRyMpJS5mr81gl5+s6wMV0nEneRVD3wDwNkFQfcSTLxaVCJvu1
    oxqQ==

X-Gm-Message-State: AO0yUKVtiO/8ARnvQdgK3QZjlI2YZ+YewEpM+ycHkcd68VVASQbgaxVa
    Sz2WcjZesl5psgPZdGyZhixI7yiAGTqPCZzJxNikGiO/ShMhCC5d
X-Received: by 2002:a05:6870:bd49:b0:17a:a52d:9df7 with SMTP id
    og9-20020a056870bd4900b0017aa52d9df7mr10020oab.4.1678734201838; Mon, 13 Mar
    2023 12:03:21 -0700 (PDT)
MIME-Version: 1.0
From: "Muhammad, Abdul" <akmuhammad@cps.edu>
Date: Mon, 13 Mar 2023 14:03:10 -0500
Message-ID: <CAL0FSbBYYCA-RmHZ0R7wQ51zi8yP4V2GMP35ZCyyPzPyNkT06w@mail.gmail.com>
Subject: Real Men Talk - Museum of Science and Industry
To: Lindblom Google Group <lindblom@googlegroups.com>
Content-Type: multipart/mixed; boundary="000000000000c7889805f6ccc380"

----- Message truncated -----

---

**Muhammad, Abdul** <akmuhammad@cps.edu>            Mon, Mar 13, 2023 at 4:40 PM
To: Lindblom Google Group <lindblom@googlegroups.com>

[Quoted text hidden]

---

**2 attachments**



**20230308_121816.jpg**
4232K



**20230308_105028.jpg**
2994K

---

**McDaniel, LaConda** <lmcdaniel1@cps.edu>           Tue, Mar 14, 2023 at 9:19 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Lindblom Google Group <lindblom@googlegroups.com>

The Black Creativity exhibit was amazing.  I am glad students were able to experience it for themselves.
Thanks to all that were involved in making this happen.

[Quoted text hidden]
   [Quoted text hidden]
   --
   You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
   To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@ googlegroups.com.

To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAL0FSbBtA50ETTKPHwdvof%2BbSzrZYMOhdYeXSfM2xyfej8dA5g%40mail.gmail.com.

--

LaConda McDaniel

School Clerk

Lindblom Math & Science Academy

www.lindblomeagles.org

773-535-9300 - main office

773-535-9304 - direct line

773-535-9314 - fax

*To report a positive COVID-19 case/ Para reportar un caso positivo de COVID-19*

**cps.edu/covidresults**

--
You received this message because you are subscribed to the Google Groups "Lindblom Math & Science Academy" group.
To unsubscribe from this group and stop receiving emails from it, send an email to lindblom+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/lindblom/CAC0h3do20F2YgooncZSW-w9v9VrcT_M4fOm3nteRVs3QZ5WQkg%40mail.gmail.com.

---

**Williams, Shohn** <sewilliams7@cps.edu>                          Tue, Mar 14, 2023 at 12:30 PM
To: "McDaniel, LaConda" <lmcdaniel1@cps.edu>
Cc: "Muhammad, Abdul" <akmuhammad@cps.edu>, Lindblom Google Group <lindblom@googlegroups.com>

We have amazing students and I am so happy to be at Lindblom, no better place in the world. Swoop Swoop. Thanks Mr. Williams
[Quoted text hidden]

---

**Gross, Joy** <jegross1@cps.edu>                          Tue, Mar 14, 2023 at 12:46 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Swoop Swoop! Thank you for sharing and bravo to our students.

*Ms. Joy E Gross*
jegross1@cps.edu
**Dance Teacher/Dance Ensemble Director**
**CPS Arts Instructional Specialist**
**Lindblom Math and Science Academy**

On Mon, Mar 13, 2023 at 4:40 PM Muhammad, Abdul <akmuhammad@cps.edu> wrote:

> [Quoted text hidden]

> [Quoted text hidden]



Muhammad, Abdul <akmuhammad@cps.edu>

---

# Museum of Science & Industry
2 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>
To: "Gentry, Donna" <dgentry1@cps.edu>
Cc: Shohn Williams <sewilliams7@cps.edu>

Wed, Feb 15, 2023 at 1:13 PM

Good Morning,

I need you to reschedule the field trip to the Museum of Science & Industry for March 8 or March 22. Thank you.

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**Gentry, Donna** <dgentry1@cps.edu>
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Wed, Feb 15, 2023 at 5:16 PM

Ok, I'll do that.

Donna Gentry
[Quoted text hidden]

## CULTURE

| | BOY | MOY | EOY |
|---|---|---|---|
| Mission & Vision | 1 (Emerging) | | |
| Shared Responsiblity | 1 (Emerging) | | |
| Collaboration | 1 (Emerging) | | |
| Equity | 1 (Emerging) | | |
| Mindsets & Beliefs | 1 (Emerging) | | |
| Overall | 1 (Emerging) | | |

## STRUCTURE

| | BOY | MOY | EOY |
|---|---|---|---|
| Systems & Procedures | 1 (Emerging) | | |
| Participation | 1 (Emerging) | | |
| Collective Engagement | 1 (Emerging) | | |
| Resources | 1 (Emerging) | | |
| Feedback | 1 (Emerging) | | |
| Overall | 1 (Emerging) | | |

## KNOWLEDGE & SKILLS

| | BOY | MOY | EOY |
|---|---|---|---|
| Data-Driven | 1 (Emerging) | | |
| Instructional Expertise | 1 (Emerging) | | |
| Instructional Focus | 1 (Emerging) | | |
| Goal-Oriented | 1 (Emerging) | | |
| Decision Making | 1 (Emerging) | | |
| Overall | 1 (Emerging) | | |

| | BOY | MOY | EOY |
|---|---|---|---|
| Culture | 1 (Emerging) | | |
| Structure | 1 (Emerging) | | |
| Knowledge & Skills | 1 (Emerging) | | |



ILT Effectiveness

| | BOY | MOY | EOY |
|---|---|---|---|
| Culture | 1 | | |
| Structure | 1 | | |
| Knowledge & Skills | 1 | | |

| 1 (Emerging) | 1 | 0 | (Emerging) |
|---|---|---|---|
| 2 (Developing) | 2 | 1.5 | (Developing) |
| 3 (Performing) | 3 | 2.5 | (Performing) |
| 4 (Transforming) | 4 | 3.5 | (Transforming) |



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

## Squatter House - Safety Concern
6 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                   Fri, Oct 14, 2022 at 12:39 PM
To: info@16thward.org, "Hill, Rodney G." <rodney.hill@chicagopolice.org>, "Hatch, Yolanda M."
<yolanda.hatch@chicagopolice.org>

Good Morning,

I am reaching out to you both, per our previous conversation, regarding a squatter house located at 1850 W. 63rd Street. I have witnessed various people going in and out of the house. This is a safety concern because our students catch the bus at the corner of 63rd & Wolcott. Thank you for any assistance you can provide to keep our students safe.

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**Hatch, Yolanda M.** <Yolanda.Hatch@chicagopolice.org>                     Fri, Oct 14, 2022 at 1:06 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "Schwarzer, Heinz J." <Heinz.Schwarzer@chicagopolice.org>, "Blair, Donald" <Donald.Blair@chicagopolice.org>, "Bojan, Bryan J." <Bryan.Bojan@chicagopolice.org>

Thank you for your concern and information. We will take a look at this address as soon as possible.

**Sgt. Yolanda Hatch  #2154**
Chicago Police Department
Administrative Sergeant
007th District - Englewood
312-747-8220  ext. 229
yolanda.hatch@chicagopolice.org

---

**From:** Muhammad, Abdul <akmuhammad@cps.edu>
**Sent:** Friday, October 14, 2022 12:39 PM
**To:** info@16thward.org <info@16thward.org>; Hill, Rodney G. <Rodney.Hill@chicagopolice.org>; Hatch,

Yolanda M. <Yolanda.Hatch@chicagopolice.org>
**Subject:** Squatter House - Safety Concern

[Quoted text hidden]

** EXTERNAL EMAIL WARNING ** This email originated outside of the Chicago Police Department. **NEVER CLICK, DOWNLOAD, or OPEN** unexpected links or attachments. **NEVER** provide User ID (PC Number) or Password or other sensitive information. If this email seems suspicious, contact the City of Chicago Help Desk at 312-744-DATA (312-744-3282) or follow instructions on THE WIRE to report Junk Email or SPAM.

---

[Quoted text hidden]

---

**16th Ward Office** <info@16thward.org>                                    Fri, Oct 14, 2022 at 2:36 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Received...we see you have included 007th District CPD which is great. We will combine our efforts to address the situation.


**Respectfully,**


**The Office of Alderman Stephanie D. Coleman | 16th Ward**

1137 W. 63rd St. | Chicago, IL 60621

Website: www.16THWARD.org - Subscribe for the latest 16th Ward news

Telephone: 773.306.1981

Follow Alderman Coleman On Instagram: @AldStephanieDColeman

Facebook: Alderman Stephanie D. Coleman – 16th Ward



[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                         Fri, Oct 14, 2022 at 2:38 PM
To: info@16thward.org, "Hill, Rodney G." <rodney.hill@chicagopolice.org>, "Hatch, Yolanda M." <yolanda.hatch@chicagopolice.org>

Thank you all for your support to keep our students safe. Thank you.

On Fri, Oct 14, 2022 at 12:39 PM Muhammad, Abdul <akmuhammad@cps.edu> wrote:
[Quoted text hidden]
[Quoted text hidden]

---

**16th Ward Office** <info@16thward.org>                                    Mon, Oct 24, 2022 at 12:10 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "Stephanie D. Coleman" <alderman@16thward.org>, Brandon Bradford <brandon@16thward.org>

Good afternoon Principal Muhammad,

I hope this email finds you well. The Department of Buildings responded today and stated that the property will be wrecked on Wednesday, October 26, 2022.

Following is the email I received with the exact verbiage:

Our records indicate, an inspection was conducted by our **Demolition Bureau** on **October 17, 2022**. At the time of the inspection, there were dangerous and hazardous conductions. As a result, an **Emergency Police Power Teardown** was entered. The wrecking contractor has fenced and secured the site. Once the asbestos abatement has approval the wrecking company will proceed with the demolition immediately.

The property will be wrecked **Wednesday Morning, October 26, 2022**.

Please let me know if you have any questions or concerns.

Respectfully,

## Cynthia Stephens

**The Office of Alderman Stephanie D. Coleman | 16th Ward**

1137 W. 63rd St. | Chicago, IL 60621

Website: www.16THWARD.org - Subscribe for the latest 16th Ward news

Telephone: 773.306.1981

Follow Alderman Coleman On Instagram: @AldStephanieDColeman

Facebook: Alderman Stephanie D. Coleman – 16th Ward



On Fri, Oct 14, 2022 at 12:39 PM Muhammad, Abdul <akmuhammad@cps.edu> wrote:
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                     Mon, Oct 24, 2022 at 1:03 PM
To: 16th Ward Office <info@16thward.org>, Brandon Bradford <brandon@16thward.org>, "Stephanie D. Coleman" <alderman@16thward.org>
Cc: "Morales, Adrienne" <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>

Thank you for letting us know.
[Quoted text hidden]

| Name | | Role | Responsibilities |
|------|------|------|------------------|
| Kijai | Banks | Techco | Working with Catlett to get all of the old and new Chromebooks sorted and ready for BOY distribution.  Sort through ones needing repairs and ones needing to be recycled. |
| Yadira | Casimiro | Clerk | Working on loose ends form SY22 - training for clerk - assisting parents - other misc. work - (Spanish-speaking) |
| Michael | Catlett | Lib Asst. - Tech | Working with Banks to get all of the old and new Chromebooks sorted and ready for BOY distribution.  Sort through ones needing repairs and ones needing to be recycled. |
| Charles | Clark | Counselor | Working on summer counseling work - programming SY23 -  alumni tracking for SY22 grads/non-grads |
| Reg | Cohill | Security | Security of school |
| Jovani | Garcia | Security | Security of school |
| Bryant | Hayes | Clerk | Working on attendance cleanup - book room (distribution for SY23) - misc. furniture/building logistics |
| Isaias | Herrera | Admissions | Working on SY23 student enrollment - SY23 admissions scheduling |
| Lisa | Johnson-Pettigrew | School Asst. | Working on SY23 student records - locker cleanouts - misc. |
| LaConda | McDaniel | Clerk | Working on all items related to budgeting - payroll |
| Ken | Morris | Security | Security of school |
| Jessica | Salazar | Post-Sec | Worked 1st two weeks to send all SY22 grad transcripts to colleges/scholarship orgs |
| Lynette | Shinaul | Security | Security of school |
| Michelle | Villagran | School Asst. | Working on SY23 student records - locker cleanouts - misc. |
| Sheri | Williams | Cnslg Asst. | Working on SY222 and 23 student records - transfers - cleanup of attendance/records |

Ex. N

4/13/23, 10:59 AM    Chicago Public Schools Mail - Folder shared with you: "Dept. Summer 2022 Planning"

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 384 of 523 PageID #:417



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

## Folder shared with you: "Dept. Summer 2022 Planning "
7 messages

---

**Karen Carpenter (via Google Drive)** <drive-shares-dm-noreply@google.com>      Fri, Jul 8, 2022 at 12:00 PM
Reply-To: Karen Carpenter <kmfitzpatrick@cps.edu>
To: akmuhammad@cps.edu
Cc: astuckey1@cps.edu, cbclark3@cps.edu, fabughoush@cps.edu, jsuh@cps.edu, lelevites@cps.edu, lmcdaniel1@cps.edu,
mdcalderbank@cps.edu, mereid3@cps.edu, mjsidarous@cps.edu, pavan@cps.edu, tpatula@cps.edu

---

# Karen Carpenter shared a folder

    Karen Carpenter (kmfitzpatrick@cps.edu) has invited you to **contribute to** the
following shared folder:

Hello everyone. This folder is being shared with you to submit the following information:
summer planning dates, agendas, deliverables and sign-in sheets. Please also put all
planning dates on the Google Calendar with a virtual link. Principal Muhammad's email
address is
akmuhammad@cps.edu

Thank you.

   Dept. Summer 2022 Planning

Open

---

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because kmfitzpatrick@cps.edu shared a file or
folder located in Google Drive with you.

Google Workspace

---

# Ex. O

---

**Muhammad, Abdul** <akmuhammad@cps.edu>      Tue, Aug 2, 2022 at 9:24 AM
To: Karen Carpenter <kmfitzpatrick@cps.edu>
Cc: astuckey1@cps.edu, Charles Clark <cbclark3@cps.edu>, fabughoush@cps.edu, jsuh@cps.edu, "Levites, Lauren"
<lelevites@cps.edu>, LaConda McDaniel <lmcdaniel1@cps.edu>, mdcalderbank@cps.edu, "Reid, Marla"

<mereid3@cps.edu>, "Sidarous, Mark" <mjsidarous@cps.edu>, "Van, Peter" <pavan@cps.edu>, Timothy Patula <tpatula@cps.edu>

Good Morning,

I am following up with you all on this email. Please update your summer department meeting folders by Friday, August 5, 2022. Thank you.

[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**Abughoush, Fadi** <fabughoush@cps.edu>                                    Tue, Aug 2, 2022 at 9:24 AM
To: akmuhammad@cps.edu

Hello. I am currently out for my summer break from 6/16-8/14 and not able to access my CPS email address all the time .

Thank you,


--
Fadi Abughoush
Arabic Teacher
World Language Department Chair
Lindblom Math & Science Academy
6130 S Wolcott Ave.
Chicago,IL 60636
@fabughoush
(708) 407-1852

---

**Abughoush, Fadi** <fabughoush@cps.edu>                                    Tue, Aug 2, 2022 at 12:05 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Charles Clark <cbclark3@cps.edu>, Karen Carpenter <kmfitzpatrick@cps.edu>, LaConda McDaniel <lmcdaniel1@cps.edu>, "Levites, Lauren" <lelevites@cps.edu>, "Reid, Marla" <mereid3@cps.edu>, "Sidarous, Mark" <mjsidarous@cps.edu>, Timothy Patula <tpatula@cps.edu>, "Van, Peter" <pavan@cps.edu>, astuckey1@cps.edu, jsuh@cps.edu, mdcalderbank@cps.edu

Mr. Muhammad,

Welcome to Lindblom! Could you please explain this further? Were we supposed to hold summer department meetings for planning? I'm not sure what is supposed to go into the folders. Please advise.

Thanks,
[Quoted text hidden]

--
Fadi Abughoush
Arabic Teacher
World Language Department Chair
Lindblom Math & Science Academy
6130 S Wolcott Ave.
Chicago, IL 60636
@fabughoush
(708) 407-1852




---

**Muhammad, Abdul** <akmuhammad@cps.edu>      Tue, Aug 2, 2022 at 2:16 PM
To: "Abughoush, Fadi" <fabughoush@cps.edu>
Cc: Charles Clark <cbclark3@cps.edu>, Karen Carpenter <kmfitzpatrick@cps.edu>, LaConda McDaniel
<lmcdaniel1@cps.edu>, "Levites, Lauren" <llevites@cps.edu>, "Reid, Marla" <mereid3@cps.edu>, "Sidarous, Mark"
<mjsidarous@cps.edu>, Timothy Patula <tpatula@cps.edu>, "Van, Peter" <pavan@cps.edu>, astuckey1@cps.edu,
jsuh@cps.edu, mdcalderbank@cps.edu

Good Afternoon,

Thank you, I am happy to be a part of the team. Some departments were meeting during the summer. We need to have
evidence to support those meetings. For those that met, we asked that the evidence be uploaded.
[Quoted text hidden]

---

**Levites, Lauren** <llevites@cps.edu>      Tue, Aug 2, 2022 at 2:38 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Karen Carpenter <kmfitzpatrick@cps.edu>, LaConda McDaniel <lmcdaniel1@cps.edu>

Hi,

My department didn't meet, but the 7th grade team met, here is the link to our folder, it is housed in the 7th House folder.
We have one more meeting next week, and then I will copy the folder over into the summer planning folder.

We do have a request for a redesign of back to school night. We think it would be beneficial to run mini parent orientation
sessions rather than have parents cycle through quick intros for each class. Ideally, we could provide a few options of
dates, and a parent would be guaranteed to be paired with one of their child's teachers. We could make short intro videos
that are shared with families if we want to keep a way for parents to "meet" each teacher.

This format would allow 1 teacher to meet with 15 or so parents, walk them through expectations, technology, logging into
Jumprope, understanding PBL/grades, making sure they are able to get google classroom summaries, etc. We think it
would alleviate a lot of the concerns we see, especially given the shorter 1st semester and long length between the end of
1st quarter and report card pickup. We were also thinking it may make sense to offer a Saturday option for some parents
and/or virtual, as well as a few additional opportunities throughout the school year, that we could refer parents to when
they are struggling to understand Lindblom systems. Happy to chat more about this!

Thanks!
Lauren
[Quoted text hidden]
--
**Ms. Lauren Levites, NBCT (she, her)**
Lindblom Math and Science Academy
Biology, AP Research
NJHS Sponsor, Science Fair Coordinator

"Education is the most powerful weapon which you can use to change the
world." -Nelson Mandela

**Sidarous, Mark** <mjsidarous@cps.edu>                                        Wed, Aug 3, 2022 at 12:12 PM
To: Karen Carpenter <kmfitzpatrick@cps.edu>
Cc: Abdul Muhammad <akmuhammad@cps.edu>

One personnel change, Paul DeRonne is now the CTE department head. I will forward this thread on to him. Thanks.

[Quoted text hidden]

---

On Oct 27, 2022, at 5:57 PM, Muhammad, Abdul <akmuhammad@cps.edu> wrote:

[Quoted text hidden]

---

**Davis, Christina** <cmdavis12@cps.edu>                                  Sat, Oct 29, 2022 at 9:29 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: LaConda McDaniel <lmcdaniel1@cps.edu>

Good Morning and happy Saturday,

Mr. Muhammad- I would like a follow up meeting with you and Ms. McDaniel. After
reviewing- I do see where my oversight is. I will make sure to have the proper
documents to submit along with funds for deposit.

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                              Sat, Oct 29, 2022 at 10:20 AM
To: "Davis, Christina" <cmdavis12@cps.edu>
Cc: LaConda McDaniel <lmcdaniel1@cps.edu>

Good morning,

We can meet Monday, Ms. McDaniel and I usually meet at 8:15 am.

[Quoted text hidden]

---

**Davis, Christina** <cmdavis12@cps.edu>                                 Sun, Oct 30, 2022 at 6:57 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: LaConda McDaniel <lmcdaniel1@cps.edu>

Good Evening,

Thanks, I will be there!

Christina

[Quoted text hidden]
--
Christina Davis,
Physical Education Teacher, Athletic Director
Lindblom Math & Science Academy
www.lindblomeaglesathletics.com
(773) 535-7883



**Muhammad, Abdul <akmuhammad@cps.edu>**

## Statement
1 message

**Muhammad, Abdul** <akmuhammad@cps.edu>                                    Mon, Nov 21, 2022 at 12:24 PM
To: Emma Harmon <eeharmon@cps.edu>

Good Morning,

I am following up with you on our conversation regarding the fundraising statement that we discussed last week. I need this statement today so that I can complete my ASPEN report. Thank you.

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

Ex. Q

Fundraiser Statement 12.02

I have been asked to write a statement for Principal Muhammad to enter into Aspen regarding the DoubleGood Fundraiser I ran through the Drama Club, specifically about how the money was transferred to the school. Below is the statement:

DoubleGood Popcorn Fundraiser asks for a payout method, and I put in my bank account information, with the plan to write a check to the school with the same amount that DoubleGood would transfer into my account. On Nov 01, 2022, $5,262.00 was transferred to my account by DoubleGood Popcorn. That money was taken out of my account on Nov 15, 2022 when the check I wrote to Lindblom was cashed. I requested to do the fundraiser on 10/05 to hold the fundraiser from 10/19-10/23 and it was approved. When the fundraiser asked for an account for the money to be deposited in, I had not received any guidance or any other account number to provide. On October 21, there was a professional development session at our school, but I was attending the Future Teacher Conference at Illinois State University with several students. I did not receive Mr. Booker's presentation on fundraising until Principal Muhammad sent it out on November 9. I was unaware of our school's new fundraising protocols when my fundraiser began. The next fundraiser that I run with students will have special attention paid to how to correctly set up payout methods directly to the school.

Emma Harmon

Ex. Q-1

# Unspent Funds SY 22

- 114-51320-290001-000151      $8,000.00
- 114-51330-290001-000151      <u>800.00</u>
                                $8,800.00

- 115-51300-290001-000575      $58,271.05
- 115-51330-290001-000575      $30,722.34
- 115-51320-290001-000575      -43,982.38
- 115-53305-119035-000575      4,224.56
- 115-54105-119035-000575      4,200.00
- 115-54505-119035-000575      <u>1,389.00</u>
                                $54,824.57

- 115-51300-290001-000576      $3,314.58
- 115-51330-290001-000576      $1,764.91
- 115-53305-113064-000576      <u>$5,740.43</u>
                                $10,819.92

- 332-51300-290001-430266      $7,319.39
- 332-51330-290001-430266      <u>$18,354.90</u>
                                $25,674.29

- 367-51320-290001-433170      $65,085.00
- 367-51330-290001-433170      943.00
- 367-53304-211001-433170      $27,810.19
- 367-53305-119010-433170      $34,946.34
- 367-53405-119010-433170      $86,033.79
- 367-54505-221011-433170      <u>$24,765.00</u>
                                239,583.32

- 370-51320-290001-499824      $46,383.21
- 370-51330-290001-499824      <u>862.84</u>
                                $47,246.05

Ex. R



Chicago
Public
Schools

**Muhammad, Abdul <akmuhammad@cps.edu>**

---

## Non-Compliant Coaches - Urgent
4 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                    Thu, Oct 20, 2022 at 12:16 PM
To: Christina Davis <cmdavis12@cps.edu>, "Shareef, Ahmad" <ashareef@cps.edu>
Bcc: "Williams, Carl" <cwilliams@cps.edu>

   Good Morning,

   I am in receipt of the Coaches Compliance list from IHSA. According to the IHSA list, we have 37 coaches who are not
   compliant. Some of these coaches are no longer at Lindblom, however, many of them are still on staff. I need you all to
   work together to remove any coaches who are no longer at Lindblom and make sure our current coaches are in full
   compliance based on IHSA guidelines. Additionally, I need you both to make sure that all assistant coaches currently at
   Lindblom who are not listed on the IHSA school center site become compliant. We will meet briefly on Monday, October
   24, 2022 to review the list. Thank you.

   --
   Abdul Muhammad
   Principal
   Lindblom Math and Science Academy
   6130 South Wolcott Avenue
   Chicago, IL 60636
   773-535-9300
   https://lindblomeagles.org/

   ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named
   herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this
   document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly
   prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and
   printout thereof.

---

**Christina Davis** <cmdavis12@cps.edu>                                    Thu, Oct 20, 2022 at 1:42 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "Shareef, Ahmad" <ashareef@cps.edu>

   Good Afternoon,

   Can you please share the list?

   Thanks,
   Christina

   Sent from my iPhone

         On Oct 20, 2022, at 12:16 PM, Muhammad, Abdul <akmuhammad@cps.edu> wrote:

                                                                                        Ex. S

         [Quoted text hidden]

**Muhammad, Abdul** <akmuhammad@cps.edu>                    Thu, Oct 20, 2022 at 2:25 PM
To: Christina Davis <cmdavis12@cps.edu>
Cc: "Shareef, Ahmad" <ashareef@cps.edu>

It is in the Schools Center site for IHSA. I have a copy in my office.
[Quoted text hidden]

---

**Davis, Christina** <cmdavis12@cps.edu>                    Thu, Oct 20, 2022 at 5:16 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "Shareef, Ahmad" <ashareef@cps.edu>

No worries. I can see it- cleaning it up now.

Thanks,
Christina
[Quoted text hidden]
--
Christina Davis,
Physical Education Teacher, Athletic Director
Lindblom Math & Science Academy
www.lindblomeaglesathletics.com
(773) 535-7883



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

# Follow Up
2 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                    Mon, Sep 19, 2022 at 9:16 AM
To: Christina Davis <cmdavis12@cps.edu>
Cc: "Morales, Adrienne" <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>

Good Morning,

I am following up with you on our conversation regarding your child being at Lindblom during school hours due to lack of childcare. The CPS law department informed me that this is not acceptable due to liability issues. Thank you.

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**Davis, Christina** <cmdavis12@cps.edu>                    Mon, Sep 19, 2022 at 9:55 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "Morales, Adrienne" <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>

## Good Morning and Happy Monday,

## Thank you!
[Quoted text hidden]
--
Christina Davis,
Physical Education Teacher, Athletic Director
Lindblom Math & Science Academy
www.lindblomeaglesathletics.com
(773) 535-7883

Ex. T



Muhammad, Abdul <akmuhammad@cps.edu>

## Project Lead The Way: Invoice #126267 URGENT
2 messages

**Jana Killion** <invoices@pltw.org>                                     Thu, Mar 2, 2023 at 9:50 AM
Reply-To: Jana Killion <messages.586015.5898408.4f387801d3@586015.email.netsuite.com>
To: AKMuhammad@cps.edu, lmcdaniel1@cps.edu, KJBooker@cps.edu

Hello,

I am reaching out to you Mr. Muhammad and you Mr. Booker, as I have been trying to resolve the attached
invoice for many, many months.  I was informed by your District AP that the PO number on this invoice is
closed.  We have only received a partial payment of $5,702.27, leaving a balance due of 3,074.24.

I have been working with Ms. McDaniel on this invoice, who told me a check would be sent out on 11/10/21.
I have talked with her and emailed several times.  I talked to her again 9/5/22 and was told a check would
go out that day.  On 10/26 she stated check #6105 was sent to the correct address on 9/12, however we did
not receive it.  She said she would cancel and reissue that day.

I have since left messages and sent emails and finally talked with her on 2/7/23.  She stated she was going
to get approval in a meeting that was to be held that day, and call me when a check was cut.

It is imperative we get this resolved.  We can take payment by credit card over the phone if need be.

Please contact me with the steps that are being taken to pay the balance of this invoice.

Regards,

Jana Killion Project Lead The Way AR Coordinator 5939 Castle Creek Pkwy North Drive Indianapolis, IN 46250 317-
669-0883

 **Invoice_126267_1677772231266.pdf**
13K

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                            Sat, Mar 4, 2023 at 9:18 AM
To: Jana Killion <messages.586015.5898408.4f387801d3@586015.email.netsuite.com>
Cc: lmcdaniel1@cps.edu, KJBooker@cps.edu

Good Morning,

Thank you for reaching out to us. I am the new Principal at Lindblom and was totally unaware of this issue, which appears to
date back to 2018. Unfortunately Ms. McDaniel did not share this information with me. However, I will work with Mr. Booker, our
Operations Manager to see how we can resolve this issue. Thank you for your patience.

Mr. Booker, follow up with me on Monday regarding this issue.
[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

Ex. U

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

Chicago
Public
Schools

**Muhammad, Abdul <akmuhammad@cps.edu>**

### Fwd: Private Nurse Role (44787105)
7 messages

---

**Kearney, Debra** <drkearney@cps.edu>
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Mon, Oct 31, 2022 at 11:20 PM

---------- Forwarded message ----------
From: **Kearney, Debra** <drkearney@cps.edu>
Date: Sun, Oct 30, 2022 at 7:47 PM
Subject: Private Nurse Role (44787105)
To: TaShunda Green <tlgreenshelton@cps.edu>

Warm Greetings,

I am the assistant principal at Lindblom High School and Ms. Haywood our District Representative suggested I contact you regarding the responsibilities of a private nurse of one of our students in the cluster program. The private nurse comes to the classroom every day with the student. The student also has a SECA. The private nurse informed me that the DL teacher and the SECA informed her that she is not supposed to do anything for the student. She is not allowed to push his wheelchair or even help with feeding him because she is a private nurse and does not work for CPS. Please provide me with CPS policy and guidelines regarding what the private nurse is allowed to support the student with during his time in school. Thank you in advance.

--
Debra Kearney
Assistant Principal
Lindblom Math and Science Academy
773-535-9300
https://lindblomeagles.org/

Pronouns: She/Her/Hers (learn more here)

"The growth and development of people is the highest calling of leadership." --*Harvey S. Firestone*

--
Debra Kearney
Assistant Principal
Lindblom Math and Science Academy
773-535-9300
https://lindblomeagles.org/

Pronouns: She/Her/Hers (learn more here)

"The growth and development of people is the highest calling of leadership." --*Harvey S. Firestone*

---

**Kearney, Debra** <drkearney@cps.edu>
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Mon, Oct 31, 2022 at 11:20 PM

---------- Forwarded message ----------
From: **Green, TaShunda** <tlgreenshelton@cps.edu>
Date: Mon, Oct 31, 2022 at 8:54 AM
Subject: Re: Private Nurse Role (44787105)
To: Kearney, Debra <drkearney@cps.edu>
CC: Jeannette White <jwhite169@cps.edu>

Good morning Ap Kearney,
How are you? Many students do attend school with their private nurse. Has this nurse been cleared through our background process for volunteer work, through CPS? If not, that must occur prior to the nurse being allowed in your building. When students have private nurses, their medical conditions are such that the nurse is there to provide care for them. As such, the nurse must be responsible for the duties that a nurse would provide. That being said, we would need the student's name and student's ID number to research if the student requires a 1:1 nurse for the school day. Can you provide that information? Once we research it I can better guide this situation. Thank-you for reaching out!

Kindest Regards,

TaShunda Green MSN, MBA, RN, NEA-BC

**Ex. V**

**Deputy Chief Health Officer**

Chicago Public Schools │ Office of Student Health and Wellness

42 W. Madison │ Chicago, IL 60602 │ Email: tlgreenshelton@cps.edu

Pronouns: she/her/hers (learn more here)

Office: 773-553-1889

On Sun, Oct 30, 2022 at 7:47 PM Kearney, Debra <drkearney@cps.edu> wrote:

Warm Greetings,

I am the assistant principal at Lindblom High School and Ms. Haywood our District Representative suggested I contact you regarding the responsibilities of a private nurse of one of our students in the cluster program. The private nurse comes to the classroom every day with the student. The student also has a SECA. The private nurse informed me that the DL teacher and the SECA informed her that she is not supposed to do anything for the student. She is not allowed to push his wheelchair or even help with feeding him because she is a private nurse and does not work for CPS. Please provide me with CPS policy and guidelines regarding what the private nurse is allowed to support the student with during his time in school. Thank you in advance.

