**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ABDUL MUHAMMAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24-cv-10225 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CHICAGO BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Abdul Muhammad applied to be the principal of a public school in Chicago.

After that school's leadership team selected him for the position, the Chicago Board of

Education (the "Board") allegedly took various unusual measures that culminated in a decision

not to award Muhammad the principal position. In this lawsuit, Muhammad brings claims

against the Board and several of its employees for violating federal civil rights laws by denying

him the principal position based on his race and religion. The Board has moved to dismiss

Muhammad's complaint for failure to state a claim. (Dkt. No. 23.) The individual employees,

too, have filed a motion to dismiss. (Dkt. No. 25.) For the reasons that follow, Defendants'

motions to dismiss are granted in part and denied in part.

**BACKGROUND**

For purposes of Defendants' motions to dismiss, the Court accepts all well-pleaded

factual allegations in Muhammad's First Amended Complaint ("FAC") as true and draws all

reasonable inferences from those facts in Muhammad's favor as the non-moving party. *See*

*Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The FAC alleges as

follows.

Muhammad, a "Black, male, Muslim member of the Nation of Islam," was employed as a teacher by the Board for over 25 years. (FAC ¶ 1, 17.) In May 2022, the Appointed Local School Counsel ("ALSC") of Lindblom Math and Science Academy ("Lindblom") invited Muhammad to interview for a vacant principal position at Lindblom. (*Id.* ¶ 64.) Muhammad interviewed for the position on June 1, 2022 along with ten other candidates. (*Id.* ¶ 70.) He was then selected as one of two finalists. (*Id.* ¶ 71.) In the next step of the selection process, the two finalists would attend a public forum. (*Id.*) As the forum approached, the second finalist withdrew from consideration, leading the ALSC to reschedule the forum to June 15, 2022. (*Id.* ¶ 72.) Upon learning that Muhammad was the only remaining candidate, Devon LaRosa, the Chief of Network 16, informed the ALSC's chairwoman, Lynn White, that he did not "like that there is only one candidate to be presented at the forum" and advised her to "get another candidate or two." (*Id.* ¶ 75.)

The ALSC decided to host the forum anyway, with Muhammad as the sole candidate present. (*Id.* ¶ 78.) Customarily, the new principal would be announced at the end of the forum. (*Id.* ¶ 79.) However, at the conclusion of the June 15, 2022 forum, the ALSC did not name a principal. (*Id.* ¶¶ 82–83.) Apparently, Kishasha Williams-Ford, the director of LSC Relations (*Id.* ¶ 87), had called White to suggest that the ALSC defer principal selection to a later date. (*Id.* ¶ 81.) In making this call, Williams-Ford violated Chicago Public Schools policies. (*Id.* ¶ 84.)

The day after the forum, the ALSC informed LaRosa that it had selected Muhammad as the new principal of Lindblom. (*Id.* ¶ 85.) The ALSC submitted a proposed four-year contract to be executed by the Board. (*Id.*) In response, Williams-Ford contacted White and suggested that the ALSC hold off on selecting a candidate. (*Id.* ¶ 87.) Around this time, Williams-Ford made a second phone call to White and advised her that Muhammad "may not be the candidate for

2

Lindblom" and recommended that the ALSC "look at other candidates." (*Id.* ¶ 98.) The chairperson responded that the ALSC had "made [its] choice" and need not consider additional candidates. (*Id.* ¶ 99.) Williams-Ford then informed White that the ALSC's vote had been defective for a lack of a quorum. (*Id.*)

A few days later, the ALSC obtained a quorum and once again voted that Muhammad would be Lindblom's new principal. (*Id.* ¶ 106.) The ALSC then forwarded Muhammad's proposed four-year contract to LaRosa for final execution. (*Id.* ¶ 107.) LaRosa responded that he "preferred two or three candidates in order for him to feel he was making a choice of a candidate." (*Id.* ¶ 108.) On July 5, 2022, LaRosa offered Muhammad an interim contract, instead of the four-year contract proposed by the ALSC. (*Id.* ¶ 110.) Muhammad signed the contract on July 7, 2022 and began serving as Lindblom's principal. (*Id.* ¶¶ 115–16.)