--

Debra Kearney

Assistant Principal

Lindblom Math and Science Academy

773-535-9300

https://lindblomeagles.org/

Pronouns: She/Her/Hers (learn more here)

"The growth and development of people is the highest calling of leadership." --*Harvey S. Firestone*

[Quoted text hidden]

---

**Kearney, Debra** <drkearney@cps.edu>                                      Mon, Oct 31, 2022 at 11:23 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

[Quoted text hidden]

---

**Kearney, Debra** <drkearney@cps.edu>                                      Wed, Nov 2, 2022 at
To: Charlotte Wilson <cawilson2@cps.edu>, Demitrius Haywood <dohaywood@cps.edu>, "Green, TaShunda" <tlgreenshelton@cps.edu>, "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Jeannette White <jwhite169@cps.edu>

Greetings,

What is everyone availability to meet on Friday at 2:00pm or Monday at 1:00pm.

On Wed, Nov 2, 2022 at 12:02 PM Green, TaShunda <tlgreenshelton@cps.edu> wrote:

Hi Principal Kearney,

I have more information that I need to share. Can we set up a meeting with your case manager, District rep. and you. We have a very huge problem that we need to rectify immediately. In s the nurse should not be in your building but there is more to it that we need the team involved in.

Kindest Regards,

TaShunda Green MSN, MBA, RN, NEA-BC

**Deputy Chief Health Officer**

Chicago Public Schools │ Office of Student Health and Wellness

42 W. Madison │ Chicago, IL 60602 │ Email: tlgreenshelton@cps.edu

Pronouns: she/her/hers (learn more here)

Office: 773-553-1889

On Mon, Oct 31, 2022 at 5:34 PM Kearney, Debra <drkearney@cps.edu> wrote:

Good Evening,

The private nurse has been cleared through the background check to volunteer. The student is ██████████44787105. Also the private nurse sent me an email regarding the SECA. I have attached the email the pri nurse sent me regarding our SECA.

---

**Josemi**                                      Oct 24, 2022, 9:57 PM (7 days ago)
to me

Good evening Mrs Kearney. My name is Racheal Ajayi. I was at the Gym with ▓▓▓ when one of the students teacher took him out of the wheelchair and lay him down and started doing sit up and stretching of legs exercise, which I feel it may be too much for the patient to handle and this activity should be something that a physical therapist should perform and not a student teacher.



**Kearney, Debra** <drkearney@cps.edu>                                                   Oct 30, 2022, 7:56 PM (21 hours ago)
to Charlotte, Josemi

Greetings,

Thank you for providing me with this information and meeting with me and the SECA on Friday October 28, 2022. As I explained to the SECA he is not allowed to take the student out of his wheelchair unless the physical education teacher and the OT has provided a specific plan for this student that involves the SECA working with the student during physical education.



**Kearney, Debra** <drkearney@cps.edu>                                                   Oct 30, 2022, 8:28 PM (21 hours ago)
to Terrence, Abdul, Michae, Charlotte

Greetings,

Per our conversation on Friday October 28, 2022, please refrain from taking the student (44787105) out of his wheelchair during physical education class to do muscle exercise with him. You have been trained to

student out of the wheelchair for **toileting** purposes however anything beyond that requires additional training and guidance.  Please consult with the diverse learner teacher, physical education, physical therapist

occupational therapist regarding this student and what your role is when supporting the student during physical education classes. Also the mother would like more communication from you regarding the student

to day activity.  Please let me know if you have any questions or concerns.



**Josemi**                                                                                11:03 AM (6 hours ago)
to me

Good morning. This is Racheal. Thanks for responding to my email. I will be glad if the SECA is also aware of this. Thank you for your time.

[Quoted text hidden]
[Quoted text hidden]

---

**Wilson, Charlotte** <cawilson2@cps.edu>                                                Wed, Nov 2, 2022 at 1:26 PM
To: "Kearney, Debra" <drkearney@cps.edu>
Cc: Demitrius Haywood <dohaywood@cps.edu>, "Green, TaShunda" <tlgreenshelton@cps.edu>, "Muhammad, Abdul" <akmuhammad@cps.edu>, Jeannette White <jwhite169@cps.edu>

I am available both days and times.
Thank you
[Quoted text hidden]

---

**Green, TaShunda** <tlgreenshelton@cps.edu>                                             Wed, Nov 2, 2022 at 1:31 PM
To: "Kearney, Debra" <drkearney@cps.edu>
Cc: Charlotte Wilson <cawilson2@cps.edu>, Demitrius Haywood <dohaywood@cps.edu>, "Muhammad, Abdul" <akmuhammad@cps.edu>, Jeannette White <jwhite169@cps.edu>

I can do 1pm on Monday. Do you have time for a quick phone call today at 4pm?

Kindest Regards,

TaShunda Green MSN, MBA, RN, NEA-BC

**Deputy Chief Health Officer**

Chicago Public Schools │Office of Student Health and Wellness

42 W. Madison │ Chicago, IL 60602 │ Email: tlgreenshelton@cps.edu

Pronouns: she/her/hers (learn more here)

Office: 773-553-1889

[Quoted text hidden]

---

**Haywood, Demitrius** <dohaywood@cps.edu>                                               Wed, Nov 2, 2022 at 2:20 PM
To: "Green, TaShunda" <tlgreenshelton@cps.edu>
Cc: Charlotte Wilson <cawilson2@cps.edu>, Jeannette White <jwhite169@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>, "Muhammad, Abdul" <akmuhammad@cps.edu>

I can do Friday or Monday.

[Quoted text hidden]

--

**Ms. Dee Haywood** | District Representative
**Office of Diverse Learner Supports and Services**
**Email** | Dohaywood@cps.edu  773-733-0671

**Click on the Procedures and Standards Customer Support Survey to share your experience with my support.**
Please visit our **website** for more information regarding upcoming ODLSS Events
Parents!



**Muhammad, Abdul <akmuhammad@cps.edu>**

# Follow Up
4 messages

---

**Valencia Jenkins** <vajenkin@gmail.com>                                 Wed, Dec 7, 2022 at 12:37 PM
To: ceirvin@cps.edu
Cc: Abdul Muhammad <akmuhammad@cps.edu>

Good Afternoon Ms. Irvin,

Pursuant to our telephone call, I took the advice of both you and my mother in law and decided to first discuss my
concerns with Lindblom's principal, Mr. Muhammad. He was very diligent in hearing & prioritizing my concerns, so I'm
choosing to respect his authority at this juncture & trust that he'll see this matter to resolve.

If either of us have any additional concerns that Mr. Muhammad is unable to address, we will be sure to reach out to you.

Thank you so much for your guidance and support. Happy holidays to you and your family!

Respectfully,

V. Jenkins
(773) 415-5420

Sent from my iPhone

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                 Wed, Dec 7, 2022 at 12:42 PM
To: Valencia Jenkins <vajenkin@gmail.com>
Cc: ceirvin@cps.edu

Good Afternoon,

Thank you for giving me the opportunity to deal with this from the school level. I have been in contact with CPS Sports
Admin regarding this. Please send me any and all documentation you have from the November 8, 2022 Cheer Parent
Meeting. Thank you.
[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

Ex. W

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named
herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this
document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly
prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and
printout thereof.

---

**Valencia Jenkins** <vajenkin@gmail.com>                                 Wed, Dec 7, 2022 at 2:45 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Mr. Muhammad,

Would you like me to recap what was discussed during the meeting? I don't have any additional documentation.

Respectfully,

V. Jenkins
(773) 415-5420

Sent from my iPhone

> On Dec 7, 2022, at 12:42 PM, Muhammad, Abdul <akmuhammad@cps.edu> wrote:

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                              Wed, Dec 7, 2022 at 2:48 PM
To: Valencia Jenkins <vajenkin@gmail.com>

No, I have notes. Thank you.
[Quoted text hidden]



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

## Meeting Follow Up
1 message

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                    Mon, Dec 19, 2022 at 9:00 AM
To: LaConda McDaniel <lmcdaniel1@cps.edu>, Kevin Booker <kjbooker@cps.edu>

Good Morning,

Thank you for meeting with me this morning. Here is a summary of what we discussed.

1. Mr. Booker will schedule 2 days for Mr. Hayes to come in during break to assemble the SMART boards.
2. Ms. McDaniel will enter all times into Oracle for SPS - Principal approval for Tuesday, December 20, 2022.
3. SMART Board software will be ordered today.
4. Books for Mr. Van and Social Science will be ordered today.
5. Mr. Booker will follow up with StichMe for Hoodies & Cheer Uniforms
6. Mr. Booker will get a quote for quiet zone order.
7. Mr. Booker will get names of teachers who were supposed to received SMART boards from Mr. Hayes.
8. Ms. McDaniel & Mr. Booker will prioritize teacher gift orders to be shipped to the school by Wednesday, December 21, 2022

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

Ex. X



# OFFICE OF INTERNAL AUDIT & ADVISORY SERVICES

## School Audit Report

### Fiscal Year 2023

## Principal Transition Review

### Robert Lindblom Math & Science Academy High School

### Report Date: March 2023

Ex. Y



*Office of Internal Audit & Advisory Services*
*School Audit FY23 - Lindblom HS (46511)*
*Principal Transition Review Report*

## TABLES OF CONTENTS

**Section I: Executive Summary**
**Section II: Scope**
**Section III: Objectives**
**Section IV: Audit Results**
- **Table 1: Internal Control Requirements**
- **Table 2: Management Action Plans**

**Section V: Prior Audit**
**Section VI: Distribution List**

## Section I: Executive Summary

The Office of Internal Audit and Advisory Services (IAAS) provides assurance and advisory services through independent and objective reviews to continuously improve systems and processes across the district that better prepare every child for success in college, career, and civic life.

IAAS conducted a Principal Transition Review (PTR) Audit of Robert Lindblom Math & Science Academy High School on November 30, 2022. Principal Abdul K. Muhammad started on July 5, 2022. The purpose of the audit was to assess and evaluate the effectiveness of the internal controls and business environment designed to help management achieve operational, financial, compliance, and strategic objectives.

The basis of this principal transition review audit was to review transactions prior to the start of the new principal to identify potential issues and provide process improvement opportunities. In order to present the most current results, Section IV represents audit exceptions from July 1, 2022 through the date of the audit. This is meant to provide meaningful and actionable data to the school principal. To review the full audit exception listing, please refer to the **preliminary report** that was submitted to the school on December 1, 2022. Lindblom's preliminary report highlights operational deficiencies within the schools current and past administration in which policies and procedures are not consistently followed.

## Section II: Scope

Our scope was primarily focused on financial controls with supplemental testing over safety and security. The audit period was July 1, 2021 through November 30, 2022. Transactions executed from July 1, 2021 through November 30, 2022 were reviewed using risk-based sampling. Lindblom HS had a follow up audit in FY17. Follow up to the FY17 audit is summarized in Section V: Prior Audit History.



*Office of Internal Audit & Advisory Services*
*School Audit FY23 - Lindblom HS (46511)*
*Principal Transition Review Report*

## Section III: Objective

To evaluate the school's internal controls and compliance with The Insider's Guide to School Business and Internal Accounts Manual for the following areas: **bank reconciliations, cash receipts, cash disbursements, iProcurement, Supplemental Pay System (SPS), fixed assets, and student safety and security training**.

## Section IV: Audit Results

The tables below report the areas audited, the exceptions noted, internal control requirements, and management action plans, if applicable. If the exception requires a management action plan, it is noted in Table 2: Management Action Plans. The school is required to submit the documentation to support the implementation of the management action plan by the due date indicated.

## Table 1: Internal Control Requirements

All internal control requirements have been discussed with the school administrators (i.e. principal, school clerk) during the exit conference on the day of the audit. All internal control requirements have been accepted by the school.

| Audit Area | Exceptions Noted | Internal Control (IC) Requirement |
|---|---|---|
| 1. Bank Reconciliations | 1 (33%) of 3 reconciliations were not approved timely (3 days late) | The Principal must review the Principal Verification Report (PVR) prepared by the Financial Team to ensure all expenses and credits are valid and accurate. After review, the Principal must approve the bank reconciliation in IAMS by the third Monday of the following month. An exception occurs when a holiday falls on that Monday, then the deadline will be moved to the next business day. |
| 2. Cash Receipts | 4 (100%) of 4 receipts, totaling $5,574.02, did not have supporting documentation to verify the source of receipts (i.e. payor lists/teacher receipts/ASPEN receipts/copy of vendor checks) | The School Clerk will ensure Treasurer Receipts are printed from IAMS and the appropriate documentation is attached (i.e., payor lists, teacher receipt books, ASPEN Receipts, copy of vendor checks). |



| Audit Area | Exceptions Noted | Internal Control (IC) Requirement |
|---|---|---|
| 3. Cash Receipts | 2 (100%) of 2 receipts related to fundraising, totaling $2,708, did not have a Fundraising Proposal and Accounting Report | The School Clerk and Principal must ensure all fundraising activities have a completed and approved fundraising proposal prior to the start of the fundraising activity. The fundraising proposal must be approved by the Principal, School Clerk, Network Chief and LSC, if applicable. Within 10 days of the conclusion of the fundraising activities an Accounting Report is completed. The Accounting Report must summarize revenue, expenses and profits obtained. Additionally the report must be signed by the fundraising Sponsor, School Clerk and Principal. |
| 4. Cash Disbursements | 3 (75%) of 4 disbursements, totaling $26,388, did not have a School Expenditure Requisition Form and/or supporting documentation (i.e. invoices/receipts) available for review | The Principal and School Clerk must ensure each school expenditure has a school expenditure requisition form and the applicable invoices/receipts attached. The requisition form must be properly completed with all required information. |
| 5. Cash Disbursements | 1 (25%) of 4 disbursements, totaling $3,491, did not have an adequately completed School Expenditure Requisition Form | The School Clerk must ensure the School Expenditure Requisition Forms are adequately completed with all required fields including: the date, vendor name and information, treasurer approval, line item description and the total amount, the internal account name and number. |
| 6. Cash Disbursements | 1 (25%) of 4 disbursements, totaling $3,491, did not have evidence of Principal and LSC approval on the School Expenditure Requisition Form<br><br>1 (25%) of 4 disbursements, totaling $3,491, did not have an approved School Expenditure Requisition Form at the time of the order (i.e. principal did not approve the requisition) | The Principal must ensure where expenditures exceed $2,500, LSC pre-approval is REQUIRED. The Principal must request approval at monthly LSC meetings and explicitly document the approval in the LSC meeting minutes by dollar amount and vendor. If approved, the LSC chairperson should sign the school expenditure requisition form. Principal pre-approval must be obtained prior to purchases being made (i.e. the pre-approval date on the school expenditure requisition form must be on or before the date of the invoice). |



| Audit Area | Exceptions Noted | Internal Control (IC) Requirement |
|---|---|---|
| 7. Cash Disbursements | 4 (100%) of 4 disbursements, totaling $29,879, were not allocated to the appropriate internal account in IAMS | Prior to writing a check, the School Clerk must ensure the appropriate internal account is used. If internal account funds are insufficient, a journal entry will be requested through a ServiceNow ticket to allocate funds to the proper account. |
| 8. Cash Disbursements | The Chase Bank signature card, containing the authorized signatories for the school's checking account, has not been updated. As of the date of audit, Principal Muhammad had not been added as an authorized signer. | The Principal must maintain an up to date copy of the Chase Bank signature card on file at all times. With each update (adding or removing staff), a new signature card with a new barcode will be needed to replace the previous card. Only authorized signers are allowed to sign checks. |
| 9. Procurement | 2 (100%) of 2 purchase orders, totaling $12,924, did not have evidence the goods were received (i.e. packing slips) | The School Clerk must ensure evidence of receipt of goods and/or services is documented for all POs.<br><br>For goods, all packing slips must be attached to the PO and invoice for goods ordered. If a packing slip is not provided the person responsible for receiving the goods must inventory the items received on the purchase order and sign and date the purchase order to evidence receipt.<br><br>For services provided, the School Clerk will create a Vendor Services Log for all vendors. The log should include the following: date, time in and out, purpose of the service, vendor business name and vendor representative name. |
| 10. Fixed Assets | 30 (100%) of 30 Apple iPads, totaling $11,340, could not be located on school grounds (PO 3822330) | The Principal and/or Technology Coordinator must implement adequate safeguards to prevent loss or theft of assets. Upon discovery of potential loss or theft of an asset, the Technology Coordinator must document, research and report the potential loss or theft to Risk Management, the Department of Facilities, and Safety & Security. A police report must also be filed. |



*Office of Internal Audit & Advisory Services*
*School Audit FY23 - Lindblom HS (46511)*
*Principal Transition Review Report*

| Audit Area | Exceptions Noted | Internal Control (IC) Requirement |
|---|---|---|
| 11. Student Safety and Security | 27 (17%) of 156 school staff did not complete all mandated training through SafeSchools | The Principal will review the SY23 Annual Staff Training calendar to note when all mandated training is due. Periodic reviews will be conducted prior to the due dates to confirm staff are completing the training. One week prior to the due date, a memo will be sent to all staff requesting they complete the mandated training. The Principal will seek assistance from their HR business partner to determine the appropriate disciplinary action(s) to take with staff non-compliance. |

**Table 2: Management Action Plans**

All management actions plans (MAP) are to be completed by the MAP completion date listed below. Please submit MAP supporting documentation to CPS Audit Services, cpsauditservices@cps.edu.

Process Owners: **Abdul Muhammad, Principal (7/5/2022 - Present Day) | Laconda McDaniels, School Clerk (10/1/2015 - Present Day) | Kevin Booker, School Operations Manager (9/25/2022 - Present Day)**

| Finding Reference # | Management Action Plan (MAP) | MAP Completion Date |
|---|---|---|
| 3. Cash Receipts | Principal Muhammad must present the current school year fundraising proposals and accounting reports identified during the audit to the Network Chief and LSC for awareness. Please submit the completed fundraising documents or email to the Network Chief for awareness to IAAS. | 4/30/2023 |
| 6. Cash Disbursements | Principal Muhammad must present checks identified not evidencing LSC approval during the audit to the LSC for awareness during the next LSC Meeting. Additionally, Principal Muhammad must review the internal control requirement for expenditures exceeding $2,500 with the LSC during this meeting. Please submit the LSC Meeting Minutes to IAAS. | 4/30/2023 |
| 8. Cash Disbursements | Contact the JPM Chase representative, Daniel Cardenas (Daniel.m.cardenas@jpmorgan.com) to request a signature card for updating the school's checking account. The school must email the signature card to consolidatedbanking@cps.edu for final review and signature. Please submit the new bank signature card to IAAS. | 4/30/2023 |



*Office of Internal Audit & Advisory Services*
*School Audit FY23 - Lindblom HS (46511)*
*Principal Transition Review Report*

| Finding Reference # | Management Action Plan (MAP) | MAP Completion Date |
|---|---|---|
| 10. Fixed Assets | Annually conduct a physical inventory to verify that the asset inventory is being maintained properly and all physical assets are accounted for. Additionally, a quarterly review should be performed to specifically review and confirm that all transactions occurring in that period were properly recorded. If the asset was located on school grounds, the asset inventory must be updated. If the asset has not been located, the school must report the loss/theft to the appropriate parties listed in the internal control requirement, file a police report and update the asset inventory accordingly. Please submit the updated inventory log and/or a police report to IAAS. | 4/30/2023 |
| 11. Student Safety and Security | All past due training must be completed by staff or reported to the appropriate party. For non-compliant staff contact your Human Resource Business Partner on next steps for employee related discipline. Please notify IAAS when staff are current with training requirements. | 4/30/2023 |

## Section V: Prior Audit History

Internal Audit conducted a follow up audit of Lindblom HS in April 2017. The FY23 audit compared to the FY17, still indicates control deficiencies with cash disbursements and fixed assets as noted in Section IV.

## Section VI: Distribution List

| Name | Title |
|---|---|
| Pedro Martinez | Chief Executive Officer |
| Bogdana Chkoumbova | Chief Education Officer |
| Miroslava Krug | Chief Financial Officer |
| Felicia Sanders | Chief Schools Officer |
| James Patrick Alforque | Controller |
| Allison Tingwall | Executive Director, Principal Quality |
| Kishasha Ford | Director, LSC Relations |
| Tai Basurto | Director of School Leader Development |
| Devon LaRosa | Chief of Schools - Network 16 |
| Anthony Rodriguez | Deputy Chief of Schools - Network 16 |
| Sonia Castro | Operations Manager - Network 16 |
| Abdul Muhammad | Principal - Robert Lindblom Math & Science Academy HS |



| Internal Audit Team | |
|---|---|
| Shelly Banks | Chief Internal Auditor |
| Arnold Kendall | Manager of Internal Audit |
| Lizeth Alvarez | Audit Supervisor |
| Morgan Moss | Senior Auditor |



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

## SY23 Indicator 13 Audit
19 messages

---

**Haywood, Demitrius** <dohaywood@cps.edu>                                    Sun, Mar 5, 2023 at 9:39 PM
To: Abdul Muhammad <akmuhammad@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>
Cc: Tora Evans <tevans@cps.edu>, Madeline Phillips <maphillips9@cps.edu>, Callie Duffin <ciduffin@cps.edu>, Devon
LaRosa <dplarosa@cps.edu>, Anthony Rodriguez <anrodriguez@cps.edu>

Good evening Lindblom Admin,

I hope this message finds you well! I am sending this email because your school has been selected to be a part of the
above-referenced audit. Your school is on the non-compliance list, and we would appreciate your help starting the
remediation process. To find the specific errors, please visit the Phase 0 report in SSM, entitled
"Transition Data Counts by School Compliance." I also include a link to the Transition Website containing resources that
support this process.

The Transition Specialists (included in this communication) and I would like to schedule an initial meeting with you to help
you with the next audit process steps. I'm sorry in advance for the urgency that is attached to this request. Please let me
know your availability for Monday and Tuesday this week to meet. I will coordinate with the transition team and send a
confirmation. I apologize for the late notice, I did express that you do not have a CM at this time. I look forward to hearing
from you.

**Ms. Dee Haywood |** District Representative
**Office of Diverse Learner Supports and Services**
**Email |** Dohaywood@cps.edu  773-294-0407

Click on the **Procedures and Standards Customer Support Survey** to share your experience with my support.
Please visit our **website** for more information regarding upcoming ODLSS Events
Parents!

---

**Kearney, Debra** <drkearney@cps.edu>                                    Sun, Mar 5, 2023 at 10:38 PM
To: "Haywood, Demitrius" <dohaywood@cps.edu>
Cc: Abdul Muhammad <akmuhammad@cps.edu>, Anthony Rodriguez <anrodriguez@cps.edu>, Callie Duffin
<ciduffin@cps.edu>, Devon LaRosa <dplarosa@cps.edu>, Madeline Phillips <maphillips9@cps.edu>, Tora Evans
<tevans@cps.edu>

Greetings,

Unfortunately that is such a short notice I have planned meetings already scheduled for Monday and as you are aware
our team day is Tuesday and our full time case manager is on a leave of absence these IEP meetings have already been
Pre scheduled. I am available on Wednesday except from 10:00 - 10:45 I have a pre observation scheduled. Does
Wednesday work for you?
[Quoted text hidden]
--
Debra Kearney
Assistant Principal
Lindblom Math and Science Academy
773-535-9300
https://lindblomeagles.org/

Pronouns: She/Her/Hers (learn more here)

Ex. Z

"The growth and development of people is the highest calling of leadership." --*Harvey S. Firestone*

---

**Haywood, Demitrius** <dohaywood@cps.edu>                           Mon, Mar 6, 2023 at 6:44 AM
To: Abdul Muhammad <akmuhammad@cps.edu>, Erin Guidara <emguidara@cps.edu>, "Kearney, Debra"
<drkearney@cps.edu>
Cc: Anthony Rodriguez <anrodriguez@cps.edu>, Callie Duffin <ciduffin@cps.edu>, Devon LaRosa <dplarosa@cps.edu>,
Madeline Phillips <maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

Good morning,

These are the days that the transition team has available. I am adding Erin for awareness and the Principal at the top of
the list.

Principal Muhammad-please share what 30 minute timeframe you have over the next two days to hear what the
expectation of the audit will be. If you would like Erin to sit in, please coordinate times and give us a few options. Thank
you in advance for your cooperation.
[Quoted text hidden]
--
[Quoted text hidden]

---

**Kearney, Debra** <drkearney@cps.edu>                           Mon, Mar 6, 2023 at 7:57 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Please do not include Erin
[Quoted text hidden]

---

**Kearney, Debra** <drkearney@cps.edu>                           Mon, Mar 6, 2023 at 8:04 AM
To: "Haywood, Demitrius" <dohaywood@cps.edu>
Cc: Abdul Muhammad <akmuhammad@cps.edu>, Anthony Rodriguez <anrodriguez@cps.edu>, Callie Duffin
<ciduffin@cps.edu>, Devon LaRosa <dplarosa@cps.edu>, Erin Guidara <emguidara@cps.edu>, Madeline Phillips
<maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

Greetings

With all due respect Ms. Guidara has already expressed that due to her going on maternity leave she is not able to take
on any additional duties. Since it's only 30 minutes I can rearrange my time for today. Does 11:30 work?
[Quoted text hidden]

---

**Haywood, Demitrius** <dohaywood@cps.edu>                           Mon, Mar 6, 2023 at 8:28 AM
To: "Kearney, Debra" <drkearney@cps.edu>
Cc: Abdul Muhammad <akmuhammad@cps.edu>, Anthony Rodriguez <anrodriguez@cps.edu>, Callie Duffin
<ciduffin@cps.edu>, Devon LaRosa <dplarosa@cps.edu>, Erin Guidara <emguidara@cps.edu>, Madeline Phillips
<maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

We have a school already. Erin is a teacher and currently a .5 CM. Therefore, she should be aware of what is going on.
Nothing was mentioned about additional duties. The principal she definitely be apart of the meeting. Please connect with
him regarding times of availability.
[Quoted text hidden]

---

**Guidara, Erin** <emguidara@cps.edu>                           Mon, Mar 6, 2023 at 10:19 AM
To: "Haywood, Demitrius" <dohaywood@cps.edu>
Cc: "Kearney, Debra" <drkearney@cps.edu>, Abdul Muhammad <akmuhammad@cps.edu>, Anthony Rodriguez
<anrodriguez@cps.edu>, Callie Duffin <ciduffin@cps.edu>, Devon LaRosa <dplarosa@cps.edu>, Madeline Phillips
<maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

Good Morning,

I will make myself available just let me know the time and place.


Thanks

[Quoted text hidden]

---

**Haywood, Demitrius** <dohaywood@cps.edu>                                    Mon, Mar 6, 2023 at 12:09 PM
To: "Guidara, Erin" <emguidara@cps.edu>
Cc: "Kearney, Debra" <drkearney@cps.edu>, Abdul Muhammad <akmuhammad@cps.edu>, Callie Duffin
<ciduffin@cps.edu>, Madeline Phillips <maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

I am there in the building tomorrow. If we can squeeze in at least 35 to 40 minutes that would be great. I will wait for
Kearny to share her availability as well. Thanks

**Ms. Dee Haywood** | District Representative
**Office of Diverse Learner Supports and Services**
**Email** | Dohaywood@cps.edu  773-294-0407

Click on the Procedures and Standards Customer Support Survey to share your experience with my support.
Please visit our website for more information regarding upcoming ODLSS Events
Parents!

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                    Mon, Mar 6, 2023 at 1:07 PM
To: "Haywood, Demitrius" <dohaywood@cps.edu>
Cc: "Guidara, Erin" <emguidara@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>, Callie Duffin <ciduffin@cps.edu>,
Madeline Phillips <maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

Good Afternoon Ms. Haywood,

What time are you available tomorrow? Also, besides the Lindblom admin team, who else will be a part of this meeting?
[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/


ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named
herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this
document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly
prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and
printout thereof.

---

**Haywood, Demitrius** <dohaywood@cps.edu>                                    Mon, Mar 6, 2023 at 1:20 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Callie Duffin <ciduffin@cps.edu>, "Guidara, Erin" <emguidara@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>,
Madeline Phillips <maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

The transition team will be apart of the meeting. I have meetings all day but will make myself available any time with the exception of 2pm. That meeting will need all of my attention.

[Quoted text hidden]

---

**Kearney, Debra** <drkearney@cps.edu>                                     Mon, Mar 6, 2023 at 4:42 PM
To: "Haywood, Demitrius" <dohaywood@cps.edu>
Cc: "Muhammad, Abdul" <akmuhammad@cps.edu>, Callie Duffin <ciduffin@cps.edu>, "Guidara, Erin"
<emguidara@cps.edu>, Madeline Phillips <maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

Greetings,

So sorry it took a while for me to respond but I have been in meetings. I am available at 12:45pm tomorrow.

[Quoted text hidden]

---

**Guidara, Erin** <emguidara@cps.edu>                                       Tue, Mar 7, 2023 at 7:48 AM
To: "Kearney, Debra" <drkearney@cps.edu>
Cc: "Haywood, Demitrius" <dohaywood@cps.edu>, "Muhammad, Abdul" <akmuhammad@cps.edu>, Callie Duffin
<ciduffin@cps.edu>, Madeline Phillips <maphillips9@cps.edu>, Tora Evans <tevans@cps.edu>

Good Morning,

                    I have class at that time but I can get one of the inclusion teachers to cover for me if it is ok with admin.


Thanks

[Quoted text hidden]

---

**Haywood, Demitrius** <dohaywood@cps.edu>                                   Tue, Mar 7, 2023 at 7:54 AM
To: "Guidara, Erin" <emguidara@cps.edu>
Cc: Callie Duffin <ciduffin@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>, Madeline Phillips <maphillips9@cps.edu>,
"Muhammad, Abdul" <akmuhammad@cps.edu>, Tora Evans <tevans@cps.edu>

I think it will be important for you to be there. I am waiting to see if the time is good for the transition team.

[Quoted text hidden]

---

**Phillips, Madeline** <maphillips9@cps.edu>                                 Tue, Mar 7, 2023 at 8:28 AM
To: "Haywood, Demitrius" <dohaywood@cps.edu>
Cc: "Guidara, Erin" <emguidara@cps.edu>, Callie Duffin <ciduffin@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>,
"Muhammad, Abdul" <akmuhammad@cps.edu>, Tora Evans <tevans@cps.edu>

Good morning all,

I hope this email finds you healthy and well. We have a meeting with another school in the Ind. 13 Audit Cycle from 1pm-
2pm. I am working to adjust the aforementioned meeting time so that we may accommodate a meeting with your
school team from 12:45-1:15pm. I will follow up to confirm as soon as possible.

Take care and talk soon,
--
Madeline (Maddie) Phillips I Transition Specialist
Pronouns: She/her/hers | Honorific: Ms.
Office of Diverse Learner Supports & Services I Chicago Public Schools
42 W Madison St., Chicago, IL 60602
Office No. 773.553.1881 | Email: MAPhillips9@cps.edu

**Need access to transition assessments, literature, and supports?**
Visit the **ODLSS Transition Services Website!**

**Want to learn more about Transition Planning for students with disabilities?** Attend a training!
*Click **here** to access our Professional Learning offerings, schedule, and registration information.*

**"My worldview is this: At all times, people are doing one of two things. They're showing love. Or they're crying out for it."**

[Quoted text hidden]

---

**Phillips, Madeline** <maphillips9@cps.edu>                                               Tue, Mar 7, 2023 at 8:49 AM
To: "Haywood, Demitrius" <dohaywood@cps.edu>
Cc: "Guidara, Erin" <emguidara@cps.edu>, Callie Duffin <ciduffin@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>,
"Muhammad, Abdul" <akmuhammad@cps.edu>, Tora Evans <tevans@cps.edu>

Greetings again all,

The Transition Team is able to meet from 12:45pm-1:15pm.