On August 24, 2022, in a letter from Allison Tingwall, the Board's Executive Director of Principal Quality, Muhammad was informed that he would not immediately be awarded a four-year contract. (*Id.* ¶ 117.) In a separate letter to the school community, the Board's Chief of Schools, Felicia Sanders, explained that "recent information regarding Muhammad's transition" had "raised concerns for" the Board's Chief Executive Officer ("CEO"), Pedro Martinez, who had decided to "take additional time to evaluate" the proposed four-year contract. (*Id.* ¶ 119.) Muhammad never found out what the "recent information" was. (*Id.* ¶ 120.) However, he subsequently learned of a series of text messages between a Lindblom school clerk, Isaias Herrera, and another person on July 19, 2022. (*Id.* ¶ 122.) In the conversation, Herrera stated that an "informant" had told him that Muhammad "belong[s] to the church [sic] [N]ation of [I]slam" and that Muhammad would "give . . . a hard time" to those who do not "look or act like him."

3

(*Id.* ¶¶ 89–92; Ex. I-1 to the FAC, Dkt. No. 20.) Herrera also conveyed that the Nation of Islam "hate[s] the Jews whit[e]s and gays." (FAC ¶ 96.)

During Muhammad's time as the interim principal of Lindblom, he experienced friction with teachers and staff based on his enforcement of school policies. (*Id.* ¶¶ 134–58.) As a result, he was subjected to two false allegations of misconduct. (*See id.* ¶ 158.) First, in November 2022, a student's parent complained to LaRosa that Muhammad had violated school policies by accompanying the student to a gas station near the school to purchase food. (*Id.* ¶¶ 159–61.) Further investigation by Kelly Tarrant, the manager of the Board's Law Department, revealed that the student had mistaken Muhammad for another staff member at Lindblom. (*Id.* ¶ 164.) Nevertheless, Tarrant "included the matter in her investigative report" on Muhammad, which would later be used to terminate his employment. (*Id.* ¶ 165.) On another occasion, Tarrant investigated Muhammad based on several alleged failures to follow reporting protocols for sexual misconduct at Lindblom. Tarrant's investigation focused "sole[ly]" on Muhammad, despite the fact that Muhammad had taken several steps to urge staff to comply with the protocols and to follow them himself. (*Id.* ¶ 183.)

All the while, Muhammad had been working with the Board toward receiving a four-year contract. Specifically, between September and October 2022, LaRosa communicated various requirements for Muhammad "to accomplish as a prerequisite to receiving his four-year contract." (*Id.* ¶ 127.) By the end of the first quarter, in October 2022, Muhammad had completed the requirements for that quarter. (*Id.* ¶ 131.) However, by then, personnel from the Board had stopped meeting with Muhammad to discuss his progress toward a four-year contract. (*Id.*) On December 9, 2022, LaRosa informed Muhammad that he would not receive a four-year contract. (*Id.* ¶ 132.) Finally, on March, 31, 2023, the Board removed Muhammad from his

position as Lindblom's principal. (*Id.* ¶ 189.) Tarrant's investigations contributed to a report compiling "eighteen different findings on baseless allegations" that were used to justify Muhammad's termination. (*Id.* ¶¶ 186–88.)

Based on these events, Muhammad filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 21, 2023. He then initiated this lawsuit on October 15, 2024, and filed the FAC on December 13, 2024. (Dkt. Nos. 2, 19.) In the FAC, he asserts several claims against the Board and various of its agents who were involved in the ultimate decision not to award him a four-year contract—namely, Martinez, Sanders, LaRosa, Tingwall, Williams-Ford, and Tarrant (together, "Individual Defendants"). The Board and Individual Defendants have filed motions to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6). (Dkt. Nos. 23, 25.)

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

A few claims can be dismissed based on the parties' agreement. First, all parties agree that Muhammad cannot state a claim against Individual Defendants under Title VII of the Civil Rights Act of 1964 ("Title VII") because they were not his employers. (*See* Pl.'s Mem. in

5

Support of Resp. to Individual Defs.' Mot to Dismiss at 2, Dkt. No. 34.) Accordingly, Muhammad's Title VII claims (Counts 1 and 2) against Individual Defendants are dismissed. Second, on the parties' agreement, the Court dismisses all claims against Individual Defendants in their official capacities. (*Id.*) Third, Muhammad concedes that 42 U.S.C. § 1981 "does not provide an independent cause of action against a local governmental entity" and thus consents to the dismissal of all claims in Count 3. (Pl.'s Mem. in Support of Pl.'s Resp. to CBE's Mot. to Dismiss at 12, Dkt. No. 32; Pl.'s Mem. in Support of Resp. to Individual Defs.' Mot to Dismiss at 2.) Accordingly, Muhammad's § 1981 claim (Count 3) is dismissed as to all Defendants. Finally, Muhammad concedes that Chicago Public Schools is not a proper defendant, so it is dismissed from this case. (Pl.'s Mem. in Support of Pl.'s Resp. to CBE's Mot. to Dismiss at 2.) With these agreed dismissals out of the way, the Court turns to the contested claims.