Thank you kindly,
--
Madeline (Maddie) Phillips I Transition Specialist
Pronouns: She/her/hers | Honorific: Ms.
Office of Diverse Learner Supports & Services I Chicago Public Schools
42 W Madison St., Chicago, IL 60602
Office No. 773.553.1881 | Email: MAPhillips9@cps.edu

**Need access to transition assessments, literature, and supports?**
Visit the **ODLSS Transition Services Website!**

**Want to learn more about Transition Planning for students with disabilities? Attend a training!**
*Click **here** to access our Professional Learning offerings, schedule, and registration information.*



**"My worldview is this: At all times, people are doing one of two things. They're showing love. Or they're crying out for it."**

[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                               Tue, Mar 7, 2023 at 9:16 AM
To: "Phillips, Madeline" <maphillips9@cps.edu>
Cc: "Haywood, Demitrius" <dohaywood@cps.edu>, "Guidara, Erin" <emguidara@cps.edu>, Callie Duffin <ciduffin@cps.edu>,
"Kearney, Debra" <drkearney@cps.edu>, Tora Evans <tevans@cps.edu>

Thank you for following up with us on this. Mr. Haywood, I would like Ms. Kearey to join me in the meeting with the
transition team. Ms. Kearney can fill Ms. Guidara in on next steps. I will see you at 12:45 pm.
[Quoted text hidden]

---

**Haywood, Demitrius** <dohaywood@cps.edu>                                               Tue, Mar 7, 2023 at 9:50 AM
To: "Phillips, Madeline" <maphillips9@cps.edu>
Cc: "Guidara, Erin" <emguidara@cps.edu>, Callie Duffin <ciduffin@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>,
"Muhammad, Abdul" <akmuhammad@cps.edu>, Tora Evans <tevans@cps.edu>

Ok great thank you!

**Ms. Dee Haywood | District Representative**

**Office of Diverse Learner Supports and Services**
**Email** | Dohaywood@cps.edu  773-294-0407

**Click on the Procedures and Standards Customer Support Survey to share your experience with my support.**
Please visit our **website** for more information regarding upcoming ODLSS Events
Parents!

[Quoted text hidden]

---

**Guidara, Erin** <emguidara@cps.edu>                                       Tue, Mar 7, 2023 at 9:50 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: "Phillips, Madeline" <maphillips9@cps.edu>, "Haywood, Demitrius" <dohaywood@cps.edu>, Callie Duffin
<ciduffin@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>, Tora Evans <tevans@cps.edu>

Just to clarify for planning purposes I am not needed in this meeting? Ms Haywood had suggested  I should be present.

[Quoted text hidden]

---

**Haywood, Demitrius** <dohaywood@cps.edu>                                  Tue, Mar 7, 2023 at 10:02 AM
To: "Guidara, Erin" <emguidara@cps.edu>, Abdul Muhammad <akmuhammad@cps.edu>
Cc: "Phillips, Madeline" <maphillips9@cps.edu>, Callie Duffin <ciduffin@cps.edu>, "Kearney, Debra" <drkearney@cps.edu>,
Tora Evans <tevans@cps.edu>

Mr. Muhammad-although Erin will be going on leave I think it will be helpful to hear the mistakes that were made last year.
Both CMs were new last year and this will be a good way to hear things again directly from the specialist. Respectfully, if
you can allow her to be relieved today for the 30 minutes that will be great! Some of the errors were possibly made last
year if that helps.

**Ms. Dee Haywood** | District Representative
**Office of Diverse Learner Supports and Services**
**Email** | Dohaywood@cps.edu  773-294-0407

**Click on the Procedures and Standards Customer Support Survey to share your experience with my support.**
Please visit our **website** for more information regarding upcoming ODLSS Events
Parents!

[Quoted text hidden]



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

## Security Audit
3 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                    Wed, Nov 16, 2022 at 12:59 PM
To: Steven Long <smlong@cps.edu>, Gregory Thomas <gthomas17@cps.edu>
Cc: "Morales, Adrienne" <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>

Good Afternoon,

I am reaching out per our conversation regarding a security audit for Lindblom. I have concerns related to the following areas:

1. Morning Entry - I have observed the morning entry for several days and noticed that the metal detector is going off, but the students are not being wanded properly.

2. Student Re-entry - I have observed when students leave the building, they are not being asked to go through the metal detector.

3. Door Unattended - I have observed entry doors be unattended.

4. Parent Entry - Clarity needs to be provided on parent entry.

5. Dismissal - I have noticed that students are exiting from various unattended side doors.

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

---

**Long, Steven** <smlong@cps.edu>                    Wed, Nov 16, 2022 at 1:45 PM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Gregory Thomas <gthomas17@cps.edu>, "Morales, Adrienne" <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>

Good afternoon Principal Muhammad,

1) We can schedule observation of morning student arrival/screening process soon. We may not be able to schedule until after Thanksgiving break.

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 420 of 523 PageID #:453

2) As you are aware we have previously met with you and the head of security (Mr. Cohill) in discussing the importance of students being rescreened when they have left from the the school building campus. My recommendation is that we meet with your school security team and reiterate the importance of this taking place. Additional recommendation is for school leadership to email all school security officers to make sure they understand the expectations in regards.
Also it should be noted within the security officers job post orders/schedule.

3) I'm not sure what you mean when you say that you have observed doors unattended.

Do you mean primary entrance areas where students enter the school?

4) I recommend that visitors and parents should be screened when they enter the school to ensure there are no dangerous objects/items/weapons in the school building.

Also school security officers should be utilizing the Visitor Management System.

5) Is there a school protocol that requires students to exit the school from specific identified doors?
[Quoted text hidden]

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                              Fri, Nov 18, 2022 at 12:38 PM
To: "Long, Steven" <smlong@cps.edu>
Cc: Gregory Thomas <gthomas17@cps.edu>, "Morales, Adrienne" <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>

Good Afternoon,

Thank you for following up with me.

I have instituted a weekly security meeting on Mondays, starting at the beginning of the school year. I have reiterated these expectations at each meeting.

Yes, I have observed entry doors being unattended, however, it has improved.

There was no school protocol in place when I arrived, however, we will establish a protocol.
[Quoted text hidden]

Ex. AA



# INVESTIGATIVE REPORT

File Number: 9543

Date: March 19, 2023
To: Libby Massey
From: Kelly Tarrant, Manager, Investigations
Subject: Abdul Muhammad, Interim Principal
Type of Incident: Mismanagement
School: Lindblom Math & Science Academy
Network: 16

---

In early December 2022, a group of seven Lindblom staff members participated in Board Office Hours and filed a formal complaint[1]. The complaint was submitted to the Law Investigation Unit (LIU) on Friday, December 16, 2022. Upon examining the complaint, the most significant allegations appeared to be as follows:

- Instances that are not in accordance with CPS policy
- Breaches of Illinois State Special Education Laws
- Concerns regarding student safety and timely Aspen reporting
- Consistent irresponsible hiring practices

A meeting took place on December 19, 2022, between **Kelly Tarrant (Tarrant)**, Title IX Chief **Camie Pratt**, General Counsel **Joseph Moriarty**, and Deputy Chief of Staff to the Board, **Vincentia Egonmwan**. Following a thorough review of the complaint, it was concluded that a triage was necessary. The following interviews were scheduled as a result:

**Wednesday, December 21, 2022:**
- 9:30  **Gabriela Feimer, EIN# 000222180** - Special Education Teacher
- 10:15  **Christina Davis, EIN# 000215580** - Regular Teacher
- 11:30  **Lauren Levites, EIN# 000212727** - Regular Teacher
- 12:15  **Danya Ata, EIN# 000253895** - Regular Teacher

**Thursday, December 22, 2022:**
- 9:30  **Joseph O'Hara, EIN#000249054** - Regular Teacher
- 3:00  **Laconda McDaniel, EIN#000238986** - School Clerk
- 3:30  **Ian Brannigan, EIN#000227287** - Regular Teacher

---
[1] The formal complaint is included as Attachment A.

Ex. BB

## Interview with Gabriela Feimer, Special Education Teacher/ALSC Representative

On December 21, 2022, the LIU interviewed Special Education Teacher **Gabriela Feimer (Feimer)**. Feimer stated that this is her 12th year at Lindblom. Feimer stated that she and six other faculty members wrote the complaint to the Board regarding Interim Principal **Abdul Muhammad** (Muhammad), **EIN 000006389.**

Feimer conducted an audit[2] on IEP meetings and observed a pattern where incorrect general education teachers were listed as invitees for several meetings. Consequently, the appropriate teachers were not invited. Feimer is referring to the original formal complaint, which reads, in part, the following:

- *Several clinicians have reported issues with scheduling of meetings. Meeting times and dates were not being shared. Meetings were rescheduled and not told to any team members. Meetings were scheduled with only 2 days notice and team members had to scramble to write and complete IEPs. Additionally, clinicians were being left off of the Notice of Conferences for meetings and not being invited to meetings.*

Feimer reported that a parent requested to meet with their child's General Education teacher in one such meeting but was refused. Another teacher who attempted to help was reprimanded by Assistant Principal **Debra Kearney** (AP Kearney), **EIN 000088154**. The parent in question was Spanish-speaking and felt exploited. As a result, the child lost access to nurse services, leaving the parent uneasy. Feimer noted that General Education teachers responsible for high-needs children drafted an email outlining the violations to AP Kearney and the new case manager. However, according to Feimer, there has not been a satisfactory response. Feimer further stated that the district representative promised to reach out, but AP Kearney has not acknowledged any wrongdoing thus far.

Feimer also highlighted another example of Special Education (SPED) concerns. In one case, the Occupational Therapist (OT) was not invited to an IEP meeting. As a result, a student[3] lost OT services.

According to Feimer, at the beginning of the year, Interim Principal Muhammad introduced everyone, including AP Kearney, whom he described as having abundant Special Education knowledge. However, Feimer expressed concern, stating that AP Kearney did not understand case management. Feimer also claimed that AP Kearney was unwilling to listen when teachers disagreed with her. As semester one progressed, Feimer said that AP Kearney was no longer the SPED expert and was not taking advice from

---

[2] The audit is included as Attachment B.
[3] The student has been identified as M███ M████, ███████████

*File#: 9543*

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 423 of 523 PageID #:456

those who were. Feimer herself had two years of experience as a case manager and had to seek guidance when unsure. Although Feimer remains actively involved, she is on the inclusion side, while the inclusion manager, who has been at Lindblom for a long time, is part-time. The cluster program, which involves a larger group of students and more services, is handled by the new cluster case manager/504 and AP Kearney.

Feimer stated that a cluster student[4] had exhibited a dangerous pattern of behavior, including making forceful contact with his genitals with three staff members, resulting in one instance where a staff member's bra was snapped. SASS was called, and social workers were involved. Despite the incident occurring on a Monday, no case log was found with OSP when inquired about on Thursday, and even three days later, the incident had not been logged in Aspen. The cluster teachers could not input it into Aspen, and it was eventually logged a week later. Despite lacking Aspen documentation, the behavioral health team was brought in. One proposed solution was to transfer the student's old SECA from Libby to Lindblom. However, this did not resolve any issues, as the student is still a danger to himself and others and is unresponsive to the SECA's efforts. One staff member is so afraid to leave the student with anyone that she has not had one period off this year. In one instance, the student ran away from her and ingested chemicals in a science room.

Feimer is referring to the original formal complaint, which reads, in part, the following:

- *Admin and the case manager have no knowledge of how a cluster program runs and have mismanaged situations with cluster students that have put students and staff in danger. There is a current cluster student who has had a pattern of exposing himself, hurting himself, and hurting staff members. A staff member was giving up all their preps and lunch periods to supervise the student for his safety starting September 12. When staff asked for support, administration downplayed the severity of the situation and was not proactive in creating solutions to ensure the safety of students or staff. PPC attempted to address the issues on October 13 and November 10, and the administration continued to downplay the issue. It was not until we filed a grievance that we had any progress in the situation. A grievance was filed on November 2 that addressed the missed preps and lack of plan for coverage. On November 14, a grievance conference was held, and it was at that meeting that Principal Muhammad addressed the concerns and agreed to the proposed solutions. Even though teachers are now making up preps, the situation with the student is far from resolved and administration continues to downplay the severity of the situation. Furthermore, administration could not communicate CPS's physical restraint and seclusion policy, especially as it pertains to this situation with the cluster student. Staff members had to review and explain the CPS physical restraint and seclusion policy with*

---

[4] The student is identified as K███ K███, ████████████████

*File#: 9543*

*administration after an email with all service providers because of conflicting directives that would be in violation of the policy.*

Additionally, Feimer stated, "*On more than one occasion, one of my students[5], [Student D], has entered the classroom, and quickly fled, sometimes after only a brief appearance. Despite this behavior, no records of it have been made. This student has been labeled as truant, as he only attended school for six days last year and did not pass. However, when we referred to him as a "flight risk," our principal reprimanded us, claiming that such language contains racist undertones.*

Feimer stated that the student was found on a neighboring roof after school last year, and a safety plan was established, although no SPED teacher was involved. Recently, the student fled again, and according to Feimer, "*we were not informed, nor were his guardians.*" The student has a history of running away from home and refusing to disclose his whereabouts and is currently designated as STLS. Feimer explained that his home life is complicated by the fact that he is adopted and his mother is disabled, making it difficult for her to take him to school.

### Interview of Christina Davis, Regular Teacher (P.E./Athletic Director)

On December 21, 2022, the LIU interviewed Physical Education **Christina Davis (Davis)**. Davis also serves as the Athletic Director. Davis has been with Lindblom for 13 years.

Davis has not received any communication about IEP meetings this year. According to Davis, the Administration has not requested her presence in any IEP meetings, even though she has attended them in previous years.

Davis has concerns about odd hiring choices this school year. Davis states that in June 2022, AP Kearney offered the Athletic Coordinator position to a SECA named **Daniel Ostrozovich** to provide the needed help. On June 14th, Ostrozovich accepted the offer. Davis met with Interim Principal Muhammad in July to discuss the program and informed him of Ostrozovich's appointment. However, in August 2022, AP Kearney notified Davis of delays in placing Ostrozovich in the position. The reason given to Davis was that Interim Principal Muhammad was instructed by downtown to reopen the position and have new applicants apply. Daniel Ostrozovich reapplied for the position, but a consultant named **Carl Williams, EIN# 000019084,** was brought in by Interim Principal Muhammad, in Davis' absence, to sit on the interview panel. The final outcome was that **Ahmad Shareef, EIN# 000131032**, who had connections with Muhammad and Carl Williams and previously worked at Muhammad's former school, was chosen as the

---

[5] The student is identified as D██ W████, ████████████

Athletic Coordinator. Despite Ostrosovich's familiarity with wrestling and girl's track and field, he was not selected, and he subsequently took up a position at Lincoln Park High School. It is worth noting that Carl Williams, who was an athletics consultant, has yet to introduce himself, according to Davis.

Davis is referring to the original formal complaint presented to the Board, which reads, in part, the following:

- *The athletics mentor and "advisor" to Mr. Muhammad, Carl Williams, has taken on responsibilities supervising security at the school. Mr. Williams has never served in an administrative capacity, and his credentials on ISBE only include a PEL for PE. Staff have been told, when they asked who he was, that he was simply a retired hourly employee serving as an advisor to Principal Muhammad. This staff member was also a former co-worker of Mr. Muhammad when they worked at CVS. This staff member has caused many problems with staff at our school as he has continuously overstepped his responsibilities as outlined to staff by Principal Muhammad. For example, he made critical changes to our security plan for Open House without consulting our then head of security or Principal Muhammad himself who was not present at this event.*

Davis stated that many experienced teachers are considering options for next year, including the possibility of leaving. Davis stated, *"I don't think this issue can be fixed with training alone."*

## Interview with Lauren Levites /Regular Teacher (Science)

On December 21, 2022, the LIU interviewed Regular Teacher **Lauren Levites (Levites)**. Levites has been with Lindblom for 11 years.

Levites stated that Special Education issues (SPED) had been discussed in several PPC meetings. Levites has been included in an email chain regarding a student who requires inclusion and has left the building in the past. The student has a safety plan in place, but there are concerns about its effectiveness and implementation due to inadequate training. Levites expressed apprehension about whether the school is the appropriate environment for this cluster student with severe issues. Levites recounted an incident where the student was left unsupervised and exhibited troubling behavior, including removing their clothes and consuming ethanol from a refrigerator, resulting in hospitalization.

Levites is not sure whether this incident has been recorded in Aspen. Levites explained that she lacks access to Aspen to verify whether a report has been made, and she has doubts that any action will be taken unless multiple individuals inquire about it. However, Levites noted that she has not needed to make any reports in Aspen.

*Investigative Report – Lindblom Math & Science Academy*
*Page 6*

Levites, who is the chair of the Science Department, reported that they had an open position during the summer and collected resumes. After conducting interviews, they typically forwarded suitable candidates to either the Principal or the Assistant Principal. However, following the departure of the former Assistant Principal, Levites noticed a decline in the number and quality of resumes received. One of the resumes they received was from someone who had never lived in the US, while another was from someone with a Ph.D. in physics but lacked teaching credentials. Upon discussing this with the Principal, Levites expressed concern about the latter candidate's suitability for the role. Levites stated that Interim Principal Muhammad thought they should extend the offer anyhow, which greatly concerned Levites. Consequently, the science teachers opted to cover the vacancy by taking on additional classes, known as "point 2's," which Levites acknowledged placed undue pressure on some department members. However, they felt that their efforts were not appreciated.

According to Levites, Interim Principal Muhammad offered someone at his church the position of Operations Manager, a new position at Lindblom. Levites claimed there was no discussion or vote on the matter, and many people were surprised by the hiring. The role of the Operations Manager in the building was unclear, but it appeared to involve tasks that an Assistant Principal would typically do.

Levites identified **Kevin Booker**[6], **EIN# 000137579,** as the new Operations Manager, responsible for ordering and purchasing supplies. Levites claimed that Interim Principal Muhammad had made unusual spending decisions, including purchasing a MAC computer and two printers for himself, while the counseling department struggled to obtain necessary supplies. Muhammad had also failed to order AP Psychology books in a timely manner and only recently ordered school software subscriptions.

Another concern Levites shared was the hiring of Carl Williams. During a PPC meeting, the topic of discussion turned to Carl Williams, who had been involved in a physical altercation with another staff member during the open house event. Interim Principal Muhammad appeared very passionate about the matter and refused to discuss it further during the meeting. When staff members at the meeting asked for information about Williams' schedule and hours, Muhammad did not provide any details, only stating that Williams was his advisor. Levites expressed uncertainty about Williams' qualifications and role, noting that she believed Williams was a former physical education teacher and that she had not observed Williams interacting with staff members, only with coaches and security personnel.

---

[6] This hiring concern regarding Mr. Booker was referred to the OIG.
*File#: 9543*

## Interview with Danya Ata, Regular Teacher (English)

On December 21, 2022, the LIU interviewed **Danya Ata (Ata)**, who teaches English at Lindblom and has been at Lindblom since 2017. Ms. Ata is also an Interventionist at Lindblom.

According to Ata, Interim Principal Muhammad has very limited engagement with the staff. Ata provided an example involving Student A (male), who had been caught smoking marijuana multiple times in school. Student A went to the bathroom and was detected by the security guard. Ata expressed her dissatisfaction with the consequences, which she believed were insufficient, given that this was the fourth instance of Student A[7] being caught. The student only received a one-day suspension. Ata raised her concerns with Muhammad but did not recall receiving any responses from him. Although AP Kearney developed a safety plan, Ata stated that it took considerable time. Ata expressed her frustration, stating they were told they didn't understand Student A and were making judgments based on the student's race.

Ata reported a lack of interaction with Muhammad, noting that her communication in the past was much clearer with the former administration. Ata stated that she would have been informed of any necessary changes and the consequences in previous instances before Interim Principal Muhammad's tenure. Ata indicated that Student A had failed her course and believed other teachers felt pressured to pass the student. Additionally, Ata reported that **Tammie Padilla, EIN#000225048,** the SECA for Student A, requested access to Google classroom and that Ata has evidence that Padilla completed an assignment on the student's behalf. Ata raised concern that Padilla was hired without notification and suggested that Padilla's relationship with the principal may be a factor in her employment. Ata further accused Padilla of violating her license.

Ata volunteered to chaperone for the 2022 Homecoming dance due to a shortage of security staff. Ata stood by the front entrance. According to Ata, there was only one guard at the entrance despite 700 students attending the dance, and the administration did not address the issue. Ata also mentioned that the security officer allowed one of her students, who had a history of being under the influence, to enter the dance. The student attempted to push Ata, but she chose not to confront the student physically and allowed the student to enter. To add to the chaos, Ata reported that no one from the administration, including Interim Principal Muhammad, was present at the dance. Ata stated that she sent an email to address these issues. Ata stated that Interim Principal Muhammad blamed security for letting the student in the dance. Ata stated that she had to get her union involved to get consequences for the student.

---

[7] The LIU was not able to identify student A. THe incident was not seen in Aspen.

*File#: 9543*

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 428 of 523 PageID #:461

Ata stated, *"This admin is not fit to run the school. It breaks my heart that some are considering leaving. This is a teacher-led school. The fact that so many want to leave it is astonishing."*

## Interview with Joseph O'Hara / Regular Teacher (Chemistry/ Physics)/ ALSC Representative

On December 22, 2022, the LIU interviewed Chemistry and Physics teacher **Joseph O'Hara (O'Hara)**. O'Hara has been with CPS since 2016. O'Hara was recently elected to the ALSC and appointed as the PPLC Chair. On one occasion, O'Hara intervened to prevent a student from leaving the school, stating, *"I am 6'4, and I blocked him."* O'Hara is well-versed in the issues surrounding IEPs and the importance of inviting the correct teachers to attend student IEP meetings. O'Hara noted that communication from the Administration has ceased since around October, leading to a breakdown in communication on IEP issues. Prior to this, O'Hara reported receiving timely notices about schedule changes.

O'Hara is referring to a complaint also mentioned in the formal complaint, which reads, in part, the following:

*[The] admin's inability and unwillingness to get to know the staff at Lindblom. After being admin for almost 5 months now, the team still does not know names of the majority of staff members. Even worse, there have been countless times that admin has not been able to differentiate between teachers and other staff members and even teachers and students. The admin team has made it clear that they do not know the roles of individuals in the building as evidenced from many interactions and miscommunication. The most egregious of all is a public Facebook post shared by Principal Muhammad on August 22nd. In this post, Principal Muhammad referred to staff, students, and parents – the entire Lindblom community – as "the opposition."*

According to O'Hara, the school environment was one where teachers were extensively involved. They were part of the hiring process, communicated regularly, and collaborated through PPLC meetings. However, poor communication emerged during the 2022 school year. O'Hara is a co-leader of the GCLS program and has highlighted that there is a significant non-binary population in the school. Despite a meeting being held at the beginning of the year, communication has been lacking, and O'Hara had to CC the Network Chief in an email to Interim Principal Muhammad in order to get a response. O'Hara also mentioned that he has not received any invitations to IEP or 504 meetings this school year, even though he does have some students with IEPs.

## Interview with Laconda McDaniels, School Clerk

**Laconda McDaniels (McDaniels)** has been with Lindblom for eight years. She serves as one of two clerks at Lindblom. McDaniels noted peculiar purchases made by Interim Principal Muhammad for a back-to-school rally at Lindblom. McDaniels is referring to the original complaint, which stated, in part, the following:

*On 8/26, the administration organized and hosted a "Welcome Back to School" Concert. This concert involved several guests who were not approved through the CPS volunteer process. These guests were introduced by Principal Muhammad as his friends, and immediately began advertising their brand. One of the "brand ambassadors" functioned as a hype person for the crowd and during her hype called on the school to "follow [her] on cash app". Additionally, the same volunteer then began circulating through the assembly, passing out cards and advertising literature. This entire event functioned more as a platform to advertise various media, singers, and authors who knew the principal rather than an event to hype up the school as it was sold to staff.*

McDaniels stated that although the students who attend Lindblom were already motivated to attend school, Muhammad insisted on organizing the rally. McDaniels observed odd purchases made by Muhammad, which included ordering balloons costing $5,000, arranging for a 360 photo booth, and hiring a DJ who played explicit music (photo below.)



According to McDaniels, Muhammad had some external guests who bypassed the usual volunteer process. McDaniels states, "*We typically enforce a rigorous process, even for volunteers.*" One of the special guests climbed onto the school's baby grand piano and performed on stage. McDaniels noted that Muhammad brought in a "*team*" to energize the crowd with entertainment, which was not typical. Some members of the entertainment group even advertised their "*CashApp*" handles, McDaniels added. Some of the entertainment people started filming the crowd. McDaniels had to have security intervene to get them to stop filming. McDaniels stated that one of the "brand ambassadors" threw slices of packaged bread to promote their bread company.

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 430 of 523 PageID #:463

McDaniels provided an example of Interim Principal Muhammad's unsupportive behavior by citing an incident involving a special education (SPED) teacher on maternity leave. McDaniels recounted that the teacher's leave was extended by one and a half months, but the principal did not arrange for a temporary replacement. Consequently, other teachers had to cover her classes.

McDaniels is referring to one of the main complaints in the formal complaint presented to the board, which reads, in part, the following:

*An inclusion teacher gave birth in June of 2022 and took leave until mid October. The leave was approved in July 2022. As of August 1, 2022 the TAT position was not posted in Taleo. On August 11th, the teacher on leave sent an email to all three members of administration (Principal Muhammad, AP Kearney, and AP **Adrienne Morales**) in regards to the leave. The teacher never received a response. On August 15th, the teacher sat in an interview with AP Kearney and brought up her leave and lack of coverage. AP Kearney did not know anything about the leave (despite both CPS HR and the teacher sending multiple emails to administration) and said the position would be posted ASAP. No position was posted. School began without a TAT covering the English minutes of 16 students, and the Independent Functioning minutes of 5 students. This includes the student mentioned previously that runs away, and yet administration did not feel the need to make sure that class had adequate coverage or students were missing minutes. A general education teacher with 5 of the 15 students without coverage sent an email regarding the vacancy on September 7th as support in the class was needed immediately. Administration did not immediately respond, but deflected to our school clerk who was filling it with a day to day sub not certified in Special Education. On September 10th the teacher on leave again emailed administration asking for an update. On September 12th, Principal Muhammad did respond that the position would be covered by a day to day sub and the inclusion department could cover the IEP minutes on their preps. A TAT position was posted on Taleo in mid-September, but went unfilled until the teacher returned on October 11th.*

McDaniels noted that the principal made the teachers feel as though they were at fault for the extended leave, insinuating that they did not provide accurate information about the teacher's absence, although that was never their responsibility.

McDaniels also reported that SECA Tammy Padilla is not a SECA but a Teacher's Assistant. McDaniels stated that Padilla herself told her that she is not a SECA. McDaniels stated that Padilla is coded as a SECA but that Padilla has told others she is not credentialed to be a SECA. McDaniels also stated, *"We have to locate her several times to retrieve the student."*

According to McDaniels, there have been some other unusual hiring practices at Lindblom since Interim Principal Muhammad arrived. McDaniels claimed that a total of

seven individuals have been hired during the current school year. McDaniels is referring to another portion of the formal complaint made to the Board, which reads, in part, the following:

*Since Principal Muhammad has joined Lindblom, he has hired or opened a number of positions that didn't previously exist at the school, among them an School Operations/Business Manager, athletics mentor to himself (retired hourly employee), an athletic coordinator, and a Community Relation Rep.*

McDaniels specifically pointed out that the appointment of Mr. Booker as Operational Manager had a significant impact on her own job. She stated that all of the access she previously had was now gone, and she did not receive any explanation as to why. McDaniels managed all substitute teachers and created daily rosters, but she could no longer access the rosters or attendance records.

Previously, the individual responsible for receiving cash or money order payments from parents was another clerk who also served as the school cashier. Presently, this duty is split between the Operation Manager and the other clerk. McDaniels reported that the Operation Manager lacks knowledge of various matters that McDaniels previously handled. For instance, the Operation Manager is unfamiliar with E-pay and requires McDaniels' assistance daily. While both the Operation Manager and McDaniels have access to the vault, only the Operation Manager possesses the key to the safe. McDaniels used to have access to both.

McDaniels is concerned about hiring multiple positions, as she had previously worked on the SY 23 budget and was aware of its limitations. Her concerns were heightened upon discovering that the new positions were being funded by local funds, causing her to worry about Lindblom's ability to make it through the school year. One such position, community representative, was filled by someone from Douglas. McDaniels has unpaid invoices dating back to the end of June. She has informed Muhammad and the Operation Manager that they should be paid using local funds. She has received numerous complaints about outstanding payments. McDaniels believes that Muhammad is delaying payments in anticipation of power grant funds. Still, she noted that the school has never relied solely on these funds in the past, as they are not immediately available.

McDaniels mentioned that before Thanksgiving, Interim Principal Muhammad realized that the power grant was not accessible and requested McDaniels to reach out to multiple firms to secure a "*promise to pay*." According to McDaniels, some companies agreed to provide Lindblom with the promise to pay until the end of November, while others declined. The Operation Manager was hired in October, but he had previously visited the school during the summer of 2022. At that time, Interim Principal Muhammad had

instructed McDaniels to exhibit the school budget to the Operation Manager even before he was hired.

### Interview with Ian Brannigan, Regular Teacher (Social Studies)

On December 22, 2023, the LIU interviewed teacher **Ian Brannigan (Brannigan),** who teaches Social Studies at Lindblom. Brannigan has been at Lindblom for 11 years.

According to Brannigan, despite having teacher vacancies, Interim Principal Muhammad displayed a great deal of indifference towards the situation and didn't seem to care that a class could go without a teacher for 2-4 weeks. Brannigan also expressed the opinion that Muhammad had little concern for the school's overall functioning, stating that he "*didn't care*" about it. Additionally, Brannigan observed that Muhammad had hired several former employees from Douglas.

According to Brannigan, there was another instance of the Principal's apathy just yesterday. Brannigan reported that there was an event in the ballroom. ██ and ██ graders were in attendance, with only one substitute teacher, **Jaidah Wilson Tornbow, EIN #000070628**, responsible for overseeing the large group of 300 students. Despite this concerning situation, Brannigan noted that some staff members attempted to support Tornbow.

On the day of the interview, Brannigan reported that Lindblom had 27 teachers call off. As a result, Counselor **Charles Clark, EIN #000245927**, and Clerk McDaniels mobilized the staff to create a plan for the day to assist the students. According to Brannigan, Interim Principal Muhammad showed up after 8 am and walked past this large group of staff without demonstrating any enthusiasm or readiness to assist in managing the school's crisis of staff absences.

According to Brannigan, there have been numerous parental complaints regarding the events at Lindblom, with some contemplating not enrolling their younger children there. "*I've never witnessed this level of mistrust from parents,*" Brannigan remarked. He further disclosed that a vote of no confidence occurred, with 65 out of 104 CTU-affiliated individuals voting no confidence. Brannigan also mentioned that the survey was not distributed to non-tenured teachers.

According to Brannigan, the school staff's generosity in keeping the school functioning enables Interim Principal Muhammad's mismanagement.

*Investigative Report – Lindblom Math & Science Academy*
*Page 13*

## Additional Concerns

A parent informed Chief LaRosa on November 18, 2022, that their daughter had left the Lindblom campus to purchase snacks at a nearby Citgo. According to the student, "*the Principal*" had taken her and her friends to the gas station to get snacks before a school concert was set to begin.