## I. Count I: Racial and Religious Discrimination (Title VII)

Title VII prohibits employers from taking adverse employment actions against their employees on the basis of a protected characteristic, such as race or religion. *See* 42 U.S.C. § 2000e-2(a)(1); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 559–60 (2020). The Seventh Circuit has advised that Title VII claims should be held to a forgiving pleading standard because "[e]mployers are familiar with discrimination claims and know how to investigate them, so little information is required to put the employer on notice of these claims." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). "'I was turned down for a job because of my race' is all a complaint has to say." *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)). Given this forgiving standard, the Seventh Circuit has warned district courts not to dismiss Title VII claims under Rule 12(b)(6) merely because they "do not seem promising." *Id.* at 1338. "[T]he time to demand evidence is

the summary-judgment stage. All the complaint need do is state a grievance. Details and proofs come later." *Id.*

The Board argues that Muhammad's Title VII claims are time-barred because the FAC includes no allegations of an adverse employment action that took place within 300 days of Muhammad's filing of his EEOC charge. A person who believes he has been discriminated against in violation of Title VII must file a charge with the EEOC within 300 days of the alleged unlawful employment action to preserve his right to file a private lawsuit based on that action. *See* 42 U.S.C. § 2000e-5(e)(1); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 463 (7th Cir. 2016). Muhammad filed his EEOC charge on September 21, 2023, meaning that his Title VII claim is time-barred if it relies exclusively on events prior to November 25, 2022. However, Muhammad alleges that he was turned down for a four-year position on December 9, 2022 and his interim principalship was terminated on March 31, 2023. *See Thomas*, 120 F.4th at 1337 (being "turned down for a job" is an adverse employment action). Both of those adverse actions occurred within 300 days of his EEOC charge's filing, so his claims are not time-barred.[1]

The Board also argues that Muhammad fails to allege that any adverse employment actions were taken against him ***because of*** his race or religion. Contrary to the Board's contention, however, Muhammad has "allege[d] enough facts to allow for a ***plausible*** inference that the adverse action suffered was connected to" his race and religion. *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022). As to religion, the messages with Hererra are sufficient to create a plausible inference that the Board declined to award Muhammad a four-year

---

[1] The Board contends that Muhammad's removal from the interim position cannot form the basis of his Title VII claim because he did not expressly re-allege it under the heading of Count 1. This argument, however, overlooks the basic rules that complaints are read "as a whole" on a Rule 12(b)(6) motion, *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011), and complaints plead claims based on facts, not legal theories. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017).

contract based on his religious affiliation with the Nation of Islam. The messages indicate that individuals involved in the hiring process counted Muhammad's religion against him. And given that it was the Board, and not the ALSC, that declined to award Muhammad the contract, it is reasonable to infer that the informant was affiliated with the Board. Indeed, Muhammad alleges that the undisclosed "informant" "was either LaRosa and/or Sanders" because they were uniquely situated to have knowledge that Muhammad was "voted [in] with a contract." (FAC ¶ 90.) It is also reasonable to infer that the same religious animus would affect the Board's later termination of Muhammad's interim principal position.

As to race, the informant's suggestion that Muhammad would "give . . . a hard time" to "white" people and others who did not "look . . . like him" indicates that the alleged religious discrimination was also connected with Muhammad's race. (Ex. I-1 to the FAC, Dkt. No. 20.) And Muhammad alleges that his two white predecessors were not subjected to the unusual selection process, four-year contract denial, and early termination that he suffered. *See Savoy v. BMW of N. Am., LLC*, 313 F. Supp. 3d 907, 919 (N.D. Ill. 2018) ("[W]hether similarly-situated comparators exist is a matter addressed at summary judgment, not on a motion to dismiss." (citing *Carlson*, 758 F.3d at 827)). These allegations are sufficient to support a plausible race discrimination claim. In sum, Muhammad has stated a plausible Title VII claim against the Board for discrimination on the basis of race and religion.