Parent T████ S████[8] emailed Chief LaRosa the following:

*My child's phone location notified me that she was off campus at a Citgo gas station at 3:34pm and made a purchase. I immediately called her to see where she was located and she informed me that the Principal took them (students that were staying after school to see a play) to a Citgo nearby. I did not give him permission to take my child anywhere. She was to stay on school grounds until I picked her up after the play. As you are aware, Lindblom is in West Englewood. It is not a safe neighborhood to be walking around, especially after school. Furthermore, he is not supposed to take any students off campus without permission from a parent/guardian. Please advise. I am very upset about this incident as anything could've happened (robbery, shooting, etc) during this time.*

On November 18, 2022, Tarrant spoke to Chief LaRosa and requested him to review the matter with Interim Principal Muhammad. On Nov. 21, 2022, Muhammad emailed Chief LaRosa the following:

*Good morning Chief,*
*Thank you for sharing this email with me. In our conversation you stated that the Dean took the students off campus to the Citgo gas station, however this email says that the Principal was responsible. I want to reiterate that neither of us took any students off campus. The parent can reach out to me anytime to discuss this matter.*

On Friday, February 3, 2023, the LIU interviewed parent T████ S████ about the Citgo incident. Ms. S████ stated that her daughter is a ███ grade student at Lindblom. Her daughter did not know the staff at Lindblom that well and mistook the Dean for the Principal. Ms. S████ confirmed that Dean[9] **Shohn Williams, EIN 000207936**, escorted the students to Citgo. Ms. S████ stated that the Dean was passing out turkeys to the neighborhood and watched the students as they went to the gas station. The students left the school to walk to the Citgo, and the Dean saw them walking and assisted them. Ms. S████ said they should have been told to return to the school building.

---

8 ████████ ███ ███ ████████████████████████████████

9 Official title is School Culture Coordinator.

*File#: 9543*

*Investigative Report - Lindblom Math & Science Academy*
*Page 14*

On January 3rd, 2023, the LIU launched a formal investigation against Interim Principal Abdul Muhammad for mismanagement related to the triage process. As part of the investigation, the LIU conducted follow-up interviews with some witnesses who had previously interviewed in December. In addition, the LIU gathered data to compare with the complaints made by the witnesses during the triage process.

**LIU Updated Interviews**

On February 28, 2023, the LIU conducted follow-up interviews with Gabriela Feimer and LaConda McDaniels. Feimer referred to the original audit she created and shared with the Lindblom administration. The audit demonstrated IEP meetings from the Fall semester that did not invite the correct teachers for each student IEP meeting. Feimer and several other staff members emailed Muhammad regarding this audit. The email stated, in part, the following:

*As a department (+Patula) we have been reviewing the new IEPs for the cluster students on our caseloads and we have found several concerning issues. IEPs are legal documents and having incorrect information listed is very concerning. Please find our document of concerns here. We would like to address these issues so that they do not happen going forward. Please list the correct general education teachers on the notice of conference and cover sheet. Please invite all general education teachers who teach the student to the meetings by sending an invitation. Please do not excuse general education teachers without inviting them to the meeting and without their knowledge.*

*As a department (+Patula) we value the ability to teach and collaborate with the clusters students, Sped teachers, and case manager(s) so much so that our inclusion classes are often our favorites. We look forward to your response on how we can rectify this situation going forward.*

According to Feimer, she conducted a new audit since the December meeting, which included a review of consent forms for IEP meetings. Feimer reported that she had not previously considered this aspect of the audit and found that several students did not have consent forms. Feimer explained that parents must complete a consent form for IEP evaluations and that one of the questions on the form is whether they consent to the evaluation. Feimer reported finding several forms where this question was marked as "no," but evaluations had already been conducted. Some students also had "verbal consent" or "no" listed on their IEP forms, and Feimer said she has a list of those students. Feimer also mentioned that the ISBE monitor had visited Lindblom several times and met with staff. Feimer believes that AP Kearney attempted to intimidate the part-time case manager[10] by pressuring her to sign documents and put her name on them. Feimer

---

[10] The part time case manager is Special Education Teacher Erin Guidara, ID#000213655.

*File#: 9543*

recalled one instance of a form she discovered, which was checked off "*no.*" During a meeting with Principal Muhammad, Feimer and others informed him that the part-time case manager felt very uncomfortable due to the alleged illegal actions. "*We reached an agreement that the matter would be resolved, and eventually, the parent provided consent for 2/7,*" stated Feimer. Feimer stated that on SSM, one could see the original signed consent and a second backdated one. Feimer also stated that the staff had to engage in multiple discussions with the AP as the AP believed that verbal consent was sufficient. Feimer acknowledged that the specific issues had been resolved but noted that no long-term corrective measures had been taken.

LaConda McDaniels, the Clerk, updated the LIU on February 28, 2023. McDaniels stated that she now has access to the vault. She stated that the Operation Manager tells her where to order things from. "*He gives me all of the information I need to order. If the order does not have the correct account number I have to go back to him. I am a middle person.*" Previously McDaniels would handle orders herself and have the Principal sign off and transfer the funds. McDaniels believes Interim Principal Muhammad wants to separate the office staff from his "*personal*" staff.

During Black History Month, McDaniels stated that Muhammad purchased $5,500 in balloons from the same vendor who provided balloons for the back-to-school rally. This marked the fourth occasion that Lindblom had used the services of this balloon vendor. According to McDaniels, Muhammad sought to expand the vendor list by submitting referral applications for new potential vendors. McDaniels commented, "*I could see this in Oracle.*" On one occasion, McDaniels observed Muhammad submit an incomplete vendor application for a current CPS employee[11]. The submission was for a "*consultant.*"
According to McDaniels, the DJ named **Shaun Redwell**, who performed at the back-to-school rally, was initially denied as a vendor. McDaniels found out that the DJ was compensated by the entertainment group[12] employed by Muhammad. McDaniels clarified that CPS paid the entertainment group, a CPS vendor, and the entertainment group paid Shaun for his services.

McDaniels shared a student safety concern involving an ██-grade ████ student. An ██ grade ████ student was subjected to repeated comments from a security guard, who made her feel uncomfortable. After one occasion, she reported to McDaniels, who informed the AP. Later that day, the same security guard requested to speak with the student again, which prompted the student to inform her parents. The following day, the

---

[11] McDaniels identified the employee as Donald Pittman. LIU has located 3 non-active employees with this name: EIN-000138971 (DNH - Law since 2010-Professional II); EIN-000155548 (Term Voluntary 2009 - Miscellaneous); EIN-000051725 (Retired Principal Quality)
[12] McDaniels identified the entertainment group as T Moore Entertainment INC, LIU has confirmed the vendor no. 42273.

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 436 of 523 PageID #:469

student did not attend school, but she and her parents visited the Principal the next school day to discuss the issue. According to McDaniels, Muhammad informed the student that the school couldn't take action because the student wished to remain anonymous. Fortunately, the AP reported the incident in Aspen[13]. It was later revealed that other ▮▮▮▮ students had similar experiences with the same security guard, who had been reported to make comments like "Hey beautiful" and "Look nice today[14]." The security guard is new to CPS, having been hired from Little Black Pearl school, according to McDaniels.

**Interview with Andrew Heiserman, Regular Teacher (Math) & CTU Delegate**

On the same date, the LIU interviewed **Andrew Heiserman** (Heiserman), **EIN# 000203416**. Mr. Heiserman is a math teacher at Lindblom and has been with CPS since 2007. He is also the CTU delegate. Heiserman expressed the following concerns to the LIU:

*I have become the point person for folks bringing problems. His [Muhammad's] presence is damaging this school, which has been a strong enrollment school. The most serious issue is how they are handling the SPED issues. I had a few folks reach out in the last week or so. They hired a new Case Manager who is an acquaintance of one of the APs[15]. She did not seem to have any experience with the cluster program. This led to a huge number of mistakes, and one specific issue is a 504 issue. They needed to get permission from a parent to get our clinicians to evaluate and see if the kid would benefit [from services.]*

According to Heiserman, it became evident that many 504 and IEP permission forms were either missing or inaccurate, and this occurred frequently. Heiserman explained that during the absence of the case manager, the part-time case manager went through the folders for the 504s and identified all the issues. The violation was then brought to the attention of the AP by Heiserman and others. "There were a lot of excuses, and subsequently, they discovered some falsified documents," Heiserman stated. Additionally, Heiserman claimed that it appeared some permission forms had been backdated as "documents are popping up backdated."

Heiserman assisted the day that Lindblom had a rash of teachers call in absent. Heiserman confirmed that Principal Muhammad walked in at 8 a.m. and did not offer to

---

[13] The LIU verified that this incident is Aspen # 2338761 and is being triaged by the OIG SAU. Confirmed on Feb. 28. 2023.

[14] These instances are not in Aspen.

[15] Charlotte Wilson, ID#000019441 is the name of the full-time Case Manager.

assist. Heiserman shared the chart created that day by the Lindblom staff to address the shortage of teachers[16].

## Interview with Erin Young /Special Education Teacher

On March 8, 2023, the LIU interviewed **Erin Young (Young)**, **EIN# 000137382**, a special education teacher. Ms. Young has been with CPS since 2004 and with Lindblom for the past two years. To obtain a deeper insight into the severity of cluster student K.K.'s situation, who has eloped from school on more than four occasions and engaged in risky behavior such as drinking chemicals, the LIU met with the student's teacher, Ms. Erin Young (Young.) Young serves as student K.K.s teacher and has tracked the severity of his behavior. Young states, "*We have 268 individual behavioral data points on his data tracker.*" Young states that she has journaled more than 68 entries for this student. Young cannot access the behavior tab in Aspen to see if the more severe incidents have been recorded as behavior incidents. Young stated, "*We don't have the ability to put things in the behavior tab in Aspen. We have been journaling and sending things to the Dean to put in Aspen.*" After student KK attempted to elope from the school and then drank chemicals from the science lab, Young attempted to have a meeting to determine his escalating needs. Young stated, "*We got pushback, and they [administration] were going to bring KKs former aide from another school.*" Young stated that the former aide is now at Lindblom. "*She has more constructional control over him [KK] but otherwise it has not changed much,*" stated Young.

Young stated that the school is now finally talking about taking KK therapeutically. Young stated, "*It should have been addressed months ago. It should have been addressed long ago. Mom had health challenges and was overwhelmed.*" Young stated that the mother also thinks KK needs more of a one-on-one setting. Young stated that she has helped KKs mother locate community resources.

## Review of Data

As of March 2, 2023, the LIU analyzed 165 Aspen entries that took place in SY 23. Additionally, on March 3, 2023, Andrew Heiserman shared 13 serious incidents reported to the Lindblom administration, including Interim Principal Muhammad, from the teachers' logs.

A portion of the email by Heiserman to the LIU states the following:

---

[16] The chart was shared with the LIU exclusively and its change history does not show Muhammad as opening it nor contributing to it.

*File#: 9543*

*Investigative Report – Lindblom Math & Science Academy*
**Page 18**

*The following spreadsheet documents some of the incidents at Lindblom that we are concerned about. We don't know (from a teacher's perspective) whether these incidents have been logged into ASPEN. Some are far more serious than others. Also linked to that spreadsheet are copies of our PPC meeting minutes from September through February.*

According to Heiserman's Teacher's Log chart, the staff reported certain incidents to the administration. The LIU compared these incidents with those reported in Aspen for SY 23 and discovered that seven out of 13 incidents were <u>not</u> recorded in Aspen. Moreover, Heiserman's chart links the PPC agendas[17], which is important because they indicate that Muhammad was informed about these concerns during the PPC meeting.

| Status in Aspen | Incident from Teacher's Log |
|---|---|
| Not in Aspen- Hostile parent roaming building threatening staff | Ms. G (A▮▮▮'s parent) left the main office and walked around the 3rd floor, unaccompanied, looking for a staff member she was angry with (Paul DeRonne) |
| Not in Aspen | "B.S. did not attend English class, but was in the building. This had become a pattern. She was found by security with two other students. The students refused to admit where they were during the period. The students were taken to the dean who was to log it as an incident as B.S. frequently does not attend class while in the building and has a history of drug abuse during the school day (21-22 school year multiple times; '22 homecoming)" |
| Not in Aspen | Student D entered the building and then went out the building when checking in with security. Guidara called home and spoke with mom. Dean Williams said that because it was not caught on camera, he did not have to log it into the system. *[This student has a 1-on-1 para written into his IEP due to his propensity for elopement - from class and the school building.]* |
| Aspen 2313652 coded as "behavior" instead of elopement | Student D entered the building around 10:40, went to the counseling suite for bus cards, and then exited upon arrival. *[This student has a 1-on-1 para written into his IEP due to his propensity for elopement - from class and the school building.]* |
| YES, Aspen but three days later after inquiry | Incident with KK physically assaulting happened on Monday 11/7, on <u>Thursday 11/10</u>, PPC asked if the incident had been logged into Aspen and OSP. Admin said no. |
| (see above) | Ms. Young spoke to AP Kearney: "Kearny was not aware that I could not create an incident report in Aspen so the incident on Monday was not documented until today. Perez is completing one from the narrative I am sharing with you. " |

---

[17] The PPC links were made available exclusively to the LIU.

**File#: 9543**

| | |
|---|---|
| Yes, for the third occurrence only; Aspen 2338761 | Student felt uncomfortable by several remarks and actions from Jarvis. Student cited that the staff member called her "beautiful" on several occasions. Student previously reported this to admin and Booker, specifically asking that they do not say her name when reporting it to Jarvis. On 2/1, the student said that Jarvis approached her, rubbed her arm and said "I need to speak to you lil mama." Student reported this again to admin who told her and parent that they would be reporting this to the district. There was no follow up and Jarvis is still interacting with students. |
| Not in Aspen | During yesterday's BHM assembly, I overheard a very concerning comment from two seniors while standing in the back of Keeler on the first floor. When the emcees were asking to hear the ██ graders' voices, one student (R.W.) said "who are they??" and another student (G.R.) said "I'm going to shoot them." Upon hearing this comment, I stopped Jovani to tell him what I heard, and he recommended that I let Dean Williams know. Unfortunately, we could not find Dean in Keeler, so I went to the main office and asked Yadi to call his office phone for me. I asked Dean to meet me at the office to share something concerning. When I shared what I heard, Dean Williams became visibly upset and raised his voice at me. He began by stating that I was "wasting (his) time," that I was "giving (him) more work to do" and that he "never gives (me) more work to do." He continued, stating that because I told him about this that now he has to "do all this paperwork" and this "isn't even a big deal." He also told me that he was not sure if I was telling the truth about this situation. The tone in which Dean Williams spoke to me was completely inappropriate and disrespectful. During the conversation with the students which myself and Jovani were present for, Dean Williams made some very alarming comments. He diminished the seriousness of their comment, stating that this is going to be a lot of work for him to do. He added that he doesn't need this job with his other businesses, but he is here to protect then kids. He also stated that even though he didn't know if I was telling the truth, he needed to talk to the kids just in case I was because he didn't want the teachers' union to go after him. He cursed several times in front of the students, most notably telling them to stop "saying stupid shit." |
| Not in Aspen | Student R was helping Ms. Bremer by opening a window in room 211. It dropped very quickly and his hand was badly injured. (He <u>needed stitches</u> and the injury affected him for months.) The incident has been on multiple PPC agendas, but never discussed. We have run out of time before getting to the issue of fixing the window. |

*Investigative Report – Lindblom Math & Science Academy*
*Page 20*

Teacher Joseph O'Hara presented an email to LIU which revealed that despite being one of the student's teachers, he was never invited to participate in the student's 504 meetings:

*O'Hara, Joseph <jaohara@cps.edu> Wed, Feb 15, 2023 at 12:51 PM*
*To: "Wilson, Charlotte" <cawilson2@cps.edu>*
*Cc: Claudia Guzman <cguzman82@cps.edu>, Colleen Bitar <ccleary@cps.edu>, Kaellagh Cassidy <kccassidy@cps.edu>, Kenneth Clark <kjclark@cps.edu>*
*Hi,*
*I'm super confused to hear that [Student L] has a 504 meeting, considering he has services in science and I was never solicited to give feedback. I wasn't ever contacted to give feedback on how [Student L] 504 plan is working in the classroom, so how could a new one be written that reflects the student's needs?*
*Joseph O'Hara*


### Interview with Interim Principal Abdul Muhammad

An in-person interview took place at the Law Department on March 16, 2023, with the participation of Manager Kelly Tarrant (Tarrant), Investigator Luis Rivera (Rivera), Investigative Aide Frank Flores (Flores), Interim Principal Abdul Muhammad, attorney Sa'ad Muhammad-Powers (Powers), and attorney Samantha Ozyniec (Ozyniec)[18].

All parties read and signed the administrative rights[19]. During the interview, Tarrant specified that Ozyniec was the responding attorney. While Mr. Muhammad-Powers is also an attorney, he was permitted to accompany Interim Principal Muhammad as a courtesy.

All parties agreed to this interview being tape-recorded[20].

Tarrant informed Muhammad about the vote of no confidence in November 2022 and also mentioned that a formal complaint had been received in December 2022.

Tarrant read aloud a portion of the complaint:

*On 8/26, administration organized and hosted a "Welcome Back to School" Concert. This concert involved several guests who were not approved through the CPS volunteer process. These guests were introduced by Principal Muhammad as his friends, and immediately began advertising their brand. One of the "brand ambassadors" functioned as a hype person for the crowd and during her*

---

[18] Ms. Ozeniec participated in the interview via Google meets.

[19] A copy of the Administrative Rights form is available upon request.

[20] The audio is available as a MP4 link, upon request.

*File#: 9543*

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 441 of 523 PageID #:474

*hype called on the school to "follow [her] on cash app". Additionally, the same volunteer then began circulating through the assembly, passing out cards and advertising literature. This entire event functioned more as a platform to advertise various media, singers, and authors who knew the principal rather than an event to hype up the school as it was sold to Staff.*

Tarrant inquired about the entertainment participating in the back-to-school rally and whether they underwent proper background checks. Muhammad replied that he was uncertain but knew vendors such as the DJ and radio host had undergone them. Tarrant then requested the names of the entertainment personnel who attended, to which Muhammad replied that he would provide them later[21]. Muhammad did mention that the DJ was an alumnus of Lindblom, the radio host was a CPS vendor, and the "Brand Ambassador"/MVP was a female. However, he couldn't recall the names of the other individuals at the event. Muhammad also disputed that the Brand Ambassador did not share her CashApp at the event. Tarrant asked specifically about the other Brand Ambassadors present, but Muhammad didn't answer. Muhammad mentioned a female individual distributing her cards but said he would provide her name later[22]. Muhammad reconfirmed that the DJ and radio host were CPS vendors.

When asked about expenses, Tarrant inquired which costs were incurred. In response, Muhammad claimed that he could not recall the actual expenses but clarified that CPS had provided additional funding to all schools for back-to-school events. He explained that his main objective in organizing the rally was to motivate students to return to school, especially since the start date was earlier than in previous years. Muhammad also stated that the majority of students had attended the event. In an email to Tarrant on March 18, 2023, Muhammad stated that the district allocated $20 per student to be used towards a back-to-school initiative.

Tarrant read another portion of the complaint:

*Our current full-time case manager was finally found, however, one of the staff members verbalized her worry that she did not have any cluster experience or knowledge but administration hired her anyway.*

Muhammad identified Charlotte Wilson as the full-time case manager but couldn't remember her qualifications or the number of candidates he interviewed for the role. He

---

[21] See Attachment D.
[22] See Attachment D.

**File#: 9543**

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 442 of 523 PageID #:475

assured Tarrant that he would make an effort to retrieve this information and provide it at a later time[23].

Tarrant read another portion of the complaint:

*Several clinicians have reported issues with scheduling of meetings. Meeting times and dates were not being shared. Meetings were rescheduled and not told to any team members. Meetings were scheduled with only 2 days notice and team members had to scramble to write and complete IEPs. Additionally, clinicians were being left off of the Notice of Conferences for meetings and not being invited to meetings.*

Tarrant inquired about the scheduling of the IEP meetings, to which Muhammad responded that it was the Case Manager who handled it. Muhammad mentioned that he was aware of the issues since attending the PPC meetings.

According to Muhammad, he arrived at Lindblom in the summer of 2022, and the previous case manager had left a week prior to his arrival (July 7). Muhammad also revealed that the PPC had threatened to file a grievance due to the absence of a case manager, as special education positions are particularly difficult to fill. He further added that he could provide Tarrant with the number of people he interviewed for the case manager role[24]. In the meantime, Ms. Kearny, the Assistant Principal, was temporarily performing those duties.

Tarrant read a different portion of the complaint:

*In reviewing Notice of Conferences, general education teachers are being listed on the notice of conference but not being told when the meetings are happening. Due to the fact that the general education teachers have no notice of the meetings, they are being routinely excused from IEP meetings without their knowledge of the meeting even happening. In some cases, the teachers listed on the notice of conference don't even have the student in their class. This is happening on multiple occasions.*

Muhammad acknowledged being aware of the situation and solved it by inviting the appropriate teachers.

Tarrant read the next complaint regarding a specific cluster student named K.K[25].:

---

[23]See Attachment D.

[24] See Attachment D.

[25] K▮▮▮▮▮

*There is a current cluster student who has had a pattern of exposing himself, hurting himself, and hurting staff members. A staff member was giving up all their preps and lunch periods to supervise the student for his safety starting September 12. When staff asked for support, administration downplayed the severity of the situation and was not proactive in creating solutions to ensure the safety of students or staff.*

According to Muhammad, he was informed about K.K. and asked by the PPC to remove the student from Lindblom. However, Muhammad stated that he could not decide to remove a cluster student from the school unilaterally. When the Network Chief visited Lindblom a few days later, Muhammad informed him about the student's escalated behavior. As a result, the Chief brought the District Representative to the school. Muhammad clarified that K.K. had rights just like any other student, and he could not comply with the staff's request for placement of K.K. at another school.

Additionally, an Illinois State Board of Education (ISBE) monitor visited the school regarding a similar complaint, according to Muhammad, but the meeting lasted only 15 minutes and concluded that there was no issue. Muhammad mentioned that he would provide Tarrant with the ISBE monitor's name later[26]. In an email to Tarrant on March 18, 2023, Muhammad stated:

*Claims regarding violation of special education laws were sent via anonymous email to ISBE. Laura Boedeker, the ISBE monitor for Special Education conducted an investigation on January 18, 2023. She concluded that nothing had been done wrong and informed us that the ALSC and PPC meetings were not forums to discuss special education students, she stated that these concerns should be addressed in an IEP meeting.*

Muhammad expressed that the ISBE monitor was displeased upon learning that K.K.'s situation was being discussed in PPC and ALSC meetings rather than only in an IEP meeting. According to Muhammad, while the ALSC spoke about K.K. in October, they did not use his name, which Muhammad deemed inappropriate.

Furthermore, Muhammad was unaware that the teacher assigned to K.K. missed her prep time until a grievance was filed. Muhammad also knew about K.K.'s severe and profound behavior and clarified that it should not be classified as a "sexual assault," despite Tarrant's assertion that it actually fell under that category.

Muhammad explained that his approach to handling incidents involving students like K.K. involves entering the incident into the Aspen system and following up with the District Representative, Ms. Haywood. According to Muhammad, Ms. Haywood

---

[26]See Attachment D.

suggested recruiting K.K.'s former SECA from Libby ES. Muhammad explained that the former SECA was brought over to Lindblom to assist with K.K., which Muhammad found to be very effective in de-escalating K.K.'s behavior.

When Tarrant asked who has access to Aspen at Lindblom and the ability to enter incidents, Muhammad informed Tarrant that it is the administration and the two Deans. He also explained that incidents could be reported to the administration by telling the Dean verbally or by email.

Tarrant inquired about the safety protocols in place for students in clusters and the individuals responsible for creating them. Muhammad replied that the Assistant Principal, specifically AP Kearny, who handles diverse learners, oversees the development of the safety plan. In the case of Student D, who frequently runs away, the Dean took charge of devising a safety plan. Dean Williams is responsible for the safety plan for █████ th graders, while Dean Perez handles grades 7-9. In a follow-up email from Muhammad to Tarrant on March 18, 2023, Muhammad stated "The safety plan for one of our diverse learner students was developed collaboratively with the Dean, Gen Ed teachers & SPED teachers."

According to Muhammad, Student D has also been discussed in PPC meetings and referred to poorly, in his opinion. The student has been referred to as a "flight risk" multiple times, which Muhammad believes is unfair since he seems to be the only one labeled as such. Muhammad questions why this term is being used for Student D if it is not included in the student's IEP. He also points out that Student D is not the only one who cuts classes at Lindblom. To clarify the meaning of "flight risk," Muhammad sent an email explaining its negative connotation to Lindblom staff, which he believes is inappropriate for labeling a student. According to Muhammad, the term "flight risk" has a negative connotation and is often used in the prison system. When asked by Rivera if Student D was leaving the school or simply skipping classes, Muhammad revealed that the student had left the school building on occasion. Overall, Muhammad feels that Student D is unfairly labeled and treated negatively.

Tarrant referred to another portion of the formal complaint involving vacancies:

*On August 11th, the teacher on leave sent an email to all three members of the administration (Principal Muhammad, AP Kearney, and AP Morales) in regard to the leave. The teacher never received a response. On August 15th, the teacher sat in an interview with AP Kearney and brought up her leave and lack of coverage. School began without a TAT covering the English minutes of 16 students and the Independent Functioning minutes of 5 students. This includes the student mentioned previously that runs away.*

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 445 of 523 PageID #:478

According to Muhammad, he did not have access to Taleo upon his arrival in July, which contributed to the position not being posted. He also noted that vacancies for special education positions are particularly challenging to fill. Muhammad did not have information regarding the resolution of the missing minutes for the students and the timeline for filling the position. In an email sent to Tarrant on March 18, 2023, Muhammad stated:

*The administrative team made numerous attempts (1) to hire a full time case manager or a retired case manager to support our diverse learner students, prior to hiring Ms. Wilson. The.5 case manager, Erin Guidara, refused to assume additional responsibilities.*

Tarrant read another aspect of the hiring complaint:

*Since Principal Muhammad has joined Lindblom, he has hired or opened a number of positions that didn't previously exist at the school, among them a **School Operations/Business Manager**, an **athletics mentor to the Principal** (retired hourly employee), an **athletic coordinator**, and a **Community Relation Rep**.*

When Tarrant inquired about the three new positions, Muhammad responded by identifying the individuals hired for each role. According to Muhammad, Kevin Booker has been hired as the Operations Manager, Carl Williams as the Athletic Mentor, and Dawn Gentry as the Community representative. When Tarrant asked what the duties of those positions were, Muhammad clarified that the details of each position could be found in the HR department, and although he did not know their qualifications at the moment, he would provide their resumes[27]. Additionally, Muhammad mentioned that all three individuals have previously worked for CPS.

Regarding the Athletic Mentor position, Muhammad corrected Tarrant by stating that the position is actually a retired employee position, and he will ensure that LIU is given the names of every candidate he interviewed[28]. Finally, Muhammad explained that all three positions were standard and followed the usual hiring protocol.

According to Muhammad, Lindblom has 1400 students and 160 staff members, and any school of this size should have an operations manager. However, Muhammad noticed that Lindblom had a clerk handling tasks that an operations manager should do. He requested an audit in July, and the preliminary audit report was released in November,

---

[27] See Attachment D.
[28] See Attachment D.
*File#: 9543*

which noted several areas where things were not being done correctly. Muhammad stated that this was the reason that he hired the operations manager.

Muhammad also pointed out that there is a lot of room for error in the realm of sports. Therefore, he brought along a person who could ensure that everything was being done properly and in accordance with CPS policies.

Additionally, Muhammad stated that Lindblom possesses a minimum of 2800 parents & grandparents and requires an individual capable of interacting with both parents and the wider community. Schools of similar size, such as other high schools like Whitney Young, Kenwood, and Brooks, typically employ a community representative and an operations manager, which are standard positions.

In an email sent to Tarrant on March 18, 2023, Muhammad stated:

*Principals make determination on staffing needs. Most schools the size of Lindblom (1400 students) have numerous positions, Kenwood's org chart, Whitney Young's org chart. At the end of SY 22 due to financial mismanagement $389,903.15 of school funds went unspent and was recouped by the district.*

Tarrant inquired whether Muhammad had informed the staff about the decision to hire for the three new positions. Muhammad denied doing so and questioned if it was mandatory to notify the staff. In response, Tarrant pointed out that inadequate communication with the staff was one of the aspects of the broader formal complaint.

Tarrant inquired about the identity of Lindblom's programmer, noting that the complaint alleged that a counselor and the Head of the Counseling Department were performing the role without compensation. According to Muhammad, the counselor, Mr. Clark, who serves as head of the department, was indeed compensated through a specific budget allocated by the administration for this purpose. Meanwhile, Network Chief LaRosa designated Mr. Clark to take on programming duties, and Muhammad facilitated his transition by connecting him with programmers from other schools who were also being paid from similar budgets.

In an email to Tarrant sent on March 18, 2023, Muhammad stated the following:
*Prior to my arrival at Lindblom, Network Chief Devon LaRosa assigned Mr. Clark to programming duties for which he was getting paid since the summer of 2022. This was communicated to the CTU union rep several times in PPC meetings, and in ALSC meetings and via email. To support Mr. Clark, I collaborated with Michelle Clark's programmer, Whitney Young's Programmer, Lakeview's programmer and attempted to hire a retired programmer, sought support from Mr. Jackson, the CPS director of programming, as well as posted a position in the CPS programmer chat to hire a programmer.*

A new programmer will be joining Lindblom on April 10, 2023.

Tarrant reported that a group of science teachers were resorting to "point 2s" to fill a science vacancy, and a complaint was lodged against Muhammad for recommending a candidate who was not qualified to teach in Illinois. Muhammad explained that Lindblom was experiencing difficulty finding a physics teacher due to the scarcity of science teachers, and the science teachers at Lindblom contacted Muhammad to request four teachers to perform "point 2s[29]." Muhammad authorized their suggestion.

In an email sent to Tarrant on March 18, 2023, Muhammad stated:

*We hired a Physics teacher in July of 2022, but he changed his mind at the last minute and went to another school. We continued our search into August of 2022, but we were unsuccessful. The Science department chair recommended that current Science teachers be given an overtime indicator.*

Muhammad explained that the student teaching candidate had not yet completed their paperwork to obtain accreditation for teaching in Illinois. However, despite this, Muhammad still shared the candidate's information with the head of the department, as the science teachers had raised concerns about the efficacy of the "point 2" program for the department. Muhammad clarified that, ultimately, the science department decided not to endorse the candidate, who was on track to become certified[30].

In an email sent to Tarrant on March 18, 2023, Muhammad addressed the hiring of the Athletic Director:

*On July 28, 2022 I met with Shaquille Blakely and Tiffany Taylor to get the position opened correctly. Shaquille Blakely in CPS Human Resources informed me that as the new Principal at Lindblom, I do not have to honor a promise from the previous administration, this was communicated to the Athletic Director, Christia Davis and the candidate. He also informed me that I should post the position and do interviews, which is exactly what I did. Five candidates were interviewed, including the candidate from Lindblom. The Athletic Director, Christina Davis was invited to participate in the interviews, but declined because she already decided that the Lindblom candidate with whom she had a relationship was her choice.*

Tarrant stated that a portion of the complaint revolves around a post made on Facebook. Tarrant read a portion of the complaint:

---

[29] "Point 2s" is a method of four teachers splitting one class. In this case, it refers to the vacant Physics position.
[30] Muhammad clarified in an email sent March 18, 2023: The candidate was a student teacher at Whitney Young and waiting on ISBE to process his teaching certificate

*Investigative Report – Lindblom Math & Science Academy*
*Page 28*

*Regarding a Facebook post shared by Principal Muhammad on August 22nd, Principal Muhammad referred to staff, students, and parents – the entire Lindblom community – as "the opposition."*

Regarding the Facebook post, Muhammad denied this allegation. In an email sent to the LIU on March 18, 2023, Muhammad stated *"The CPS Law Department did not have documentation to prove this claim, however I never referred to students, staff and parents as the*



*opposition."* LIU had the post as evidence at the time of the interview, but LIU did not show it. Rather, LIU inquired about its existence and meaning. Muhammad refused to discuss it until LIU provided the evidence.

Muhammad would not elaborate on what "the opposition" did refer to, stating in the interview "no, that's my answer." Tarrant also asked Muhammad if he attended the Open House event held in September 2022 and Muhammad stated he did not, due to a "previous engagement."