II.     **Count 2: Workplace Harassment**

"To state a Title VII hostile work environment claim, a plaintiff must allege (1) she was subject to unwelcome harassment; (2) the harassment was based on her national origin or religion (or another reason forbidden by Title VII); (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment;

and (4) there is basis for employer liability." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833–34 (7th Cir. 2015). In determining whether a work environment was in fact hostile, "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000). Instead, the work environment must be evaluated based on the "totality of the circumstances." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013). Important factors for this inquiry include "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

Taking the FAC's allegations together, the Board allegedly created an environment where Muhammad was (1) assigned work tasks based on the false representation that he would receive a four-year contract if he completed them and (2) investigated for false reports made by Lindblom teachers and staff. (*See* FAC ¶¶ 200–204.) These conditions, however, are insufficient to support a hostile work environment claim, because Muhammad does not allege any way in which they changed the conditions of his employment. Although the Board's guidance may have directed Muhammad's work efforts, he does not allege that he received "extra work" that "materially affected the terms and conditions of [his] employment." *E.E.O.C. v. RJB Props., Inc.*, 857 F. Supp. 2d 727, 750 (N.D. Ill. 2012) (citing *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006)). Moreover, even if the work assignments and investigations resulted in critical feedback or unwelcome supervision for Muhammad, those conditions, as alleged in the FAC, are also insufficient to amount to a hostile work environment. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (finding no hostile work environment at the summary

9

judgment stage based on allegations of "unfair suspensions, financially harmful floor reassignments, unjustified write-ups, and unusually close supervision" because these conditions did not create an "objectively offensive" environment and the "work environment was not physically threatening, nor was it openly racist, nor did it unreasonably interfere with plaintiffs' performance").

Simply put, the level of severity of the allegedly discriminatory treatment is not close to that typically required. *See, e.g.*, *Ross v. UChicago Argonne, LLC*, No. 18 CV 04200, 2019 WL 3562700, at *7 (N.D. Ill. Aug. 5, 2019) (dismissing complaint after declining to find a hostile work environment because allegations that co-worker "hung a black-faced puppet in [the plaintiff's] locker" and made two provocative comments that "lacked an overt discriminatory or racial purpose" were not severe enough); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (affirming summary judgment for defendant because, among other things, the alleged harassment was not overtly racial, humiliating, or physically threatening). Accordingly, Muhammad fails to state a hostile work environment claim under Title VII.

### III.    Count 4: 42 U.S.C. § 1983 – Due Process Violation

Muhammad claims that the Board, Martinez, Sanders, LaRosa, and Williams-Ford violated his right to due process under the Fourteenth Amendment. He asserts claims against each of them pursuant to 42 U.S.C. § 1983, which creates a private right of action against any "person" who violates the plaintiff's federal rights while acting under color of state law. 42 U.S.C. § 1983. "To state a procedural due-process claim, a plaintiff must allege (1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008). "Under Illinois law, a person has a property interest in his job only where he has a legitimate expectation of continued

10

employment based on a legitimate claim of entitlement." *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1039 (7th Cir. 2021) (internal quotation marks omitted). "[T]o show a legitimate expectation of continued employment, a plaintiff must show a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him." *Id.*

Muhammad has failed to allege a protected interest. His primary argument to the contrary is that he held a property interest in the "written and approved offer of a four-year contract" that the ALSC submitted to the Board. (Pl.'s Mem. in Support of Pl.'s Resp. to CBE's Mot. to Dismiss at 14.) However, without pointing to some state-law indication to the contrary, a person "has no protected property interest in future . . . contracts." *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010). So long as the contract's formation was within the Board's sole discretion, Muhammad had nothing more than a unilateral hope it would be signed. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (explaining that a protected interest arises under the Fourteenth Amendment only where a person has "more than a unilateral expectation of [the claimed interest]. He must, instead, have a legitimate claim of entitlement to it."). Additionally, Muhammad held no protected interest in his continued employment as an interim principal because, as he recognizes, the position was "at-will." (Pl.'s Mem. in Support of Pl.'s Resp. to CBE's Mot. to Dismiss at 14); *Cheli*, 986 F.3d at 1039 ("Generally, to show a protected property interest in the employment context, the terms of employment must provide that termination will only be for cause or otherwise evince mutually explicit understandings of continued employment." (internal quotation marks omitted)). Accordingly, he fails to allege a protected interest upon which to base a due process claim.