Tarrant stated there was also a concern about how the budget is utilized at Lindblom. The complaint reads, in part, the following:

*Mr. Muhammad has tried to direct all purchasing through the Illinois Empower grant. The prior year's grant cycle ended Aug 31, 2022, and the new grant for SY23 has not opened, as of Dec 22. A major concern for teachers are digital subscriptions, which have not been paid for. Some of these subscriptions (IXL, Albert.io, NewsELA, etc.) are aligned to standardized tests (IAR, SAT, AP) and teachers are concerned about students not having access to essential services.*

Muhammad attributed the inability to use the Illinois Empower Grant to the delayed release of funds by ISBE, which consequently prevented Lindblom from paying for the software included in the previous school year's budget. In response, Muhammad contacted the vendors to request an extension for the existing licenses, allowing teachers to continue using the software. Typically, the grant is released to Lindblom around October, but Muhammad stated that it had not been received as of the interview date. The Operations Manager and clerk supported Muhammad in contacting the vendors for the necessary extensions.

In an email to Tarrant sent March 18, 2023, Muhammad stated:

*In SY22, before I arrived at Lindblom, the IL-EMPOWER budget was created by the previous administration and $27,810 was allocated for software. As of March 16, 2023 ISBE has not released those funds. I have inquired with ISBE about the release of these funds several times.*

*File#: 9543*

*This was communicated to the PPC, ILT and teachers numerous times. To support teachers, we negotiated with software vendors to extend licenses. This was communicated to staff.*

Tarrant inquired if Muhammad had ever submitted a new vendor application for someone seeking to join CPS as a vendor. Muhammad clarified that he had only completed sponsorship applications[31] for current CPS vendors and had never filled out an application on behalf of a prospective vendor seeking to join CPS.

## Other Concerns Not Identified in the Formal Complaint

In November 2022, there was an incident involving a ▉-grade student who went to Citgo for snacks after school, which was reported to Chief LaRosa. Tarrant provided details about this incident, where the student claimed to have been accompanied by an administrator. The student's parent wrote to the Chief about this incident. When questioned, Muhammad said he knew about the complaint but denied walking the students to Citgo. However, Tarrant pointed out that the LIU possessed an email shared by Chief LaRosa, in which Muhammad had stated that neither he nor a Dean had taken the students to Citgo. Muhammad confirmed that he remembered the email[32].

Tarrant informed Muhammad that the LIU had spoken with the student's mother and discovered that Dean **Shohn Williams** had escorted the student and her friends to Citgo. Additionally, the mother reported that the Dean had distributed turkeys on the same day. The LIU concluded that the person in question was indeed Dean Williams.

Muhammad expressed surprise upon learning that Dean Williams had accompanied the students to Citgo, as Dean Williams helped Muhammad walk the students to a nearby bus stop after school. When asked by Chief LaRosa if he or the Dean had taken the students to Citgo, Muhammad had responded negatively, assuming that Dean Williams had been with him when they walked the students to the bus stop. Tarrant inquired whether Muhammad had asked Dean Williams directly about this matter, to which Muhammad replied that he had not. When Tarrant asked how Muhammad could be so certain that Dean Williams had not taken the students to Citgo, Muhammad suggested that he may have asked Dean Williams, who denied any involvement to Muhammad.

---

[31] See attachment D.

[32] A copy of the email regarding the Citgo incident is included as Attachment C.

*File#: 9543*

In an email sent to Tarrant on March 18, 2023, Muhammad stated:

*I spoke with Dean Williams on November 21, 2022 and he informed me that he did not take any student to the Citgo gas station. I emailed Chief LaRosa. Shortly thereafter, Chief LaRosa forwarded me the parents email, which stated that the Principal, not the Dean, took a student to Citgo, to which I responded in that same email thread that I did not.*

Tarrant asked Muhammad about an alleged sexual harassment allegation between an █-grade █████ student and Security Officer Robert Jarvis[33].

The February 1, 2023, Aspen reads as follows:

*N██ stated to Security Officer Giovani, "he did it again." N██ was referring to the fact that Security Officer Jarvis called her lil mama and caressed her left arm. N██ repeated this statement to AP Morales and adds that she feels uncomfortable. N██ states that this has happened on 3 occasions. The first time was a compliment about N██'s face. The second time Jarvis was following N██ and her friend through the hall and said, "let's go beautiful." N██ provided a written statement which is attached above in Supporting Document.*

The school response, written by AP Morales in Aspen, states:

*Called mom and informed her that Student N. reported her concern of a staff member making her feel uncomfortable. Mom states that she's aware of the comments and would like to meet in person after she speaks with Student N. I told her that wouldn't be a problem. Mom states that she wants us to adhere to her daughter's wishes to remain anonymous.*

Tarrant asked Muhammad to explain when he found out about the allegations and how he handled it.

Muhammad discussed the allegations against Jarvis and recalled being informed about the first time Jarvis used a "term of endearment" towards a student. Following this, the Operations Manager spoke with Jarvis to address the matter and emphasize that such language is inappropriate when interacting with students. Muhammad is uncertain if the first incident was recorded in ASPEN or if DCFS was notified[34]. While the student wanted to remain anonymous in the report to Mr. Cohill[35], Muhammad stated he was not aware

---

[33] The LIU checked with OIG SAU on February 28, 2023 to be sure that they were triaging this complaint. This was verified.

[34] The LIU has verified that the first sexual harassment involving Jarvis incident is not in Aspen.

[35] The student's statement indicates that she spoke with Security Guard Giovanni Garcia, and not Mr. Cohill.

*File#: 9543*

of the student's request to be anonymous. The second incident[36] was reported to OSP, according to Muhammad. Muhammad stated that he spoke with the parents and the student about it.

## LIU Verifications

On Thursday, March 16, 2023, after the conclusion of the interview with Interim Principal Muhammad, the LIU sought to verify several points made by Muhammad.

Regarding the claim made by Muhammad that a preliminary audit was the reason for hiring the operation manager, the LIU received the following email[37] from the audit department[38]:

*We have not yet released the audit report for Lindblom HS from our audit on November 30, 2022. We are in the process of finalizing the write up and review of the report. It should be released prior to spring break. We did provide Principal Abdul Muhammad a preliminary report on December 1, 2022 which noted all of the audit exceptions. Preliminary reports provide immediate results of the audit and affords schools 7 days to review the report and provide any outstanding documentation that was not located while we were on site.*

*The audit uncovered numerous exceptions where policy was not consistently followed. The majority of the transactions we review for our audits fall under the review of the clerk(s) and/or business manager(s). At the time of the audit the school had an employee they identified as their business manager, Kevin Booker and the clerk responsible for performing the responsibilities related to the audit was LaConda McDaniel.*

Furthermore, the audit department stated that they do not recommend any hiring practices, and "*with the school already having a business manager, suggesting an operations manager seems duplicative….*"

Regarding the testimony made by Muhammad about the sexual allegations against Security Officer Jarvis, the LIU touched base with Clerk LaConda Daniels, who initially apprised the LIU of this situation. McDaniels was an outcry witness for the ██-grade student who was the victim of this incident.

---

[36] The student's statement indicates that this occurred <u>three times</u> with Security Officer Jarvis. The only Aspen found is a report on the third time of occurrence.

[37] The full email is available upon request.

[38] Written by Arnold Kendall, Manager of Auditing - Office of Internal Audit and Advisory Services, on March 17, 2023.

McDaniels wrote in an email[39] to Tarrant the following:

*The student stated to myself and a teacher that the principal told her there was nothing that could be done since she wanted to remain anonymous.*

Tarrant also requested clarification from McDaniels on the allegation that Muhammad was involved in vendor applications. McDaniels stated the following in response:

*In terms of vendors, at the time that vendor sponsorships were entered into Oracle, the application to start the sponsorship has the principal as the "request" rather than a clerk like myself or any other employee who would have access to submit a sponsorship. When looking at our Oracle number, it will show who the requestor is.*

McDaniels asserts that at Lindblom, it is solely Muhammad who initiates the sponsorship requests for vendor applications, deviating from the standard practice where the clerk or operations manager would typically handle this responsibility.

Additionally, the LIU investigated the involvement of the two vendors mentioned in the back-to-school rally and found that the DJ[40], as claimed by Muhammad, is not a vendor affiliated with CPS. Furthermore, the LIU obtained evidence such as a photograph, flier, and promotional material that was distributed at the rally, indicating that Muhammad's statement denying the presence of "brand ambassadors" may not be accurate.



---

[39] The full email is available upon request.
[40] DJ Shaun Redwell is not listed as a CPS vendor with procurement.

*File#: 9543*

*Investigative Report – Lindblom Math & Science Academy*
*Page 33*

**Investigative Findings:**

In regards to *CPS policy violations*, evidence **DOES EXIST** to support the allegation that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, violated the volunteer/visitor background policy by allowing several members of the public into the school to entertain at the Back-to-school Pep Rally held in August 2022 without the proper background checks.

Evidence **DOES EXIST** to support the finding that during the March 16, 2023 interview, Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, provided inaccurate information to the LIU about the background checks of these individuals. The LIU was given three names of the several participants and the DJ and Brand Ambassador are not background checked. The radio host is a CPS vendor and is background checked. Muhammad was unable to provide the complete list of participants at the interview but has provided a follow up to this allegation in Attachment D. The lack of background checks remains valid, although Muhammad considered the one valid vendor to have background checked everyone else who was at the event. In the matter of the DJ and the female brand ambassador, they are not a part of the vendor T. Moore Entertainment, LLC. Muhammad disputed the claims that there were brand ambassadors, however, LIU has a copy of a photo of more than eight people on stage. LIU does not have their names to verify background checks.

Evidence **DOES EXIST** to support the finding that during the March 16, 2023 interview, Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, provided false information to the LIU about the allegation that members of the entertainment group were marketing their own brands, with one sharing her "CashApp" handle. Muhammad denied that there were brand ambassadors and also denied that anyone shared a CashApp handle at the event. The LIU is in possession of a flier, photos from the rally, and several witness interviews who testified to these activities occurring at the pep rally. Additionally, LIU has witness testimony that there was a female sharing her CashApp handle with the Lindblom attendees.

Evidence **DOES EXIST** to support the allegation that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, violated the Mandated Reporter policy in the Fall of 2022. The LIU has testimony from an outcry witness that Principal Muhammad was aware of a sexual allegation against a security guard and, instead of reporting it in Aspen, asked the Operation Manager to reprimand the guard. This is also supported by Muhammad's testimony at the formal interview on March 16, 2023. Additionally, the LIU is unable to locate the Aspen reports for two of the three sexual harassment allegations referred to in the student victim's statement. DCFS was not notified of the two incidents.

*File#: 9543*

Evidence **DOES EXIST** to support the allegation that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, Breached Title IX policies by failing to properly respond to a harassment allegation brought to him by a student. Muhammad told the student that, due to the victim's request for anonymity, the school could not assist her. According to the outcry witness interview (McDaniels), the student victim disclosed that Muhammad stated he could not assist the student if she remained anonymous.

Evidence **DOES EXIST** to support the finding that during the March 16, 2023 interview, Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, provided false information to the LIU at the formal interview held on March 16, 2023. Muhammad stated that he was not aware of the request for anonymity by the student victim. This claim will be flagged for the Office of the Inspector General- Sexual Allegation Unit.

In regards to *Breaches of Illinois Special Education Laws*, evidence **DOES EXIST** to support the allegation that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, was aware the general education teachers were not being invited to student IEP meetings. A teacher-led audit conducted in the Fall of 2022 revealed that many invitations excluded the general education teachers, moreover many included the wrong teachers. In his testimony to LIU, Muhammad stated he attended the PPC meetings and was aware of this complaint. In a follow-up interview with teacher Feimer in February 2023, little to no changes or improvements have been made.

Evidence **DOES EXIST** to support the allegation that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, was aware that IEP/504 consent forms were discovered to be incomplete. A teacher-led secondary audit discovered that parents never completed many consent forms as "permitted" to be evaluated, and later, several were discovered to be back-dated after the evaluation had already happened. Muhammad was in attendance at PPC meetings that addressed this situation. To date, this discrepancy has not been addressed by ODLSS. An ISBA monitor has visited Lindblom. In a follow-up, Muhammad provided the name and date of the ISBE monitor found in Attachment D. Muhammad stated in his email that "there was nothing wrong." The issues of the back-dated evaluations were not the basis of the ISBE monitor's visit, nor was it known to her at the time. The ISBE monitor came to Lindblom in response to an anonymous complaint about cluster students. Additionally, according to testimony from staff, the ISBE monitor has been to Lindblom several times.

Evidence **DOES EXIST** to support the finding that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, failed to heed the safety concerns brought up by a cluster teacher about a cluster student. Muhammad disregarded over 67 journal entries made by a cluster teacher indicating the severity of the behavior of the cluster

student. LIU is in possession of the teacher's journal for this student. Muhammad stated in his interview that he was aware of the student's behavior issues and did not have the authority to place him elsewhere. These safety concerns were brought up over the course of SY 23 at several PPC meetings that Muhammad attended. The student remains a severe threat to himself and others, at one time ingesting chemicals from the science lab and at another four times running out of school. In an interview with LIU, the assigned teacher stated that the parent of the student wished for the student to be placed in a therapeutic environment and recognized the need for more one-on-one care. Despite this, the transfer discussions did not begin until March 2023, after the teacher recorded over 200 data points of concern on the student throughout SY 23.

Evidence **DOES EXIST** to support the finding that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, was aware of critical inaccuracies in the IEP and 504 procedures and record keeping. Despite being aware, the inaccuracies still occur. Teacher O'Hara has sent a February 2023 email to LIU demonstrating that he was not invited to his student's 504 meeting. This finding will be referred to ODLSS for further review.

In regards to *Safety Issues*, evidence **DOES EXIST** to support the allegation that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, fails to implement proper and timely reporting procedures regarding Aspen reporting, causing an underrepresentation of serious matters occurring at the school. The school's ineffective and delayed reporting protocols have led to a failure to document critical incidents occurring on campus properly. During his interview, Muhammad mentioned that faculty and staff could inform the "Dean" verbally or by email to report any incidents. The LIU reviewed more than 160 incidents reported in Aspen at Lindblom as of March 3, 2023, and discovered that a considerable number of incidents recorded in teachers' journals or reported by witnesses to the LIU were not documented in Aspen as official incidents.

Evidence **DOES EXIST** to support the finding that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, failed to properly respond to staff reports of being sexually abused by a cluster student. Staff interviewed stated that three teachers were victimized by a cluster student who was unclothed and rubbing his genitals on them. The staff reported that Muhammad downplayed the seriousness of the incident. When questioned about it during his interview with Tarrant, Muhammad admitted to knowing about the incident but disputed the characterization of it as a sexual assault. Tarrant reaffirmed that the incident was, in fact, correctly classified as such.

Evidence **DOES EXIST** to support the finding that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, provided inconsistent information to Chief Devon LaRosa. An email obtained by LIU revealed that Muhammad denied

accompanying a student to a Citgo gas station to purchase snacks after school, and claimed that the Dean did not do so either. However, testimony obtained by LIU indicated that the Dean did indeed walk the student to the gas station. When questioned about this inconsistency, Muhammad was unable to explain how he came to the conclusion that the Dean had not escorted the student, as he had stated in his email to LaRosa. In a follow-up email sent March 18, 2023 (found in Attachment D), Muhammad stated that the Dean told him that he did not go to Citgo.

Evidence **DOES EXIST** to support the finding that The Deans and staff at Lindblom Math and Science Academy have not received adequate training on how to use the incident reporting system. Several entries were discovered by LIU to be miscoded. To address this issue, the LIU will organize an Aspen training day at Lindblom before the end of the current academic year, 2022-2023.

In regards to *Odd Hiring Practices*, evidence **DOES EXIST** to support the allegation that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, hired three individuals for new positions at the school without informing the existing staff and without disclosing the hiring procedures he followed. According to the staff, three new positions were created at Lindblom as a result. When the LIU inquired about the credentials of the new hires, Muhammad could not recall but promised to provide their resumes. When asked about the number of candidates interviewed, Muhammad stated that he did not remember but would provide a list of names to the LIU. In a follow-up email to LIU[41], Muhammad provided resumes of the hired candidates for all three positions. A candidate link is also included. The LIU cannot confirm if the candidates went through the Taleo process. The LIU cannot confirm of the positions were posted in Taleo[42].

Evidence **DOES EXIST** to support the finding that Interim Principal Abdul Muhammad, of Lindblom Math and Science Academy, gave incorrect information about a vendor he hired for the back-to-school rally, specifically the DJ. He stated that the DJ was a district vendor who was paid by the district. However, the LIU confirmed that the DJ was not a vendor for CPS, and the district did not pay him. In a witness interview with the Clerk, it was discovered that the DJ received unofficial and unapproved compensation through another vendor in an "off-the-books" manner.

---

[41] Attachment D.

[42] The candidate list is not viewable by the LIU in Attachment D as of close of this report.

Evidence **<u>DOES EXIST</u>** to support the finding that three individuals were hired to new positions at Lindblom.  The hiring of the three individuals for new positions at Lindblom without a known hiring protocol[43] has been flagged for further review by the Office of the Inspector General.

Evidence **<u>DOES EXIST</u>** to support the finding that the unapproved compensation was given to the DJ through off-the-books methods. This has been flagged for further review by the Office of the Inspector General.

*<u>Kelly Tarrant</u>*

Kelly Tarrant, Manager, Investigations

---

[43] LIU could not confirm that the 3 positions were posted in Taleo, interviewed by a committee, and followed CPS hiring standards, such as the use of the HRBP and Taleo.

# INDEX SECTION

File Number:        9543 - Lindblom Math & Science Academy


Attachment A        COMPLAINT_ Supporting Documentation for Lindblom

Attachment B        FAVPA IEP Issues SY2223.pdf

Attachment C        Chicago Public Schools Mail - Fwd_ Lindblom Acting Principal
                    Took My Child (AC Student) Off Campus WITHOUT My
                    Permission Attachment D  August 26, 2020, email response from
                    CFF

Attachment D        Documents provided by Principal Muhammad

# Attachment A

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

Lindblom staff as a collective, across all departments, teachers and ESP, have indicated that there are sufficient concerns with the current administration which go beyond differences of opinion or fit. We would like to provide evidence for the following areas of concern:

1. Incidents that are out of compliance with CPS Policy
2. Violations of IL State Special Education Laws
3. Patterns of Irresponsible Hiring Choices
4. Lack of Knowledge and Willingness to Adapt to School Culture
5. Lack of Leadership, Communication and Transparency
6. Pattern of Providing Untruthful Information during ILT, PPC, ALSC, and other forums
7. Public Image of Lindblom

As a result of these issues, our staff took a vote of no confidence on November 15th, 2022. These results are shared in the image below.

**Our ask is that Principal Muhammad not be made the contract Principal of Lindblom. If he is not made the contract Principal of Lindblom, we ask that the district support our school community's wish to have input and voice in the process of selecting a new candidate by asking the ALSC to reopen the principal selection process.**



**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

<u>**Incidents that are out of compliance with CPS Policy**</u>

On 8/26, administration organized and hosted a "Welcome Back to School" Concert. This concert involved several guests who were not approved through the CPS volunteer process. These guests were introduced by Principal Muhammad as his friends, and immediately began advertising their brand. One of the "brand ambassadors" functioned as a hype person for the crowd and during her hype called on the school to "follow [her] on cash app". Additionally, the same volunteer then began circulating through the assembly, passing out cards and advertising literature. This entire event functioned more as a platform to advertise various media, singers, and authors who knew the principal rather than an event to hype up the school as it was sold to staff.

Additionally, CPS Guidelines state that the principal is responsible for ensuring that all grades are entered into aspen on time and for reviewing aspen to make sure all grades are entered. On the due date for quarter 1 grades, administration did not respond to teachers emailing for help, and was not available in the building to help with any emergencies that came up. When asked about their responsibilities at PPLC, administration noted that they had not checked grades in aspen and were not sure if any classes were missed. No email updates were sent to staff to let them know if they were missing classes or if anything was forgotten.

<u>**Violations of IL State Special Education Laws**</u>

Our administration and newly hired full-time case manager have no knowledge of special education, especially the cluster program and have mismanaged situations with cluster students that have put students and staff in danger as well as have potential legal ramifications.

We started the school year without a full time case manager, a case manager was found only after the first quarter. During the process of trying to find a case manager, administration kept finding candidates that would not be released from their current schools. The special education team asked to be included in the interviews but were often denied. Our current full-time case manager was finally found, however, one of the staff members verbalized her worry that she did not have any cluster experience or knowledge but administration hired her anyway.

During the interim, our assistant principal was the full time case manager and has little to no knowledge of case managing process and procedures. Several clinicians have reported issues with scheduling of meetings. Meeting times and dates were not being shared. Meetings were rescheduled and not told to any team members. Meetings were scheduled with only 2 days notice and team members had to scramble to write and complete IEPs. Additionally, clinicians were being left off of the Notice of Conferences for meetings and not being invited to meetings.

In one example, a student in our cluster program receives OT services in his IEP. Our OT was not on the notice of conference and was not invited to the meeting. What ended up happening,

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

because the OT did not know the meeting was happening, was that OT services were taken away from the student during the meeting by the assistant principal/case manager. The OT asked for a revision since October to be able to re-add the OT services and they still have not been added.

Another example was that during meetings, parents are routinely being asked to excuse the general education teachers from meetings by administration and the case manager. In one meeting, a parent asked to speak to the general education teacher who was not in the meeting and was denied by the AP. A clinician took issue with this as it violates the parent's rights and instead was reprimanded at the meeting and reported to her manager because she did not want to violate procedural safeguards.

In reviewing Notice of Conferences, general education teachers are being listed on the notice of conference but not being told when the meetings are happening. Due to the fact that the general education teachers have no notice of the meetings, they are being routinely excused from IEP meetings without their knowledge of the meeting even happening. In some cases, the teachers listed on the notice of conference don't even have the student in their class. This is happening on multiple occasions. When the general education teachers attempted to address this with the AP, she did not have knowledge on why an excusal of staff at an IEP without their knowledge was wrong and minimized any wrongdoing. She continued to minimize and downplay the issue and even responded to the email that listed these concerns with, "We will keep track of the general education teachers that have been invited and are not showing up for the IEP meetings," without acknowledging or remediating the fact that general education teachers are still consistently not being invited to IEP meetings.

The situation has escalated to point where staff members are becoming increasingly alarmed with procedural safeguards being violated and parental rights not being honored which has caused staff members to start referring parents to an advocate, T███ S███████████, as staff feels that parents are being taken advantage of and special education law is not being followed.

Admin and the case manager have no knowledge of how a cluster program runs and have mismanaged situations with cluster students that have put students and staff in danger. There is a current cluster student who has had a pattern of exposing himself, hurting himself, and hurting staff members. A staff member was giving up all their preps and lunch periods to supervise the student for his safety starting September 12. When staff asked for support, administration downplayed the severity of the situation and was not proactive in creating solutions to ensure the safety of students or staff. PPC attempted to address the issues on October 13 and November 10, and the administration continued to downplay the issue. It was not until we filed a grievance that we had any progress in the situation. A grievance was filed on November 2 that addressed the missed preps and lack of plan for coverage. On November 14, a grievance conference was held, and it was at that meeting that Principal Muhammad addressed the concerns and agreed to the proposed solutions. Even though teachers are now making up preps, the situation with the student is far from resolved and administration continues to downplay the severity of the situation. Furthermore, administration could not communicate CPS's physical restraint and seclusion policy, especially as it pertains to this situation with the cluster student. Staff members had to review and explain the CPS physical restraint and seclusion policy with administration after an email with all service providers because of conflicting directives that would be in

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

violation of the policy.

Additionally, there was an incident with that cluster student where they sexually assaulted 3 staff members. The teachers documented what happened in Aspen. The incident happened on Monday November 7. On Thursday November 10 during a PPC meeting (which I am a representative on) I asked administration if they had logged an OSP case and they said no and would do it ASAP. The cluster teachers followed up with the AP on November 14. She was unaware that teachers could not log incident reports into Aspen and the incident report was only filed on Nov 14. I followed up with an email on Nov 14 asking if there was a case logged with OSP, following up from the previous PPC conversation, and received no response.

There has been an on-going pattern of not logging in incidents, not just with the cluster department. We have another student in our inclusion program who has a tendency to flee the building and several times he refused to go through metal detectors, grabbed his stuff and fled the building. These incidents were also not documented in Aspen. Due to these incidents, a safety plan was created for the student who has an IEP. Not a single special education teacher was invited to the creation of the plan, only administration and the dean of students, and the plan was not shared with the special education team or pertinent staff. After much push back, the administration agreed to recreate a plan while involving the special education team. However, that safety plan is not being adhered to at all after a very short period of time.

An inclusion teacher gave birth in June of 2022 and took leave until mid October. The leave was approved in July 2022. As of August 1, 2022 the TAT position was not posted to Taleo. On August 11th, the teacher on leave sent an email to all three members of administration (Principal Muhammad, AP Kearney, and AP Morales) in regards to the leave. The teacher never received a response. On August 15th, the teacher sat in an interview with AP Kearney and brought up her leave and lack of coverage. AP Kearney did not know anything about the leave (despite both CPS HR and the teacher sending multiple emails to administration) and said the position would be posted ASAP. No position was posted. School began without a TAT covering the English minutes of 16 students, and the Independent Functioning minutes of 5 students. This includes the student mentioned previously that runs away, and yet administration did not feel the need to make sure that class had adequate coverage or students were missing minutes. A general education teacher with 5 of the 15 students without coverage sent an email regarding the vacancy on September 7th as support in the class was needed immediately. Administration did not immediately respond, but deflected to our school clerk who was filling it with a day to day sub not certified in Special Education. One September 10th the teacher on leave again emailed administration asking for an update. On September 12th, Principal Muhammad did respond that the position would be covered by a day to day sub and the inclusion department could cover the IEP minutes on their preps. A TAT position was posted on Taleo in mid-September, but went unfilled until the teacher returned on October 11th.

## Patterns of Irresponsible Hiring Choices

Principal Muhammad has shown a troubling pattern of hiring staff he either has previous relationships with or positions that the school has shown the capacity to function without. Since Principal Muhammad has joined Lindblom, he has hired or opened a number of positions that

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

didn't previously exist at the school, among them an School Operations/Business Manager, athletics mentor to himself (retired hourly employee), an athletic coordinator, and a Community Relation Rep.

The position of Operations/Business Manager has job responsibilities that have, in the past, been adequately completed by front office staff and assistant principals.  The Operations/Business manager hired was also co-workers with Mr. Muhammad when they worked at Chicago Vocational High School. The Operations Manager originally told a student he was going to work at Lindblom in August. This was discussed at the ALSC meeting prior to the start of school. At that time Mr. Muhammad said this individual did not have a position at Lindblom. The position was prioritized, but not voted on by the ALSC, many members were surprised that the position had been hired for when the current operations manager was introduced.

The athletics mentor and "advisor" to Mr. Muhammad, Carl Williams, has taken on responsibilities supervising security at the school. Mr. Williams has never served in an administrative capacity, and his credentials on ISBE only include a PEL for PE. Staff have been told, when they asked who he was, that he was simply a retired hourly employee serving as an advisor to Principal Muhammad.  This staff member was also a former co-worker of Mr. Muhammad when they worked at CVS. This staff member has caused many problems with staff at our school as he has continuously overstepped his responsibilities as outlined to staff by Principal Muhammad. For example, he made critical changes to our security plan for Open House without consulting our then head of security or Principal Muhammad himself who was not present at this event. At this same event, the police were called on a parent, and ALSC was informed he has a role with security and athletics. PPC was told that he does not have a role with security or athletics, and instead he is solely an "advisor to the principal." Followup questions regarding his days/hours in the building and what he does as an advisor were not answered by Principal Muhammad, who instead chose to respond "I've already answered your question __ times," over and over.

The athletic coordinator position has been newly funded by CPS. Our athletics department had an in-school candidate and coach who was identified as their preferred candidate, and had been hired in writing prior to Principal Muhammad being onboarded, but the process was delayed due to an error in the original posting. Principal Muhammad took advantage of the error in the original posting, reinterviewing for that position and hired the former Dean of Students from his prior school, Douglass. The hiring process did not include critical members of the Lindblom team including Christina Davis, the current athletic director.

Finally, the ALSC asked about the Community Relations position that has been opened, and why it was necessary.  Principal Muhammad responded that they could represent the school at events like community breakfasts in lieu of administration. Additional seasonal positions have also been

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

added, which the ALSC questioned at the November meeting and have yet to receive responses on.

Other key positions that staff have communicated as priorities, namely a programmer, have gone unfilled despite being notified months ago of the need. Lindblom is currently without a programmer. Charles Clark has been fulfilling programmer duties in addition to his full time role as a counselor and department chair. He has yet to be paid for the hundreds of hours he has spent in this role outside of the regular school day. He requested to be relieved of all of these duties after finishing the beginning of the year programming and schedule changes. He made this request prior to the start of the school year. He continues to do programming duties, including beginning to plan for SY24 course options and course selection. An operations manager and other positions were prioritized before a programmer. The CTE department asked Mr. Muhammad to begin hiring a programmer on August 8th. When PPC inquired about the status of a programmer on 9/12, they were told by Mr. Muhammad that he requested the network pay for one, but was denied. At that time it seemed as if a programmer would not be hired. A position was eventually posted, and it was posted with specific credentials as it was posted for a specific person that Mr. Muhammad knows, however that person chose not to transfer schools. The position was posted as an ESP K-8 position, not as a teacher position. It was suggested at the 11/3 ILT meeting that it be reposted as a teacher position, but the posting was removed as of 11/30. It is very unclear who will be able to build the SY24 matrix and program over 1400 students for SY24.

**Lack of Knowledge and Willingness to Adapt to School Culture**

Over the last semester, the admin team has made it clear that they do not understand and are not willing to take the steps to understand our school culture, grading culture, staff, and students.

Admin has shown that they do not understand critical differences between staff committees, school schedules, and even staff roles and names. One example of this is the admin not understanding the difference between department chairs and house grade level team leads. Until this day, admin confuses these roles which has caused avoidable misunderstandings, miscommunication, and delays in events and programming. Additionally, despite providing ample information on the differences in these roles, admin continues to get them confused.

A similar example is misunderstanding of staff and school schedules. Admin has not taken the time to understand a crucial part of what makes Lindblom successful which is our block scheduling. Most recently, in a parent meeting, Principal Muhammad expressed that the schedule did not make sense and was too difficult to understand. He also made a comment in an all staff meeting regarding our Wednesday colloquium schedule, stating that understanding the schedule

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

was "above [his] pay grade." If our admin does not take the time to learn and understand how this school runs, there is no way we can be successful.

Admin has also proved a lack of learning and understanding of our grading culture at Lindblom. We have been a Proficiency Based Learning school since 2015 which is another aspect that makes Lindblom special. Despite having opportunities to learn from staff about this grading system over the course of the semester, admin constantly avoids learning about it. We cannot expect success from our staff and students if we do not have the support from the admin team.

On top of all of this, what is arguably most problematic is the admin's inability and unwillingness to get to know the staff at Lindblom. After being admin for almost 5 months now, the team still does not know names of the majority of staff members. Even worse, there have been countless times that admin has not been able to differentiate between teachers and other staff members and even teachers and students. The admin team has made it clear that they do not know the roles of individuals in the building as evidenced from many interactions and miscommunication.

The most egregious of all is a public Facebook post shared by Principal Muhammad on August 22nd. In this post, Principal Muhammad referred to staff, students, and parents – the entire Lindblom community – as "the opposition."

Ultimately, the admin team not only made it clear that they do not understand what makes Lindblom, Lindblom, but that they have not taken the steps necessary to learn what makes us successful.

## <u>Lack of Leadership, Communication and Transparency</u>

There are several concerning choices made to Lindblom's budget, as well as an overall lack of transparency around how new positions are being funded. Since the summer, Mr. Muhammad has tried to direct all purchasing through the Illinois Empower grant. The prior year's grant cycle ended Aug 31, 2022, and the new grant for SY23 has not opened, as of Dec 22. A major concern for teachers are digital subscriptions, which have not been paid for. Some of these subscriptions (IXL, Albert.io, NewsELA, etc.) are aligned to standardized tests (IAR, SAT, AP) and teachers are concerned about students not having access to essential services.

There is a lack of transparency with opening new positions and how positions are being funded. Specifically, a science position was closed due to lack of applicants and concerns that occurred in the hiring process. Mr. Muhammad stated in an ALSC meeting that the funds left over after allocating 4 0.2 positions, were being used to fund the operations manager. There is a concern amongst staff about reopening this necessary position for next school year.