#### IV.    Count 5: Section 1983 – Equal Protection

The Equal Protection Clause of the Fourteenth Amendment prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019). Muhammad alleges that the Board, Martinez, Sanders, LaRosa, and Williams-Ford violated the Equal Protection Clause by arbitrarily discriminating against him based on his race and religion. Defendants raise several arguments for dismissal of these claims.

First, Individual Defendants argue that Count 5 "never specifies precisely what each of [them] did that supposedly denied Mr. Muhammad's rights under the Equal Protection Clause." (Individual's Defs.' Mem. in Support of Mot. to Dismiss at 10, Dkt. No. 26.) But, as noted above, the Court reviews the complaint "as a whole" in adjudicating a Rule 12(b)(6) motion. *Atkins*, 631 F.3d at 832. Taking the FAC as a whole, Muhammad clearly alleges each Defendant's specific contribution to the effort to deny him a four-year contract based on his race and religion. For example, Muhammad alleges that the "informant" who had discussed his religion with others on the Board was "either Mr. LaRosa and/or Ms. Sanders." (*Id.* ¶ 90.) Williams-Ford's various efforts to interfere in the forum and other ALSC proceedings are also alleged in detail. (*E.g.*, *id.* ¶¶ 81, 87, 98, 100.) Meanwhile, Muhammad alleges that Martinez made the decision not to award him a four-year contract. (*Id.* ¶¶ 119–20.) Thus, "reading the allegations sensibly and as a whole, there is no genuine uncertainty regarding who is responsible for what." *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013).

Individual Defendants also argue that Muhammad fails to plead facts suggesting that they acted based on Muhammad's protected characteristics. "Section 1983 creates a cause of action

based on personal fault; to be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Russell v. Vill. of Skokie*, No. 24-CV-5197, 2025 WL 1489229, at *4 (N.D. Ill. May 23, 2025). As the Court discussed in allowing his Title VII discrimination claim, Muhammad has alleged sufficient facts to support an inference that the Board denied him a position based on his race and religion. Muhammad cannot hold Individual Defendants liable under Title VII because they are not his employers. However, he alleges specific ways in which they knowingly participated in the racial and religious discrimination, and that is sufficient to state an Equal Protection claim against each of them. *See, e.g.*, *Russell*, 2025 WL 1489229, at *4 (determining that the plaintiff had stated claims pursuant to § 1983 against individual defendants where he "adequately pled that each of the individual defendants was personally responsible for the [employer's] failure to promote" the plaintiff).

The Board argues that Muhammad fails to state an equal protection claim against it because he has not pleaded municipal liability for purposes of § 1983. A municipal entity, "such as a board of education," may be sued under § 1983. *Bennett v. Roberts*, 295 F.3d 687, 699 (7th Cir. 2002); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978). Under § 1983, "[m]unicipalities may be sued only for their own violations of federal law, however, and cannot be held vicariously liable for the constitutional torts of their employees." *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023). "Three types of municipal action support *Monell* liability: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* (internal quotation marks omitted). The FAC does not allege facts sufficient to suggest that the Board had an express policy or widespread practice that

13

led to the discrimination against Muhammad. Rather, Muhammad argues that the FAC establishes Martinez had "final policymaking authority" for principal-employment decisions.

"State law informs who legally constitutes a final policymaker." *Connelly v. Cook Cnty. Assessor's Off.*, 583 F. Supp. 3d 1142, 1148 (N.D. Ill. 2022). "It is a 'well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority. There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.'" *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 666 (7th Cir. 2009). Although Muhammad alleges facts suggesting that Martinez had the final authority to hire and fire, his allegations indicate nothing about Martinez's ***policymaking*** authority. Without any such allegations, Muhammad fails to allege a municipal action and thus does not state a plausible *Monell* claim against the Board. *Compare Thuet v. Chicago Pub. Schs.*, No. 20 C 1369, 2020 WL 5702195, at *4 (N.D. Ill. Sept. 24, 2020) (finding that the plaintiffs stated a *Monell* claim against the Board because they alleged that the Board's CEO fired the plaintiffs based on the CEO's own policy).