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

Mr. Muhammad and this administrative team have demonstrated a lack of leadership with MTSS, ILT, and other school based teams. Patterns have been established of attending meetings late, sending agendas minutes before the meeting, the meeting itself being unorganized, an inability to work with technology, such as sharing google docs or providing edit access to agendas. Furthermore, beyond an initial check in to meet individual grade level leads, there has been no communication or consultation with this team. Administration chooses not to consult with teacher leaders who are developing academic interventions with students, and chooses to conduct their own weekly conversations around grades, without any teacher input. These actions are happening even after teachers have invited administration to collaborate, ask questions, and get involved at many levels.

There is a lack of involvement in district run ILT institutes. The summer institute was not attended by Mr. Muhammad. The 2nd ILT institute, there was no coordination of teachers attending at a specific time or coordinating the time and action items for school based initiatives. Mr. Muhammad did not send information about registration to ILT for the November ILT Institute.

Our school has a system of proficiency based learning, which falls under the umbrella of Competency Based Education (CBE). Lindblom has been part of the state of Illinois CBE pilot, which has included crucial funding for our program. Our Admin received the renewal application for the CBE/PBL Pilot on Nov 2nd, however, no action was taken for a month. They casually contacted a teacher on Dec 1 about the application and shared the actual request Dec 2nd. The teacher responded with significant access to documentation over the weekend. There were no changes or additions made to any of the required documents throughout the week indicating a fundamental lack of understanding of the importance of the program or the work required to submit the renewal application. The documentation and application was due Dec 7, the teacher contacted the program and was able to get an extension until Dec 18th. This teacher is now organizing the process of gathering staff input to complete this application, with limited input or collaboration from administration.

Overall, there is poor communication with parents, staff and students. Communication from administration has been untimely, unclear, or completely non-existent around parent events, evaluations, meetings with staff and students, and newly hired staff. This has caused countless problems between staff, affected relationships with families, and created an overall lack of trust for administration.

Staff learned of roles and responsibilities that they were not aware of for Back to School Night, via a flier shared with all staff, just hours before the event. Additionally, many staff were left off the flier, resulting in confusion for many parents looking for teachers. Staff and students have requested meetings with the Principal but have not received timely responses or times for

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

meetings. New staff have been brought into the building, and requests have been made for them to be introduced to the rest of school staff, but it has either not happened or happened weeks later.

Many staff requests via email have been left unanswered. In person, answers have turned out to be untruthful or the promise that was made did not occur. For example, at the 11/3 ILT, multiple concerns were expressed and Mr. Muhammad promised to develop protocols and systems for handling concerns around cleanliness, ordering of supplies, technology concerns, and others. There has been no followup from administration since this meeting.

## Pattern of Providing Untruthful Information during ILT, PPC, ALSC, and other forums

Principal Muhammad has a repeated pattern of placing the onus for his decisions on staff, rather than take responsibility for his actions. In the 10/3/22 ALSC meeting Principal Muhammad stated that the idea for several science teachers to take .2s and cover the open position was one that the Science department suggested. This complete leaves out the fact that he repeatedly submitted candidates to the department who were not qualified to teach in Illinois (i.e. were not accredited to teach in the state of Illinois) and so the Science Department was put in a position to choose between taking .2s or starting the year without that position being filled.

In the 10/3/22 ALSC Meeting Principal Muhammad stated that the gyms during homecoming had adequate ventilation. This is contrary to what staff and students who were present for homecoming reported (window that open were not opened and many of the windows in the gym do not open)

In the 10/3/22 ALSC meeting Principal Muhammad claimed that Mr. Anaya, Ms. Namowitz, and Mr. Clark "supported us" (meaning the administration) in rolling out colloquium. Principal Muhammad, AP Kearney, and AP Morales have repeatedly made comments that they do not understand the schedule or how colloquium happens.

In the 11/7/22 ALSC meeting Principal Muhammad repeatedly stated that metal detector policy is districtwide and all students must go through. This led to an incident at open house with AP Kearney calling 911 on a prospective parent. This has not been a policy at Lindblom at any time in the past 11 years.

Back to School Bash was unorganized and a poor way to start the school year with new families. There was no DJ like Principal Muhammad promised and no water in the dunk tank. A teacher had to go to the fire department to get water in it.

**SUPPORTING DOCUMENTATION FOR LINDBLOM MATH & SCIENCE ACADEMY**

## Public Image of Lindblom

There is a prevalent concern that the public image of Lindblom is declining. ALSC meetings have been sparsely attended in the past, but since August, attendance has been between 70 and 230 people, including a number of staff, parents, prospective parents and students, which shows that many people are concerned.

At report card pickup on November 21st, a few teachers had parents actively volunteer that they are planning on not sending their younger children, prospective ██████ graders, to Lindblom next year, or they ranked Lindblom lower on their GoCPS application. Parents cited concerns stemming from administration's "sell" at Open House, as well as a pattern of concerns with administration this school year.

As a selective enrollment school, the Fall Open House is our school's opportunity to put our best foot forward to convince families that Lindblom is the right school for their child. We had student volunteers giving tours, and at least two staff represented from every department, but only one administrator (the AP representing the Academic Center) was present for the day. Additionally, that administrator did not address the group of parents who attended. Parents shared that they were looking for administration to share their vision of the school and answer questions, but were disappointed in not seeing the principal or HS Assistant Principal.

# Attachment B

FAVPA IEP Issues SY2223

- C▮▮ Z▮▮▮
  - Jake Wark was included as the general education teacher on a notice of conference for meeting on 12/6. Jake does NOT in fact teach C▮▮ and should not have been the general education teacher on the notice of conference. Jake did NOT receive an invitation to this meeting.
  - Jeni Crone never received a notice with an invite for the meeting for C▮▮, however, Jeni did attend the meeting because she found out 30 minutes before the meeting from another teacher that the meeting was happening. Only at the time of the meeting was Jeni sent the invite with the link to the meeting. Despite the lack of notice, Jeni DID attend and yet on the coversheet for the meeting that happened on 12/6, Jeni's name is not marked as being in attendance.
- A▮▮ M▮▮▮
  - Jake Wark was included as the general education teacher on a notice of conference for meeting on 10/1. Jake does teach A▮▮, however, he never received an invite to this meeting.
  - Joy Gross was included on the notice of conference for an eligibility meeting scheduled for 12/13. Joy does NOT in fact teach A▮▮. Joy did NOT receive an invitation to the meeting.
- M▮▮ R▮▮▮
  - Jake Wark was included as the general education teacher on a notice of conference for meeting on 10/18. Jake does NOT in fact teach M▮▮ and should not have been the general education teacher on the notice of conference. Jake did NOT receive an invitation to this meeting.
  - Additionally, the coversheet for that IEP has Jake marked present when he was not even invited to that meeting, much less present. There is an excusal for Jake in the documents, but it is not reflected on the coversheet.
- E▮▮ O▮▮▮
  - Jake Wark was included as the general education teacher on a notice of conference for meeting on 9/13 and also on a notice of conference for a meeting on 10/4. Jake does teach E▮▮, however, Jake did NOT receive an invitation to the meeting. Even though he had no knowledge of the meeting occurring, Jake was excused from the meeting. Jake was excused from the meeting without his knowledge.
- E▮▮▮▮ L▮▮
  - Jake was included on the coversheet for a meeting for E▮▮▮ that occurred on 11/29 and 11/30. However, the notice of conference has Erin Young as the general education teacher. Jake does NOT in fact teach E▮▮▮▮. Jake did NOT receive an invitation to the meeting.
- J▮▮▮ S▮▮
  - Jake was included as the general education teacher on a notice of conference for meeting on 11/15. Jake does NOT in fact teach J▮▮. Jake did NOT receive an invitation to the meeting.

- ○ Jeni Crone was NOT notified of the meeting for J▮▮▮ on 11/15. Jeni is on the coversheet for the meeting as the general education teacher and is marked as being excused by the parent. She was excused from the meeting without her knowledge. Jeni did provide notes to the cluster teacher prior to the meeting for the IEP but did NOT receive any meeting notice or invite from the case manager.
- U▮▮ A▮▮▮
  - ○ Jake Wark was included as the general education teacher on a notice of conference for meeting on 10/26. Jake is also listed as the general education teacher on the coversheet of the IEP. Jake does NOT in fact teach U▮▮. Jake did NOT receive an invitation to the meeting.
- D▮▮▮ B▮▮▮
  - ○ Jake Wark was included as the general education teacher on a notice of conference for meeting on 12/6. Jake does NOT in fact teach D▮▮▮ Jake did NOT receive an invitation to the meeting.
  - ○ Alex Sutphen was listed as the general education teacher on the coversheet for D▮▮▮s IEP meeting on 12/6. Alex was excused on the coversheet as not attending. Alex was excused from the meeting without his knowledge. Alex did NOT receive an invitation to the meeting, however, Alex has a long standing history with D▮▮▮s family and would like to have attended.
- M▮▮▮ M▮▮▮
  - ○ Jake Wark was included as the general education teacher on a notice of conference for meeting on 10/18. Jake does NOT in fact teach M▮▮▮. Jake did NOT receive an invitation to the meeting.
  - ○ Jeni Crone was not notified of the meeting for M▮▮▮ on 10/18. Jeni is listed on the coversheet for the meeting as the general education teacher and is marked as being excused by the parent. She was excused from the meeting without her knowledge. Jeni does teach M▮▮▮, however, she did NOT receive any meeting notice or invite from the case manager.
- J▮▮▮ C▮▮▮
  - ○ Jake Wark was included as the general education teacher on a notice of conference for meeting on 10/25. Jake was also included as the nurse on a notice of conference for meeting on 11/29. Jake does NOT in fact teach J▮▮▮. Jake did NOT receive an invitation to the meeting.
  - ○ Joy Gross was included on the notice of conference for an eligibility meeting on 11/29. Joy does have J▮▮▮, however, she never was never invited to this meeting. The eligibility/IEP were not finalized, will the meeting be rescheduled and the documents finalized? If so, will the appropriate staff be invited?
  - ○ Jeni Crone does NOT have J▮▮▮ C▮▮▮ as a student. Her name is listed on the coversheet of the draft IEP. It is still in draft but has a date of 11/29. Please include the correct general education teacher for the future IEP meeting.
- B▮▮▮ H▮▮▮
  - ○ Jake Wark was included as the general education teacher on a notice of conference for meeting on 10/5. Jake is also listed on the coversheet of the IEP that is still in draft as the general education teacher. Jake does NOT in fact teach B▮▮▮. Jake did NOT receive an invitation to the meeting.

- S█████ R█
  - Jake Wark was included as the general education teacher on a notice of conference for meeting on 11/15. Jake is also listed on the coversheet of the IEP that is still in draft as the general education teacher. Jake does NOT in fact teach S██████ Jake did NOT receive an invitation to the meeting.
- H████ M██████
  - Jake Wark was included as the general education teacher on a notice of conference for meeting on 12/6. Jake was also listed on the coversheet of the as the general education teacher. Jake does teach H█████ however, he did NOT receive an invitation to the meeting.
  - Jeni Crone was listed on a Notice of Conference for a meeting on 12/6. Jeni does NOT in fact teach H█████. Jeni did NOT receive an invitation to the meeting.
- I███ J█████████
  - Jake Wark was included as the general education teacher on a notice of conference for meeting on 11/29. Jake does NOT in fact teach I████. Jake did NOT receive an invitation to the meeting.
- V██████ R█████
  - Joy Gross was included on the notice of conference for a meeting on 10/28. Joy does NOT in fact teach V██████. Joy did NOT receive an invitation to the meeting.
  - Mel Gerleve was included as the general education teacher on the coversheet for V██████ R█████ and then also excused from the meeting that occurred on 11/1 and 11/4. Mel was excused from the meeting without her knowledge. Mel does NOT in fact teach V██████ Mel did NOT receive an invitation to the meeting.
- B█████ W██████
  - Tim Patula was listed as the general education on the notice conference for a meeting on 9/27. Tim did NOT receive an invitation to the meeting.
  - Jeni Crone was NOT invited to B██████ W████'s meeting. Mr. Patula was on the notice of conference, but Jeni was the teacher on the coversheet and she was excused from the meeting. Jeni was excused from the meeting without her knowledge. Jeni was only told about this meeting from another staff member attending.
- O██████ R█████
  - Jeni Crone was listed on a Notice of Conference for a meeting on 12/6. Jeni does NOT in fact teach O█████. Jeni did NOT receive an invitation to the meeting.

We just wanted to send this email in order to clear up the issues listed above. Trends we have noticed are:

· General education teacher names are being included on notice of conferences and coversheets for teachers that do NOT have the student in their class. The wrong teachers are being listed.

· General education teachers are not being invited to IEP meetings.

· General education teachers are being excused without their knowledge and without even knowing the meeting is happening.

We would like to address these issues so that they do not happen going forward.

·   Please list the correct general education teachers on the notice of conference and coversheet

·   Please invite all general education teachers who teach the student to the meetings by sending an invitation.

·   Please do not excuse general education teachers without inviting to the meeting and without their knowledge.

We look forward to your response on how we can rectify this situation going forward.

Thank you,

# Attachment C





Tarrant, Kelly <katarrant@cps.edu>

**Fwd: Lindblom Acting Principal Took My Child (AC Student) Off Campus WITHOUT My Permission**

**LaRosa, Devon** <dplarosa@cps.edu>
To: Kelly Tarrant <katarrant@cps.edu>

Mon, Dec 12, 2022 at 7:19 PM

I explained that he should let all his staff know … a permission slip in advance is required to
Take students off campus

I also shared, That I would order 10 pizzas on busy days and invite kids to come to the commons to eat and connect until the game or play started, brought kids together and I could keep and eye on them.

---------- Forwarded message ---------
From: **Muhammad, Abdul** <akmuhammad@cps.edu>
Date: Mon, Nov 21, 2022 at 11:34 AM
Subject: Re: Lindblom Acting Principal Took My Child (AC Student) Off Campus WITHOUT My Permission
To: Larosa, Devon <dplarosa@cps.edu>

Good morning Chief,

Thank you for sharing this email with me. In our conversation you stated that the Dean took the students off campus to the Citgo gas station, however this email says that the Principal was responsible. I want to reiterate that neither of us took any students off campus. The parent can reach out to me anytime to discuss this matter.

On Mon, Nov 21, 2022, 10:21 AM Larosa, Devon <dplarosa@cps.edu> wrote:
> FYI
> [Quoted text hidden]

# Attachment D

**Principal Muhammad - Documentation**
Received by email from Interim Principal Muhammad to Kelly Tarrant, on Saturday, March 18, 2023, at 4:20 p.m.

(As of 5 pm March 18, 2023, the links to this document were not accessible to the LIU. An email requested access, however as of the close of this report the LIU did not review the links.)

1. Kevin Booker, Donna Gentry, Carl Williams
2. ISBE Monitor - Laura Boedeker lboedeke@isbe.net
3. ASPEN Incident #2338761 (The Office of Student Protections was notified and is investigating)
4. T-Moore Entertainment Inc - Vendor Number 42273
5. T-Moore Entertainment Inc - Vendor Number 42273
6. Vendor Sponsorship
7. Case Manager resume
8. Operations Manager resume
9. Retired CPS employee resume
10. Athletic Coordinator resume

**1. Instances That Are Not In Accordance With Policy**

Claim - Principal Muhammad misappropriated school funds to host a Back to School Pep Rally on August 26, 2022. Evidence - Here is the email from Network Chief Devon LaRosa stating that CPS is providing the school $20 per student to host reengagement/back to school activities for students. When I arrived at Lindblom, there were no back to school reengagement activities planned.

Claim - Principal Muhammad brought guests who did not go through the background check. The vendor information for the vendor that was used for the August 22, 2022 Pep Rally all entertainment was provided by the vendor.

Claim - Principal Muhammad used the wrong funding and did not pay for software for teachers. Evidence: In SY22, before I arrived at Lindblom, the IL-EMPOWER budget was created by the previous administration and $27,810 was allocated for software. As of March 16, 2023 ISBE has not released those funds. I have inquired with ISBE about the release of these funds several times. This was communicated to the PPC, ILT and teachers numerous times. To support teachers, we negotiated with software vendors to extend licenses. This was communicated to staff.

**2. Special Education Laws Violated**

Claim - Administration did not hire a case manager, the case manager hired was not qualified. Marla Reid resigned from the position of Case Manager on August 1, 2022.

The administrative team made numerous attempts (1) to hire a full time case manager or a retired case manager to support our diverse learner students, prior to hiring Ms. Wilson. The.5 case manager, Erin Guidara, refused to assume additional responsibilities.
In December the PPC asked me to find a separate placement for a cluster student that they felt was a threat to Lindblom staff without any consultation from ODLSS. I refused. This was also brought up in November's PPC meeting.
The Union representative, Andrew Heiserman, also stated in a public ALSC meeting that the administration was unresponsive to concerns brought by staff for removal of this cluster student. The list of supports the administration provided to the cluster student is here, here, and here.
Claims regarding violation of special education laws were sent via anonymous email to ISBE. Laura Boedeker, the ISBE monitor for Special Education conducted an investigation on January 18, 2023. She concluded that nothing had been done wrong and informed us that the ALSC and PPC meetings were not forums to discuss special education students, she stated that these concerns should be addressed in an IEP meeting. The action items from that investigation are here.
The safety plan for  one of our diverse learner students was developed collaboratively with the Dean, Gen Ed teachers & SPED teachers.

### 3. Student Safety Reports Completed In A Timely Manner

Lindblom has 2 Deans. Dean Perez, ███ grade, Dean Williams ███th
The Deans are responsible for inputting reports

### 4. Inconsistent Hiring Practices

Claim - Principal Muhammad provided the Science Department Chair with an unqualified candidate. Evidence - We hired a Physics teacher in July of 2022, but he changed his mind at the last minute and went to another school. We continued our search for August of 2022, but we were unsuccessful.  The Science department chair recommended that current Science teachers be given an overtime indicator. On January 31, 2023 I reached out to Paola Carrera to request the Science teacher resume book, the resume shared with the Science Department Chair Lauren Levites was given to me by CPS via the resume book. The candidate was a student teacher at Whitney Young and waiting on ISBE to process his teaching certificate, which I communicated with Ms. Levites.

Claim - Mr. Clark worked pro bono as the programmer. Principal Muhammad did not attempt to hire a programmer. Evidence: Prior to my arrival at Lindblom, Network Chief Devon LaRosa assigned Mr. Clark to programming duties for which he was getting paid since the summer of 2022. This was communicated to the CTU union rep several times in PPC meetings, and in ALSC meetings and via email.  To support Mr. Clark, I collaborated with Michelle Clark's programmer, Whitney Young's Programmer, Lakeview's programmer and attempted to hire a retired programmer, sought support from Mr. Jackson, the CPS director of programming, as well as posted a position in the CPS programmer chat to hire a programmer.

Claim - Principal Muhammad created positions that were not currently at Lindblom. Evidence: All possible positions are provided by CPS Human Resources. Principals do not create their own positions.  Principals make determination on staffing needs. Most schools the size of Lindblom (1400 students) have numerous positions, Kenwood's org chart, Whitney Young's org chart. At the end of SY 22 due to financial mismanagement $389,903.15 of school funds went unspent and was recouped by the district. Additionally, a CPS audit revealed a pattern of financial mismanagement. Lastly, several teachers at Lindblom were conducting fundraisers improperly. These serious violations of CPS policy led to the decision to hire an Operations manager. Several candidates were interviewed for the Operations Manager position.

Claim - Principal Muhammad did not honor the promise from the previous administration to hire an Athletic Coordinator. Evidence - The previous administration opened the Athletic coordinator position incorrectly as a result the candidate that was promised the position could not be hired. On July 28, 2022 I met with Shaquille Blakely and Tiffany Taylor to get the position opened correctly. Shaquille Blakely in CPS Human Resources informed me that as the new Principal at Lindblom, I do not have to honor a promise from the previous administration, this was communicated to the Athletic Director, Christia Davis and the candidate. He also informed me that I should post the position and do interviews, which is exactly what I did. Five candidates were interviewed, including the candidate from Lindblom. The Athletic Director, Christina Davis was invited to participate in the interviews, but declined because she already decided that the Lindblom candidate with whom she had a relationship was her choice. Everything related to hiring any candidates was cleared by Shaquille Blakely in CPS Human Resources.

Claim - Network Chief Devon LaRosa claimed that Principal Muhammad and or the Dean took a student to the Citgo gas station located at 63rd & Damen. Evidence - On Monday, November 21, 2022 Network Chief LaRosa called me and said he received a complaint from a parent stating that the Dean (we have two Deans, he did not say which one) took a student from Lindblom to the Citgo gas station on 63rd & Damen. I spoke with Dean Williams on November 21, 2022 and he informed me that he did not take any student to the Citgo gas station. I emailed Chief LaRosa. Shortly thereafter, Chief LaRosa forwarded me the parents email, which stated that the Principal, not the Dean, took a student to Citgo, to which I responded in that same email thread that I did not.

Claim - Principal Muhammad referred to the parents, students and staff of Lindblom as the opposition. Evidence - The CPS Law Department did not have documentation to prove this claim, however I never referred to students, staff and parents as the opposition.

**NOTE:**
**An email requesting access was sent on March 18, 2023, at 5:00 pm. The urls in this email were not viewable as of 8:00 am March 19, 2023.**

**Tarrant, Kelly** <katarrant@cps.edu>
to Abdul, Luis, Samantha, cps ▾                                                5:01 PM

Please open the links in your document to "any CPS" otherwise, no one will be able to read them

Thank you-

Kelly Tarrant



Principal Muhammad - Documentation
Received by email from Interim Principal Muhammad to Kelly Tarrant, on Saturday, March 18, 2023, at 4:20 p.m.

(As of 5 pm March 18, 2023, the links to this document were not accessible to the LIU. An email requested access, however as of the close of this report the LIU did not review the links.)

1. Kevin Booker, Donna Gentry, Carl Williams
2. ISBE Monitor - Laura Boebeker lboebekre@isbe.net
3. ASPEN Incident #2338761 (The Office of Student Protections was notified and is investigating)
4. T-Moore Entertainment Inc - Vendor Number 42273
5. T-Moore Entertainment Inc - Vendor Number 42273
6. Vendor Sponsorship
7. Case M
8. Operatir      drive.google.com/file/d/1i...
9. Retired       You do not have access to this file
10. Athletic           Request access

1. **Instances That Are Not In Accordance With Policy**

Claim - Principal Muhammad misappropriated school funds to host a Back to School Pep Rally on August 26, 2022. Evidence - Here is the email from Network Chief Devon LaRosa stating that CPS is providing the school $20 per student to host reengagement/back to school activities for students. When I arrived at Lindblom, there were no back to school reengagement activities



# Office of Student Protections & Title IX (OSP) Procedure Manual

**Effective November 16, 2022**
**Version 4.0**

Ex. CC



**Office of Student Protections & Title IX (OSP) Procedure Manual**
Effective November 16, 2022
Version 4.0 - Last Revised on 11.16.22

**TABLE OF CONTENTS**

I.     **Introduction**

     A.   Purpose
     B.   Office of Student Protections & Title IX (OSP)
     C.   Office of Inspector General (OIG)
     D.   Equal Opportunity Compliance Office (EOCO)
     E.   Title IX of the Education Amendments of 1972 (Title IX)

II.    **Definitions**

     A.   Biased Based Behavior
     B.   Complainant
     C.   Conduct Unbecoming
     D.   Consent
     E.   Corporal Punishment
     F.   Covered Individual Adult
     G.   Decision-Maker
     H.   Discrimination
     I.   Failure to Report
     J.   Microaggressions
     K.   Physical Abuse
     L.   Respondent
     M.   Retaliation
     N.   Sex/Gender-Based Discrimination
     O.   Sex/Gender-Based Harassment
     P.   Sexual Harassment (City of Chicago)
     Q.   Sexual Harassment (IDHR)
     R.   Sexual Harassment (Title IX)
     S.   Sexual Misconduct
     T.   Verbal Abuse

III.   **Reporting and Intake Procedures**

     A.   Mandatory Reporting Requirements

B.  Amnesty
C.  Request to Not Investigate
D.  Intake and Review of Report
E.  Title IX Sexual Harassment
F.  Conduct Covered Outside of Title IX Sexual Harassment
G.  Designation of Investigation Type
H.  Student Refusal to Participate in Investigation
I.  Notification to School
J.  Supportive Measures

**IV.    Case Procedures**

K.  General Guidelines
L.  Informal Resolution of all Complaints (Title IX and non-Title IX)
M.  Notification of Allegation and Interview to the Parties
N.  Advisors
O.  Investigations
P.  Determinations
Q.  Discipline/Sanction
R.  Resolution Timeframe
S.  Appeal Procedures
T.  Recordkeeping
U.  Related OSP Procedures

**V.    List of Appendices**

V.  Appendix A: Student Rights in Investigations
W.  Appendix B: Employee Rights in Investigations
X.  Appendix C: Responding to Incidents Involving Electronic Communications of a Sexual Nature
Y.  Appendix D: Resource Guide

## I.  INTRODUCTION

**A.  Purpose:** This **Office of Student Protections & Title IX (OSP) Title IX Procedure Manual** is incorporated into the Board of Education of the City of Chicago's (Board) [Comprehensive Non-Discrimination, Harassment, Sexual Harassment, Sexual Misconduct and Retaliation Policy](#) (Non-Discrimination Policy) approved by the Board on July 22, 2020. The purpose of this OSP Procedure Manual is to outline the procedures for the prompt and equitable resolution of complaints alleging sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, harassment, sexual misconduct and retaliation, all of which are prohibited by Board Policy and Title IX of the Education Amendments of 1972 (Title IX). Additionally, this OSP Procedure Manual supports Chicago Public Schools' (CPS) policies and guidance ([Staff Acceptable Use Policy](#), [Reporting of Child Abuse, Neglect, and Inappropriate Relations Between Adults and Students](#) and [Domestic Violence, Dating Violence and Court Orders of Protection, Restraint or No Contact](#), [Addressing Bullying and Bias-Based Behavior](#)) and student policies ([Student Code of Conduct](#), [Student Acceptable Use Policy](#)).

**B.  Office of Student Protections and Title IX (OSP):** OSP is responsible for coordinating the CPS response to promptly investigate, stop, prevent and remedy all incidents of sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, sexual misconduct and retaliation and ensuring compliance with Title IX. In addition, OSP investigates allegations of physical abuse, corporal punishment and bias-based harm. OSP works with schools to receive reports/complaints, investigate incidents, provide supportive measures, and long-term remedies as needed. OSP also provides connections to counseling and advocacy, as well as guidance to schools and families on reporting to police and DCFS. Additionally, OSP provides regular training on how to recognize, prevent and appropriately respond to Title IX and sexual misconduct incidents as well as Biased-Behavior incidents.
  - **OSP** can be reached at **773-535-4400 and osp@cps.edu**.

**C.  Office of Inspector General (OIG):** OIG is responsible for conducting the investigation of sex/gender-based harassment, sexual harassment, sexual misconduct, and retaliation allegations involving student complainants against Covered Individual Adults. The OIG conducts independent investigations and issues its findings, and the OIG coordinates with OSP in ensuring that students are receiving appropriate supports and in ensuring compliance with Title IX, the Non-Discrimination Policy and this Procedure Manual.
  - **OIG** can be reached at **833-TELL-CPS**.

**D.  The Equal Opportunity Compliance Office (EOCO):** EOCO is located within OSP and is responsible for conducting investigations into allegations of sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, sexual misconduct and retaliation; as well as all allegations of discrimination, harassment, and retaliation based on a Covered Individual Adult's actual or perceived membership in a Protected Category. **EOCO** can be reached by phone at: **773-553-1013 or by email to: eoco@cps.edu**.

E. **Title IX of the Education Amendments of 1972 (Title IX):** As a school district receiving federal financial assistance, **Title IX** applies to CPS, including all of its schools, educational programs and activities.

- Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity, including but not limited to educational programs, employment, and admission receiving federal financial assistance."

- The Board's **Title IX Coordinator** is responsible for coordinating CPS efforts to comply with and carry out the district's responsibilities under Title IX and implementing regulations to investigate, stop, prevent and remedy sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, sexual misconduct, and retaliation. Additional information, including the contact information for the Board's Title IX Coordinator, can be found at **www.cps.edu/osp**.
  - Title IX Coordinator:
    **Camie Pratt, Chief Title IX Officer**, 110 N. Paulina St. Chicago, IL 60612, 773-535-4400, osp@cps.edu.

## II. DEFINITIONS

A. **Bias-Based Behavior:** any physical, verbal, nonverbal, microaggression, or other act or conduct, including communications made in writing or electronically, directed toward a member or perceived member of a protected category within the school community that is of a discriminatory or harmful nature.

B. **Complainant:** The person who has experienced the alleged harm. This person is considered a complainant regardless of whether they choose to file a complaint.

C. **Conduct Unbecoming:** Behaviors that disrupt the orderly educational or work process in the classroom, in the school, or in the office and may occur on or off the school grounds or assigned work location.

D. **Consent is defined as:**
- **Informed.** A person must understand the who, what, when, where and nature of the activity;
- **Active.** Verbal or nonverbal actions that clearly show willingness to participate in the activity. The absence of no does not mean yes; No means No. Stop means Stop;
- **Voluntary.** Freely given without the use of force, coercion, manipulation, or threats;
- **Specific.** Consent must be present every time, for every action. Consent to engage in one type of activity is not consent to engage in a different type of activity; and
- **Ongoing.** A person can take back consent at any time. Once consent is taken back, all activity must stop.
- **A person cannot give consent if:**
  - They are incapacitated from voluntary or involuntary drug or alcohol use;
  - They are asleep or unconscious;

- They have a physical, developmental or cognitive difference that prevents them from understanding what is happening;
- They are a minor who is under the age to legally consent to sexual activity under state law even if the minor welcomed the sexual activity; or
- The other person is in a position of authority or trust.

**E. Corporal Punishment:** Punishment designed to cause pain or discomfort to a child in response to a child's behavior. Examples include the deliberate use of physical force with a student (e.g., slapping, hitting, pushing, shaking, twisting, pinching, choking, swatting, head banging, or other physical contact; using any type of object or instrument that has contact with a student) or conduct that does not result in the physical contact with a student (e.g., humiliating a student, forcing a student to stand or kneel for an inordinate period of time, forcing a student into a physical position that causes pain, or requiring isolated timeouts that violates isolated time out procedures).

**F. Covered Individual Adults:** Includes, but is not limited to, employees (part- or full-time), applicants for employment, contractors, consultants, vendors, Members of the Board of Education, Local School Council (LSC) members, and volunteers.

**G. Decision-Maker:** Individuals who are free from conflicts of interest and biases and who are trained to serve impartially without prejudging the facts at issue. Decision-makers have the authority to make the determination regarding whether the Policy was violated, whether or not a complaint is dismissed and final appeal determinations. Discipline will be imposed only after consultation with a student's principal or, for Covered Individual adults, the CPS Law Department. Discipline will be imposed pursuant to applicable CPS discipline policies.

**H. Discrimination:** treating an individual less favorably because of their actual or perceived membership in one or more of the Protected Categories.

**I. Failure to Report:** failing to report harassment, discrimination, sexual harassment, sexual misconduct, physical abuse, verbal abuse, conduct unbecoming, corporal punishment, bias-based harm, or retaliation as required by this Procedure Manual and the Non-Discrimination Policy.

**J. Microaggressions:** The everyday verbal, nonverbal, and environmental slights, snubs, or insults, whether intentional or unintentional, which communicate hostile, derogatory, or negative messages to target persons based solely upon their actual or perceived Protected Category membership such as race, sexual orientation, and gender identity (Adapted from Wing Sue, Derald. "Racial Microaggressions in Everyday Life," 2010)

**K. Physical Abuse:** Inflicting, causing to be inflicted, or allowing to be inflicted physical injury, by other than accidental means, which creates a substantial risk of causing death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function. Physical Abuse does not include physical restraint used for therapeutic purposes or as necessary to preserve the safety of students or others as outlined in the Physical Restraints and Time Outs Policy.