Finally, Defendants and Muhammad dispute whether Muhammad attempts to raise an impermissible "class-of-one" equal protection claim in the FAC. An Equal Protection claim against a public employer is barred where a plaintiff does not allege that he was discriminated against based on a protected class like race or religion. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 609 (2008). Thus, "[t]o bring an equal protection claim, public employees aggrieved by their firing must be able to allege and later prove discrimination ***against a protected class***." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) (emphasis added). Defendants argue that Muhammad has raised a class-of-one claim because he alleges that he was treated differently than his two predecessors without connecting that treatment to his race or religion.

14

However, even a cursory review of the FAC shows that Muhammad alleges racial and religious discrimination. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 n.1 (7th Cir. 2004) ("In the typical equal protection claim, the victim alleges disparate treatment based on race, gender, ethnicity, religion or sexual orientation.") Muhammad has not pleaded a class-of-one claim, and he has stated a plausible equal protection claim against Individual Defendants based on their alleged participation in discrimination on the basis of his race and religious. *See Albritton v. Vill. of Dolton*, No. 10 C 7581, 2011 WL 4501418, at *9 (N.D. Ill. Sept. 28, 2011) ("[T]he Court notes that *Engquist* did not bar all equal protection claims against public employers. . . . To the extent Plaintiffs bring a class-based equal protection claim . . . this claim would not be barred by *Engquist*.).

To summarize, Muhammad has stated a plausible equal protection claim against Martinez, Sanders, LaRosa, and Williams-Ford based on their alleged involvement in discriminatory hiring practices.[2] However, he has failed to state an equal protection claim against the Board.

## V.    Count 6: 42 U.S.C. § 1985 – Conspiracy

The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985, prohibits "two or more persons in any State" from conspiring to deprive another person of his civil rights. 42 U.S.C. § 1985(3). Muhammad alleges that "[a]ll Defendants" violated § 1985 by participating in the scheme to prevent his appointment to a four-year principal position.

---

[2] Individual Defendants also argue that they are entitled to qualified immunity on Muhammad's § 1983 claims. That may well be the case in the end, but a "plaintiff does not have to plead around affirmative defenses in a complaint, including qualified immunity." *Costa v. Ramaiah*, 689 F. Supp. 3d 553, 576 (N.D. Ill. 2023). Given that the FAC does not establish every element of a qualified immunity defense, the Court declines to dismiss Muhammad's equal protection claim on that ground. *See id.* at 577 (collecting cases showing that "[i]f the question turns on the facts, the issue of qualified immunity is best left for a later day").

15

Defendants argue that Muhammad cannot state a claim under § 1985 because the alleged conspiracy included only actors who were agents of the Board. Under the intracorporate conspiracy doctrine, a corporation cannot conspire with its own employees. *Travis v. Gary Cmty. Mental Health Ctr.*, 921 F.2d 108, 110–11 (7th Cir. 1990) ("[I]ntra-corporate discussions are not 'conspiracies.'"). This doctrine applies to public and private entities. *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994); *Doe v. Bd. of Educ. of Hononegah School Dist. 207,* 833 F.Supp. 1366, 1381–82 (N.D. Ill. 1993) (applying the intracorporate conspiracy doctrine to a § 1985 claim against public school administrators who allegedly agreed with each other to disregard state law reporting requirements for allegations of sexual abuse).

Instead of disputing that the alleged conspiracy involved intracorporate actors, Muhammad counters that this case falls into an exception for intracorporate conspiracies involving "egregious circumstances." *Wright*, 40 F.3d at 1508. This exception "refers not to the act of discrimination complained of, but instead" applies "where corporate employees 'are shown to have been motivated solely by personal [rather than corporate] bias.'" *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 633 n.9 (7th Cir. 1999). "A frequent example of personal bias noted in court cases is where the Ku Klux Klan incorporates to avoid conspiracy liability for 'carrying out acts of violence.'" *Tanner v. Bd. of Trs. of Univ. of Ill.*, No. 3:17–CV–3039, 2018 WL 1161140, at *12 (C.D. Ill. Mar. 5, 2018) (quoting *Travis*, 921 F.2d at 110) (internal quotation marks omitted).

Muhammad does not explain in his brief what circumstances were egregious, and it is not apparent from the FAC that they were. His allegations do not suggest that any Defendant acted solely out of personal bias. Instead, Muhammad alleges that each Defendant, each playing a part through their employment roles, took actions (like making phone calls, sending e-mails, and

16

conducting investigations) to further the Board's alleged interest in denying him employment. Accordingly, the intracorporate conspiracy doctrine applies, and Muhammad fails to state a claim under § 1985. *See id.* at 633 (declining to apply the exception at the pleadings stage where the plaintiff failed "to point to a putatively 'egregious circumstance'"); *Tanner*, 2018 WL 1161140, at *12 (declining to apply the exception in employment context because the "complaint contain[ed] no allegations to plausibly suggest that Defendants were solely motivated by personal bias").