L. **Respondent:** The person accused of causing harm.

M. **Retaliation:** Any adverse action to employment or academics, or adverse change in employment or academic status, taken against a Covered Individual for having made a complaint or report of Discrimination, Harassment, Sexual Harassment or Sexual Misconduct, whether made internally, or externally with a federal, state, or local agency; or for participating, aiding, or refusing to participate in an investigation, proceeding or hearing related to a report or complaint of Discrimination, Harassment, Sexual Harassment or Sexual Misconduct under the Board's Non-Discrimination Policy, whether internal, or external with a federal, state, or local agency, is strictly prohibited. An adverse action can include discipline or denial of access to a service or benefit. For purposes of Title IX, intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX, constitutes retaliation. Subject to applicable laws and regulations, including Title IX, nothing herein is intended to conflict with an employee's obligations under Board Rule 4-4 (m) to cooperate in investigations by the Office of the Inspector General.

N. **Sex/Gender-Based Discrimination:** Treating an individual less favorably because of their actual or perceived sexual orientation, gender or sex (includes gender identity, gender expression, pregnancy, childbirth, breastfeeding, and pregnancy-related medical conditions) and gender equity in athletics or academics.

O. **Sex/Gender-Based Harassment:** Unwelcome verbal, nonverbal, visual, or physical conduct that is based on an individual's actual or perceived sex/gender, sexual orientation or gender identity. Unwelcome conduct may include bullying, intimidation, offensive jokes, slurs, epithets or name calling, assaults or threats, touching, ridicule or mockery, insults or put-downs, offensive objects or pictures, messages sent via email, text or social media, sexual advances, requests for sexual favors, conduct of a sexual nature, sex-based conduct and any other persistent, pervasive or severe conduct that is objectively offensive and unreasonably interferes with, limits, or denies an individual's educational or employment access, benefits, or opportunities.

P. **Sexual Harassment (City of Chicago):** Sexual harassment means any

(1) unwelcome sexual advances or unwelcome conduct of a sexual nature;

(2) requests for sexual favors or conduct of a sexual nature when
> (i) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or
> (ii) submission to or rejection of such conduct by an individual is used as the basis for any employment decision affecting the individual; or

(iii) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment; or

(3) sexual misconduct, which means any behavior of a sexual nature which also involves coercion, abuse of authority, or misuse of an individual's employment

position.

**Q.** **Sexual Harassment (Illinois Human Rights Act):** Any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when:
- submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,
- submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or
- such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

**R.** **Sexual Harassment (Title IX):** Conduct on the basis of sex that satisfies one or more of the following:
- An employee of the District conditioning the provision of an aid, benefit, or service of the District on an individual's participation in unwelcome sexual conduct;
- Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the District's education program or activity; or
- **Sexual Assault**, defined as:
  - **Sex Offenses**: Any sexual act or attempted sexual act directed against a complainant, without the consent of the complainant including instances where the complainant is incapable of giving consent.
    - **Rape**: Penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of complainant, without the consent of the complainant.
    - **Sodomy**: Oral or anal sexual intercourse with another person, forcibly and/or against that person's will (non-consensually) or not forcibly or against the person's will in instances where the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    - **Sexual Assault With An Object**: To use an object or instrument to penetrate, however slightly, the genital or anal opening of the body of another person, forcibly and/or against that person's will (non-consensually) or not forcibly or against the person's will in instances where the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    - **Fondling**: The touching of the private body parts of another person (buttocks, groin, breasts), above or below clothes, for the purpose of sexual gratification, forcibly and/or against that person's will (non-consensually) or not forcibly or against the person's will in instances where the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

- ○ **Incest**: Sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by Illinois law.
- ○ **Statutory Rape**: Sexual intercourse with a person who is under the statutory age of consent of 17 years old (or 18 years old when the perpetrator is in a position of trust or authority, such as a teacher or coach).
- **Dating Violence**, defined as: violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the complainant. The existence of such a relationship shall be determined based on the complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition:
  - Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.
  - Dating violence does not include acts covered under the definition of domestic violence.
- **Domestic Violence**, defined as: a felony or misdemeanor crime of violence committed:
  - By a current or former spouse or intimate partner of the complainant;
  - By a person with whom the complainant shares a child in common;
  - By a person who is cohabitating with, or has cohabitated with, the complainant as a spouse or intimate partner;
  - By a person similarly situated to a spouse of the complainant under the domestic or family violence laws of Illinois; or
  - By any other person against an adult or youth complainant who is protected from that person's acts under the domestic or family violence laws of Illinois.
  To categorize an incident as Domestic Violence, the relationship between the respondent and the complainant must be more than just two people living together as roommates. The people cohabitating must be current or former spouses or have an intimate relationship.
- **Stalking**, defined as: engaging in a course of conduct directed at a specific person that would cause a reasonable person to:
  - Fear for the person's safety or the safety of others; or
  - Suffer substantial emotional distress.
  For the purposes of this definition:
  - Course of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
  - Reasonable person means a reasonable person under similar circumstances and with similar identities to the complainant. Substantial emotional distress means significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling.

S. **Sexual Misconduct** is a form of sex or gender-based discrimination or harassment that includes any conduct that is sex-based or of a sexual nature that is unwelcome or

inappropriate and unreasonably interferes with, limits, or denies an individual's educational or employment access, benefits, or opportunities. CPS uses seven (7) categories to further breakdown sexual misconduct incidents. In addition, sexual harassment allegations, as defined above, may be investigated as Non-Title IX sexual misconduct allegations  if they do not meet all jurisdictional requirements under Title IX.

- **Grooming:** When someone builds a relationship, trust and/or emotional connection with a child or young person so they can manipulate, exploit and/or abuse them.
- **Inappropriate Touching:** Knowingly or intentionally making or attempting to make unwelcome physical contact with genitals, anus, groin, or breasts, whether direct or indirect through clothes or with an object or any other intentional bodily contact in a sexual manner.
- **Sexual Electronic Communication**: Intentionally viewing, creating, possessing, or sharing sexual language or images/recordings without the  consent of one or more parties.
- **Sexual Bullying:**  Severe, pervasive or persistent unwelcome conduct of a sexual nature or based on a person's sexuality or gender that is based on an imbalance of power or power and control with an intent to cause harm. Such behavior has or can be reasonably predicted to have one or more of the following effects:
  - placing the student in reasonable fear of harm to the student's person or property;
  - causing a substantially detrimental effect on the student's physical or mental health;
  - substantially interfering with the student's academic performance; or
  - substantially interfering with the student's ability to participate in or benefit from the services, activities, or privileges provided by a school.
- **Sexual Exploitation:** Taking non-consensual or abusive sexual advantage of another person for their own benefit or the benefit of a third party (e.g. for the purpose of sexual gratification, financial gain, personal benefit or advantage, human trafficking), or any other non-legitimate purpose.
- **Sexual Violence:** Sexual conduct, or attempted sexual conduct that occur without the consent of one or more parties, that may or may not involve the use of implicit or implied force. This includes any unwelcome oral, anal or vaginal penetration, however slight, with any object by a person upon another person.
- **Exposure/Voyeurism/Masturbation:** Non-consensual exposing of one's genitals, anus, buttocks, or breasts in a sexual nature; watching others when their body parts are exposed without their consent; or touching one's own genitals for sexual pleasure.

T. **Verbal Abuse:**  Negative oral or written communication, including via electronic means, or threatening language directed at students, with or without profanity.


III.     **REPORTING AND INTAKE PROCEDURES**

   A.  **Mandatory Reporting Requirements**
- **Covered Individual Adults Reporting of Sex/Gender-Based Discrimination, Sex/Gender-Based Harassment, Sexual Harassment, Sexual Misconduct and Retaliation:**
  - All Covered Individual Adults are required to report to the Chief Title IX

Officer, the District's Title IX Coordinator, all sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, sexual misconduct and retaliation concerns they become aware of in the scope of their role, whether it involves students, adults, or conduct between adults and students.

- Covered Individual Adults must follow the reporting procedures outlined below for all incidents of sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, sexual misconduct, and retaliation of which they become aware. Failure to report may result in discipline/sanctions, up to and including termination and removal from and prohibiting access to District premises.
- Failure of Covered Individual Adults to report harassment, discrimination, or retaliation that they are experiencing or have experienced is not a policy violation.

■ **Mandated Reporting of Child Abuse:**
- Per Board policy, all mandated reporters who have reasonable cause to believe that a child known to the reporter in the reporter's official capacity may have been abused or neglected must immediately report such to the Illinois Department of Children and Family Services (DCFS) by calling the DCFS Hotline at 1-800-252-2873 (1-800-25-ABUSE). Mandated reporters must also report to DCFS any interactions or behaviors which suggest that an adult has or had an inappropriately intimate relationship with a child or may be grooming a child, even if the employee does not have reasonable suspicion that sex abuse is occurring or has occurred.
  - After notifying the Hotline, a mandated reporter must inform the reporter's principal/supervisor of the report. If the alleged abuser is the mandated reporter's principal/supervisor, or the mandated reporter fears retaliation from their principal/supervisor, the mandated reporter must notify the Network Chief/Chief Officer of the report.
- "Mandated reporters" include all Board employees (including administrators and both certificated and non-certificated school employees), educational advocates assigned to a child pursuant to the School Code, social workers, registered nurses, licensed practical nurses, recreational program personnel, registered psychologists, psychiatrists, physicians, and others, who have reasonable cause to believe that a child known to them in their professional or official capacity may be an abused or neglected child. Mandated Reporters also include vendors, contractors, volunteers and Local School Council members. As used in this Section, "a child known to them in their professional or official capacities" means: (A) the mandated reporter comes into contact with the child in the course of the reporter's employment or practice of a profession or through a regularly scheduled program, activity, or service; (B) the mandated reporter is affiliated with Chicago Public Schools; (C) a person makes a specific disclosure to the mandated reporter that an identifiable child is the victim of child abuse or child neglect, and the disclosure happens while the mandated reporter is engaged in his or her employment or practice of a profession, or in a regularly scheduled program, activity, or service.

- For more information, see the Board policy on Reporting of Child Abuse, Neglect and Inappropriate Relations between Adults and Students.
- OSP coordinates supportive measures for cases that may fall out of our purview as well, such as home based abuse and inadvertent exposure.

■ **Title IX and Sexual Misconduct Mandatory Reporting Procedure:** A Covered Individual Adult must take the following steps upon receiving a report:
  - Ensure the safety and well-being of the party disclosing to you.
  - **If it is an emergency**, per the Student Code of Conduct, **notify 911**.
  - **If you suspect child abuse or neglect, notify the Illinois Department of Children and Family Services (DCFS) at 1-800-252-2873** (1-800-25-ABUSE).
  - Notify your school principal.
  - For additional information, see the "Mandated Reporting of Child Abuse" section above.
  - Notify **OSP immediately**.
    - **District Schools:** Fill out an Aspen report and answer the two questions related to sexual misconduct.
      1. Does this alleged incident involve a student or adult, sex/gender-based discrimination, sexual harassment (including sexual assault, dating violence, domestic violence, and stalking), sexual misconduct, or retaliation?
      2. Does this alleged incident involve adult on student behavior? For the purposes of this question, adult shall mean a staff member (part or full time), employee of a vendor, LSC member, school-affiliated individual, or volunteer.
    - **Charter Schools:** Fill out a report using the **Online Report Form** on the **OSP Website**.
  - **Staff unable to access Aspen, and for any questions or assistance, contact the Office of Student Protections and Title IX at 773-535-4400 or osp@cps.edu.**

■ **Procedure for Reporting a Covered Individual Adult Complaint:** All reports of complaints covered herein by a Covered Individual Adult complainant (*i.e.*, adult-to-adult or student-to-adult conduct) must be reported to the Equal Opportunity Compliance Office (EOCO) at 110 N. Paulina Street, Chicago, Illinois 60612, **773-553-1013 or eoco@cps.edu,** or by completing the Online Report Form on the EOCO webpage

■ **Former Students May File A Complaint of Sex/Gender-Based Discrimination, Sex/Gender-Based Harassment, Sexual Harassment, Sexual Misconduct and Retaliation**

B. **Amnesty:** CPS supports and encourages reporting and considers addressing all misconduct a priority. A complainant who makes a good faith report or a witness who shares what they know of conduct covered in these procedures will not be subject to disciplinary action for any minor policy violations related to the incident being reported. Amnesty does not apply to more serious policy violations such as physical abuse of another or illicit drug distribution.

C. **Request to Not Investigate:** Once a report is received or at any point during the investigation, the complainant can state they do not want an investigation, but the District may have an obligation to move forward based on the safety and threat to the community. When the complainant requests that no investigation into a particular incident be conducted or disciplinary action taken, the District will assess the request against the District's obligation to provide a safe environment for all within the District community, including the complainant. There are times when the District may proceed with the investigation and/or discipline despite the request for no investigation. When a complaint involves a Covered Individual Adult respondent, the District will, absent extenuating circumstances, move forward with the procedures detailed below.

D. **Intake and Review of Report**:
  - **OSP/EOCO Intake and Review:** Once OSP/EOCO receives a report of misconduct covered herein they will conduct an intake, review the information received, determine whether the District has jurisdiction (as defined in the [Non-Discrimination Policy](#)) to process the report, and determine whether the report falls under Title IX. OSP/EOCO will, at all times, coordinate support for the parties whether or not the District has jurisdiction and whether or not the report falls under Title IX.
    - If the District has jurisdiction then OSP/EOCO will reach out to the complainant, provide information about the ability to file a formal complaint under Title IX (if applicable), and coordinate supportive measures.
    - When appropriate, OSP/EOCO will forward matters to OIG for review.

E. **Title IX Sexual Harassment:** Reports that fall within the definition of ***sexual harassment*** under Title IX are covered by Title IX and will be processed as follows.
  - **Formal Complaint:** In reports falling under Title IX sexual harassment a formal complaint, which is a written document filed by a complainant (parents/guardians have the right to act on behalf of the student) or signed by the Title IX Coordinator alleging a Title IX sexual harassment violation against a respondent, must be filed to request that the District investigate the allegation.
  - A formal complaint may be filed in person, by mail, by electronic mail, or via the [Online Report Form](#) on the [OSP website](#) or the [EOCO website](#):
    - OSP - Mail: 110 N. Paulina Street, Chicago, IL 60612; Phone: 773-535-4400; Email: [osp@cps.edu](mailto:osp@cps.edu)
    - EOCO - Mail: 110 N. Paulina Street, Chicago, IL 60612; Phone: 773-553-1013; Email: [eoco@cps.edu](mailto:eoco@cps.edu)
    - Title IX Coordinator - Mail: Chief Title IX Officer, Camie C. Pratt, 110 N. Paulina Street, Chicago, IL 60612; Phone - 773- 535-4400; Email: [osp@cps.edu](mailto:osp@cps.edu)
  - When a complaint involves a Covered Individual Adult respondent and a student complainant, the Title IX Coordinator or designee will, absent extenuating circumstances, move forward with filing a formal complaint. The Title IX Coordinator (or designee) will respect the complainant's wishes with respect to whether to investigate unless the Title IX Coordinator determines it is necessary to pursue the complaint in light of a health or safety concern for the community.
  - **Dismissal of a Formal Title IX Sexual Harassment Complaint:**

- **Mandatory Dismissal:** If any of the following are met, a formal complaint *must* be dismissed without conducting an investigation under Title IX:
  ○ If the conduct did not occur against a person in the United States; and/or
  ○ If at the time of filing a formal complaint, a Complainant is not participating in or attempting to participate in the education program or activity of the District; and/or
  ○ If the conduct did not occur in the District's education program or activity; and/or
  ○ If the conduct alleged in the formal complaint would not constitute sexual harassment as defined in herein.
- **Discretionary Dismissal:** If any of the following are met, a formal complaint *may* be dismissed without conducting an investigation under Title IX:
  ○ If at any time during the investigation or hearing, a Complainant notifies the Title IX Coordinator in writing that the Complainant would like to withdraw the formal complaint or any allegations therein;
  ○ The Respondent is no longer enrolled or employed by the District; or
  ○ Specific circumstances prevent the District from gathering evidence sufficient to reach a determination as to the formal complaint or allegations.
- **Dismissal Notification and right to appeal:** Both parties will receive simultaneous notification of complaint dismissal from the Dismissal Determination Decision-Maker and have the opportunity to appeal the dismissal determination according to the appeals section below.
- *When a Title IX sexual harassment complaint is **dismissed**, the complaint will be **evaluated for other policy violations** defined herein and processed accordingly.*

F. **Conduct Covered Outside of Title IX Sexual Harassment:** Reports that fall outside of the definition of ***Title IX sexual harassment*** but under misconduct covered herein do not require a formal complaint to be filed.

G. **Designation of Investigation Type:** Once a report is accepted as an investigation, the District will designate a misconduct category and an investigation type. The following investigation types can be designated:

- **OSP Investigation:** For severe or complex incidents that involve significant factors and for Title IX sexual harassment, an OSP investigator will be assigned to investigate the incident. An OSP investigator will respond to the school once the  OSP investigation is opened and assigned to an investigator. The OSP investigator will need access to the Student Protections School Representative, access to all parties/students involved, a private location for interviews, and all relevant evidence and documents.
- **School-Based Investigation:** For less severe incidents and those falling outside of Title IX sexual harassment, OSP or EOCO will ask the school and its Student Protections School Representative to conduct a school-based investigation.

School-based investigations are led by school administrators and/or Student Protections School Representatives. OSP or EOCO will provide the school guidance and a school *must not conduct an investigation* unless directed to do so by OSP or EOCO.

- **Office of Inspector General (OIG) Investigation:** Complaints involving concerns of Sexual Harassment, Sexual Misconduct, Retaliation, and any other conduct or Harassment of a sexual nature by Covered Individual Adults against a student will be investigated by the OIG. The OIG, in consultation with OSP, will assess the complaint and OIG will assign an investigator. OSP will provide students, families and schools any assistance they require while OIG conducts their investigation.
- **EOCO Investigation:** For incidents involving Covered Individual Adult complainants, an EOCO investigator will be assigned who will work in conjunction with the school or worksite to conduct the investigation.

H. **Student Refusal to Participate in Investigation:** Any student may refuse to participate in an investigation, though the investigation may still continue and result in a determination of an outcome based on available information.

I. **Notification to School:** Upon receiving a report from a school, OSP will triage the report and will send the school a designation of investigation and follow-up communication letting the school know what type of investigation, if any, will occur.

J. **Supportive Measures:** In all incidents, the District will coordinate with schools/worksites to provide the parties with supportive measures which are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the parties before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve access to the District's education program or activity, without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the Districts' educational environment, or deter sexual harassment or other conduct covered herein. Available supportive measures include, but are not limited to, the following:

- Check-In/Check Out (CICO) interventions
- Counseling or social work support at school
- Referral to the Employee Assistance Program (**Magellan/Employee Assistance Program:** 1-800- 424-4776; Website: https://www.magellanascend.com/)
- **Safety Plan and No Contact Orders:**
  - A Safety Plan is a plan designed to provide special safety supervision to the parties. The plan includes specific interventions which targets concerning behavior in order to minimize the risk of harm to the parties or others. A Safety Plan can provide flexibility in a party's access to educational/work spaces in order to feel safe and succeed academically/professionally. In cases of conduct covered herein, a Safety Plan may be appropriate to keep parties separate and safe. A Safety Plan may also prioritize elements of emotional safety and coping mechanisms.
  - A No Contact Order is a directive by the District preventing the parties from contacting each other directly and/or indirectly. This helps to ensure the parties have no contact or communication and can include additional

restrictions (such as location) to best facilitate the No Contact Order.
- If a Safety Plan and/or No Contact Order restricts access to school/work spaces or events, the plans should be equitably restrictive on all parties in a case prior to an outcome determination.
- Regardless of the outcome of a case, a continued Safety Plan and/or No Contact Order may be considered in consultation with OSP/EOCO for the continued well-being of the parties.

- Connection to external counseling, support, medical/health services and/or advocacy services. For more information on specific referrals, see the Resource Guide in **Appendix D**.
- Extensions of time to complete assignments, modifications to course/work schedules, or any other course/work-related adjustments.
- To ensure the safety and well-being of the school environment in the presence of an immediate threat, a school may consult with OSP/EOCO, Network Offices, the Office of Social Emotional Learning (OSEL), and Safety and Security to explore additional options of removal or placement.
  - Emergency removals of student respondents will only occur if the District follows these specific steps:
    - Undertake an individualized safety and risk analysis to determine whether there is an immediate physical threat to the health or safety of students or other individuals arising from the allegations that would justify removal; and
    - Provide the student respondent with written notice of the emergency removal; and
    - Provide an opportunity for the student respondent to challenge the decision immediately following notice of the removal.
  - At all times, the District reserves its right to remove Covered Individual Adult respondents when it is necessary during the course of an investigation to ensure student/staff safety.
- Supportive measures may be provided to a party during and following an investigation. Also, supportive measures will be offered to a party even if OSP/EOCO does not accept a report as a case when needed to address any in-school/work effects on a party.
- Additionally, measures may be provided District-wide, school-wide or throughout a work site, such as increased security, policy exceptions, educational programming, etc. if needed to stop, prevent and remedy misconduct covered herein.

## IV.    CASE PROCEDURES

A. **General Guidelines:** The following procedures will be followed when the District receives a report of sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, sexual misconduct, and/or retaliation. All relevant reporting and investigative steps are documented in the District's Guardian Case Management Software System.

- Special Consideration: When responding to sexual misconduct incidents, both in the application of case procedures and in the assessment of applicable policies and discipline, the District takes into special consideration other factors, including but not limited to age, language ability, and disability status of students/employees. To the

greatest extent possible, and subject to Title IX, the District will make reasonable accommodations in case procedures to avoid potential retraumatization of a child and to avoid any potential interference with an investigation by the Department of Child and Family Services or a law enforcement agency.

■ Subject to Title IX, after an alleged incident of sexual abuse is accepted for investigation by the Department of Children and Family Services or a law enforcement agency, an alleged impacted party will not be interviewed by the District regarding details of the alleged incident of sexual abuse until after the completion of a forensic interview at a Children's Advocacy Center, if such an interview is expected to be conducted.

**B. Informal Resolution of all Complaints (Title IX and non-Title IX):** An informal resolution is available to the parties once a formal complaint has been filed and any time prior to a determination being made for a Title IX sexual harassment complaint and at all times for complaints falling outside of Title IX. ***Informal resolutions are not available where the Complainant is a student and the Respondent is a Covered Individual Adult.*** Informal resolution can be used on a case-by-case basis, as determined by the District where applying remedies will resolve the situation and only when the Complainant and Respondent agree to informal resolution or the Respondent is willing to accept responsibility for a violation. A preliminary inquiry will still typically precede this step to ensure that the case is appropriate for an informal resolution.

■ The parties are provided with a written notice that includes:
   ● The reported misconduct/allegations;
   ● The requirements of the informal resolution process, including the circumstances under which, once completed, it precludes the parties from changing their minds and reverting to a formal grievance process;
   ● The right of the parties to withdraw from the informal resolution process and resume the formal grievance process;
   ● Any consequences resulting from participating in the process, including what sanctions can result, as well as any records that will be maintained and/or can be shared; and
   ● Whether the resolution will be binding on the parties.

■ It is not necessary to pursue Informal Resolution first in order to pursue the formal process of a complete investigation, and any party participating in Informal Resolution can stop the process at any time and request a complete investigation.

■ Prior to implementing Informal Resolution, the District will obtain voluntary, written confirmation that the Complainant and Respondent wish to resolve the matter through Informal Resolution.

■ When the allegations involve serious misconduct or a pattern of employee misconduct, the District may be unable to honor a request for confidentiality and/or informal resolution.

**C. Notification of Allegations and Interview to the Parties Following a Formal Title IX Complaint:** The District will provide written notice of allegations and interviews to the parties, including to parent(s)/guardian(s) exercising the right of a party of respondent(s) and complainant(s), before a formal interview takes place. If the allegations change at any point over the course of the investigation the District will provide formal notice again to include the additional allegations, copying all parties.

- **Notification of Allegation(s)** will include the following:
  - Details of the allegation:
    - A summary of the allegations made including the date(s) and location(s) of the alleged incident(s);
    - The identities of the parties involved (if known);
    - The classification of allegations made including the conduct that is considered to be sex/gender-based discrimination, sex/gender-based harassment, sexual harassment, and/or sexual misconduct;
    - The type of investigation that will occur;
    - The rights of the parties to supportive measures;
    - In-school and local resources available to the parties; and
    - Applicable section(s) of the policies and procedures alleged to have been violated.
  - A statement that the Respondent is presumed to be not responsible for the alleged conduct until a determination is made according to the process outlined herein.
  - A statement that the parties may have an advisor of their choice, who may be an attorney.
  - A reminder of the expectation of truthfulness in the process, including the consequences of providing false statements or submitting false information.
  - A statement that the information learned and shared during an investigation is expected to be treated as confidential.
- **Notification of Interview** will be sent to parties at least four (4) calendar days before the initial interview to provide parties with sufficient time to prepare to participate in the interview; however, circumstances may necessitate a shorter or longer time frame.
  - The notice will include the following:
    - Date;
    - Time;
    - Location;
    - Participants; and
    - Purpose of the investigative interview or meeting.
  - If the investigation necessitates additional interviews, notification of subsequent interviews will be provided to parties and the parties may waive the four (4) calendar day timeframe for preparation.
- **Notification of Allegations and Interviews may, at the District's discretion, be combined into one notice containing all required information.**

D. **Advisors:** All parties have the right to an advisor of their choice present during the process outlined herein, including any related meeting or proceeding. An advisor may be an attorney.

E. **Investigations**
- **Investigation Norms:** All investigations, regardless of type, will be conducted in a prompt, thorough, fair and impartial manner. No information protected by privilege will be used during the investigation (unless the privilege is waived by the party).
  - **Schools and CPS employees should never undertake their own investigations, unless specifically directed by OSP or EOCO to**

**conduct a school-based investigation. Discipline should never be imposed until after OSP or EOCO indicate that this can occur.**

- Each investigation will include the following steps, though not necessarily in this order:
  - Interviewing all parties and witnesses (to include watching recorded forensic interviews when available) and conducting follow-up interviews as needed while notifying the parties of any meeting or interview in advance;
  - Allowing each party the opportunity to provide any inculpatory and exculpatory evidence, suggest witnesses and questions they wish the investigator to ask of the other party and witnesses;
  - Interviewing all available relevant witnesses and conducting follow-up interviews as necessary;
  - Completing the investigation as promptly as possible and without unreasonable deviation from the intended timeline;
  - Providing ninety (90) day status update notifications to the parties throughout the investigation;
  - In cases falling under Title IX Sexual Harassment:
    - Writing a comprehensive final investigative report fully summarizing the investigation, all witness interviews, and addressing all relevant inculpatory and exculpatory evidence;
    - A decision-maker reviewing all of the material, rendering a determination of responsibility based upon a preponderance of the evidence standard.
- The burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rests on the District and not on the parties.
- **Investigative Report:** Investigations conducted by OSP, OIG and EOCO will result in an investigative report that fully summarizes the investigation, all witness interviews, and addresses all relevant inculpatory and exculpatory evidence. Investigative reports falling under Title IX sexual harassment will be shared with the parties and their advisors by the investigator pursuant to the requirements of the Title IX Regulations. Prior to completion of the Title IX sexual harassment investigative report, the investigator will send each party and their advisor for inspection and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint. The parties will have ten (10) calendar days to submit a written response, which the investigator will consider prior to completion of the investigative report. In Title IX investigations, the finalized investigative report will be provided to the parties and their advisors.
  - **Impact of CPD and DCFS Investigations:** CPD and DCFS investigations are separate from OSP and OIG investigations, and they may be complementary or simultaneous. A call to CPD and/or DCFS does not suffice a call to OSP and/or OIG, and vice versa.
  - **Non-Title IX Investigations:** Many investigations conducted by the OIG Sexual Allegations Unit (SAU), OSP and EOCO may not be designated as Title IX

investigations. Non-Title IX investigations are not subject to the procedures outlined above for Title IX investigations. Further, OIG, OSP, and EOCO investigations that were initially designated as Title IX investigations but subsequently dismissed under Title IX (see Section III (E) above) will no longer be subject to those procedures, as of the date of dismissal.

- **OIG Investigations:**
  - The following are principles and standards of OIG SAU investigations and procedures for non-Title IX investigations.
    - Fair and Impartial Investigations: The OIG is responsible for conducting thorough, fair and independent investigations and reporting.
    - When allegations arise of adult-to-student sexual misconduct, schools and CPS employees ***should not undertake their own investigations***, unless specifically directed by OSP to conduct a school-based investigation. Likewise, unless specifically directed to by the OIG or OSP, schools and CPS employees should not collect written statements from Complainants, Respondents or witnesses.
    - All parties have the right to the presence of a union representative or an attorney during an OIG interview.
  - **Coordination with the Chicago Children's Advocacy Center (CCAC):** OIG's investigations may involve coordination with law enforcement and other agencies, including the CCAC, DCFS, the Chicago Police Department and the Cook County State's Attorney's Office. The OIG carefully coordinates its work with the CCAC to minimize any retraumatization of victims and to preserve evidence. In some instances, law enforcement agencies are involved in the OIG's investigations at the outset. The OIG also refers matters to law enforcement agencies when evidence indicates criminal misconduct.
  - **Reporting to the Board:** The OIG issues reports of its findings and recommendations in a non-Title IX investigation to the Board, OSP and other CPS administration members which can then respond to the report as it determines appropriate.
  - **Corrective Action By the District Following an OIG Report:** Employees, Vendors and Volunteers may be subject to appropriate corrective action following a non-Title IX investigation and report:
    - **Employees:** Employees who are found to have violated any CPS policy (including but not limited to the Board's Non-Discrimination Policy) or applicable law or statute are subject to internal disciplinary action up to and including termination.
      - **Charter School Employees:** Charter School Employees who are found to have engaged in sexual misconduct are subject to discipline/sanctions in accordance with agreed upon procedures dictated by the District's Memorandum of Understanding with Charter Operators, which may be amended from time to time and incorporated into the Charter Agreement.
    - **Contractors, Consultants or Vendors:** The CPS Law Department

will coordinate with the appropriate individual(s) within CPS to determine the appropriate disciplinary actions for contractors, consultants or vendors which can include legal remedies including debarment.

- ○ **Volunteers:** The CPS Law Department will coordinate with the appropriate individual(s) within CPS to determine the appropriate disciplinary action for volunteers which can include, but is not limited to, having their authorization to serve as a volunteer rescinded.

- **Referrals:** The OIG may refer non-Title IX investigations to a relevant CPS department if it determines that the allegations under investigation do not involve adult-to-student conduct of a sexual nature.

- **Resolution Timeframes:** Non-Title IX investigations will be resolved as promptly as possible. Due to a variety of factors, including police involvement, collection of evidence from third parties and the availability of witnesses, some investigations may continue for months.

F. **Determinations:** The parties will receive a determination regarding responsibility using the preponderance of the evidence standard. Regardless of the outcome of the investigation, the District will take steps to prevent the recurrence of sexual harassment, as well as all misconduct covered herein, and correct any discriminatory effects on all impacted parties as appropriate.

- ■ **Cases falling under Title IX Sexual Harassment - Written Determinations:** After the District has sent the investigative report to the parties and before reaching a determination regarding responsibility, the Determination Decision-Maker will afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party. The Determination Decision-Maker may make a determination that a question is not relevant and will explain to the party proposing the questions any decision to exclude questions as not relevant. The Determination Decision-Maker will issue a written determination regarding responsibility using the preponderance of the evidence standard.

  - The written determination will be simultaneously sent in a prompt and equitable manner to inform the parties and their advisors, including the parent(s)/guardian(s) of respondent(s) and complainant(s), of the following:
    - ○ The section(s) of the policies alleged to have been violated;
    - ○ A description of the procedural steps taken from the receipt of the formal complaint through the end of the process, including any notifications made to the parties, interviews with parties and witnesses, site visits, other mechanisms used to gather evidence, and hearings held (if applicable);
    - ○ Findings of fact that support the determination;
    - ○ Conclusions regarding the application of the "findings of fact" to the alleged policy violations;
    - ○ A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions the District imposes on the Respondent, and whether

remedies designed to restore or preserve equal access to the District's education program or activity will be provided by the recipient to the Complainant; and

○ Procedures for appeal, including the bases upon which the parties may appeal.