## VI.    Count 7: 42 U.S.C. § 1986 – Failure to Prevent a Conspiracy

Section 1986 "provides a cause of action against a person who fails to prevent a violation of Section 1985's prohibition against engaging in a conspiracy to deprive a person of equal protection of the laws." *Burton v. Oak Point Univ.*, No. 1:24-CV-00295, 2024 WL 3338925, at *4 (N.D. Ill. July 9, 2024). Because "Section 1986 liability is derivative of Section 1985 liability," "the dismissal of the Section 1985(3) claim requires dismissal of the Section 1986 claim." *Rodgers v. Lincoln Towing Serv., Inc.*, 771 F.2d 194, 203 (7th Cir. 1985); *see also Burton*, 2024 WL 333892, at *4 (same). Given that Muhammad fails to state a claim under § 1985, his § 1986 claim must be dismissed as well.

## VII.    Count 8: Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et. seq.*

The IWPCA "regulates wage payment and is primarily concerned with the prompt and full payment of wages due workers at the time of separation from employment." *Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1240 (N.D. Ill. 1996). Muhammad's IWCPA claim is based on an alleged reduction in his expected pension benefits. Under the terms of his retirement plan, Muhammad's pension payments were based on the average of his "four highest paying years within the last 10 years of [his] employment." (FAC ¶ 243.) When Muhammad joined Lindblom

as the interim principal, he was in the final 10 years of his employment. (*Id.* ¶ 244.) Had he been issued a four-year contract, his salary at Lindblom "would have factored into" his ultimate pension calculation. (*Id.* ¶ 247.) As a result of his termination, Muhammad's pensionable salary dropped from $167,544 to $3,928. (*Id.* ¶¶ 245, 249.) Moreover, the Board has stopped paying into his pension since his termination. (*Id.* ¶ 253.) Thus, Muhammad alleges, Defendants have violated the IWPCA by preventing him from receiving a four-year contract that would have resulted in higher pension payments. (*Id.* ¶¶ 254–55.)

Muhammad's claims are not cognizable under the IWCPA because he does not allege an entitlement to these would-be pension contributions based on a legally binding agreement. "To establish a claim under the [IWCPA], a plaintiff must show that wages or final compensation are due to him as an employee from an employer under an employment contract or agreement." *Owen v. Vill. of Maywood*, 235 N.E.3d 1198, 1205 (Ill. App. Ct. 2023). The Board had no legal obligation to provide Muhammad a four-year contract or the pension benefits that would accrue with it; indeed, the gravamen of his complaint is that he was ***not*** awarded a contract. *See id.* ("It goes without saying that a person cannot recover wages, final compensation, or wage supplements to which they were not entitled or that the employer was not obligated to pay.").

Nevertheless, Muhammad contends that he states a claim under the IWPCA because he was denied a contract due to Defendants' "unlawful[] discriminat[ion]." (Pl.'s Mem. in Support of Pl.'s Resp. to CBE's Mot. to Dismiss at 20.) Thus, he argues, if his discrimination "claims are found to be viable, and if a verdict were awarded in his favor, Mr. Muhammad would be entitled to wages and benefits he was denied based upon the Defendant CBE's discriminatory actions." (*Id.*) That may very well be true, but it does not establish that Defendants violated the IWPCA.

18

Instead, a reduction in compensation may be factored into a damages award for Muhammad's discrimination claims, should he prevail on them.

## CONCLUSION

Defendants' motions to dismiss the First Amended Complaint (Dkt. Nos. 23 and 25) are granted in part and denied in part. The following claims survive as pleaded: (1) the racial and religious discrimination claims against the Board under Title VII (Count 1); and (2) the equal protection claim against Martinez, Sanders, LaRosa, and Williams-Ford under 42 U.S.C. § 1983 (Count 5). All other claims in the First Amended Complaint are dismissed. The dismissals are without prejudice to Muhammad seeking leave to file a further amended complaint that remedies the pleading deficiencies identified herein.

ENTERED:

Dated:  March 27, 2026

_____

Andrea R. Wood
United States District Judge