- **Cases falling outside of Title IX - Written Outcome Determinations** - The parties will receive a written outcome determination letter regarding responsibility using the preponderance of the evidence standard.

  - **OSP and School-Based Investigations:** Both parties will receive a written outcome determination (if requested in School-Based Investigations) stating whether the investigation was substantiated or unsubstantiated. If the case is substantiated, the school administrator will communicate any consequences pursuant to the Student Code of Conduct to the Respondent student and their parents/guardians.

  - **EOCO Investigations:** The EOCO will issue a written outcome determination to both parties stating whether the investigation was substantiated or unsubstantiated. If the case is substantiated, it will be transferred to the CPS Law Department for review. Once the Law Department's review is final, a written outcome determination will be issued to both parties.

  - **OIG Investigations:** Investigations are forwarded to the CPS Law Department and OSP. In substantiated cases, the Law Department issues a written outcome determination to both parties. In unsubstantiated cases, the Law Department or OSP issues a written outcome determination to both parties.

G. **Discipline/Sanction:** Appropriate disciplinary action will be taken when an individual is found to have engaged in misconduct or retaliation as described herein in violation of the Board's Non-Discrimination Policy.

- **Students:** In Non-Title IX cases, the school is responsible for next steps regarding restorative actions and/or discipline for students. OSP can provide advice and guidance as necessary. In Title IX cases, the Title IX Determination Decision-Maker is responsible for next steps.

  - Students who violate the Board's Non-Discrimination Policy are subject to disciplinary action pursuant to the Student Code of Conduct, which may be amended from time to time.

  - Discipline should be implemented immediately once the written determination/written outcome determination of an OSP or school-based investigation is communicated.

  - If a student has an IEP/504 plan, consultation with the District Office of Diverse Learning Supports & Services (ODLSS) Representative shall occur.

- **Employees**: Investigations into employee misconduct are forwarded to the CPS Law Department in non-Title IX cases and to the Title IX Determination Decision-Maker in Title IX cases for review and analysis. Employees who violate the Board's Non-Discrimination Policy are subject to disciplinary action up to and including termination.

- **Contractors, Consultants or Vendors**: Contractors, consultants or vendors who violate the Board's Non-Discrimination Policy are subject to removal from and

prohibiting access to District premises, remedies of law, and/or remedies under their contract.

- **Volunteers**: Volunteers who violate the Board's <u>Non-Discrimination Policy</u> are subject to their authorization to serve as a volunteer being rescinded.

**H. Resolution Timeframe:** Investigations will be completed promptly, although some investigations take months, depending on the nature, extent, and complexity of the allegations, availability of witnesses, police involvement, etc.

- OSP, EOCO and OIG will make a good faith effort to complete the resolution process, not including appeals and discipline, within a ninety (90) calendar day time period from the filing of a formal complaint, which can be extended as necessary for appropriate cause by the Title IX Coordinator (or designee), with notice to the parties as appropriate.
- School-based investigators will make a good faith effort to complete the resolution process, not including appeals, within ten (10) calendar days which can be extended as necessary for appropriate cause by the Title IX Coordinator, with notice to the parties as appropriate.

**I. Appeal Procedures**

- **Appeal Process for <u>Written Determination</u> and <u>Dismissal of a Formal Title IX Sexual Harassment Complaint</u>:**
  - **Making an Appeal Request:** The Complainant and Respondent have the opportunity to appeal a written determination or dismissal of a formal Title IX sexual harassment complaint through a written request, within five (5) calendar days of receiving a written determination letter or notification of dismissal. Appeals can be made on any of the following grounds which must be articulated in the appeal:
    - A procedural irregularity that affected the outcome of the matter;
    - New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter;
    - The Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against Complainants or Respondents generally or the individual Complainant or Respondent, that affected the outcome of the matter; and
    - The sanction is disproportionate to the violation.
  - When exigent circumstances exist, limited extensions may be granted at the discretion of the District. Any party may submit their request in person or by mail to the office address listed below, or they may submit their request via e-mail to **ospappeals@cps.edu** with the subject line of "Appeal for [Student/Employee Name]."
    - Student Protections, Title IX, and the Equal Opportunity Compliance Office
      110 N. Paulina Street, Chicago, IL 60612
      Phone: 773-535-4400
      E-Mail: **ospappeals@cps.edu**
  - Upon receiving an appeal, the Appeal Decision-Maker will notify each party in writing and give the parties an equal opportunity to submit a written

statement in support of, or challenging, the outcome. The response must be received within five (5) calendar days. All responses and appeals will be shared with all parties.

- Should the District receive an appeal that challenges the fairness of the investigation, the investigators, the decision-maker(s), or any hearing (as applicable) may be permitted to submit a response to the appeal or to the appeal response which will be shared with all parties.
- **Receiving a Decision on an Appeal:** The Appeal Decision-Maker shall render a determination within ten (10) calendar days of receiving the written request for appeal or within ten (10) calendar days of the response to the appeal (if applicable). Extensions can be granted on a case-by-case basis. The Appeal Decision-Maker shall notify both parties of the decision and shall document that notification in District records.

**J. Recordkeeping**: The Board's Title IX Coordinator shall be responsible for maintaining records related to all Title IX complaints received by the District. These records will be maintained (and available for request by the parties) for a period of at least seven years.
- This includes, but is not limited to the following information for each complaint:
  - Relevant information related to the Complainant, Respondent and identified witnesses;
  - Name and title of the person who received the complaint;
  - Date, time, nature and location of reported incident;
  - Date the District became aware of the incident;
  - Date the Title IX Coordinator received notice of the incident;
  - Supportive measures and resources offered to the parties;
  - Final investigative reports;
  - Outcome notification letters provided to the parties; and
  - Disciplinary sanctions issued to individuals found in violation under these procedures.
- All materials used to train coordinators, investigators, decision-makers, and informal resolution facilitators with regard to sexual harassment.

**K. Related OSP Procedures**
- **Student Rights in Investigations:** All students involved in an investigation should receive a copy of their student rights which can be found in **Appendix A**. Administrators should familiarize themselves with the language in this appendix to be able to share the information with students and their families.
- **Employee Rights in Investigations:** All employees involved in an investigation should receive a copy of their employee rights which can be found in **Appendix B**.
- **Staff Response to Incidents Involving Electronic Communications of a Sexual Nature:** For guidance on managing electronic communications involved in sexual misconduct incidents, see **Appendix C**.

**V. LIST OF APPENDICES**

**A.** Appendix A: Student Rights in Investigations

**B.** Appendix B: Employee Rights in Investigations

C.   Appendix C: Staff Response to Incidents Involving Electronic Communications of a Sexual Nature

D.   Appendix D: Resource Guide

**Appendix A:**
**Student Rights in Investigations**

When the Office of Student Protections & Title IX (OSP) learns about something that might be negatively impacting a student in a way that is sexual, we will do an investigation. As part of that investigation, we talk with students involved to hear their side of the story and what happened. After that, we decide if something happened, and if it did, we will let your school know and they will respond. Below are your rights in that process.

- You have the right to have a prompt, thorough, fair and impartial investigation being conducted.
- You have a right to be heard and to share your experience.
- You have the right to an advisor of your choice present during the process.
- You have a right to have a support person you choose in the room with you.
- You have a right to let us know if you do not feel safe.
- You have a right to receive individualized supportive services at your school.
- You have a right to meet somewhere private.
- You have a right for us to keep what you tell us as private as possible.
- You have a right to not answer any questions or be part of the investigation.
- You have a right to share with us any evidence, names of witnesses, or information you know connected to the case.
- You have a right to ask for an update on your case.
- You have a right to access the information gathered during the investigation and the evidence that will be used to make a determination.
- You have a right to know the outcome of the investigation.
- You have a right to ask for a review of the outcome of the investigation.
- You have a right to be free from retaliation.

**Appendix B:**
**Employee Rights in Investigations**

Chicago Public Schools (CPS) is committed to providing a safe and secure working and learning environment free from discrimination, harassment, and retaliation. When complaints of discrimination, harassment, or retaliation are received and an investigation is initiated, the parties to the complaint have certain rights during the investigation process, such as:

- You have the right to receive written notice of the investigation.
- You have the right to a prompt, reliable, and equitable resolution of the complaint.
- You have a right to receive individualized supportive services.
- You have the right to be referred to available supportive resources if needed.
- You have a right to have an advisor and/or a support person of your choosing present in the room with you during the investigation process, including the opportunity to be accompanied to any related meetings or proceedings.
- You have the right for the process to respect the confidentiality and reputation of all parties to the extent possible.
- You have a right to request that the matter be resolved through informal resolution when appropriate.
- You have the right to present witnesses, evidence, and information to support your claim.
- You have the right to obtain notification of the time frames for all major stages of the investigation.
- You have the right to be free from retaliation.
- You have the right to file a complaint with a federal, state, or local agency.
- You have a right to receive a written notice of the outcome of the investigation.

**Appendix C:**
**Staff Response to Incidents Involving Electronic Communications of a Sexual Nature**

**Purpose:**

While you must notify OSP regarding all electronic communications that are sexually inappropriate, this guidance is focused on electronic communications which are pictures or recordings of a minor's breasts, genitals, buttocks, or engagement in a sex act.

**Guidance:**

Do not view electronic communication. If there is a suspicion of inappropriate sexual images/recordings, please respond as outlined below.

- Do not ask that the sexually inappropriate images/recordings be sent or shown to a staff member, screenshot, uploaded into Aspen, or shared in any way. Instead, obtain detailed descriptions of the image/recording from the parties (including witnesses) and evaluate the evidence based on the consistency of the descriptions.
- Do not instruct a student to retain possession of the sexually inappropriate images/recordings.
- If sexually inappropriate images/recordings have been shared via a CPS server or device, please contact OSP for guidance on removing the content.

**To Respond:**

1. Call the Chicago Police Department (CPD) at 312-492-3810 for next steps
   - CPD will either (1) instruct you to ask the student to delete the image, or (2) instruct you to take the phone until they retrieve the phone.
2. Call OSP at 773-535-4400.
   - OSP will guide you through the next steps.
3. Call DCFS at 800-252-2873 (800-25-ABUSE)
4. Call the National Center for Missing and Exploited Children (1-800-843-5678 or https://report.cybertip.org/) if the image has been circulated online or on a social media platform.

**Appendix D:**
**Resource Guide**

| RESOURCE GUIDE | | |
|---|---|---|
| _Important Phone Numbers:_<br>**Chicago Rape Crisis Hotline** - 888-293-2080<br>**Illinois Domestic Violence Hotline** - 877-863-6338 (877-TO END DV)<br>**Illinois Department of Children and Family Services** (IDCFS) - 800-252-2873 (800-25ABUSE)<br>**Office of Student Protections & Title IX** - 773-535-4400 | | |
| **AGENCY** | **DESCRIPTION** | **CONTACT INFORMATION** |
| **CPS Employee Assistance Program** | Employees of Chicago Public Schools may receive free employee assistance programs through Magellan, including: legal, financial, and mental health services. | 800-424-4776 (800-4-CHIPSO)<br>https://www.magellanassist.com/default.aspx |
| **Chicago Children's Advocacy Center** | Counseling, advocacy, case management and referral linkages for child survivors of sexual abuse. Provide services addressing problematic sexual behavior for youth 12 and under. | 312-492-3700<br>http://www.chicagocac.org/ |
| **YWCA of Metropolitan Chicago** | Sexual violence support services, including counseling, case management, and advocacy, including for non-offending family members, as well as prevention education at multiple locations. | 312-372-6600<br>https://ywcachicago.org/ |
| **Resilience** (formerly Rape Victim Advocates) | Free trauma therapy, medical, and legal advocacy related to sexual violence at multiple locations | 312-443-9603<br>https://www.ourresilience.org/ |
| **Mujeres Latinas En Acción** | Free bilingual/bicultural individual counseling and therapy for domestic and sexual violence. | 773-890-7676<br>https://mujereslatinasenaccion.org/ |
| **Youth Outreach Services** | Behavioral health counseling and support services for youth and families, including for problematic sexual behavior. Multiple Chicago area locations and in home services. | 773-777-7112<br>https://www.yos.org/ |
| **Between Friends** | Domestic violence multilingual counseling and support services, teen relationship education, and court advocacy. Confidential location. | 800-603-4357<br>https://www.betweenfriendschicago.org/ |
| **Garfield Park Behavioral Hospital** | Behavioral health and psychiatric support to children and teens ages 3 to 17, including for problematic sexual behavior. | 773-265-3700<br>https://garfieldparkhospital.com/ |

| | | |
|---|---|---|
| **Apna Ghar** | Sexual and domestic violence services focused on crisis response, counseling, and advocacy for immigrants. Uptown and Skokie. | 773-334-4663<br>http://www.apnaghar.org/ |
| **KAN-WIN** (formerly Korean American Women in Need) | Provides domestic violence and sexual violence support and advocacy focused on Asian American survivors. Confidential location. | 773-583-0880<br>http://www.kanwin.org/ |
| **Lurie Children's Hospital of Chicago** | Provides comprehensive services for transgender, gender expansive and gender non-conforming youth as well as offers supports for children and adolescents with sex development conditions. | Gender Development Program - 800-543-7362<br>Sex Development Program - 312-227-6203<br>https://www.luriechildrens.org/en/specialties-conditions/gender-identity-children/ |
| **Broadway Youth Center** | A safe haven for LGBTQ youth. Health clinic, drop-in services, counseling and resource advocacy. Uptown. | 773-388-1600<br>https://howardbrown.org/service/broadway-youth-center/ |
| **Life Span** | Specializes in court advocacy for orders of protection and other civil legal remedies, as well as counseling for domestic violence and sexual violence. Loop. | 312-408-1210<br>https://life-span.org/ |
| **A Long Walk Home** | Uses art to engage and empower adolescent girls around their experiences of violence in a variety of school-based programs. | 877-571-1751<br>http://www.alongwalkhome.org/ |
| **Illinois Safe School Alliance** | Promotes healthy development for LGBTQ youth in IL schools through advocacy, education and youth organizing. | 312-629-2988<br>https://www.ilsafeschools.org/ |
| **Illinois Caucus for Adolescent Health** | Engage youth and communities through peer education around sexual health and reproductive justice. | 312-427-4460<br>https://www.icah.org/ |
| **Chicago Alliance Against Sexual Exploitation** | Individualized legal advice, consultation, and representation following and related to sexual assault. | 773-244-2230<br>https://www.caase.org/ |



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

# Meeting Follow Up
1 message

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                Mon, Sep 19, 2022 at 9:10 AM
To: Maria I Aguilera <maguilera1@cps.edu>
Cc: "Morales, Adrienne" <akgreen2@cps.edu>, Debra Kearney <drkearney@cps.edu>

Good Morning,

Thank you for meeting with us last week to discuss security issues at Lindblom. As we discussed in our meeting, if you witness or have any knowledge of sexual assault it is your resposibility to report it to the office of student protections. Failure to do so will make you liable. If you have any questions or concerns, follow up with us. Thank you.
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

Ex. DD



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

# Next Steps
2 messages

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                 Thu, Nov 17, 2022 at 11:47 AM
To: Shohn Williams <sewilliams7@cps.edu>

Here is what needs to be done.

1. Upload screenshot
2. Call DCFS
3. Notify the Office of Student Protections via email (osp@cps.edu)
4. John Jackson, Total Facilities Maintenance (Robert Kendell Modiest - Manager)

--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.



**Screen Shot 2022-11-17 at 11.42.42 AM.png**
274K

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                                 Thu, Nov 17, 2022 at 2:35 PM
To: Shohn Williams <sewilliams7@cps.edu>

**800-25-ABUSE (22873)**

[Quoted text hidden]

Ex. EE

Mr. Cohill came to me right outside of Keeler Hall with a female student and informed me that one of the security officers made a inappropriate statement to her and she felt uncomfortable around this officer. I asked the student the name of the officer and she said she didn't know his name, but he was the new security officer. The only new male security officer that we had at that time was Security Officer Robert Jarvis. I ask the student to tell me what took place and her story was her and some of her friends were in the hallway and where Officer Jarvis was working clearing the halls. The student stated that Officer Jarvis made a statement of "Hey beautiful", which made the student feel uncomfortable. I stated to the student we need to inform the principal and Mr. Cohill stated the student said to him she wanted to remain anonymous. I asked the student if this was true and she stated Yes.

At this point I informed the Mr. Muhammad of the situation and he asked me to have a conversation with Officer Jarvis. Later that day I asked Officer Jarvis to come to my area and alone with Mr. Cohill informed him of what was told to us. Officer Jarvis strongly denied allegations. Not accusing Officer Jarvis of anything, he was instructed not to make any unprofessional comments to any students, no matter male or female. Officer Jarvis will continue to work the floors until I am directed to change it.

Ex. FF

 Chicago Public Schools

# Robert Lindblom Math & Science Academy HS
# Incident Report

Incident ID: 2338761

Event Date: 02/01/2023     Event Time: 11:30 AM

Event Reason(s): Inappropriate Behavior

Location(s): On Campus, Hallway

Activities: School - Between Classes

## REQUIRED QUESTIONS

1. Does this alleged incident involve student-to-student or adult-to-student, sex/gender-based discrimination, sexual harassment (including sexual assault, dating violence, domestic violence, and stalking), sexual misconduct, retaliation, academic equity or sports equity?  **YES**

2. Does this incident report involve allegations that a CPS-affiliated adult engaged in the following types of conduct against student(s): sexual harassment (including sexual assault, dating violence, domestic violence, and stalking), or sexual misconduct? CPS-affiliated adults include employees, vendor/contractor staff, volunteers, visitors, LSC members, and similar individuals.  **NO**

3. Does this alleged incident involve student-to-student or adult-to-student Bias-Based Behavior or other forms of Discrimination? This includes alleged bias-based or discriminatory actions against students by students or adults based on race, color, community, national or ethnic origin, immigration status, sex, gender, gender identity, gender expression, sexual orientation, age, religion, pregnancy, or disability.  **NO**

4. Does this alleged incident involve physical, verbal abuse, or corporal punishment of a student by a district affiliated adult? This includes full or part-time employees, vendors, contractors, volunteers, bus aides, and LSC members.  **NO**

## Event Narrative:

█████ stated to Security Officer Giovani, "he did it again." ████ was referring to the fact that Security Officer Jarvis called her lil mama and caressed her left arm. ████ repeated this statement to AP Morales and adds that she feels uncomfortable. ████ states that this has happened on 3 occasions. The first time was a compliment about ██████ face. The second time Jarvis was following ████ and her friend through the hall and said, "let's go beautiful." ████ provided a written statement which is attached above in Supporting Document.

## Participants:

Student Name:     ██████████

Role:             Victim

Willing to Testify:   Yes

Testimony Details


Staff Name:       Garcia, Giovanni

Role:             Witness/Reporter

Willing to Testify:   Yes

Testimony Details     ████ states that she told Giovani about the incidents because she feels comfortable with him.


Staff Name:       McDaniel, LaConda

Role:             Witness/Reporter

Willing to Testify:   Yes

Testimony Details     ████ states that she told Ms. McDaniel because she feels safe talking to her.

Ex. GG

| | |
|---|---|
| Staff Name: | Clark, Charles |
| Role: | Witness/Reporter |
| Willing to Testify: | Yes |
| Testimony Details | Clark told AP Morales that ▬ is stating that the security officer is making her feel uncomfortable. I asked if he had details and he stated the student just mentioned that Jarvis said some things to ▬ and it needs to be addressed. |

| | |
|---|---|
| Staff Name: | Ata, Danya |
| Role: | Witness/Reporter |
| Willing to Testify: | Yes |
| Testimony Details | ▬ states that she told Ms. Ata about the incidents because she feels safe talking to her. |

| | |
|---|---|
| Staff Name: | Jarvis, Robert |
| Role: | Person of Concern |
| Willing to Testify: | No |
| Testimony Details | |

**Parent Contact Attempt Notification**

| | |
|---|---|
| Contact Name | Cecille De Mello |
| Date | 02/01/2023 |
| Time | 01:30 PM |
| Parent Conference Information | Called mom and informed her that ▬ reported her concern of a staff member making her feel uncomfortable. Mom states that she's aware of the comments and would like to meet in person after she speaks with ▬ I told her that wouldn't be a problem. Mom states that she wants us to adhere to her daughter's wishes to remain anonymous. |
| Outcome | |



**LINDBLOM**
MATH & SCIENCE ACADEMY

6130 S Wolcott Ave
Chicago, IL 60636
773.535.9300

**3/31/23**

**Subj:** An Important Update for the Lindblom Math and Science Academy Community

Dear Lindblom Parents and Guardians,

We always strive to keep you informed of matters involving your school, which is why I am writing to you today.

Today, Friday, March 31, CPS removed Abdul Muhammad from his principal duties at Lindblom effective immediately due to an investigation that substantiated findings against Mr. Muhammad. He has been reassigned to the Network 16 Office.

We are fully committed to supporting the Lindblom community through this challenging situation. Beginning Monday, April 10, Everett Edwards will serve as Lindblom's Administrator-in-Charge. I am confident he will support the continued success of the Lindblom community.

Please know that we are taking this situation extremely seriously, and we remain committed to providing Lindblom students with a positive learning environment where they can reach their full potential. While the Network 16 team is unable to discuss details regarding the case, we are available to discuss the steps CPS takes to support students and matters related to your child.

Please call the Network 16 office at 773-535-8240 if you have any questions or concerns.

Sincerely,

Devon LaRosa
Chief of Schools
Network 16

Ex. HH

**Subj:** Una actualización importante para la comunidad de la Academia de Matemáticas y Ciencia Lindblom

Estimados padres y tutores legales:
Siempre buscamos mantenerlos informados de asuntos que involucran su escuela, y es por eso que les escribo hoy.

Hoy viernes, 31 de marzo, las CPS removieron a Abdul Muhammad de sus deberes como director de Lindblom, efectivo inmediatamente, debido a una investigación que dio sustancia a hallazgos que se habían encontrado en su contra. Ha sido reasignado a la oficina de la Red 16.

Estamos plenamente comprometidos a respaldar a la comunidad de Lindblom durante esta situación difícil. A partir del lunes, 10 de abril, Everett Edwards será el administrador a cargo de Lindblom. Tengo confianza de que luchará por el éxito continuo de la comunidad escolar.

Deseo que por favor sepan que estamos tomando esta situación extremadamente en serio y que permanece en vigor nuestro compromiso con brindarles a los estudiantes de Lindblom un ambiente de aprendizaje positivo donde puedan alcanzar su pleno potencial. Aunque el equipo de la Red 16 no puede discutir detalles del caso, sus miembros están disponibles para discutir los pasos que las CPS toman para respaldar a los estudiantes y otros asuntos relacionados a sus niños.

De tener preguntas o preocupaciones, favor llamar a la oficina de la Red 16 al 773-535-8240.

Sinceramente,

Devon LaRosa
Jefe de escuelas
Red 16

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 518 of 523 PageID #:551



**Muhammad, Abdul <akmuhammad@cps.edu>**

---

# Letters from Today's Conversation
9 messages

---

**Taylor, Tiffany** <titaylor@cps.edu>              Fri, Mar 31, 2023 at 9:39 AM
To: Abdul Muhammad <AKMuhammad@cps.edu>
Cc: Devon LaRosa <dplarosa@cps.edu>

Good Morning Mr. Muhammad,

Per our conversation, attached you will find the two letters read on today's call.

I am also confirming that you will drop the Lindblom keys off at the network office located at 1326 W. 14th St. When you arrive, you will call the network office number (773-535-8240) to let them know you have arrived and they will come down to receive the keys.

As a reminder, you should not engage with anyone as the principal of Lindblom or on behalf of Lindblom as of our 9a call this morning.

Please feel free to contact me if you have any additional questions.

Kind Regards,



**Tiffany Taylor**
**Executive Director of HR Partnerships**

**A** 501 W. 35th Street, Chicago, IL 60616
**O** 773.553.6155  **C** 773.456.7532  **E** titaylor@cps.edu
cps.edu/oee (For information on discipline and grievance procedures.)

"Titles mean nothing. The one with a servant's heart is the leader."

---

**2 attachments**

 **Adbul Muhammad Reassigment Letter.pdf**
57K

 **Muhammed, A. - Eligibility Status Update 03.30.2023.pdf**
196K

---

**Muhammad, Abdul** <akmuhammad@cps.edu>       Fri, Mar 31, 2023 at 10:04 AM
To: Troy LaRaviere <tlaraviere@mycpaa.com>, Samantha Odyniec <sodyniec@mycpaa.com>, brosaadalim@gmail.com

[Quoted text hidden]

---

**2 attachments**

 **Adbul Muhammad Reassigment Letter.pdf**
57K

**Muhammed, A. - Eligibility Status Update 03.30.2023.pdf**
196K

**Ex. II**

---

**Muhammad, Abdul** <akmuhammad@cps.edu>       Fri, Mar 31, 2023 at 10:18 AM

To: "Taylor, Tiffany" <titaylor@cps.edu>
Cc: Devon LaRosa <dplarosa@cps.edu>

Good Morning,

Do you have the answers to the questions that I raised.

[Quoted text hidden]
--
Abdul Muhammad
Principal
Lindblom Math and Science Academy
6130 South Wolcott Avenue
Chicago, IL 60636
773-535-9300
https://lindblomeagles.org/

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

**Samantha Odyniec** <sodyniec@mycpaa.com>                    Fri, Mar 31, 2023 at 10:21 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>

Hi Abdul,

I am so sorry to hear this happened. As I had mentioned the other day, I am available at 1pm to chat about next steps if that works for you.

All the best,



***Samantha M. Odyniec***
***Deputy General Counsel***

*Chicago Principals and Administrators Association*
*542 South Dearborn Street, Suite 400*
*Chicago, Illinois 60605*
*Legal Hotline: (312) 263-7773*
*Direct: (312) 263-7923*
*Cell: (312) 363-7959*
*Fax: (312) 263-2012*
*sodyniec@mycpaa.com*

NOTICE: Please contact the sender immediately if you received this message in error, and permanently delete the original and any printout of the e-mail. This e-mail message and any attachment(s) transmitted with it may contain attorney-client privileged, attorney work-product privileged, or otherwise confidential and privileged information intended solely for the use of the individual or entity named above. Receipt of this e-mail message or attachment(s) by any person or entity that is not the intended recipient does not constitute a waiver of any applicable legal privilege. If you are not the intended recipient of this e-mail or attachment(s), dissemination, distribution, or copying of this e-mail or attachment(s) is strictly prohibited.

[Quoted text hidden]

**Taylor, Tiffany** <titaylor@cps.edu>                         Fri, Mar 31, 2023 at 10:52 AM

To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Devon LaRosa <dplarosa@cps.edu>

Not yet.  I will share it as soon as I get them.

[Quoted text hidden]

--
[Quoted text hidden]

---

**Taylor, Tiffany** <titaylor@cps.edu>                           Sat, Apr 1, 2023 at 8:32 AM
To: "Muhammad, Abdul" <akmuhammad@cps.edu>
Cc: Devon LaRosa <dplarosa@cps.edu>

Good Morning Mr. Abdul,

I have consulted with Law and they advised that you will receive the investigation findings over the next couple of weeks.

Please let me know if you have additional questions.

Thank you,
Tiffany
[Quoted text hidden]

---

**Troy LaRaviere** <tlaraviere@mycpaa.com>                      Wed, Apr 5, 2023 at 9:52 PM
To: maa@ulaw.com
Cc: Abdul Muhammad <akmuhammad@cps.edu>, Tanesha O'Neal <toneal@mycpaa.com>, Samantha Odyniec
<sodyniec@mycpaa.com>

Margaret,
Please see the eligibility status letter below for Abdul Muhammad and submit the necessary request for an
appeal/grievance.
[Quoted text hidden]

---

**2 attachments**

 **Adbul Muhammad Reassigment Letter.pdf**
57K

 **Muhammed, A. - Eligibility Status Update 03.30.2023.pdf**
196K

---

**Angelucci, Margaret** <maa@ulaw.com>                          Thu, Apr 6, 2023 at 1:52 PM
To: Troy LaRaviere <tlaraviere@mycpaa.com>
Cc: Abdul Muhammad <akmuhammad@cps.edu>, Tanesha O'Neal <toneal@mycpaa.com>, Samantha Odyniec
<sodyniec@mycpaa.com>

Will do.
[Quoted text hidden]
--
Margaret Angelucci
Asher, Gittler & D'Alba
200 W. Jackson Blvd
Suite 720
Chicago, Illinois
312/263-1500
312/263-1520
www.ulaw.com
www.worker-rights.com

---

**Muhammad, Abdul** <akmuhammad@cps.edu>                        Fri, Apr 21, 2023 at 7:56 AM
To: "Angelucci, Margaret" <maa@ulaw.com>

Case: 1:24-cv-10225 Document #: 2-1 Filed: 10/15/24 Page 521 of 523 PageID #:554

Cc: Troy LaRaviere <tlaraviere@mycpaa.com>, Tanesha O'Neal <toneal@mycpaa.com>, Samantha Odyniec <sodyniec@mycpaa.com>

Good morning,

I hope this email finds you well. I am reaching out to determine the status of the appeal.  Thank you.

[Quoted text hidden]



CHICAGO PUBLIC SCHOOLS 42 West Madison Street - Garden Chicago, Illinois 60602

March 31, 2023

Abdul Muhammad
9732 S. Green
Chicago, IL 6043

Dear Mr. Muhammad,

Effective today, March 31, 2023, as a result of a substantiated Law Department Investigations Unit investigation, you are herby removed as Interim Principal of Lindblom Math and Science Academy. You will be issued discipline for your misconduct at a later date.

For the next 60 days, you remain a CPS employee, with your same salary and benefits. Beginning Monday, you should report to work at a location determine by Network Chief Devon LaRosa.

You are encouraged to seek new full-time roles within CPS. Your Network Chief and the Talent Office are available to assist you in this search, and accommodations and flexibility will be provided to enable you to attend interviews and other job search activities.

If by, June 23, 2023 (60 school days), you have not yet found a new full-time position within CPS, or otherwise resigned from CPS, your employment will be terminated. In approximately 30 days, a Talent Office representative will schedule a meeting with you to check in on your job search and otherwise support and assist you.

At the end of the 60 days, regardless of the outcome of your job search, you will NOT be place on the Do Not Hire (DNH) list as a result of this reassignment.

Kind Regards,

*Tiffany Taylor*

Tiffany Taylor
Executive Director of School-Based HR Partnerships
Chicago Public Schools

cc: Libby Massey, Law Department
    Employee Services
    Devon LaRosa, Network Chief



**Department of Principal Quality**
42 West Madison, Garden Area• Chicago, Illinois 60602

Dr. Allison Tingwall
*Executive Director*

03/31/2023

***Via Email***
Abdul Muhammed
9735 S Green
Chicago, IL 60643
AKMuhammad@cps.edu


Dear Abdul Muhammad:

Per the Board of Education's current Principal Eligibility Policy (21-0428-PO1), the CEO or designee may remove individuals from the Principal Candidate Pool who are found to no longer meet the high standards of conduct and professionalism expected of a CPS Principal.

This letter is to inform you that your membership in the CPS Principal Candidate Pool has been discontinued following the review of your discipline and misconduct history. To qualify for a principalship at a CPS school, you must be a member of the Pool.

Should you wish to request a review of the decision to remove you from the Principal Candidate Pool, you may do so by contacting cpsleaders@cps.edu within 30 days from the date of this letter. The Chief Education Officer or her designee will review your request. If you choose not to appeal the decision but wish to seek admission into the Pool at any time, you will be required to successfully pass the Screening and Assessments portion of the Eligibility Policy.

You can find the Policy online, in the Board Policy Handbook, at www.CPS.edu. If you have any questions about the CPS Principal Eligibility Policy, please contact me at 773-553-2369.


Sincerely,

*Allison C. Tingwall*

Allison Tingwall, EdD
Executive Director of Principal Quality


*Educate, Inspire, Transform*